UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————— x

ABERDEEN CITY COUNCIL AS
ADMINISTRATING AUTHORITY FOR
THE NORTH EAST SCOTLAND PENSION
FUND,

                           Plaintiff,

      vs.

BLOOMBERG L.P.,

                        Defendant.

————————————————————————

(*In re Under Armour Securities Litigation,
Pending in the United States District Court,
District of Maryland*, Civil No. RDB-17-388)

————————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Miscellaneous Civil Action No. 7:23-cv-00070

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION TO COMPEL
BLOOMBERG L.P. TO PRODUCE
DOCUMENTS RESPONSIVE TO
PLAINTIFF'S SUBPOENA

REDACTED

4867-7548-0918.v1

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ..................................................................................................5

  A. Summary of the Underlying Action..........................................................5

  B. ████████████████████████████████ .......................6

  C. Ruhle's Close Personal Relationship as "Advisor" ████████ to the
    Under Armour CEO ...............................................................................12

III. ARGUMENT ......................................................................................................17

  A. Because Ruhle Was Under Armour's "Advisor," Telling Under Armour's
    Story, and Not Acting as an Independent Journalist, the Journalists'
    Privilege Does Not Apply .......................................................................17

  B. Even if the Journalists' Privilege Applies, Plaintiff's Need for
    Bloomberg's Responsive Documents Overcomes the Privilege ..........22

  C. Producing These Documents Is Not Unduly Burdensome ....................24

IV. CONCLUSION....................................................................................................25

4867-7548-0918.v1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*von Bulow ex rel. Auersperg v. von Bulow,*
    811 F.2d 136 (2d Cir. 1987)................................................................17, 18, 21, 22

*Baker v. F. & F. Inv.,*
    470 F.2d 778 (2d Cir. 1972)................................................................18

*Bridgeport Music Inc. v. UMG Recordings, Inc.,*
    2007 WL 4410405 (S.D.N.Y. Dec. 17, 2007) .........................................24

*Chevron Corp. v. Berlinger,*
    629 F.3d 297 (2d Cir. 2011)................................................... *passim*

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.,*
    284 F.R.D. 132 (S.D.N.Y. 2012) ............................................24

*Gonzales v. Nat'l Broad. Co., Inc.,*
    194 F.3d 29 (2d Cir. 1999)................................................... *passim*

*In re Nat. Gas Commodities Litig.,*
    235 F.R.D. 241 (S.D.N.Y. 2006) .........................................23

*New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.,*
    2000 WL 62315 (E.D. Pa. Jan. 13, 2000) .............................23

*SEC v. AT&T, Inc.,*
    __ F. Supp. 3d __, 2022 WL 4110466
    (S.D.N.Y. Sept. 8, 2022) .......................................................13

*In re Signet Jewelers Ltd. Sec. Litig.,*
    332 F.R.D. 131 (S.D.N.Y. 2019),
    *aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019) ..........................20

*In re Under Armour Sec. Litig.,*
    __ F. Supp. 3d __, 2022 WL 4545286
    (D. Md. Sept. 29, 2022) ........................................................1

*In re Under Armour Sec. Litig.,*
    540 F. Supp. 3d 513 (D. Md. 2021) .....................................5

4867-7548-0918.v1

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.

§78j(b),................................................................................................................5

§78t(a) ...............................................................................................................5

§78t-1 ................................................................................................................5

17 C.F.R.

§243.100............................................................................................................13

Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen" or "Plaintiff") is the lead plaintiff in a certified securities fraud class action (the "Action" or "Underlying Action") against Under Armour, Inc. ("Under Armour" or the "Company") and Under Armour's Chairman of the Board, founder, and former Chief Executive Officer, Kevin Plank ("Plank").  The Action is currently pending before the Honorable Judge Richard D. Bennett of the United States District Court for the District of Maryland.  *See generally In re Under Armour Sec. Litig.*, __ F. Supp. 3d __, 2022 WL 4545286 (D. Md. Sept. 29, 2022). Plaintiff respectfully submits the following motion to compel ("Motion") Bloomberg L.P. ("Bloomberg") to produce documents responsive to the subpoena served on it January 6, 2023 (the "Subpoena").[1]

## I.     INTRODUCTION

Plaintiff's Motion boils down to one simple question: when the CEO of a publicly traded company █████████████████ close, personal friend – and member of the financial media – ████████████████████████████████████████████████████████████████ can the █████ employer shield her communications with the CEO from discovery under the guise of the journalists' privilege?  Based on the facts presented here and controlling Second Circuit precedent, the answer is a resounding "no."

