UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

ABERDEEN CITY COUNCIL AS　　　　　:　Miscellaneous Civil Action No. 1:23-
ADMINISTRATING AUTHORITY FOR　　:　mc-00070-LAK
THE NORTH EAST SCOTLAND PENSION　:
FUND,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:　MEMORANDUM OF POINTS AND
　　　　　　　　　　　　　　　　　　:　AUTHORITIES IN SUPPORT OF
　　　　　　　　　　　　Plaintiff,　:　PLAINTIFF'S MOTION TO COMPEL
　　　　　　　　　　　　　　　　　　:　BLOOMBERG L.P. TO PRODUCE
　　　　　　　　　　　　　　　　　　:　DOCUMENTS RESPONSIVE TO
　　　　vs.　　　　　　　　　　　　:　PLAINTIFF'S SUBPOENA
　　　　　　　　　　　　　　　　　　:
BLOOMBERG L.P.,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　:　　　　　REDACTED
　　　　　　　　　　　　　　　　　　:

—————————————————————— :

(*In re Under Armour Securities Litigation,*　:
*Pending in the United States District Court,*　:
*District of Maryland*, Civil No. RDB-17-388)　:

—————————————————————— x

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................1

II.  BACKGROUND ..................................................................................5

    A.   Summary of the Underlying Action..........................................5

    B.   Bloomberg's Ruhle Schemed with the Under Armour CEO to Refute a Negative Analyst Report and Protect Under Armour's Stock Price.......................6

    C.   Ruhle's Close Personal Relationship as "Advisor" and "Counsel" to the Under Armour CEO ...................................................12

III. ARGUMENT .....................................................................................17

    A.   Because Ruhle Was Under Armour's "Advisor," Telling Under Armour's Story, and Not Acting as an Independent Journalist, the Journalists' Privilege Does Not Apply ...........................................17

    B.   Even if the Journalists' Privilege Applies, Plaintiff's Need for Bloomberg's Responsive Documents Overcomes the Privilege ..........................22

    C.   Producing These Documents Is Not Unduly Burdensome ...................................24

IV.  CONCLUSION...................................................................................25

4867-7548-0918.v1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*von Bulow ex rel. Auersperg v. von Bulow*,
811 F.2d 136 (2d Cir. 1987) .................................................................17, 18, 21, 22

*Baker v. F. & F. Inv.*,
470 F.2d 778 (2d Cir. 1972) ..............................................................................18

*Bridgeport Music Inc. v. UMG Recordings, Inc.*,
2007 WL 4410405 (S.D.N.Y. Dec. 17, 2007) .......................................................24

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011) ....................................................................... *passim*

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*,
284 F.R.D. 132 (S.D.N.Y. 2012) .........................................................................24

*Gonzales v. Nat'l Broad. Co., Inc.*,
194 F.3d 29 (2d Cir. 1999) ......................................................................... *passim*

*In re Nat. Gas Commodities Litig.*,
235 F.R.D. 241 (S.D.N.Y. 2006) .......................................................................23

*New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*,
2000 WL 62315 (E.D. Pa. Jan. 13, 2000) ...........................................................23

*SEC v. AT&T, Inc.*,
__ F. Supp. 3d __, 2022 WL 4110466
(S.D.N.Y. Sept. 8, 2022) .....................................................................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
332 F.R.D. 131 (S.D.N.Y. 2019),
*aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019) ............................................20

*In re Under Armour Sec. Litig.*,
__ F. Supp. 3d __, 2022 WL 4545286
(D. Md. Sept. 29, 2022) ........................................................................................1

*In re Under Armour Sec. Litig.*,
540 F. Supp. 3d 513 (D. Md. 2021) .......................................................................5

4867-7548-0918.v1

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b),...................................................................................................................5
    §78t(a) ....................................................................................................................5
    §78t-1 .....................................................................................................................5

17 C.F.R.
    §243.100...............................................................................................................13

4867-7548-0918.v1

Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen" or "Plaintiff") is the lead plaintiff in a certified securities fraud class action (the "Action" or "Underlying Action") against Under Armour, Inc. ("Under Armour" or the "Company") and Under Armour's Chairman of the Board, founder, and former Chief Executive Officer, Kevin Plank ("Plank"). The Action is currently pending before the Honorable Judge Richard D. Bennett of the United States District Court for the District of Maryland. *See generally In re Under Armour Sec. Litig.*, __ F. Supp. 3d __, 2022 WL 4545286 (D. Md. Sept. 29, 2022). Plaintiff respectfully submits the following motion to compel ("Motion") Bloomberg L.P. ("Bloomberg") to produce documents responsive to the subpoena served on it January 6, 2023 (the "Subpoena").[1]

## I.    INTRODUCTION

Plaintiff's Motion boils down to one simple question: when the CEO of a publicly traded company secretly enlists the help of a close, personal friend – and member of the financial media – to counter the negative public image and stock price impact caused by a critical analyst report, can the friend's employer shield her communications with the CEO from discovery under the guise of the journalists' privilege? Based on the facts presented here and controlling Second Circuit precedent, the answer is a resounding "no."

In January 2016, Kevin Plank was the CEO of Under Armour and Stephanie Ruhle Hubbard ("Ruhle") worked for Bloomberg as an editor and television news anchor. As Plank testified under oath in the Underlying Action, Ruhle was his "friend" and someone from whom he

---

[1]    Exs. 1-2. All exhibits referenced herein are attached to the Declaration of Michael G. Capeci in Support of Plaintiff's Motion to Compel Bloomberg L.P. to Produce Documents Responsive to Plaintiff's Subpoena ("Capeci Declaration"), filed concurrently herewith, unless otherwise noted. Additionally, all emphasis is added and all internal citations are omitted unless otherwise noted.

sought "counsel."[2]  According to Plank, he and Ruhle had "an understanding of trust" that what they discussed was "not to be shared with anyone."[3]  But the purpose of this "understanding of trust," as the *Wall Street Journal* noted, was for Ruhle to provide Plank "input on a range of business matters," not for Ruhle to obtain confidential source material as a journalist.[4]  Indeed, unbeknownst to Under Armour investors and the public, Plank and Ruhle used the intimate secrecy pact to counter a negative Morgan Stanley analyst report published Sunday, January 10, 2016.[5]  On the morning of Monday, January 11, 2016, the Morgan Stanley report caused Under Armour's stock price to plummet on unusually high trading.[6]  Plank was apoplectic, but the Company's "quiet period" prevented him and Under Armour from speaking publicly about it.[7]  The Under Armour CEO put it bluntly in an internal email: "We are in a quiet period but this will not go unanswered."[8]

---

[2]  Ex. 3 at 280:18-281:4, 284:15-17; *see also* Ex. 4 (*Wall Street Journal* article noting that Plank turned to Ruhle for "business advice," that Ruhle provided "input on a range of business matters," and that "the company uncovered emails that showed an intimate relationship between them").

