# EXHIBIT 3

[REDACTED]

1   IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MARYLAND

3

4 ----------------------------------)

5 IN RE UNDER ARMOUR SECURITIES  )Civil No.

6 LITIGATION         )RDB-17-388

7 ----------------------------------)

8

9       CONFIDENTIAL

10

11  Videotaped Deposition of KEVIN A. PLANK,

12  held at 100 International Drive, Baltimore,

13  Maryland, commencing at 10:03 a.m.,

14  Wednesday, February 15, 2023, before

15  Tina M. Alfaro, a Notary Public within

16  and for the State of Maryland.

17

18

19

20

21 JOB No. 5630283

22 PAGES 1 - 349

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | percent profit when you sold that hundred million | 16:11:19 |
| 2 | in stock, right? | 16:11:21 |
| 3 | A. Virtually. | 16:11:22 |
| 4 | MR. HENSSLER: Let's go off the record. | 16:11:27 |
| 5 | THE VIDEOGRAPHER: Off the record, | 16:11:29 |
| 6 | 16:11. | 16:11:30 |
| 7 | (A break was had.) | 16:23:39 |
| 8 | THE VIDEOGRAPHER: We're back on the | 16:29:49 |
| 9 | record 16:29. | 16:29:50 |
| 10 | BY MR. HENSSLER: | 16:29:53 |
| 11 | Q. Welcome back, sir. You understand you're | 16:29:53 |
| 12 | still under oath? | 16:29:56 |
| 13 | A. Yes. | 16:29:58 |
| 14 | Q. Okay. Let's talk about what's referred to | 16:29:59 |
| 15 | as a quiet period. | 16:30:00 |
| 16 | A. Do we need this on? Okay. | 16:30:02 |
| 17 | Q. Let's talk about what's referred to as a | 16:30:04 |
| 18 | quiet period. You're familiar with that phrase | 16:30:06 |
| 19 | from your time as the CEO of Under Armour, right? | 16:30:08 |
| 20 | A. Yes. | 16:30:11 |
| 21 | Q. And the quiet period refers to the time | 16:30:11 |
| 22 | between the end of a financial quarter and the | 16:30:14 |

Page 259

```
1    company announcing financial results, right?      16:30:17

2        A.  Yes.                                       16:30:22

3        Q.  And is it your understanding that during   16:30:22

4    the quiet period a public company like Under Armour 16:30:25

5    must avoid selective disclosure of material         16:30:27

6    information?                                        16:30:30

7            MR. REISNER:  Objection to form, calls for  16:30:31

8    a legal conclusion.  You may answer.                16:30:33

9        A.  Ask that again.                             16:30:35

10       Q.  Happy to.                                   16:30:37

11           Is it your understanding that during a      16:30:39

12   quiet period a public company like Under Armour     16:30:40

13   must avoid selective disclosure of material         16:30:43

14   information?                                        16:30:46

15           MR. REISNER:  Same objection.               16:30:48

16       A.  Yeah.  Yes.                                 16:30:49

17       Q.  And the quiet period is something that you  16:30:57

18   were well aware of during the 2015 to 2017 time     16:30:59

19   period as a CEO, right?                             16:31:04

20       A.  It's been consistent since we went public   16:31:05

21   in November of 2005, yes.                           16:31:08

22       Q.  And you understood that as a public         16:31:10
```

| | | |
|---|---|---|
| 1 | was actually reacting to I can't believe he | 16:43:13 |
| 2 | recorded me.  So it happened, forgotten about it, | 16:43:15 |
| 3 | never thought about it, and certainly have never | 16:43:22 |
| 4 | done -- it's not something that I do. | 16:43:25 |
| 5 |      Q.  You recorded that conversation, right? | 16:43:30 |
| 6 |      A.  I believe so, yes. | 16:43:32 |
| 7 |      Q.  Did you use your iPhone? | 16:43:33 |
| 8 |      A.  It might have happened where it happened | 16:43:35 |
| 9 | to be recording and I think it might have been a | 16:43:37 |
| 10 | surprise because, again, I have no interest in | 16:43:39 |
| 11 | proactively recording anyone. | 16:43:42 |
| 12 |      Q.  You sent it to someone, right? | 16:43:45 |
| 13 |      A.  I did. | 16:43:47 |
| 14 |      Q.  Did you accidentally send it to somebody? | 16:43:50 |
| 15 |      A.  No.  I proactively sent it to them once I | 16:43:53 |
| 16 | realized that I had the recording and it was sort | 16:43:56 |
| 17 | of an exasperated this is my long night. | 16:43:59 |
| 18 |      Q.  You didn't tell Mr. Mirchin you were | 16:44:03 |
| 19 | recording him at the time you were recording that | 16:44:05 |
| 20 | conversation, right? | 16:44:07 |
| 21 |      A.  I don't believe I was aware that I was | 16:44:08 |
| 22 | recording that conversation. | 16:44:09 |