In January 2016, Kevin Plank was the CEO of Under Armour and Stephanie Ruhle Hubbard ("Ruhle") worked for Bloomberg as an editor and television news anchor.  ██████████ ████████████████████████████████████████████████████████████████

---

[1]     Exs. 1-2.  All exhibits referenced herein are attached to the Declaration of Michael G. Capeci in Support of Plaintiff's Motion to Compel Bloomberg L.P. to Produce Documents Responsive to Plaintiff's Subpoena ("Capeci Declaration"), filed concurrently herewith, unless otherwise noted. Additionally, all emphasis is added and all internal citations are omitted unless otherwise noted.



█████████████ [2] ████████████████████████████████████████████████

████████████████████████████████ [3] But the purpose of this ████████████████

████ as the *Wall Street Journal* noted, was for Ruhle to provide Plank "input on a range of

business matters," not for Ruhle to obtain confidential source material as a journalist.[4]  Indeed,

unbeknownst to Under Armour investors and the public, ██████████████████████████

████████████████████████████████████████████████████████████████████ [5]

On the morning of Monday, January 11, 2016, the Morgan Stanley report caused Under Armour's

stock price to plummet on unusually high trading.[6] ████████████████████████████

████████████████████████████████████████████.[7] ████████████

████████████████████████████████████████████████████████████████

██████████ [8]

---

[2]   ████████████████████████████ *see also* Ex. 4 (*Wall Street Journal* article noting that Plank
turned to Ruhle for "business advice," that Ruhle provided "input on a range of business matters,"
and that "the company uncovered emails that showed an intimate relationship between them").

[3]   Ex. 3 at 281:9, 318:12-13; *see also id.* at 281:20-282:1 ████████████████████████
████████████████████████████████████████████████████████████████████████

[4]   Ex. 4.

[5]   Ex. 5 at ¶175.

[6]   *Id.*

[7]   *See, e.g.*, Ex. 6; Ex. 7 at UA_00280474 ██████████████████████████████████████
████████████████████████████████████████████████████████████████████);
Ex. 8 at UA_01171478 (████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████.

[8]   Ex. 6; *see also* Ex. 3 at 259:17-260:16.

So to mitigate the Morgan Stanley report and the devastating financial impact it had on Under Armour (an immediate 8% stock price decline), 

[9] Ruhle ████ went on Bloomberg TV at 12:30 p.m. on January 11, 2016 (*i.e.*, the middle of the trading day) and ████████████████████████.[10] Two weeks later, ████

[11]

Because of Ruhle's seemingly extensive involvement with Under Armour, Plaintiff served a document subpoena on Bloomberg seeking (1) documents and communications between Ruhle and Plank or other Under Armour employees concerning Under Armour, and (2) documents and communications sent or received by Ruhle concerning Under Armour, from January 1, 2015 to June 30, 2017.[12] The documents Plaintiff seeks (the "Responsive Documents") are important evidence in the Action because the Morgan Stanley report ████████████████████ ██████████████████████████ was the first time the relevant truth about the

---

[9]   *E.g.*, Ex. 8.

[10]   *See* Ex. 9 at 79:21-88:14; Bloomberg, *Under Armour Shares Decline, Here's Why*, Bloomberg Markets Videos (Jan. 11, 2016), https://www.bloomberg.com/news/videos/2016-01-11/under-armour-shares-decline-here-s-why ("Jan. 11 Bloomberg Video").

[11]   Ex. 10 at UA_01173730.

[12]   Ex. 1.

4867-7548-0918.v1

Company's true financial condition was partially disclosed to the investing public – a truth that Plaintiff alleges Plank and Under Armour fraudulently concealed from investors throughout the Class Period.  Thus, the Responsive Documents are probative of both Plank and Under Armour's "scienter" (*i.e.*, culpable state of mind), which Plaintiff must ultimately prove to prevail on its securities fraud claim.

Refusing to produce any documents whatsoever, Bloomberg objects on the basis of purported journalists' privilege and burden.[13]  But the journalists' privilege does not apply because

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████.[14]  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 300 (2d Cir. 2011).  As the Second Circuit held in *Chevron*:

> The privilege for such information is intended to protect the public's interest in being informed by "a vigorous, aggressive, ***and independent*** press" . . . .
>
> \*      \*      \*
>
> Those who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press.