[3]  Ex. 3 at 281:9, 318:12-13; *see also id.* at 281:20-282:1 ("[S]he would give me counsel on things I was dealing with that were either banking or media or human nature in relation.").

[4]  Ex. 4.

[5]  Ex. 5 at ¶175.

[6]  *Id*.

[7]  *See, e.g.*, Ex. 6; Ex. 7 at UA_00280474 (Plank: "You should ask your guy's [sic] from [Morgan Stanley] about this little piece that has erased $2 [billion] from our coffers in the last 4.5 hours."); Ex. 8 at UA_01171478 (Plank: "Push print and get [positive information] out to everyone who is our friend and arm them with this information.  ALL CNBC including Fast Money group & Cramer, Bloomberg, Fox, CNN, Darren, Camillo, Robby, Omar.  EVERYONE!").

[8]  Ex. 6; *see also* Ex. 3 at 259:17-260:16.

4867-7548-0918.v1

So to mitigate the Morgan Stanley report and the devastating financial impact it had on Under Armour (an immediate 8% stock price decline), Plank enlisted his close "friend" and "advisor" Ruhle to draw up and implement a counteroffensive aimed at changing the public narrative about the Company and redirecting the trajectory of its stock price.[9]  Ruhle gladly obliged; she went on Bloomberg TV at 12:30 p.m. on January 11, 2016 (*i.e.*, the middle of the trading day) and parroted Under Armour and Plank's talking points.[10]  Two weeks later, Plank rewarded Ruhle for her efforts to prop up Under Armour's stock price with a coveted interview of Under Armour-sponsored NBA star Stephen Curry.  As the Under Armour CEO explained, the Curry interview was "***a great thank you for being the only member of media to get UA's back when [Morgan Stanley] came out against us*** – I hope that the CNBC crew takes notice and shows more love (even when the chips are down!)."[11]

Because of Ruhle's seemingly extensive involvement with Under Armour, Plaintiff served a document subpoena on Bloomberg seeking (1) documents and communications between Ruhle and Plank or other Under Armour employees concerning Under Armour, and (2) documents and communications sent or received by Ruhle concerning Under Armour, from January 1, 2015 to June 30, 2017.[12]  The documents Plaintiff seeks (the "Responsive Documents") are important evidence in the Action because the Morgan Stanley report that Ruhle helped Under Armour (*via* Plank and other Company executives) attack was the first time the relevant truth about the

---

[9]  *E.g.*, Ex. 8.

[10]  *See* Ex. 9 at 79:21-88:14; Bloomberg, *Under Armour Shares Decline, Here's Why*, Bloomberg Markets Videos (Jan. 11, 2016), https://www.bloomberg.com/news/videos/2016-01-11/under-armour-shares-decline-here-s-why ("Jan. 11 Bloomberg Video").

[11]  Ex. 10 at UA_01173730.

[12]  Ex. 1.

4867-7548-0918.v1

Company's true financial condition was partially disclosed to the investing public – a truth that Plaintiff alleges Plank and Under Armour fraudulently concealed from investors throughout the Class Period. Thus, the Responsive Documents are probative of both Plank and Under Armour's "scienter" (*i.e.*, culpable state of mind), which Plaintiff must ultimately prove to prevail on its securities fraud claim.

Refusing to produce any documents whatsoever, Bloomberg objects on the basis of purported journalists' privilege and burden.[13] But the journalists' privilege does not apply because Ruhle, far from acting as an ***independent*** journalist, was helping her close friend Plank and Under Armour ***co-opt*** Bloomberg and other financial news media in an effort to protect the Company's stock price.[14] *Chevron Corp. v. Berlinger*, 629 F.3d 297, 300 (2d Cir. 2011). As the Second Circuit held in *Chevron*:

> The privilege for such information is intended to protect the public's interest in being informed by "a vigorous, aggressive, ***and independent*** press" . . . .
>
>     \*   \*   \*
>
> Those who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press.

*Id*. at 306, 308 (emphasis in original) (quoting *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987)). Moreover, even if the privilege did apply (it does not), Plaintiff's request overcomes Bloomberg's assertion of privilege because the Responsive Documents are probative of a key issue and cannot be obtained from another source. *See Gonzales v. Nat'l Broad. Co., Inc.*,

---

[13] Ex. 11 at 1.

[14] *See, e.g.*, Ex. 10; Ex. 12 (Ruhle to Plank: "look at that stock!!!").

4867-7548-0918.v1

194 F.3d 29, 36 (2d Cir. 1999). Finally, Bloomberg's claims of burden are unserious and unsupported.

## II.     BACKGROUND

### A.     Summary of the Underlying Action

The Action arises under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934. As succinctly encapsulated by Judge Bennett in his Opinion upholding the operative Complaint, Plaintiff alleges that Under Armour and Plank "misrepresented the level of demand for Under Armour products" to investors during the September 16, 2015 through November 1, 2019 (inclusive) Class Period. *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 516 (D. Md. 2021). As Judge Bennett noted, the U.S. Securities and Exchange Commission ("SEC") has already found that Under Armour misled investors during the Class Period. *See id.* In short, the SEC found that Under Armour "fail[ed] to disclose material information about its revenue management practices that rendered statements it made misleading."[15] The SEC made numerous specific findings that support plaintiffs' allegations in the Action – all of which Under Armour consented to.[16] In particular, the SEC noted that for six consecutive quarters (3Q15 through 4Q16), "Under Armour pulled forward approximately $408 million in orders" while misleadingly making "positive statements regarding its revenue growth rate and the factors contributing to the revenue growth rate, without disclosing the significant impact on revenue from its use of pull forwards."[17]

---

[15] Ex. 13 at 2.