Veritext Legal Solutions
866 299-5127

1      Q.  You didn't get his permission to record        16:44:10

2  him, right?                                            16:44:12

3      A.  No, I did not.                                 16:44:13

4          MR. REISNER:  Objection, asked and            16:44:14

5  answered.                                              16:44:14

6      Q.  You understand that's the law in Maryland,    16:44:14

7  you have to get someone's permission to record a       16:44:16

8  conversation like that?                                16:44:18

9      A.  Yeah, but as I said, I don't believe I        16:44:20

10  proactively recorded that conversation with an         16:44:22

11  intent.                                                16:44:25

12      Q.  Why did you secretly record that             16:44:28

13  conversation with Mr. Mirchin?                         16:44:30

14          MR. REISNER:  Objection, misstates the       16:44:32

15  evidence.                                              16:44:33

16      A.  I feel like I've said this a few times.      16:44:33

17  We could be in disagreement if you'd like, but I       16:44:36

18  didn't secretly record that conversation with          16:44:38

19  Mr. Mirchin.  I might have had my phone on, I might    16:44:41

20  have put it down because we were sitting on my back    16:44:44

21  deck and we were, as I said, drinking whiskey.  I      16:44:46

22  might have rested my glass on it, I might have put     16:44:49

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | an ashtray on it because you can hear there's a | 16:44:51 |
| 2 | click with a lighter going off as well.  I don't | 16:44:53 |
| 3 | know what happened or how it got recorded.  As I | 16:44:56 |
| 4 | said, I don't have a practice of doing that.  You | 16:44:58 |
| 5 | all have thousands of hours of every inch of audio | 16:45:00 |
| 6 | that we've ever had as a company and there's not a | 16:45:02 |
| 7 | stitch of that happening anywhere else.  So I was | 16:45:05 |
| 8 | as surprised as you were as I stated earlier.  So | 16:45:08 |
| 9 | no, secretly recording was not an intention of | 16:45:13 |
| 10 | mine. | 16:45:14 |
| 11 | Q.  It was your intention to send that | 16:45:15 |
| 12 | recording to someone else outside the company, | 16:45:17 |
| 13 | though, right? | 16:45:19 |
| 14 | MR. REISNER:  Objection, asked and | 16:45:20 |
| 15 | answered. | 16:45:20 |
| 16 | A.  Yeah.  I was characterizing it's 8:45 or | 16:45:20 |
| 17 | 8:30 at night, I've had a long night, I'm trying to | 16:45:24 |
| 18 | go home, and Matt's holding me here hostage talking | 16:45:27 |
| 19 | about the business. | 16:45:30 |
| 20 | Q.  The audio that we just listened to where | 16:45:36 |
| 21 | you said that the Under Armour CFO, Mr. Molloy, | 16:45:38 |
| 22 | told you that Under Armour should take the quarter | 16:45:41 |