*Id*. at 306, 308 (emphasis in original) (quoting *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987)).  Moreover, even if the privilege did apply (it does not), Plaintiff's request overcomes Bloomberg's assertion of privilege because the Responsive Documents are probative of a key issue and cannot be obtained from another source.  *See Gonzales v. Nat'l Broad. Co., Inc.*,

---

[13]   Ex. 11 at 1.

[14]   *See, e.g.*, Ex. 10; Ex. 12 ███████████████████████████████

194 F.3d 29, 36 (2d Cir. 1999).   Finally, Bloomberg's claims of burden are unserious and unsupported.

## II.      BACKGROUND

### A.      Summary of the Underlying Action

The Action arises under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934. As succinctly encapsulated by Judge Bennett in his Opinion upholding the operative Complaint, Plaintiff alleges that Under Armour and Plank "misrepresented the level of demand for Under Armour products" to investors during the September 16, 2015 through November 1, 2019 (inclusive) Class Period. *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 516 (D. Md. 2021). As Judge Bennett noted, the U.S. Securities and Exchange Commission ("SEC") has already found that Under Armour misled investors during the Class Period. *See id.*  In short, the SEC found that Under Armour "fail[ed] to disclose material information about its revenue management practices that rendered statements it made misleading."[15]   The SEC made numerous specific findings that support plaintiffs' allegations in the Action – all of which Under Armour consented to.[16]   In particular, the SEC noted that for six consecutive quarters (3Q15 through 4Q16), "Under Armour pulled forward approximately $408 million in orders" while misleadingly making "positive statements regarding its revenue growth rate and the factors contributing to the revenue growth rate, without disclosing the significant impact on revenue from its use of pull forwards."[17]

---

[15]   Ex. 13 at 2.

[16]   *Id.* at 1.

[17]   *Id.* at 2.

4867-7548-0918.v1

**B.** ███████████████████████████████████

The first suggestion to investors that all was not as it seemed at Under Armour appeared while the market was closed on Sunday, January 10, 2016. Morgan Stanley published a report about the Company titled "Declining Share and ASPs Dual Threat to Premium Valuation" in which it downgraded the stock to "Underweight" and reduced its price target from $103 to $62 per share.[18] The report relied on industry point-of-sale data from SportScan to reveal the Company's ASPs, market share, and margins had been declining since Spring 2015. Under Armour's stock price dropped sharply in response to the report.[19] However, despite the fact that it was in a ███

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.[20] ███████████

██████████████████████████████████████████████

██████████████████████[21]

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

█████████████████████████████████████████

---

[18]  Ex. 14.

[19]  Ex. 5 at ¶175.

[20]  Ex. 6.

[21]  *Id.*; *see also* Ex. 3 at 259:17-260:16.

████████████████████████████████████████████████████[22]

███████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████████

████████████[23]

███████████████████████████████████████████████████████

█████████████████████ ██████████████████████████████████

████████████████████

██████████████████████████████████████████████

██████[25]

Thus, Ruhle was advising Under Armour that ████████████████████████

█████████████████████████████████████████████████████████

█████████████████████ ██████████████████████████████████

█████████████████ so this was Ruhle's advice and counsel, and not "journalism."  That

afternoon, ████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

---

[22] Ex. 15 at UA_01171447 (██████████████████████████████).

[23] *Id.* at UA_01171446.

[24] *Id.*

[25] *Id.*



█████████████████████████████████████████████████████ [26]

On-air, Ruhle offered a detailed counterpoint to the Morgan Stanley report: she attacked the factual data underlying it,[27] pointed out Under Armour's long-term investments in mobile and digital technologies,[28] emphasized the Company's historical growth,[29] and highlighted the Company's sponsored athletes.[30] ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [31]

---

[26] Ex. 16; *see also* Jan. 11 Bloomberg Video ████████████████████████

[27] "What we need to note is, they're not giving us all retailers. While they evaluate many, they don't look at Foot Locker; they don't look at Dick's Sporting Goods. Those are two huge outlets for Under Armour. What they do have in there is Kohl's. Now, Nike made a huge push at Kohl's in the last year; Under Armour doesn't sell through this channel." Jan. 11 Bloomberg Video.