[16] *Id.* at 1.

[17] *Id.* at 2.

4867-7548-0918.v1

### B. Bloomberg's Ruhle Schemed with the Under Armour CEO to Refute a Negative Analyst Report and Protect Under Armour's Stock Price

The first suggestion to investors that all was not as it seemed at Under Armour appeared while the market was closed on Sunday, January 10, 2016. Morgan Stanley published a report about the Company titled "Declining Share and ASPs Dual Threat to Premium Valuation" in which it downgraded the stock to "Underweight" and reduced its price target from $103 to $62 per share.[18] The report relied on industry point-of-sale data from SportScan to reveal the Company's ASPs, market share, and margins had been declining since Spring 2015. Under Armour's stock price dropped sharply in response to the report.[19] However, despite the fact that it was in a pre-earnings call "quiet period" in which it was required to refrain from communicating with investors, the Company plotted with Ruhle and others to put their "friends in media and other analysts to work to refute this report" and mitigate its effects on the Company's stock price.[20] On the morning of January 11, 2016, the Under Armour CEO told his executive team: "***We are in a quiet period but this will not go unanswered***."[21]

Ruhle actually emailed with Diane Pelkey, Under Armour's Senior Vice President of Global Communications and Entertainment, about a different Under Armour business matter early on January 11, 2016, writing:

> [C]an you tell me any official ##s how many record [a newly released Under Armour app] downloads etc. . . . you gave me data on Friday – but im guessing ##s

---

[18]  Ex. 14.

[19]  Ex. 5 at ¶175.

[20]  Ex. 6.

[21]  *Id.*; *see also* Ex. 3 at 259:17-260:16.

are way up and more acolades [sic] its worth giving to Kyle Stock – I had him on two weeks ago and he was bulled up on KP.[22]

After Pelkey responded with positive information, Ruhle noted she had seen the news about Morgan Stanley downgrading Under Armour and offered some advice:

> [P]erfect – I'd make the rounds with this only bc healdine [sic] just crossed abt morgan stanley going underweight UA -this content is perfect just in case anyone decides to cover the Morgan stanleyt [sic] thing – it combats any risk of negativity.[23]

Pelkey responded: "Yes. Just heard from our IR [Investor Relations] guy. Agree. Will push positive messages out. Thanks!"[24] Ruhle then outlined a plan for protecting Under Armour's stock price from the negative news:

> [W]hat will likely happen markets reporters doing updates could hit UA today *if the stock moves- so just arm the anchors (me, cramer in the 9am) with this good tidbit* – im sure cramer will look for the positive note – so give it to him before mkt opens (i dunno who is on fox at that hour).[25]

Thus, Ruhle was advising Under Armour that because of the Morgan Stanley report "going underweight," the Company should get positive information to Jim Cramer of CNBC **before** the stock market opened on January 11, 2016. But CNBC was Bloomberg's "financial news" competition at that time – so this was Ruhle's advice and counsel, and not "journalism." That afternoon, Ruhle sent Plank, Pelkey, and Jen Smith (Plank's Chief of Staff) the following note:

> *I went on-air at 12:30 covering your stock move – here it is*
>
> I don't know if/how well you know Chen Haitzius, he follows UA from our Bloomberg Intelligence team – he remains very bullish

---

[22]   Ex. 15 at UA_01171447 (KP is a common acronym for Kevin Plank).

[23]   *Id.* at UA_01171446.

[24]   *Id.*

[25]   *Id.*

https://bloomberg.com/news/videos/2016-01-11/under-armour-shares-decline-here-s-why.[26]

On-air, Ruhle offered a detailed counterpoint to the Morgan Stanley report: she attacked the factual data underlying it,[27] pointed out Under Armour's long-term investments in mobile and digital technologies,[28] emphasized the Company's historical growth,[29] and highlighted the Company's sponsored athletes.[30]   Remarkably, yet unsurprisingly given the close relationship between the Under Armour CEO and Ruhle, ***all of these points*** were echoed in an internal Under Armour email Plank forwarded to Ruhle later that afternoon in which he told her:

> ***This is the fact sheet we are going to send out to ALL media to arm them for any discussion***.  The 'losing market share' idea is preposterous.  Read the FACTS.  Please let me know if you see anything missing from here.[31]

---

[26]   Ex. 16; *see also* Jan. 11 Bloomberg Video (video linked in Ruhle's email).

[27]   "What we need to note is, they're not giving us all retailers.  While they evaluate many, they don't look at Foot Locker; they don't look at Dick's Sporting Goods.  Those are two huge outlets for Under Armour.  What they do have in there is Kohl's.  Now, Nike made a huge push at Kohl's in the last year; Under Armour doesn't sell through this channel."  Jan. 11 Bloomberg Video.

[28]   "Kevin Plank has come out and said he's as confident about Connected Fitness as he was about compression t-shirts – what was that, 20 years ago – clearly that trade worked out.  And if you're going to go long Under Armour and follow this trend, this has got to be a long term buy.  They invested almost a billion dollars last year in M&A in this space, so it's not like you're going to see this turn around overnight; it's going to take some time."  *Id.*

[29]   "They've had a massive growth business, so when you say it's a slowdown, I almost compare it to an ESPN slowdown, where people said, 'my goodness, is there a chink in the armor in terms of ESPN,' – how well companies like that have done.  Under Armour's growth has been explosive."  *Id.*

[30]   "Let's just look at who their athletes are.  They've got much fewer athletes than Nike does, but they got Steph Curry, number one player in the NBA; Tom Brady is playing – the Patriots are playing in the playoffs next weekend; Lindsey Vonn won the World Cup in downhill skiing this weekend; and Jordan Spieth in Honolulu.  So, while smaller than Nike, clearly they pick winners."  *Id.*