Veritext Legal Solutions
866 299-5127

1    down by $10 million, you'd agree that that was        16:45:44

2    nonpublic information, right?                          16:45:47

3         MR. WAREHAM:  Object to the form,                 16:45:49

4    foundation, calls for a legal conclusion.             16:45:51

5         A.  Can you please ask that question again.       16:45:53

6         Q.  Sure.                                         16:45:56

7              Nobody outside of the company knew that       16:45:56

8    the CFO came to you and said we've got to take the    16:45:59

9    quarter down 10 million, right?                        16:46:02

10        MR. REISNER:  Objection to form.  You may        16:46:06

11   answer.                                                16:46:07

12        A.  I don't -- I wouldn't believe so, but I      16:46:08

13   think that a number like $10 million would be         16:46:09

14   immaterial regardless.                                 16:46:12

15        Q.  Well, I asked whether it was nonpublic       16:46:13

16   information.                                           16:46:14

17        A.  I wouldn't -- I wouldn't have an opinion,    16:46:17

18   I don't think so, but I think $10 million is sort     16:46:20

19   of variable one way or the other.                      16:46:22

20        Q.  What do you mean by "immaterial"?            16:46:24

21        A.  $10 million to a billion three or a          16:46:28

22   billion four quarter is what I would refer to as      16:46:31

Veritext Legal Solutions
866 299-5127

1   not a material amount of money.                          16:46:33

2       Q.  You do agree, though, that that                  16:46:36

3   information that Molloy came to you, as you said on       16:46:39

4   the recording, and said we've got to drop the            16:46:42

5   quarter by 10 million, that was nonpublic                16:46:45

6   information at the time, right?                          16:46:47

7           MR. REISNER:  Objection to form, asked and       16:46:49

8   answered, three times already.                           16:46:49

9           MR. HENSSLER:  You can answer.                   16:46:51

10      A.  Yeah, it would feel like the kind of             16:46:52

11  information I'd be comfortable sharing with the          16:46:53

12  confidants that I had in my circle with an               16:46:55

13  understanding it would be kept in trust.                 16:46:57

14      Q.  There's never been any disclosure to this        16:46:59

15  day, right, that the CFO of the company came to you      16:47:01

16  in the first quarter of 2016 and said we need to         16:47:04

17  drop the quarter by 10 million, right?                   16:47:08

18          MR. WAREHAM:  Objection to form,                 16:47:10

19  foundation, grossly mischaracterizes what                16:47:11

20  Mr. Molloy says on the record actually happened.         16:47:13

21          MR. HENSSLER:  We're talking about the           16:47:15

22  audio we just listened to.                               16:47:16

| | | |
|---|---|---|
| 1 | MR. WAREHAM:  I'm talking about the record | 16:47:22 |
| 2 | and I'm objecting to the form of your question. | 16:47:22 |
| 3 | MR. HENSSLER:  Do you want to play it | 16:47:22 |
| 4 | again? | 16:47:22 |
| 5 | MR. WAREHAM:  Do you want to fight with me | 16:47:22 |
| 6 | or do you want to ask questions? | 16:47:23 |
| 7 | MR. HENSSLER:  Well, you're misstating the | 16:47:25 |
| 8 | record. | 16:47:26 |
| 9 | MR. WAREHAM:  If you want to fix the | 16:47:26 |
| 10 | infirmed question, fix the infirmed question.  If | 16:47:27 |
| 11 | you want to pick door number three and fight with | 16:47:30 |
| 12 | me, go ahead and do that.  It's late in the day. | 16:47:30 |
| 13 | I'm happy to have it happen. | 16:47:33 |
| 14 | MR. HENSSLER:  I definitely don't want to | 16:47:35 |
| 15 | fight with anyone. | 16:47:36 |
| 16 | BY MR. HENSSLER: | 16:47:45 |
| 17 | Q.  You'd agree, sir, that there's never to | 16:47:45 |
| 18 | this day been any public disclosure of what you | 16:47:48 |
| 19 | said on that audio that we just listened to, which | 16:47:51 |
| 20 | is Exhibit 28 to today's deposition, where you said | 16:47:53 |
| 21 | Molloy, the motherfucker, came to you and said | 16:47:58 |
| 22 | we've got to drop the quarter 10 million, right? | 16:48:00 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | MR. WAREHAM:  Form and foundation | 16:48:03 |
| 2 | objections. | 16:48:03 |
| 3 | MR. REISNER:  Objection to form and asked | 16:48:03 |
| 4 | and answered four times now. | 16:48:04 |
| 5 | MR. HENSSLER:  You can answer. | 16:48:07 |
| 6 | A.  Yeah.  I wouldn't know why that would need | 16:48:08 |
| 7 | to be disclosed to anyone, to be honest with you. | 16:48:10 |
| 8 | So no, I'm not aware of any public disclosure | 16:48:12 |
| 9 | that's occurred about that $10 million on the | 16:48:15 |
| 10 | 1.3-billion-dollar quarter. | 16:48:19 |
| 11 | Q.  And you sent that audio that we just | 16:48:27 |
| 12 | listened to to Stephanie Ruhle, right? | 16:48:30 |
| 13 | A.  I did.  And to Jen Smith. | 16:48:34 |
| 14 | Q.  And to Jen Smith also? | 16:48:35 |
| 15 | A.  Yes. | 16:48:38 |
| 16 | Q.  Anyone else? | 16:48:38 |
| 17 | A.  I don't believe.  So. | 16:48:39 |
| 18 | Q.  So you shared nonpublic information about | 16:48:41 |
| 19 | Under Armour's business with Stephanie Ruhle at | 16:48:45 |
| 20 | that time, right? | 16:48:47 |
| 21 | MR. REISNER:  Objection to form. | 16:48:48 |
| 22 | MR. WAREHAM:  Form objection, | 16:48:50 |

Page 280

1    foundation.                                          16:48:50

2         A.  Well, she's a confidant.                    16:48:50

3         Q.  What does that mean, confidant?             16:48:52

4         A.  She's someone I can get counsel from.       16:48:53

5         Q.  Did you have a nondisclosure agreement      16:48:55

6    that you'd executed with Ms. Ruhle?                  16:48:58

7         A.  No.                                         16:49:01

8         Q.  Handshake deal?                             16:49:01

9         A.  Yeah.  It was an understanding of trust.    16:49:04

10        Q.  And was that something you guys had a        16:49:06

11   conversation about?                                  16:49:07

12        A.  No, not in detail I don't believe.          16:49:10

13        Q.  So it was just your assumption that you      16:49:12

14   could provide her with nonpublic information about   16:49:13

15   Under Armour's business and she wouldn't mention it  16:49:17

16   to anyone else?                                      16:49:19

17             MR. REISNER:  Objection to form.  You may  16:49:20

18   answer.                                              16:49:21

19        A.  Yeah.  It was understanding the context is  16:49:21

20   that I would give her counsel on her career and she  16:49:24

21   would give me counsel on things I was dealing with   16:49:26

22   that were either banking or media or human nature    16:49:28

Veritext Legal Solutions
866 299-5127

1    in relation.                                        16:49:33

2        Q.  Did Ms. Ruhle give you counsel on what we   16:49:38

3    just listened to where you shared with her the fact 16:49:42

4    that Molloy came to you and said we've got to drop   16:49:45

5    the quarter by 10 million?                           16:49:48

6            MR. REISNER:  Objection to form.             16:49:49

7        A.  Yeah.  I don't believe so, but I don't       16:49:51

8    recall a conversation following it.  As I said, I    16:49:52

9    don't recall making the recording, I don't recall    16:49:57

10   sending the recording out, and I certainly don't     16:49:58

11   recall discussing the recording.                     16:50:01

12                   (Plank Exhibit 29 was marked         16:50:07

13                    for identification.)                16:50:07

14   BY MR. HENSSLER:                                     16:50:07

15       Q.  Let's mark the next exhibit, it's 29.        16:50:07

16       A.  I'm going to start meeting you halfway,      16:50:32

17   Tina.  It's late in the day.                         16:50:34

18           THE REPORTER:  Thank you.                    16:50:37

19           THE WITNESS:  You got it.                    16:50:38

20       Q.  This is Exhibit 29 to today's deposition.    16:50:39

21   It's also been marked Government Exhibit 213.  For   16:50:41

22   the record, Exhibit 29 is Bates UA-IE-10344888.      16:50:44

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | This is you sending that audio file we just | 16:50:53 |
| 2 | listened to to Stephanie Ruhle, right? | 16:50:55 |
| 3 | A.  Yes. | 16:51:00 |
| 4 | Q.  And the e-mail address you sent it to is | 16:51:00 |
| 5 | ██████████████████, right? | 16:51:03 |
| 6 | A.  Yes. | 16:51:08 |
| 7 | Q.  What is that domain, ravenfoundry.com? | 16:51:08 |
| 8 | A.  It was an e-mail address. | 16:51:13 |
| 9 | Q.  Did you create that e-mail address? | 16:51:14 |
| 10 | A.  I didn't personally, but yes, it was part | 16:51:16 |
| 11 | of my -- a group that I had.  I had several phones | 16:51:19 |
| 12 | from there. | 16:51:25 |
| 13 | Q.  So you created a separate e-mail address | 16:51:26 |
| 14 | for yourself for a specific phone? | 16:51:29 |
| 15 | A.  Yes.  I had -- I had two or three of those | 16:51:31 |
| 16 | phones for a number of different reasons, and I | 16:51:35 |
| 17 | gave them to friends of mine to communicate with. | 16:51:37 |
| 18 | Q.  So you gave the phone -- I'm sorry. | 16:51:40 |
| 19 | A.  I said I gave them to friends of mine to | 16:51:44 |
| 20 | communicate with. | 16:51:46 |
| 21 | Q.  So you gave Stephanie Ruhle a phone with | 16:51:46 |
| 22 | this e-mail address? | 16:51:48 |