[28] "Kevin Plank has come out and said he's as confident about Connected Fitness as he was about compression t-shirts – what was that, 20 years ago – clearly that trade worked out. And if you're going to go long Under Armour and follow this trend, this has got to be a long term buy. They invested almost a billion dollars last year in M&A in this space, so it's not like you're going to see this turn around overnight; it's going to take some time." *Id.*

[29] "They've had a massive growth business, so when you say it's a slowdown, I almost compare it to an ESPN slowdown, where people said, 'my goodness, is there a chink in the armor in terms of ESPN,' – how well companies like that have done. Under Armour's growth has been explosive." *Id.*

[30] "Let's just look at who their athletes are. They've got much fewer athletes than Nike does, but they got Steph Curry, number one player in the NBA; Tom Brady is playing – the Patriots are playing in the playoffs next weekend; Lindsey Vonn won the World Cup in downhill skiing this weekend; and Jordan Spieth in Honolulu. So, while smaller than Nike, clearly they pick winners." *Id.*

[31] Ex. 17 (████████████████████████████████████████████████
████████████████████████████████████████████████████████████

4867-7548-0918.v1



[32]

[33]

"[34]

"[35]

Jan. 11 Bloomberg Video ("What we need to note is, they're not giving us all retailers.  While they evaluate many, they don't look at Foot Locker; they don't look at Dick's Sporting Goods. Those are two huge outlets for Under Armour.  What they do have in there is Kohl's.  Now, Nike made a huge push at Kohl's in the last year; Under Armour doesn't sell through this channel.").

[32]   Ex. 9 at 79:21-88:14.

[33]   Ex. 8 at UA_01171478.

[34]   *Id.* at UA_01171477.

[35]   *Id.*

*Id.*

- 9 -

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████[37]████████████████

███████████████████████████████████████████████████

███████[38] ___███████████████████████████████████████

███████"[39]██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[36] *Id.* at UA_0117148; *see also* Ex. 3 at 305:12-21 ████████
████████████████████████████████████████████████████████
███████████████████████████████████████).

[37] Ex. 18 (████████████████████████████████████████████
███████████████████████████████████

[38] Ex. 19 at UA_01171466; Ex. 3 at 310:21-311:6 ██████████
████████████████████████████████████████████████████████
██████████████████████████

[39] Ex. 19 at UA_01171466.



████████████████████████████████████████████████████████████████████████████████████ [40]

    Under Armour's CEO and Ruhle ████████████████████████████████████████████████████

████████████████████████████████ [41]  Under Armour – ████████████████████████████████

████████████████████████████████ [42] – posted positive results.  As the recently released

financial  results  started  pushing  the  Company's  stock  price  up,  ████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████ ''[43]  The next day, Under Armour ████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ ''[44] ████████

████████████████████████████████████████████████ ''[45]

---

[40] Ex. 20.

[41] *See, e.g.*, Ex. 21; Ex. 22; Ex. 23 ████████████████████████████████████████████████

█████ .

[42] Ex. 24 at UA_00223912.

[43] Ex. 25; Ex. 12; *see also* Ex. 26.

[44] Ex. 10 at UA_01173730.

[45] Ex. 27 at UA_01173734.

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████"46 ██████████████████████████

█████████████████████████████.47

**C.    Ruhle's Close Personal Relationship as "Advisor" ████████████ to the Under Armour CEO**

That Ruhle rushed to Under Armour's aid in January 2016 makes sense given her close,

personal relationship with Plank. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████ a *Wall Street Journal* article from 2019 that publicly revealed Ruhle was Plank's

"Unusual Adviser" and that the two shared a "close" and "intimate relationship."[48]  Ruhle and

Plank ████████████████████████████████████████████████████

████████████   This ████████████ makes clear that Ruhle and Plank did not have an independent

journalist-source relationship.  For example:



---

[46]  Ex. 6; *see also* Jan. 11 Bloomberg Video  (Ruhle notes "we don't know the hard numbers" because "Under Armour doesn't come out with their earnings yet; they're in their quiet period").

[47]  Ex. 13 at 2.

[48]  Ex. 4.

4867-7548-0918.v1



[REDACTED] [49]

- [REDACTED] [50]

- [REDACTED] [1]

Additionally, as reported in the *Wall Street Journal* [REDACTED] Ruhle received free flights all over the world on Plank's private jet in 2015 and 2016 – [REDACTED] [52]

[REDACTED]

[REDACTED] [53] Plank even had a [REDACTED]

---

[49]   Ex. 28.

[50]   Ex. 29.

[51]   Ex. 30 at UA_01155627; *see also* Ex. 31; Ex. 22 [REDACTED] .