[31]   Ex. 17 (the paragraphs titled "Congrats," "We are a growth company," "SportScan," and "Connected Fitness" are all points Ruhle made on-air).  *Compare id.* ("This [SportScan data] excludes UA's DTC and International business, ***as well as DKS, Foot Locker***, and our department

- 8 -

This consistency supports the inference that Under Armour and Ruhle coordinated regarding the substance of Under Armour – and Ruhle's – response to the Morgan Stanley report before Ruhle went on-air at 12:30 p.m. Ruhle's testimony about her January 11, 2016 Bloomberg TV report on Under Armour further supports the inference that Under Armour and Ruhle coordinated regarding the substance of her television appearance. Ruhle testified that her report included many of the Under Armour CEO's talking points, that she doesn't know where she learned the specific information about what data is included in SportScan, and that she doesn't recall whether she communicated with the Under Armour CEO prior to her television appearance.[32]

Minutes after forwarding the "fact sheet" to Ruhle, Plank directed his team to "put the growth company paragraph first" and then to "[p]ush print and *get it out to everyone who is our friend and arm them with this information*. ALL CNBC including Fast Money group & Cramer, Bloomberg, Fox, CNN, Darren, Camillo, Robby, Omar. EVERYONE!"[33] Plank then forwarded the updated version to Ruhle with the note, "we are working on TV now."[34] Ruhle responded with yet more advice: "R U DOING THE NBA TECH CONFERENCE."[35]

---

stores channel. Further, recent changes in methodology *includes Kohl's where our competition has aggressively sold in 2015 driving reported market share where we do not have a presence*."), *with* Jan. 11 Bloomberg Video ("What we need to note is, they're not giving us all retailers. While they evaluate many, they don't look at Foot Locker; they don't look at Dick's Sporting Goods. Those are two huge outlets for Under Armour. What they do have in there is Kohl's. Now, Nike made a huge push at Kohl's in the last year; Under Armour doesn't sell through this channel.").

[32]  Ex. 9 at 79:21-88:14.

[33]  Ex. 8 at UA_01171478.

[34]  *Id.* at UA_01171477.

[35]  *Id.* Plank replied, "I don't know what that is but bc we are powering their entire connected fitness platform – am sure Robin or someone is scheduled to go." *Id.*

One minute later, the Under Armour CEO forwarded Ruhle a positive analyst report by Robert Ohmes of Bank of America (or "Robby" as Plank referred to him in an email[36]) – which reiterated the analyst's "BUY" rating and parroted many of the points from Under Armour's "fact sheet" – with the note, "[a]nd here comes the cavalry."[37] Less than twenty minutes later, Plank forwarded Ruhle another positive analyst report, this time with the note, "[t]hese analysts are all over [it][38] – *let's get you a list to have them balance that bull shit story poisining [sic] the public markets*!"[39] This report also parroted many of the points from Under Armour's "fact sheet," noting, for example, the same criticisms of the SportScan data and Under Armour's rising footwear ASPs and investments in Connected Fitness.

Two days later, on January 13, 2016 – while Under Armour was still in its "quiet period" – Ruhle acted as a conduit between the Under Armour CEO and an Under Armour shareholder. The Under Armour CEO relayed through Ruhle that the shareholder should "hang in there" even though the stock had dropped because of the Morgan Stanley report and Ruhle confirmed to the CEO that the shareholder would "buy more" Under Armour stock. Specifically, Ruhle forwarded Plank an exchange between herself and investor ███████████ in which she told

---

[36] *Id.* at UA_0117148; *see also* Ex. 3 at 305:12-21 ("Q. And Darren, Camile, Robbie, and Omar, are those financial analysts that covered Under Armour at the time? A. Camilo. No. Darren is Darren Rovell, Omar was independent, Robbie may have been between banks. I don't know. Maybe he was still at Bank of America, but he was an analyst at one time for sure. Q. Cramer refers to Jim Cramer from CNBC? A. Yeah.").

[37] Ex. 18 (*e.g.*, at UA_01171452 the report makes similar points about SportScan, Under Armour's footwear ASPs, footwear growth, etc.).

[38] Ex. 19 at UA_01171466; Ex. 3 at 310:21-311:6 ("Q. And you wrote in your e-mail at 3:41 on January 11th, 2016 to Ms. Ruhle 'These analysts are all over. Let's get you a list to have them balance that bullshit story poisoning the public markets!' Right? [Objection] A. Yeah. Looks like I probably meant to say 'these analysts are all over it.'").

[39] Ex. 19 at UA_01171466.

4867-7548-0918.v1

██████████, "**sounds like you should buy the stock** ██[,] they don't sell oil[,] they sell the american dream."  In the forwarded message, Ruhle wrote to Plank, "**one of your shareholders**[,] hasn't even met you but loves your company."  Plank replied, "██ bought our stock about a month ago – I forgot to tell you – I feel terrible he has to see this downside in my stock.  Tell him to bear down and hang in there . . . ."  Ruhle responded, "**he is going to buy more**."[40]

Under Armour's CEO and Ruhle kept in close contact regarding the Company's stock price until the next earnings call on January 28, 2016.[41]  Under Armour – ████████████████████ ████████████████ ████[42] – posted positive results.  As the recently released financial results started pushing the Company's stock price up, Ruhle forwarded Plank a Bloomberg article about Under Armour with the note, "boom!" and sent another email with no body text and the subject heading, "look at that stock!!!"[43]  The next day, Under Armour rewarded Ruhle for her help by arranging an interview with Stephen Curry as "a great thank you for being the only member of media **to get UA's back when [Morgan Stanley] came out against us** – I hope that the CNBC crew takes notice and shows more love (even when the chips are down!)."[44]  Ruhle told Under Armour, "[t]hank you so much . . . [w]e are so excited."[45]

---

[40] Ex. 20.

[41] *See, e.g.*, Ex. 21; Ex. 22; Ex. 23 (Plank forwards Ruhle an Under Armour internal email attaching an updated – and still negative – Morgan Stanley report with the note, "[h]ow about this rat.").