Veritext Legal Solutions
866 299-5127

1    A.  I did.                                      16:51:49

2    Q.  Who created that e-mail address for you?    16:51:51

3  You said it wasn't you.                           16:51:54

4    A.  Well, whoever the company was.              16:51:55

5    Q.  Did one of your assistants handle that for  16:51:57

6  you or you did that yourself?                     16:51:59

7    A.  I don't recall.                             16:52:02

8    Q.  Is that something you typically do          16:52:04

9  yourself or did you have Jen Smith do that?       16:52:05

10   A.  I probably would have someone from my       16:52:07

11 family office, and Jen Smith worked at Under      16:52:09

12 Armour, not at the family office at that time.    16:52:11

13   Q.  And who was Ms. Ruhle at this time?         16:52:23

14   A.  I'm sorry?                                  16:52:27

15   Q.  Who was Ms. Ruhle?  What was the            16:52:28

16 relationship?                                     16:52:30

17   A.  She's a great friend of mine.              16:52:31

18   Q.  And she did not work for Under Armour,      16:52:33

19 though, right?                                    16:52:35

20   A.  No.                                         16:52:36

21   Q.  She never has worked for Under Armour?     16:52:37

22   A.  No.  Never compensated, never part of it,   16:52:39

Veritext Legal Solutions
866 299-5127

```
1    no.                                                16:52:42

2         Q.  And so she's a great friend and I think   16:52:43

3    you said a confidant; is that right?               16:52:46

4         A.  Yeah.                                      16:52:47

5         Q.  Did she ever fly on the Under Armour jet?  16:52:49

6         A.  Yes, along with 150-plus others.           16:52:52

7         Q.  How many times?                            16:52:57

8         A.  Outside -- people outside of Under         16:52:58

9    Armour.                                             16:52:59

10        Q.  How many times did Ms. Ruhle fly on the    16:53:00

11   Under Armour jet?                                   16:53:01

12        A.  I don't remember.  Less than a handful.    16:53:02

13        Q.  Why did she get to fly on the Under Armour 16:53:04

14   jet?                                                16:53:06

15        A.  Well, because we were probably going to    16:53:06

16   the same place in the same city and leaving from    16:53:09

17   the same destination.                               16:53:11

18        Q.  Did you clear that with the Under Armour   16:53:12

19   board of directors having Ms. Ruhle fly on the      16:53:14

20   Under Armour jet?                                   16:53:15

21        A.  Well, it's actually my jet.  So I lease it 16:53:16

22   to Under Armour for Under Armour business and the   16:53:19
```

| | | |
|---|---|---|
| 1 | company reimburses me for Under Armour-specific | 16:53:20 |
| 2 | travel.  For anything that's outside of that or | 16:53:21 |
| 3 | anybody outside of Under Armour, I would cover that | 16:53:25 |
| 4 | personally or not have that reimbursed. | 16:53:28 |
| 5 | Q.  Under Armour pays you a monthly lease | 16:53:33 |
| 6 | payment for that jet; is that right? | 16:53:34 |
| 7 | A.  Yes.  Well, it depends on the year, but it | 16:53:37 |
| 8 | didn't start until about four or five years into my | 16:53:42 |
| 9 | owning a jet, yes. | 16:53:45 |
| 10 | Q.  In this time frame, around 2016, the | 16:53:47 |
| 11 | company leased the jet from you, though, right? | 16:53:51 |
| 12 | A.  Portions of the jet, yes. | 16:53:54 |
| 13 | Q.  Was it like a regular monthly payment that | 16:53:55 |
| 14 | was made to you from the company for the jet? | 16:53:58 |
| 15 | A.  That was one of the aspects as to how we'd | 16:54:00 |
| 16 | get reimbursed, yes. | 16:54:03 |
| 17 | Q.  So about 166,000 a month? | 16:54:05 |
| 18 | A.  That sounds directionally correct. | 16:54:09 |
| 19 | Q.  It was a black Gulfstream; is that | 16:54:10 |
| 20 | correct? | 16:54:12 |
| 21 | A.  It is. | 16:54:12 |
| 22 | Q.  Did you clear sharing that inside | 16:54:14 |