[52]   Ex. 4; *see also* Ex. 9 at 37:14-38:2, 38:22-39:7 [REDACTED] ).

[53]   [REDACTED]

4867-7548-0918.v1

█████████████████████████████████████████████████████.[54]  Examples of the

████████████████████████████████████████████████████████

███████████ include:



- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████[55]

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████[56]

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████[57]

_____

████████████████████████████████████████████████████████
██████████

[54]  Ex.   32   at   153:3-154:4 ███████████████ ████████████████████
█████████████████████████████████████████████████████████
███████████████████████; *see also* Ex. 9 at 122:13-15 ████████████
███████████████████████████████████████████████.

[55]  Ex. 33; *see also* Ex. 34 (█████████).  Under Armour redacted the ████████
from this document.  *See* Ex. 3 at 282:20-288:11.
████████████████████████████████████████ *Id.* at 274:5-280:13.

[56]  Ex. 35 at UA_01200171.

[57]  Ex. 36.

4867-7548-0918.v1

Indeed, Plank █████████████████████████████████████████████████

██████████████████████████████████



[58]

As reported in the *Wall Street Journal* several years later, Under Armour's Board of Directors eventually became aware of its Chairman/CEO and Ruhle's "unusual and problematic" relationship and the improper communications between the two and investigated.[59]

Furthermore, contrary to Bloomberg's assertion that Ruhle was acting as a journalist when corresponding with Plank, the former Under Armour CEO ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████:

███████████████████████████████████████

██████████████

---

58   Ex. 3 at 328:14-329:11; *see also id.* at 322:9-323:17.

59   Ex. 4. ████████████████████████████████████████████████
████████████████████████████████ Ex. 3 at
330:22-334:1.

- 15 -



Plank ████████████ :

Given that Ruhle ██████████████████████████████

██████████████████████████████████████████████

---

[60] Ex. 3 at 280:18-281:9.

[61] *Id.* at 317:22-320:12.

██████████████████ [62] ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ [63]

## III.    ARGUMENT

### A.    Because Ruhle Was Under Armour's "Advisor," Telling Under Armour's Story, and Not Acting as an Independent Journalist, the Journalists' Privilege Does Not Apply

The Second Circuit recognizes a qualified journalists' privilege,[64] grounded in the First Amendment, for the noble purpose of "protect[ing] the public's interest in being informed by 'a vigorous, aggressive *and independent* press.'" *Chevron*, 629 F.3d at 306 (quoting *von Bulow*, 811 F.2d at 142) (emphasis in original).  The "qualified right" of newsgathering, "which results in the journalist's privilege, emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public." *von Bulow*, 811 F.2d at 142.  The privilege, however, must not be "expansively construed" because it operates "'in derogation of the search for truth'" and "contravene[s] a fundamental principle of our jurisprudence that 'the public . . . has a right to every man's evidence.'" *Id.* at 141 (citing, respectively, *Unites States v. Nixon*, 418 U.S. 683, 710 (1974); *United States v. Bryan*, 339 U.S. 323, 331 (1950)).

---

[62]  Exs. 17, 20.

[63]  Thus, this is not a situation in which Ruhle used Plank as a confidential source. *Cf. Gonzales*, 194 F.3d at 32-33 (citing *Baker v. F. & F. Inv.*, 470 F.2d 778 (2d Cir. 1972); *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5 (2d Cir. 1982)).  Rather, ████████████████████████ ████████████████████████ mouthpiece.  Moreover, Ruhle and Plank's relationship is far from confidential. *See, e.g.*, Ex. 4.

[64]  Because the Underlying Action is a "federal question" case (Ex. 5 at ¶23), the federal law of privilege controls whether the privilege asserted by Bloomberg should be recognized. *von Bulow*, 811 F.2d at 141.

4867-7548-0918.v1

To establish entitlement to the privilege, therefore, the Second Circuit holds that "in collecting the information in question, the person must have acted in the role we identified in *Baker*, *von Bulow*, and *Gonzales* as that favored by the public interest that motivates the privilege – ***the role of the independent press***." *Chevron*, 629 F.3d at 307.  To the contrary, "[a]n undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest," and "[t]hose who do not retain independence as to what they will publish but are subservient to the objectives of others who have a stake in what will be published have either a weaker privilege or none at all."  *Id.* at 308.