[42] Ex. 24 at UA_00223912.

[43] Ex. 25; Ex. 12; *see also* Ex. 26.

[44] Ex. 10 at UA_01173730.

[45] Ex. 27 at UA_01173734.

Thus Ruhle, Plank, and other Under Armour executives successfully joined forces in January 2016 to perpetuate Under Armour's fraudulent scheme by having Under Armour's story (denying and downplaying the issues revealed in the Morgan Stanley report) told in the financial media. Plank and Under Armour needed Bloomberg (through Ruhle) to be their mouthpiece because the Company was in its "quiet period."[46] This quick action, aided and even led by Ruhle, allowed the Company to continue its pull-forward scheme.[47]

### C. Ruhle's Close Personal Relationship as "Advisor" and "Counsel" to the Under Armour CEO

That Ruhle rushed to Under Armour's aid in January 2016 makes sense given her close, personal relationship with Plank. Documents produced by Under Armour and MSNBC (Ruhle's employer after Bloomberg) and Plank and Ruhle's deposition testimony in the Underlying Action corroborate a *Wall Street Journal* article from 2019 that publicly revealed Ruhle was Plank's "Unusual Adviser" and that the two shared a "close" and "intimate relationship."[48] Ruhle and Plank corresponded regularly, in very familiar terms and at all hours, for months before and after January 2016. This correspondence makes clear that Ruhle and Plank did not have an independent journalist-source relationship. For example:

- On February 27, 2015, at 12:35 a.m., Ruhle wrote to Plank regarding Under Armour's recent Connected Fitness acquisitions: "If successful, the community alone could become worth billions. BOOM BOOM BOOM[.] And that's an 'if' . . . simply hot fudge poured over a banana split of softgoods likely to grow 20% annually." Plank replied about ten minutes later: "BINGO – Invest in / Bet on the jockey. . . . #EXCEPTIONAL ENTREPRENEUR #Of This Generation[.]

---

[46] Ex. 6; *see also* Jan. 11 Bloomberg Video (Ruhle notes "we don't know the hard numbers" because "Under Armour doesn't come out with their earnings yet; they're in their quiet period").

[47] Ex. 13 at 2.

[48] Ex. 4.

BOOM!!" Three minutes later, at 12:49 a.m., Ruhle responded: "Boom boom boom[.] As expected. It gave me the chills."[49]

- On April 21, 2015, Ruhle sent Plank the following note: "1- my colleague BL is in fact a dope[,] 2- *Erik and I in fact argued earlier in your defense*. *We did a read on UA shares being down and missing analyst estimates . . . and DUMBASSSS IBM shares coasting*. They actually had YET ANOTHER suckassss quarter – but analysts reduced estimates, so technically they 'outperformed'[;] the system is completely stupid – pointless and rigged . . . and we just beat up a goldman guy over it[.] *You did well and your shares are down[;] IBM sucked and they are aok[;] SO DUMB*."[50]

- On June 15, 2015, at 8:37 p.m., Plank forwarded Ruhle an Under Armour internal email with an unpublished announcement about Under Armour's upcoming stock split (which allowed Plank to sell millions of dollars of stock for 100% profit during the Class Period while the stock price was inflated by the fraudulent scheme) and the following request: "Please read my letter . . . . Let me know what you think of my letter??!!"[51]

Additionally, as reported in the *Wall Street Journal* and confirmed by Ruhle in her deposition in the Action, Ruhle received free flights all over the world on Plank's private jet in 2015 and 2016 – a gift worth thousands of dollars.[52]

The Under Armour CEO also frequently sent Ruhle material nonpublic information about the Company during its quiet periods.[53] Plank even had a special email account, accessible on a

---

[49] Ex. 28.

[50] Ex. 29.

[51] Ex. 30 at UA_01155627; *see also* Ex. 31; Ex. 22 (Ruhle to Plank: "When you trust and love more . . . good wins[.] And you aren't good[;] [y]ou are great.").

[52] Ex. 4; *see also* Ex. 9 at 37:14-38:2, 38:22-39:7 ("Q. Did you pay for the flight from France to the US on Mr. Plank's private jet? A. No, I didn't. Q. So the flight from France to the US on Mr. Plank's private jet was free to you? A. It was. Q. Did you ever price that out how much a flight from the US to France on a private jet would cost? A. I don't believe I did. Q. Thousands of dollars; right? A. Yes, theoretically.").

[53] Such selective disclosure of material nonpublic information violates SEC Regulation FD, promulgated at 17 C.F.R. §243.100. *See also SEC v. AT&T, Inc.*, __ F. Supp. 3d __, 2022 WL 4110466, at *2 (S.D.N.Y. Sept. 8, 2022) ("Reg FD was promulgated in 2000 to fill a gap in federal securities laws with respect to the selective disclosure by public companies of material nonpublic

specific iPhone, created and given to Ruhle for their private communications.[54] Examples of the

*material nonpublic information* Plank sent to Ruhle at this email address *during Under Armour's*

*quiet periods* include:

- On April 15, 2016, Plank sent Ruhle a secret recording he made of a discussion with Under Armour's President of North America, Matt Mirchin, ██████████ ████████████████████████████████████████████ Plank added a note to Ruhle: "My night."[55]



information. In promulgating the regulation, the SEC explained that where such information is selectively disclosed, it 'leads to a loss of investor confidence in the integrity of our capital markets.'").

[54] Ex. 32 at 153:3-154:4 ("Q. Okay. I see you have an e-mail here, it's ████████████████████. One of the e-mails that you listed in your background – your background questionnaire is R5001@ravenfoundry.com. Any reason you – both you and Stephanie Ruhle share these adjacent e-mail addresses at ravenfoundry.com? A. I provided her with the phone."); *see also* Ex. 9 at 122:13-15 ("Q. So you had three phones at that time: So a work phone, a personal phone, and a Kevin Plank phone? A. Yeah.").

[55] Ex. 33; *see also* Ex. 34 ████████. Under Armour redacted the secret Ruhle email address from this document. *See* Ex. 3 at 282:20-288:11. *The recording was made by Plank without Mirchin's knowledge and then forwarded to Ruhle*. *Id.* at 274:5-280:13.