Page 286

CONFIDENTIAL

1    information about Under Armour with Ms. Ruhle with    16:54:16

2    the Under Armour board of directors?    16:54:18

3         MR. REISNER:  Objection to form, lacks    16:54:20

4    foundation.    16:54:22

5         A.  Yeah.  I'm not drawing the same conclusion    16:54:24

6    you are.    16:54:26

7         Q.  The information that was on the recording    16:54:26

8    of you and Mr. Mirchin talking about Mr. Molloy    16:54:28

9    being a motherfucker for telling you that the    16:54:31

10   company needed to drop the quarter 10 million, did    16:54:33

11   you clear with the board of directors that you were    16:54:36

12   sharing that with somebody outside the company,    16:54:39

13   Stephanie Ruhle?    16:54:41

14        MR. REISNER:  Same objection.  You may    16:54:42

15   answer.    16:54:43

16        A.  I more than likely would have had a    16:54:43

17   conversation with my board of directors to describe    16:54:45

18   the same frustration that I described to Ms. Ruhle    16:54:47

19   regarding Mr. Molloy about asking to take a    16:54:50

20   1.3-billion-dollar quarter down $10 million in    16:54:53

21   outlook.  It was probably a similar frustration.    16:54:58

22   Did I get clearance?  I don't believe that that    16:55:00

Page 287

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | would be -- I don't believe I would think that was | 16:55:02 |
| 2 | something to get clearance on or for for someone | 16:55:05 |
| 3 | that I had in confidence. | 16:55:08 |
| 4 | Q.  So you didn't think you needed the board's | 16:55:11 |
| 5 | clearance to share that inside company information | 16:55:13 |
| 6 | with Ms. Ruhle? | 16:55:15 |
| 7 | MR. REISNER:  Objection to form, assumes | 16:55:16 |
| 8 | facts not in evidence.  You may answer. | 16:55:18 |
| 9 | A.  To call my board to ask them if I can | 16:55:19 |
| 10 | speak to Ms. Ruhle in confidence?  No, I don't feel | 16:55:21 |
| 11 | I need to do that. | 16:55:24 |
| 12 | Q.  Did you share with anyone at the company | 16:55:25 |
| 13 | the fact that you were sharing inside information | 16:55:28 |
| 14 | about Under Armour with Stephanie Ruhle? | 16:55:30 |
| 15 | MR. REISNER:  Objection to form, assumes | 16:55:33 |
| 16 | facts not in evidence.  You may answer. | 16:55:34 |
| 17 | A.  I have a number of different outside | 16:55:35 |
| 18 | advisors who I seek counsel from.  I'm very | 16:55:38 |
| 19 | fortunate to have a great black book or Rolodex or | 16:55:41 |
| 20 | a list of names that I can go to to ask counsel for | 16:55:43 |
| 21 | depending on the situation, and when appropriate I | 16:55:45 |
| 22 | would ask different people for their areas of | 16:55:47 |

Page 288

| | | |
|---|---|---|
| 1 | and put in one place so it wouldn't be violating a | 17:12:52 |
| 2 | quiet period and make sure the people have the | 17:12:55 |
| 3 | facts of just something that we can say. | 17:12:57 |
| 4 | Q.  You wanted this sent to everyone, right, | 17:12:59 |
| 5 | that's why you put it in all caps? | 17:13:02 |
| 6 | MR. REISNER:  Objection to form. | 17:13:04 |
| 7 | A.  I don't recall. | 17:13:04 |
| 8 | Q.  When you put something in all caps like | 17:13:05 |
| 9 | that with an exclamation point, you're adding | 17:13:07 |
| 10 | emphasis, right? | 17:13:09 |
| 11 | A.  Perhaps. | 17:13:11 |
| 12 | Q.  And Darren, Camile, Robbie, and Omar, are | 17:13:14 |
| 13 | those financial analysts that covered Under Armour | 17:13:19 |
| 14 | at the time? | 17:13:21 |
| 15 | A.  Camilo.  No.  Darren is Darren Rovell, | 17:13:23 |
| 16 | Omar was independent, Robbie may have been between | 17:13:31 |
| 17 | banks.  I don't know.  Maybe he was still at Bank | 17:13:34 |
| 18 | of America, but he was an analyst at one time for | 17:13:37 |
| 19 | sure. | 17:13:39 |
| 20 | Q.  Cramer refers to Jim Cramer from CNBC? | 17:13:40 |
| 21 | A.  Yeah. | 17:13:43 |
| 22 | Q.  And then did you personally send these | 17:13:46 |

Veritext Legal Solutions
866 299-5127

```
1    refute the Morgan Stanley report?                17:18:06

2            MR. WAREHAM:  Form, foundation            17:18:08

3    objections.                                       17:18:09

4        A.  I don't recall, but this looks like the   17:18:10

5    basis of facts.                                   17:18:14

6                    (Plank Exhibit 34 was marked      17:18:19

7                    for identification.)              17:18:19

8    BY MR. HENSSLER:                                  17:18:19

9        Q.  Let's look at Exhibit 34.  For the record,17:18:19

10   Exhibit 34 is UA_01171520.  This is an e-mail you 17:18:40

11   sent as part of your job as the CEO, right?       17:18:48

12       A.  I believe, yes.                           17:18:50

13       Q.  On January 11th, 2016 to Stephanie Ruhle  17:18:51

14   at Bloomberg, correct?                            17:18:54

15       A.  Well, it looks like I'm just forwarding   17:18:56

16   her some of the response we're getting to --      17:18:59

17   getting to the report that came out earlier that  17:19:06

18   day.                                              17:19:08

19       Q.  The Morgan Stanley report?                17:19:08

20       A.  Correct.                                  17:19:09

21       Q.  And you wrote in your e-mail at 3:41 on   17:19:09

22   January 11th, 2016 to Ms. Ruhle "These analysts are 17:19:14
```

| | | |
|---|---|---|
| 1 | all over.  Let's get you a list to have them | 17:19:19 |
| 2 | balance that bullshit story poisoning the public | 17:19:22 |
| 3 | markets!"  Right? | 17:19:26 |
| 4 | MR. WAREHAM:  Objection to form. | 17:19:29 |
| 5 | A.  Yeah.  Looks like I probably meant to say | 17:19:30 |
| 6 | "these analysts are all over it." | 17:19:32 |
| 7 | Q.  As in the analysts are covering the Morgan | 17:19:37 |
| 8 | Stanley report? | 17:19:42 |
| 9 | A.  Yeah.  Other people read the report as | 17:19:42 |
| 10 | well and they're reacting to it. | 17:19:44 |
| 11 | Q.  And you're telling Ms. Ruhle that in your | 17:19:46 |
| 12 | opinion the Morgan Stanley report is poisoning the | 17:19:48 |
| 13 | public markets? | 17:19:50 |
| 14 | A.  I can't be sure what I'm talking about | 17:19:54 |
| 15 | there. | 17:19:55 |
| 16 | Q.  The bullshit story that you're referring | 17:19:56 |
| 17 | to, is that the Morgan Stanley report? | 17:19:58 |
| 18 | A.  Probably. | 17:20:00 |
| 19 | Q.  And you sent Ms. Ruhle this analyst report | 17:20:03 |
| 20 | so that she could help you refute the Morgan | 17:20:08 |
| 21 | Stanley report, right? | 17:20:10 |
| 22 | MR. REISNER:  Objection, form, asked and | 17:20:11 |