In *Chevron*, the Second Circuit refused to apply the journalists' privilege to a documentary filmmaker who created a film about litigation in Ecuador.  *Id.* at 300.  The film was streamed as a documentary on *Netflix* and eventually released on DVD.  *Id.* at 303.  Although the court recognized that a "person need not be a credentialed reporter working for an established press entity to establish entitlement to the privilege," it held that the filmmaker was not entitled to the privilege because he had failed to establish his independence from the attorney litigating the case that was the subject of the film; indeed, the attorney had asked him to make the film.  *Id.* at 307, 309-10.  Specifically, the court found "most pertinent" that the "making of the film was solicited by the plaintiffs in the [Ecuador] litigation ***for the purpose of telling their story***, and that changes to the film were made at their insistence."  *Id.* at 300, 305 (emphasis in original).

This case is on all fours with *Chevron*.  Here, like in *Chevron*, Ruhle's "reporting" about Under Armour was ██████████████████ ***for the purpose of telling [Under Armour's] story*.**  *Id.* at 300.  To wit: in the span of one day, Under Armour ████████████████



More broadly, attempting to use the journalists' privilege to shield discovery into Ruhle's activities vis-à-vis Under Armour is an insult to the notion of a "'vigorous, aggressive **and independent** press.'"  *Chevron*, 629 F.3d at 306 (emphasis in original).  It is frankly perplexing that Bloomberg chooses to argue that Ruhle's activities are worthy of First Amendment protection rather than to recognize Ruhle and Under Armour's co-option of their platform for what it is.[70]

---

[65]   Ex. 17.

[66]   Ex. 8 at UA_01171478.

[67]   Ex. 16.

[68]   Ex. 19.

[69]   Ex. 37.

[70]   Notably, Ruhle's activities violated Bloomberg's own ethics policies.  *See* Matthew Winkler, *The Bloomberg Way: A Guide for Reporters and Editors* 91 (John Wiley & Sons, Inc. 2014) (Ex. 38) ("We seek to avoid a **conflict of interest**, which is an economic, personal or political relationship that may compromise a journalist's impartiality.  We are mindful that the appearance of a conflict or impropriety can be as damaging to a reputation as doing something improper.

Far from operating as an independent reporter, Ruhle ███████████████████████

negative press about Under Armour and ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. [71]

Moreover, much of Ruhle and Plank's "close" and "intimate" relationship wasn't even about her so-called reporting, further demonstrating Ruhle's lack of independence. [72] The holding in *Chevron* is analogous in this sense to other cases in this Circuit holding that professional privileges do not apply when the professional is not acting in the role the privilege is designed to protect. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019) ("The PR firms here were not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals. Rather, the PR firms were involved in public relations activities aimed at burnishing Signet's image."), *aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019).

Here, according to █████████████████████████████████████████

████████████████████ [73] ████████████████████████████████████

████████████████████████████████████████████████████████████

---

Bloomberg News does not allow external parties or the commercial interests of Bloomberg LP to dictate our reporting.") (emphasis in original).

[71]   Ex. 15.

[72]   Ex. 4; *see also* Ex. 9 at 38:7-14 ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████.

[73]   Ex. 3 at 280:18-281:9; Ex. 9 at 27:13-14.



.[74]  She

[75]  She

.[76]  And,

perhaps most damaging to Bloomberg's claim that Ruhle was acting as a reporter,

[77]  Even a source that demands confidentiality deals with a reporter with the mutual

understanding that the information conveyed will eventually be ***reported*** on.  *See von Bulow*, 811

F.2d at 144 (nonparty claiming privilege must show "intent to use material – sought, gathered, or

received – to disseminate information to the public").

"'It is axiomatic that the burden is on a party claiming the protection of a privilege to

establish those facts that are the essential elements of the privileged relationship.'"  *Id.* (quoting *In*

*re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)).  All that

Bloomberg can muster here is that it is a news organization and Ruhle was ostensibly hired as a

---

[74]  *See, e.g.*, Ex. 4 (reporting that "Mr. Plank took Ms. Ruhle's advice rather than management's on how to handle consumer backlash over a key sneaker model in 2016" and that she "also gave advice on how he should engage with President Trump in 2017 that was at odds with some executives who urged Mr. Plank to keep his distance"); *see also* The Washington Free Beacon, *NBC's Stephanie Ruhle Hawked Under Armour Shoes on Air Without Disclosing Relationship with CEO*, YouTube (Feb. 21, 2019), https://freebeacon.com/politics/nbcs-stephanie-ruhle-hawked-under-armour-shoes-on-air-without-disclosing-relationship-with-ceo/ (Ruhle on the Today Show in response to criticism of the sneakers: "I really like this shoe"; "they look an awful lot like a classic Nike or a New Balance – that's a mass market shoe"; "just in time for Father's Day, dads!").