[56] Ex. 35 at UA_01200171.

[57] Ex. 36.

4867-7548-0918.v1

Indeed, Plank admitted to sending Ruhle material nonpublic information during Under Armour's quiet period in his deposition in the Action:

> [Q.] You'd agree, sir, that you did share material nonpublic information about Under Armour's business during the quiet period by sending this e-mail to Ms. Ruhle, which is Exhibit 37 [*i.e.*, Ex. 36 to the Capeci Declaration]?
>
> [Objection]
>
> A. I sent this to her the night before the earnings call, yes, which is technically in the quiet period but doesn't violate anything within my understanding of trust.
>
> Q. And you also agree that this was material nonpublic information, the fact that Under Armour was dropping operating income, correct?
>
> [Objections]
>
> A. Yeah.[58]

As reported in the *Wall Street Journal* several years later, Under Armour's Board of Directors eventually became aware of its Chairman/CEO and Ruhle's "unusual and problematic" relationship and the improper communications between the two and investigated.[59]

Furthermore, contrary to Bloomberg's assertion that Ruhle was acting as a journalist when corresponding with Plank, the former Under Armour CEO testified in the Action that he felt comfortable sharing material nonpublic information with Ruhle because ***they had an understanding that the information was not to be shared with anyone***:

> Q. So you shared nonpublic information about Under Armour's business with Stephanie Ruhle at that time, right?
>
> [Objections]

---

[58]  Ex. 3 at 328:14-329:11; *see also id.* at 322:9-323:17.

[59]  Ex. 4.  Plank testified in his deposition in the Action that the Board was concerned and instructed him to stop sharing nonpublic information about Under Armour with Ruhle.  Ex. 3 at 330:22-334:1.

4867-7548-0918.v1

A. Well, she's a confidant.

Q. What does that mean, confidant?

A. She's someone I can get counsel from.

Q. Did you have a nondisclosure agreement that you'd executed with Ms. Ruhle?

A. No.

Q. Handshake deal?

A. Yeah. It was an understanding of trust.[60]

Plank elaborated further:

Q. And this e-mail was sent to Ms. Ruhle during a quiet period, correct?

A. Yeah. It was sent to that confidential e-mail.

Q. Two days before the investor call, right?

A. Well, as I said, I had her as someone in confidence.

Q. There was no agreement that anything was confidential, right?

[Objection]

A. There was an agreement. ***There was certainly an understanding that it was not to be shared with anyone of anything we discuss***, and the same thing regarding her career.

Q. So what was the agreement?

A. ***There's an understanding of confidentiality, to be able to discuss things that wouldn't be shared***.[61]

Given that Ruhle gleefully forwarded to Plank examples of her advising an Under Armour

shareholder to buy the stock while she relayed messages from the CEO to the stockholder during

---

60   Ex. 3 at 280:18-281:9.

61   *Id.* at 317:22-320:12.

the January 2016 "quiet period,"[62] and did not report on various material nonpublic information that the Under Armour CEO shared with her as his "advisor" clearly the "understanding" between the two was that Ruhle would only share information from Plank that the CEO wanted publicized.[63]

## III. ARGUMENT

### A. Because Ruhle Was Under Armour's "Advisor," Telling Under Armour's Story, and Not Acting as an Independent Journalist, the Journalists' Privilege Does Not Apply

The Second Circuit recognizes a qualified journalists' privilege,[64] grounded in the First Amendment, for the noble purpose of "protect[ing] the public's interest in being informed by 'a vigorous, aggressive ***and independent*** press.'" *Chevron*, 629 F.3d at 306 (quoting *von Bulow*, 811 F.2d at 142) (emphasis in original). The "qualified right" of newsgathering, "which results in the journalist's privilege, emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public." *von Bulow*, 811 F.2d at 142. The privilege, however, must not be "expansively construed" because it operates "'in derogation of the search for truth'" and "contravene[s] a fundamental principle of our jurisprudence that 'the public . . . has a right to every man's evidence.'" *Id.* at 141 (citing, respectively, *Unites States v. Nixon*, 418 U.S. 683, 710 (1974); *United States v. Bryan*, 339 U.S. 323, 331 (1950)).

---

[62] Exs. 17, 20.

[63] Thus, this is not a situation in which Ruhle used Plank as a confidential source. *Cf. Gonzales*, 194 F.3d at 32-33 (citing *Baker v. F. & F. Inv.*, 470 F.2d 778 (2d Cir. 1972); *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5 (2d Cir. 1982)). Rather, the evidence shows that Plank used Ruhle as a "confidant," "advisor," and mouthpiece. Moreover, Ruhle and Plank's relationship is far from confidential. *See, e.g.*, Ex. 4.

[64] Because the Underlying Action is a "federal question" case (Ex. 5 at ¶23), the federal law of privilege controls whether the privilege asserted by Bloomberg should be recognized. *von Bulow*, 811 F.2d at 141.

4867-7548-0918.v1

To establish entitlement to the privilege, therefore, the Second Circuit holds that "in collecting the information in question, the person must have acted in the role we identified in *Baker*, *von Bulow*, and *Gonzales* as that favored by the public interest that motivates the privilege – *the role of the independent press*." *Chevron*, 629 F.3d at 307. To the contrary, "[a]n undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest," and "[t]hose who do not retain independence as to what they will publish but are subservient to the objectives of others who have a stake in what will be published have either a weaker privilege or none at all." *Id.* at 308.

In *Chevron*, the Second Circuit refused to apply the journalists' privilege to a documentary filmmaker who created a film about litigation in Ecuador. *Id.* at 300. The film was streamed as a documentary on *Netflix* and eventually released on DVD. *Id.* at 303. Although the court recognized that a "person need not be a credentialed reporter working for an established press entity to establish entitlement to the privilege," it held that the filmmaker was not entitled to the privilege because he had failed to establish his independence from the attorney litigating the case that was the subject of the film; indeed, the attorney had asked him to make the film. *Id.* at 307, 309-10. Specifically, the court found "most pertinent" that the "making of the film was solicited by the plaintiffs in the [Ecuador] litigation *for the purpose of telling their story*, and that changes to the film were made at their insistence." *Id.* at 300, 305 (emphasis in original).