Veritext Legal Solutions
866 299-5127

1    Q.  Well, your phrase "new math," right?    17:26:03

2    A.  Sure.  I mean, we shared the best ideas.    17:26:05

3    Q.  And you sent it to that ravenfoundry.com    17:26:14

4    e-mail that -- which is the phone that you provided    17:26:18

5    for Ms. Ruhle?    17:26:20

6    A.  Yeah.    17:26:21

7    Q.  And you wrote to Ms. Ruhle "This is how I    17:26:22

8    feel about our opportunity and I plan to drag my    17:26:24

9    team if I have to forward, and, for the record,    17:26:26

10   having you in my life has helped me write this,"    17:26:29

11   correct?    17:26:32

12   A.  Yeah.    17:26:33

13   Q.  The "my team" that you're going to drag    17:26:37

14   forward, that refers to your executive team,    17:26:40

15   right?    17:26:41

16   A.  I think just the Under Armour team in    17:26:42

17   general.    17:26:43

18   Q.  And how did having Ms. Ruhle in your life    17:26:44

19   help you write this e-mail to your executive team?    17:26:47

20   A.  I don't recall, but I think she's a    17:26:51

21   positive force that thinks about moving forward.    17:26:57

22   Q.  And this e-mail was sent to Ms. Ruhle    17:26:59

Veritext Legal Solutions
866 299-5127

```
 1    during a quiet period, correct?              17:27:01

 2         A.  Yeah.  It was sent to that confidential  17:27:05

 3    e-mail.                                       17:27:08

 4         Q.  Two days before the investor call, right?  17:27:08

 5         A.  Well, as I said, I had her as someone in  17:27:11

 6    confidence.                                   17:27:13

 7         Q.  There was no agreement that anything was  17:27:14

 8    confidential, right?                          17:27:15

 9              MR. REISNER:  Objection to form,    17:27:16

10    misstates --                                  17:27:18

11         A.  There was an agreement.  There was   17:27:18

12    certainly an understanding that it was not to be  17:27:20

13    shared with anyone of anything we discuss, and the  17:27:21

14    same thing regarding her career.              17:27:25

15         Q.  So what was the agreement?           17:27:28

16         A.  There's an understanding of          17:27:31

17    confidentiality, to be able to discuss things that  17:27:33

18    wouldn't be shared.                           17:27:37

19              You know what?  I'm either going to fill  17:27:43

20    that bottle or I need to use the restroom as  17:27:45

21    well.                                         17:27:48

22              MR. REISNER:  Can we go off the record and  17:27:48
```

Veritext Legal Solutions
866 299-5127

```
1    take a break.  Thank you.                    17:27:49

2            THE VIDEOGRAPHER:  Going off the record at  17:27:51

3    17:27.                                        17:27:53

4                    (A break was had.)            17:39:25

5            THE VIDEOGRAPHER:  We're back on the  17:39:31

6    record at 17:39.                              17:39:32

7    BY MR. HENSSLER:                              17:39:48

8        Q.  Welcome back.  You understand you're still  17:39:48

9    under oath?                                   17:39:49

10       A.  Yes.                                   17:39:50

11       Q.  And when we took a break you were talking  17:39:50

12   about what you described as the agreement that you  17:39:53

13   had with Stephanie Ruhle.  Could you please   17:39:56

14   describe this confidentiality agreement that you  17:40:01

15   had with Ms. Ruhle.                           17:40:02

16       A.  It's just an understanding that I had with  17:40:04

17   a few expert advisors from different fields that  17:40:06

18   give me counsel, mentors, friends from time to  17:40:09

19   time,                                         17:40:12

20       Q.  I'm specifically asking about the     17:40:15

21   agreement with Ms. Ruhle.  Nothing in writing,  17:40:17

22   though, right?                                17:40:20
```