[75]  Ex. 20.

[76]  Exs. 33-34.

[77]  Ex. 3 at 317:22-320:12.

4867-7548-0918.v1

news anchor.[78]  But in reality, as demonstrated above, Ruhle's activities with respect to Under Armour were a far cry from the lofty and noble goal of "robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment" (*von Bulow*, 811 F.2d at 144), that the journalist's privilege is designed to protect. The Court should refuse to apply the journalists' privilege to Ruhle's un-journalistic endeavors.

### B. Even if the Journalists' Privilege Applies, Plaintiff's Need for Bloomberg's Responsive Documents Overcomes the Privilege

Even if the Responsive Documents were deserving of protection under the First Amendment (they are not), Plaintiff's request overcomes any privilege that attaches to them. Where, as here, a confidential source is not at issue, the privilege is more easily overcome. *Gonzales*, 194 F.3d at 36 ("[W]e now hold that, while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought."). "Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show [(1)] that the materials at issue are of likely relevance to a significant issue in the case, and [(2)] are not reasonably obtainable from other sources." *Id.*

Here, Bloomberg has not even contested relevance,[79] and for good reason.  The Responsive Documents will allow Plaintiff to show, in the Underlying Action, how the Under Armour CEO and other Company executives ██████████████████████████████████ the first hint to the public of the truth concealed by their fraudulent scheme, *i.e.*, the Morgan Stanley

---

[78]  Ex. 11 at 1.

[79]  Ex. 11 at 1.

report published on January 10, 2016.[80]  This is important evidence of an element that Plaintiff

must prove in order to prevail in the Action – Plank and Under Armour's scienter.  *See, e.g.*, *In re*

*Nat. Gas Commodities Litig.*, 235 F.R.D. 241, 245 (S.D.N.Y. 2006).

Moreover, the Responsive Documents are not reasonably available from any other source.

Plaintiff has already exhausted discovery from defendants in the Action – Plank and Under Armour

– and while that process has yielded the documents cited herein, Plaintiff seeks the additional

Responsive Documents for several reasons.  *See id.* ("Plaintiffs sought the information from

Defendants, none of which was able to produce a complete set of the reported trade information.").

Most obviously, Plaintiff seeks Ruhle's emails to other nonparties ***about*** Under Armour – evidence

that Under Armour itself could not have (███████████████████████████████

███████████).  Similarly, if Ruhle ██████████████████████████████████

████████████████████████████████████████████.  Furthermore, Under

Armour redacted ████████████████████████████████████████████

████████████████████████████████████████████████████

██████.[81]  *See, e.g.*, *New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*, 2000 WL 62315,

at *5 (E.D. Pa. Jan. 13, 2000) (holding that a plaintiff is entitled to serve third-party subpoenas "to

test the veracity of defendants' assertion that they have produced all documents they were required

to produce").  Finally, the evidence that Plaintiff does have suggests that communications exist

beyond what was produced by Plank and Under Armour[82] – notably, ███████████████

---

[80]   Ex. 6.

[81]   *See supra* n.55.  Additionally, Under Armour did not produce ███████████████
████████████████████████████████████████████.

[82]   *See supra* n.31.

4867-7548-0918.v1

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [83]   Thus, Bloomberg should be compelled to produce the Responsive Documents.

### C.        Producing These Documents Is Not Unduly Burdensome

Bloomberg's assertion of undue burden is without merit.  Courts in this District hold: "Whether a subpoena imposes an 'undue burden' depends upon 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Bridgeport Music Inc. v. UMG Recordings, Inc.*, 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007).  Here, as explained above, the documents sought from Bloomberg are indisputably relevant and cannot be obtained from another source.  Additionally, Plaintiff's requests are very specific and would require simple search protocols to be run on Ruhle's Bloomberg email, imposing very little burden.  Moreover, it is Bloomberg's burden to show that complying with the Subpoena would be unduly burdensome.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012).  Bloomberg's assertion of undue burden is conclusory and unsupported.[84]  Thus, the Court should compel Bloomberg to produce the Responsive Documents.