This case is on all fours with *Chevron*. Here, like in *Chevron*, Ruhle's "reporting" about Under Armour was "solicited by [Under Armour] *for the purpose of telling [Under Armour's] story*." *Id.* at 300. To wit: in the span of one day, Under Armour collaborated with Ruhle on a

"fact sheet"[65] that they sent "out to everyone who is our friend" to "arm them with this information";[66] Ruhle reported back to Under Armour that she "went on-air at 12:30 covering your stock move," and sent them the clip in which she parroted, in detail, the same points from the fact sheet;[67] Under Armour then fed Ruhle even more information to "report" on, sending her positive analyst reports throughout the day and planning to "get [her] a list to have them balance that bull shit story poisining [sic] the public markets!"[68] Similarly, Ruhle made changes to her so-called reporting at Under Armour's insistence. For example, minutes after Under Armour's CEO sent Ruhle a message titled "can we discuss" with the instruction to "[c]heck out the UA headlines from Bloomberg," she responded, "[y]ou are 100% right – its [sic] a bad headline and bad practice[.] *I am commited [sic] to changing it on my side of the house* (tv) . . . ."[69]

More broadly, attempting to use the journalists' privilege to shield discovery into Ruhle's activities vis-à-vis Under Armour is an insult to the notion of a "'vigorous, aggressive *and independent* press.'" *Chevron*, 629 F.3d at 306 (emphasis in original). It is frankly perplexing that Bloomberg chooses to argue that Ruhle's activities are worthy of First Amendment protection rather than to recognize Ruhle and Under Armour's co-option of their platform for what it is.[70]

---

[65] Ex. 17.

[66] Ex. 8 at UA_01171478.

[67] Ex. 16.

[68] Ex. 19.

[69] Ex. 37.

[70] Notably, Ruhle's activities violated Bloomberg's own ethics policies. *See* Matthew Winkler, *The Bloomberg Way: A Guide for Reporters and Editors* 91 (John Wiley & Sons, Inc. 2014) (Ex. 38) ("We seek to avoid a *conflict of interest*, which is an economic, personal or political relationship that may compromise a journalist's impartiality. We are mindful that the appearance of a conflict or impropriety can be as damaging to a reputation as doing something improper.

Far from operating as an independent reporter, Ruhle (in her own words) worked to "combat" negative press about Under Armour and "arm" herself with positive spin directly from the Company's CEO and communications department, all the while delivering this to Bloomberg's unsuspecting viewers under the guise of objective news reporting.[71]

Moreover, much of Ruhle and Plank's "close" and "intimate" relationship wasn't even about her so-called reporting, further demonstrating Ruhle's lack of independence.[72] The holding in *Chevron* is analogous in this sense to other cases in this Circuit holding that professional privileges do not apply when the professional is not acting in the role the privilege is designed to protect. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019) ("The PR firms here were not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals. Rather, the PR firms were involved in public relations activities aimed at burnishing Signet's image."), *aff'd*, 2019 WL 5558081 (S.D.N.Y. Oct. 23, 2019).

Here, according to Ruhle and Plank's sworn deposition testimony, Ruhle acted as a "confidant," "advisor," and "friend."[73] She helped orchestrate Under Armour's response to events that harmed the Company's stock price and public image, not just in January 2016, but

---

Bloomberg News does not allow external parties or the commercial interests of Bloomberg LP to dictate our reporting.") (emphasis in original).

[71]  Ex. 15.

[72]  Ex. 4; *see also* Ex. 9 at 38:7-14 ("Q. Was it part of your work as a Bloomberg reporter to fly on Mr. Plank's private jet? A. Not specifically. Q. Was it – were you flying with him as Mr. Plank's friend? A. I was flying on his plane as myself, Stephanie Ruhle. I'm – I'm not really in a category one or the other.").

[73]  Ex. 3 at 280:18-281:9; Ex. 9 at 27:13-14.

4867-7548-0918.v1

repeatedly.[74] She counseled a Company shareholder to buy Under Armour stock and relayed the CEO's message to the shareholder during the January 2016 "quiet period."[75] She served as a sounding board for Plank when he was frustrated with his employees – including the CFO.[76] And, perhaps most damaging to Bloomberg's claim that Ruhle was acting as a reporter, Plank testified under oath that the two had an understanding that their discussions were "***not to be shared with anyone***."[77] Even a source that demands confidentiality deals with a reporter with the mutual understanding that the information conveyed will eventually be ***reported*** on. *See von Bulow*, 811 F.2d at 144 (nonparty claiming privilege must show "intent to use material – sought, gathered, or received – to disseminate information to the public").

"'It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.'" *Id.* (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)). All that Bloomberg can muster here is that it is a news organization and Ruhle was ostensibly hired as a

---

[74] *See, e.g.*, Ex. 4 (reporting that "Mr. Plank took Ms. Ruhle's advice rather than management's on how to handle consumer backlash over a key sneaker model in 2016" and that she "also gave advice on how he should engage with President Trump in 2017 that was at odds with some executives who urged Mr. Plank to keep his distance"); *see also* The Washington Free Beacon, *NBC's Stephanie Ruhle Hawked Under Armour Shoes on Air Without Disclosing Relationship with CEO*, YouTube (Feb. 21, 2019), https://freebeacon.com/politics/nbcs-stephanie-ruhle-hawked-under-armour-shoes-on-air-without-disclosing-relationship-with-ceo/ (Ruhle on the Today Show in response to criticism of the sneakers: "I really like this shoe"; "they look an awful lot like a classic Nike or a New Balance – that's a mass market shoe"; "just in time for Father's Day, dads!").

[75] Ex. 20.

[76] Exs. 33-34.

[77] Ex. 3 at 317:22-320:12.

news anchor.[78]  But in reality, as demonstrated above, Ruhle's activities with respect to Under Armour were a far cry from the lofty and noble goal of "robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment" (*von Bulow*, 811 F.2d at 144), that the journalist's privilege is designed to protect. The Court should refuse to apply the journalists' privilege to Ruhle's un-journalistic endeavors.