Page 319

1    A.  No, but it's a sophisticated banker who    17:40:21

2  understands finance, Wall Street, and as well with    17:40:24

3  media.  So there's definitely a depth of    17:40:30

4  understanding that she would know the consequences    17:40:32

5  of breaching any of that confidentiality.    17:40:34

6    Q.  What would be the consequences?    17:40:37

7    A.  I think it would be very dangerous things    17:40:40

8  to do.    17:40:42

9    Q.  What do you mean?    17:40:43

10    A.  Inside trading, things like that, trading    17:40:44

11  any of that information, but she wouldn't own the    17:40:47

12  stock, trade in the stock, advise on the stock.    17:40:50

13    Q.  We were looking at Exhibit 36.  Do you    17:40:58

14  still have that in front of you?  It's the    17:41:01

15  July 24th, 2016 e-mail that you sent to Ms. Ruhle.    17:41:06

16    A.  Yes.  Got it.    17:41:11

17    Q.  You didn't clear with anybody that you    17:41:11

18  were sharing this information about Under Armour    17:41:14

19  with Ms. Ruhle, correct?    17:41:17

20    A.  No.  And -- no.    17:41:18

21    Q.  Okay.  We can put that one aside.    17:41:20

22    Let's talk about the 3Q '16 investor call,    17:41:24

1    advise...," right?                                    17:42:43

2        A.  Yeah.                                         17:42:45

3        Q.  And then in your e-mail to Ms. Ruhle you     17:42:48

4    wrote "Please read the attached script.  This was    17:42:52

5    my first stab at the answer to the big question.  I  17:42:58

6    have evolved since this version and working the      17:43:02

7    edges of it now...," correct?                        17:43:05

8        A.  Yeah.                                         17:43:08

9        Q.  And the big question that you were           17:43:11

10   answering, does that refer to what you wrote in the  17:43:13

11   next line of your e-mail where it says "What's the   17:43:16

12   new news since investor day September 2015 was       17:43:19

13   800 million and now is 600M-ish??"?                   17:43:24

14       A.  I don't recall specifically, but that        17:43:32

15   could be it, yes.                                     17:43:33

16       Q.  The "new news" in that line of your          17:43:34

17   e-mail, that does refer to the operating income      17:43:36

18   that was 800 million and now is going to be guided   17:43:38

19   to 600 million-ish, right?                           17:43:43

20          MR. REISNER:  Objection to form.  You may     17:43:45

21   answer.                                              17:43:49

22       A.  Yes.                                          17:43:50

Veritext Legal Solutions
866 299-5127

1    Q.  You'd agree that the fact that Under            17:43:50

2   Armour was going to drop operating income guidance   17:43:52

3   was material nonpublic information at this time,      17:43:56

4   right?                                               17:43:58

5    A.  Yeah, certainly.  This is the eve before        17:43:59

6   our earnings call after the close of the market and  17:44:03

7   looking at seeking counsel on how we could           17:44:06

8   articulate this message to our shareholders and the  17:44:11

9   broader media community.                             17:44:13

10   Q.  And you understand if somebody had this          17:44:14

11  information, a short sale, for example, they could   17:44:16

12  utilize that information, right?                     17:44:18

13       MR. REISNER:  Objection to form.                17:44:21

14       MR. WAREHAM:  Objection to form,                17:44:21

15  foundation, mischaracterizes the testimony.          17:44:22

16   A.  Yeah.  If someone traded on that                17:44:24

17  information, sure.                                   17:44:26

18   Q.  Let's look at another part of this e-mail       17:44:36

19  you sent to Ms. Ruhle.  The second full paragraph    17:44:38

20  you see there's a star and it says "All those are    17:44:41

21  just"?                                               17:44:43

22   A.  Yes.                                            17:44:47

| | | |
|---|---|---|
| 1 | going to speak over each other.  We just have to | 17:48:37 |
| 2 | make the record.  So I apologize.  We're not | 17:48:37 |
| 3 | prescient.  I can't tell when he's going to speak, | 17:48:37 |
| 4 | and he can't tell when I'm going to speak.  So | 17:48:37 |
| 5 | we'll slow it down.  You'll get it right. | 17:48:37 |
| 6 | THE REPORTER:  I'd appreciate it.  It's | 17:48:37 |
| 7 | been a long day. | 17:48:37 |
| 8 | THE WITNESS:  Jamie, you give the | 17:48:39 |
| 9 | objection this time. | 17:48:40 |
| 10 | MR. WAREHAM:  Form, foundation objections. | 17:48:42 |
| 11 | BY THE WITNESS: | 17:48:47 |
| 12 | A.  What was the question again? | 17:48:47 |
| 13 | Q.  Happy to restate it. | 17:48:48 |
| 14 | You'd agree, sir, that you did share | 17:48:50 |
| 15 | material nonpublic information about Under Armour's | 17:48:53 |
| 16 | business during the quiet period by sending this | 17:48:55 |
| 17 | e-mail to Ms. Ruhle, which is Exhibit 37? | 17:48:58 |
| 18 | MR. WAREHAM:  Form, foundation, | 17:49:01 |
| 19 | competence, calls for multiple legal conclusions. | 17:49:02 |
| 20 | Go ahead and answer. | 17:49:05 |
| 21 | A.  I sent this to her the night before the | 17:49:06 |
| 22 | earnings call, yes, which is technically in the | 17:49:08 |