If the Court is not inclined to order Bloomberg to produce the entirety of the documents sought by Plaintiff's subpoena, Plaintiff believes it is entitled to at least the production of two extremely targeted sets of documents: (1) emails Ruhle exchanged with the domains

---

[83]   Ex. 12; Ex. 9 at 110:23-24.

[84]   Ex. 11 at 1.

"underarmour.com" and "ua.com" (*i.e.*, with Under Armour employees) during the **single month** of January 2016, and (2) Ruhle's ***sent*** emails that include the terms "Under Armour," "UAA,"[85] or "Plank" during the single month of January 2016.  Bloomberg's counsel has already collected and reviewed all documents in the first category; actually producing these documents will incur negligible additional burden.[86]  Collecting and producing the remaining documents should take very little time.

## IV.    CONCLUSION

Having demonstrated that the journalists' privilege has no application here – and that even if it did, Plaintiff meets both elements of the *Gonzales* test for overcoming the privilege – Plaintiff has overcome Bloomberg's objections to the Subpoena.  Plaintiff respectfully requests that the Court issue an Order compelling Bloomberg to comply with the Subpoena.

DATED:  March 15, 2023                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL G. CAPECI (MC-0617/NY)


                                                  s/ Michael G. Capeci
                                         MICHAEL G. CAPECI

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         mcapeci@rgrdlaw.com

---

[85]   UAA is Under Armour's stock ticker.

[86]   Ex. 11 at 5.

- 25 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
X. JAY ALVAREZ
ROBERT R. HENSSLER JR.
MATTHEW I. ALPERT
JUAN CARLOS SANCHEZ
CHRISTOPHER R. KINNON
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
jaya@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
jsanchez@rgrdlaw.com
ckinnon@rgrdlaw.com
afolkerth@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
ANDREW T. REES
MATTHEW RICHARD
MASON G. ROTH
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
mrichard@rgrdlaw.com
mroth@rgrdlaw.com

Lead Counsel for Plaintiff

4867-7548-0918.v1

## DECLARATION OF SERVICE BY EMAIL

I, T. Alex B. Folkerth, not a party to the within action, hereby declare that on March 15, 2023, I served the attached document on the parties in the within action by email addressed as follows:

**COUNSEL FOR PLAINTIFF**:

| NAME | FIRM | EMAIL |
|------|------|-------|
| Mark Solomon<br>X. Jay Alvarez<br>Robert Henssler Jr.<br>Matthew I. Alpert<br>Juan Carlos Sanchez<br>Christopher R. Kinnon<br>T. Alex B. Folkerth | Robbins Geller Rudman<br> & Dowd LLP<br>655 West Broadway,<br>Suite 1900<br>San Diego, CA  92101<br>Telephone:  619/231-1058 | marks@rgrdlaw.com<br>jaya@rgrdlaw.com<br>bhenssler@rgrdlaw.com<br>malpert@rgrdlaw.com<br>jsanchez@rgrdlaw.com<br>ckinnon@rgrdlaw.com<br>afolkerth@rgrdlaw.com |
| Jack Reise Stephen<br>R. Astley<br>Elizabeth A. Shonson<br>Andrew T. Rees<br>Matthew Richard<br>Mason G. Roth | Robbins Geller Rudman<br> & Dowd LLP<br>120 East Palmetto Park Road,<br>Suite 500<br>Boca Raton, FL  33432<br>Telephone:  561/750-3000 | jreise@rgrdlaw.com<br>sastley@rgrdlaw.com<br>eshonson@rgrdlaw.com<br>arees@rgrdlaw.com<br>mrichard@rgrdlaw.com<br>mroth@rgrdlaw.com |
| Michael G. Capeci | Robbins Geller Rudman<br> & Dowd LLP<br>58 South Service Road,<br> Suite 200<br>Melville, NY  11747<br>Telephone:  631/367-7100 | mcapeci@rgrdlaw.com |

**COUNSEL FOR DEFENDANT**:

| NAME | FIRM | EMAIL |
|------|------|-------|
| Dori Ann Hanswirth<br>Theresa M. House | Arnold & Porter<br>250 West 55th Street<br>New York, NY 10019-9710<br>Telephone: 212/836-8095 | dori.hanswirth@arnoldporter.com<br>theresa.house@arnoldporter.com |

4867-7548-0918.v1

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March

15, 2023, at San Diego, California.

s/ T. Alex B. Folkerth
_____
T. ALEX B. FOLKERTH