### B. Even if the Journalists' Privilege Applies, Plaintiff's Need for Bloomberg's Responsive Documents Overcomes the Privilege

Even if the Responsive Documents were deserving of protection under the First Amendment (they are not), Plaintiff's request overcomes any privilege that attaches to them. Where, as here, a confidential source is not at issue, the privilege is more easily overcome. *Gonzales*, 194 F.3d at 36 ("[W]e now hold that, while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought."). "Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show [(1)] that the materials at issue are of likely relevance to a significant issue in the case, and [(2)] are not reasonably obtainable from other sources." *Id.*

Here, Bloomberg has not even contested relevance,[79] and for good reason.  The Responsive Documents will allow Plaintiff to show, in the Underlying Action, how the Under Armour CEO and other Company executives put their "friends in media and other analysts to work to refute" the first hint to the public of the truth concealed by their fraudulent scheme, *i.e.*, the Morgan Stanley

---

[78]  Ex. 11 at 1.

[79]  Ex. 11 at 1.

4867-7548-0918.v1

report published on January 10, 2016.[80] This is important evidence of an element that Plaintiff must prove in order to prevail in the Action – Plank and Under Armour's scienter. *See, e.g.*, *In re Nat. Gas Commodities Litig.*, 235 F.R.D. 241, 245 (S.D.N.Y. 2006).

Moreover, the Responsive Documents are not reasonably available from any other source. Plaintiff has already exhausted discovery from defendants in the Action – Plank and Under Armour – and while that process has yielded the documents cited herein, Plaintiff seeks the additional Responsive Documents for several reasons. *See id.* ("Plaintiffs sought the information from Defendants, none of which was able to produce a complete set of the reported trade information."). Most obviously, Plaintiff seeks Ruhle's emails to other nonparties ***about*** Under Armour – evidence that Under Armour itself could not have (unless, in the rare case, Ruhle then forwarded such an email to Plank). Similarly, if Ruhle forwarded her emails with Under Armour and Plank to others, Under Armour and Plank would not have these additional documents. Furthermore, Under Armour redacted the secret email address that Plank made for Ruhle in a document bearing no other redactions, suggesting that it was attempting to hide Plank's communications with Ruhle from Plaintiff.[81] *See, e.g.*, *New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*, 2000 WL 62315, at *5 (E.D. Pa. Jan. 13, 2000) (holding that a plaintiff is entitled to serve third-party subpoenas "to test the veracity of defendants' assertion that they have produced all documents they were required to produce"). Finally, the evidence that Plaintiff does have suggests that communications exist beyond what was produced by Plank and Under Armour[82] – notably, Ruhle testified that she

---

[80] Ex. 6.

[81] *See supra* n.55. Additionally, Under Armour did not produce many of the communications that Plaintiff obtained from MSNBC (Ruhle's employer after leaving Bloomberg).

[82] *See supra* n.31.

4867-7548-0918.v1

doesn't recall whether she communicated with the Company to prepare for her January 11, 2016 Bloomberg TV spot where she was, according to the CEO, "'the only member of media to get UA's back when [Morgan Stanley] came out against us.'"[83] Thus, Bloomberg should be compelled to produce the Responsive Documents.

### C.     Producing These Documents Is Not Unduly Burdensome

Bloomberg's assertion of undue burden is without merit.  Courts in this District hold: "Whether a subpoena imposes an 'undue burden' depends upon 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Bridgeport Music Inc. v. UMG Recordings, Inc.*, 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007).  Here, as explained above, the documents sought from Bloomberg are indisputably relevant and cannot be obtained from another source.  Additionally, Plaintiff's requests are very specific and would require simple search protocols to be run on Ruhle's Bloomberg email, imposing very little burden.  Moreover, it is Bloomberg's burden to show that complying with the Subpoena would be unduly burdensome.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012).  Bloomberg's assertion of undue burden is conclusory and unsupported.[84]  Thus, the Court should compel Bloomberg to produce the Responsive Documents.

If the Court is not inclined to order Bloomberg to produce the entirety of the documents sought by Plaintiff's subpoena, Plaintiff believes it is entitled to at least the production of two extremely targeted sets of documents: (1) emails Ruhle exchanged with the domains

---

[83]  Ex. 12; Ex. 9 at 110:23-24.

[84]  Ex. 11 at 1.

"underarmour.com" and "ua.com" (*i.e.*, with Under Armour employees) during the **single month** of January 2016, and (2) Ruhle's **sent** emails that include the terms "Under Armour," "UAA,"[85] or "Plank" during the single month of January 2016. Bloomberg's counsel has already collected and reviewed all documents in the first category; actually producing these documents will incur negligible additional burden.[86] Collecting and producing the remaining documents should take very little time.

## IV.    CONCLUSION

Having demonstrated that the journalists' privilege has no application here – and that even if it did, Plaintiff meets both elements of the *Gonzales* test for overcoming the privilege – Plaintiff has overcome Bloomberg's objections to the Subpoena. Plaintiff respectfully requests that the Court issue an Order compelling Bloomberg to comply with the Subpoena.

DATED: March 15, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL G. CAPECI (MC-0617/NY)


s/ Michael G. Capeci
MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
mcapeci@rgrdlaw.com

---

[85]   UAA is Under Armour's stock ticker.

[86]   Ex. 11 at 5.

4867-7548-0918.v1

ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
MARK SOLOMON
X. JAY ALVAREZ
ROBERT R. HENSSLER JR.
MATTHEW I. ALPERT
JUAN CARLOS SANCHEZ
CHRISTOPHER R. KINNON
T. ALEX B. FOLKERTH
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
jaya@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
jsanchez@rgrdlaw.com
ckinnon@rgrdlaw.com
afolkerth@rgrdlaw.com

ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
ANDREW T. REES
MATTHEW RICHARD
MASON G. ROTH
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
mrichard@rgrdlaw.com
mroth@rgrdlaw.com

Lead Counsel for Plaintiff