Page 328

```
1    quiet period but doesn't violate anything within my    17:49:10

2    understanding of trust.                                17:49:14

3         Q.  And you also agree that this was material     17:49:16

4    nonpublic information, the fact that Under Armour       17:49:19

5    was dropping operating income, correct?                17:49:21

6              MR. REISNER:  Objection.                      17:49:23

7              MR. WAREHAM:  Same objections, form,          17:49:24

8    foundation, competence, calls for a legal               17:49:25

9    conclusion.                                             17:49:28

10             MR. REISNER:  And asked and answered.         17:49:29

11        A.  Yeah.  I don't know how many times I can       17:49:31

12   tell you.  I had an understanding of trust with         17:49:32

13   her.  She didn't trade in this, her family doesn't      17:49:36

14   trade in this.  She's simply giving me input, the       17:49:39

15   same way I talked to sophist- -- this was a -- yes,     17:49:42

16   this was -- this was during -- during the quiet         17:49:48

17   period technically, yes.                                17:49:49

18        Q.  And it was material nonpublic information?     17:49:51

19             MR. WAREHAM:  Same objections, form,          17:49:53

20   foundation, competence, calls for a legal               17:49:54

21   conclusion.                                             17:49:57

22        A.  That was not to be traded on or moved or       17:49:57
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | acted on, just simply to give reaction to myself. | 17:50:00 |
| 2 | Q.  The answer's yes? | 17:50:04 |
| 3 | MR. WAREHAM:  Form, foundation, | 17:50:05 |
| 4 | competence, legal conclusion objections. | 17:50:07 |
| 5 | A.  Yeah.  Good job. | 17:50:09 |
| 6 | Q.  At some point, Mr. Frank, your | 17:50:18 |
| 7 | relationship with Ms. Ruhle was brought to the | 17:50:20 |
| 8 | attention of the Under Armour board of directors, | 17:50:23 |
| 9 | correct? | 17:50:25 |
| 10 | A.  My relationship, yes. | 17:50:25 |
| 11 | Q.  And do you know who alerted the Under | 17:50:27 |
| 12 | Armour board of directors to your relationship with | 17:50:29 |
| 13 | Ms. Ruhle? | 17:50:33 |
| 14 | A.  No. | 17:50:33 |
| 15 | Q.  You never heard anything about who that | 17:50:36 |
| 16 | might have been? | 17:50:37 |
| 17 | A.  This isn't a topic that I was -- I'm | 17:50:40 |
| 18 | interested in. | 17:50:42 |
| 19 | Q.  Someone at Under Armour uncovered certain | 17:50:44 |
| 20 | e-mails between you and Ms. Ruhle, right? | 17:50:47 |
| 21 | A.  I'm not aware. | 17:50:49 |
| 22 | Q.  Did the board of directors see the e-mails | 17:50:53 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | that we have just looked at where you shared | 17:50:56 |
| 2 | information on Under Armour with Ms. Ruhle during | 17:50:59 |
| 3 | various quiet periods? | 17:51:01 |
| 4 | MR. REISNER:  Objection to form, | 17:51:02 |
| 5 | foundation, competence. | 17:51:03 |
| 6 | A.  Yeah, they did. | 17:51:04 |
| 7 | Q.  And then did they question you about the | 17:51:06 |
| 8 | e-mails that we've just looked at where you shared | 17:51:07 |
| 9 | confidential Under Armour information with | 17:51:10 |
| 10 | Ms. Ruhle during various quiet periods? | 17:51:13 |
| 11 | MR. WAREHAM:  Form, foundation, | 17:51:15 |
| 12 | competence, legal conclusion, objections. | 17:51:17 |
| 13 | A.  I spoke with our lead director, yes. | 17:51:17 |
| 14 | Q.  Who's that? | 17:51:19 |
| 15 | A.  It was Buzzy Krongard at the time. | 17:51:20 |
| 16 | Q.  And did he ask you questions about those | 17:51:23 |
| 17 | e-mails that you sent Ms. Ruhle? | 17:51:25 |
| 18 | A.  Yeah. | 17:51:27 |
| 19 | Q.  What did he ask you? | 17:51:29 |
| 20 | A.  I explained to him the nature of our | 17:51:30 |
| 21 | relationship and the mutual understanding of | 17:51:32 |
| 22 | respect and confidence that we had. | 17:51:36 |

Veritext Legal Solutions
866 299-5127

1    Q.  What else did he ask you?                    17:51:41

2    A.  I don't recall.                              17:51:43

3    Q.  Do you recall about when that was?           17:51:46

4    A.  I don't recall.  Was it '18?  '18 or 19?     17:51:52

5  '17, '18, '19.  I don't remember.                  17:51:59

6    Q.  So it was just a one-on-one with the head    17:52:02

7  of the board?                                       17:52:04

8    A.  The conversations I had, yes, in depth was   17:52:05

9  with Buzzy Krongard --                              17:52:08

10   Q.  Did the --                                    17:52:10

11   A.  -- our lead director.                         17:52:10

12   Q.  I'm sorry.                                    17:52:11

13       Did the Under Armour board of directors      17:52:13

14 take any further actions about what they uncovered 17:52:14

15 about the e-mails to Ms. Ruhle?                     17:52:17

16   A.  I think they wrote -- they wrote a note      17:52:19

17 for a file for me I believe is what happened.       17:52:21

18   Q.  Did they ask you to stop doing that?         17:52:25

19   A.  Yeah.  They asked to -- that they wouldn't   17:52:29

20 look fondly on sharing that information.  I         17:52:32

21 explained the mutual understanding, and they        17:52:35

22 understood it and just said, yep, as a result of    17:52:38

Page 332

| | | |
|---|---|---|
| 1 | that we're advising you not to do that.  I said | 17:52:41 |
| 2 | thanks very much, that's really helpful, but we | 17:52:46 |
| 3 | didn't feel any obligation -- we checked with | 17:52:49 |
| 4 | counsel.  We didn't feel any obligation to | 17:52:51 |
| 5 | disclose, to notify anyone, and there was no breach | 17:52:53 |
| 6 | or any evidence of anybody doing anything outside | 17:52:56 |
| 7 | of other than just exchanging information with one | 17:52:58 |
| 8 | another from time to time. | 17:53:01 |
| 9 | Q.  So the board instructed you to stop that | 17:53:02 |
| 10 | practice? | 17:53:06 |
| 11 | A.  What practice? | 17:53:07 |
| 12 | Q.  Sharing company inside information with | 17:53:08 |
| 13 | Stephanie Ruhle. | 17:53:10 |
| 14 | MR. REISNER:  Objection to form. | 17:53:11 |
| 15 | A.  No.  They simply just asked -- there | 17:53:12 |
| 16 | wasn't anything to go to that level of detail, but | 17:53:15 |
| 17 | yeah, they asked please don't e-mail, don't share | 17:53:17 |
| 18 | back.  You'll have your advisors, talk to who you | 17:53:20 |
| 19 | need to talk to.  That was it. | 17:53:25 |
| 20 | Q.  Did they say it's okay to continue sharing | 17:53:27 |
| 21 | nonpublic information about the company with | 17:53:29 |
| 22 | Stephanie Ruhle? | 17:53:32 |

Veritext Legal Solutions
866 299-5127

```
 1        A.  I don't think that was the view.  I think    17:53:33

 2   the ask was -- yeah, the sending the e-mail over       17:53:37

 3   the script was one that I didn't have a                17:53:41

 4   recollection of that either and that's one that was    17:53:46

 5   pretty arresting to me, but yeah, because I could      17:53:50

 6   see how that would be perceived and it would make      17:53:53

 7   people uncomfortable and it would really press         17:53:56

 8   the -- you know, the confidence from Ms. Ruhle too.    17:53:58

 9   So I don't think that put her in a very fair           17:54:01

10   position and I don't think it was the right thing      17:54:03

11   for our board or myself.  And so I acknowledged.  I    17:54:05

12   agreed with, you know, Mr. Krongard and said I         17:54:07

13   wouldn't do that again.                                17:54:09

14        Q.  And did you then after that conversation      17:54:12

15   with Mr. Krongard stop sharing inside company          17:54:15

16   information with Ms. Ruhle?                            17:54:20

17             MR. REISNER:  Objection to form, assumes     17:54:21

18   facts not in evidence.  You may answer.                17:54:23

19        A.  I mean, we continued to talk, I continued     17:54:25

20   to use Ms. Ruhle as an advisor -- I mean, as           17:54:27

21   someone that I would share information with.           17:54:30

22        Q.  So you disregarded Mr. Krongard's             17:54:33
```

Veritext Legal Solutions
866 299-5127