# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | **JURY TRIAL DEMANDED** |

**CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..........................................................................................1

II.  SUMMARY OF THE ACTION ....................................................................2

III.  JURISDICTION AND VENUE ....................................................................9

IV.  PARTIES ....................................................................................................10

V.  SUBSTANTIVE ALLEGATIONS .............................................................13

     A.  Background of the Company ...................................................13

     B.  Plank Drove Under Armour's Aggressive Growth Strategy ....................14

     C.  Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined ...........................................................16

     D.  Under Armour Ramps Up Its Promotional Activity .................................18

     E.  Defendants Engaged in Suspect Sales Practices to Further Mask Slowing Demand and Maintain the Company's 20% Growth Streak .....................20

          1.  Defendants Pull-Forward Sales and Stuff Channels to Artificially Boost Revenues .............................................................20

          2.  Defendants Induce Retailers to Take Unneeded Product with Promises to Buyback Merchandise and Through Discounts and Other Sweeteners .........................................................24

     F.  Defendants' Declining Apparel Sales and Suspect Sales Practices Led to Excess Inventory and Liquidations ...........................................26

     G.  Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines ....................................29

     H.  Under Armour's Declining Demand and Unsustainable Business Practices Catch Up to Them but Defendants Mislead the Market as to the True Reasons Behind the Company's Problems .................................31

     I.  The Market Began to Learn the Truth About the Company's Sales Problems, Causing the Stock Price to Decline ...........................................33

     J.  The SEC and DOJ Launched Investigations Into Under Armour's Accounting Practices and Related Disclosures, Plank Stepped Down as the Company's Chief Executive Officer, and the SEC Preliminarily Determined to File an Enforcement Action Against Defendants .............35

i

K. Numerous Facts Support Defendants' Scienter ..........................................38

 1. Numerous Facts Support Plank's Scienter.....................................38

  a. Plank Had Direct Knowledge of, and Was Personally Implicated in, the Fraud ....................................................38

  b. Plank's Public Statements and Access to the Company's Internal Systems and Data ..................................................40

  c. The SportScan Data Cited in the Morgan Stanley Report Mirrored the Company's Internal Sales Data ...................43

  d. Plank's Participation in Company Meetings.....................47

  e. Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value ...................49

 2. The Scienter of Company Executives Is Imputed to Defendant Under Armour ..................................................................................56

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...............................................................................................60

 A. 2015 Investor Day.......................................................................62

 B. Third Quarter 2015 Financial Results........................................65

VII. INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET ..................................................71

 A. Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour .......................................................72

 B. Misleadingly Positive Fourth Quarter 2015 and Fiscal Year 2015 Financial Results and Downplay of the Morgan Stanley Report..............75

 C. Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy ...........................................................83

 D. Misleadingly Positive First Quarter 2016 Financial Results and Guidance Raise .........................................................................84

 E. Departures of the Company's Chief Merchandising Officer and Chief Digital Officer ..........................................................................91

 F. Reduced Financial Guidance Tied to the Sports Authority Bankruptcy....93

Page

G. Under Armour Bond Offering ...................................................96

H. Disappointing Second Quarter 2016 Financial Results: Partial
Revelations of a Growth Slowdown ........................................97

I. Goldman Sachs Global Retailing Conference .........................106

J. Disappointing Third Quarter 2016 Financial Results: Further
Revelations of a Growth Slowdown and Compressed Margins .............108

K. Disappointing Fourth Quarter 2016 and Fiscal Year 2016 Financial
Results: Revelations of a Severe Growth Slowdown and the Sudden
Resignation of CFO Molloy....................................................116

L. The Fallout From the Fraud Continued, but Defendants Conceal the Full
Truth From Investors .............................................................125

M. The Company Announces Plank's Resignation as CEO ........................136

N. Federal Investigations Into the Company's Accounting Practices and
Related Disclosures..............................................................137

VIII. DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND
MISLEADING FINANCIAL STATEMENTS .................................144

A. Under Armour Failed to Disclose Its Improper Sales Practices .............145

1. The Financial Impact of Channel Stuffing on Under Armour's
Quarterly Revenue ....................................................148

2. The Impact of Channel Stuffing on Future Results ....................149

B. Under Armour's Continued Growth Was Achieved by Improperly
Recognizing Revenue on Contingent Sales and Understating Reserves
for Customer Returns, Allowances, Markdowns, and Discounts ...........150

1. Improper Contingent Sales .......................................150

C. Improper Reserves for Customer Returns, Allowances, Markdowns, and
Discounts..........................................................................154

D. Under Armour Overstated Inventory .......................................157

IX. POST-CLASS PERIOD REVELATIONS.........................................159

X. LOSS CAUSATION AND ECONOMIC LOSS....................................164

A. January 10, 2016 Revelations ...............................................165

**Page**

B.    May 3, 2016 Revelations ........................................................165

C.    May 31, 2016 Revelations ......................................................166

D.    July 26, 2016 Revelations ......................................................166

E.    October 25, 2016 Revelations ................................................167

F.    January 31, 2017 Revelations ................................................167

G.    August 1, 2017 Revelations ..................................................167

H.    November 3, 2019 Revelations..............................................168

XI.    PRESUMPTION OF RELIANCE ....................................................170

XII.    NO SAFE HARBOR .........................................................................172

XIII.    CLASS ACTION ALLEGATIONS ..................................................174

## I.      INTRODUCTION

1.      Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen"), Monroe County Employees' Retirement System ("Monroe"), and KBC Asset Management NV ("KBC") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.      Plaintiffs bring this federal class action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Under Armour, Inc. ("Under Armour" or "Company") between September 16, 2015, and November 1, 2019, inclusive ("Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants Under Armour and the Company's former Chief Executive Officer ("CEO") and Chairman of the Board Kevin A. Plank ("Plank") (collectively, "Defendants").

3.      Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel which included, without limitation: (a) review and analysis of public filings made by Under Armour and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties; (e) interviews with factual sources, including individuals formerly employed by the Company and its retail partners; and (f) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

4.     Under Armour is one of the largest sports apparel companies in the world.  The Company sells branded athletic products, which it divides into three categories: apparel, footwear, and accessories.  By a wide margin, apparel is the Company's largest selling product, accounting for over two-thirds of net revenue in 2016.  During the Class Period, nearly two-thirds of the Company's sales were made through wholesale channels such as sporting goods chains (*e.g.*, Dick's Sporting Goods ("Dick's"), Foot Locker, Champs, Finish Line, and The Sports Authority ("Sports Authority" or "TSA")).  While Under Armour products are available worldwide, over three-quarters of its sales come from North America.  According to Plank, North American apparel is the Company's "largest and most profitable business by far."

5.     Under Armour faces steep competition in the athletic apparel industry.  The Company's chief rivals, Nike and Adidas, have dominated the sector for decades.  But the Company slowly gained market share since its formation in 1996, capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour surpassed Adidas to become the number two sportswear brand by revenue in the United States and seemed poised to challenge Nike's supremacy as the top brand.

6.     Defendants knew that growth was critical to keep pace with competitors and to perpetuate the market's perception of the Company as a leading premium sports brand.  For 26 consecutive quarters, spanning from the second quarter of 2010 ("2Q10") to the third quarter of 2016 ("3Q16"), Under Armour reported a compounded annual growth rate of 20% or more.  At every turn, Plank reminded investors of this feat, noting that it was shared by only one other company in the S&P 500, and assured the market that such growth would continue, and continue as a premium-priced brand.

7.     Indeed, at the start of the Class Period, during the Company's Investor Day on September 16, 2015 ("2015 Investor Day"), Defendants boasted that "demand for our brand has never been stronger" and led the market to believe that the Company's incredible growth streak would continue.

8.     In reality, however, the Company was experiencing a severe decline in its apparel business due to its "brand heat" (*i.e.*, customer demand) dying.  In other words, customer demand for core products that the Company had successfully sold for years had begun to wane.  As Defendants would later admit, the Company failed to compensate for this decline by offering new and fashionable products in line with the latest consumer trends, such as athletic leisure apparel (a.k.a. "lifestyle" or "athleisure").  As a result, the Company's apparel sales began to slow, causing it to lose market share to Nike and Adidas.

9.     Although this slowdown in demand was apparent to Defendants in 2015, Plank demanded that Under Armour maintain aggressive sales goals based on its historic 20% growth that were now unrealistic.  However, it was never acceptable within the Company to lower these unrealistic goals – even after the Company's second biggest account, Sports Authority, declared bankruptcy.

10.    Accordingly, the Company abandoned its fundamental sales philosophy of competing on brand strength over price, and resorted to lowering sales prices and offering promotions and liquidating excess inventory.   Defendants' steep discounting, however, contributed to a drop in the Company's average sales prices ("ASPs") at a time when competitors in the sports apparel industry, such as the Company's chief rival Nike, were steadily increasing their own ASPs.  Defendants also attempted to offset the decline of the Company's core apparel business by accelerating investments in lower margin footwear products and international

expansion, which provided a scapegoat for the Company's margin declines.  While these strategies helped to temporarily prop up revenue growth, they were alone insufficient to generate the sales necessary to continue the Company's growth streak of 20%.

11.     As a result, Defendants resorted to a slew of improper and/or concealed sales and accounting practices that violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations.  These practices were used repeatedly in 2015 and/or 2016, with multiple retailers such as the Company's largest customers, Dick's and Sports Authority, and included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, resulting in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.X. Co.[1] so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at the Company's own stores; and (f) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy and collectability of the revenue was not probable. These suspect sales practices enabled the Company to increase quarterly revenue, mask slowing demand for Under Armour products, and extend the 26-quarter streak of 20% sales growth. However, these illicit tactics were unsustainable.  Although they helped Under Armour hit the

---

[1]    T.J.X. Co. is an American multinational off-price department store corporation that includes TJ Maxx, Marshalls, HomeGoods, Homesense, and Sierra in the United States.

number and close the gap, they were robbing from future quarters.  As one former Under Armour sales executive explained to *The Wall Street Journal* ("WSJ"), the "[p]roblem is once this starts it doesn't seem to stop.  We found ourselves pulling forward every quarter."[2]

12.     The strains on Under Armour's business were evident inside the Company, as were the Company's suspect sales practices.  Plank and other executives knew of the Company's fading brand heat, excess inventories, steep discounting, pull forwards, and other machinations employed to boost revenue and hit Plank's aggressive sales targets.  Indeed, the U.S. Department of Justice ("DOJ") and SEC are investigating Defendants' involvement in these practices, including emails that show Plank knew about efforts to move revenue between quarters.[3]

13.     However, to preserve the Company's carefully cultivated image as a fast-growing, premium sports brand and a legitimate challenger to Nike, Defendants concealed the Company's problems and improper accounting and sales practices during the Class Period.  Rather than explain to the market that brand heat for the Company's apparel was dying and that the Company was forced to employ improper accounting and sales tricks to maintain a façade of consistent growth, Defendants instead falsely claimed that Under Armour apparel sales were stronger than ever. Plank trumpeted explosive growth and strong customer demand, while downplaying and concealing the Company's suspect sales practices, declining brand heat, ballooning inventory, liquidations, and gross margin compression.  And, despite these negative trends afflicting the Company's core business, Defendants doubled down on their fraud by repeatedly emphasizing the purportedly continuing premium brand strategy.

---

[2]     Ex. A, Khadeeja Safdar & Aruna Viswanatha, *Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter'*, WALL ST. J., Nov. 14, 2019, at 3.

[3]     *See id.* at 2; *see also* Ex. B, Aruna Viswanatha & Khadeeja Safdar, *Under Armour Is Subject of Federal Accounting Probes*, WALL ST. J., Nov. 3, 2019, at 1.

14.     As a result, Under Armour's common stock prices were artificially inflated throughout the Class Period.  In fact, analysts noted that Under Armour stock achieved an "unprecedented valuation" near the beginning of the Class Period.  Plank personally cashed in on this artificial inflation (and the "unprecedented valuation") by selling a substantial amount of his Company stock for total proceeds of $138.2 million during the Class Period.  As detailed below, these sales were suspicious in timing and amount.  Indeed, over just nine days in November 2015 and April 2016, Plank sold 36% and 42%, respectively, of the shares he had available to sell shortly after making material misstatements and omissions.  Since 2016, Plank has not sold a single share of his Company stock.  Defendants also leveraged their fraud by raising nearly $600 million from the sale of then-investment grade bonds ("Bonds") during the Class Period.

15.     The first cracks in Under Armour's veneer began to appear on January 10, 2016, when Morgan Stanley published a report relying on fact-based industry sales data that revealed declining ASPs, market share, and margins since spring 2015, before the start of the Class Period.[4] The sales data in the report was materially consistent with Under Armour's own internal sales data available to Defendants, through multiple sources.  In response to the Morgan Stanley Report, Under Armour's stock price declined sharply, which represented the beginning of a decline in Under Armour common stock prices as the truth began to emerge.  However, Defendants denied the report and reassured investors that the Company's financial results and prospects were as strong as ever and that the Company was and would continue to be a premium brand that would not compete on price.  The market credited the Company's claim with numerous analysts issuing

---

[4]     Ex. C, Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016) ("Morgan Stanley Report").

reports stating that Under Armour was now pursuing its premium-priced strategy even more aggressively.

16.     Ultimately, the Company was no longer able to keep the charade going.  The Company's illicit and unsustainable sales practices were no longer able to prop up Under Armour's sales, and its purported growth streak came to a crashing halt in the fourth quarter of 2016.  Despite months of pushback from Defendants against the Morgan Stanley Report data and their assurances that Under Armour would continue to grow and that its brand was strong, the market continued to learn of Under Armour's true financial condition through a series of additional disclosures, including a dramatic slowdown in growth, compressed margins, excess inventory, and Company executive resignations that included two of the Company's Chief Financial Officers ("CFO"), Brad Dickerson ("Dickerson") and Lawrence P. Molloy ("Molloy") (who left after only 13 months on the job).  The market's reaction to these partial revelations caused precipitous drops in Under Armour's common stock prices and losses of millions of dollars by Under Armour's investors.

17.     Yet Plank – despite knowing of the Company's efforts to move revenue between quarters and the strains in Under Armour's business – continued to tell investors that that "our demand is still there," that Under Armour's revenue growth and "growth story" were "intact," that its "brand is truly stronger than it's ever been," and that the Company's problems were "due to the function of our extreme growth."  The Company's downward spiral continued thereafter, confirming the depth of the problems alleged herein.  Under Armour continued to report drastically reduced sales growth, lower margins, and excess inventory.  The Company also went through a massive restructuring in an attempt to restore the Company's brand heat, including an evolution from Under Armour's traditional performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."

18.     Defendants continued to conceal the full truth from investors, including the illicit sales practices they had used to buoy sales growth for more than a year and that the DOJ and SEC were investigating the Company's revenue-recognition, accounting and sales practices, Molloy's tenure, and its late 2016 results.

19.     On October 22, 2019, Under Armour announced suddenly that Plank was stepping down as CEO.  This came as a surprise because Plank had repeatedly told shareholders that "maintaining our founder-led approach" was so important that it required recapitalizing the Company, which he did by creating a new class of common shares that allowed him to stay in control of Under Armour.  Defendants again failed to reveal the true reason behind his departure. Less than two weeks later, on November 3, 2019, WSJ surprised the market further by revealing that the DOJ and SEC were conducting criminal and civil securities fraud investigations into whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results "appear healthier" than they actually were.[5]  This article forced the Company to issue a statement confirming the ongoing investigations and admitting that they had hidden them from investors for nearly three years: "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[6]

20.     Under Armour later disclosed that, as a result of the SEC's investigation, the Company, Plank, and Molloy's successor, CFO David E. Bergman ("Bergman"), each received a Wells Notice informing them that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the

---

[5]     Ex. B, at 1.

[6]     *Id.* at 2.

Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters." "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives." Notably, the Wells Notices concern the same time period in which Plank reaped profits of $138.2 million from his sales of Under Armour stock.

21.     Under Armour subsequently provided additional information about the Wells Notices, including that the Wells Notices informed Defendants that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."

## III.    JURISDICTION AND VENUE

22.     The Exchange Act claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Under Armour conducts substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

25.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United

States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.  PARTIES

26.    Plaintiff Aberdeen was appointed to serve as Lead Plaintiff in this action by the Orders of this Court dated April 26, 2017 [ECF No. 13] and September 14, 2020 [ECF No. 150]. As shown in the certification filed with the Court on January 6, 2020 and attached hereto as Exhibit D, Aberdeen purchased or otherwise acquired 815,726 shares of Class A and Class C Under Armour common stock at artificially inflated prices during the Class Period.[7]

27.    As shown in the certification attached hereto as Exhibit E, Monroe purchased Class A Common Stock of Under Armour at artificially inflated prices during the Class Period.

28.    As shown in the certification attached hereto as Exhibit F, KBC's funds purchased Class A Common Stock of Under Armour at artificially inflated prices during the Class Period.

29.    Plaintiffs suffered economic losses when true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the prices of such common stock.

30.    Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230.

---

[7]    The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common Stock outstanding and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

31.     Defendant Plank is the founder of Under Armour and served as CEO and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through January 1, 2020, when he stepped down as CEO and transitioned to Executive Chairman and Brand Chief.  Plank spoke on Under Armour's behalf during conference calls, in press releases, and in the media.  Plank was also the Company's largest shareholder throughout the Class Period, beneficially owning just over 15% of all shares outstanding and controlling approximately 65% of the voting shares.  Plank went to great lengths to maintain control of the Company, as demonstrated by a massive recapitalization during the Class Period that solidified Plank's control.  Since its Initial Public Offering ("IPO") in 2005, the Company had two classes of stock, Class A and Class B.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded and carries ten votes per share.  As of October 28, 2015, Plank held 35,700,000 ten-vote Class B shares and 76,445 one-vote Class A shares, giving him 66.5% of the votes.

32.     In the years following the 2005 IPO, events such as the issuance of new Class A stock and employee stock compensation, among other things, diluted Plank's ownership share and put his voting control of the Company at risk.  A provision in Under Armour's charter provides that should Plank's ownership stake fall below 15%, Plank's ten-vote Class B shares would automatically convert to one-vote Class A shares and, thereby, divest Plank of his voting power, which would fall from 65% to below 15%.  As one analyst noted, "Given there have been two splits in the last three years, his ownership has already been diluted, which is why it is becoming dangerously close to the 15% threshold."  In 2015, to prevent that from happening, Plank caused the Company to adopt several amendments to its charter centered on ensuring that Plank would

not lose voting control.  Specifically, the Company resolved in July 2015 to issue a third class of common stock: Class C (NYSE: UA).  The new Class C stock would have zero votes.

33.     Plank publicly lobbied for the Class C issuance in a June 15, 2015, letter to shareholders.  Plank acknowledged that the Company's dual-class structure was designed to ensure he "retain control over significant decisions impacting Under Armour's future."  Plank warned that diluting his ownership stake "could ultimately undermine our current governance structure" and claimed that "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders."  Plank's letter further touted the purported benefit of giving him "flexibility of selling these non-voting shares . . . while maintaining our founder-led approach."  Importantly, the related amendments to the Company's charter included a provision limiting the amount of shares Plank could sell in any given year to 2.5 million shares, with potential rollover starting in 2017.

34.     On April 7, 2016, the Class C shares were issued as a 1:1 dividend to all holders of Class A and Class B shares.  The benefit to Plank was two-pronged.  First, the Company could use the zero-vote Class C shares for employee stock-based compensation and financing transactions, *e.g.*, acquisitions involving Company stock, without diluting Plank's voting power.  Second, as discussed further below, Plank could sell Class C shares without reducing his voting power – as he did just a few weeks after the Class C shares were issued.

35.     Although the Class C issuance demonstrated the lengths Plank would go to maintain control of the company he founded, it was not well received by all.  As a July 24, 2015, analyst report issued by Morningstar Equity Research ("Morningstar") noted, the "addition of a Class C stock . . . can hardly be an improvement for shareholders as a whole."  Likewise, contemporaneous media noted, "the move by Under Armour will no doubt stoke the ire of some

- 12 -

corporate governance experts and academics in the field.  Any time a single person has more voting power in a publicly traded company than her or his proportional ownership stake in that company, there will be potential conflict."

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background of the Company

36.    Under Armour was founded in 1996 by Plank, a 23-year-old former University of Maryland football player, who engineered a t-shirt using a synthetic fabric, with moisture-wicking performance fibers that helped keep athletes cool and dry under hot conditions.  The Company specializes in highly technical, performance-oriented athletic apparel, such as ColdGear, HeatGear, and AllSeasonGear styles designed to enhance comfort and mobility and regulate body temperature in different types of weather.  Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

37.    Over the years, the Company's product lineup has expanded from a single shirt to myriad Under Armour branded athletic products in three categories: apparel, footwear, and accessories.  However, apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in fiscal year 2016 ("FY16").  While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016.  Thus, North American apparel sales are critical to the Company's success.  As Plank admitted on January 31, 2017: "North American apparel is still our largest and most profitable business by far. Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

38.     During the Class Period, nearly two-thirds of the Company's sales were wholesale sales to national and regional sporting goods chains (*e.g.*, Sports Authority, Dick's, Foot Locker, Champs), independent and specialty retailers, department store chains, institutional athletic departments, and sports leagues and teams.  Under Armour also owned and operated its own retail locations (called "Brand House" and "Factory House" stores)[8] and retail websites that exclusively sold Under Armour products, which are collectively referred to as the "direct-to-consumer" ("DTC") channel, accounting for 31% of the Company's sales in 2016.

39.     Under Armour has many competitors, including athletic brands such as Nike, Adidas, Reebok, lululemon, Columbia, New Balance, Brooks, and Puma.  However, the Company steadily gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.  As one analyst put it just prior to the Class Period, Under Armour's "brand . . . is sacrosanct."  By protecting that premium brand image, Under Armour had become, by fall 2014, the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on number one – Nike.

### B.     Plank Drove Under Armour's Aggressive Growth Strategy

40.     Since Under Armour's inception in 1996, and even after it went public in 2005, Plank called the shots, always controlling a majority of stockholder votes and serving as CEO until January 1, 2020, and as Chairman of the Board throughout the Class Period.  Under this "founder-led" approach, which Plank went to great lengths to protect, Plank set the destination and the route.

---

[8]     Brand House stores showcase Under Armour's latest products.  Factory House stores, primarily located in outlet centers, sell excess or undesirable inventory at reduced prices.  At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America. By the end of 2019, Under Armour had added only 1 Brand House store (19 total) but had added 18 Factory House stores (169 total) in North America.

41.     Plank relished the Company's image as a scrappy, fast-rising upstart from Baltimore.  He implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.  In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

42.     For Plank and Under Armour, the overriding objective was growth.  Within Under Armour, instructions for determining growth forecasts were very simple: take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with maintaining Under Armour's 20% growth streak – which he played up on conference calls with analysts, repeatedly referring to Under Armour as a "growth company" – drove the Company's revenue-growth-at-all-costs strategy.  Employees knew that the Company's growth record was extremely important to Plank such that it was never acceptable to lower sales goals.

43.     Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Class Period.  For 26 consecutive quarters (over six years) spanning from 2Q10 to 3Q16, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year-over-year basis).  Plank never missed an opportunity to remind investors of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it ***not because we are pushing or pressing, because it's the demand and the app from our consumer***.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And frankly, we have no expectation of that stopping anytime soon.

C.     **Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined**

44.     However, despite many years of successful growth, the Company's product styles had grown stale and its premium brand heat was dying by the start of the Class Period in September 2015.  "Brand heat" was an expression Plank and others at Under Armour used to refer to the demand generated by the Company's brand appeal to consumers.  When the Company failed to offer new and updated products in line with the latest consumer trends, its brand heat declined. One such trend involved athletic leisure apparel (a.k.a. "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Class Period.  Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores.  Many of the Company's competitors, particularly Nike and Adidas, adapted to this trend by expanding their product lines to include athletic leisure apparel. However, Under Armour failed to offer its own line of athletic leisure apparel until late 2016. Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts.  Although historically these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors, and were not as interested in buying them again.  This enabled competitors to capture critical sales volume and market share from Under Armour, and enhance their brand values at the expense of Under Armour.

45.     Declining demand for Under Armour apparel caused progressively worse financial problems at the Company.  This was particularly damaging because apparel sales provided the majority of the Company's sales (67% of net revenue in 2016) and were critical to meeting the Company's aggressive financial projections.  According to SportScan retail data, the Company's core apparel sales began slowing around spring of 2015, causing the Company to lose market share

to rivals like Nike and Adidas.[9]  Compounding these problems, the Company was experiencing a monumental downturn in its primary sales channel, North American wholesale.  Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (*e.g.*, Target, Wal-Mart).  This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into, the sales of, apparel sold at traditional sporting goods stores.

46.     This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period. On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.  And, on February 9, 2016, CNN reported that Under Armour's second-largest retail customer, Sports Authority, faced bankruptcy after missing a $20 million debt payment.  Sports Authority then filed for Chapter 11 bankruptcy protection on March 2, 2016, and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering 463 stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  Losing these customers put

---

[9]     Ex. C, at 1, 4-6.  As discussed below, the SportScan retail data set forth in the Morgan Stanley Report was materially consistent with Under Armour's internal retail data, showing a slowdown in core apparel sales that began around spring of 2015, but Defendants nonetheless publicly downplayed and discredited this report and falsely reassured investors that the Company's sales growth was as strong as ever.

additional pressure on the Company's faltering apparel demand.  Several former Under Armour executives told WSJ, "The strains in Under Armour's business were evident inside the company in 2016."[10]  They further explained to WSJ that this "slowdown was occurring in more places than just [TSA]" and that the TSA bankruptcy "just amplified the issue."[11]

47.     Despite losing these customers – including Sports Authority – Under Armour maintained its now-unrealistic sales goals.  Internally, it was never acceptable to lower these goals even though everyone knew they were unrealistic without Sports Authority – a major account for Under Armour.  Attempting to cover up these sales declines and provide the illusion of financial health, Defendants' abandoned Under Armour's fundamental sales philosophy of competing on brand strength rather than price.  Instead, Defendants resorted to lowering sales prices, including offering heavy discounts and promotions, and engaging in a myriad of suspect sales practices.

**D.     Under Armour Ramps Up Its Promotional Activity**

48.     Beginning in 2015, Under Armour lowered sales prices and ramped up its promotional activity.[12]  This resulted in rapidly decelerating average sales prices of the Company's apparel, causing decreased product margins.  This trend compared unfavorably with the sports apparel industry overall and particularly with the Company's chief rival Nike, which was experiencing steadily *increasing* average sales prices.[13]

49.     Under Armour heard all the time from buyers and sales representatives in 2015 and 2016 that the Company's brand heat was dying down.  One notable example of this trend involved Under Armour's "big logo hoodie" – a performance-oriented hooded fleece sweatshirt with a big

---

[10]   Ex. A, at 3.

[11]   *Id.* at 4.

[12]   *See* Ex. C, at 1, 4-5.

[13]   *See id.* at 4.

Under Armour logo on the chest.  This was a top seller and huge business volume driver for years and, thus, Under Armour consistently carried a large inventory in many different colors.  However, as brand heat was dying, sales for this product began to decline significantly.  As a result, the Company decided – for the first time ever – to run sales of the hoodie during Black Friday of 2015 (November 27, 2015).  The Company offered the hoodie for as much as 25% off at numerous stores, including Dick's, Sports Authority, and Macy's.

50.     The Company's sales declines opened the promotional floodgates.  After the hoodie was put on sale for the first time ever in November 2015, Under Armour began to run more and more promotions in 2015 and 2016.  For example, in addition to the big-logo hoodie, Under Armour began to sell other staples of its apparel lineup like polo shirts and training t-shirts for 25% off in 2015 and 2016.  Like the big-logo hoodie, these products historically drove large sales volume at premium prices and, unlike any prior time, had to be put on sale during the Class Period because of dying demand for the Company's brand.

51.     For a while, the heavy discounts, promotions, and lower sales prices, helped the Company continue to report revenue growth, meeting Plank's aggressive 20% growth projections.  But, this manufactured, price-driven, low-quality growth caused lower product margins that damaged the Company's bottom line and eroded the Company's "premium" brand image.  These negative effects were observed by a former Merchandising Manager of the Company, Brock Andersen ("Andersen"), who stated that: "Under Armour's apparel products . . . suffered from reduced customer appeal and demand"; "the Company's ASPs were falling sharply in North America"; and the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing

Company discounts and promotions, and falling ASPs of the Company's products."[14]   Andersen

further stated that Plank knew or recklessly disregarded these "true facts" and misled investors

about them during the Class Period.[15]

<div style="margin-left:2em">

**E.  Defendants Engaged in Suspect Sales Practices to Further Mask
     Slowing Demand and Maintain the Company's 20% Growth Streak**

**1.  Defendants Pull-Forward Sales and Stuff Channels to
     Artificially Boost Revenues**

</div>

52.     In addition to the aggressive promotions and discounting described above,

Defendants also employed a variety of improper sales and accounting practices to mask slowing

demand, enable the Company to appear healthier, and maintain the façade of quarterly growth

demanded by Plank.[16]   This false portrayal of growth was unsustainable, however, because the

Company was robbing sales from future quarters to portray growth in the current one.

53.     Defendants engaged in channel stuffing by pulling forward sales from future

quarters into the current quarter to artificially boost revenue, enabling the Company to close the

gap and hit aggressive sales goals, while feigning continued growth to the market.  As a former

Under Armour sales executive told WSJ, "It was a pretty common practice to pull forward orders

from the month after the quarter to ship within the quarter in order to hit the number or close the

gap."[17]   As one former merchandising executive at Under Armour told WSJ, "It was all in the

name of hitting the number, and it would happen out in the open."[18]   This scramble to pull in as

---

[14]  *Andersen v. Plank*, No. 1:18-cv-02239-TDC, Verified Shareholder Derivative Complaint, at
75-76 (D. Md. July 23, 2018), ECF No. 1 ("Andersen Complaint").

[15]  *See id.* at 74.

[16]  *See* Ex. A, at 3-5.

[17]  Ex. A, at 3.

[18]  *Id.* at 2.

many orders as possible began as early as the third quarter of 2015 ("3Q15"), and continued at least through the end of 2016, increasing after the TSA bankruptcy.

54.    In some cases, Under Armour backdated shipment dates and moved shipment dates up from the first month of the following quarter to the last month of the current quarter.  Indeed, a former logistics executive at Under Armour explained to WSJ that the Company's shipping plans in the final days of the quarter sometimes contradicted the dates on the boxes.[19]

55.    The practice of pulling forward sales occurred with retailers including Dick's, Under Armour's biggest customer in 2015 and 2016, totaling $400 million dollars of annual sales. The Company leaned on Dick's to boost its revenue.  Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[20] However, as further detailed in Section V.E.2, such sales were contingent on "handshake" deals that allowed Dick's the right to return products it could not sell.

56.    The former sales executive further explained to WSJ that the "[p]roblem is once this starts it doesn't seem to stop . . . .  We found ourselves pulling forward every quarter."[21]  The reason the Company repeatedly pulled sales forward was to sustain its growth record, including its 26-quarter streak of sales growth, which the Company's employees knew was important to Plank.[22] Plank directed the Company's sales organization to maintain the growth streak and frequently bragged about the streak on conference calls with analysts, including on the Company's 3Q16

---

[19]    *See id.*

[20]    *See id.* at 3.

[21]    *Id.*

[22]    *See id.* at 1.

earnings call.[23]  Plank played up the Company's growth streak as a sign of its success, repeatedly referring to Under Armour as a "growth company."

57.     Although the sales goals needed to maintain such growth were unrealistic as discussed above, it was never acceptable to lower them.  Indeed, desperate to keep the streak alive during the summer of 2016, despite the loss of TSA, Plank told the sales organization that they needed to hit 20% growth or "heads will roll."  Accordingly, Plank set the tone at the top, and created an atmosphere which emphasized growth as the foremost priority regardless of what it took to get there.  And, critically, as further detailed below in Section V.K.1.a, WSJ reported that ***federal investigators are examining emails that show Plank knew about efforts to move revenue between quarters***.[24]

58.     Indeed, the practice of pulling orders forward was well-known within the Company and discussed at weekly meetings attended by high-level executives.  The Company's demand planning team would send emails to employees passing down directives to pull orders forward after looking to see how far off they were from meeting financial goals.  The sales operation team was also instructed to pull forward orders from future quarters.  The employees were asked to look at the inventory on hand and determine what orders were available to ship so Under Armour could report more sales and revenue in the current quarter.  These requests increased over time, such that the employees were asked to pull more orders forward as 2016 progressed.  The Company tracked the pull-forward orders in massive spreadsheets containing detailed sales and inventory data, including inventory that Under Armour had available to ship and inventory held by Under Armour customers such as Sports Authority.  The spreadsheets were regularly updated and saved in a

---

[23]   *See id.* at 2-3.

[24]   *See id.* at 2.

shared public folder, and anyone who wanted access could review them and identify orders that had been adjusted and pulled forward from one quarter into an earlier quarter.

59.     To further help meet the Company's quarterly targets in 2016, Under Armour also stuffed as much inventory as possible into certain retailers to frontload the recognition of revenue, despite the consequences that followed.   For example, Under Armour began shipping new inventory intended for Factory House stores to T.J.X. Co. discount stores like T.J. Maxx.[25]   A former merchandise executive at the Company explained to WSJ that this practice allowed Under Armour to immediately book the products as revenue instead of having to wait for a customer to buy them at its own stores.[26]   Under Armour ensured its massive inventory shipments to T.J.X. Co. fell just short of triggering the 10% of sales threshold for disclosing the discount outlet as one of its top customers in Under Armour's securities filings.[27]   This would have surely indicated to the market that Under Armour had loss its premium brand status and its ASPs were falling.

60.     Defendants also continued to stuff Under Armour's products into Sports Authority and book revenue for those sales, despite knowing that Sports Authority was having significant issues,[28] might not be able to pay for the products, and the products could be returned *en masse*. As former Under Armour executives in sales, logistics, merchandising, and finance stated to WSJ, Under Armour continued shipping goods to TSA, and booking sales for those goods, even after it was clear that TSA was in trouble.[29]   Indeed, red flags relating to retailer accounts, including TSA, were apparent to the Company's wholesale team as early as 2015.   Yet, Under Armour kept

---

[25]   *See id.* at 4.

[26]   *See id.*

[27]   *See id.*

[28]   *See id.*

[29]   *See id.*

shipping inventory to TSA.  Unsurprisingly, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  The large amount of returns from TSA, Dick's, and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

61.     By stuffing customers with products, pulling forward sales, and shifting sales to discount retailers, Under Armour was able to mask declining sales and waning brand heat and inflate revenues to artificially continue Plank's growth streak.  However, many of these sales were achieved through discounting and premised on retailers' ability to return them.  They were, thus, contingent, illusory, and violated GAAP.

> ### 2.     Defendants Induce Retailers to Take Unneeded Product with Promises to Buyback Merchandise and Through Discounts and Other Sweeteners

62.     To pull-ahead much needed sales to perpetuate the Company's "growth," the Company leaned on retailers such as Dick's to accept early shipments of the Company's products.[30]  To incentivize retailers to accept the shipments early, Defendants adjusted retailers' contract terms or offered them discounts.[31]  As former Under Armour executives explained to WSJ, "Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products" in order to convince retailers to take products before their requested shipping date.[32]

---

[30]   *See id* at 3.

[31]   *See id.*

[32]   *Id.*

63.     Defendants also used a buyback program to incentivize retailers to order certain merchandise, under which sales representatives guaranteed that Under Armour would buy back a certain amount of the merchandise that did not sell.  On the books, the Company's customers bought and owned the merchandise for three or four months, but after six months Under Armour was forced to buy back some of the unsold merchandise.  These buyback or "return to vendor" agreements were regular at Under Armour with its biggest customers and increased in late 2015 and 2016.  Because of low product sell-through, Under Armour wound up having to buy back a lot of product pursuant to these deals.

64.     Indeed, under these arrangements, Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  In early 2016, for example, VP of North America Sales, Brian Cummings ("Cummings"), convinced Dick's to order shoes that Dick's did not want.  Dick's predicted they would have to return 80% of the shoes, but Cummings agreed that Under Armour would take back any unsold product.  Dick's ended up returning 80% or more of the deal later in 2016.

65.     By the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.

66.     Accordingly, many of the Company's sales were illusory because Dick's and other customers accepted them on the condition that Under Armour would buy the products back if the customers could not sell them.  These buyback and contingent sales arrangements violated GAAP, as discussed further below in Section VIII.B.  Moreover, as discussed in the following section, these arrangements came back to haunt Under Armour, leading to excess inventory and liquidations.

### F.     Defendants' Declining Apparel Sales and Suspect Sales Practices Led to Excess Inventory and Liquidations

67.     The diminishing demand for, and declining sales of, core Under Armour products resulted in excess inventory.  In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  This problem occurred at both the Company's own Brand House stores and at the stores of its retail customers.  Excess inventory was a constant problem throughout the Class Period at the Company's Brand House stores, including products from every category.

68.     At one point during the Class Period, for example, Under Armour's planning team bought a very large quantity of one of the Company's t-shirts, around 10,000 units, to be sold at Under Armour's top two Brand House stores, which were supposed to be the pinnacle of the Under Armour product experience.  However, only about 100 units of the t-shirt were actually sold, and the rest became excess inventory.  This excess inventory had to be sent to Under Armour's Factory House stores and other accounts to be liquidated at a discount.  This happened many times with different products throughout the Class Period, and was very common with men's apparel.

69.     Sometimes only about 30% of the inventory at the Company's Brand House stores was considered "productive," meaning only 30% was actually sold to consumers.  The remaining inventory was comprised of "presentation quantity" (inventory allowing the stores to present one

or two units of each size on display) or excess inventory that had to be transferred back to Under Armour's distribution houses.

70.     The distribution houses would send the excess inventory to the Company's Factory House stores (*i.e.*, outlet stores) or to liquidation channels like Marshalls and T.J. Maxx, where the products were sold at a discount.  The discount rates at the liquidation channels were the highest, providing the Company with very low product margins.  Sometimes Under Armour was simply trying to break even on products sent to the liquidation channels.  In addition to reducing margins (due to the discounted sales prices), distributions to the Factory House stores and liquidation channels resulted in higher expenses due to the extra shipping, processing, and labor costs required to transfer the excess inventory.

71.     Excess inventory was also a problem at the Company's retail customers such as Sports Authority and Dick's.  Facing dwindling sales and ballooning inventory, the Company's merchandising team would collaborate with the sales teams and give suggestions about promotions for the inventory that Under Armour needed to move.  Retailers would also make requests for promotions to rid themselves of the excess inventory, and the Company would then determine whether to allow such promotions.

72.     As with the inventory returned from Brand House stores, discussed above, the Company would attempt to sell the excess inventory returned from retail customers at discounted prices through liquidation channels such as discount stores like Marshalls and T.J. Maxx.  As a last resort, the Company would ship inventory to be liquidated at Costco stores in Mexico.  However, much of the excess inventory just sat around at the Company, not being sold through any channel, because the liquidation channels used by the Company were not enough to handle all of the excess.

73.     In addition, the Company's inventory problems were magnified by returns resulting from its contingent sales pursuant to buyback agreements, and its mass shipment of products in the final days of a quarter.  As detailed above, the Company was able to pull ahead sales by entering into contingent sales arrangements with certain retailers (including Dick's – its biggest customer). While this gave Under Armour a temporary boost in sales, they were obligated to buy back unsold inventory.  And, since they had overstuffed these retailers with products they did not need and could not sell (particularly where Under Armour's brand heat had diminished), much of that product was being returned to the Company.  As a former logistics executive at Under Armour explained to WSJ, "truckloads" of unopened boxes thus returned unsold to Under Armour in 2016.[33]

74.     Indeed, following TSA's bankruptcy, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  In July 2016, Plank announced a deal with Kohl's Corp. ("Kohl's"), a mid-tier value retailer.  As former executives told WSJ, Kohl's provided hundreds of new locations to stock its goods, including those meant for TSA.[34]  However, Kohl's ran frequent promotions in competition with Dick's and often had lower prices.  This move angered Dick's, who had been holding unsold Under Armour goods.[35]  Dick's then stopped agreeing to take products early, which had enabled the Company's pull forward sales, and took less product from Under Armour, making the Company even more dependent on off-price chains.[36]

75.     The excess inventory was a frequent topic of discussion among sales and planning leaders at Under Armour, and information on inventory was widely available at the Company.  For

---

[33]  *Id.*

[34]  *See id.* at 4.

[35]  *See id.*

[36]  *See id.*

example, the Company's planning team met weekly to discuss excess inventory.  Executives Matt Mirchin (President, North America) ("Mirchin") and Cummings (VP of North American Sales) both had access to sales and inventory reports, and Kevin Eskridge (Senior VP of Global Merchandizing and Planning, subsequently Chief Product Officer) ("Eskridge") talked with Merchandising staff about inventory all the time.  Indeed, Plank and fellow executives admitted to the excess inventory in their public statements.  But, they misleadingly blamed the rising inventory on benign factors, including a strategic plan to improve the speed of shipments to customers, and reassured investors that the situation was improving.  In reality, the Company's dying brand heat reduced customer demand and caused sales declines, preventing it from unloading unwanted inventory.

76.     In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  This problem occurred continually from at least September 2015 through November 2016 at both the Company's own Brand House stores and at the stores of its retail customers, across all Under Armour brands.  The sheer amount of excess inventory made it obvious internally that Under Armour would eventually miss its sales goals, and ultimately led to inventory write downs as discussed in Section VIII.D, below.

### G.     Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines

77.     As a result of the Company's declining apparel sales, exacerbated by the collapse of its primary sales channel, Defendants perceived a threat to the Company's carefully cultivated market perception as a fast growing superstar of the sports brand business.  To compensate, Defendants sought to aggressively expand Under Armour's footwear and international sales businesses in 2015 through 2016.  This expansion, along with the lowering of apparel prices and

suspect sales practices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) into 2016 even as the Company's core North American apparel business was faltering.  However, as Defendants admitted, the footwear and international businesses provided much lower margins than the North American apparel business, and a much smaller percentage of revenue (shoes accounted for only 21% of revenue in 2016).  Moreover, the Company needed to make massive expenditures of time and money to undertake such expansion.

78.     An example of the difficulty of this expansion was the rollout of Under Armour's "Curry One" shoe worn by star NBA basketball player Stephen Curry in early 2015.  Under Armour heavily promoted this shoe.  However, the Company was essentially paying to have the shoe placed in stores because the associated expenses were so high and margins were so poor.  The Company's "Curry Two" shoe faced similar problems in the third and fourth quarter of 2015.[37] The shoes were badly underpriced in an apparent attempt to boost revenue and capture market share from Nike, at the risk of damaging Under Armour's brand image.[38]  Under Armour also slashed their prices on running shoes in an attempt to compete on price rather than brand image and innovation.[39]

79.     Defendants used the footwear and international businesses as scapegoats for the Company's declining gross margins.  At the same time, Defendants misleadingly claimed the Company's footwear and international margins and ASPs were improving and its ***apparel*** margins and ASPs remained strong.  These misleading statements allowed Defendants to conceal the fact

---

[37]   *See* Morgan Stanley Report at 8-9.

[38]   *Id.* at 9-10.

[39]   *Id.* at 11.

that margin compression was caused, not only by the growing footwear and international businesses, but also by declines in the Company's apparel business, driven by lower sales prices, rampant promotions and discounting, and excess inventory.  It was far more palatable for Defendants to blame margin compression on the Company's supposedly expanding footwear and international businesses than to reveal the truth about the declines in its core apparel segment, which accounted for most of the Company's sales.

 **H.**  **Under Armour's Declining Demand and Unsustainable Business Practices Catch Up to Them but Defendants Mislead the Market as to the True Reasons Behind the Company's Problems**

 80. As detailed above, the Company's suspect business practices, including pull-forward sales, channel stuffing, and buyback arrangements, temporarily helped the Company continue its growth streak.  However, as discussed further in Section VIII, these practices violated GAAP and also had significant adverse consequences for the Company's financial results.

 81. Indeed, during the time period that the Company was engaged in pulling sales forward (channel stuffing) and other machinations, the Company experienced explosive growth in its accounts receivables (which are sales made on credit to be paid back to the Company at a later date).  Before the third quarter of 2015, Under Armour's overall sales always eclipsed or grew evenly with its accounts receivables.  But, by the fourth quarter of 2015 ("4Q15"), accounts receivable growth badly outpaced revenue growth (55% accounts receivable growth vs. 31% revenue growth), a trend that continued throughout 2016.  Further, Under Armour's days sales outstanding ("DSO"), the number of days it took the Company to collect its receivables, nearly doubled from 28 days in fourth quarter of 2014 ("4Q14")  to nearly 51 days in first quarter of 2017 ("1Q17").  This shows that the Company was increasingly extending credit to customers and getting paid later and later – consistent with the early shipments and adjusted contract terms.

82.     Likewise, the Company's reserves for returns skyrocketed 55% by the end of 2016 and 68% in 2017, reaching a whopping $247 million.  Demonstrating that it expected large volumes of excess inventory to be returned, the Company drastically increased its reserves for returns, the amount of money Under Armour set aside for markdowns or returns, as discussed in Section VIII.C below.

83.     In addition, Defendants' softening demand, returns, and illicit sales practices led to an accumulation of material amounts of excess and obsolete (*i.e.*, impaired) inventory at the Company.  Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018 due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down inventory, which should have been recorded in 2016.

84.     The excess inventory also caused the Company to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  Gross margins declined from 48.1% in fiscal year 2015 ("FY15"), to 46.5% in FY16, to 45.1% in fiscal year 2017 ("FY17").

85.     As further detailed in Section VII below, Defendants downplayed these negative financial trends, concealing the true reasons for them and attempting to explain them away.  However, as the market would later learn, the Company's declining financial condition and inventory problems were the direct result of the Company's waning brand heat, declining demand, and the various suspect practices the Company had undertaken to artificially prop up sales.

I.  **The Market Began to Learn the Truth About the Company's Sales Problems, Causing the Stock Price to Decline**

86.  The Company's declining sales problems, "fundamental shift" to competing on price rather than a premium product, and use of suspect sales practices to artificially boost revenue and mask slowing demand, were ultimately revealed in a series of partial disclosures that caused the Company's common stock prices to gradually decline, as detailed in Sections VII and X, below. The declines would have been swifter and steeper, but Defendants attempted to downplay and soften the news with continued misrepresentations and omissions throughout the Class Period.

87.  First, on January 10, 2016, Morgan Stanley issued a detailed report with point-of-sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales prices, and market share dating back to spring 2015. This surprising news, which directly contradicted Defendants' carefully cultivated image of the Company, caused Under Armour common stock prices to fall.

88.  Following this report and the departure of the Company's CFO Dickerson in February 2016 – "which came as a surprise" to analysts, who noted that "this transition comes at an inopportune time in the company's history. . . . Losing a key leader at a time like this is a concern" – the Company's Chief Merchandising Officer ("CMO"), Henry Stafford ("Stafford"), suspiciously departed the Company in May 2016. Stafford's departure coincided with the departure of another high-level executive, the Company's Chief Digital Officer ("CDO") Robin Thurston ("Thurston"), which was announced on the same day. These abrupt and suspicious departures of these key executives caused common stock prices to decline again on May 4, 2016.

89.  On June 1, 2016, contrary to their prior assurances, Defendants revealed a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional common stock price declines.

90.     Over the next year, a series of increasingly poor quarterly financial results and reduced financial projections caused further declines in the Company's common stock prices after such news was released.  On July 26, 2016, Defendants reported second quarter of 2016 ("2Q16") decreases in operating and net income, announced a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast the slowest quarterly growth in over six years.  On October 25, 2016, Defendants revealed a further slowdown in growth in 3Q16, attributed to North American apparel and wholesale declines, and compressed margins attributed in part to higher discounts, promotions, and liquidations.   On January 31, 2017, Defendants revealed a slowdown in 2016 growth that was far more severe than previously reported and dramatically reduced financial projections, attributed to problems in the North American apparel business, as well as compressed margins and inventory growth.  On the same day, Defendants surprised investors by revealing the sudden and highly suspicious departure of Molloy.  On August 1, 2017, the Company cut FY17 guidance and announced a massive restructuring, in order to "evolve" the Company's business and restore "brand heat," including a shift from traditional performance-oriented products to more fashionable products.  The Company further announced that it expected $110 to $130 million in restructuring-related charges including "approximately $20 million of inventory related charges."

91.     Despite the drastic measures being implemented, the Company's financial performance never recovered.  Indeed, no longer able to rely on the suspect sales practices that had allowed the Company to report 20% revenue growth and mask slowing demand, Under Armour experienced a severe downturn in its business.  The Company reported total revenue growth of just 3.4% and 4.1% and apparel revenue growth of 1.8% and 5.4% in 2017 and 2018, respectively.   Yet, the Company's stock price remained artificially inflated based on the

concealment of Defendants' improper sales practices, including the pull-forward of sales to boost quarterly revenues and mask slowing demand.

J.       **The SEC and DOJ Launched Investigations Into Under Armour's Accounting Practices and Related Disclosures, Plank Stepped Down as the Company's Chief Executive Officer, and the SEC Preliminarily Determined to File an Enforcement Action Against Defendants**

92.       As news of the Company's true financial condition was slowly revealed, the DOJ and SEC launched non-public criminal and civil investigations into Defendants' sales and accounting practices, including whether they pulled sales forward during the Class Period in order to make the Company's quarterly revenue appear stronger than it actually was.   Although Defendants began responding to the investigators in July 2017, they concealed these investigations from shareholders for nearly three years.

93.       While the government investigations were ongoing, the Company suddenly announced on October 22, 2019, that Plank was stepping down as the Company's CEO, effective January 1, 2020, and transitioning to Executive Chairman and Brand Chief.  Less than two weeks later, on November 3, 2019, WSJ revealed the SEC and DOJ investigations, reporting that the probes focused on Under Armour's "accounting practices" and "whether the sportswear maker shifted sales from quarter to quarter to appear healthier."[40]  The article forced the Company to issue a statement admitting that it was under investigation and "began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[41]  The Company's stock price suffered another steep decline in response to this news.

---

[40]  Ex. B, at 1.

[41]  *Id.* at 2.

94.     On November 14, 2019, WSJ released a follow-up article with more information related to the investigations.[42]   The article revealed that the government's criminal and civil securities fraud probes were "into the Company's revenue recognition and whether there were improper tactics used to shift sales," and that investigators were examining "Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy."[43]   The article was based on interviews with former Company executives in four different departments – logistics, sales, merchandising, and finance – who told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel," and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[44]

95.     Before the market opened on July 27, 2020, the Company filed an SEC Form 8-K announcing that, on July 22, 2020, the Company, Plank, and Bergman received Wells Notices from the SEC, which "informed the Company and the Executives [Plank and Bergman] that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws."  The Company explained that the Wells Notices related to the Company's previously-disclosed SEC investigation, and further specified that:

> The Wells Notices relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of "pull forward" sales in connection with revenue during those quarters.  A pull forward generally includes a customer sale that is executed earlier than originally planned.  Specifically, the SEC Staff

---

[42]   Ex. A, at 2.

[43]   *Id.*

[44]   *Id.* at 1.

is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives.[45]

96.     The Company's filing on July 27, 2020, added that "the Company and the Executives . . . expect to engage in a dialogue with the SEC Staff to work toward a resolution of this matter."

97.     On August 6, 2020, Under Armour further disclosed in its second quarter of 2020 ("2Q20") Form 10-Q filing that "[t]he Wells Notices informed the Company" the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."   The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices included," among other things, "civil monetary penalties, as well as, in the case of the Executives, a bar from serving as an officer or director of a public company." The Company also confirmed that the DOJ's separate investigation remained ongoing.

98.     As discussed further below (Sections VII and X), Under Armour investors lost millions of dollars as Defendants' fraud was revealed over time, causing the artificial inflation resulting from the fraud to dissipate from the Company's common stock.

---

[45]    The SEC describes the general Wells Notice process as follows:  "If [SEC] Enforcement makes a preliminary determination to recommend enforcement action, it may elect to provide individuals or entities who would be charged in the action with a Wells notice explaining the proposed charges against them and informing them that they can make a voluntary submission setting forth their interests and position.  If Enforcement believes (based on the evidence it has compiled and after considering a Wells submission or deciding not to issue a Wells notice) that enforcement action should be taken, Enforcement seeks authorization from the Commission for the SEC to file a civil lawsuit, to commence an administrative proceeding, or, in certain circumstances, to issue a report of investigation.   Any enforcement action that the SEC initiates is based on Commission authorization."  U.S. Securities and Exchange Commission, *Investor Bulletin: SEC Investigations* (Oct. 22, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_investigations.html.

### K.      Numerous Facts Support Defendants' Scienter

99.      Defendants knew of, or at a minimum were severely reckless in disregarding, the problems facing the Company as a result of declines in the apparel business.  As discussed herein, numerous additional indicia of scienter support this, including the fact that federal investigators are examining emails that show Plank knew of the Company's efforts to move revenue between quarters,[46] the DOJ and SEC investigations, the Wells Notices, Plank's and other Company executives' statements admitting access to the relevant data, and Plank's highly suspicious Class Period sales of $138.2 million of Under Armour stock during the same period that is the subject of the SEC's Wells Notices to the Company and Plank.

### 1.      Numerous Facts Support Plank's Scienter

#### a.      Plank Had Direct Knowledge of, and Was Personally Implicated in, the Fraud

100.      Plank had direct knowledge of the fraudulent conduct alleged herein.  As part of the ongoing DOJ and SEC investigations "into the company's revenue recognition and whether there were improper tactics used to shift sales" during the Class Period, WSJ reported that investigators "are examining *emails that show Under Armour's founder and chief executive, Kevin Plank, knew about efforts to move revenue between quarters*."[47]  Former Under Armour executives also told WSJ that "pulling sales forward helped the sportswear company sustain its growth record, which employees *knew was important to Mr. Plank*" and that "[t]he strains in Under Armour's business were evident inside the company in 2016."[48]  Indeed, Plank drove the

---

[46] *See Id.* at 2.

[47] *Id.*

[48] *Id.* at 3.

Company's aggressive growth strategy, employing a founder-led approach. He set the tone by pressuring employees to achieve 20% growth every quarter.

101.    Plank's direct knowledge of the Company's suspect sales practices is further evidenced by the fact that Plank personally received one of the SEC's Wells Notices. The Wells Notice stated that a preliminary determination had been made to recommend that the SEC bring an enforcement action against him for federal securities law violations relating to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[49]

102.    The suspicious timing of Plank's resignation as CEO – announced on October 22, 2019, following a string of other executive departures as the truth leaked out – also supports his knowledge or reckless disregard of the fraud alleged herein. Just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success. On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of our business" because it "provides for clear accountability and efficient and effective leadership." The Company never explained the abrupt flip-flop.

103.    Less than two weeks after Under Armour announced Plank's resignation, the Company acknowledged that the DOJ and SEC were investigating its accounting and related disclosures. As Morningstar observed:

> The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company. . . .  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began.  While Under Armour claims the investigation had nothing to do with Plank's decision, the timing

---

[49]    Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.

104.    Other media also noted the suspicious timing of Plank's departure as CEO.  For example, *Forbes* stated in a November 4, 2019, article that "[i]n light of the recent investigations, it now makes more sense why Plank stepped aside.  There most likely will be serious repercussions related to the dual investigations."

105.    The timing of these events, coupled with the Plank emails and other indicia discussed herein, strongly supports that Plank was directly involved in and responsible for the matters under investigation.

### b.    Plank's Public Statements and Access to the Company's Internal Systems and Data

106.    Plank's scienter is further supported by numerous public statements in which Plank discussed the Company's apparel sales growth, sales prices, gross margins, and inventory levels. In fact, Plank provided a prepared statement on – or was asked and answered detailed questions about – at least one of those matters during nearly every (14/16) quarterly earnings call with securities analysts throughout the Class Period, as well as during the 2015 and 2018 Investor Day Meetings.  As detailed herein, Plank echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period.

107.    Plank and fellow Company executives also stated that they had systems in place to closely monitor such aspects of the Company's business.  For example, Plank boasted of an SAP (Systems Applications Products) software system that provided point-of-sale information and other detailed business data.  The Company enhanced this system during the Class Period.  As Plank stated during the 4Q15 earnings call on January 28, 2016:

> The single view of the consumer is something we're building with the team at SAP that combines **global point-of-sale, e-commerce and transactional information** through a single sign-on capability together with our Connected Fitness business to create an insight

engine that will inform and guide our decision to help grow and scale our brand.  This will build on our existing SAP platform as we double down and continue to make big bets with big partners.  We believe that this unique technological advancement will position UA as a best-in-class real-time digital enterprise.

108.    This statement by Plank confirms that, through "point-of-sale" information available on the Company's SAP system, Plank had actual knowledge of industry sales data from the Company's retailers.   As discussed further below, because the SportScan data (a.k.a. SportScanInfo or SSI) revealed in the Morgan Stanley Report was based on the same point-of-sale industry data reported to Plank from the Company's retailers, Plank had actual knowledge of (or recklessly disregarded) the SportScan data revealed in the Morgan Stanley Report.[50]  The sales data showed that, since spring of 2015, the Company's North American apparel growth was in decline, the Company was losing market share, and the Company's ASPs were dropping.[51] Everyone at Under Armour on the sales team had full visibility into sales data because they had very detailed and up-to-date data available to them through multiple sources, and the data was regularly reviewed.  Multiple reports showing sales data were distributed every Monday.  The sales reports were very detailed, including breakdowns by regions, retail store, and product styles.  Sales management also had a "dashboard" on their computers or iPads to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  Under Armour planning and sales employees also had access to inventory and sales-related data in massive and constantly-updated spreadsheets kept in a shared folder and available to anyone who wanted to access them (which also tracked pull-forward orders).   Further, Plank repeatedly claimed he had extensive data concerning consumer demand, buying preferences, and product usage through Under Armour's Connected

---

[50]    *See* Ex. C.

[51]    *See id.* at 13.

Fitness platform.  As Plank boasted during the Class Period, "I can't think of any companies that would have that amount of data flow to understand their consumer better."  Thus, Plank had knowledge of (or recklessly disregarded) the financial declines first revealed by Morgan Stanley.

109.    Additional evidence of Plank's scienter is found in Plank's statement during the first quarter of 2016 ("1Q16") conference call on April 21, 2016, that "probably the thing that drives [North American distribution] for us more than anything else is just merchandising. . . . And now we've really gotten to a point where understanding that merchandising needs to be a core competency for us. . . .  And so we really – we identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in 2014, we began building the [merchandising] team in 2015."  Through these merchandising efforts, Plank had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel).  In addition, Plank's statement indicated that the Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

110.    Plank also paid close attention to the Company's inventory during the Class Period, and therefore Plank knew or recklessly disregarded that the Company had excess inventory caused by declining demand and sales.  As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

> On the working capital front, ***the majority of our focus is going to be on inventory management and the efficiency of inventory management***.  Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.
>
> First, on the near term – over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates.  This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.

Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory.  These initiatives are focused on how we plan and deliver our seasonal products.

111.    Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

> ***Today, we have inventory data in multiple retail, planning, transportation, and distribution systems***.  In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is extremely powerful.  In fact, very few organizations have been able to achieve this goal.

112.    One system through which inventory data was available to Plank was the SAP system discussed by Plank in the statement quoted above.  The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation channels), and how much inventory was being sent to liquidation.  The SAP system provided inventory information for all Under Armour products sold to consumers.  Based on this data, Plank, who was intently focused on inventory, had actual knowledge of, or recklessly disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.

### c.    The SportScan Data Cited in the Morgan Stanley Report Mirrored the Company's Internal Sales Data

113.    Numerous facts establish that the SportScan data cited in the Morgan Stanley Report, revealing negative financial trends at Under Armour, was a materially accurate depiction of the Company's internal sales data, thus supporting Plank's knowledge or reckless disregard of such data.  Indeed, retail industry participants, including Under Armour, frequently use industry data compiled by SportScan.  For instance, in connection with a 2005 sale of $167 million in stock, Under Armour described SportScan as "a leading market research firm that provides weekly point-

of-sale data for the athletic and sporting goods industry" and disclosed that the Company's "[i]nformation regarding the market for compression style clothing is ***derived from SportScanInfo***."

114.    Furthermore, Plank admitted on multiple occasions that industry data, and SportScan in particular, was reliable and consistent with internal Under Armour data.  Prior to and during the Class Period, Under Armour, and Plank in particular, made repeated statements regarding Under Armour's market share.  Those statements relied on industry data, including data tracked by SportScan, thus supporting Plank's knowledge or reckless disregard of such data.  For example, during the October 25, 2016, 3Q16 earnings call, Plank boasted that "[i]n the back-to-school window of July through September, [Under Armour's] overall footwear market share nearly doubled according to ***industry data***."  The following day, on October 26, 2016, WSJ stated that this industry data came from SportScan: "During the back-to-school period, Under Armour . . . nearly doubled its share of the footwear market, amassing 8.2% of the market for the 13 weeks ended Oct. 1, up from 4.6% a year ago, ***according to industry tracker SportScanInfo***."  Other examples include Plank's September 16, 2015, and October 22, 2015, statements praising the Company's "40% market share" in football cleats.  *See also* ¶200 ("we are taking share").

115.    Plank's knowledge or reckless disregard of the data reported by SportScan is further supported by the fact that SportScan captured Under Armour's largest sales channel, North American wholesale, which had the greatest impact on the Company's growth, and encompassed virtually all of Under Armour's core sales channels.  As Plank said in January 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."  According to SportScan, its sales data includes sales from 15,000 retail doors across 12 separate retail channels.

Further, when Dickerson addressed the Morgan Stanley Report during the Company's 4Q15 earnings call on January 28, 2016, he admitted that the report's SportScan data captured the Company's largest customers, citing Dick's as an example.  And, neither Dickerson, Plank, nor anyone else at the Company disputed the accuracy of the data reported by SportScan (which included data for all four quarters of 2015 and prior).  The only portions of Under Armour's business that the SportScan data did not directly capture were lower-priced and less profitable sales that were much less indicative of how Under Armour's overall business is performing.  This included, for example, Under Armour's physical retail locations, most of which were Factory House stores, a liquidation channel with low-margin sales.  This also included Under Armour's website, which analyst reports during the Class Period observed "has been increasingly us[ed] . . . as a clearance channel."

116.    Under Armour's financial disclosures corroborate the Morgan Stanley Report's revelations and confirm Plank's knowledge or reckless disregard of the data revealed.  For instance, Under Armour reported inventory growth outpaced sales in 3Q15 (36.0% year-over-year inventory increase vs. 28.4% year-over-year net revenue increase) and 4Q15 (45.9% year-over-year inventory increase vs. 30.8% year-over-year net revenue increase).  Under Armour's gross margins also declined in 3Q15 (from 49.6% to 48.8% year-over-year) and 4Q15 (from 49.9% to 48.0% year-over-year).  The extreme inventory increases and gross margins declines reported by Under Armour on January 28, 2016, for 4Q15, are consistent with the Morgan Stanley Report's disclosure on January 10, 2016, based on SportScan data, of decelerating sales growth, loss of market share, and declining ASPs.  When confronted, however, Defendants continued to mislead the market by falsely denying and downplaying these issues.  *See* Section VII.B.  In addition, with specific regard to the SportScan data disclosed in the Morgan Stanley Report, which included data

for 2015 and prior, Plank and the Company did not dispute the accuracy of the data for first quarter of 2015, second quarter of 2015, or 3Q15.

117.    Further evidence of Plank's knowledge or reckless disregard of the SportScan data is found in subsequent Morgan Stanley reports issued during the Class Period.  In a report dated April 10, 2016, Morgan Stanley continued to discuss the declining demand for Under Armour apparel, particularly in women's apparel, based primarily on SportScan data.  Morgan Stanley noted that Under Armour's SEC filings corroborate the SportScan data.  In particular, Under Armour's disclosures "show sales to its biggest customer . . . were -8% in 4Q15," which is consistent with the declining apparel demand revealed in the earlier Morgan Stanley Report. Morgan Stanley also noted that Dick's SEC filings "show a deceleration in UA sales growth" consistent with the negative trends shown by SportScan.  Indeed, Under Armour sales to Dick's corroborate the "fundamental shift" of competing on price rather than a premium brand image.  As demand for Under Armour declined and the Company changed course to increased promotions and lower ASPs to find revenue, Under Armour sales to Dick's declined steadily.  As a percentage of Under Armour's revenue, sales to Dick's fell from 14.4% in FY14, to 11.5% in FY15, to 10% in FY16, and dropped below 10% in FY17 and thereafter (per Under Armour's Form 10-K filings), declines that were partly attributable to the fact that Under Armour lost business from Dick's in FY16 after entering into an agreement with value retailer Kohl's, angering Dick's.  *See* Section V.F.  As discussed below, Under Armour and Dick's personnel, including Plank and Dick's CEO, met regularly and exchanged sales data.[52]

---

[52]   Nonetheless, Defendants falsely and misleadingly downplayed and discredited the Morgan Stanley Report and SportScan data cited therein.  *See* Section VII.B.

118.    In an October 27, 2016 report, Morgan Stanley continued to discuss falling ASPs at Under Armour and how competing on price rather than "brand image and innovation" evidenced the "fundamental shift" Morgan Stanley first revealed in January 2016.  Morgan Stanley noted that its ASP data was based not only on SportScan but also "on channel checks and conversations with retailers."   Based on extensive analysis from multiple sources, Morgan Stanley concluded the SportScan data was "directionally accurate."

119.    On February 14, 2017, Morgan Stanley issued another report lowering its price target for Under Armour Class A shares from $25 to $20.  As it had in prior reports, Morgan Stanley relied on SportScan data, among other inputs.  In support of its continued reliance on SportScan data, Morgan Stanley compared historical SportScan data on total apparel sales growth and ASPs (including data appearing in the Morgan Stanley Report issued on January 10, 2016) to Under Armour's actual results during that same period.  Morgan Stanley concluded: "SportScan data has accurately depicted directional UAA sales trends . . . and we continue to view it as the best source for understanding UAA's US business at a micro level."

### d.    Plank's Participation in Company Meetings

120.    Plank's scienter is further evidenced by his attendance and presentation at meetings where Company performance was discussed.  Plank presented at quarterly "town hall" meetings during the Class Period where Plank discussed the Company's performance.  During two "town hall" meetings held close together in August 2016 or October 2016, Plank discussed how the Company was having struggles.  During the first of those two meetings, Plank discussed having to lower the Company's projections.  During the second meeting, Plank tried to ease employees' fears and further explain the situation.

121.    Plank also regularly attended one-on-one meetings with the President of Dick's.  Monthly meetings with Dick's and Under Armour employees were also held.  The monthly

meetings typically took place in Pittsburgh, at the offices of Under Armour or Dick's.  Sales to Dick's, which was once Under Armour's largest customer, soured heading into the Class Period. During the meetings, as demand for Under Armour products declined, Dick's told Under Armour that sales of Under Armour products at Dick's had begun to downturn significantly.

122.   As further detailed above, by the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.  Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  According to WSJ, former Under Armour executives in sales, finance, logistics, and merchandising stated that Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[53]  But, Dick's stopped taking products early after Under Armour struck a deal with value retailer Kohl's, who sold many of the same products as Dick's at lower prices, angering Dick's.[54]

---

[53]   *See* Ex. A, at 4.

[54]   *See id.*

123.    Similarly, red flags relating to retailer accounts, including TSA, were apparent to the Company's wholesale team as early as 2015.  Yet, Under Armour kept shipping TSA inventory. Unsurprisingly, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  The large amount of returns from TSA, Dick's, and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

### e.    Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value

124.    For years, Plank had carefully cultivated a public perception of the Company as an up-and-coming, fast-growing challenger to Nike's position as the number one sportswear brand. Plank was highly motivated to maintain this public perception and, in turn, the Company's lofty, artificially inflated common stock prices.

125.    Plank stood to gain most from the Company's artificially inflated share prices.  He was the Company's largest shareholder throughout the Class Period, owning just over 15% of the Company's total Common Stock outstanding.  As of October 28, 2015, Plank beneficially owned 35,700,000 shares of Class B Common Stock (which were not publicly traded but convertible to Class A Common Stock) and 76,445 shares of Class A Common Stock.  With such a massive equity stake in the Company, Plank was highly motivated to keep the share prices artificially inflated.

126.    Plank profited handsomely from the artificial inflation by selling a massive number of Under Armour shares during the Class Period.  Specifically, over nine days in November 2015 and April 2016, Plank sold a total of 2,300,000 Under Armour shares for $138.2 million.  With all of Plank's shares coming from stock grants at no cost to him, that $138.2 million was 100% profit.

Significantly, Plank's Class Period sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company: "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "*the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016*, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[55]

127.    Plank's Class Period stock sales were highly suspicious in several respects.  Just prior to the Class Period, Plank enacted a complicated and risky plan to protect his voting control and status as the unchallenged leader of Under Armour.  Events such as the Company issuing new shares of Class A Common Stock for executive compensation had diluted Plank's ownership share since the IPO.  Thus, Plank was concerned that such compensation, coupled with his own stock sales, would drop his ownership stake below 15%, causing him to lose voting control.  To maintain voting control, Plank could only sell 3,448,332 shares of Class A and Class B Common Stock. Because Plank made clear that giving up voting control was not an option and went to great lengths to prevent that from happening, those shares of Plank's needed to maintain his 15% ownership were effectively not available to sell.  To prevent further dilution and protect his control, Plank caused the Company to undertake an extraordinary recapitalization of the Company's balance sheet by issuing a new class of common stock – Class C Common Stock with zero votes.  Plank advocated for this third class of stock and the need for Plank to maintain control in a June 15, 2015, letter to shareholders.  Plank made clear that the recapitalization was intended to allow Plank to continue selling millions of dollars in Under Armour stock without losing control of the Company.

---

[55]    Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

While Plank told investors "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders," the real beneficiary was Plank.

128.    Although Plank's $138.2 million in sales were purportedly made pursuant to a Rule 10b-5-1 trading plan ("Plan") providing for his sale of Class B Common Stock and, when issued, Class C Common Stock, this supposed Plan was suspiciously entered into on October 28, 2015, while Plank was already in possession of material, non-public information about the Company - this nullifies the purpose of the Plan.   Moreover, to the extent such a Plan exists, there is no indication that the dates, timing, and price of Class Period sales were pursuant to a written formula in the Plan that were not susceptible to change or influence, or that that trades were in accordance with the unamended Plan.  *See* 17 C.F.R. 240.10b5-1(c).   Thus, any asserted Plan is suspect because it was entered into as a cover for Plank's insider trading at a time he was actively engaged in deceiving investors.

129.    Specifically, in November 2015, Plank sold 1,250,000 shares of Class B Common Stock for proceeds of $99,968,961 million.  That sale amounted to roughly 36% of the shares Plank could sell without losing control of Under Armour.  In other words, in one week and while in possession of material negative information (in particular the Company's undisclosed "fundamental shift" of competing on price rather than brand strength and suspect sales practices), Plank sold 36% of the shares he had available to sell.

130.    On April 7, 2016, pursuant to Plank's recapitalization plan, the Company issued Class C Common Stock to all holders of Class A and Class B Common Stock.  As a result, Plank beneficially owned 135,020 shares of Class A Common Stock, 34,450,000 shares of Class B Common Stock, and 34,585,020 shares of Class C Common Stock.  With the issuance of the Class C shares, Plank could continue his Class Period selling spree without diluting his voting control.

- 51 -

He did just that.  Plank liquidated a total of 1,050,000 of his newly-issued Class C shares, for $38,262,467 in proceeds, in a series of trades over four days on April 26-29, 2016.  As with his November 2015 sales, these were 100% profit.  Plank's April 2016 sales of 1,050,000 Class C shares liquidated a remarkable 42% of the shares he could sell during the entire year without ceding control of the Company.[56]  And, like the November 2015 sales, the April 2016 sales were made without disclosing the material negative information in Plank's possession.  In particular, at this time, the Company was engaged in the "fundamental shift" away from its oft-stated bedrock principle of not competing on price and was engaged in suspect sales practices including pulling sales forward in order to mask slowing demand and maintain the appearance of growth.  And, Plank was aware of the Company's repeated efforts to move revenue between quarters, including by pulling sales forward.[57]

131.    Importantly, had Plank not recapitalized Under Armour's balance sheet, he would have had to convert and sell additional Class B shares (which carried ten votes) in order to achieve the same amount of total Class Period proceeds ($138.2 million), thereby reducing his ownership of the Company's voting shares.  The recapitalization allowed Plank to avoid this by selling Class C shares (which carried no votes) instead of Class B shares.  Had Plank sold 1,050,000 Class B shares in April 2016 (instead of the 1,050,000 Class C shares he actually sold), his total Class Period sales (2,300,000 shares) would have represented a much larger portion – approximately

---

[56]    Pursuant to a charter amendment made in connection with the creation of the Class C Common Stock, Plank was limited to selling 2,500,000 shares in any given year or his voting control would unwind.  Although the provision allowed for potential rollover of shares if Plank sold less than 2,500,000 shares in a year, thus increasing his annual limit, that did not apply to 2016 because it was the first year the provision was in effect.

[57]    *See id.* at 2.

67% – of the shares Plank had available to sell from September 16, 2015, through January 30, 2017, without losing voting control of the Company (3,448,332 shares).

132. Plank's $138.2 million Class Period trades were out of line with Plank's subsequent trading. Indeed, as the truth concealed by Defendants' fraud began to be revealed and Under Armour's stock price was punished accordingly, Plank stopped selling. Plank has not sold a single share of Under Armour stock since 2016.

133. Plank's Class Period stock sales were also out of line with typical sales by public company executives. For example, a 2010 study found that "the typical CEO sells only about 1.9% of her equity incentives each year."[58] In contrast, Plank's November 2015 sales of 36% of the total shares he was able to sell without losing control of the Company were about 18 times the average annual sales of CEOs at large public companies. Plank's April 2016 sales of 42% of shares available to sell are even more out of line with a typical CEO's behavior.

134. Plank's Class Period trading was also suspicious in timing. On September 16, 2015, October 22, 2015, and November 4, 2015, Plank made a series of misstatements and omissions that artificially inflated, or maintained the artificial inflation of, the Company's stock price. From November 17-23, 2015, Plank took advantage of this artificial inflation by selling approximately $100 million of Under Armour stock. Plank's November 2015 sales were made near all-time highs for Under Armour stock. Less than two months after Plank reaped $100 million in illicit trading proceeds, the Morgan Stanley Report revealed that the Company was experiencing a core business decline, losing market share, falling ASPs, and contracting key margins, and the Company was (and had been) engaged in a fundamental shift in strategy.[59] The Morgan Stanley

---

58 John E. Core & Wayne R. Guay, *Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework*, 24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).

59 Ex. C.

Report also observed that the Company's shares had reached an "unprecedented valuation," trading at a price 78 times greater than the Company's earnings per share ("EPS") in FY15.[60] Moreover, unbeknownst to Under Armour investors, Defendants were using undisclosed, suspect sales practices to mask slowing demand and make the Company appear healthier, including moving revenue between quarters by, among other things, pulling sales forward.

135.   Plank's sales in April 2016 were likewise suspicious in timing.  On March 2, 2016, one of Under Armour's biggest customers, Sports Authority, announced it was filing for bankruptcy.  On April 16, 2016, Sport Chalet, another of Under Armour's wholesale customers, announced it was going out of business.  Despite those announcements, on April 21, 2016, Plank raised 2016 guidance and made a series of other false and misleading statements and omissions regarding the Company's purportedly strong financial condition, as alleged herein, causing Under Armour's stock prices to continue trading at artificially inflated prices.  A few days later, on April 26, 2016, Sports Authority declared that rather than restructure and continue to operate in some capacity, as it had previously planned to do, it would liquidate.  That very same day, Plank sold 225,000 shares for nearly $10 million in profit.  In total, between April 26, 2016, and April 29, 2016, Plank unloaded 908,570 shares for $38.2 million in profit, taking advantage of the recapitalization plan discussed above.  At that time, Plank knew that the Company was engaged in suspect sales practices when at the same time the Company was losing one of its biggest customers and facing waning demand.[61]

---

[60]   *Id.* at 3.

[61]   In April 2020, Plank belatedly disclosed additional Class Period sales from 2016 that were also suspicious in timing:  these sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company and while Plank possessed material negative information, including that the Company was engaged in the "fundamental shift" away from its oft-stated bedrock principle of not competing on price and was engaged in suspect sales practices like pulling sales forward to mask slowing demand and maintain the appearance of growth.  Although Plank's

136.    Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016, through November 3, 2019.

137.    The financial press took note of Plank's "amazing" timing.  A February 7, 2017, article on *TheStreet.com* titled, "Under Armour Founder Kevin Plank Has Been Amazing at Predicting Recent Stock Crashes," noted "it shouldn't come as a shock that Plank's recent stock trades were a good indicator on the company's surprising new challenges, and Wall Street's subsequent brutal response."  Regarding Plank's April 2016 sales, the article stated "[t]he sales were well-timed."

138.    Plank was also motivated to misrepresent and conceal the Company's true financial condition in order to conduct the Bond offering for nearly $600 million in proceeds on June 8, 2016.  On June 6, 2016, Under Armour filed a registration statement on Form S-3ASR ("Registration Statement") with the SEC regarding the Bond offering.  The Company also filed Forms 424B5 and FWP with the SEC on June 8, 2016 (with Registration Statement, "Offering Materials").  Pursuant to the Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million ("Offering").

139.    The Company, and in turn Plank, immediately benefited from the Offering, receiving $593.6 million in total net proceeds.  The Offering terms would have been far less favorable to the Company had the market known the truth about the Company's ailing financial condition.  As the truth concealed by Defendants' Class Period misstatements and omissions was

---

November 2015 and April 2016 trades were purportedly made pursuant to a Rule 10b5-1 trading plan, these belatedly-disclosed 2016 trades were not.

revealed through a series of partial disclosures, the Bonds were downgraded to junk status on February 1, 2017.  Had the Bonds been issued a junk status rating at the time of their issuance, the Offering would have made less financial sense and been less advantageous to Under Armour, particularly because Defendants intended to use the Bond proceeds to repay outstanding debt under its revolving credit facility.  Furthermore, Under Armour reported negative free cash flow in 2015 and 2016.  In fact, the Company's reported negative cash flow from operations of -$44 million in FY15 was its first negative operating cash flow year since FY07 and down from $219 million in FY14.  Under Armour's cash position provided an acute need for the Bond proceeds.  These facts were well known to Plank, serving as additional motive to misrepresent and conceal the Company's true financial condition and suspect sales practices to keep the Bonds above junk status.

### 2.     The Scienter of Company Executives Is Imputed to Defendant Under Armour

140.    Plank's scienter is imputed to Under Armour.   In addition, numerous facts demonstrate that other members of the Company's senior management knew or recklessly disregarded the adverse facts concealed by the Class Period misrepresentations.  The scienter of these Under Armour executives, like that of Plank, is imputed to Under Armour.  Because Plank and other members of Under Armour's senior management had the requisite scienter, Under Armour had the requisite scienter.

141.    In addition to Plank, the extensive information and reporting systems discussed above (¶¶107-108, 111-112) were available to other Company executives.  Everyone at Under Armour on the sales team had full visibility into detailed and regularly updated sales data. Declining demand, excess inventory, and margin compression were widely discussed throughout Under Armour.  According to former Under Armour executives, as reported by WSJ: "The strains

in Under Armour's business were evident inside the company in 2016."[62]  And, Under Armour employees in sales and planning relied on massive and constantly-updated spreadsheets with detailed sales and inventory data to track the Company's undisclosed practices of pulling forward sales and determine what inventory to get rid of.

142.   Two of the Company's most senior executives, former CFOs Dickerson and Molloy, made numerous public statements in which they discussed the Company's apparel sales growth, sales prices, inventory levels, and gross margins, evidencing their personal knowledge of such matters.  This included prepared statements on, and detailed answers about, at least one of those matters during every quarterly earnings call with securities analysts during their respective tenures in the Class Period.  During the Company's 2015 Investor Day, for example, Dickerson specifically acknowledged his and the Company's close monitoring of inventory, stating that "the majority of our focus is going to be on inventory management and the efficiency of inventory management."  Dickerson and Molloy also echoed these statements in numerous press releases and SEC filings of the Company during the Class Period.  Along with Plank, Dickerson signed and certified the Company's false and misleading Form 10-Q issued on November 4, 2015, and Molloy signed and certified the Company's false and misleading Form 10-K issued on February 22, 2016, and Forms 10-Q issued on April 29, 2016, August 3, 2016, and November 2, 2016. Dickerson's knowledge of the SportScan data reported by Morgan Stanley is further supported by the fact that he discussed and responded to the Morgan Stanley Report at length during the Company's 4Q15 earnings call on January 28, 2016, as detailed in ¶183.  While he (along with Plank) tried to downplay and discredit the report and reassure the market of the Company's financial strength as to each of the business segments addressed in the report, these statements

---

[62]   Ex. A, at 3.

were simply motivated to keep the Company's stock price afloat, and ultimately proved false and misleading later in the Class Period, when Defendants revealed the same problems reported by Morgan Stanley.

143.    Moreover, in just over a one-year period, as Defendants' fraud was gradually revealed to the market, Dickerson and Molloy both departed the Company.  Molloy's abrupt departure came only 13 months after he had joined the Company, replacing Dickerson.  And, according to WSJ, investigators are examining "the tenure of former finance chief Chip Molloy."[63] These sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that Dickerson and Molloy knew of the fraud detailed herein.

144.    Molloy's replacement as CFO, Bergman, also knew of the fraud detailed herein. Along with Plank, Bergman personally received a Wells Notice from the SEC informing him that SEC Staff made a preliminary determination to recommend that the SEC file an enforcement action against him alleging violations of the federal securities laws.  During the Class Period, Bergman signed and certified the Company's Forms 10-Q issued on May 9, 2017, August 8, 2017, and November 9, 2017; May 10, 2018, August 3, 2018, and November 5, 2018; and May 9, 2019, and August 1, 2019; and the Company's Forms 10-K issued on February 23, 2017, February 28, 2018, and February 25, 2019.

145.    Kip Fulks ("Fulks"), the Company's co-founder and CPO during the Class Period, and Plank's "right-hand man," attended the Company's monthly sales meetings with Dick's. Cummings, Senior VP Regional Sales, also attended these meetings.  As noted, the declining demand for Under Armour products at Dick's was discussed at these meetings, and Dick's provided Under Armour with detailed sales reports.  Cummings pressured the Under Armour sales

---

[63]   Ex. A, at 2.

team to do whatever they could to get the sales, and the sales team was encouraged to get customers to place orders by telling them that the orders could be cancelled or returned later. For example, Cummings orchestrated a deal with Dick's in early 2016 wherein Cummings convinced Dick's to order shoes that Dick's did not want (Dick's predicted they would have to return 80% of the shoes). But, Cummings agreed that Under Armour would take back any unsold product. Dick's ended up returning 80% or more of the deal later in 2016.

146.  Fulks and Cummings also received internal sales reports every Monday. The sales team also prepared summaries of the sales data for upper management. In addition, sales management had a "dashboard" on their computers or tablets to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business. For example, sales reports in 2016 indicated that the sell-through for Under Armour's athleisure products was only around 1% to 2%, when it should have been closer to 10% to 15%.

147.  The Company's extensive inventory reporting systems, including information about excess inventory, was widely available. Indeed, the Company's inventory problems, including excess inventory across all brands, were topics of frequent discussion. For example, Mirchin, President North America and later Strategic Advisor Global Revenue, Rob Goodwin ("Goodwin"), VP of North American Merchandising, Bill Healy, Director Hunt/Fish & Tactical Sales, Eskridge, Senior VP Global Merchandising and later President Sports Performance, and Cummings discussed excess inventory. Goodwin noted that Under Armour had the most excess inventory he had ever seen at a company. The amount of excess inventory grew so large that Under Armour's liquidation channels became flooded and, for some of the inventory, there was nowhere to go.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

148.   Throughout the Class Period, Defendants misrepresented the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies.  Defendants' misstatements and omissions failed to provide a full picture of the true circumstances at Under Armour.  In reality, the Company's primary product category, apparel, suffered from reduced customer appeal and demand, which hurt the Company's revenue and operating income growth, created excess inventory, caused Defendants to make a fundamental strategic shift to competing on price rather than premium strength (*i.e.*, dropping sales prices), and compressed the Company's margins.  Defendants concealed these problems and employed several fraudulent sales and accounting practices, in violation of GAAP,[64] to inflate Under Armour's quarterly financial results and growth in order to appear healthier and to mask slowing demand. These practices included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy and the goods would be returned; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could

---

[64]   Defendants' GAAP violations and materially false and misleading financial statements during the Class Period are detailed in Section VIII, below.

immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman alleging violations of the federal securities laws by pulling forward sales during the Class Period.

149.    When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about the Company and its products that would have made such statements not misleading. Specifically, they were under a duty to disclose the Company's slower revenue and operating income growth, lower ASPs, increased discounting and promotions, elevated inventory, and compressed margins attributable to the Company's apparel issues and fundamental shift in strategy (competing on price rather than brand strength) during the Class Period, and their manipulation of quarterly results, including by pulling future sales forward in order to appear healthier and to mask slowing demand. This information was material because it would have altered the total mix of information made available to reasonable investors. However, Defendants failed to reveal this information, and instead they omitted and concealed it from investors. In addition, many of Defendants' statements about sales, demand, market share, pricing, inventory, and margins were explicitly and materially false and misleading in and of themselves. Defendants' material omissions and false and misleading statements are detailed in this section.

150.    Defendant Under Armour is liable for the material misstatements and omissions of its employees alleged herein. Likewise, as CEO, Chairman, and controlling stockholder during

the Class Period, Plank is liable for the material misstatements and omissions of Under Armour employees alleged herein.

### A.    2015 Investor Day

151.    The Class Period begins on September 16, 2015.  On that day, the Company held its 2015 Investor Day.  Plank and other members of Under Armour's senior management gave presentations on behalf of the Company.

152.    Throughout the meeting, Plank and other senior executives repeatedly made false and misleading statements that the Company was experiencing increased demand and sales growth in key categories.  In particular, Defendants failed to disclose that they inflated the Company's financial results and growth to appear healthier and to mask slowing demand for Under Armour by (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  As noted above, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015, which is the same quarter the Investor Day statements were made.

153.    Plank stated that "[t]he demand for our brand has never been stronger" and represented that the "drivers" of sales growth were the same as they had been "over the past 10 years."  CMO Stafford told investors that Under Armour's "men's business is stronger than ever."  With respect to women's products, in particular, VP of the Women's Division, Kelly Cortina, added, "[d]emand for our product is growing."  And Peter Ruppe, Senior VP Footwear, stated that the Company had "raised margins" in the footwear division.

154.   Dickerson added that "[a]pparel, our largest category, continues to grow over 20%."  Stafford told investors that the Company was "increasing our ASPs" in men's apparel. Defendants failed to disclose that the Company's apparel business – its largest and most important business – was compressing margins as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

155.   Another Company representative, Susie McCabe, Under Armour's Senior VP of Global Retail, made clear that Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

156.   With regard to wholesale sales, which accounted for 65% of Under Armour's sales in 2016, Mirchin, President North America, misleadingly stated that "[Under Armour's] relationship and our partnership with Dick's has never been stronger and our business continues to grow."  Mirchin stated that the Company had "incredible growth at wholesale."

157.   Analysts reacted positively to Defendants' statements made at Under Armour's 2015 Investor Day.  For example:

(a)   in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating and stated, "UA continues to be our *#1* pick for long-term growth investors."  In support of the positive outlook, the report noted the "company has been patient and methodical in managing the growth of the brand by only entering the proper channels";

(b)   on September 16, 2015, KeyBanc Capital Markets issued a report stating "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and investments should continue to support >20% top-line growth over the next few years. We think UA's impressive growth demonstrates the power of strong brands";

(c)     on September 17, 2015, Cowen and Company issued a report raising its estimates and increasing its price target to $120 from $112, stating, "[m]anagement's revenue targets could ultimately be conservative given the acceleration in investments"; and

(d)     on September 17, 2015, BB&T Capital Markets issued a report raising its price target to $115 and commenting, "we came away from UA's Investor Day enthusiastic about the brand's trajectory."

158.     The Company's Class A Common Stock increased from a closing price of $49.34 per share[65] on September 15, 2015, to $51.68 per share on September 16, 2015, and $52.05 per share on September 17, 2015 (the stock's all-time high closing price).

159.     Defendants' misstatements and omissions on September 16, 2015, as set forth in ¶¶151-156 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

---

[65]   The prices of Class A Common Stock on or before April 7, 2016, referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

(c)     the sales growth and demand trumpeted by Defendants were overstated by their undisclosed quarterly practice of shifting sales from quarter to quarter to appear healthier and to mask slowing demand, including by pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

(d)     Defendants failed to disclose these material problems to the market, and instead gave investors the misleadingly positive perception that apparel growth was continuing and that demand for the Company's products "has never been stronger," when in truth Under Armour was experiencing declining demand and using pull-forward sales and contingent sales pursuant to buyback agreements to maintain a façade of growth;

(e)     the Company was not "protect[ing] the brand" through controlled use of off-price distribution and refraining from "chas[ing] easy profits"; rather, the Company was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth projections, in an attempt to combat the core apparel declines, which compressed margins; and

(f)     Under Armour's wholesale business, including with Dick's, was not "stronger" but weaker, and the Company did not have "incredible growth at wholesale."  In fact, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale.

## B.     Third Quarter 2015 Financial Results

160.     On October 22, 2015, the Company issued a press release announcing its financial results for 3Q15, followed by a conference call the same day to discuss those results.  On November 4, 2015, the Company filed a Form 10-Q with the SEC reporting its financial results for 3Q15.  In the press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants

failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015 when they made these statements.

161.    The press release stated gross margin headwinds were "partially offset by favorable product margins."  During the October 22, 2015 conference call, Plank again misrepresented the level of demand for the Company's products, which he would later admit had failed to adapt to changing consumer preferences.  ¶¶275-276, 301-303.  Plank stated that the Company was experiencing "unparalleled demand for the Under Armour brand."  During the conference call, Dickerson stated that "[i]nventory for the quarter increased 36% to $867 million."

162.    Dickerson admitted that margins had contracted, but he misleadingly blamed such contraction on relatively benign factors including the strength of the U.S. dollar, exchange rates, and the emerging footwear business (which carried lower margins), rather than declining sales of apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins:

> Moving on to margins, third quarter gross margins contracted 80 basis points to 48.8%, compared to 49.6% in the prior year's period.  The following factors were the primary drivers during the quarter.  First, the continued strength of the US dollar negatively impacted gross margins by approximately 90 basis points versus the prior year.  Second, sales mix negatively impacted gross margin by approximately 50 basis points in the third quarter versus the prior year, primarily driven by the continued strong performance of our footwear business.
>
> Also, on our ongoing focus to better flow of product to service our business resulted in

higher freight expenses, which negatively impacted gross margin by approximately 20 basis points in the quarter versus the prior year. Partially offsetting these margin pressures, we continue to see favorable product margins in both our North America and international business, which benefited gross margin by approximately 90 basis points in the third quarter.

163.    Dickerson further represented that "we *continue* to see favorable product margins in both our North America and international businesses" and that "we will *continue* to see improvements in our product margins." Dickerson was asked for additional detail on the Company's margin contraction during the question-and-answer session with analysts, and made clear that margins in the apparel business were not to blame, and were actually improving "right now":

> **Omar Saad, Evercore ISI:** . . . [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera. But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that. Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?
>
> **Dickerson:** That's really probably more on our core apparel business. Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, ***most of our core apparel product margins are improving***. That's helping offset some of the other pressures we talked about.
>
> **Saad:** Is that more generating scale in the business on the cost side? Are you taking price strategically, or is it mixed to more premium products? Maybe just expand a little bit more?
>
> **Dickerson:** Yes, it's a little bit across the board. . . . But, again, you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so ***that's where we're seeing it right now***.

164.    Separately, Dickerson failed to attribute elevated inventory levels to the Company's slowing apparel sales. Instead, he misleadingly blamed this on a strategic plan to flow product to customers in a timelier manner, and stated the "bigger driver of" increased inventory levels "is the flow of product."

165.    Analysts reacted positively to Defendants' statements on October 22, 2015, regarding Under Armour's strong 3Q15 financial results.  For example:

(a)    in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results;

(b)    on October 22, 2015, SunTrust maintained its "Buy" rating and commented that Under Armour showed "[s]trength across categories" and its guidance should prove "conservative"; and

(c)    on October 23, 2015, Telsey Advisory Group ("TAG") issued a report maintaining its "Outperform" rating and saying the results "marked another solid beat and raise quarter" for Under Armour.

166.    On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15, which were also discussed in the Company's press release and during its earnings call on October 22, 2015.  The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

167.    Plank signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating, in relevant part:

1.    I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

\*        \*        \*

- 68 -

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

168.    Defendants' misstatements and omissions on October 22, 2015, and November 4, 2015, as set forth in ¶¶160-164, 166-167 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the net revenue growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

(d)     Defendants failed to disclose these material problems to the market, and instead gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and contingent sale pursuant to buyback agreements to maintain a façade of growth;

(e)     the Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline.  Rather, they were narrowing due to increasing Company discounts and promotions, falling ASPs of the Company's products, and increasing liquidations;

(f)     the "bigger driver of" the Company's increasing inventory was not a strategic plan concerning "the flow of product" but, rather, the declining apparel sales and reduced demand for Under Armour's products;

(g)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing.  Under Armour only maintained the false appearance of growth by engaging in the suspect sales practices described herein; and

(h)     the Company's Form 10-Q for 3Q15 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

## VII.   INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

169.   Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins.  The truth was ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's common stock prices.  The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the true state of the Company's financial condition and by concealing Defendants' improper sales and accounting practices, which inflated its quarterly financial results and growth to appear healthier and to mask slowing demand for its products, including by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the

Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016. By continuing to mislead the market in this manner, Defendants kept the Company's common stock prices artificially inflated throughout the remainder of the Class Period. This section details the partial revelations of truth regarding Defendants' fraud, the resulting Under Armour common stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's common stock prices artificially inflated even as the truth began to leak out.

### A.   Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour

170.   On Sunday, January 10, 2016, Morgan Stanley issued a report downgrading the Company, reducing its sales and EPS growth forecasts for the Company, and significantly reducing its price target for the Company's stock from \$103 to \$62 per share.[66] Based on analysis of several data points, including fact-based sales data capturing Under Armour's core sales channel provided by SportScan, Morgan Stanley revealed a "fundamental shift" at Under Armour whereby the Company had, unbeknownst to investors, began competing on price rather than its premium brand image.[67] Citing retail data, the report explained that the Company's North American apparel business was slowing, leading to market share and average sales price declines:

> Data indicates near-term earnings uncertainty is more than just weather: Recent SportScan data shows [Under Armour] is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace. Both trends are more pronounced in women's apparel, despite major marketing investment in this division last year. Though warm weather surely explains some of this, we think [Under Armour] may be reaching maturity in US apparel faster than previously thought. Though we remain constructive on [Under Armour]'s int'l opportunity, we don't think the shares are priced

---

[66]   Ex. C, at 1.

[67]   *Id.* at 2.

for a US slowdown.[68]

171.    According to the retail data disclosed in the report, the declines were occurring since at least spring of 2015 (prior to the Class Period):

> Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests [Under Armour] is losing apparel market share (Exhibit 5).  Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single- digit growth this year.  This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs (Exhibit 6).[69]

172.    In particular, the report concluded, based on the retail data, that the Company's sales of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth, falling ASPs, and market share losses cited above have been more pronounced in women's apparel. Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share loss in women's has been larger and happening for 5 months, while Nike continues to take share (Exhibit 7)."[70]  This was "concerning because Under Armour invested nearly $15M in a major marketing campaign in 2014 targeted toward women. . . .  To continue its growth story, [Under Armour] must excel in women's apparel."[71]

173.    The report also raised concerns about Under Armour's potential distribution deal with Kohl's.  "Entering Kohl's would seem like Under Armour is risking some of its brand equity to find growth . . . [and] would imply there may not be as much growth in these other channels as previously thought."[72]  Expansion to Kohl's would be further evidence of a "fundamental shift" at

---

[68]   *Id.* at 1.

[69]   *Id.* at 4.

[70]   *Id.* at 6.

[71]   *Id.*

[72]   *Id.* at 7.

Under Armour because it "risks eroding the premium image of the UA brand" in order to try and maintain revenue growth with higher volume lower priced sales.[73]  Morgan Stanley further noted that the move to Kohl's "was not part of UA's 2018 plan given at its investor day" and expansion into Kohl's would signal that "growth is becoming harder to find for UA than previously thought."[74]  In subsequent reports, Morgan Stanley explained further that a move by Under Armour into mid-tier stores "changes the UA investment thesis.  One main reason to own UA is it is a premium brand.  Premium brands have reputations for having higher margins, holding price better, and having more sustainable cash flows long-term.  The market, in turn, would likely not perceive the same growth or margin story that it used to and send the P/E lower."  Put another way, "adding more mid-tier doors is really UA just taking its brand down – essentially trading on its premium brand image in exchange for sales growth."

174.    In addition to the apparel problems, the Morgan Stanley Report, citing the fact-based retail data, noted that "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . .  [Under Armour] has always competed on brand image and innovation, rarely on price.  This change in trend is a major concern because this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."[75]  The report also noted that, with respect to the Company's Curry Two

---

[73]    *Id.*

[74]    *Id.* at 4.  As other analysts at the time noted, Under Armour made clear at Analyst Day that its focus was on "premium distribution" and "premium locations" in order "to maintain brand strength."  *See* Brean Capital, LLC, UA: Initiating with a Buy; As Good of A Growth Story As There Is, October 15, 2015.

[75]    Ex. C, at 1.

basketball shoes, Under Armour appeared to be "trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."[76]

175.    In response to the Morgan Stanley Report, the Company's Class A Common Stock price fell sharply.  After closing at $37.50 per share on Friday, January 8, 2016, the stock closed at $34.98 per share on Monday, January 11, 2016 (the first trading day after the report was issued), a decline of 6.72% ($2.52 per share), on unusually high trading volume of over 29 million shares.

176.    In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example:

(a)    on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS";

(b)    in a report dated January 25, 2016, Cowen and Company lowered its estimates and reduced its price target to $95 from $110; and

(c)    on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that product discounting was "likely worse than expected."

**B.    Misleadingly Positive Fourth Quarter 2015 and Fiscal Year 2015 Financial Results and Downplay of the Morgan Stanley Report**

177.    On January 28, 2016, Defendants issued a press release announcing the Company's 4Q15 and FY15 financial results.  The press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 90 basis points from sales mix, specifically from strong footwear growth, approximately 80 basis points from the continued

---

[76]    *Id.* at 10.

strength of the U.S. Dollar, and approximately 30 basis points from higher liquidations." Defendants held a conference call that same day to discuss the 4Q15 and FY15 results.  During the January 28, 2016 conference call, Dickerson stated that "[i]nventory for the quarter increased 46% to $783 million compared to $537 million at December 31, 2014."  On February 22, 2016, the Company filed a Form 10-K with the SEC reporting its financial results for 4Q15 and FY15.

178.    In the 4Q15 and FY15 press release, on the subsequent conference call, and in the Form 10-K, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

179.    In the January 28, 2016, press release and conference call, Plank continued to represent to investors that Under Armour's core products were in high demand and Under Armour was and would continue to be a premium brand.  Plank stated "'[o]ur core business remains incredibly strong'" and that Under Armour's "growth story is strong, we remain a growth company, and none of that is wavered."  Although he would later admit the Company's apparel offerings had failed to change with consumer preferences, Plank led investors to believe the Company's revenue growth was based on high demand for core apparel.  Plank stated that "[i]n

- 76 -

the fourth quarter, Apparel growth of 22% show cases that our brand has products for all seasons and temperatures."  And that "[o]ur brand, our presence, our ability to drive ASPs have never been stronger in North America."

180.    Defendants also discussed the declining margins and increasing inventory, but pinned the blame on relatively benign and short-term factors (faster growing but lower margin footwear and international business, the strength of the U.S. dollar, and higher freight expenses) rather than declines in the Company's apparel business.

181.    Dickerson tied excess inventory and liquidations to a designed strategy to deliver products to customers earlier, as well as recent weather trends, rather than any sales problems caused by the declining apparel business:

> This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . .  In addition, the recent weather trends have led to some excess inventory creation, which we will continue to work through across our normal liquidation channels during the first half of 2016.

182.    Following Dickerson's opening remarks, an analyst questioned Defendants about the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP reductions, as detailed in Sections V.C-D above and in Exhibit C attached hereto.  Dickerson downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data), claiming the data was too focused on the Company's large accounts, citing Dick's as an example.  In response to the same question, Dickerson also reassured investors that, notwithstanding such data, apparel growth was robust:

> **Matthew J. McClintock, Barclays:** My question is, Kevin, there seems to be a lot of debate in the marketplace on several of your strategies, and you kind of hit upon some of this in your prepared remarks.  But in particular, the competitive positioning of both your Footwear and your Women's business, and then also the potential maturity of the domestic business.  I was just wondering if you can give us your updated thoughts on those topics?  Have there been any strategic changes that we should be thinking about?  Thanks.
>
> **Dickerson:** . . .  So utilizing that [SportScan] data as a proxy for our success, especially in

- 77 -

the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%. So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular.

183.    In discussing the Company's gross margin contraction, Dickerson omitted any mention of the Company's declining ASPs in apparel and increased promotions and liquidations, all of which, unbeknownst to investors, were negatively impacting Under Armour's gross margins:

> Moving on to margins. Fourth quarter gross margins contracted 190 basis points to 48% compared to 49.9% in the prior year's period. The following factors were the primary drivers during the quarter: First, sales mix negatively impacted gross margin by approximately 90 basis points in the fourth quarter versus the prior year, primarily driven by the continued strong performance of our Footwear business. Second, the continued strength of the U.S. dollar negatively impacted gross margin by approximately 80 basis points versus the prior year. Third, higher inventory liquidations negatively impacted gross margin by approximately 30 basis points.

184.    In discussing 2015 gross margin headwinds, Dickerson stated that "we were able to offset most of the non-currency related [gross margin] pressure through ***more favorable product margins in*** both our ***North America*** and International businesses."

185.    Defendants were asked specifically about ASPs of apparel and gross margins, and Plank and Dickerson responded as follows:

> **Omar Saad, Evercore ISI**: You kept mentioning premiumization, I think specifically to Footwear. Can you just dig a little bit deeper there, and then talk about does this translate over to Apparel at some point, we sort of see ASPs going up there? And then Brad, maybe you could comment on premiumization, maybe how it might flow-through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag and what are the really underlying gross margins going to do over time? Thanks.

> **Plank**: . . . So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel. So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators.

> *            *            *

> As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . . ***We continue to drive and demonstrate that premium position in the marketplace***.

- 78 -

\*   \*   \*

**Dickerson**: And we were able to offset a lot of that [gross margin contraction] just through ***our general increase and improvement in product margins, specifically on the Apparel side***.

So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins. . . .

So I think in all aspects of our business, you will see that improve over time. . . .  And our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak.

186.    Further attempting to allay gross margin concerns, Dickerson represented that "we're definitely seeing improvements in Footwear margins in general" and that "Footwear margins . . . have improved."

187.    Plank later added, "we do see the ability to *continue* to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

188.    Analysts reacted positively to Defendants' statements on January 28, 2016 regarding Under Armour's strong 4Q15 and FY15 financial results.  For example:

(a)    in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders";

(b)    on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness;

(c)    on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73;

- 79 -

(d)     on January 28, 2016, Deutsche Bank issued a report noting Under Armour's representations that, contrary to the Morgan Stanley Report, the Company remained a premium brand: "UA m[anagement] made it clear today that they are now pursuing premiumization more aggressively";

(e)     on January 28, 2016, Cowen and Company issued a report titled "*Sentiment Normalizes Post 'Sportscan' Fear*" that noted the importance of "the introduction of evermore premium price points in footwear and apparel [to] improve[] prospects for long-term margin enhancement; and

(f)     on January 28, 2016, Evercore ISI issued a report noting UA's purported "increasing success in more premium products."

189.    On February 22, 2016, the Company filed with the SEC a Form 10-K reporting financial results for 4Q15 and FY15, which were also discussed in the Company's press release and earnings call on January 28, 2016.  The Form 10-K stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

190.    The Company's Form 10-K also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

191.    Defendants' misstatements and omissions on January 28, 2016, and February 22, 2017, as set forth in ¶¶178-187, 189-190 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including

declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap, and making contingent sales subject to buyback agreements;

(d)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and making contingent sales subject to buyback agreements to maintain a façade of growth;

(e)     Plank's assertion that the Company's ability "to drive ASPs have never been stronger in North America" was false because the Company's ASPs were falling sharply in North America as Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices, increase promotions and discounts (*e.g.*, offering its key products on sale for the first time during Black Friday, 2015), and liquidate more products;

(f)     Defendants' attempts to downplay the January 10, 2016 Morgan Stanley Report were false and misleading because the Company was, in fact, as the report stated, experiencing lower apparel sales growth, increasing ASPs, and a loss of market share;

(g)     the Company's inventory growth was not "largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates" or simply due to "recent weather trends have led to some excess inventory creation." Rather, it was a symptom of reduced sales and market share due to the Company's declining apparel business and buying back unsold products pursuant to buyback agreements;

(h)     Defendants were not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was and had been diminishing since at least spring 2015.  As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and pulling sales forward and making contingent sales subject to buyback agreements to try to compensate for its declining brand heat, creating a façade of growth and the false appearance of interest in its products;

(i)     the Company was not "able to offset a lot of that [gross margin contraction] just through our general increase and improvement in product margins, specifically on the Apparel side" and improvement in apparel margins was not "happening right now as we speak."  Rather, apparel margins were deteriorating as a result of reduced ASPs, discounting, promotions, and increased liquidations as Defendants' scrambled to maintain lofty growth projections artificially in the face of monumental declines in the Company's apparel business; and

(j)     the Company's Form 10-K for FY15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### C.     Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy

192.    On March 4, 2016, the Company issued a press release confirming its previously released net revenue and operating income projections for 2016, notwithstanding the bankruptcy of Sports Authority, one of Under Armour's largest retail customers, filed on March 2, 2016.

193.    The March 4, 2016 press release stated that the Company planned to offset the impact of the bankruptcy on the Company's full year 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

194.    Defendants' March 4, 2016 press release was materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth, including shipping new inventory intended for the Company's own factory

stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at a higher price at its own stores;

(c)      the Company's net revenue and operating income were being inflated by Defendants' suspect sales and accounting practices designed to make Under Armour's financial results and growth to appear healthier and to mask slowing demand for its products; and

(d)      Defendants failed to disclose these material problems to the market and instead gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using suspect sales practiced, as detailed herein, to create a façade of growth.

### D.      Misleadingly Positive First Quarter 2016 Financial Results and Guidance Raise

195.      On April 21, 2016, Defendants issued a press release announcing the Company's 1Q16 financial results.  The press release stated a decline in gross margins "primarily reflect[ed] negative impacts of approximately 100 basis points from higher liquidations and approximately 70 basis points from foreign currency exchange rates, partially offset by approximately 60 basis points from improved product cost margins."  During a conference call held that same day to discuss the 1Q16 results, Molloy stated that "[i]nventory for the quarter increased 44% to $834 million compared to $578 million at March 31, 2015."  On April 29, 2016, the Company filed a Form 10-Q with the SEC reporting its financial results for 1Q16.

196.      In the 1Q16 press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose improper sales and accounting practices, which inflated the Company's quarterly financial results and growth to appear healthier and to mask slowing demand

for Under Armour, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products early; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

197.    In the April 21, 2016 press release, Plank continued his exceedingly positive messaging: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate *the balanced growth of our brand across product categories*, channels and geographies."

198.    Plank was similarly optimistic as to Under Armour's future growth.  Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company *raised* its outlook for FY16

net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

199.    During the question-and-answer session of the April 21, 2016 conference call, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand:

> **Camilo Lyon, Canaccord Genuity**: Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel.  There's a lot of moving parts and some of your bigger customers have been shutting doors, some of the tertiary players are going away. Can you talk about the health of that channel and what that could lead to from a channel expansion opportunity and how do you think about segmentation, within that strategy?

> \*      \*      \*

> **Plank**: I mean, posting 30% growth in a quarter where . . . one of our largest customers, one of our top two or three customers just a few years ago filed for bankruptcy.  I think putting that kind of number up is something that just continues to demonstrate the strength of the brand and how strong our portfolio ultimately is.

> We do believe that there is still an underlying very strong wholesale market out there.  And we expect to continue to be iconic, to be a destination.

> \*      \*      \*

> So . . . *our growth is effectively coming from everywhere*.  And North America is something that we feel incredibly strong about.

200.    In response to a separate question, Plank emphasized that "[a]nd again we are, to be clear, driving massive growth.  *We are taking share*."  As to footwear, Plank stated "[w]e are a premium Footwear brand that's *driving ASPs meaningfully higher*. . . ."

201.    During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to rising inventory levels, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  Molloy stated further: "As previously mentioned, the strategy

to improve wholesale, customer service levels resulted in elevated inventory investments beginning in the second quarter of last year."

202.    In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned:

> **Camilo Lyon, Canaccord Genuity**: If you could just disaggregate the composition of inventory between planned inventory increases and any sort of excesses that you have, given the liquidations they had during the quarter?  And coupled with the expectations for flat gross margins in Q2.  If you could just help us understand.  It seems like we're shifting more towards that planned increase, if I'm reading that correctly.  But just any detail there would be great.

> **Molloy**: . . . [M]ajority of the growth is planned.  But we did have slightly excess. . . .  But we are working through that.  ***As you can see we worked through it*** through liquidation.  We're continuing to manage through that. . . .  So we were working through it.  But the majority of it is planned.

203.    As to gross margins, Molloy blamed "higher liquidations to clear through excess inventory and foreign currency exchange rates," but stated that product margins were "favorable" (offsetting the overall gross margin declines), rather than disclosing that apparel product margins were declining as a result of reduced customer demand, prompting lower sales prices, discounting, and promotions.  In response to an analyst's question on gross margins, Molloy highlighted "product margin improvements we've seen."

204.    Analysts reacted positively to Defendants' statements on April 21, 2016.  For example:

(a)    in a report dated April 21, 2016, Deutsche Bank Market Research raised its price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but so did gross & operating margins and EPS" and also noted that the Company's management "reiterated that inventories would normalize in 2Q";

(b)    on April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is

experiencing across categories, channels, and geographies, and moreover should allay concerns around its growth outlook and opportunities"; and

(c)     on April 22, 2016, TAG issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

205.    The Company's Class A Common Stock rose from a closing price of $43.95 per share on April 20, 2016, to a closing price of $46.93 on April 21, 2016.  The Company's Class C Common Stock rose from a closing price of $42.46 per share on April 20, 2016, to a closing price of $45.41 per share on April 21, 2016.

206.    On April 29, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 1Q16, which were also discussed in the Company's press release and during its earnings call on April 21, 2016.  The Form 10-Q also stated:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf."

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy. . . ."

207.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

208.    Defendants' misstatements and omissions on April 21, 2016 and April 29, 2016, as set forth in ¶¶196-203, 206-207 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the

Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the purportedly "massive" and "balanced" net revenue growth "effectively coming from everywhere" was inflated by Defendants' (undisclosed) improper sales and accounting practices, which inflated quarterly financial results and growth to appear healthier and to mask slowing demand, including pulling sales forward from future quarters; adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; shipping products earlier than planned and in the final days of the quarter; continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing declining demand and created a façade of growth using the suspect sales practices

detailed herein.  Further, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing;

(e)     the decrease in gross margin percentage was not primarily driven by Under Armour's "changing inventory management strategy."  Rather, gross margin decreases were primarily driven by increased discounting and promotions, including discounts offered to incentivize retailers to take products before their requested ship dates, increased liquidations, and selling new inventory intended for the Company's own factory stores to off-price sellers to book that inventory as revenue immediately, and corresponding lower sales prices;

(f)     the Company was not "driving massive growth, and . . . taking share." Rather, its growth and market share were falling as a result of the Company's apparel sales declines, and Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, that it obscured using the suspect sales practices detailed herein;

(g)     the Company's rising inventory was not merely a result of "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and the majority of the inventory growth was not part of a strategic plan.  Rather, it was largely attributable to declining apparel sales and diminishing demand, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess inventory, which it failed to write down in 2016 (*see* Section VIII.D);

(h)     the Company's gross margin declines were not caused by strategically planned inventory increases and offset by "favorable" product margins.  Rather, declining product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, discounts and other promotions, including those offered to retailers as incentives to take products before their requested ship dates, and increased liquidations due to lower consumer demand for the Company's apparel;

(i)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was, and had been, diminishing since at least spring 2015.  As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and was covering this up by engaging in the suspect sales practices described herein; and

(j)     the Company's Form 10-Q for 1Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### E.     Departures of the Company's Chief Merchandising Officer and Chief Digital Officer

209.     After the market closed on May 3, 2016, the Company surprised investors by filing a Form 8-K with the SEC announcing the departures of two key executives, CMO Stafford and CDO Thurston, both of whom spoke glowingly about the Company's financial results and outlook at the Company's 2015 Investor Day.  The Company provided no reason for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming

on the heels of former CFO Dickerson's departure and Morgan Stanley's downgrade and exposure of problems affecting the Company's revenue and operating income growth, gross margins, and market share, and the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

210.    As a result of this news, the price of Under Armour's Class A Common Stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the stock dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

211.    The Company's Class C Common Stock, which was issued to Class A common stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

212.    The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

213.    Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example:

(a)     in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent";

(b)     on May 4, 2016, Brean Capital, LLC lowered its rating to "Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations; and

(c)     on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

214.    Defendants' misstatements and omissions regarding the Stafford and Thurston departures on May 3, 2016, as set forth in ¶209 above, were materially misleading because they failed to disclose problems at the Company that contributed to such departures.

**F.      Reduced Financial Guidance Tied to the Sports Authority Bankruptcy**

215.    On May 31, 2016, the Company issued a press release titled, "Under Armour Updates 2016 Outlook," which lowered the Company's 2016 financial guidance, after Defendants had provided strong reassurances as to the Company's financial health and raised 2016 financial guidance just a month earlier.  The Company's updated projection included: (a) FY16 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY16 operating income in a range of $440 million to $445 million (down from the previously projected $503 million to $507 million).  The Company also announced an impairment charge of $23 million and FY16 revenues of $43 million from Sports Authority (instead of the originally planned $163 million) "given the recent decision of the bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business."

216.     As a result of this announcement, the Company's stock fell from $37.73 at the close of trading on May 31, 2016, to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.

217.     Similarly, the Company's Class C Common Stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

218.     In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to the bankruptcy.  For example:

(a)     on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35;

(b)     on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)";

(c)     on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target from $43 to $35, citing the Company's $23M impairment charge in 2Q16 and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million; and

(d)     On June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range from $38-$42 to $34-$38.

219.   The stock declines on June 1, 2016, would have been larger had Defendants revealed the full truth to investors regarding the Company's financial problems.  However, Plank continued to mislead the market in the May 31, 2016 press release, stating "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."  This statement was materially false and misleading and omitted material facts because growth in and demand for the Company's apparel business were in decline, not increasing.  Moreover, the Company's apparent growth and demand were overstated by Defendants' concealed sales and accounting practices, which inflated its financial results and growth quarterly to make the Company to appear healthier and to mask slowing demand for its products, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank,

and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

220.    As Defendants continued to mislead, the market continued to be deceived.  Indeed, despite the partial revelation of the truth on May 31, 2016, a Deutsche Bank report stated, "[n]otably, m[anagement] reiterated 2Q's rev[enue] plan of 'growth in high 20%s', allaying palpable fears that trends slowed since 1Q."

### G.    Under Armour Bond Offering

221.    On June 6, 2016, Under Armour filed the Registration Statement with the SEC concerning the Bond offering.  The Company filed additional Offering Materials, Forms 424B5 and FWP with the SEC on June 8, 2016.  Pursuant to the Registration Statement and Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million.

222.    The Offering Materials incorporated by reference the Company's Form 10-K for 4Q15 and FY15 and Form 10-Q for 1Q16, which contained the false and misleading statements and omissions of material fact detailed in ¶¶177-187, 189-190 above.

223.    One month after the Bond offering was completed, on July 8, 2016, Morgan Stanley issued a report with additional analysis regarding Under Armour's strategy and fundamental shift to competing on price rather than brand strength, which the Company had not disclosed and indeed refuted.  Morgan Stanley again analyzed Under Armour's declining ASPs, noting that although wholesale sales are up, "the sales increase can be explained by the ASP decline."  The report recognized that historically and, according to Defendants' Class Period misrepresentations to date, Under Armour "is a premium brand."  But, based on SportScan data, Morgan Stanley stated that, "seven straight quarters of 2.5% ASP declines, on average, challenges that notion."  Morgan

Stanley also analyzed women's apparel, as it had in January, concluding that "UA's women's apparel sales growth rate in the US wholesale channel has decelerated." With regard to footwear, Morgan Stanley noted that "two low priced styles . . . drove 9% of the FY15 growth in running footwear. . . . We believe selling low priced footwear threatens to erode UA premium brand image and limit its long-term growth potential."

224.     The report issued by Morgan Stanley on July 8, 2016 also looked at the impact of a potential move by Under Armour into Kohl's. The report noted "UA knows there is risk in entering this channel" and "UA has not pursued [Kohl's] or [JCPenney] until now because a) these channels may cause erosion of UA's premium brand image and UA didn't want to take the risk, and b) it had so many other growth avenues. We think the reason UA is preparing to enter Kohl's or JC Penney now is it needs to find new avenues to maintain the sales growth rates the market expects. Otherwise, it probably wouldn't want to take the risk." This risk materialized almost immediately thereafter, when unbeknownst to investors, Dick's stopped taking Under Armour products early because it was angered by Under Armour's decision to sell at Kohl's.[77] Overall, Morgan Stanley viewed the declining ASPs, emphasis on low-priced footwear, decelerating women's wholesale apparel, and a potential move into a mid-tier store like Kohl's and concluded that the "strategies UA is using to stimulate sales growth jeopardize its brand equity."

**H.     Disappointing Second Quarter 2016 Financial Results: Partial Revelations of a Growth Slowdown**

225.     On July 26, 2016, just three months after raising guidance, the Company issued a press release announcing disappointing 2Q16 financial results. The Company reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from

---

[77]   Ex. A, at 4.

the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

226.    The Company also reported 2Q16 gross margin of 47.7%, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  Earnings were only $0.01 per share, $0.03 lower than the year-ago quarter.

227.    On the same day, July 26, 2016, Under Armour hosted a conference call to discuss its 2Q16 financial results.  On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16

228.    In the 2Q16 press release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) shipping new inventory

intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

229.    In his opening remarks on the conference call, Molloy stated that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

230.    During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY16.  Molloy stated that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

231.    Separately, the Company forecast 3Q16 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

232.    On this news, the Company's Class A Common Stock fell from a close of $43.59 per share on July 25, 2016, to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares.  The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares per day, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

233.     The Company's Class C Common Stock also fell on this news, dropping from
$38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading
on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6
million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following
day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1
million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

234.     The stock declines would have been larger had the Company revealed the full truth
to investors.  But Defendants continued to mislead investors and downplayed the negative news.

235.     The July 26, 2016 press release stated that a decline in gross margins "primarily
reflect[ed] negative impacts of approximately 130 basis points from sales mix driven by strong
growth in footwear and international, partially offset by approximately 50 basis points from
improved product cost margins."  In a conference call to discuss the 2Q16 results that same day,
Molloy reported "[i]nventory for the quarter increased 30% to $1.1 billion compared to $837
million at June 30, 2015."

236.     Plank continued to insist that Under Armour remained "a growth company" and
falsely stated that "[o]ur second-quarter results are strong evidence that **demand for Under
Armour has never been higher**."

237.     Echoing this message, in his opening earnings call comments, Molloy emphasized
"the **consistent growth across our diverse product lines and channels** [that] delivered another
quarter of strong results," including growth in apparel revenues.

238.     During the question-and-answer session that followed, an analyst inquired about
"athletic inventory in the channel today" and whether Plank was comfortable with the promotional
backdrop.  Plank admitted to a high level of promotion as well as a shifting retail environment, but

misleadingly stated that the level of promotion was the same as in prior years, and that the Company's core base of apparel was growing, notwithstanding shifting fashion trends such as athletic leisure:

> **Matthew Robert Boss, JPMorgan**: Kevin, can you talk about athletic inventory in the channel today? It sounds like inventory for you guys will be in line with sales by the end of this quarter.  Nike expects to be clean by August.  I guess are you comfortable with the promotional backdrop you see out there today?  And then larger picture, what would you say to those calling for a top in the athletic cycle out there?

> **Plank**: Yes, I'm not going to say I'm comfortable with the promotion out there in the market today, but *I don't know if that's different than what we've seen in the last several years, either*.

<p style="text-align:center">*       *       *</p>

> I think there's a shift happening.  I think the way the people are dressing is changing, and it's altering.  And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend.  But the good news is that we're not grounded in trend, we're grounded in sport.  That'll keep us here, and the trends will come and go.  But *we're also watching our core base continue to grow* for us, as well.

239.    With regard to the Company's deteriorating margins, Molloy again falsely attributed the declines largely to benign factors, concealing the margin declines caused by reduced demand for apparel, increased promotions and liquidations, and declining ASPs.  Molloy instead falsely represented that the Company's product margins were improving.

> Moving on to margins, second quarter gross margins decreased 70 basis points to 47.7% compared to 48.4% in the prior year's period.  Sales mix negatively impacted the second quarter by approximately 130 basis points, *primarily driven by the continued strength of our footwear and international growth*.  Partially offsetting this negative impact were *continued favorable product margins*, benefiting gross margin by approximately 50 basis points.

240.    Plank also announced that the Company was expanding its wholesale distribution to include Kohl's.  Plank falsely represented that there was "nothing reactionary about Kohl's" a

mid-tier department store with frequent steep discounting but rather, "[t]his was a proactive move for us."

241.    Despite Defendants' continued false and misleading statements, a number of analysts reacted negatively to Defendants' statements on July 26, 2016, regarding Under Armour's 2Q16 financial results and declining average sales prices.  For example:

(a)    on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target to $40 from $47; and

(b)    on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "[s]ales are growing solidly, but ASPs are fading.  UA competes on brand image and innovation, rarely on price.  This trend change is a concern because it suggests a fundamental shift in the UA story."  With regard to the Company's expansion into Kohl's, which Morgan Stanley had discussed in prior reports, the report noted it "is not a positive in our view," voicing concern that "it is potentially brand dilutive."

242.    On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16, which were also discussed in the Company's press release and during its earnings call on July 26, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

243.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

244.    Defendants' misstatements and omissions on July 26, 2016, and August 3, 2016, as set forth in ¶¶228-230, 234-240, 242-243 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the "continued" and "consistent" growth and high demand Defendants reported were overstated by Under Armour's suspect quarterly practices, designed to make the Company to appear healthier and to mask slowing demand for its products, including: pulling sales forward, adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates, making contingent sales pursuant to buyback agreements, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)     Defendants failed to disclose these improper practices and material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing an ongoing monumental downturn in its primary

sales channel, North American wholesale, and covering up declining demand and sales by engaging in the suspect sales practices described herein to create a façade of growth;

(e)     Molloy's statement that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority]" omitted that Under Armour continued to ship products to Sports Authority, and booked sales for those goods when shipped, even after it knew that TSA was headed to bankruptcy and the goods would be returned;

(f)     the statement that "demand for Under Armour has never been higher" was false and misleading because customer demand for the Company's apparel products, which accounted for the majority of sales, was suffering and in decline, and Defendants obscured this decline using improper and undisclosed sales practices to appear healthier and to mask slowing demand, as detailed herein;

(g)     the Company was not experiencing consistent growth across all product lines and channels.  Rather, growth was slowing due to the declining apparel business.  Under Armour was covering up this decline and creating the false appearance of growth engaging in the suspect sales practices described herein;

(h)     the Company's promotions were growing and were not the same as "the last several years," as Plank misleadingly implied, but much higher, as the Company ran an increasing number of promotions of apparel products during the Class Period;

(i)     the statement that Under Armour was "watching our core base continue to grow" despite changing fashion trends was misleading because the Company's failure to capitalize on changing fashion trends, such as the athletic leisure trend, was reducing demand for the Company's products and thus reducing the Company's core base.  Further, Under Armour was

experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and creating a façade of growth to appear healthier and to mask slowing demand by engaging in suspect sales practices, as detailed herein;

(j)     the statements indicating that the gross margin decline was temporary due to rising product margins, and driven by the footwear and international businesses, were misleading because they implied that apparel margins were strong and failed to disclose that gross margin declines were also driven by slower apparel sales and a monumental decline in Under Armour's primary North American wholesale sales channel, resulting in promotions, discounts (including adjusted contract terms or discounts offered to retailers to incentivize them to take products before their requested ship dates), lower sales prices, increased liquidations, and shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(k)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing. Further, any growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices to manipulate its quarterly results; and

(l)     the Company's Form 10-Q for 2Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### I.      Goldman Sachs Global Retailing Conference

245.     On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference.  Defendants made false and misleading statements at the conference. In particular, Defendants failed to disclose that they inflated the Company's financial results and growth quarterly in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

246.     Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained.  When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved, and that

despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> Yeah, for us **we're in a really good position [with inventory levels]**.  We feel really healthy and it's our understanding that the marketplace is in a healthy position, too.  Came out of the winter season, there was a lot of excess inventory.  You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies.  It was flush with inventory.  It was a promotional environment.  **We didn't participate – have to participate too much in that promotional environment**.

> But from what we can understand that as of the end of August that most of the domestic retail partners are in really good inventory positions.  **We know we are**.

247.    In response to additional questions on inventory, Molloy stated that "retail is pretty good and inventories are clean" and that "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected."

248.    Molloy's September 7, 2016, misstatements and omissions set forth in ¶¶245-247 above were materially false and misleading and omitted material facts for the following reasons:

(a)    the Company's inventory levels were not healthy, clean, in a good position, or "cleaned up a lot sooner than many expected."  Rather, inventory levels were inflated and continued to grow due to declining customer demand for, and declining sales of, the Company's apparel, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's shipping products in the final days of a quarter, resulting in "truckloads of unopened boxes [that] would come back to Under Armour" in 2016.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016.  *See* Section VIII.D.  Moreover, Defendants were indeed participating in and creating a "promotional environment" by running heavy and increasing promotions and discounts in response to the Company's apparel sales declines and inflated inventory levels, which had to be liquidated at a steep discount, and by offering discounts to incentivize retailers to take products before their requested ship dates.  Further, the Company was shipping new inventory intended for the

Company's own factory stores directly to off-price sellers like T.J.X. Co., which allowed Under Armour to book the inventory as revenue immediately (instead of having to wait for a customer to buy the items at its own stores) but at a lower prices and thus lower margins;

(b)    In truth, Under Armour was experiencing an ongoing monumental downturn in its primary retail sales channel, North American wholesale, and any retail growth was because the Company manipulated its quarterly sales to appear healthier and to mask slowing demand, including by making contingent sales pursuant to buyback agreements with its biggest retailers (including Dick's), pulling forward sales from future quarters, adjusting contract terms and offering discounts that incentivized retailers to take products before their requested ship dates, shipping products in the final days of the quarter to hit numbers, and shipping new inventory intended for the Company's own factory stores to off-price sellers so that Under Armour could book the inventory as revenue immediately instead of having to wait for a customer to buy the items at its own stores.

### J.    Disappointing Third Quarter 2016 Financial Results: Further Revelations of a Growth Slowdown and Compressed Margins

249.    On October 25, 2016, the Company issued its 3Q16 earnings release.  Defendants surprised investors by reporting 3Q16 gross margin of only 47.5%, compared with 48.8% in the prior year's period.  On the same day, Under Armour hosted a conference call to discuss its 3Q16 financial results.  On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16.

250.    In the 3Q16 earnings release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated the Company's quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including

by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

251.    Plank and Molloy participated in the call on behalf of the Company.  In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations.  Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year."

252.    During the conference call, Molloy further revealed that apparel growth would be less than projected at the Company's 2015 Investor Day: "[T]he landscape for our business and our industry continues to evolve . . . .  North America apparel growth is slowing across the industry.

While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

253.    Molloy also revealed that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years."  In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . . [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution."

254.    The Company's stock fell sharply as a result of this negative news.   Under Armour's Class A Common Stock dropped from a close of $37.90 per share on October 24, 2016, to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.  The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per day, as the market continued to digest the news.  The total stock price decline over this four-day period was 18.36% ($6.96 per share).

255.    The Company's Class C Common Stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016, to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.  The stock dropped an additional 8.67% ($2.46 per

share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

256.    The stock declines would have been larger had Defendants revealed the full truth regarding the Company's problems.   Instead, Defendants continued to mislead investors and downplay the negative news.  In an October 25, 2016 press release, Defendants stated that a decline in gross margins "primarily reflect[ed] negative impacts from the timing of liquidation, increased promotions, and foreign exchange rates, partially offset by continued product cost margin improvements."  During the October 25, 2016, conference call to discuss 3Q16 results, Molloy stated that "[i]nventory for the quarter increased 12% to $971 million."

257.    Plank boasted during the October 25, 2016, earnings call that "*[w]e are a growth company*.  And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter.  Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."  Plank insisted that "*our demand is still there*" and that "*[revenue] growth remains intact*."

258.    Plank also stated during the earnings call that "with *apparel remaining incredibly profitable* . . . there's not an end to the North American apparel story.  That continues to march on for us as well."

259.    Defendants continued to conceal the full extent and causes of the Company's deteriorating margins and operating income, pointing investors to the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as

opposed to the declining apparel business being a source of the margin and operating income issues).  Molloy also represented that "*we're already seeing improvements in our footwear margins.*"

260.    With regard to inventory, Molloy assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier.*"  In response to an analyst question later in the call, Molloy falsely stated that the Company was "*in really good shape from an inventory perspective*" and "growth rates [have] come down, but *the inventory is in great shape*."

261.    Notwithstanding Defendants' attempts to put a positive spin on the disappointing 3Q16 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example:

(a)    on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak," noting "UA's entry into low-end channels has raised the risk its brand equity erodes";

(b)    on October 25, 2016, Wells Fargo Equity Research issued a report stating the Company's new 2017/2018 outlook was "far worse than expected";

(c)    on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal";

(d)    on October 25, 2016, Piper Jaffray issued a report in response to the Company's disclosures, commenting "[c]learly we and the Street were blindsided by m[anagement]'s update to its long-term guidance on the call";

(e)     on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM"; and

(f)     on October 27, 2016, Morgan Stanley issued a report in response to the Company's October 25, 2016, disclosures.  The report noted that although the market had been led to believe Under Armour's contracting margins were due to investment for future growth, the poor results and margin guidance "suggests UA is increasing discounting and pursuing business in lower-margin channels to meet its sales goals."  Morgan Stanley concluded, "UA's brand momentum is slowing."  The report further noted, with the recent announcement of an expansion into Kohl's alongside worsening margins and falling ASPs, "Under Armour's brand strategy seems increasingly risky.  On one hand the company tries to elevate the brand . . . [o]n the other hand, it allows its brand to be sold at deep discounts."  The report warned, "[i]f the brand equity erodes, it will be almost impossible to get back and growth will be increasingly hard to come by."

262.     On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16, which were also discussed in the Company's press release and during its earnings call on October 25, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

263.     The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

264. Defendants' misstatements and omissions on October 25, 2016, and November 2, 2016, as set forth in ¶¶250, 256-260, 262-263 above, were materially false and misleading and omitted material facts for the following reasons:

(a) Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015. This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b) Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c) the "intact" net revenue growth and "incredible" financial results reported by Defendants were inflated by the Company's suspect sales and accounting practices, which manipulated its quarterly growth and financial results to appear healthier and to mask slowing demand, including by: pulling sales forward from future quarters, making contingent sales pursuant to buyback agreements with its biggest customers like Dick's, adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)      Defendants failed to disclose these material problems and suspect practices to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and covering up declining demand and sales by using the suspect sales practices detailed herein to create a façade of growth;

(e)      the pressure on the Company's margins and operating income was not driven solely by the footwear and international businesses becoming greater sources of revenue and the need for additional investment to take advantage of growth opportunities, as Defendants misleadingly stated.  Such pressure was also a function of the declining apparel business, which reduced sales and ASPs, while increasing promotions, liquidations, inventory, discounts, including discounts offered to retailers to incentivize them to take products before their requested ship dates, and lowering sales prices, including by shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(f)      the Company's inventory position was not "healthier" or in "great shape." Rather, inventory was a major problem and continued to get worse, causing increased levels of inventory that the Company was forced to liquidate at discounted prices and to offer discounts to incentivize retailers to take products before their requested ship dates, as demand for the Company's apparel products continued to suffer.  The Company's elevated inventory levels were exacerbated by diminishing demand and sales of Under Armour's core products, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter resulting in "truckloads" of unopened

boxes of inventory returned to Under Armour.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016;

(g)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing.  Indeed, purported growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices, a detailed herein; and

(h)     the Company's Form 10-Q for 3Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

K.     **Disappointing Fourth Quarter 2016 and Fiscal Year 2016 Financial Results: Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy**

265.     The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017.  On that day, Under Armour stunned investors with a press release announcing dramatically lower-than-expected growth and other financial problems during the fourth quarter of 2016 ("4Q16") and FY16.  During a conference call with analysts on the same day, Defendants elaborated on the news revealed in the Company's earnings release.  Defendants made false and misleading statements in the 4Q16 earnings release and on the 4Q16 earnings call.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by

adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

266. In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results." Specifically, the Company revealed that:

- Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth. Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

- Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

- FY16 gross margin dropped from 48.1% to 46.5%.

- 4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

- FY16 inventory increased 17%.

267.    Moreover, the press release provided a surprisingly negative outlook for 2017.  Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters.  In addition, gross margin was "expected to be slightly down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

268.    Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he had only been at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Molloy was replaced by Bergman, the Company's Senior VP of Corporate Finance, who was Under Armour's third CFO in the 2016-2017 period.

269.    Plank, Molloy, and Bergman participated in the January 31, 2017 conference call on behalf of the Company.  In his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.
>
> \*        \*        \*
>
> So first, I'd like to explain a few things: what happened, what we learned and what we're doing about it.  So let's start with what happened.  ***In the fourth quarter, slower traffic caused significant promotional activities earlier, deeper and broader than expected.  This commoditized some of our more basic core product that had previously sold through for us in years past***.
>
> This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment.  ***So we lost top line volume as we worked to adapt [through]***

*our mix and pricing*.  Now, to be fair, we did comp positively in the quarter in both our own retail stores and our e-commerce channel, but ultimately the result was below original plan.

There was also lower channel recapture of bankruptcy volume that we'd expected, as *pricing came down in the points of distribution that we serve*.  Finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full price sales.

<p style="text-align:center">*     *     *</p>

We learned that when we play in a discounted environment, we can drive volume and win, but the role both we and our retailers expect us to play is as a premium full-price brand.

270.    While Plank couched these issues as having emerged in 4Q16, in reality, this was a continuation of problems known, or recklessly disregarded, by Defendants during the Class Period.  Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

271.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today."  He emphasized that "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

272.    Molloy also stated that "[f]ourth quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior year's period.  The decrease includes a negative impact of approximately 230 basis points, driven by higher discounts and promotions," as well as lower margins resulting from footwear and international sales.  As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory including discounting, especially in the back half of the year."

273.     Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call, and proactive actions to manage inventory levels down in the marketplace, we expect full year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017."  Regarding 1Q17, Bergman stated:

> We anticipate the first quarter to grow at a mid-single digit rate as fourth quarter conditions in North America carry over and we will have not yet lapsed some of the significant bankruptcies we saw in 2016.  We're expecting first quarter gross margin to be down almost 100 basis points year-over-year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

274.     Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

275.     During a question-and-answer session with analysts, Plank confirmed the shift in consumer preference towards more fashion-oriented athletic apparel and referenced increased competition and heavy discounting in Under Armour's "core basic" performance-oriented athletic apparel:

> **Omar Saad, Evercore ISI**: [M]aybe if you could expand on a comment you made I think in the prepared remarks around some trends going on in the apparel business, maybe moving away from performance more to fashion or lifestyle?  I know the UA Sportswear line is still kind of pretty nascent, but maybe elaborate on what you're seeing from that standpoint.
>
> Is there something pretty deep going on at the consumer level?  A shift towards more fashion-oriented athletic apparel versus performance oriented?  Obviously, Under Armour is known for its technical performance.  And if this is the case, how do you evolve the brand a little bit to be really relevant on both sides of that fence?
>
> **Plank**: Yes. . . .
>
> ***We need to become more fashionable with the products that we have out there***.  And one of the things we found is that some of the core basics were some of the challenges that we saw, is that we were counting on core basics as we have in years past to do more work for

us.  **But the consumer today frankly has more options.**

**[F]rankly most of those options are from good brands that we compete with, that are heavily discounting as well**.  So what you'll see is that I don't think it's one shift of abandoning one for the other.  Obviously, with things like the investment we're making in [Under Armour Sportswear] in sport lifestyle in general, but we need to become more fashion.  The consumer wants it all.

276.    Plank responded to a separate question by stating that the retail market for apparel was being "disrupted" and that "promotions and the consumer environment, all those things are very, very real, but we could have done a better job with our merchandising mix to be more proactive and more thoughtful about where they were going."

277.    Separately, an analyst from UBS inquired about 2017 gross margins as to the North American market:

I would've thought . . . that would largely be down next year due to more markdowns.  And then your guidance and inventory seems to sound like it will be improving through the year relative to the rate of revenue growth.  What do you think is the realistic near term recapture rate for the gross margin after 2017 after some inventory clearing?

278.    Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

279.    On this news, the price of Under Armour stock plummeted.  After closing at $28.94 per share on January 30, 2017, shares of Class A Common Stock dropped *25.74%* ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares.  This represented the largest single-day stock price decline in the Company's history.  The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued

to digest the news.  The total stock price decline over this three-day period was *28.65%* ($8.29 per share).

280.    Shares of Under Armour's Class C Common Stock also fell sharply as a result of this news.  After closing at $25.09 per share on January 30, 2017, shares of Class C Common Stock dropped **23.40%** ($5.87 per share) in a single trading day, closing at $19.22 per share on January 31, 2017, on unusually high trading volume of approximately 57 million shares.  The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of **27.78%** ($6.97 per share) over this three-day period.

281.    In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy.  For example:

(a)    on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario";

(b)    on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story";

(c)    on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.'  Wall Street often assumes that an executive leaving for 'personal reasons' is a sign that a company is in trouble

and that someone needs to take the fall.  Under Armour (UAA) tanked on this trifecta of bad news.

Shares plunged nearly 25% in early trading Tuesday.  That put the stock on track for its worst one-

day drop ever";

> (d)     on January 31, 2017, Reuters released an article titled, "Under Armour's founder-led approach wears thin."  The article observed that the Company "reported its slowest top- line growth in eight years and signaled more challenges ahead.  Its chief financial officer is also bailing.  The news wiped a quarter off the company's market value.  Chief Executive Kevin Plank's strategy of maintaining power [by controlling the Company's voting stock] is underperforming badly. . . . revenue growth slowed dramatically to 12 percent because of deep discounting caused by slower foot traffic";

> (e)     on February 1, 2017, TAG issued a report stating that "the magnitude of the miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide- down for 2017 came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment thesis as estimates and multiples are revised downwards";

> (f)     on February 1, 2017, Oppenheimer issued a report calling Under Armour's announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus far"; and

> (g)     on February 3, 2017, Sporting Goods Monitor issued a report expressing its disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue growth at half of the rate we, and Wall Street, expected" and Under Armour's management "*severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent earnings calls.*"

282.     Defendants continued to mislead investors on the 4Q16 earnings call by concealing the full truth, attributing Under Armour's poor performance to "extreme growth" while continuing to tout the Company's "incredible brand strength."  Plank claimed in his prepared remarks that Under Armour's "brand is truly stronger than it's ever been," that the Company's "growth strategy is intact," and that "there is no change to our growth strategy."  In response to an analyst question about Under Armour's purported "22% top line growth," Plank said that "there's acceleration there," assuring investors that "you'll see 20% growth from this company."  Molloy said on the January 31, 2017 conference call that "total revenue was up 12%," that "sales to wholesale customers were up 5%," and that "North American revenues . . . increased 6%."

283.     Defendants' misstatements and omissions on January 31, 2017, as set forth in ¶¶269-271, 282 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's "top line" apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, increased liquidations, and compressed margins;

(b)     Under Armour had undergone a "fundamental shift" and was competing on price rather than brand strength and a premium product; as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     Defendants failed to disclose these material problems and improper sales and accounting practices to the market (practices they used to appear healthier and to mask slowing

demand), but instead they gave investors the misleadingly positive perception that the Company's brand was "stronger than it's ever been" and that the Company was seeing acceleration in "top-line" apparel that was leading back to 20% growth ("there's acceleration there"), consistent with historical trends.  In truth, Under Armour had been covering up declining demand and sales by using contingent sales pursuant to buyback agreements, pull-forward sales, adjusted contract terms or discounts that incentivized retailers to take products before their requested ship dates, shipments in the final days of the quarter, and shipments of new inventory intended for the Company's own factory stores to off-price sellers (so that Under Armour could book the inventory as revenue immediately instead of having to wait for a customer to buy the items at its own stores) to create a façade of growth and brand health; and

(d)    Under Armour's inventory increases were not part of a strategic plan or a result of the Company's "efforts to manage the brand appropriately for the marketplace.  Rather the excess inventory was a result of diminishing demand and sales, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016.

**L.    The Fallout From the Fraud Continued, but Defendants Conceal the Full Truth From Investors**

284.    The fallout from the fraud continued.  Defendants attempted a massive restructuring and other dramatic actions to revive the Company, but without the ability to rely on suspect sales practices to meet sales targets, they were never able to turn the tide, as the Company's sales continued to struggle.

285.    On February 9, 2017, The Motley Fool published an article titled, "5 Signs Under Armour Inc. Needs New Management," which stated that:

> ***Under Armour needs a leader who makes realistic promises***.  At the end of fiscal 2015, [Under Armour] estimated its annual revenue would rise 25% to $4.95 billion in 2016. However, its 2016 revenue actually rose just 22% to $4.8 billion, and [Under Armour] now expects sales to rise just 11-12% in 2017.
>
> That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5 billion in annual revenues in fiscal 2018.  Plank insists that the company is still on track to hit that target, but that would require its top line growth to accelerate to over 40% in 2018 – which hardly seems realistic.

286.    A February 14, 2017, Morgan Stanley report recognized that – according to the Company's own data – 2016 sales growth rates were "overstated," due to the increased reliance on "low quality" sales that caused days sales outstanding to increase to a nine year high.  The report stated:

> Plus UAA accounts receivable increased 44% in FY16 on top of 55% growth in FY15 (Exhibit 11).  Day sales outstanding increased to 47 days (Exhibit 12), a nine year high, and this is even more surprising considering DTC makes up a much bigger percentage of sales than it did nine years ago.  These data points signal some of UAA's recent sales may have been low quality and thus recent sales growth rates may be overstated.

287.    The Company data discussed by Morgan Stanley further corroborates Plank's admission that 2016 growth was achieved by driving volume in a "discounted environment," and not by sticking to the role the market expected Under Armour to continue to "play" "as a premium full-price brand."

288.    On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's rating to underperform and slashed the Company's Class A Common Stock price target from $20 to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause UA apparel growth/margins to be worse than expected."

289.    On April 27, 2017, the Company announced its 1Q17 results in a press release and then discussed those results on an earnings call with analysts later the same day.  The 1Q17 press release announced total net revenue growth of only 7%, a far cry from the consistent 20% growth Defendants reported and projected previously.  Net revenue growth from the Company's apparel business also grew only 7%, the North American business was down 1%, gross margin was down 70 basis points (to 45.2%) "due to continued inventory management efforts," and inventory increased 8%.

290.    On the 1Q17 earnings call the same day, Plank and Bergman (the new CFO following Molloy's suspicious departure) discussed the Company's struggles.  Much of the call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.  Plank stated that the Company was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products.  Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

291.    Nonetheless, Defendants continued to mislead the market.  Defendants concealed that the Company had used suspect sales practices to appear healthier and to mask slowing demand from 3Q15 through the end of FY16 and failed to disclose that the Company was still grappling with the consequences of those practices, such as elevated inventories, which it was desperately trying to clear.  Yet, Plank misleadingly told investors that the Company's "inventory levels are appropriate."

292.    Evercore issued an analyst report on April 27, 2017, following the Company's 1Q17 results.  The report noted "North America was negative for first time in the history of the

company - despite N[orth ]A[merican] store count up 8% and initial shipments into Kohl's, both of which should have contributed to growth."

293.   An April 27, 2017, report from Susquehanna noted the Company's "hasty distribution strategy" was reactionary to declines in Under Armour's wholesale business and "hurt the sanctity of the Under Armour brand:"

> We continue to raise flags about Under Armour's expanded distribution into the moderate/family channel (KSS, DSW, Famous Footwear, SCVL).  It is true, as CEO Plank pointed out on the earnings call, that Under Armour has about 10,000 fewer points of distribution vs. Nike.  Nike has successfully done business in the moderate/family channel for years without hurting its brand.  However, Under Armour has yet to build out the product depth, grassroots expertise, and overall marketing prowess that allows for a successfully segmented business across channels.  A proper strategy takes time and resources, yet UAA is moving quickly and hastily down-market.  We believe that the decision to expand into the moderate channel is a result of the liquidation of TSA and Sport Chalet, the pending liquidations of Gander Mountain & MC Sports. As a result, the sanctity of the Under Armour brand is being put at risk.

> We believe that the reason North American revenue was only down 1.1% is because of the initial orders sold into Kohl's.  The assortment sold into Kohl's was, in our view, too broad, lacked appropriate segmentation, and will do more harm than good to the Under Armour brand.

294.   On June 20, 2017, David Butler published an article on SeekingAlpha.com titled, "Underperforming Under Armour."  Butler stated that "[e]verything really peaked in 2014 when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in net income.  Ever since, things have been slowing.  It's not a trendy shift either.  We've seen almost two and half years of decreasing business growth.  The company isn't maneuvering to maintain margins in spite of the slowdown either."

295.   On June 26, 2017, Kenra Investors published an article on SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."  The article discussed continual declines in the Company's brand power and customer interest dating back to 2015, stating,

> There are several datasets that show ongoing weakness for Under Armour. . . .   Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an

idea of how digital sales are evolving. . . . *[T]here is a strong downtrend [that] started in mid-2015, and search interest [in Under Armour] actually became negative since a few months ago*.

296.    The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive, and search interest is in a sharp downtrend. . . . *So many negative signs make me think the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015*."

297.    Another June 26, 2017, article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."  The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think.  In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand.  For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times.  On Friday morning's call, Under Armour was mentioned just once. . . . and it was a part of a broader discussion regarding multiple brands.

298.    On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is Down 30% This Year."  The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling this year, with the sportswear stock down 30% . . . .  The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways."  Specifically, the article noted that wholesale revenue was up just 5% in 4Q16 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand."  The article concluded that "Under Armour's slowing growth is a sign that

the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . .
The company needs to establish itself as a fashion brand as well as a performance one."

299. In July 2017, unbeknownst to investors, Under Armour began responding to requests for documents and information from federal investigators at the DOJ and SEC in connection with Defendants' practice of pulling future sales forward to inflate quarterly financial results. But, Defendants concealed both the issues under investigation and the existence of the investigations from investors.

300. News from the Company worsened on August 1, 2017, when it reported financial results for the second quarter of 2017. The Company issued a press release reporting total net revenue growth and apparel net revenue growth of 9% and 11%, respectively, far below the quarterly 20%+ growth previously reported and projected by Defendants. Footwear also performed surprisingly poorly, with net revenue declining 2%. The Company blamed the revenue declines on a "dynamic and promotional retail environment in North America [that] continued to temper results." The Company also reported an operating loss of $5 million, a net loss of $12.3 million, and $0.03 decline in diluted EPS. Gross margin declined 190 basis points (to 45.8%) based in part on "inventory management initiatives" with inventory again increasing 8%.

301. In conjunction with this negative news, the Company also announced on August 1, 2017, that it was implementing a massive restructuring plan "to more closely align its financial resources to support the [C]ompany's efforts to better serve the evolving needs of the changing consumer and customer landscape." As a result, the Company announced expected "restructuring and related charges" of $110 to $130 million in 2017, including "approximately $20 million of inventory related charges and approximately $40 million of intangibles and other asset related

impairments." The restructuring would involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

302. During the August 1, 2017, earnings call that followed, Plank discussed the restructuring in more depth. He stated that, "The landscape is evolving quickly. Therefore, we too must evolve quickly. This evolution requires a pivot, and we're doing just that." He later explained that "we are clearly operating in a different environment, particularly in our largest market, North America. With our largest growth drivers including international, footwear and DTC continuing to scale but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

303. Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends especially the top line, can you just give us an update where you think the brand health is and the vision for the business today?" He acknowledged that "***we're not pleased with where we're positioned right now***" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear." To that end, he later added that:

> [W]e've adjusted the balance of product we've had, which is ***decreas[ing] many of the core and key items that we've had***. We used to have – we're a very much a key item focused, a big logo hoodie and things in-store, and now we've got a lot of balance of that around versatility, layering, and newness . . . . We will be telling our story in the back half of this year, and ***you'll see increased brand heat coming from us***, frankly spending against that.

304. The Company's negative news on August 1, 2017 also involved a reduction in guidance for FY17. Total net revenue was expected to grow only 9%-11% (vs. previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American business," while adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

305.    As a result of this news, the Company's Common Stock prices fell precipitously. After closing at $20.02 per share on July 31, 2017, the Company's Class A Common Stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C Common Stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high trading volume of over 23 million shares.

306.    Under Armour's stock price would have fallen further had its true financial condition been fully revealed.  Instead, Plank continued to mislead the market, touting Under Armour's "rapid growth" and the achievement of "more than doubl[ing] our revenue from $2.3 billion to $4.8 billion" over "the last three years" while concealing that the Company had engaged in suspect sales practices to appear healthier and mask slowing demand from 3Q15 through the end of 2016.  Plank also concealed that a month earlier, Under Armour had begun responding to requests for documents and information from the DOJ and SEC in connection with the criminal and civil investigations into the Company's accounting practices and related disclosures.

307.    Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . .  [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US . . . [and] US customers are abandoning the brand because it lacks a clear

identity."  The article further noted that "Plank has previously acknowledged [on January 31, 2017] that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

308.    Susquehanna issued a report following the Company's second quarter of 2017 ("2Q17") results on August 1, 2017.  The report noted that despite expansion into more mid-tier retailers, "2Q17 North American revenue only increased 0.3%.  2Q17 wholesale revenue increased 3.1%, which implies a material drop in North American revenue."  The report further stated the "problem . . . is that incremental shipments in the moderate retail channel . . . are being more than offset by order cancellations from Under Armour's best, and most brand appropriate retailers, such as Dick's Sporting Goods."  Susquehanna concluded "the heart of UAA current problems stem from the decision to open distribution to the moderate channel prior to having a broad enough product assortment in order to appropriately execute a segmentation strategy."

309.    Defendants continued to conceal the truth regarding the depth of the problems Under Armour was facing.  Although they had propped up the Company's financial results and growth in 2015 and 2016, they never disclosed this to investors.  No longer able to rely on suspect sales practices to inflate the numbers, the Company's revenue growth continued to decline from 2017 through 2019.  During that period, total year-over-year ("YOY") net revenue growth plummeted from 20%+ growth to low single digit % growth, while North American and apparel revenues suffered even steeper declines:

| $ in thousands | Total Net Revenue | North America Net Revenue | Apparel Net Revenue |
|---|---|---|---|
| **FY17** | $4,989,244 (3.2% YOY increase) | $3,802,406 (5.1% YOY decrease) | $3,284,652 (1.7% YOY increase) |
| **FY18** | $5,193,185 (4.1% YOY increase) | $3,735,293 (1.8% YOY decrease) | $3,464,120 (5.5% YOY increase) |
| **FY19** | $5,267,132 (1.4% YOY increase) | $3,658,353 (2.1% YOY decrease) | $3,470,285 (0.2% YOY increase) |

310.    Nonetheless, Plank continued to tout Under Armour's "rapid growth"; the "hyper-growth" the Company had enjoyed "for several years"; the achievement of doubling the business by 2013 "and then doubl[ing] again from 2013 to 2016[] [f]ueled by strategic growth in North America"; and the Company's "26-quarter streak of 20% sales growth," while omitting that such growth had been fueled not by Under Armour's premium brand image (which had lost heat), but by discounting and myriad suspect sales practices.

311.    And, while Defendants struggled to deal with the Company's elevated inventory levels resulting in part from the suspect sales practices detailed herein, including the ramifications of buybacks (*see* Sections V.E-F), Defendants failed to disclose the true cause of the Company's inventory problems and continued to assure investors that Under Armour's inventory levels were "appropriate." Then, beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory. *See* Section VIII.D. Despite the Company's inventory write downs, however, Under Armour continued to experience bloated inventory levels that were exacerbated by its suspect sales practices. In 2017 and 2018, Under Armour took aggressive measures to reduce its inflated inventory levels by liquidating product to off-price sales channels like its own Factory House outlet stores and third-party off-price partners, continuing to devalue its brand and drive margins down. It ultimately took Under Armour approximately 1.5 years to "really clean up the marketplace," which had been flooded with excess inventory.

312.    On July 23, 2018, Andersen, along with shareholder Balraj Paul, filed a verified derivative complaint on behalf of Under Armour "against certain current and former officers and directors of the Company for breaches of fiduciary duties, insider selling, and unjust enrichment."[78] Andersen worked at Under Armour for nearly all of the Class Period (September

---

[78]    Andersen Complaint, at 1.

2015 through November 2016) as a Merchandising Manager.  Andersen's job duties included, among others, "[i]nitiat[ing] seasonal business plans for all Outdoor categories across Outdoor/Action Sports Specialty, Sporting Goods, Department Stores, & Mall channels focusing on strategic initiatives, revenue targets, local market characteristics, style/SKU efficiencies, demand, forecasts, current inventory levels, segmentation/differentiation, & distribution" and "[a]nalyz[ing], understand[ing], & clearly communicat[ing] sales history, market trends/forces."

313.    The Andersen Complaint alleges Plank and other defendants caused Under Armour to issue materially false and misleading statements, including many of the statements alleged herein to be false and misleading.  For example, the Andersen Complaint alleges Plank's September 16, 2015 statement that "demand for our brand has never been stronger" and Dickerson's October 22, 2015, statement that "most of our core apparel product margins are improving" were materially false and misleading when made.[79]  Other examples include Plank's January 28, 2016 statement that "[o]ur core business remains incredibly strong,"[80] April 21, 2016, statement that Under Armour was "driving massive growth," and "*[w]e are taking share*,"[81] and May 31, 2016, statement that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."[82]

314.    The Andersen Complaint alleges that Plank and the other defendants concealed the "true facts, which were known or recklessly disregarded by" Plank.[83]  Those "true facts" alleged in the Andersen Complaint to have been concealed include, among others, that: "Under Armour's

---

[79]   Andersen Complaint, at 3, 38.

[80]   *Id.* at 42.

[81]   *Id.* at 48.

[82]   *Id.* at 35.

[83]   *Id.* at 74.

apparel products . . . suffered from reduced customer appeal and demand"; the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products"; the "Company's inventory increases . . . were due to declining sales of the Company's apparel"; "the Company's ASPs were falling sharply in North America"; and "growth and market share were falling as a result of the Company's apparel sales declines."[84]

315.    Defendants' misstatements and omissions continued.  In December 2018 - over a year into the government's non-public criminal and civil investigations into Under Armour - Plank blamed the Company's performance at the end of 2016 on "a number of internal and external factors" that "conspired" against Under Armour, while concealing both that the Company had been engaged in suspect sales practices and the existence of the investigations.

316.    Meanwhile, suspicious executive departures continued to plague the Company.  On April 18, 2019, the Company reported that Jason LaRose, the head of its North American business since October 2016, would leave the Company at the end of the month.  On May 1, 2019, the Company disclosed that its Senior VP and Principal Accounting Officer, Andrew Page, had left the Company after serving in that position for only three months.  Yet, Defendants never disclosed the ongoing SEC and DOJ investigations into Defendants' suspect business practices and disclosures.

## M.    The Company Announces Plank's Resignation as CEO

317.    Then, on October 22, 2019, Under Armour announced Plank's resignation as CEO, effective January 1, 2020, but again remained silent on the SEC and DOJ investigations he and the

---

[84]   *Id.* at 75-77.

Company were facing.  At the time, media and analysts linked the move to Under Armour's ongoing financial problems discussed herein, including a dramatic slowdown in growth, lost market share, and severe stock price declines.  For example, in an article released the same day, *The New York Times* observed that the Company "has faltered while the revenues of its rivals Nike and Adidas have grown thanks to surging consumer interest in athleisure wear.  The company . . . has seen its once-robust profit turn into net losses of more than $46 million in each of the last two fiscal years.  Last year, it cut around 400 jobs to streamline a business suffering from slowing growth.  Under Armour's stock peaked around $52 in September 2015, but is currently trading around $20."  *Forbes* released an article two days later, on October 24, 2019, observing that Plank's move was "perhaps not surprising" given the Company's "financial troubles," including a dramatic slowdown in growth after years of 20%-plus annual revenue increases, and the Company's severe stock price decline since reaching its all-time high in September 2015.  Moreover, just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success.  On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of our business" because this "provides for clear accountability and efficient and effective leadership."

### N.      Federal Investigations Into the Company's Accounting Practices and Related Disclosures

318.     On November 3, 2019, less than two weeks after the Plank announcement, WSJ surprised the market by revealing that the DOJ and SEC were investigating whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results

appear healthier than they actually were.[85]  According to the article, the investigators were in the process of questioning people in the Company's hometown of Baltimore, and had done so within the week prior to the article's release.[86]  The article noted that "[w]hen examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions."[87]  The article further linked the investigation to the Company's apparent success (26 straight quarters of 20% revenue growth), followed by sales problems at the Company that emerged publicly in January 2017, causing the stock price to plummet:

> The company [Under Armour], which is scheduled to report third-quarter [2019] results on Monday, has been restructuring its operations and struggling with weak sales in the past two years.  Until then, it had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth.  That streak ended abruptly when Under Armour missed its sales targets in the final quarter of 2016.  On Jan. 31, 2017, the company's shares plunged after it reported sales growth of 12% in the holiday quarter and cut its growth forecasts for the next year.  That day, Under Armour also said its then-finance chief [Molloy] was leaving after a year on the job.[88]

319.    After the release of the WSJ article, Defendants were forced to issue a statement confirming the investigations and revealing that they had been ongoing for well over two years: "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[89]

320.    Before the market opened on the following day, on November 4, 2019, the Company filed an SEC Form 8-K reiterating that "[t]he Company confirmed to *The Wall Street*

---

[85]   Ex. B, at 1.

[86]   *See id.*

[87]   *Id.* at 2.

[88]   *Id.*

[89]   *Id.*

*Journal* that it has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017." The Company added that it "continues to believe its accounting practices and related disclosures were appropriate" but "does not intend to comment further on the status of this investigation except to the extent required by law."

321.    Similar statements were made by Bergman during the Company's earnings call that took place before the market opened on November 4, 2019. Bergman stated in his opening remarks that he was "break[ing] from our typical company policy of not discussing any regulatory or litigation matters" in order to address the SEC and DOJ investigations revealed by WSJ. Bergman stated that "[w]e have been fully cooperating with these inquiries for nearly 2.5 years. To this effect, we began responding back in July of 2017 to their request for documents and information. We firmly believe that our accounting practices and disclosures were appropriate." Later in the call, Bergman was asked for comments on the investigations and why the market was "just hearing about it now" after two-and-a-half years. Bergman declined to provide any additional information.

322.    In response to the news that the Company's accounting practices and related disclosures were under investigation, calling into question the propriety of such practices and disclosures, the Company's Class A Common Stock price fell 18.92% ($4.00 per share), from a closing price of $21.14 per share on Friday, November 1, 2019, to a closing price of $17.14 per share on Monday, November 4, 2019, on unusually high volume of 43.42 million shares. The Company's Class C Common Stock price fell 18.35% ($3.47 per share), from a closing price of $18.91 per share on Friday, November 1, 2019, to a closing price of $15.44 per share on Monday, November 4, 2019, on unusually high volume of 18.69 million shares.

323.    Securities analysts and media took note of the surprising news regarding the Under Armour investigations, the serious misconduct being investigated, and the resulting stock price decline.  For example:

(a)    in a November 4, 2019, article titled, "Under Armour's Stock Tanks as Troubles Pile Up," *The New York Times* wrote that the Company's stock sank over 18% following news that the federal authorities were investigating "whether Under Armour had shifted sales results from quarter to quarter to appear healthier," coupled with the announcement of a fifth straight quarterly revenue decline and reduced annual revenue forecast;

(b)    WSJ released an article on November 4, 2019, titled, "Under Armour Shares Slide on News of Accounting Probe," observing the Company's stock price decline "after the company confirmed it was the subject of a federal investigation into its accounting practices," and noting that "[e]xecutives declined on an earnings call Monday to provide details about the probe or explain why Under Armour hadn't previously disclosed its existence, even though they had been responding to document requests for more than two years";

(c)    the *Baltimore Business Journal* released an article on November 4, 2019 stating that "Wall Street analysts wanted to know why they are just now learning about a federal investigation into Under Armour Inc.'s accounting practices that has been going on for more than two years . . . . In a move that deviated from Under Armour's usual policy, CFO David Bergman confirmed the Baltimore-based sportswear maker began responding to inquiries from the federal agencies in July 2017 and has been fully cooperating with the probe" although "[t]he inability to answer questions about the probe and Under Armour's North American sales outlook caused the company's stock price to get hammered";

(d)       an article by *Fortune* on November 4, 2019, observed that: "Under Armour

Inc. shares plunged after the company disclosed that federal officials have been probing its

accounting practices for more than two years, bringing a fresh headache to investors just as the

sports brand prepares for a CEO transition. . . . Investigators from the Justice Department and SEC

were questioning people at the sports apparel's base in Baltimore as recently as last week [*The*

*Wall Street Journal*] reported, citing people familiar with the matter.  The probe is focused on

whether Under Armour inflated sales from quarter to quarter, the newspaper said";

(e)       on November 4, 2019, CNBC released an article stating that news regarding

the federal probe into Under Armour's accounting practices, along with lowered 2018 guidance,

"sent the retailer's shares plunging more than 18%. . . .  Under Armour says it has been responding

to requests for documents related to its accounting practices since 2017, which is about when an

incredible sales streak came to an end.  Until the end of 2016, it had reported more than 20

consecutive quarters of sales growth topping 20%, making it one of the fastest growing retailers

in the U.S.";

(f)       on November 4, 2019, analyst Susquehanna released a report titled, "Under

Armour, Inc.: Weak Guidance Post 3Q Beat Further Marred by Federal Investigations," stating in

part that the "[f]ailure of management, on the earnings call, to address why the investigation was

not disclosed prior to last night is disconcerting" and that, among other factors, "we expect the

overhang of the federal investigations . . . to cast shadows over UAA's results and stock

performance for quite some time[]";

(g)       on November 4, 2019, Morningstar released a report stating that, along with

a reduced outlook, "news of an investigation into its revenue recognition practices by the SEC and

[DOJ], caus[ed] shares to drop by a midteen percentage. . . .  The timing is notable, as Under

Armour's business began to deteriorate in late-2016, in part because of the bankruptcy of retail partner Sports Authority.  Moreover, former CFO James Molloy resigned in January 2017 for personal reasons after just over one year in the position.  We view news of this investigation as potentially serious.  Investigations of this type can lead to fines and earnings re-statements and, less commonly, criminal charges. . . . The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company.  Under Armour has been hit with bad publicity and management turnover in recent years.  Unless quickly resolved, news of this investigation will certainly draw more negative attention.  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began. While Under Armour claims the investigation had nothing to do with Plank's decision, the timing looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.  Although companies are not legally required to disclose SEC investigations, we think Under Armour should have done so[]";

(h)     also on November 4, 2019, PiperJaffray released a report observing: "UAA shares closed down ~19% today despite sound execution & encouraging trends on the call as the WSJ article flagging the DOJ/SEC accounting investment pressured the stock[]";

(i)     analyst TAG also released a report on November 4, 2019, stating that "Under Armour's better-than-expected 3Q19 result was overshadowed by the cut to its 2019 revenue outlook and the WSJ story that emerged yesterday about an ongoing investigation by the SEC and DOJ into the company's accounting practices[]";

(j)     analyst William Blair noted the effect the Company's disclosures had in its November 4, 2020, report, stating that "Under Armour's stock is down nearly 20% as investors digest the lower-than-expected fourth-quarter outlook and accounting investigation[]";

(k)     CFRA's November 4, 2019, report likewise emphasized the effect the belated disclosure of the investigations had on Under Armour stock: "We also expect increased awareness about regulatory and litigation matters regarding UAA's accounting practices to weigh on shares and further adds to our negative view[]";

(l)     a report by Oppenheimer on November 4, 2019, stated that "the real issue for UAA and its shares is likely to prove reports from WSJ over the weekend that the company is subject to a federal criminal investigation over its accounting practices and efforts to make trends appear more upbeat."   The report went on to say that "indications of potential accounting irregularities at the [Under Armour] brand further cloud an already shaky fundamental story[]";

(m)     on November 5, 2019, the *Baltimore Sun* released an article on the investigation noting that the Company's stock price was "pummeled" nearly 19% in "reaction to news of the investigation," and including the following comments from financial consultant Timothy Spence, who advises companies on SEC matters: "Public companies must follow strict rules regarding the way revenue is recognized, including proper timing . . . . There appear to be two questions here.   The first is, was this a smoothing of revenue to make quarterly revenue recognition more consistent?   Another question would be whether the company recognized revenue in advance and expected to make it up in the next quarter, he said.   Both practices are highly questionable accounting if not outright fraud[]"; and

(n)     Argus published a report on November 13, 2019, stating that Under Armour's disclosure of the DOJ and SEC investigations "overshadowed the company's 3Q19 results", which were reported on the same day, and noted that "UAA shares dropped 19% on news that the SEC and the Justice Department were investigating the company's revenue recognition

practices, including the potential manipulation of revenues to make them appear stronger and steadier."

## VIII.   DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

324.     In order to demonstrate continued revenue growth during the Class Period, Plank and the Company engaged in a scheme to inflate revenue by pulling in – channel stuffing – sales into earlier quarters.  This practice violated GAAP[90] and SEC disclosure rules.

325.     Defendants, in violation of GAAP, also improperly recorded revenue on contingent sales and understated the Company's sales returns and allowances, markdowns and discounts, and failed to timely record the write-down of excess and obsolete inventory.

326.     As a result of the above, the following Under Armour financial statements issued to the public and filed with the SEC were materially false and misleading: Form 10-K for the year ended December 31, 2015, and Form 10-Q's for periods ending September 30, 2015, March 31, 2016, June 30, 2016, and September 30, 2016.

| ($ in thousands, except EPS) | 3Q15 | 4Q15 | FY15 | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|---|---|---|
| Net Revenues | $ 1,204,109 | $ 1,170,686 | $ 3,963,313 | $ 1,047,702 | $ 1,000,783 | $ 1,471,573 |
| Net Income | $ 100,477 | $ 105,602 | $ 232,573 | $ 19,180 | $ 6,344 | $ 128,225 |
| Earnings Per Share - Diluted | $ 0.45 | $ 0.48 | $ 1.05 | $ 0.04 | $ 0.15 | $ 0.29 |
| Inventories | $ 867,082 | $ 783,031 | $ 783,031 | $ 834,287 | $ 1,086,749 | $ 970,621 |

327.     The misstatements were material.  For example, in 3Q16, Under Armour's net income and EPS were overstated by an estimated 30% considering only the impact of the (a) understated sales reserves for returns, allowances, markdowns and discounts and (b) inflated

---

[90]   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

inventory.  This does not even include the impacts of contingent sales and channel stuffing, which further inflated net income and EPS in each relevant quarter as described herein.

## A.   Under Armour Failed to Disclose Its Improper Sales Practices

328.    During the Class Period, Under Armour pulled sales into the current fiscal quarter to boost its reported revenue and artificially report continued revenue growth of 20%+.[91]   The premature recognition of sales that would have otherwise been recognized in a subsequent period is commonly referred to as "channel stuffing."  The SEC has defined channel stuffing as follows: [T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[92]

329.    As pled herein, Under Armour engaged in severe channel stuffing practices routinely in order to meet sales growth and earnings targets communicated to the market, and "sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the product" to convince retailers to take products before their requested shipping date.[93]  This practice of pulling forward orders occurred regularly in 2015 and 2016.[94] Indeed, investigators are examining emails that show Plank knew about efforts to move revenue between quarters.[95]

---

[91]   *See* Ex. A, at 1.

[92]   *In re Sunbeam Corp.*, SEC Release No. 7976, Exchange Act Release No. 44305, SEC Order Instituting Public Administrative Proceedings (May 15, 2001).

[93]   Ex. A, at 3.

[94]   *See id.*

[95]   *See id.* at 2.

330.    The SEC is very clear that channel stuffing practices and their financial impact are

required to be disclosed under Item 303.  The SEC affirmed this position when it filed claims of

earnings management against the Sunbeam Corporation ("Sunbeam").  The SEC specifically cited

that Sunbeam's "undisclosed or inadequately disclosed acceleration of sales through 'channel

stuffing' . . . materially distorted the Company's reported results of operations."[96]

331.    Subsequent speeches made by SEC staff further support these requirements.  For

example, former Chief Accountant with the SEC, Lynn Turner, noted the following:

> The *Sunbeam* case highlights . . . ***channel stuffing*** abuses, among others, and sends
> a message to registrants and their auditors – the SEC will aggressively attack
> fraudulent revenue recognition practices. . . . Sunbeam failed to disclose that it
> offered discounts and other inducements to customers to sell merchandise
> immediately that otherwise would have been sold in later periods, which threatened
> to depress Sunbeam's future results of operations.  [SEC Staff Accounting Bulletin
> ("SAB") 101] notes that disclosure in [Management's Discussion & Analysis of
> Financial Condition ("MD&A")] is required of shipments of product at the end of
> a reporting period that significantly reduce customer backlog and that reasonably
> might be expected to result in lower shipments and revenue in the next period.
> MD&A disclosures also are required of the impact of granting extended payment
> terms to customers that will result in a longer collection period for accounts
> receivable and, thus, slower cash inflows from operations, ultimately impacting a
> registrant's liquidity and capital resources.[97]

332.    The SEC expressly states that disclosure is mandatory where there is a known trend

or uncertainty that is reasonably likely to have a material effect on the registrant's financial

condition or results of operations.  Item 303 (and Instruction No. 3 to Paragraph (a) of Item 303)

requires companies to:

> Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations.

\*         \*         \*

---

[96]    *Supra*, n.93, at 1.

[97]    Lynn Turner, Chief Accountant, *Speech by SEC Staff: Revenue Recognition* (May 31, 2001).

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .[98]

333.    The undisclosed pull-in of revenue from future periods to the current period "*cause[d] reported financial information*" contained in Under Armour's SEC filings to "*not . . . be . . . indicative of future operating results*."

334.    Defendants also violated GAAP by failing to disclose the Company's channel stuffing practices and their financial impact in the Company's financial footnotes.  Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 275, *Risks and Uncertainties*, focuses primarily on disclosures arising from risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term.  In particular, it also calls for financial statement disclosure in certain circumstances, if the volume of business transacted with particular customers could be severely impacted in the near term.[99]  ASC 605, *Revenue Recognition*, requires that companies provide both qualitative and quantitative information about their revenue arrangements and about significant judgments that may significantly affect the timing or amount of revenue recognition.[100]  Thus, significant channel

---

[98]    17 C.F.R. §229.303.   Similarly, SAB 114 Topic 13 requires the MD&A to contain "a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

[99]    FASB ASC 275-10-05-2, FASB ASC 275-10-50-16, FASB ASC 275-10-50-18.

[100]    FASB ASC 605-25-50-1.

stuffing would also trigger the need for such footnote disclosure in an entity's financial statements under ASC 275 and ASC 605.

335.    By failing to make required disclosures in accordance with GAAP and SEC disclosure rules, Under Armour's revenue growth, earnings, and inventory reported in the Company's SEC filings were materially misstated during the Class Period, from 3Q15 through 3Q16.

###    1.    The Financial Impact of Channel Stuffing on Under Armour's Quarterly Revenue

336.    From the beginning of the Class Period through 3Q16, Under Armour stressed the importance of quarterly revenue growth by touting that the Company had more than 20 consecutive quarters of revenue growth of at least 20%.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an [sic] quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And, frankly, we have no expectation of that stopping anytime soon.

337.    And Plank stated on the Company's 2Q16 earnings call held on July 26, 2016:

> And we're still projecting; we're 25 quarters north of 20% in a row.  Over six years of doing that, we see that trend continuing for us, number one.  We do continue to see it to project 25% plus growth for the full year.

338.    Unbeknownst to investors, Defendants achieved Under Armour's 20%+ revenue growth by stuffing the channel with premature sales taken from future quarters.[101]  Without channel stuffing, which added at least tens of millions in sales every quarter, the Company's quarterly growth percentage would have been materially less than reported.

---

[101] *See* Ex. A, at 1.

## 2.      The Impact of Channel Stuffing on Future Results

339.    The significant financial impact of channel stuffing on Under Armour's future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules, *i.e.*, Item 303.

340.    The MD&A should give investors an analysis of the registrant's financial condition and results of operations, "with particular emphasis on the registrant's prospects for the future,"[102] and:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information ***not to be necessarily indicative of future operating performance*** or of future financial condition.
>
> *            *            *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the ***likelihood that past performance is indicative of future performance.*** [103]

341.    SAB 114 Topic 13 also provides the following specific example of a required disclosure pertaining to the Company's recognition of revenue: Shipments of product at the end of a reporting period that significantly reduce customer backlog and that ***reasonably might be expected to result in lower shipments and revenue in the next period.***[104]  This is exactly what Under Armour was doing, but failing to disclose to investors.[105]

---

[102] SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, SEC Release Nos. 33-6835; 34-26831; IC-16961; FR-36 (May 18, 1989).

[103] SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-48960; FR-72, (effective Dec. 29, 2003).

[104] SAB 114, Topic 13.B.

[105] Under Armour attempted to conceal the impact on a future quarter by repeating the practice at the end of each quarter (*e.g.*, at the second quarter Under Armour made up for the second quarter revenue that had been artificially pulled into the first quarter by repeating the practice and

342. By pulling-in or taking revenue from future quarters, Under Armour was aware that revenue in subsequent quarters would be adversely impacted. As a result, the Company was required to warn investors that its reported revenue was not indicative of future revenue.

**B.      Under Armour's Continued Growth Was Achieved by Improperly Recognizing Revenue on Contingent Sales and Understating Reserves for Customer Returns, Allowances, Markdowns, and Discounts**

343. As pled herein, Defendants assured investors through 3Q16 that the Company's trend of 20%+ revenue growth would continue. Continuing this growth, however, came at a cost. In order to achieve 20%+ revenue growth, Defendants engaged in two accounting schemes: (a) improperly recognizing revenue on contingent sales; and (b) improperly understating reserves for product returns, allowances, markdowns, and discounts. Both of these schemes violated GAAP.

**1.      Improper Contingent Sales**

344. Defendants, in violation of GAAP, inflated revenues and earnings in the Company's Forms 10-Q and 10-K, press releases and investor conference calls from 3Q15 through 3Q16 by recognizing revenue on contingent sales.[106] Contingent sales are transactions in which payment to the seller is contingent upon the buyer's ability to resell the merchandise. The recognition of revenue for contingent sales is not permissible under GAAP. When an entity sells its product but gives the buyer the right to return the product, revenue from the sales transaction may only be recognized at the time of sale if certain conditions are met, including that "[t]he buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is ***not contingent***

---

artificially pulling the third quarter revenue into the second quarter). However, the practice of channel stuffing is unsustainable and will eventually impact future revenues. Indeed, Under Armour shocked the market with revenue growth of only 11.5% for 4Q16 – far below the touted 20%+ guidance. Since then, the Company has been unable to achieve even low double-digit growth, and has even experienced revenue decreases in some quarters.

[106] Correspondingly, Under Armour's accounts receivable balance, which is a direct function of revenue but appears on the balance sheet instead of the income statement, was also overstated.

on resale of the product."[107]   Revenue for such contingent sales may not be recognized until the
return privilege has substantially expired.[108]

345.   Defendants falsely assured investors that the Company was complying with GAAP
and not recording revenue on contingent sales transactions.   Specifically, the Company's Forms
10-Q stated that Under Armour's financial statements were:

> [p]resented in accordance with the rules and regulations of the Securities and
> Exchange Commission . . . and accounting principles generally accepted in the
> United States of America for interim consolidated financial statements. In the
> opinion of management, all adjustments consisting of normal, recurring
> adjustments considered necessary for a fair statement of the financial position and
> results of operations were included. . . .[109]

346.   Defendants further claimed in Under Armour's revenue recognition policy that
"[n]et sales are recognized upon transfer of ownership, including passage of title to the customer
and transfer of risk of loss related to those goods."[110]

347.   Contrary to Defendants' statements, Under Armour's financial statements were ***not***
prepared in accordance with GAAP and SEC requirements and were ***not*** a fair representation of
the Company's operations.

348.   Through the end of 2016, to incentivize buyers/accounts to order certain
merchandise, Under Armour utilized a buyback program under which Under Armour sales
representatives ***guaranteed*** that Under Armour would buy back a certain amount of unsold
merchandise (*i.e.*, these sales were contingent upon resale) (*see* Section V.E).   On the books, the

---

[107]  FASB ASC 605-15-25-1.

[108]  *Id.*

[109]  Similarly, the Company's Forms 10-K disclosed that Under Armour's consolidated financial
statements were "presented in accordance with principles generally accepted in the United States
of America."

[110]  *See, e.g.*, Under Armour's 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form
10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

accounts bought and owned the inventory temporarily, but after six months Under Armour would buy back some of the unsold inventory.  The number of buybacks increased over time throughout 2016.

349.    In addition, Under Armour was not collecting on its accounts receivable because customers did not have to pay for the merchandise unless (if ever) it was sold.  Beginning with 4Q15, the rate of growth of Under Armour's accounts receivable balance over prior year was consistently outpacing net revenue growth until the fourth quarter of 2017.[111]  As a result of the increased receivables from the contingent sales, Under Armour's DSO[112] nearly doubled from 28 days in the fourth quarter of 2014 ("4Q14") to nearly 51 days in 1Q17.  At the end of 2015, Under Armour's DSO of 40 equaled the median DSO of the Textiles, Apparel & Footwear industry.[113]  However, Under Armour's DSO increased 18% during 2016 while the industry median DSO *decreased* 9% during the same period.[114]  Similarly, beginning in 1Q16, Under Armour's DSO was consistently higher than that of direct competitor Nike, when it had been comparable previously.[115]  Further, Under Armour's DSO had historically been better than that of rival Adidas.

---

[111]  In 2018, in an effort to help reduce the bloated receivables balance on its balance sheet resulting from the Company's elusive accounting schemes in these earlier periods, Under Armour entered into contracts with two financial institutions to sell selected receivables (up to $290 million) on a recurring, non-recourse basis.  Despite this, receivables growth still outpaced sales growth throughout 2018.

[112]  DSO is a common financial measure for assessing the age and quality of accounts receivable.  DSO represents the average number of days it takes a company to collect its receivables.  It is a measure of collectability and serves as a useful measure of cash flow efficiency and revenue quality.  A DSO of 30, for example, means that it takes a company 30 days on average to convert a credit sale (*i.e.*, an account receivable) into cash.

[113]  The Hackett Group, 2017 US Working Capital Survey.

[114]  *Id.*

[115]  Nike has a May 31 fiscal year end.  The quarterly periods referenced here are Under Armour's fiscal quarter and Nike's nearest fiscal quarter (closest in time; one month difference).  For

But, Adidas' DSO was slightly improving during the Class Period, while Under Armour's DSO was worsening and higher (worse) than Adidas by 2017. Thus, Under Armour's rising DSO was not attributable to industry conditions but rather to Defendants' fraud.

350. By the first quarter of 2018 ("1Q18"), as a result of the Company's accounting practices, Under Armour's DSO had swollen to 62 days – more than double what it had been back in 4Q14 and 55% more than the median DSO in 2017 for the Textiles, Apparel & Footwear industry.[116] Moreover, the DSO figure of 62 in 1Q18 does not even include the $55.6 million of receivables that the Company had sold to a financial institution that quarter, all of which remained outstanding. If Under Armour had not factored these receivables, its true 1Q18 DSO would have been 66 days (approximately 65% more than the 2017 industry median). An increasing DSO is a sign that receivables are at risk of collection and may indicate problems with a company's collection process.[117] The significance of this measure has been noted by the SEC: "A growing DSO figure is often a telltale sign that a company's receivables are impaired."[118] Similarly, Ernst & Young, a Big Four accounting firm, has noted the significance of a DSO spike: "The higher the number, the greater should be the concern over customers not paying the bills." The older a

_____

example, 1Q16 refers to Under Armour's quarter ended March 31, 2016 and Nike's closest quarter ended February 29, 2016.

[116] The Hackett Group, 2018 US Working Capital Survey.

[117] *See* David C. Hammer, *Performance is reality, how is your revenue cycle holding up?*, HEALTHCARE FIN. MGMT. ASSOC. (July 1, 2005); *see also* Michael D. Carpenter & Jack E. Miller, *A Reliable Framework for Monitoring Accounts Receivable*, 8 FIN. MGMT., 37-40 (Winter 1979); Scott Blakeley, Esq., *The Credit Professional's Duty and Protection with Disclosing Corporate Fraud at the Public Company*, CREDIT RES. FOUND., at 2 (Nov. 2002) ("A company's DSO is, at least on Wall Street, an important indicator of the condition of its accounts receivable, and therefore a gauge of asset quality.").

[118] *See SEC v. Korkuc*, No. 2:03-cv-03017-LDW-WDW, Complaint at ¶28 (E.D.N.Y. June 19, 2003); *see also* SEC Accounting and Auditing Enforcement Release No. 1673A (Nov. 25, 2002), http://www.sec.gov/litigation/litreleases/lr17859a.htm.

receivable becomes, the less likely it is to be collected.  This is consistent with Under Armour's increasing DSO resulting from its practice of booking contingent sales for which accounts receivable would never be collected.

351.   Defendants improperly overstated revenue by recording contingent sales, which caused the Company's net revenue, net income, and EPS to be materially overstated.  In addition, throughout the Class Period, Defendants failed to make MD&A and financial footnote disclosures describing the Company's contingent sales from the buyback program and resulting financial impacts, as required by SEC and GAAP.  *See* Section VIII.A, above.[119]

### C.   Improper Reserves for Customer Returns, Allowances, Markdowns, and Discounts

352.   Defendants, in violation of GAAP, also inflated the Company's revenues and earnings reported in Forms 10-Q and Forms 10-K, press releases, and investor conference calls from 3Q15 through 3Q16, by failing to properly reduce revenue for estimated customer returns, allowances, markdowns, and discounts given to customers.

353.   SEC Reg. S-X Rule 5-03 requires companies to report "net sales of tangible products (gross less discounts, returns and allowances)."  17 C.F.R. §210.5-03.

---

[119] Under Armour was also required to disclose the impact of contingent revenue transactions. *See* Section VIII.A, above.  FASB ASC 235-10-50, *Notes to Financial Statements*, states that "[i]nformation about the accounting policies adopted by an entity is essential for financial statement users," and that the "[d]isclosure of accounting policies shall identify and describe the accounting principles followed by the entity and the methods of applying those principles that materially affect the determination of financial position, cash flows, or results of operations . . . [and] shall encompass important judgments as to appropriateness of principles relating to recognition of revenue."  Contingent transactions were not allowed under GAAP to be recognized as revenue as discussed herein.  However, since Under Armour improperly recognized revenue and decreased inventory as a result of contingent transactions – which materially affected Under Armour's financial position and results of operations by overstating revenue and earnings and understating inventory – this accounting practice was required to be, but was not, disclosed by Defendants.

354.     GAAP, specifically ASC 605-50-45-1, allows that a vendor may give a customer a sales incentive or other consideration, where such consideration is either:

a.  An adjustment of the selling prices of the vendor's products or services and therefore characterized as a reduction of revenue when recognized in the vendor's income statement.

b.  A cost incurred by the vendor for assets or services received from the customer and therefore characterized as a cost or expense when recognized in the vendor's income statement.

355.     GAAP also requires that revenue may only be recognized if the amount of future returns can be reasonably estimated.[120]  FASB Statement No. 48, Revenue Recognition When Right of Return Exists, ¶7 states: "If sales revenue is recognized . . ., any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement No. 5, Accounting for Contingencies.  *Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns*."[121]

356.     Defendants falsely assured investors that the Company was complying with GAAP, as discussed above, and that the Company was properly accounting for estimated allowances, markdowns, discounts, and returns.   Specifically, they stated in Under Armour's revenue recognition policy in its SEC filings:

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us.  The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates.  *If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination.*  Provisions for customer specific discounts are based on contractual obligations with certain major customers.  Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts

---

[120]  FASB ASC 605-15-25-1.

[121]  *See also* FASB ASC 605-15-25-2.

receivable as settlements are made through offsets to outstanding customer invoices . . . .[122]

357.    Under Armour had excess inventory across all brands from at least 3Q15 through 4Q16.  The Company's core apparel sales began slowing by at least spring 2015.  To increase sales, Under Armour had to give incentives and promotions such as selling products for 25% off.  But the Company's inventory problems persisted.  The bankruptcy of TSA in 2016 further increased excess inventory.  One of the top reasons Under Armour missed its financial goals at the end of 2016 was because of inventory management.

358.    As a result, Under Armour sold excess inventory at heavy discounts and even shipped some to Mexico just to get its money back (*see* Section V.F).  But overall there was so much inventory in the latter half of 2016 that Under Armour's liquidation channels were already flooded and there was nowhere to go with some of the inventory.

359.    Further, in order to clear the inventory and meet its sales and profit projections (including continued 20%+ growth), during 2015 and 2016, Under Armour began offering deeper and broader price discounts and allowances; increasing sales promotions to many of its customers; and accepting the returns of more products (in addition to the increased buybacks as discussed above) (*see* Sections V.D-F).  These known and anticipated discounts and allowances, along with destocking and sales returns, should have reduced Under Armour's reported net sales, margin, and income as discussed above (*see* ¶¶353-357).

360.    However, Under Armour failed to adequately account for these known and estimable returns, discounts, markdowns, and allowances.  Defendants, who authorized this scheme, knew that the Company's results would be false and misleading as a result.  By the end

---

[122] *See, e.g.*, Under Armour 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

of 3Q16, Under Armour failed to properly recognize approximately $34 million in sales returns, allowances, markdowns, and discounts.[123]  This scheme alone caused the Company to materially overstate net sales, net income, and EPS during 3Q16 by as much as over 2%, 17%, and 18%, respectively.  The Company ultimately increased its reserves for customer returns, allowances, markdowns and discounts to more than 5.2% of net product sales in 2017 whereas previously at the end of 2015, these reserves represented just 2.5% of net product sales – a 109% increase.  These large increases in 2017 support that Under Armour had under-reserved in 2016.

### D.    Under Armour Overstated Inventory

361.    As a result of poor planning, softening demand, returns, and increased buybacks from contingent sale transactions, Under Armour accumulated material amounts of excess and obsolete (*i.e.*, impaired) inventory, which it failed to write down during 2016.

362.    GAAP mandates that inventory:

Be measured at the lower of cost and net realizable value.[124]  When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs.  That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes.[125]

363.    Similarly, Under Armour disclosed to the public in its SEC filings:

Market value[126] is estimated based upon assumptions made about future demand and retail market conditions.  If the Company determines that the estimated market value of its

---

[123]  $34 million was calculated by applying and comparing the 2017 percentage of reserves for customer returns, allowances, markdowns, and discounts (5.2%) to 3Q16 net product sales, assuming the percentage actually used by the Company during 3Q16 was the average of the percentages used at year end 2015 (2.5%) and year end 2016 (3.1%).

[124]  Net realizable value is determined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation.  FASB ASC 330-10-20.

[125]  FASB ASC 330-10-35-1B.

[126]  "As used in the phrase lower of cost or market, the term market means current replacement cost (by purchase or by reproduction, as the case may be) provided that it meets both of the

inventory is less than the carrying value of such inventory, it records a charge to cost of goods sold to reflect the lower of cost or market . . .[127]

364.    Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018.  This was due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Such incentives reduced the net realizable value of inventory.  At any given time, Under Armour had at least twice as much, and even three to four times as much, inventory than the Company's plan.

365.    As noted above, TSA's bankruptcy in 2016 added to the excess inventory problem because full categories and seasons of apparel had been allocated to TSA before it closed, and the inventory had to go back to Under Armour, including apparel from old seasons (*see* ¶¶60, 74, 123).  Moreover, Under Armour did not cancel TSA orders before the bankruptcy or reduce its sales goals after it, thus exacerbating its excess inventory problem (*see id.*).

366.    This is consistent with the Company's inventory growth rate, which significantly outpaced its revenue growth rate from 3Q15 through 2Q16, indicating that demand for Under Armour products was slowing and the Company was not able to sell as much of its burgeoning supply of inventory as anticipated.

367.    Despite Defendants' knowledge regarding excess inventory as described herein, Under Armour continued the charade by misleading investors during the 3Q16 earnings call on October 25, 2016, when Malloy stated: "Despite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward*."  Malloy also reiterated

following conditions: a. Market shall not exceed the net realizable value [and] b. Market shall not be less than net realizable value reduced by an allowance for an approximately normal profit margin."  FASB ASC 330-10-20.

[127]  Under Armour, Inc., Annual Report (Form 10-K) (Feb. 20, 2015), at 47.

the expectation for revenues to grow approximately 20% in 4Q16, and explicitly told an analyst, "*We feel like we're in really good shape from an inventory perspective*."

368.    Under Armour's positive statements regarding inventory were misleading because, unbeknownst to investors, the Company's inventory was impaired.  Projected sales growth and corresponding attrition of inventory could only be achieved through the Company's unprecedented promotions and discounts, which impacted margins well beyond 2016, and undisclosed contingent sales and channel stuffing.

369.    Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory.  These charges to reduce the overstated inventory balance should have been recorded in 2016.  Under Armour's inventory balance was overstated from 2016 through 2018 by as much as 3%.  This was a material overstatement, as demonstrated by the fact that, by failing to take the impairment charge in 3Q16, Under Armour's operating income and net income for that quarter were both overstated by approximately 13%.  Moreover, Under Armour would have missed its operating income guidance had the full charge been taken in 3Q16.

## IX.    POST-CLASS PERIOD REVELATIONS

370.    Following the Class Period, additional facts were revealed concerning the nature and severity of Defendants' fraud.  As discussed above, on November 14, 2019, WSJ released an article titled, "Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter,'" which was based on interviews with several former Company executives in sales, logistics, merchandising, and finance, and referenced emails obtained by federal investigators showing Plank's direct knowledge of the efforts to move revenue between quarters.[128]   The former

---

[128]  Ex. A, at 2.

executives told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel" and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[129]   According to WSJ, a former sales executive said "[i]t was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap."[130] According to these former executives, WSJ reported, Defendants used these tactics every quarter "to help extend a 26-quarter streak of 20% sales growth," a streak that "employees knew was important to Mr. Plank," which "came to an abrupt end in late 2016."[131]

371.    A former merchandising executive at the Company explained to WSJ that these practices were "all in the name of hitting the number."[132]   These former executives also explained to WSJ how if "retailers declined to take products before their requested ship date, Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products."[133]   And a former logistics executive further revealed to WSJ that "[s]hipping plans in the final days of the quarter sometimes contradicted the dates on the boxes, and truckloads of unopened boxes would come back to Under Armour."[134]   WSJ also reported that the former executives observed that the "strains in Under Armour's business were evident inside the company in 2016," that Under Armour continued shipping products and booking

---

[129]   *Id.* at 1.

[130]   *Id.* at 3.

[131]   *Id.* at 1-2.

[132]   *Id.* at 2.

[133]   *Id.* at 3.

[134]   *Id.*

sales to Sports Authority even "[a]fter it was clear Sports Authority was in trouble," and that Dick's (which was holding unsold Under Armour goods) stopped taking products early because it was "angered" by Under Armour's deal with discount value retailer Kohl's, who often offered the same products but with more discounts.[135]  Additionally, WSJ reported, a former merchandise executive said that, "[t]o help meet its quarterly targets, Under Armour in 2016 shipped new inventory intended for its own factor stores to off-price seller TJX Cos.," which "allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the item at its own stores."[136]  But "[t]his executive and another former employee said Under Armour was careful to avoid shipping too much inventory to TJX so that it wouldn't have to disclose that the discounter was among its major customers in its securities filings," according to WSJ.[137]

372.    On November 15, 2019, the *Baltimore Business Journal* released an article discussing accounting irregularities at the Company that were likely being reviewed by the SEC and DOJ.  In particular, the article focused on the Company's rising accounts receivable that began in the final quarter of 2015 – when it jumped 55% vs. sales growth of 31% - and continued through the end of 2016, along with a rising number of days sales outstanding.  The article stated in part:

> The revelation of a federal probe, [Plaintiffs'] lawsuit and claims by former executives of aggressive sales tactics offer a glimpse into what may have been behind Under Armour's stumbles after so much success.  The company says no accounting irregularities occurred and that it was just an unfortunate mix of market forces – Sports Authority's demise, the retail industry's free fall and a trend toward athleisure apparel that Under Armour declined to embrace.

> The shareholders' allegations and past executives quoted in the Wall Street Journal story point to ***something more nefarious***.  Whether done intentionally by UA executives or driven by market pressure, some accountants and university professors called on by the Baltimore Business Journal to review the numbers say something was amiss that caused

---

[135]  *Id.* at 3-4.

[136]  *Id.* at 4.

[137]  *Id.*

unusual patterns in the company's financials.

<div align="center">*     *     *</div>

Under Armour's financial statements show a pattern of rising accounts receivable and sales that couldn't keep up as the company struggled to keep pace in an increasingly competitive industry.

373.    On January 6, 2020, the *Baltimore Business Journal* reported that Under Armour had

> "quietly hired a chief accounting officer [Aditya Maheshwari] in November, filing a key C-suite position for the sportswear maker whose accounting practices are at the center of a federal probe. . . . Maheshwari was brought on three weeks after Under Armour confirmed a Wall Street Journal report that its accounting practices are being investigated by the SEC and the [DOJ].

<div align="center">*     *     *</div>

> While the investigation continues, he will be responsible for cooperating with regulators and ensuring Under Armour is following all of the rules."  By not issuing a press release or submitting a filing with the SEC announcing Maheshwari's hiring, the article noted, Under Armour departed from the usual corporate practice of notifying shareholders by of an executive appointment.

374.    On July 27, 2020, Under Armour disclosed in their SEC Form 8-K that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws."  These "Wells Notices," Under Armour's filing stated, "relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters."  "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives."

375.    On August 6, 2020, Under Armour further disclosed in its 2Q20 Form 10-Q that "[t]he Wells Notices informed the Company" that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated

<div align="center">- 162 -</div>

thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act." The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices included," among other things, "civil monetary penalties, as well as in the case of the Executives, a bar from serving as an officer or director of a public company."

376. Securities analysts and media took note of the additional news regarding the Under Armour investigations, the seriousness of the misconduct being investigated, and the SEC's preliminary decision to file an enforcement action. For example:

(a) on November 18, 2019, UBS released an analyst report stating that the investigations created an "overhang" on the stock. The report interviewed an expert on DOJ and SEC investigations, who explained that it was "routine" for companies to disclose such investigations in their SEC filings;

(b) on January 6, 2020, J.P.Morgan released a report "applying a 20% haircut for accounting investigation overhang";

(c) On January 20, 2020, Zack's published an analyst report looking back on 2019 and observing that, despite "better-than-expected third-quarter 2019 results," "a federal accounting probe and trimming of 2019 revenue growth forecast hurt investor sentiment"; and

(d) Jefferies' February 11, 2020 report emphasized how "the accounting investigation is an item for investors to contend with" even months after Under Armour belatedly disclosed the nearly three-year old DOJ and SEC investigations;

(e) in a July 27, 2020 article, WSJ quoted a partner at Arthur Andersen, who called the Wells Notices "the declaration of war" and said they mean "Enforcement is locked and loaded, ready to go." WSJ further noted the "serious" nature of the Notices, noting that "[t]he SEC

issues a so-called Wells Notice when it believes it can establish a violation and is prepared to recommend the commission file a civil lawsuit[]"

(f)    on July 28, 2020, Bloomberg Tax published an article emphasizing shareholder implications, stating that "the SEC inquiry is focused on what the athletic apparel company disclosed to shareholders about [pulling sales from the next quarter into the current period]." The Bloomberg article noted that "[c]ompanies are supposed to disclose how they make material accounting estimates, including whether their policy is to recognize revenue by pulling forward sales." Explaining how these practices are unsustainable, Bloomberg quoted an auditor, who said: "At some point, the music is going to stop and you're not going to have a chair . . . . You don't have any more sales to pump up into that quarter." The auditor explained that "[a]ll of this really relates to revenue smoothing. . . . They are trying to provide consistent, recurring, smooth numbers that meet or beat analyst expectations instead of just reporting what really happened[]" Bloomberg further noted that pull-forward sales "often come[ ] with incentives to the customer in the form of discounts, rebates or buy-back guarantees, all of which impact revenue[,]" and "can also disguise sham transactions known as channel stuffing."

## X.    LOSS CAUSATION AND ECONOMIC LOSS

377.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated (or maintained the artificial inflation of) the prices of Under Armour's common stock and operated as a fraud or deceit on Class Period purchasers of Under Armour's common stock. When the relevant truth was revealed and became apparent to the market, the prices of Under Armour's common stock fell as the prior artificial inflation came out. The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations of truthful information. As a result of their purchases of Under Armour's common

stock during the Class Period, Plaintiffs and the other members of the Class (defined in ¶407 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.      January 10, 2016 Revelations

378.    The truth began to emerge on Sunday, January 10, 2016, when, as detailed in Section VII.A above, Morgan Stanley issued a report detailing slower growth of the Company's North American apparel sales, falling sales prices, and reduced market share.  As a result of the information revealed to the market, the Company's Class A Common Stock dropped approximately 6.72% on unusually high trading volume.  At the Company's next earnings call on January 28, 2016, the Company rejected and denied the Morgan Stanley Report's revelations and reassured investors of the Company's strong financial condition.

### B.      May 3, 2016 Revelations

379.    The truth continued to emerge after the market closed on May 3, 2016, when, as detailed in Section VII.E above, the Company surprised investors by announcing the sudden departures of key executives Stafford and Thurston.  These departures, coming on the heels of Dickerson's departure, the Morgan Stanley Report exposing problems at the Company, and three major retail customer bankruptcies, were viewed by investors as a signal that there were undisclosed problems at the Company.  As a result, the Company's Class A Common Stock dropped approximately 7.54% on unusually high trading volume.  The Company's Class C Common Stock, which was issued to Class A Common Stock holders on a one-for-one basis after the market closed on April 7, 2016, also experienced a price decline as a result of this news, falling approximately 6.80% on unusually high trading volume.  The declines would have been more dramatic had Defendants disclosed the declines in sales demand, the suspect sales practices used

to mask slowing demand, and the resulting financial problems that led to the departures of Stafford and Thurston.  Instead, Defendants were completely silent on the reasons for their departures.

### C.      May 31, 2016 Revelations

380.     As detailed in Section VII.F above, the Company surprised investors on May 31, 2016, by revealing that, contrary to the Company's positive statements and guidance raise just a month earlier, 2016 revenue and operating income would be much lower than projected, citing the Sports Authority bankruptcy.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 3.92% and 3.57%, respectively, on unusually high trading volume.  The drops would have been more dramatic had Defendants disclosed the suspect sales practices used to mask slowing demand and the true extent of the financial difficulties facing the Company.  Instead, Defendants misleadingly stated that Under Armour's momentum was stronger than ever, and that the Company continued to experience growth and increased demand across all product categories and geographies.

### D.      July 26, 2016 Revelations

381.     The truth continued to emerge on July 26, 2016, when, as detailed in Section VII.H above, the Company surprised investors by revealing slowdowns in apparel sales growth, operating income, and net income.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 5.12% and 3.56%, respectively, on unusually high trading volume.  The drops were tempered by Defendants' attempts to blunt the negative results by making misleadingly positive statements regarding the Company's sales demand and revenue growth, and their failure to disclose the suspect sales practices used to mask slowing demand and the true extent of financial difficulties facing the Company.

### E.    October 25, 2016 Revelations

382.    As detailed in Section VII.J above, on October 25, 2016, the Company revealed a slowdown in North American apparel growth and compressed margins attributed to higher discounts, promotions, and liquidations.  As a result of the information, Under Armour's Class A Common Stock and Class C Common Stock prices dropped approximately 18.36% and 21.25%, respectively, on unusually high trading volume.  The drops would have been more dramatic had Defendants disclosed the true extent of the sales declines, the suspect sales practices used to mask slowing demand, and the associated financial difficulties facing the Company.  But Defendants failed to do so and, instead, reassured investors that the Company's overall growth and demand were strong and stated that the Company's inventory position was healthier.

### F.    January 31, 2017 Revelations

383.    On January 31, 2017, the Company shocked investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in Section VII.K above.  As a result, the Company's Class A Common Stock and Class C Common Stock prices plummeted approximately 28.65% and 27.78%, respectively, on unusually high trading volume.  The share price declines would have been larger had Defendants disclosed the suspect sales practices used to mask slowing demand and the true state of the Company's financial condition.  But, Defendants continued to hide these facts and made misleading statements about the reasons for the reported financial results.

### G.    August 1, 2017 Revelations

384.    On August 1, 2017, the Company's common stock prices fell precipitously when it announced another quarter of poor North American sales, lowered 2017 guidance, and a massive restructuring involving hundreds of job cuts and $110 to $130 million in expected restructuring-

related charges, including "approximately $20 million of inventory related charges," as detailed further in Section VII.L above.  The Company's Class A Common Stock and Class C Common Stock prices dropped 8.59% and 10.38%, respectively, on unusually high trading volume.

### H.     November 3, 2019 Revelations

385.     As detailed in Section VII.N above, WSJ revealed on November 3, 2019 that Under Armour's revenue recognition practices were subject to ongoing civil and criminal investigations by the SEC and DOJ, and that Under Armour had been responding to requests for documents and information since July 2017.  The Company released a statement later that day confirming the investigations.  As a result, the Company's Class A Common Stock and Class C Common Stock prices fell 18.92% and 18.35%, respectively, on unusually high trading volume.

386.     As a result of their purchases of Under Armour common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Under Armour's business and prospects. Defendants' false and misleading statements had the intended effect and caused Under Armour common stock to trade at artificially inflated levels throughout the Class Period.

387.     When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of Under Armour's common stock declined.  These declines removed the inflation from the prices of Under Armour's common stock, causing real economic loss to investors who had purchased Under Armour's common stock during the Class Period.

388.     The declines in the prices of Under Armour's common stock after the revelations came to light were a direct result of the partial disclosures of truthful information relating to Defendants' misrepresentations.  The timing and magnitude of the price declines in Under Armour

common stock negate any inference that the losses suffered by Plaintiffs and the other members

of the Class were caused by changed market conditions, macroeconomic or industry factors, or

Company-specific facts unrelated to Defendants' fraudulent conduct.  This is evidenced by the

chart below, which demonstrates the clear divergence of the Company's Class A Common Stock

prices from the Company's benchmark indices and peer company stock prices[138] as the revelations

of the truth became known to the market:



389.    The economic losses, i.e., damages, suffered by Plaintiffs and the other members

of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices

of Under Armour common stock and the subsequent significant declines in the value of Under

---

[138]  Under Armour identified the S&P 500 Index and S&P Apparel, Accessories and Luxury Good
Index as benchmarks for its Class A Common Stock performance in its FY15 through FY19 Forms
10-K.

Armour common stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## XI.    PRESUMPTION OF RELIANCE

390.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

391.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.   As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.   Plaintiffs and other members of the Class (defined in ¶286 below) purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Under Armour, and have been damaged thereby.

392.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     as a regulated issuer, Under Armour regularly made public filings with the SEC and related press releases;

(b)     Under Armour regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     Under Armour was followed by several securities analysts employed by major brokerage firms, such as Morgan Stanley, Deutsche Bank, Canaccord Genuity, Wells Fargo, Credit Suisse, Barclays, UBS, Jeffries, Cowen and Company, and Piper Jaffray, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace; and

(d)     certain of the Company's securities, Class A Common Stock and Class C Common Stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

393.    As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of the Company's common stock.

394.    Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

395.    At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts

concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

396.    As a result of the above circumstances, the presumption of reliance applies.

397.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XII.    NO SAFE HARBOR

398.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Under Armour's Class Period filings.

399.    For example, Under Armour's 2014 Form 10-K, filed with the SEC on February 20, 2015, contained the following boilerplate "caution":

*A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth.*

400.     The generic nature of this disclosure is illustrated by the fact that it was simply repeated verbatim from the Company's 2013 Form 10-K, filed with the SEC on February 21, 2014, and was again repeated in the Company's 2015, 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 22, 2016, February 23, 2017, February 28, 2018, February 25, 2019, and February 26, 2020, respectively, when the problems plaguing the Company were well known internally.

401.     Similarly, Under Armour issued the following risk warning in both its 2013 and 2014 Forms 10-K concerning the decline of brand image, net revenues, and profitability:

*If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of a global business and as a result our brand image, net revenues and profitability may decline.*

402.     A substantially similar warning appeared in the Company's 2015 and 2016 Forms 10-K:

*We must continue to effectively manage our growth and the increased complexity of a global business or we may not achieve our long-term growth targets and our brand image, net revenues and profitability may decline.*

403.     A substantially similar warning appeared in the Company's 2017, 2018, and 2019 Forms 10-K:

*We must successfully manage the increasingly complex operations of our global business, or our business and results of operations may be negatively impacted. . . . If we experience difficulties in supporting the growth of our business, we could experience an erosion of our brand image and a decrease in net revenues and net income.*

404.     The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions"

- 173 -

were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

405.    Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew it was false or misleading when made.

## XIII.   CLASS ACTION ALLEGATIONS

406.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded common stock of Under Armour during the Class Period, and who were damaged thereby ("Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

407.    Members of the Class are so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of October 31, 2019, Under Armour had more than 188 million shares of Class A Common Stock and more than 228 million shares of Class C Common Stock outstanding.   While the exact number of members of the Class can only be

determined by appropriate discovery, Plaintiffs believe that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

408.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the members of the Class sustained damages arising out of Defendants' wrongful conduct complained of herein.

409.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class that Plaintiffs seek to represent.

410.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

411.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)      whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)      whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)      whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Under Armour and Plank

412.     Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

413.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Plaintiffs and other members of the Class to purchase the Company's publicly traded common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

414.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Plank is also sued as a controlling person of Under Armour, as alleged below.

415.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.)* and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

416.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

417.    Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

418.    Plank's primary liability and controlling person liability arise from the following facts, among others: (a) Plank was a high-level executive at the Company during the Class Period; (b) Plank, by virtue of his responsibilities and activities as CEO and Chairman was privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) Plank enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) Plank was aware of the Company's dissemination of information to the investing public which he knew, or recklessly disregarded, was materially false and misleading.

419.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the

Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

420.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's common stock were artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired the Company's common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the common stock price declines above.

421.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their Under Armour publicly traded common stock during the Class Period; or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

422.    By virtue of the foregoing, Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

423.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was removed from the Company's common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendants Under Armour and Plank

424.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

425.    Plank acted as a controlling person of Under Armour within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Plank had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Plank was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and

other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In addition, Plank had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.  Under Armour controlled Plank and the Company's other officers and employees.

426.    As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their control, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

<div align="center">

**COUNT III**

**For Violation of Section 20A of the Exchange Act**
**Against Plank**

</div>

427.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Plank on behalf of Plaintiffs who were damaged by Plank's insider trading.

428.    As detailed herein, Plank was in possession of material, non-public information concerning Under Armour.  Plank took advantage of his possession of material, non-public information regarding Under Armour to obtain millions of dollars in insider trading profits during the Class Period.

429.    Plank's sales of Under Armour stock were made contemporaneously with Aberdeen's, Monroe's, and one of KBC's fund's purchases, and other Class Members' purchases, of Under Armour stock during the Class Period.

430.    For example, in November 2015, Plank sold the following shares of Under Armour common stock for total proceeds of $99,968,961.

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/23/2015 | $92.46 | 199,920 | $18,484,603 |
| 11/23/2015 | $93.00 | 80 | $7,440 |
| 11/23/2015 | $92.46 | 24,991 | $2,310,668 |
| 11/23/2015 | $93.00 | 9 | $837 |
| 11/20/2015 | $92.72 | 80 | $7,418 |
| 11/20/2015 | $92.04 | 68,917 | $6,343,121 |
| 11/20/2015 | $91.24 | 131,003 | $11,952,714 |
| 11/20/2015 | $92.72 | 9 | $834 |
| 11/20/2015 | $92.04 | 8,615 | $792,925 |
| 11/20/2015 | $91.24 | 16,376 | $1,494,146 |
| 11/19/2015 | $89.60 | 320 | $28,672 |
| 11/19/2015 | $88.89 | 158,001 | $14,044,709 |
| 11/19/2015 | $88.42 | 41,679 | $3,685,257 |
| 11/19/2015 | $89.60 | 40 | $3,584 |
| 11/19/2015 | $88.89 | 19,751 | $1,755,666 |
| 11/19/2015 | $88.42 | 5,209 | $460,580 |
| 11/18/2015 | $85.39 | 89,002 | $7,599,881 |
| 11/18/2015 | $87.09 | 10,838 | $943,881 |
| 11/18/2015 | $86.42 | 100,160 | $8,655,827 |
| 11/18/2015 | $85.39 | 11,125 | $949,964 |
| 11/18/2015 | $87.09 | 1,355 | $118,007 |
| 11/18/2015 | $86.42 | 12,520 | $1,081,978 |
| 11/17/2015 | $87.31 | 1,200 | $104,772 |
| 11/17/2015 | $86.17 | 28,676 | $2,471,011 |
| 11/17/2015 | $85.42 | 170,124 | $14,531,992 |
| 11/17/2015 | $87.31 | 151 | $13,184 |
| 11/17/2015 | $86.17 | 3,584 | $308,833 |
| 11/17/2015 | $85.42 | 21,265 | $1,816,456 |

431.    Monroe purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|

| 11/20/2015 | 91.62 | 676 | $61,935 |

432.    One of KBC's fund's purchased the following shares of Under Armour common

stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/20/2015 | 92.01 | 11,161.00 | $1,026,923.60 |

433.    In addition, Plank sold the following shares of Under Armour common stock in

April 2016 for total proceeds of $38,262,467.

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 4/29/2016 | $40.84 | 197,680 | $8,073,251 |
| 4/29/2016 | $41.58 | 2,320 | $96,466 |
| 4/29/2016 | $40.84 | 24,709 | $1,009,116 |
| 4/29/2016 | $41.58 | 291 | $12,100 |
| 4/28/2016 | $42.92 | 48,446 | $2,079,302 |
| 4/28/2016 | $42.45 | 151,554 | $6,433,467 |
| 4/28/2016 | $42.92 | 6,056 | $259,924 |
| 4/28/2016 | $42.45 | 18,944 | $804,173 |
| 4/27/2016 | $43.00 | 33,762 | $1,451,766 |
| 4/27/2016 | $42.39 | 166,238 | $7,046,829 |
| 4/27/2016 | $43.00 | 4,220 | $181,460 |
| 4/27/2016 | $42.39 | 20,780 | $880,864 |
| 4/26/2016 | $44.15 | 200,000 | $8,830,000 |
| 4/26/2016 | $44.15 | 25,000 | $1,103,750 |

434.    Aberdeen purchased the following shares of Under Armour common stock, among

others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 5/4/2016 | $40.07 | 43,317 | $1,735,712 |
| 5/3/2016 | $42.76 | 9,953 | $425,590 |
| 5/2/2016 | $43.67 | 5,119 | $223,547 |
| 4/29/2016 | $43.70 | 2,997 | $130,969 |
| 4/27/2016 | $45.07 | 3,014 | $135,841 |
| 4/26/2016 | $46.75 | 15,641 | $731,217 |
| 4/25/2016 | $46.48 | 2,275 | $105,742 |
| 4/22/2016 | $46.74 | 3,413 | $159,524 |
| 4/20/2016 | $43.93 | 11,375 | $499,704 |
| 4/19/2016 | $43.96 | 2,958 | $130,034 |

435.    KBC's funds purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 4/29/2016 | 43.94 | 5,185.00 | $227,828.90 |

436.    Plaintiffs and other Class members, who purchased shares of Under Armour common stock contemporaneously with sales by Plank suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding rescission or a rescissionary measure of damages.

E.    Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  October 14, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
ROBERT R. HENSSLER JR.
MATTHEW I. ALPERT
JUAN CARLOS SANCHEZ
CHRISTOPHER R. KINNON

*s/ Robert R. Henssler Jr.*

ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
jsanchez@rgrdlaw.com
ckinnon@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
MAUREEN E. MUELLER
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
mmueller@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Plaintiffs*

MOTLEY RICE LLC
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for KBC Asset Management NV*

SILVERMAN THOMPSON SLUTKIN
    & WHITE LLC
ANDREW C. WHITE (Federal Bar No. 0821)
WILLIAM SINCLAIR (Federal Bar No. 28833)
PIERCE C. MURPHY (Federal Bar No. 30030)
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)
awhite@mdattorney.com
bsinclair@mdattorney.com
pmurphy@mdattorney.com

*Local Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 14, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


<div style="text-align:right">

*s/ Robert R. Henssler Jr.*

ROBERT R. HENSSLER JR.

</div>

# EXHIBIT A

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/inside-under-armours-sales-scramble-pulling-forward-every-quarter-11573777489

◆ WSJ NEWS EXCLUSIVE | BUSINESS

# Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter'

Sportswear brand pushed early shipments, dumped goods at off-price chains to stay on growth streak, former executives say



Under Armour leaned on retailers to take products early and redirected goods intended for the company's factory stores to off-price chains, according to former executives.

PHOTO: BRENDAN MCDERMID/REUTERS

*By Khadeeja Safdar and Aruna Viswanatha*

Updated Nov. 14, 2019 9:42 pm ET

Former executives at Under Armour Inc., the sportswear company whose accounting is under federal investigation, said they scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel.

The Baltimore company frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter, according to former executives in sales, logistics, merchandising and finance.

They said the company repeatedly used these and other moves to help extend a 26-quarter streak of 20% sales growth, a feat that came to an abrupt end in late 2016. Some of the executives said such end-of-quarter moves are common in the retail industry.

Case 1:17-cv-00388-RDB   Document 153-1   Filed 10/14/20   Page 3 of 6

"It was all in the name of hitting the number, and it would happen out in the open," said a former Under Armour merchandising executive. "They [the company] didn't think there was anything improper about it."

Under Armour said it is confident in its accounting practices, revenue recognition and investor disclosures. It said it operated within standard industry practices and in compliance with generally accepted accounting principles.

RELATED ARTICLES

- <u>Under Armour Shares Slide on News of Accounting Probe</u> (Nov. 4, 2019)
- <u>Under Armour Is Subject of Federal Accounting Probes</u> (Nov. 4, 2019)
- <u>Under Armour Founder Kevin Plank Steps Aside as CEO</u> (Oct. 22, 2019)

Federal investigators are conducting a probe into the company's revenue recognition and whether there were improper tactics used to shift sales, <u>the Journal has reported</u>. Investigators are examining emails that show Under Armour's founder and chief executive, Kevin Plank, knew about efforts to move revenue between quarters, according to a person familiar with the matter.

Among the issues investigators are examining, according to people familiar with the matter, are Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy, who resigned in January 2017 on the same day the company said sales growth fell below 20%. Under Armour shares <u>tumbled 23% that day</u>.

A criminal probe is being led by the U.S. attorney's office in Baltimore, which is coordinating with a civil securities-fraud investigation by the Securities and Exchange Commission, the people said. Mr. Molloy didn't respond to requests for comment. The former executives who described efforts to meet quarterly targets said they hadn't been interviewed by investigators.

Under Armour said it has been cooperating with the investigations since July 2017.

"Our management and board of directors have extensively reviewed this matter over the past two and a half years, and we continue to believe that our accounting practices and related disclosures have been appropriate," the company said. Analysts and accounting experts agree the end-of-quarter maneuvers described by these executives are generally permitted under accounting rules.

Former executives said pulling sales forward helped the sportswear company sustain its growth record, which employees knew was important to Mr. Plank. On several earnings calls,

Mr. Plank boasted about the streak, including the third quarter of 2016.

"Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business," Mr. Plank said on Oct. 25, 2016.

That day, the Baltimore company acknowledged it was <u>seeing a slowdown</u> in the North American apparel industry and feeling the impact of bankruptcies of retailers such as Sports Authority Inc. Executives said they needed to boost investments, hurting profits, but reiterated their goal of 20% sales growth in the fourth quarter of 2016, as well as in 2017 and 2018.

"We want to be clear, our demand is still there," Mr. Plank said. Sales ended up rising 12% in the fourth quarter and 3% and 4% in 2017 and 2018, respectively.

Former employees described efforts in 2016 to sustain the 20% quarterly growth rate, even as retailers failed to sell some of the company's sweatshirts, T-shirts and other apparel. "It was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap," a former sales executive said.

When retailers declined to take products before their requested ship date, Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products, this former executive and other employees said. "Problem is once this starts it doesn't seem to stop," the sales executive said. "We found ourselves pulling forward every quarter."

Another former executive said Under Armour had negotiations with customers about shipping products earlier than planned, but always got their approval. "I never witnessed anything where we would just ship something unbeknownst to a customer," the executive said. "If the customer accepted and you have a conversation about it, that's all good."

Shipping plans in the final days of the quarter sometimes contradicted the dates on the boxes, and truckloads of unopened boxes would come back to Under Armour, a former logistics executive said.

There is no rule prohibiting manufacturers from urging customers to accept early sales to meet quarterly expectations, said Ethan Rouen, a professor at Harvard Business School. "If there is an explicit or implied favor being involved, then that's problematic," he said.

Still, efforts to shift sales between quarters can hurt investors, said Mr. Rouen. "If you're mortgaging the future, it's eventually going to catch up," he said.

The strains in Under Armour's business were evident inside the company in 2016, several former executives said. Sports Authority, a major customer, filed for bankruptcy protection

that spring and closed its remaining locations that summer. "The slowdown was occurring in more places than just there," the former sales executive said. "They just amplified the issue."

After it was clear Sports Authority was in trouble, Under Armour continued shipping products to the retailer, booking sales for those goods, according to former executives. Sports Authority's collapse eventually left Under Armour looking for other outlets, they said.

In July 2016, Mr. Plank announced a deal with Kohl's Corp., a department store, to carry Under Armour gear the following year. The move gave the company hundreds of new locations to stock its goods, including inventory meant for Sports Authority, the former executives said. Kohl's didn't immediately respond to a request for comment.

It also angered the company's biggest customer, Dick's Sporting Goods Inc., these executives said. As a result, Dick's, which was holding unsold Under Armour goods, stopped taking products early, they said. Dick's was Under Armour's biggest customer in 2015 and 2016, accounting for about $400 million of annual sales, according to securities filings. A spokesman for Dick's declined to comment.

While sales were slowing, the amount of money that Under Armour was setting aside for returns or markdowns was accelerating. In 2016, the company's revenue rose 22%, while its reserves for returns jumped 55%. The next year, revenue rose about $150 million to nearly $5 billion, while its reserve for returns jumped $100 million to $247 million, the securities filings show.

To help meet its quarterly targets, Under Armour in 2016 shipped new inventory intended for its own factory stores to off-price seller TJX Cos ., the former merchandise executive said. That allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the item at its own stores.

This executive and another former employee said Under Armour was careful to avoid shipping too much inventory to TJX so that it wouldn't have to disclose that the discounter was among its major customers in its securities filings.

A spokeswoman for TJX, which operates the TJ Maxx and Marshalls chains, declined to comment.

Case 1:17-cv-00388-RDB   Document 153-1   Filed 10/14/20   Page 6 of 6

**Write to** Khadeeja Safdar at <u>khadeeja.safdar@wsj.com</u> and Aruna Viswanatha at <u>Aruna.Viswanatha@wsj.com</u>

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT B

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835

◆ WSJ NEWS EXCLUSIVE | BUSINESS

# Under Armour Is Subject of Federal Accounting Probes

Justice Department, SEC examining how sportswear maker recorded revenue; company says it is
cooperating with investigators



U.S. authorities have questioned people in Baltimore, where Under Armour is based, according to a person familiar with the
probe. **PHOTO:** SPENCER PLATT/GETTY IMAGES

*By Aruna Viswanatha and Khadeeja Safdar*

Updated Nov. 3, 2019 7:06 pm ET

Federal authorities are investigating Under Armour Inc.  UA **2.22%** ▲ 's accounting practices in a probe
examining whether the sportswear maker shifted sales from quarter to quarter to appear healthier,
according to people familiar with the matter.

As part of the probe, which hasn't been made public, investigators questioned people in Baltimore, where
the company is based, as recently as last week, one of the people said.

Justice Department prosecutors are conducting a criminal inquiry into the matter in coordination with civil
investigators at the Securities and Exchange Commission, another person said.

Under Armour said it is cooperating with the Justice Department and SEC investigations. "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures," Under Armour said after The Wall Street Journal published this article. "The company firmly believes that its accounting practices and disclosures were appropriate."

Spokespeople for the Justice Department and SEC declined to comment.

When examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions.

The company, which is scheduled to report third-quarter results on Monday, has been restructuring its operations and struggling with weak sales in the last two years. Until then, it had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth.

That streak ended abruptly when Under Armour missed its sales targets in the final quarter of 2016. On Jan. 31, 2017, the company's shares plunged after it reported sales growth of 12% in the holiday quarter and cut its growth forecasts for the next year. That day, Under Armour also said its then-finance chief was leaving after a year on the job.

At the time, founder, Chairman and CEO Kevin Plank attributed the slowdown to fewer store visits by shoppers, the company's product assortment and changes in the sportswear industry, including retailer bankruptcies such as Sports Authority Inc. Mr. Plank moved to restructure the operations, cutting jobs and hiring an outsider, Patrik Frisk, as president.

Under Armour had three chief financial officers from 2016 to 2017. Brad Dickerson, who had served as CFO since 2008, left the company in February 2016. Chip Molloy, a former PetSmart Inc. executive, took over but stayed a year on the job. Under Armour at the time cited unspecified personal reasons for his departure.

David Bergman was named acting finance chief in February 2017 after the company reported its quarterly sales miss and Mr. Molloy's exit. Mr. Bergman, who has worked at Under Armour since 2004 in various finance roles, was named permanent CFO in December 2017.

Messrs. Dickerson, Molloy and Bergman didn't respond to requests for comment Sunday.

The slowing growth, coupled with some unexpected declines in quarterly profit, fanned concerns about Under Armour's ability to continue to win market share from Nike Inc. and Adidas AG . The company's class A shares, which once traded above $40, closed Friday at $21.14.

Last month, the company said Mr. Plank was stepping down as CEO on Jan. 1 after more than 20 years in the role. Mr. Plank plans to stay at the company as executive chairman and brand chief, and Mr. Frisk will

take over as CEO and continue reporting to Mr. Plank.

MORE ON UNDER ARMOUR

- Under Armour Founder Kevin Plank Steps Aside as CEO
- Meet Under Armour CEO's Unusual Adviser: An MSNBC Anchor

Mr. Plank, a former University of Maryland football player, founded Under Armour in his grandmother's basement with sweat-wicking compression apparel. Over time, he added new products and struck endorsements with athletes including NBA star Stephen Curry and golfer Jordan Spieth, building the company into a global brand with about $5 billion in annual sales.

In recent years, the company has refocused on performance attire but has continued to struggle in its domestic market. In its second fiscal quarter, Under Armour reported a 3% decline in sales in North America and said it expects them to decline over the full year. Analysts expect total sales of $1.41 billion in the third quarter, compared with $1.44 billion in the same period last year.

Like many companies, Under Armour has faced complaints by current and former employees about its culture, including the expensing of strip-club visits and inappropriate behavior by executives, the Journal has reported. Mr. Plank has spoken openly about Under Armour's shortcomings, promised to make improvements and replaced some senior executives.

When he announced plans to hand over the CEO title, the 47-year-old billionaire said the decision was part of the company's long-term succession planning.

—*Dave Michaels contributed to this article.*

THE 10-POINT IN YOUR INBOX

Get a daily, guided tour of the best scoops and stories in The Wall Street Journal. Sign up.

Write to Aruna Viswan atha at Aruna.

Viswanatha@wsj.com and Khadeeja Safdar at khadeeja.safdar@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT C

January 10, 2016

# Under Armour Inc.

## Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW

MORGAN STANLEY & CO. LLC

**Jay Sole**
Jay.Sole@morganstanley.com          +1 212 761-5866

**Joseph Wyatt, CFA**
Joseph.Wyatt@morganstanley.com      +1 212 761-4206

**Edward A Ryan**
Eddie.Ryan@morganstanley.com        +1 212 761-4384

| Industry View | Stock Rating | Price Target |
|---|---|---|
| **In-Line** | **Underweight** | **$62.00** |

Our data shows declining share in women's apparel and falling ASPs in footwear -- categories that represent 40% of forecasted growth -- leaving little room for error on a high P/E stock. We lower our FY16 estimate by 6% and see 21% PT downside.

| What's Changed? | | From: | To: |
|---|---|---|---|
| **Under Armour Inc.** | | | |
| Rating | | Equal-weight | Underweight |
| Price Target | | $103.00 | $62.00 |

**Data indicates near-term earnings uncertainty is more than just weather:** Recent SportScan data shows UA is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace. Both trends are more pronounced in women's apparel, despite major marketing investment in this division last year. Though warm weather surely explains some of this, we think UA may be reaching maturity in US apparel faster than previously thought. Though we remain constructive on UA's int'l opportunity, we don't think the shares are priced for a US slowdown.

**UA running footwear prices are down 20% since January 2013, while the industry's are down just 4%:** UA is now positioned as a mid-tier running brand. UA has always competed on brand image and innovation, rarely on price. This change in trend is a major concern because this positioning threatens to erode UA's premium brand image and ultimately its long-term growth potential. We see a similar theme occurring in basketball footwear.

**We lower our 5-year sales and EPS growth forecasts by 1% and 3%, respectively to 23% and 21%:** Our forecast assumes North America revenue grows 19% per year. Our bear case assumes revenue/EPS growth of 21% and 16% over the next 5 years and includes a further N. Am. slowdown to 16%. Though we feel comfortable with our base case, if US women's apparel and footwear sales are weaker than we envision, bear case risks rise.

**We lower our UA PT to $62/share from $103:** This assumes an 8.5% cost of equity and 4% long-term growth rate. The cost of equity has risen 50 bps from our last note due to current market pricing for risk. All other assumptions are unchanged. The PT change is 20% based on our new EPS estimates, the other 80% on the Ke difference. This indicates just how sensitive to a change in risk perception a high P/E stock like UA is. The stock has maintained a premium multiple despite downward margin revisions. However, we don't think the stock would hold its P/E on a genuine sales miss, which has never happened.

### Under Armour Inc. ( UA.N, UA US )

Branded Apparel & Footwear / United States of America

| | |
|---|---|
| Stock Rating | Underweight |
| Industry View | In-Line |
| **Price target** | **$62.00** |
| Shr price, close (Jan 8, 2016) | $75.00 |
| Mkt cap, curr (mm) | $16,585 |
| 52-Week Range | $105.89-63.77 |

| Fiscal Year Ending | 12/14 | 12/15e | 12/16e | 12/17e |
|---|---|---|---|---|
| **EPS ($)\*\*** | **0.95** | **1.00** | **1.27** | **1.60** |
| Prior EPS ($)\*\* | - | 1.05 | 1.35 | 1.75 |
| Consensus EPS ($)§ | 0.94 | 1.05 | 1.36 | 1.72 |
| P/E, consensus§ | 71.9 | 76.9 | 55.0 | 43.7 |
| EV/EBITDA\*\* | 34.3 | 37.1 | 28.9 | 23.1 |
| Div yld (%) | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue, net ($mm) | 3,084 | 3,883 | 4,883 | 6,060 |
| EBIT margin (%)\*\* | 11.5 | 10.1 | 9.9 | 9.8 |
| Return on avg eqty (%)\*\* | 17.3 | 15.1 | 16.1 | 17.2 |
| Net debt/EBITDA\*\* | NM | 0.8 | 1.2 | 1.2 |
| ModelWare EPS ($) | 0.04 | (0.66) | (1.49) | (2.91) |

Unless otherwise noted, all metrics are based on Morgan Stanley ModelWare framework
§ = Consensus data is provided by Thomson Reuters Estimates
\*\* = Based on consensus methodology
e = Morgan Stanley Research estimates

### QUARTERLY EPS ($)

| | | 2015e | 2015e | 2016e | 2016e |
|---|---|---|---|---|---|
| Quarter | 2014 | Prior | Current | Prior | Current |
| Q1 | 0.06 | - | 0.05a | 0.06 | 0.06 |
| Q2 | 0.08 | - | 0.07a | 0.10 | 0.09 |
| Q3 | 0.41 | - | 0.45a | 0.60 | 0.58 |
| Q4 | 0.40 | 0.47 | 0.43 | 0.59 | 0.53 |

e = Morgan Stanley Research estimates, a = Actual Company reported data

Morgan Stanley does and seeks to do business with companies covered in Morgan Stanley Research. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of Morgan Stanley Research. Investors should consider Morgan Stanley Research as only a single factor in making their investment decision.

**For analyst certification and other important disclosures, refer to the Disclosure Section, located at the end of this report.**

# Risk Reward

## Declining share and ASPs threaten UA's premium valuation



Source: Thomson Reuter,s Morgan Stanley Research

| | | |
|---|---|---|
| **Price Target** | **$62** | Derived from our DCF analysis, which uses an 8.5% cost of equity and a 4% LT growth rate. The cost of equity is based on the current market risk free rate, expected market return, and beta. The growth rate is based on our bullish global athletic wear view. The P/E we use is backed-into from this analysis. |
| **Bull** 64x Bull Case FY17e EPS $1.85 | **$118** | **Under Armour will.** The market sees UA becoming the world's No. 2 athletic brand. UA's connected fitness strategy creates a large new growth driver. Sales CAGR is 25% and EPS CAGR is 25%. |
| **Base** 39x Base Case FY17e EPS $1.60 | **$62** | **Growth questioned.** UA progresses internationally, but a US women's apparel sales slowdown and concerns about LT footwear potential cause P/E slippage. Sales/EPS CAGRs are 23%/21%. |
| **Bear** 29x Bear Case FY17e EPS $1.40 | **$40** | **De-cleated.** UA fails to sustain secondary category momentum. Growth limited to men's and youth apparel. The sales CAGR drops to 21% and the EPS CAGR falls to 16%. The P/E contracts. |

**Exhibit 1:** Key value drivers: Our inputs and the impact on scenario values



Source: Company data, Morgan Stanley Research

### Investment Thesis

■ UA is a growth story, but SportScan data shows UA is losing apparel market share for the first time in three years. Perhaps more concerning is ASPs are declining at an accelerating rate. These issues are particularly acute in women's apparel.

■ We also have concerns about the footwear strategy. UA has always competed on brand image and innovation, rarely on price. Footwear sales are growing strongly, but ASPs are falling. This change in trend is a major concern because it suggests a fundamental shift in the UA story.

■ We see an unfavorable risk/reward. The stock has maintained a premium multiple despite downward margin revisions. However, if the market questions the UA growth story, the P/E could fall significantly and out FY16 EPS estimate is 7% below consensus.

### Key Value Drivers

■ Sales – UA has six main sales drivers: men's, women's and youth athletic apparel, athletic footwear, international markets, and connected fitness.

■ UA primarily uses a wholesale distribution model, but also has robust company-owned square footage and online growth potential.

■ Gross margin – UA is a premium-priced brand. Gross margin is affected by labor and input cost changes, inventory management, as well as product and channel mix shifts.

■ SG&A – Channel mix shifts, marketing, new product R&D and personnel drive expense growth.

### Risks to Achieving Price Target

■ North American athletic apparel industry momentum could accelerate and the Under Armour brand gain traction internationally faster than we expect.

■ Major supply chain, SAP implementation, and connected fitness investments deliver benefits faster than expected.

■ Foreign currency exchange rate volatility could either help or hurt UA.

■ Mismanagement of Environmental, Social, and Governance issues could lead to reputational damage, hurting valuation.

# Too Many Risks Emerging; Downgrade to UW

**If Under Armour's sales growth rate slows, it could lead to significant multiple compression.** Under Armour trades at 78x FY15 EPS. This is an unprecedented valuation for a consumer discretionary company of this size. Our view, and the market's, has been Under Armour is a great brand and will eventually become the world's number two athletic wear company and possibly number one. This has justified the premium valuation since UA could drive double-digit sales growth for each of the next 20 years. However, we see two main risks developing which could cause the market to question how long it may take for UA to become #2, or even if it can still become #2, and this may cause the stock's P/E to slip. The key risk is potentially softening US women's apparel sales. The second is possible long-term US footwear growth limitations. Together, these two categories account for 40% of the sales growth we forecast for UA over the next 5 years.

**Our new price target is $62, 21% below today's price.** Because of these risks, adverse FX moves, and a weather-related 4Q15 sales slowdown, we have lowered our FY16 EPS estimates by 6%. Our new $1.27 outlook is 6% below the Street's $1.35. We have also increased the cost of equity assumption used in our Intrinsic Value Analysis. Together, these changes drive a 33% price target drop to $62, 12% below today's stock price, and the rating change.

**We see an unfavorable risk/reward.** This price target still implies UA should trade at 49x FY16 EPS. We think this is fair because UA is still a great brand with a terrific long-term growth story. The main difference between now and before is our conviction in the business story has dropped somewhat and with the stock "priced for perfection" it has caused a material change in our view of the stock and its valuation. Small changes in long-term growth assumptions can have big impacts on valuation (**Exhibit 2**). In addition, if the bear case plays out, where US women's apparel sales slow and this causes a major total company sales growth rate deceleration instead of the minor one we currently forecast, the stock's P/E could drop to the 20s. Overall, we see a 1/1 bull/bear risk/reward.

**Exhibit 2:** Under Armour's valuation is highly sensitivity to cost of equity and long-term growth expectations

| Price Target Sensitivity | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cost of Equity | 7.50% | 7.75% | 8.00% | 8.25% | 8.50% | 8.75% | 9.00% | 9.25% | 9.50% | 9.75% | 10.00% |
| **Stock Price** | **$108** | **$98** | **$90** | **$82** | **$76** | **$70** | **$65** | **$60** | **$55** | **$52** | **$48** |
| Stock Price change | | -9% | -9% | -8% | -8% | -8% | -8% | -7% | -7% | -7% | -7% |
| | | | | | | | | | | | |
| Years to reach steady-state | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 | 26 | 28 | 30 |
| **Stock Price** | **$33** | **$36** | **$40** | **$45** | **$49** | **$54** | **$60** | **$66** | **$72** | **$79** | **$86** |
| Stock Price change | | 11% | 11% | 11% | 10% | 10% | 10% | 10% | 10% | 10% | 9% |

Source: Morgan Stanley Research

**We think this call could play out near-term and see two potential catalysts.** The first catalyst is Under Armour's 4Q15 earnings report on January 28th. Warm weather and adverse FX moves have likely hampered UA's 4Q. We think a sales and EPS miss or weak FY16 guidance is possible. The stock's P/E has held up despite downward EPS revisions based on lower margin guidance (**Exhibit 3**). We believe the reason is the market believes margins will eventually rebound as the company scales, so near-term margin erosion doesn't really change the company's long-term earning power. However, we think a sales slowdown would hurt UA's P/E since this probably would challenge the long-term growth story. UA has never missed the Street's sales forecast in any quarter (**Exhibit 4**).

**Exhibit 3:** The stock's P/E has held up despite downward EPS revisions based on lower margin guidance



Source: Bloomberg

**Exhibit 4:** UA has never missed the Street's sales forecast in any quarter, starting in '06. We think a miss would challenge the LT story.

UA quarterly sales beats vs. consensus



Source: Bloomberg

The second potential 2016 catalyst is if Under Armour introduces new distribution into Kohl's (KSS is covered by Kimberly Greenberger). Industry sources suggest this is possible. We believe Kohl's was not part of UA's 2018 plan given at its investor day. A move into that retailer would suggest to us growth is becoming harder to find for UA than previously thought.

**We like Nike over Under Armour.** We rate Nike Overweight and believe the stock will grind higher through 2016. Like UA, Nike has an expensive P/E valuation, but on a PEG ratio basis, NKE looks much cheaper, 1.7 vs. 3.8 for UA. We also have very high conviction in our CY16 Nike EPS estimates, whereas we see more downside risk to UA. The main risks are 1) UA can drive greater international growth than currently modeled; 2) UA's EBIT margin rises more than expected, something few in the market expect; and 3) UA's connected fitness business growth and profitability is stronger than expected. These factors could cause UA's P/E to rebound. However, we doubt any of these play out this year. We already model very strong international growth and with cost pressures rising and the connected fitness business is still so new, we don't see upside surprises from these areas.

## Potentially slowing apparel sales is the main risk

*Warm weather has likely affected UA's North American apparel business, but other factors may be at work*

**SportScan data shows -2% Under Armour Holiday quarter apparel sales growth and market share loss.** Under Armour sales have been particularly slow in the sweats/fleece category. This seems somewhat predictable due to the unseasonably warm weather the US has experienced this Holiday season. Weather Trends International indicated the retail November 2015 was the 2nd warmest in 24+ years with above normal warmth across the eastern half of the US. Plus, December followed a similar pattern. However, Nike has experienced double-digit growth in sweats/fleece in November and December, on higher unit sales and higher average selling prices (ASPs), so it is probably not in our view only weather impacting UA. Overall, UA sales growth has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests UA is losing apparel market share (**Exhibit 5**). Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single-digit growth this year. This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs (**Exhibit 6**).

**Exhibit 5:** UA sales growth has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests UA is losing apparel market share



Source: SSIData

**Exhibit 6:** UA ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single-digit growth this year. This compares unfavorably to the industry and Nike.



Source: SSIData

*The issues are more acute in women's apparel*

224

**Women's apparel has been a strong growth driver for Under Armour, but the trend has slowed recently.** Women's apparel grew faster than men's for Under Armour in recent years. Lately the overall trend of slowing sales growth, falling ASPs, and market share losses cited above have been more pronounced in women's apparel. Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP declines. Plus, UA has lost only a small amount of share in men's, but share loss in women's has been larger and happening for 5 months, while Nike continues to take share (**Exhibit 7**).



**Exhibit 7:** UA share loss in women's has been happening for 5 months, while Nike continues to take share



Source: SSIData

**We find this concerning because Under Armour invested nearly $15M in a major marketing campaign in 2014 targeted toward women.** We think this UA "Brand Holiday" should have stimulated growth, but the opposite may be happening. UA's "I Will What I Want" women's campaign, featuring Misty Copeland, who stars for the American Ballet Theatre, skier Lindsey Vonn, US Women's National Soccer Team standout Kelley O'Hara and supermodel Gisele Bündchen, was critically acclaimed and Ad Age named Under Armour its 2014 Marketer of the Year.

**To continue its growth story, UA must excel in women's apparel.** Women's apparel is a much larger market than men's apparel and UA has a much smaller share in it than it does in men's. We estimate UA must grow US women's apparel sales at a 23% CAGR through 2019 if it is going to meet market expectations (**Exhibit 8**). This is 20% of the total growth we forecast for Under Armour. Given UA women's apparel growth in US wholesale channels, according to SportScan, is essentially flat for the last six months, we think meeting the 23% bar could be more difficult than previously thought.

**Exhibit 8:** We estimate UA must grow US women's apparel sales at a 23% CAGR through 2019

| Category | Forecasted sales growth |
|---|---|
| Connected Fitness | 51% |
| Footwear | 28% |
| Womens apparel | 23% |
| Accessories | 16% |
| Licensing and other | 16% |
| Mens apparel | 14% |
| Kids apparel | 13% |
| **North America total** | **19%** |

Source: Morgan Stanley Research

*If Under Armour enters Kohl's, we think it would signal a potential problem for UA in US apparel*

**Appearing at this type of retailer would be a departure from UA's strategy put UA's premium image/pricing at risk.** Industry sources suggest Under Armour is discussing with Kohl's potentially opening up new distribution there. This would likely add strong growth to Under Armour's apparel revenues and give the brand access to a new cohort of female consumers. However, the issue we would have is it risks eroding the premium image of the UA brand. Kohl's is a mid-tier department store and highly promotional on a daily basis.

**Some would argue Nike does it and still maintains a premium image, so why can't UA? The reason is Nike is able to differentiate the products it offers at various retailers better than UA can.** Plus, Nike is much more skewed to footwear than apparel, where it is much easier to differentiate the products. Kohl's consumers recognize Nike products there aren't top of the line goods, which is why they are lower priced. Under Armour's apparel assortment hasn't evolved yet to the point where customers would really know the difference between what sells at Dick's Sporting Goods (the high-end of UA's distribution) and what would sell at Kohl's. Plus it doesn't have a footwear assortment ready to go.

**Entering Kohl's would seem like Under Armour is risking some of its brand equity to find growth.** We forecast 17% US apparel growth for UA annually over the next five years. The plan to get there has been industry growth (4% annually, and 450 bps of our 17% forecast), market share gains in existing doors (another 450 bps), new full price "Brand House" stores (290 bps), strong double-digit eCommerce gains (115 bps), plus increased distribution in athletic specialty retailers like Foot Locker and high-end department stores like Nordstrom (the rest). However, all of this depends on strong women's apparel growth. Entering Kohl's would imply there may not be as much growth in these other channels as previously thought.

## Our data shows falling footwear ASPs and this is a concern

*We UA running footwear prices are down 20% since January 2013, while the industry's are down just 4%*

**UA running footwear ASPs have declined at an accelerating rate in 2015.** We see potential pricing issues developing which threaten UA's premium brand image. This is something the Street is probably not aware of because UA is having great success growing running footwear sales this year. According to SportScan, UA's running footwear sales are up almost 100% y/y. Yet, prices have fallen at a mid-single-digit rate and continue to deteriorate (**Exhibit 9**). Plus, this is also in contrast to the total industry which has experienced much less significant price declines. Since January of 2013, UA running footwear prices are down 20%, while the industry's are down just 4%. Part of the explanation is a mix shift toward kids footwear, but the majority of the ASP declines are not due to that.



**Exhibit 9:** UA running footwear prices have fallen at a mid-single-digit rate and continue to deteriorate. Since January of 2013, UA running footwear prices are down 20%, while the industy's are down just 4%



Source: SSIData

**At this point, UA is positioned as a mid-tier running brand.** The chart below shows the average UA running footwear ASP is now $56, which places it near Adidas and New Balance and well below Nike, Asics and Brooks (**Exhibit 10**). Interestingly, in just January of 2013, Under Armour footwear prices were essentially on par with Nike's, but have since deteriorated to the point where Nike's average price is now 18% higher than Under Armour's. The problem with this is to meet the Street's sales growth expectations UA has to deliver a 28% footwear CAGR over the next five years in North America in our view (**Exhibit 8**). To do that, it will have to take share from Nike and the other premium players. Competing on price is definitely working now and may work for some time, but eventually, this erodes brand equity and may caused unexpected sales growth deceleration down the road.

**Exhibit 10:** UA is positioned as a mid-tier running brand. The average UA running footwear ASP is now $56, which places it near Adidas and New Balance and well below Nike, Asics, and Brooks



Source: SSIdata

**We think the most startling thing about this development is it is so different from what Under Armour has normally done.** Under Armour has always been about maintaining that premium image. In cleats, Under Armour has always maintained high prices (**Exhibit 11**). In fact, it has steadily taken prices up over the past three years and its ASPs are now slightly ahead of Nike's. We wonder why the company does not insist on doing the same thing in basketball and running footwear.

**Exhibit 11:** Under Armour has always maintained high prices in cleats



Cleated footwear ASPs - Rolling 12 month basis

Source: SSIData

## We also have concerns about the basketball footwear strategy

*UA's basketball footwear strategy suggests it may be more interested in damaging Nike than maximizing its brand image*

**We think UA's Stephen Curry shoes are underpriced.** UA is charging $130 for the various Stephen Curry Two offerings. Curry is the hottest story in the NBA and the reigning NBA MVP from last year's champion Golden State Warriors. Last NBA season, Curry's Golden State Warriors jersey became the most popular jersey in the NBA, based on overall sales from NBAStore.com. Curry overtook LeBron James in jersey sales. We believe Under Armour should be charging a premium price since it has the most popular player. Nike charges $200 or more for top-of-the-line LeBron James, Kobe Bryant, and Kevin Durant signature shoes. UA's Curry pricing is more in-line with prices for Nike's Kyrie Irving offerings even though Curry is the more popular player.

**In the secondary market for basketball sneakers, Curry shoes have a big price premium over the retail price.** The earlier $110 Curry ones enjoy a 48% premium to the retail price, while later Currys with a $120 retail price have a much higher 81% premium (**Exhibit 12**). Given the rise in relevance we believe Curry's shoes could merit more than a $10 increase. We think the Curry Two shoes could easily be priced at $150.

**Exhibit 12:** In the secondary market for basketball sneakers, Curry shoes have a big price premium over the retail price



Source: Ebay.com, Campless.com, Footlocker.com, Finishline.com, Morgan Stanley Research

**There are multiple explanations for why the Curry Twos are only $130, but none are very satisfying.** Perhaps UA did not realize how big of a star Curry would become and how fast this would happen, so the price was set before some of this became apparent and the price for the Curry Three will rise significantly. This is probably the most reasonable reason. Or maybe Under Armour does not believe the quality of the product justifies a higher price. We don't think this is a good reason since if the product is good enough for Curry to wear in games, it is good enough to warrant a higher price. Even if this is the reason, it's not a great statement about UA's basketball footwear quality. Lastly, maybe UA wants to stimulate short-term sales growth in order to meet ambitious revenue targets. This is also a bad sign in our view. We never like to see a premium brand trade price for volume growth because this risks damaging the premium image that is the source of the long-term growth potential.

**We worry the main reason is Under Armour wants to damage Nike.** Pricing Curry shoes at $130 has had the effect of hurting sales of Nike's premier LeBron and Kevin Durant offerings and causing noticeable ASP declines. Under Armour's dislike of Nike is no secret and after fifteen years of building its basketball business at the grassroots level, UA finally has the chance to inflict real pain on Nike and it is. The problem is this strategy is basically about competing with Nike on price. We think this is a mistake because it positions Under Armour in basketball as a challenger brand, rather than an equal. If UA is going to deliver the basketball footwear growth the Street is looking for long-term, we think it has to take share from Nike by replacing it as the coolest, most premium brand, not by undercutting it on price (**Exhibit 13**).

**Curry's surprising success has created a unique moment for UA to define itself as an equal to Nike and it is not capitalizing on it yet.** UA may be inadvertently setting a ceiling on the value of its brand in basketball. If a UA shoe with the NBA's top player costs only $130, what will it charge for another player? Certainly not $130. We don't think kids would believe there is as much value in the product for a secondary player. Lastly, this is not at all what Under Armour did in apparel or cleats as it grew. Under Armour never competed on price. In fact, even today, UA apparel prices, according to SportScan, are over 10% higher than Nike's. It used insights and superior products in those categories to position itself as either equal to or better than Nike and succeeded. We think it has the same opportunity in basketball, but is not taking advantage of it. Or, this could be a red flag that UA is having a problem competing in basketball.

**Exhibit 13:** UA's product offering in apparel is higher priced than Nike's, on average. The same is not true in footwear.



Source: SSIData

**The question is how will UA raise prices for its footwear over time, thereby driving sales and margin growth?** According to SportScan, the average basketball shoe costs just over $90. The average Under Armour basketball sneaker costs around $73, even after getting the benefit of the Curry mix shift (which drove about a 30% y/y price increase). To raise the $73 number, UA must raise the price of the highest end of its offering in order to create the perception of value which allows it to put upward pressure on the more everyday styles where the bulk of the money is made. UA is hurting Nike, but it is not as clear it is helping itself as much as it could be. It is possible UA may be prioritizing market share gains vs. Nike and short-term sales growth over maximizing margin and brand image.

### What does Under Armour's basketball strategy mean for Nike and Foot Locker?

*We think Under Armour is causing a big headache for Nike in basketball.* However, to put this in perspective, Nike basketball is only 14% of Nike Inc. sales and a significant piece of this business happens overseas. So its exposure to this emerging risk is limited. Plus, Nike has sustained challenges before and won. Adidas, with its Derrick Rose shoes, looked like a threat until Rose got injured. Allen Iverson was a popular player with Reebok for many years, but Nike continued to dominate. Plus, the vast majority of NCAA basketball tournament teams and the NBA are sponsored by Nike. Nevertheless, the big risk is Under Armour significantly damages the category. Nike has spent three decades convincing consumers the value of the product is high. Suddenly, Under Armour is sending a message that shoes from elite players are not worth $200 or $250, but rather $130.

This could have a very negative implications for basketball shoe ASPs. We've seen in other retail categories when leading players try to take market share by competing on price with top rivals they often succeeded, but at the same time damage the category. Nike has known for years the key to keep the basketball category growing, it must closely manage supply, create a "pull" market, and maintain an image of scarcity. It has had the discipline to stick to this strategy for decades. However, Under Armour's strategy threatens to disrupt this balance. We'll watch how long Under Armour sticks with this strategy and if Curry can remain the NBA's most popular player. It is too early to make a call on the category, but

if this persists long-term, it could change our view.

*Under Armour's strategy has a mostly negative impact on Foot Locker, with some possible silver linings.* If Under Armour causes more ASP declines in basketball, this would be a negative for Foot Locker. Foot Locker would have to offset by diversifying into another category or some other strategy, which is what it successfully did last quarter. We think it is possible that this can continue for some time. The interesting thing in our view is Foot Locker is a big key to Under Armour's growth. UA needs FL more than FL needs UA at this point. Foot Locker will not be interested in increasing the amount of UA it sells if a consequence is it hurts the rest of its basketball business. At the same time, Nike wants FL to keep UA out. This could give FL an opportunity to establish even closer ties with NKE, which could result in better product allocation, for example.

## Three other concerns

### *Football participation is declining*

**Under Armour connects best with consumers through the sport of American football, but participation in that sport is declining.** Despite strong growth in cleats, this past football season was disappointing for the industry from a units perspective. Unit sales fell 5%. We think this is a good proxy for football participation, which is suffering due to increased concussion risk awareness. We think declining football participation is a trend which continues and on the margin is a negative for UA.

### *The Under Armour brand did not test well in our AlphaWise survey of UK consumers*

**The Under Armour brand has surprisingly low consumer awareness in the U.K.** In 2011, Under Armour signed an agreement to become the official uniform provider of the English Premier League's Tottenham Hotspur Football Club, gaining entry to the European soccer market for the first time. At the time, Under Armour said the $80 million deal demonstrated its commitment to growing the Under Armour brand in the U.K. Louise Singlehurst, who covers Adidas for Morgan Stanley in London, led a survey of European consumers asking about their preferences for different athletic footwear brands since little information exists on the subject. One surprise was only 20% of UK consumers said they have heard of Under Armour (**Exhibit 14**).

**Exhibit 14:**  The Under Armour brand has surprisingly low consumer awareness in the U.K.

UK: Brand Awareness



Source: AlphaWise

**Perhaps 20% is the right number for a brand which has been in the country for less than a decade, but maybe not.** Our point though is if building awareness is this difficult in other countries, UA may have a hard time meeting the Street's 40% outside-of-North-America 5-year sales CAGR expectation or becoming the world's number two athletic brand in a reasonable amount of time. Notably, UA brand awareness was lower than 20% in the other Western European nations we surveyed. The UK data point was also in contrast to the aided awareness data UA provided at its analyst day, which was strong.

*UA is undergoing a CFO/COO transition at a time of increasing organizational and operational complexity*

**In October, Under Armour announced Brad Dickerson, the company's chief financial and operating officer, is leaving.** He is going to become chief financial officer of Blue Apron, the recipe and ingredient delivery service, early next year. Chip Molloy, a Maryland native and U.S. Naval Academy graduate who served 10 years as a Navy fighter pilot will become the new CFO. Molloy served as executive vice president and CFO at PetSmart from 2007 to 2013. In 2011 he was named Institutional Investor's CFO of the Year for specialty retail. He has been a senior advisor for Atlanta-based private equity firm Roark Capital Group since October 2014.

**Despite Mr. Molloy's impressive credentials, we believe this transition comes at an inopportune time in the company's history.** We don't believe executive transitions necessarily signal anything negative and Under Armour has experienced management-level employee turnover before without any issue. However, Under Armour is becoming a much more complex business. The company was a men's and boys' US apparel wholesale business, but is becoming, a multi-channel, multi-category, dual-gender global enterprise. Major ongoing projects include a company-wide SAP implementation, a large new headquarters build-out, a new connected fitness business, and major store growth and eCommerce growth in multiple geographies at once. Losing a key leader at a time like this is a concern.

## EPS changes

*Our $0.43 4Q EPS estimate is 4c below consensus*

**We lower our 4Q estimate from $0.43 due to slow sales in 4Q.** Key parts of UA's business are still performing very well, including footwear as discussed earlier and international. We also believe UA's US stores and websites are probably doing fine. The issue is in US wholesale in apparel. We believe to make numbers, UA must deliver +13% growth in US in this area (**Exhibit 15**).

**Given weak SportScan numbers, +13% wholesale apparel growth may not play out and this could cause pressure on UA sales and margins.** SportScan shows a -2% decline for Under Armour apparel sell-through in 4QTD. We assume UA can take some inventory back and box it up for next year when the weather is supposed to be colder and sell it through its outlet stores. This will create more open-to-buy dollars for retailers and help UA continue to show strong sales growth. Plus, there is a lag between sell-through and orders which impact the income statement. Weak 4Q sell-through may impact 2016 sales more than 4Q15. ASPs have also been under pressure and store checks suggest retailers have been more promotional y/y. This could cause a margin hit, especially if UA's own stores and websites also had to be more promotional y/y.

**Warm weather has played a role in causing an apparel sales slowdown, but we don't think it explains the majority of it.** **Exhibit 16** shows how UA's US apparel business mix changes by quarter. In 4Q, it skews more toward sweats/fleece, hunting/shooting, and outerwear. This is not a surprise and likely due in part to weather and other seasonal factors. Outerwear is

**Exhibit 15:** UA must deliver 13% US wholesale apparel growth to meet our expectation

| 4Q15 Revenue Growth Forecast | |
|---|---|
| **North America** | |
| Total | 20% |
| Wholesale | 16% |
| Wholesale - apparel & other | 13% |
| Wholesale - footwear | 111% |
| Stores | 19% |
| eComm | 53% |
| **International** | |
| Total (includes FX) | 33% |
| Total (currency neutral) | 50% |
| **UA Inc.** | |
| Total UA | 22% |

Source: Morgan Stanley Research

the most weather sensitive category, but only 5% of UA's 4Q mix is from outerwear. Together these categories make up 42% of the mix in 4Q vs. 13% in the other three quarters.**Exhibit 17** shows UA did poorly in sweats/fleece in 4Q, which is 28% of UA's 4Q mix. However, we note this may not be all due to weather. Nike's sweats/fleece business was up 23% with higher ASPs, so weather didn't seem to affect it much. Furthermore, much of UA's 4Q weakness was in undergarments, which is not a big 4Q business and likely not very sensitive to weather. UA actually performed better in outerwear this year than it did last year.

**Exhibit 16:** Sweats and Fleece are a larger share of sales in 4Q



UA Revenue Mix by Category

Source: SSI Data, Morgan Stanley Research

**Exhibit 17:** Weather was a factor, but likely doesn't explain all of the softness in SportScan UA sales data

UA apparel sales growth components

Source: SSI Data, Morgan Stanley Research

**Foreign exchange is an ongoing problem.** Currencies such as the Canadian Dollar, Brazilian Real, Mexican

Peso and Japanese Yen moved against UA in the quarter. Much of the expected hit is already in -100 bps y/y change in gross margin guidance, but the change during the quarter should could add 5-15 bps more headwind unless UA hedges offset more than we imagine.

**Our sales estimate is $38M below consensus and our EPS estimate is 9% under the Street's view.** Slow apparel sales and FX are the main drivers of our revenue forecast change. We also slightly reduced our margin outlook for the same reason (**Exhibit 18**).

**Exhibit 18:** UA model changes

| Metric | 4QFY15 | | FY16 | | FY17 | |
|---|---|---|---|---|---|---|
| | Old | New | Old | New | Old | New |
| Sales growth % | 24.8% | 21.8% | 26.7% | 25.8% | 24.6% | 24.1% |
| GM % | 48.9% | 48.7% | 48.4% | 48.2% | 48.6% | 48.3% |
| SGA % | 33.1% | 33.9% | 38.0% | 38.3% | 38.3% | 38.5% |
| EBIT % | 15.7% | 14.7% | 10.3% | 9.9% | 10.3% | 9.8% |
| EPS ($) | $0.47 | $0.43 | $1.35 | $1.27 | $1.75 | $1.60 |

Source: Morgan Stanley Research

*We also lower our FY16 EPS estimates 6%*

**One important difference is negative FX moves have worsened considerably since UA's last earnings announcement** (**Exhibit 19**). We forecasted a 40 bps top-line negative FY16 impact in mid-October. However, now that has doubled and we now see an 80 bps impact. This reduces our gross margin outlook by 20 bps. We assume new hedges will provide an offset, although UA's disclosures suggest little reclassifications from AOCI to net income in future quarters. We also lowered our FY16 organic sales growth outlook. UA gave preliminary FY16 sales growth guidance of 25%, but has beaten its initial sales guidance by an average of 500 bps annually since FY12. We lower our FY16 sales outlook to 25% growth.

**Exhibit 19:** Currency pressure has intensified since the 3Q15 report



Change in Currency

Source: Thomson Reuters, Morgan Stanley Research

*We model fundamental risks mentioned above more as bear case scenarios*

**Our long term sales growth outlook has declined by roughly $100M, 1.3% lower than our previous forecast.** We don't expect women's apparel sales or footwear sales to slow dramatically. Under Armour remains one of retail's strongest brands in one of the mall's best categories. Plus, our experience is no industry data source is perfectly correlated to a company's results, so we still would like see more evidence of risks becoming reality before more significantly reducing our long-term EPS estimates. In a bear case however, we think long-term sales (FY18) fall $830M short of our base case (11% below our base case. This also equates to Under Armour achieving only 80% of the growth we forecast in our base case). This bear case results mainly from US women's apparel and US footwear sales not living up to expectations. Secondly, international sales also slow more than anticipated.

## Valuation likely begins to look stretched if sales slow

**We see an unfavorable bull/bear risk/reward.** The old thesis was P/Es don't really matter because if UA will become a $50B market cap company a few decades from now, it still pays to buy it today at a high P/E when it is only a $15B company. We think that line of thinking only works as long as Under Armour is executing all parts of its sales growth strategy as expected. If the story begins to change, the P/E could fall significantly because it may become reasonable to think UA becomes "only" a $25B company, similar to adidas, many years from now. We think the P/E could shrink to 29x FY17 EPS in a bear case.

**In our base case, we still view UA as one of retail's best growth stories, just slightly less attractive than before.** This justifies our 42x P/E. The basic logic of UA becoming one of the world's top athletic brands still holds. Our discounted cash flow analysis computes a $62 fair value and we back into the P/E from this calculation. Our analysis assumes an 8.5% cost of equity, 4% long-term growth rate and 20% long-term ROE. The cost of equity is 50 bps higher than our previous iteration. The difference is due to market pricing of risk. A key aspect of these assumptions is because the long-term growth prospects are such a big part of the valuation, UA is very sensitive to small changes in the long-term outlook. 80% of our price target change is due to changes in our assumptions. The other 20% is due to EPS estimate changes.

**On a relative basis, UA looks very expensive.** Our What's In The Price analysis shows 77% of UA's stock price value comes from long-term (beyond three years) growth expectations. This compares to a 12% industry median. If the market's perception of UA's long-term growth outlook changes, we think this difference could narrow significantly. UA trades at a PEG ratio of 3.8x vs. a 1.7x group median. We think UA deserves a premium for its long-term growth opportunity, but its PEG is even 2.1x above Nike's. We think the PEG could normalize in a bear case.

**UA even looks expensive vs. its own history.** UA has historically traded at 47x FY1 EPS. In 2013, when it became clear UA may capitalize on the international, footwear, and women's apparel opportunities, the P/E expanded greatly (**Exhibit 20** and **Exhibit 21**).

**Exhibit 20:** Key UA sales driver improvements (footwear, women's apparel, international, and connected fitness) over the past few years have pushed UA's peak to new peaks



Source: Morgan Stanley Research

On average over the last 10 years, 75% of UA's stock price value has come from long-term (beyond three years) growth expectations (**Exhibit 22**). So today's 77% is above average. We think this suggest UA is expensive, because as the company grows, the value of the stock should naturally shift more toward the next three years rather than the outer years. In other words, we don't think UA has as much growth in front of it (in terms of growth rate) than it did ten years ago. If questions emerge about the growth trajectory, we think UA's P/E could revert back toward its mean.

**Exhibit 21:** UA's P/E looks high versus its own history. Even with the recent sell-off in the stock, its P/E is still near peak.



Source: Thomson Reuters, Morgan Stanley Research

**Exhibit 22:** What's in the price? UA's long-term growth as a % of current share price has averaged 75%. Today it is 77%.



Source: Thomson Reuters, Morgan Stanley Research

## Bull and bear cases

*The bull case is 4Q15 weakness was mostly about weather plus FX and the fundamental story is still very strong and sales growth will reaccelerate next year*

**Other key factors which could drive the stock higher and improved connected fitness results and higher margins.** If UA is able to manage through this period without making a significant cut to numbers, the stock's P/E probably remains high. With so few pure growth stocks available, we think investors will be willing to stick with UA unless the story definitely changes. From our conversations, we sense a long line of investors who would like to buy UA on a pullback and this could keep the stock high. If growth accelerates, we think the stock could retrace back above $100 and head towards $115. Better connected fitness results or higher EBIT margins would be total surprises and cause the market revise its long-term earning projections higher. We see a

25% 5-year EPS CAGR in this scenario. We think the multiple could return to 60x+ FY17 EPS of $1.85 (2.2x PEG) and possibly go higher.

*The bear case is UA struggles in women's apparel and footwear. Plus, it has trouble beating adidas in Europe.*

**In this scenario, essentially Under Armour is no longer perceived as the ideal growth story and the multiple falls significantly.** Part of what is implied in the sections above is at some point in the not-too-distant future, Under Armour needs to take share from Nike if it is going to continue its strong growth. In a bear case, the company has a difficult time doing that and not only does sales growth slow, but also margins also contract as UA needs to keep investing in the brand to keep up with Nike and therefore can't avoid operational deleverage. Sales growth slows to 21% annually and margins drift 100 bps lower over four years. Overall EPS grows at a 16% 5-yr. CAGR in this scenario. This drives major P/E contraction. We anticipate 29x FY17 EPS of $1.40 (a 1.7x PEG, in-line with the industry average).

## What would change our view

**If sales growth turns out to be stronger in 2016 and pricing improves, it could change our view.** If weakness in women's apparel turns out to be short lived, we would most likely view that positively. Our other main concern is Under Armour is not managing its brand image the same way it used to. It may be willing to compromise somewhat on price and/or quality in order to drive sales growth. If these fears prove unfounded, we may reconsider our view. For example, if UA raises Curry basketball footwear prices, we would take that as a good sign. Essentially, if we can remove doubts that have recently crept into our thinking and return to viewing Under Armour as eventually becoming the number two and possibly number one global athletic wear brand over time, it may change our view.

# We forecast a 21% 5-yr EPS CAGR

## UA is a long-term secular growth story

**Under Armour's EPS algorithm is 23% sales growth, slight operating margin improvement and a better tax rate (Exhibit 23).** As a rapidly emerging global activewear brand, Under Armour has a significant long-term growth opportunity ahead of it. We expect it to benefit from the continued consumer trend towards heath and fitness (**Global Insight: Very Bullish Five-Year Outlook**). It should be able to maintain 20%-plus revenue growth over the next several years due to new product innovation, targeted international growth, increased domestic wholesale distribution, store expansion, and the connected fitness business. We have confidence in management's ability to invest in the business and execute accordingly over time.

**Exhibit 23:** We model a 21% 5-yr. EPS CAGR based on 23% sales growth, slight operating margin contraction and a better tax rate.



Source: Morgan Stanley Research estimates

## Our 23% annual sales growth forecast is derived from a combination of regional, channel, and category drivers

*The Unites States remains UA's key market*

**We forecast a 19% five year domestic CAGR.** We expect the athletic footwear and apparel category/athleisure trend to remain strong and continuing Under Armour brand momentum. This should help generate strong comps with existing wholesale partners. We model the US market contributing ~70% of UA's total growth through FY19 (**Exhibit 24**).

**Exhibit 24:** North America remains UA's key market. We model the US market contributing ~70% of UA's total growth through FY19.



Source: Company Data, Morgan Stanley Research

**Secondly, we expect new category growth.** Besides comp growth, we project UA grows significantly in footwear. The category makes up just 14% of the company's sales mix. UA has just a low-single-digit footwear market share, but it is growing. UA's 2015 basketball footwear market success proved it can continue taking athletic footwear market share. Women's apparel is another key driver. Under Armour also highlighted Golf, Basketball, Running, and Soccer as newer categories where it will attack. **Exhibit 25** shows UA still has room to gain share before it needs to take it from Nike to grow. Given essentially all of UA's growth to date has come from these competitors, we see no reason why share gains can't continue. Plus, we see no structural reason UA's share may have reached an upper limit. However, at some point in the future it will likely have to take share from Nike in order to continue strong growth rates. That point may be coming sooner rather than later and we are not sure if UA can accomplish this.

**Exhibit 25:** UA and NKE continue to co-exist and gain share



Source: Sportscan, Morgan Stanley Research

**Lastly, UA still has distribution expansion opportunities.** We anticipate UA increases its US mall distribution. For example, we believe UA is in less than 50% of Foot Lockers today and those stores have only a small amount of UA product. With UA moving into the sportswear market and looking to expand in footwear, we think UA's FL presence will increase. Its new Armoury shop-in-shop test concept at Champs, owned by FL, demonstrates how it may expand in the mall. A separate factor is UA likely opens more owned "Brand Houses" in US malls. We estimate UA will continue grow its owned North American square footage at a 9% CAGR. We estimate this implies ~1M square feet of sales space domestically and nearly $600M in domestic store sales from $400M+ currently.

*We expect a 40% five year international sales CAGR*

**Under Armour is in early stages of growing internationally and should expand its tiny 0.3% international share.** We model $1.3B in 2018 international revenues by 2018, growing from $279 in 2014. The company's 60% foreign sales CAGR since 2012 established it can grow outside the US. Vast potential remains in our view given UA still only has a 0.3% share outside North America. UA's direct-to-consumer channel should enable fast growth. We expect its stores and websites to deliver nearly 40% of the company's growth through 2019 vs 34% since 2010 (**Exhibit 26**, US and Int'l combined). The company is focused on expanding square footage, particularly through partner stores which are expected to be 70% of the total by 2018. We believe this is an effective way to build brand awareness in foreign markets and grow sales both in-store and online.

**Exhibit 26:** We expect to direct-to-consumer to grow as a share of sales as the company expands globally



Channel Sales Contribution

Source: Company Data, Morgan Stanley Research

**Under Armour's fast pace of market entry is a major international growth driver.** Under Armour plans to enter several countries over the course of the next few years, which will open an incremental $84B market opportunity across Europe, Asia, and Latin America. In **Exhibit 27**, we illustrate how rapidly UA is entering new markets. We believe UA's pace of market entry, combined with its very small market share and brand strength, makes our nearly 50% CAGR forecast achievable. Our outlook assumes UA reaches just 2% share in the markets outside of North America by 2018 (compared to 13% and 14% currently for Nike and Adidas).

**Exhibit 27:** Under Armour's fast pace of market entry is a major international growth driver



Source: Under Armour Analyst Day, Morgan Stanley Research

*Connected fitness likely helps UA sell more footwear and apparel, plus generates its own revenue stream*

**Connected fitness should add $200M by 2018,** but also serve as an effective marketing vehicle for UA's apparel and footwear business. It should help not only establish deeper connections to US customers, but also help introduce the brand to international consumers. We believe growth in ads and services remains a significant longer-term opportunity for the business as the network grows.

*We see operating margin moving to 10.6% by 2019, from 10.4% in FY15*

**Under Armour requires heavy investment in its business to fuel its growth.** Gross margin should rise over time, but footwear and international growth likely negatively impact the mix, plus foreign exchange pressures create another drag. Together, these factors probably keep gross margin flattish over the next few years (**Exhibit 28**). Mix will hurt, but these businesses should get operating leverage as they scale. We expect SG&A to also remain flattish over the next few years despite strong sales growth as the company invests aggressively in growing footwear, expanding international, and developing support areas of the business. Marketing likely can also fluctuate as a percentage of sales and be a potential source of deleverage. Increased capital expenditures also add depreciation expenses over time. One offset is corporate expenses, which should leverage as sales grow. Please click **Financial Model** for more detail.

**Exhibit 28:** We see operating margins remaining capped around 10.6% due to SG&A investment



UA operating margin breakdown

We expect FY15 GM to contract by 70bps to 48.3% and SG&A to delever by 38bps to 37.9%.

Source: Company Data, Morgan Stanley Research estimates

*We forecast a 25% 5-year bull case EPS CAGR*

**Our bull case scenario assumes more rapid international growth and sustained North American momentum.** This forecast assumes a 25% revenue CAGR with incremental leverage from a lower tax rate given the pace of international growth. We assume a 22% North American revenue CAGR, an annual 53% growth rate in the rest of the world, while connected fitness delivers $250M in revenue by 2018 and is on a path to becoming a $2.5B business in 2030 (**Exhibit 29**). Similar to the base case, we assume EBIT margins rise slightly as UA gains some operating leverage. We estimate FY17 EPS of $1.85. *Please see our bull case model in* **Exhibit 40** *for more.*

**Exhibit 29:** Connected Fitness upside revenue potential is large in our view



Connected Fitness Revenue ($M)

Source: Company Data, Morgan Stanley Research

*We forecast a 16% 5-year bear case EPS CAGR*

**Our bear case assumes women's US apparel sales growth slows and US footwear sales are strong, but weaker than expected. Connected fitness also fails to deliver big growth.** This forecast assumes a 21% revenue CAGR. We assume a 18% North American revenue growth rate, an annual 36% growth rate in the rest of the world, while connected fitness delivers only ~$100M in revenue by 2018. We assume EBIT margins fall to just above 8% as the rate of required investments outpaces the sales growth rate. We estimate FY17 EPS of $1.40. *Please see our bear case model in* **Exhibit 41** *for more.*

Morgan Stanley

# Discounted Cash Flow Analysis

**Exhibit 30:** Our discounted cash flow analysis suggests a $62 fair value

| Morgan Stanley | Under Armour DCF (USD millions) | current FY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | F2015e | F2016e | F2017e | F2018e | F2019e | F2020e | F2021e | F2022e | F2023e | F2024e | F2025e | TY - 2026 |
| **Discounted cash flow analysis** | | | | | | | | | | | | |
| Operating revenue | $3,883 | $4,883 | $6,060 | $7,349 | $8,703 | $10,234 | $11,947 | $13,845 | $15,927 | $18,187 | $20,613 | $21,438 |
| % change Y/Y | NA | 25.8% | 24.1% | 21.3% | 18.4% | 17.6% | 16.7% | 15.9% | 15.0% | 14.2% | 13.3% | 4.0% |
| Income (loss) from operations | 391 | 483 | 593 | 730 | 878 | 1,033 | 1,241 | 1,480 | 1,760 | 2,053 | 2,389 | |
| Free Cash Flow | ($723) | ($291) | ($198) | $3 | $194 | $225 | $355 | $513 | $700 | $860 | $1,100 | $1,144 |
| % of revenue | -19% | -6% | -3% | 0% | 2% | 2% | 3% | 4% | 4% | 5% | 5% | 4% |

| Fair value | |
|---|---|
| PV of FCF | 956 |
| NPV of terminal value | 13,239 |
| Enterprise value | 14,195 |
| (-) Debt | (655) |
| (+) Cash | 270 |
| Equity value | 13,809 |
| Fully Diluted Shares (for valuation) | 220 |
| Equity value per share | $62.65 |
| Implied terminal EBITDA multiple | 25.7x |

| Equity Value: WACC vs. Perpetual Growth Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 6.9% | 7.4% | 7.9% | 8.4% | 8.9% | 9.4% | 9.9% |
| 3.50% | 17,322 | 14,471 | 12,302 | 10,604 | 9,244 | 8,135 | 7,217 |
| 4.00% | 20,219 | 16,521 | 13,809 | 11,746 | 10,130 | 8,836 | 7,781 |
| 4.50% | 24,327 | 19,279 | 15,761 | 13,182 | 11,219 | 9,681 | 8,450 |

| Equity Value per Share: WACC vs. Perpetual Growth Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 6.9% | 7.4% | 7.9% | 8.4% | 8.9% | 9.4% | 9.9% |
| 3.50% | 79 | 66 | 56 | 48 | 42 | 37 | 33 |
| 4.00% | 92 | 75 | 63 | 53 | 46 | 40 | 35 |
| 4.50% | 110 | 87 | 72 | 60 | 51 | 44 | 38 |

| DCF Valuation Assumptions | |
|---|---|
| Valuation Date | Jan-17 |
| Cost of Equity | 8.5% |
| Cost of Debt | 3% |
| Marginal Tax-Rate | 40% |
| Long-Term Debt / Total Cap. | 9% |
| WACC | 7.9% |
| Perpetual Growth Rate | 4% |

Source: Company data, Morgan Stanley Research

**Our discounted cash flow analysis suggests a $62 fair value.** This analysis uses 10 years of explicitly forecasted cash flows. After incorporating our new EPS estimates into the analysis and tweaking a few assumptions, our UA intrinsic value estimate falls to $62. The 33% decline in our price target is 80% due to the increase in cost of capital with the remain 20% due to our changes in earnings estimates. Because so much of UA's value is in long-term growth expectations, small changes in long-term growth assumptions can have big impacts on valuation (**Exhibit 2**). **Exhibit 30** also shows sensitivities to our WACC and perpetual growth rate assumptions. WACC and perpetual growth rate assumptions are as follows:

- 8.5% cost of equity - This estimate is based on current market rates. The risk free rate is 2.24%, the required market rate of return used is 9.4%. The beta is 0.8. The risk free rate and required market rate of return are higher than our last note and drive the change vs. our 8.0% assumption prior.

- 4% perpetual growth rate - In addition to the cost of equity, this variable has the most impact on valuation. UA likely still has substantial growth beyond our 10 years of

# Morgan Stanley

explicitly forecasted cash flows. We have a very bullish view on the global sales outlook for athletic apparel and footwear. We believe 4% capture several more years of rapid growth.

**The 39x FY2 P/E we use to value UA is backed-into from this model.** Over the past ten years, UA has typically traded around 35-45x. Today, 77% of current valuation lies in growth expected beyond the next three years (**Exhibit 32**). This is at an above average level. **Exhibit 22** shows 77% is above the 76% long-term average. We believe a correction in market expectations around UA's long-term growth assumption could cause UA's P/E to contract towards the historical mean or below (**Exhibit 31**).

**Exhibit 31:** UA's current 57x FY17 EPS is above the 43x 5-yr average far above 38x 10-yr average

UA FY2 PE



Source: Thomson Reuters, Morgan Stanley Research

Case 1:17-cv-00388-RDB    Document 153-3    Filed 10/14/20    Page 28 of 45

## Relative value analysis

**UA's value is predominantly weighted towards out years.** 77% of UA's value lies in the implied estimates beyond the next 3 years (**Exhibit 32**) reflecting the significant long-term opportunity and expectations for the company. This is at the top of our 21 stock coverage universe where the low-end of the range is negative (**Exhibit 33**). This suggests the stock is expensive relative to peers. We think the premium is somewhat justified by UA's long-term growth opportunity, but could contract if the market starts to question the opportunity.

**Exhibit 32:** Our "What's in the price?" analysis suggests that 77% of the value in UA is based on long-term growth. This is at the top of our coverage universe.



Source: Thomson Reuters, Morgan Stanley Research

**Exhibit 33:** UA's stock price implies 77% of its value comes from growth expected to occur beyond three years. 77% is the highest in the group and above the median of 12%.

## Long-term growth as a % of current share price



Source: Thomson Reuters, Morgan Stanley Research

**Our PEG ratio analysis also suggests UA is expensive, but at least partially explained by its growth potential. Exhibit 34** shows UA has the best long-term EPS growth story among industry peers based on our estimates, but is very expensive. We think this is consistent with our "What's in the price?" analysis and underscores our point that stock is expensive relative to peers and the premium could decline if the story changes.

**Exhibit 34:** FY2 P/E vs. 4-year forward EPS CAGR



Source: Thomson, Morgan Stanley Research Estimates

Looking at P/E multiples, UA has the highest valuation by far (**Exhibit 35**). Interestingly, UA's valuation is still near peak, even though the average P/E for peers is not below average. UA was one of only two stocks in our coverage universe last year that experienced P/E expansion (the other was Nike). The average peer P/E was down 18% in 2015. We think UA's P/E could correct like peers' have if the market starts to question the long-term growth story. Please click **Valuation vs. peers** for more stats.

**Exhibit 35:** UA is trading near its peak P/E even though the industry median is actually below its 5-year average



FY2 P/E - 5 Year Distribution: Min / Avg / Max

Source: Thomson Reuters, Morgan Stanley Research

# Morgan Stanley

## Valuation vs. peers

**Exhibit 36:** Branded Apparel & Footwear Valuation Sheet (ordered by preference)

| Ticker | MS Rating | Price 1/8/2016 | Mkt ($ MM) | Price Target | Return to PT | YTD Perf | EPS 2014A | EPS 2015E | EPS 2016E | P/E 2014A | P/E 2015E | P/E 2016E | '14-'18 Growth | PEG 2015E | FCF Yield 2015E | FCF Yield 2016E | EV/EBITDA 2015E | EV/EBITDA 2016E | Dividend Yield (FY1) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKX | O | 27.94 | 4,244 | $49 | 77% | -8% | 0.91 | 1.55 | 2.25 | 30.8 | 18.0 | 12.4 | 32.8 | 0.5 | 3.2% | 7.0% | 9.3 | 7.1 | NA |
| NKE | O | 59.85 | 102,098 | $70 | 16% | -4% | 1.85 | 2.16 | 2.58 | 32.3 | 27.7 | 23.2 | 16.2 | 1.7 | 3.2% | 3.2% | 18.1 | 15.7 | 1.0% |
| HBI | O | 30.44 | 11,927 | $36 | 18% | 3% | 1.41 | 1.67 | 1.90 | 21.5 | 18.3 | 16.0 | 15.3 | 1.2 | 3.5% | 6.2% | 14.0 | 12.8 | 1.4% |
| GCO | O | 58.23 | 1,286 | $81 | 39% | 2% | 4.74 | 4.59 | 5.65 | 12.3 | 12.7 | 10.3 | 11.8 | 1.1 | 4.2% | 8.7% | 5.0 | 4.4 | NA |
| PSG | O | 8.72 | 397 | $21 | 135% | -9% | 0.99 | 1.05 | 0.73 | 8.8 | 8.3 | 12.0 | 2.8 | 2.9 | -1.1% | 16.5% | 6.8 | 9.1 | NA |
| PLCE | O | 63.20 | 1,262 | $89 | 41% | 14% | 3.05 | 3.52 | 3.95 | 20.7 | 18.0 | 16.0 | 14.3 | 1.3 | 5.8% | 8.3% | 6.2 | 5.8 | 0.9% |
| RL | O | 104.56 | 8,962 | $123 | 17% | -6% | 7.88 | 7.24 | 7.75 | 13.3 | 14.4 | 13.5 | 5.2 | 2.8 | 5.0% | 6.3% | 6.8 | 6.4 | 1.8% |
| FL | E | 64.44 | 8,845 | $78 | 21% | -1% | 3.58 | 4.26 | 4.80 | 18.0 | 15.1 | 13.4 | 13.3 | 1.1 | 5.2% | 6.5% | 7.5 | 6.8 | 1.6% |
| PVH | E | 71.44 | 5,855 | $98 | 37% | -3% | 7.30 | 6.99 | 6.50 | 9.8 | 10.2 | 11.0 | 3.1 | 3.3 | 7.8% | 9.2% | 7.9 | 8.2 | 0.2% |
| CAL | E | 25.70 | 1,123 | $32 | 25% | -4% | 1.72 | 1.98 | 2.05 | 15.0 | 13.0 | 12.5 | 8.2 | 1.6 | 4.6% | 4.8% | 7.4 | 7.2 | 1.0% |
| EXPR | E | 17.49 | 1,445 | $21 | 20% | 1% | 0.81 | 1.40 | 1.57 | 21.6 | 12.5 | 11.2 | 23.0 | 0.5 | 6.6% | 7.5% | 4.3 | 4.0 | NA |
| VSTO | E | 47.75 | 2,975 | $45 | -6% | 7% | 2.35 | 2.32 | 2.70 | 20.4 | 20.6 | 17.7 | 8.9 | 2.3 | 5.1% | 6.6% | 10.6 | 9.7 | NA |
| FINL | E | 16.63 | 766 | $19 | 11% | -8% | 1.67 | 1.22 | 1.85 | 10.0 | 13.7 | 9.0 | 5.2 | 2.6 | -2.7% | 7.8% | 5.4 | 4.1 | 2.1% |
| WWW | E | 16.41 | 1,688 | $18 | 10% | -2% | 1.63 | 1.43 | 1.49 | 10.1 | 11.5 | 11.0 | 1.9 | 6.2 | 8.9% | 8.7% | 7.8 | 7.8 | 1.5% |
| DECK | E | 46.81 | 1,513 | $50 | 7% | -1% | 4.67 | 4.26 | 3.90 | 10.0 | 11.0 | 12.0 | (0.1) | NM | 8.1% | 8.3% | 4.8 | 5.2 | NA |
| SHOO | E | 30.70 | 1,921 | $31 | -1% | 2% | 1.76 | 1.90 | 2.17 | 17.5 | 16.1 | 14.1 | 9.8 | 1.6 | 6.0% | 6.0% | 10.2 | 9.3 | NA |
| SKUL | E | 4.53 | 129 | $5 | 10% | -4% | 0.27 | 0.38 | 0.46 | 17.0 | 12.0 | 9.9 | 17.9 | 0.7 | 4.3% | 1.7% | 3.1 | 2.9 | NA |
| VFC | U | 59.45 | 25,344 | $58 | -2% | -4% | 3.08 | 3.16 | 3.39 | 19.3 | 18.8 | 17.5 | 8.1 | 2.3 | 5.1% | 5.1% | 12.4 | 11.8 | 2.0% |
| COLM | U | 49.68 | 3,494 | $42 | -15% | 2% | 1.94 | 2.34 | 2.50 | 25.6 | 21.3 | 19.8 | 12.3 | 1.7 | 3.6% | 4.7% | 11.2 | 10.7 | 1.3% |
| UA | U | 78.00 | 16,834 | $62 | -21% | -3% | 0.95 | 1.00 | 1.27 | 82.4 | 77.7 | 61.5 | 20.5 | 3.8 | -1.1% | -1.8% | 35.2 | 28.7 | NA |
| DSW | U | 24.00 | 2,079 | $19 | -23% | 1% | 1.69 | 1.48 | 1.58 | 14.2 | 16.2 | 15.2 | (0.4) | NM | 8.7% | 6.6% | 6.6 | 6.2 | 3.3% |
| **Branded Apparel Avg.** | | | | | -1% | -1% | $2.67 | $2.72 | $2.94 | 20.0x | 18.4x | 16.3x | 9.9 | 2.2x | 4.1% | 6.5% | 9.6 | 8.8 | 1.5% |
| **Branded Apparel Med.** | | | | | -1% | -1% | $1.80 | 2.07 | 2.34 | 17.2 | 14.8 | 13.5 | 9.3 | 1.7 | 4.8% | 6.5% | 7.5 | 7.5 | 1.5% |

Source: Thomson Reuters, Morgan Stanley Research estimates

# Morgan Stanley

**Exhibit 37:** Branded Apparel & Footwear Fundamentals Sheet

| | CAL | COLM | DECK | DSW | EXPR | FINL | FL | GCO | HBI | NKE | PLCE | PSG | PVH | RL | SHOO | SKUL | SKX | UA | VFC | VSTO | WWW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Returns** | | | | | | | | | | | | | | | | | | | | | |
| ROIC | 13% | 11% | 18% | 15% | 12% | 14% | 20% | 11% | 22% | 26% | 11% | 6% | 9% | 14% | 16% | 6% | 14% | 15% | 20% | 8% | 10% |
| ROE | 15% | 11% | 18% | 15% | 13% | 14% | 21% | 11% | 44% | 30% | 11% | 11% | 14% | 16% | 17% | 5% | 13% | 17% | 23% | 9% | 19% |
| **ROE Breakdown** | | | | | | | | | | | | | | | | | | | | | |
| Net profit margin | 2% | 4% | 8% | 7% | 5% | 4% | 6% | 4% | 7% | 10% | 4% | 7% | 7% | 9% | 10% | 0% | 2% | 5% | 10% | 7% | 5% |
| Asset turnover | 2.2 | 1.2 | 1.6 | 1.7 | 1.8 | 2.0 | 2.0 | 1.8 | 1.1 | 1.5 | 1.8 | 0.8 | 0.7 | 1.3 | 1.5 | 1.3 | 1.5 | 1.7 | 1.2 | 0.8 | 1.1 |
| Equity multiplier | 2.3 | 1.3 | 1.2 | 1.4 | 2.4 | 1.6 | 1.4 | 1.6 | 3.6 | 1.7 | 1.6 | 2.6 | 2.6 | 1.6 | 1.3 | 1.3 | 1.5 | 1.5 | 1.7 | 1.7 | 2.9 |
| **Profitability** | | | | | | | | | | | | | | | | | | | | | |
| EBITDA growth | 13% | 46% | 8% | -8% | -25% | 9% | 18% | 0% | 25% | 13% | -9% | -25% | -9% | -9% | -15% | 172% | 85% | 35% | 10% | -2% | 9% |
| EBITDA margin | 7% | 12% | 15% | 13% | 10% | 9% | 13% | 9% | 16% | 17% | 9% | 12% | 14% | 16% | 14% | 9% | 11% | 14% | 17% | 15% | 12% |
| Operating income margin | 5% | 9% | 12% | 10% | 6% | 7% | 11% | 6% | 14% | 14% | 6% | 10% | 11% | 12% | 13% | 5% | 9% | 11% | 15% | 12% | 10% |
| Net income growth | 23% | 45% | 6% | -11% | -41% | 1% | 21% | 1% | 45% | 17% | -10% | -30% | 5% | -14% | -15% | -993% | 153% | 28% | 11% | -4% | 16% |
| **Credit** | | | | | | | | | | | | | | | | | | | | | |
| Net debt/EBITDA | 0.7 | (1.7) | (0.9) | (0.7) | (0.7) | (0.4) | (0.9) | (0.5) | 1.8 | (0.8) | (1.4) | 4.2 | 2.6 | (0.3) | (0.4) | (1.7) | (1.3) | (0.7) | 0.2 | 1.5 | 2.1 |
| Total debt/EBITDA | 1.1 | 0.1 | 0.0 | 0.0 | 0.9 | 0.1 | 0.1 | 0.1 | 2.1 | 0.2 | 0.0 | 4.7 | 3.0 | 0.4 | 0.0 | 0.0 | 0.5 | 0.7 | 0.7 | 2.1 | 2.8 |
| Net debt/equity | 0.4 | 0.0 | 0.0 | 0.0 | 0.4 | 0.0 | 0.1 | 0.0 | 1.3 | 0.1 | 0.0 | 1.1 | 0.8 | 0.1 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.4 | 1.0 |
| Total debt/total assets | 16% | 1% | 0% | 0% | 16% | 1% | 4% | 2% | 35% | 5% | 0% | 45% | 32% | 9% | 0% | 0% | 7% | 14% | 14% | 23% | 36% |
| **Other** | | | | | | | | | | | | | | | | | | | | | |
| CapEx/Sales | 4% | 3% | 5% | 4% | 5% | 5% | 3% | 4% | 1% | 3% | 4% | 3% | 3% | 5% | 1% | 4% | 2% | 5% | 2% | 2% | 1% |

Source: Thomson Reuters, Morgan Stanley Research estimates

# Morgan Stanley

## Financial Model

**Exhibit 38:** UA Annual Income Statement

| Annual Income Statement | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 606.6 | $ 725.2 | $ 856.4 | $ 1,063.9 | $ 1,472.7 | $ 1,834.9 | $ 2,332.1 | $ 3,084.4 | $ 3,860.7 | $ 4,882.9 | $ 6,090.4 | $ 7,348.7 |
| Cost of Sales | $ 301.5 | $ 370.3 | $ 446.3 | $ 533.4 | $ 759.8 | $ 955.6 | $ 1,195.4 | $ 1,572.2 | $ 2,008.5 | $ 2,531.5 | $ 3,133.2 | $ 3,788.2 |
| Gross Profit | $ 305.0 | $ 354.9 | $ 410.1 | $ 530.5 | $ 712.8 | $ 879.3 | $ 1,136.7 | $ 1,512.2 | $ 1,874.2 | $ 2,351.4 | $ 2,927.2 | $ 3,560.5 |
| Selling, general and administrative expenses | $ 218.8 | $ 278.0 | $ 324.9 | $ 418.2 | $ 550.1 | $ 670.6 | $ 871.6 | $ 1,158.3 | $ 1,482.9 | $ 1,868.7 | $ 2,334.3 | $ 2,830.5 |
| Income (loss) from operations | $ 86.3 | $ 76.9 | $ 85.3 | $ 112.4 | $ 162.8 | $ 208.7 | $ 265.1 | $ 354.0 | $ 391.3 | $ 482.8 | $ 592.9 | $ 730.0 |
| Interest expense, net | $ - | $ (0.9) | $ (2.3) | $ (2.3) | $ (3.8) | $ (5.2) | $ (2.9) | $ (5.3) | $ (14.7) | $ (27.1) | $ (27.8) | $ (28.5) |
| Income before income taxes | $ 89.0 | $ 69.9 | $ 82.4 | $ 108.9 | $ 156.9 | $ 203.4 | $ 261.0 | $ 342.2 | $ 368.3 | $ 455.7 | $ 565.2 | $ 701.5 |
| Income tax expense (benefit) | $ 36.5 | $ 31.7 | $ 35.6 | $ 40.4 | $ 59.9 | $ 74.7 | $ 98.7 | $ 134.2 | $ 147.0 | $ 177.3 | $ 214.8 | $ 263.1 |
| Adjusted earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 221.4 | $ 278.4 | $ 350.4 | $ 438.4 |
| | | | | | | | | | | | | |
| Extraordinary Items, Net of Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GAAP earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 221.4 | $ 278.4 | $ 350.4 | $ 438.4 |
| | | | | | | | | | | | | |
| Accretion of and cumulative preferred dividends on Series A Preferred Stock | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net Income Available for Comon Shareholders | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 221.4 | $ 278.4 | $ 350.4 | $ 438.4 |
| | | | | | | | | | | | | |
| **Adjusted Diluted EPS** | **$ 0.26** | **$ 0.19** | **$ 0.23** | **$ 0.33** | **$ 0.46** | **$ 0.61** | **$ 0.75** | **$ 0.95** | **$ 1.00** | **$ 1.27** | **$ 1.60** | **$ 2.00** |
| | | | | | | | | | | | | |
| Diluted Shares | 199.8 | 201.4 | 202.6 | 205.1 | 210.1 | 212.8 | 216.0 | 219.7 | 220.4 | 219.4 | 219.4 | 219.4 |
| | | | | | | | | | | | | |
| Margin Analysis | | | | | | | | | | | | |
| Gross Margin | 50.3% | 48.9% | 47.9% | 49.9% | 48.4% | 47.9% | 48.7% | 49.0% | 48.3% | 48.2% | 48.3% | 48.5% |
| Expense Ratio | 36.1% | 38.3% | 37.9% | 39.3% | 37.4% | 36.5% | 37.4% | 37.6% | 38.2% | 38.3% | 38.5% | 38.5% |
| Operating Margin | 14.2% | 10.6% | 10.0% | 10.6% | 11.1% | 11.4% | 11.4% | 11.5% | 10.1% | 9.9% | 9.8% | 9.9% |
| Tax Rate | 41.0% | 45.3% | 43.2% | 37.1% | 38.2% | 36.7% | 37.8% | 39.2% | 39.9% | 38.9% | 38.0% | 37.5% |
| | | | | | | | | | | | | |
| Year-Over-Year Growth | | | | | | | | | | | | |
| Sales | NA | 19.6% | 18.1% | 24.2% | 38.4% | 24.6% | 27.1% | 32.3% | 25.9% | 25.8% | 24.1% | 21.3% |
| SG&A Expense | NA | 27.1% | 16.8% | 28.7% | 31.5% | 21.9% | 30.0% | 32.9% | 28.0% | 26.0% | 24.9% | 21.3% |
| Operating Income | NA | -10.8% | 10.9% | 31.8% | 44.9% | 28.2% | 27.0% | 33.5% | 10.5% | 23.4% | 22.8% | 23.1% |
| Earnings Per Share | NA | -27.8% | 21.6% | 44.6% | 38.2% | 31.2% | 24.2% | 26.0% | 6.1% | 26.3% | 25.8% | 25.1% |

Source: Company data, Morgan Stanley Research estimates

# Morgan Stanley

**Under Armour Inc.** | January 10, 2016

MORGAN STANLEY RESEARCH

**Exhibit 39:** UA Quarterly Income Statement

| Quarterly Income Statement | 2014 1QA | 2QA | 3QA | 4QA | 2015 1QA | 2QA | 3QA | 4QE | 2016 1QE | 2QE | 3QE | 4QE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 641.6 | 609.7 | 937.9 | 895.2 | 804.9 | 783.6 | 1,204.1 | 1,060.1 | 1,008.1 | 978.0 | 1,517.8 | 1,379.0 |
| Cost of Sales | 340.9 | 309.7 | 472.6 | 448.9 | 427.3 | 404.5 | 616.9 | 559.7 | 539.2 | 503.9 | 776.2 | 712.3 |
| Gross Profit | 300.7 | 300.0 | 465.3 | 446.3 | 377.7 | 379.1 | 587.2 | 530.3 | 469.0 | 474.1 | 741.6 | 666.8 |
| Selling, general and administrative expenses | 273.8 | 265.3 | 319.2 | 300.0 | 350.0 | 347.2 | 415.8 | 370.0 | 439.6 | 434.7 | 525.4 | 469.0 |
| Income (loss) from operations | 26.9 | 34.7 | 146.1 | 146.3 | 27.7 | 31.9 | 171.4 | 160.3 | 29.3 | 39.4 | 216.2 | 197.8 |
| Interest expense, net | (0.8) | (1.2) | (1.5) | (1.7) | (2.2) | (4.3) | (4.1) | (4.1) | (6.8) | (6.8) | (6.8) | (6.8) |
| Income before income taxes | 25.1 | 33.7 | 141.2 | 142.1 | 23.6 | 27.7 | 164.1 | 153.0 | 22.6 | 32.6 | 209.5 | 191.0 |
| Income tax expense (benefit) | 11.6 | 16.0 | 52.1 | 54.4 | 11.9 | 12.9 | 63.6 | 58.6 | 8.8 | 12.7 | 81.5 | 74.3 |
| Adjusted earnings | 13.5 | 17.7 | 89.1 | 87.7 | 11.7 | 14.8 | 100.5 | 94.4 | 13.8 | 19.9 | 128.0 | 116.7 |
| Extraordinary Items, Net of Tax | - | - | - | - | - | - | - | - | - | - | - | - |
| GAAP earnings | 13.5 | 17.7 | 89.1 | 87.7 | 11.7 | 14.8 | 100.5 | 94.4 | 13.8 | 19.9 | 128.0 | 116.7 |
| Accretion of and cumulative preferred dividends on Series A Preferred Stock | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Income Available for Common Shareholders | 13.5 | 17.7 | 89.1 | 87.7 | 11.7 | 14.8 | 100.5 | 94.4 | 13.8 | 19.9 | 128.0 | 116.7 |
| Adjusted Diluted EPS | 0.06 | 0.08 | 0.41 | 0.40 | 0.05 | 0.07 | 0.45 | 0.43 | 0.06 | 0.09 | 0.58 | 0.53 |
| Diluted Shares | 216.9 | 217.3 | 218.0 | 219.7 | 219.6 | 219.9 | 221.1 | 221.1 | 219.4 | 219.4 | 219.4 | 219.4 |
| **Margin Analysis** | | | | | | | | | | | | |
| Gross Margin | 46.9% | 49.2% | 49.6% | 49.9% | 46.9% | 48.4% | 48.8% | 48.7% | 46.5% | 48.5% | 48.9% | 48.4% |
| Expense Ratio | 42.7% | 43.5% | 34.0% | 33.5% | 43.5% | 44.3% | 34.5% | 33.9% | 43.6% | 44.4% | 34.6% | 34.0% |
| Operating Margin | 4.2% | 5.7% | 15.6% | 16.3% | 3.4% | 4.1% | 14.2% | 14.7% | 2.9% | 4.0% | 14.2% | 14.3% |
| Tax Rate | 46.1% | 47.5% | 36.9% | 38.3% | 50.3% | 46.7% | 38.8% | 38.3% | 38.9% | 38.9% | 38.9% | 38.9% |
| **Year-Over-Year Growth** | | | | | | | | | | | | |
| Sales | 22.7% | 23.0% | 25.7% | 35.0% | 25.5% | 28.5% | 28.4% | 21.8% | 25.2% | 24.8% | 26.1% | 26.5% |
| SG&A Expense | 34.7% | 18.7% | 21.1% | 45.9% | 27.8% | 30.9% | 30.3% | 23.3% | 25.6% | 25.2% | 26.4% | 26.7% |
| Operating Income | -44.7% | 175.7% | 32.8% | 20.7% | 3.0% | -8.1% | 17.3% | 9.6% | 6.1% | 23.5% | 26.2% | 23.4% |
| Earnings Per Share | -47.4% | 159.9% | 25.8% | 26.6% | -14.4% | -17.5% | 11.2% | 7.0% | 17.7% | 35.3% | 28.3% | 24.6% |

Source: Company data, Morgan Stanley Research estimates

**Exhibit 40:** UA Segment Quarterly Income Statement

| Segment Income Statement | 2014 1QA | 2QA | 3QA | 4QA | 2015 1QA | 2QA | 3QA | 4QE | 2016 1QE | 2QE | 3QE | 4QE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **North America** | | | | | | | | | | | | |
| Net Sales | 582.6 | 558.0 | 847.6 | 808.2 | 700.5 | 680.8 | 1,059.4 | 969.2 | 842.2 | 818.1 | 1,288.0 | 1,179.7 |
| YY % Change | NM | NM | NM | NM | 21.0% | 23.0% | 26.3% | 21.0% | 21.0% | 21.0% | 22.0% | 22.0% |
| Income (loss) from operations | 31.1 | 46.6 | 147.5 | 147.1 | 38.4 | 52.4 | 181.8 | 173.9 | 44.4 | 63.7 | 222.3 | 212.9 |
| YY % Change | NM | NM | NM | NM | 3.0% | 2.3% | 26.3% | 21.0% | 21.0% | 21.0% | 22.0% | 22.0% |
| % of Revenue | 5.3% | 8.4% | 17.4% | 18.2% | 5.5% | 7.7% | 17.2% | 17.9% | 5.3% | 7.8% | 17.3% | 18.0% |
| YY Basis Point Change | 202 bps | 10 bps | 13 bps | 208 bps | 13 bps | 66 bps | 24 bps | 25 bps | -20 bps | 10 bps | 10 bps | 10 bps |
| **Other foreign countries and businesses** | | | | | | | | | | | | |
| Net Sales | 55.1 | 46.1 | 85.8 | 82.5 | 96.0 | 89.2 | 130.2 | 109.4 | 150.3 | 134.8 | 203.0 | 178.1 |
| YY % Change | NM | NM | NM | NM | 85.9% | 111.8% | 67.8% | 50.0% | 45.0% | 45.0% | 45.0% | 45.0% |
| Income (loss) from operations | (0.7) | (7.1) | 3.8 | (14.5) | 4.3 | (4.4) | 6.2 | (19.2) | 6.0 | (6.9) | 9.8 | (31.1) |
| YY % Change | NM | NM | NM | NM | 85.9% | 111.8% | 67.8% | 50.0% | 45.0% | 45.0% | 45.0% | 45.0% |
| % of Revenue | -1.2% | 15.3% | 4.4% | -17.6% | 4.5% | -4.9% | 4.7% | -17.6% | 4.0% | -5.1% | 4.8% | -17.5% |
| YY Basis Point Change | 0 bps | 0 bps | 0 bps | 0 bps | 570 bps | 1041 bps | 30 bps | 0 bps | -50 bps | -20 bps | 10 bps | 10 bps |

Source: Company data, Morgan Stanley Research estimates

# Morgan Stanley

**Exhibit 41:** UA Bull Case

| BULL CASE | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | | |
| Revenues | $ 606.6 | $ 725.2 | $ 856.4 | $ 1,063.9 | $ 1,472.7 | $ 1,834.9 | $ 2,332.1 | $ 3,084.4 | $ 3,916.6 | $ 5,052.5 | $ 6,366.1 | $ 7,798.5 |
| Cost of Sales | $ 301.5 | $ 370.3 | $ 446.3 | $ 533.4 | $ 759.8 | $ 955.6 | $ 1,195.4 | $ 1,572.2 | $ 2,022.1 | $ 2,601.7 | $ 3,265.4 | $ 4,000.1 |
| Gross Profit | $ 305.0 | $ 354.9 | $ 410.1 | $ 530.5 | $ 712.8 | $ 879.3 | $ 1,136.7 | $ 1,512.2 | $ 1,894.5 | $ 2,450.8 | $ 3,100.7 | $ 3,798.4 |
| Selling, general and administrative expenses | $ 218.8 | $ 278.0 | $ 324.9 | $ 418.2 | $ 550.1 | $ 670.6 | $ 871.6 | $ 1,158.3 | $ 1,488.0 | $ 1,919.6 | $ 2,418.7 | $ 2,962.9 |
| Income (loss) from operations | $ 86.3 | $ 76.9 | $ 85.3 | $ 112.4 | $ 162.8 | $ 208.7 | $ 265.1 | $ 354.0 | $ 406.5 | $ 531.2 | $ 682.0 | $ 835.5 |
| Interest expense, net | $ - | $ (0.9) | $ (2.3) | $ (2.3) | $ (3.8) | $ (5.2) | $ (2.9) | $ (5.3) | $ (14.7) | $ (27.1) | $ (27.8) | $ (28.5) |
| Income before income taxes | $ 89.0 | $ 69.9 | $ 82.4 | $ 108.9 | $ 156.9 | $ 203.4 | $ 261.0 | $ 342.2 | $ 383.5 | $ 504.1 | $ 654.3 | $ 807.0 |
| Income tax expense (benefit) | $ 36.5 | $ 31.7 | $ 33.6 | $ 40.4 | $ 59.9 | $ 74.7 | $ 98.7 | $ 134.2 | $ 153.0 | $ 196.1 | $ 248.6 | $ 302.6 |
| Adjusted earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 230.5 | $ 308.0 | $ 405.6 | $ 504.4 |
| | | | | | | | | | | | | |
| Extraordinary Items, Net of Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GAAP earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 230.5 | $ 308.0 | $ 405.6 | $ 504.4 |
| | | | | | | | | | | | | |
| Accretion of and cumulative preferred dividends on Series A Preferred Stock | | | | | | | | | | | | |
| Net Income Available for Common Shareholders | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 230.5 | $ 308.0 | $ 405.6 | $ 504.4 |
| | | | | | | | | | | | | |
| **Adjusted Diluted EPS** | $ 0.26 | $ 0.19 | $ 0.23 | $ 0.33 | $ 0.46 | $ 0.61 | $ 0.75 | $ 0.95 | $ 1.05 | $ 1.40 | $ 1.85 | $ 2.30 |
| Diluted Shares | 199.8 | 201.4 | 202.6 | 206.1 | 210.1 | 212.8 | 216.0 | 219.7 | 220.4 | 219.4 | 219.4 | 219.4 |
| | | | | | | | | | | | | |
| **Margin Analysis** | | | | | | | | | | | | |
| Gross Margin | 50.3% | 48.9% | 47.9% | 49.9% | 48.4% | 47.9% | 48.7% | 49.0% | 48.4% | 48.5% | 48.7% | 48.7% |
| SG&A Ratio | 36.1% | 38.3% | 37.9% | 39.3% | 37.4% | 36.5% | 37.4% | 37.6% | 38.0% | 38.0% | 38.0% | 38.0% |
| Operating Margin | 14.2% | 10.6% | 10.0% | 10.6% | 11.1% | 11.4% | 11.4% | 11.5% | 10.4% | 10.5% | 10.7% | 10.7% |
| Tax Rate | 41.0% | 45.3% | 43.2% | 37.1% | 38.2% | 36.7% | 37.8% | 39.2% | 39.9% | 38.9% | 38.0% | 37.5% |
| | | | | | | | | | | | | |
| **Year-Over-Year Growth** | | | | | | | | | | | | |
| Sales | 40.8% | 19.6% | 18.1% | 24.2% | 38.4% | 24.6% | 27.1% | 32.3% | 27.0% | 29.0% | 26.0% | 22.5% |
| SG&A Expense | 37.9% | 27.1% | 16.8% | 28.7% | 31.5% | 21.9% | 30.0% | 32.9% | 28.5% | 29.0% | 26.0% | 22.5% |
| Operating Income | 51.6% | -10.8% | 10.9% | 31.8% | 44.9% | 28.2% | 27.0% | 33.5% | 14.8% | 30.7% | 28.4% | 22.5% |
| Earnings Per Share | 33.8% | 27.8% | 21.6% | 44.6% | 38.2% | 31.2% | 24.2% | 26.0% | 10.5% | 34.2% | 31.7% | 24.3% |

Source: Company data, Morgan Stanley Research estimates

Morgan Stanley

**Under Armour Inc.** | January 10, 2016

MORGAN STANLEY RESEARCH

**Exhibit 42:** UA Bear Case

| BEAR CASE | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | | |
| Revenues | $ 606.6 | $ 725.2 | $ 856.4 | $ 1,063.9 | $ 1,472.7 | $ 1,834.9 | $ 2,332.1 | $ 3,084.4 | $ 3,844.1 | $ 4,767.6 | $ 5,785.9 | $ 6,900.1 |
| Cost of Sales | $ 301.5 | $ 370.3 | $ 446.3 | $ 533.4 | $ 759.8 | $ 955.6 | $ 1,195.4 | $ 1,572.2 | $ 1,992.4 | $ 2,483.1 | $ 3,022.7 | $ 3,615.2 |
| Gross Profit | $ 305.0 | $ 354.9 | $ 410.1 | $ 530.5 | $ 712.8 | $ 879.3 | $ 1,136.7 | $ 1,512.2 | $ 1,851.8 | $ 2,274.4 | $ 2,763.1 | $ 3,284.9 |
| Selling, general and administrative expenses | $ 218.8 | $ 278.0 | $ 324.9 | $ 418.2 | $ 550.1 | $ 670.6 | $ 871.6 | $ 1,158.3 | $ 1,475.9 | $ 1,835.0 | $ 2,240.3 | $ 2,678.6 |
| Income (loss) from operations | $ 86.3 | $ 76.9 | $ 85.3 | $ 112.4 | $ 162.8 | $ 208.7 | $ 265.1 | $ 354.0 | $ 375.9 | $ 439.5 | $ 522.9 | $ 606.3 |
| Interest expense, net | $ - | $ (0.9) | $ (2.3) | $ (2.3) | $ (3.8) | $ (5.2) | $ (2.9) | $ (5.3) | $ (14.7) | $ (27.1) | $ (27.8) | $ (28.5) |
| Income before income taxes | $ 89.0 | $ 69.9 | $ 82.4 | $ 108.9 | $ 156.9 | $ 203.4 | $ 261.0 | $ 342.2 | $ 352.9 | $ 412.4 | $ 495.1 | $ 577.8 |
| Income tax expense (benefit) | $ 36.5 | $ 31.7 | $ 35.6 | $ 40.4 | $ 59.9 | $ 74.7 | $ 98.7 | $ 134.2 | $ 140.8 | $ 160.4 | $ 188.1 | $ 216.7 |
| Adjusted earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 212.1 | $ 252.0 | $ 307.0 | $ 361.1 |
| Extraordinary Items, Net of Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GAAP earnings | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 212.1 | $ 252.0 | $ 307.0 | $ 361.1 |
| Accretion of and cumulative preferred dividends on Series A Preferred Stock | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net Income Available for Comon Shareholders | $ 52.6 | $ 38.2 | $ 46.8 | $ 68.5 | $ 96.9 | $ 128.8 | $ 162.3 | $ 208.0 | $ 212.1 | $ 252.0 | $ 307.0 | $ 361.1 |
| **Adjusted Diluted EPS** | $ 0.26 | $ 0.19 | $ 0.23 | $ 0.33 | $ 0.46 | $ 0.61 | $ 0.75 | $ 0.95 | $ 0.96 | $ 1.15 | $ 1.40 | $ 1.65 |
| Diluted Shares | 199.8 | 201.4 | 202.6 | 205.1 | 210.1 | 212.8 | 216.0 | 219.7 | 220.4 | 219.4 | 219.4 | 219.4 |
| **Margin Analysis** | | | | | | | | | | | | |
| Gross Margin | 50.3% | 48.9% | 47.9% | 49.9% | 48.4% | 47.9% | 48.7% | 49.0% | 48.2% | 47.8% | 47.8% | 47.6% |
| SG&A Ratio | 36.1% | 38.3% | 37.9% | 39.3% | 37.4% | 36.5% | 37.4% | 37.6% | 38.4% | 38.6% | 38.7% | 38.8% |
| Operating Margin | 14.2% | 10.6% | 10.0% | 10.6% | 11.1% | 11.4% | 11.4% | 11.5% | 9.8% | 9.2% | 9.0% | 8.8% |
| Tax Rate | 41.0% | 45.3% | 43.2% | 37.1% | 38.2% | 36.7% | 37.8% | 39.2% | 39.9% | 38.9% | 38.0% | 37.5% |
| **Year-Over-Year Growth** | | | | | | | | | | | | |
| Sales | 40.8% | 19.6% | 18.1% | 24.2% | 38.4% | 24.6% | 27.1% | 32.3% | 24.6% | 23.8% | 21.6% | 19.3% |
| SG&A Expense | 37.9% | 27.1% | 16.8% | 28.7% | 31.5% | 21.9% | 30.0% | 32.9% | 27.4% | 24.3% | 22.1% | 19.6% |
| Operating Income | 51.6% | -10.8% | 10.9% | 31.8% | 44.9% | 28.2% | 27.0% | 33.5% | 6.2% | 16.9% | 19.0% | 16.0% |
| Earnings Per Share | 33.8% | -27.8% | 21.6% | 44.6% | 38.2% | 31.2% | 24.2% | 26.0% | 1.6% | 19.3% | 21.8% | 17.6% |

Source: Company data, Morgan Stanley Research estimates

# Morgan Stanley

**Exhibit 43:** UA Cash Flow Statement

| CASH FLOW STATEMENT | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income (Loss) | 53 | 38 | 47 | 66 | 97 | 129 | 162 | 208 | 221 | 278 | 350 | 438 |
| Depreciation and Amortization | 15 | 21 | 28 | 31 | 36 | 43 | 51 | 72 | 98 | 118 | 165 | 241 |
| Other Amortization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Income Taxes | (5) | (3) | (5) | (10) | 4 | (13) | (19) | (18) | 0 | 0 | 0 | 0 |
| Working Capital Accounts: | | | | | | | | | | | | |
| Change in Accounts Receivable | (24) | 3 | 4 | (32) | (34) | (53) | (36) | (101) | (78) | (99) | (110) | (120) |
| Change in Inventories | (84) | (19) | 33 | (65) | (115) | 5 | (157) | (85) | (152) | (214) | (129) | (112) |
| Change in Accounts Payable | 12 | 17 | (4) | 16 | 17 | 35 | 15 | 49 | 61 | 74 | 86 | 96 |
| Other Changes in WC | 13 | (10) | 7 | 22 | (15) | 22 | 45 | 32 | 25 | 31 | 36 | 40 |
| Change in Working Capital | (83) | (10) | 40 | (59) | (146) | 9 | (133) | (104) | (144) | (208) | (116) | (97) |
| Other Adjustments | 6 | 23 | 9 | 20 | 24 | 32 | 59 | 61 | (6) | (7) | (9) | (9) |
| Net Cash Provided (Used) by Operating Activities | -$15 | $70 | $119 | $50 | $15 | $200 | $120 | $219 | $170 | $181 | $391 | $573 |
| Additions to Property, Plant and Equipment | (34) | (39) | (20) | (30) | (56) | (51) | (88) | (141) | (349) | (488) | (606) | (588) |
| Investments and Acquisitions, Net of Cash Acquired | 0 | 0 | 0 | (11) | (27) | 0 | (148) | (11) | (560) | 0 | 0 | 0 |
| Other, net | (0) | (3) | (0) | (0) | (6) | 4 | (2) | (1) | 0 | 0 | 0 | 0 |
| Net Cash Provided (Used) by Investing Activities | ($34) | ($42) | ($20) | ($42) | ($89) | ($47) | ($238) | ($152) | ($909) | ($488) | ($606) | ($588) |
| Dividends Paid | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Equity | 3 | 2 | 5 | 7 | 15 | 15 | 15 | 16 | 16 | 0 | 0 | 0 |
| Net Change in Debt | 15 | 33 | (22) | (0) | 31 | (2) | 112 | 167 | 400 | 300 | 150 | (50) |
| Net Cash Provided (Used) by Financing Activities | $18 | $35 | ($16) | $7 | $46 | $12 | $127 | $182 | $416 | $300 | $150 | ($50) |
| Effect of Foreign Exchange Rates Changes on Cash | 0 | (1) | 3 | 1 | (0) | 1 | (3) | (3) | 0 | 0 | 0 | 0 |
| Net Increase (Decrease) in Cash | ($30) | $61 | $85 | $17 | ($28) | $166 | $6 | $246 | ($324) | ($7) | ($65) | ($65) |
| Starting Cash | 71 | 41 | 102 | 167 | 204 | 175 | 342 | 347 | 593 | 270 | 262 | 197 |
| Ending Cash | 41 | 102 | 187 | 204 | 175 | 342 | 347 | 593 | 270 | 262 | 197 | 132 |

Source: Company data, Morgan Stanley Research

**Morgan Stanley**

**Exhibit 44:** UA Balance Sheet

| BALANCE SHEET | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | | | |
| Cash | $41 | $102 | $187 | $204 | $175 | $342 | $347 | $593 | $270 | $262 | $197 | $132 |
| Accounts Receivable, net | $94 | $81 | $79 | $102 | $134 | $176 | $210 | $280 | $358 | $456 | $566 | $687 |
| Inventories | $166 | $182 | $148 | $215 | $324 | $319 | $469 | $537 | $688 | $902 | $1,031 | $1,143 |
| Deferred Taxes | $10 | $13 | $13 | $15 | $16 | $23 | $38 | $52 | $52 | $52 | $52 | $52 |
| Other Current Assets | $12 | $18 | $20 | $19 | $40 | $44 | $64 | $87 | $110 | $138 | $171 | $208 |
| Total Current Assets | $322 | $396 | $448 | $556 | $690 | $904 | $1,129 | $1,549 | $1,478 | $1,812 | $2,019 | $2,222 |
| **Long Term Assets** | | | | | | | | | | | | |
| Property and Equipment, net | $52 | $74 | $73 | $76 | $159 | $181 | $224 | $306 | $1,117 | $1,487 | $1,928 | $2,275 |
| Goodwill net | $0 | $0 | $0 | $0 | $0 | $0 | $122 | $123 | $123 | $123 | $123 | $123 |
| Intangibles net | $6 | $5 | $6 | $4 | $6 | $4 | $24 | $26 | $26 | $26 | $26 | $26 |
| Other Assets | $10 | $12 | $19 | $39 | $65 | $68 | $79 | $91 | $114 | $143 | $178 | $216 |
| Total Long Term Assets | $68 | $91 | $98 | $120 | $230 | $253 | $449 | $546 | $1,380 | $1,780 | $2,256 | $2,640 |
| **Total Assets** | **$391** | **$488** | **$546** | **$675** | **$919** | **$1,157** | **$1,578** | **$2,095** | **$2,858** | **$3,592** | **$4,274** | **$4,863** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | | |
| Current portion of long-term borrowings and capital lease obligations | $5 | $32 | $9 | $7 | $7 | $9 | $105 | $29 | $29 | $29 | $29 | $29 |
| Accounts Payable | $55 | $72 | $69 | $85 | $101 | $144 | $165 | $210 | $272 | $346 | $432 | $528 |
| Other Current Liabilities | $36 | $28 | $42 | $58 | $76 | $99 | $156 | $182 | $229 | $289 | $358 | $434 |
| Total Current Liabilities | $96 | $133 | $120 | $149 | $184 | $252 | $427 | $422 | $530 | $663 | $819 | $991 |
| **Long Term Liabilities** | | | | | | | | | | | | |
| Long-term borrowings and capital lease obligations | $10 | $13 | $11 | $9 | $71 | $53 | $48 | $255 | $655 | $955 | $1,105 | $1,055 |
| Other Deferred Liabilities | $5 | $10 | $14 | $20 | $28 | $35 | $50 | $68 | $85 | $108 | $133 | $162 |
| Total Long-Term Liabilities | $14 | $23 | $25 | $29 | $99 | $88 | $98 | $323 | $741 | $1,063 | $1,239 | $1,217 |
| Total Liabilities | $110 | $156 | $146 | $178 | $283 | $340 | $524 | $745 | $1,271 | $1,726 | $2,058 | $2,208 |
| **Shareholders' Equity** | | | | | | | | | | | | |
| Common Stock | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Additional paid-in capital + other | $162 | $175 | $197 | $225 | $568 | $321 | $397 | $508 | $508 | $508 | $508 | $608 |
| Accumulated other comprehensive income | $1 | $0 | $0 | $2 | $2 | $2 | $2 | ($15) | ($15) | ($15) | ($15) | ($15) |
| Retained Earnings | $118 | $156 | $202 | $270 | $366 | $493 | $654 | $857 | $1,094 | $1,372 | $1,723 | $2,161 |
| Treasury Stock | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Shareholders' Equity | $280 | $331 | $400 | $497 | $636 | $817 | $1,053 | $1,350 | $1,587 | $1,866 | $2,216 | $2,655 |
| **Total liabilities and equity** | **$391** | **$488** | **$546** | **$675** | **$919** | **$1,157** | **$1,578** | **$2,095** | **$2,858** | **$3,592** | **$4,274** | **$4,863** |

Source: Company data, Morgan Stanley Research estimates

# Morgan Stanley

**Exhibit 45:** UA Financial Stats

| FINANCIAL STATS | 2007A | 2008A | 2009A | 2010A | 2011A | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Returns (Dupont analysis)** | | | | | | | | | | | | |
| Return on equity | 21.2% | 12.5% | 12.8% | 15.3% | 19.5% | 20.2% | 19.9% | 19.8% | 13.9% | 14.9% | 15.8% | 16.5% |
| Net Income/sales | 8.7% | 5.3% | 5.5% | 6.4% | 6.6% | 7.0% | 7.0% | 6.7% | 5.7% | 5.7% | 5.8% | 6.0% |
| Sales/assets | 1.8 | 1.7 | 1.7 | 1.7 | 2.2 | 2.0 | 2.0 | 1.5 | 1.8 | 1.4 | 1.4 | 1.5 |
| Assets/equity | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.5 | 1.8 | 1.9 | 1.9 | 1.8 |
| **Free cash flow** | | | | | | | | | | | | |
| Net income margin | 8.7% | 5.3% | 5.5% | 6.4% | 6.6% | 7.0% | 7.0% | 6.7% | 5.7% | 5.7% | 5.8% | 6.0% |
| D&A, as a percent of sales | 2.4% | 2.9% | 3.3% | 2.9% | 2.5% | 2.3% | 2.2% | 2.3% | 2.5% | 2.4% | 2.7% | 3.3% |
| CapEx as a percent of sales | 5.6% | 5.3% | 2.3% | 2.8% | 3.8% | 2.8% | 3.8% | 4.6% | 9.0% | 10.0% | 10.0% | 8.0% |
| Free cash flow margin | -8.0% | 3.8% | 11.6% | 0.8% | -5.0% | 8.3% | -5.1% | 2.2% | -19.0% | -6.3% | -3.5% | -0.2% |
| Dividends plus buybacks as a percent of sales | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Payout ratios** | | | | | | | | | | | | |
| Dividend payout ratio | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Buyback payout ratio | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total payout ratio | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Credit** | | | | | | | | | | | | |
| EBITDA | $101 | $98 | $114 | $144 | $199 | $252 | $316 | $426 | $490 | $600 | $758 | $971 |
| Net debt | ($526) | ($56) | ($167) | ($188) | ($98) | ($260) | ($195) | ($309) | $415 | $722 | $937 | $952 |
| Net debt/EBITDA | -0.3x | -0.6x | -1.5x | -1.3x | -0.5x | -1.1x | -0.6x | -0.7x | 0.8x | 1.2x | 1.2x | 1.0x |
| Debt to total capital | 3.7% | 9.4% | 3.7% | 2.4% | 8.5% | 5.3% | 9.7% | 13.6% | 23.9% | 27.4% | 26.5% | 22.3% |
| **Liquidity** | | | | | | | | | | | | |
| Inventory turns | 2.4x | 2.1x | 2.7x | 2.9x | 2.8x | 3.0x | 3.0x | 3.1x | 3.3x | 3.2x | 3.2x | 3.5x |
| Days inventory | 201 | 180 | 121 | 147 | 156 | 122 | 143 | 125 | 125 | 130 | 120 | 110 |
| Days receivable | 56 | 41 | 34 | 35 | 33 | 35 | 33 | 33 | 34 | 34 | 34 | 51 |
| Days payable | 67 | 71 | 56 | 58 | 48 | 55 | 51 | 49 | 49 | 50 | 50 | 51 |
| Cash conversion cycle | 191 | 149 | 99 | 124 | 141 | 102 | 126 | 109 | 109 | 114 | 104 | 93 |

Source: Company data, Morgan Stanley Research estimates

**Valuation Methodology and Risks -- NKE.N:** Derived from our DCF analysis, which uses a 9.05% cost of equity and a 3.50% LT growth rate. The cost of equity is based on the current market risk free rate, expected market return, and beta of 0.96. The growth rate is based on our LT industry growth forecast. **Risks:** Under Armour – strongly growing US athletic brand could continue to take share in the kids demographic, potentially taking loyal long-term customers away from Nike; China – changing consumer tastes may challenge Nike's ability to sell apparel in China; Valuation – slower than expected growth could cause significant multiple contraction; FX – unanticipated swings in FX create some risk to EPS given Nike is nearly 60% international; Environmental, social and governance – mismanagement of ESG issues could lead to business or reputational risk, which could hurt cash flow or valuation.

## Disclosure Section

The information and opinions in Morgan Stanley Research were prepared by Morgan Stanley & Co. LLC, and/or Morgan Stanley C.T.V.M. S.A., and/or Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., and/or Morgan Stanley Canada Limited. As used in this disclosure section, "Morgan Stanley" includes Morgan Stanley & Co. LLC, Morgan Stanley C.T.V.M. S.A., Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., Morgan Stanley Canada Limited and their affiliates as necessary.

For important disclosures, stock price charts and equity rating histories regarding companies that are the subject of this report, please see the Morgan Stanley Research Disclosure Website at www.morganstanley.com/researchdisclosures, or contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY, 10036 USA.

For valuation methodology and risks associated with any price targets referenced in this research report, please contact the Client Support Team as follows: US/Canada +1 800 303-2495; Hong Kong +852 2848-5999; Latin America +1 718 754-5444 (U.S.); London +44 (0)20-7425-8169; Singapore +65 6834-6860; Sydney +61 (0)2-9770-1505; Tokyo +81 (0)3-6836-9000. Alternatively you may contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY 10036 USA.

### Analyst Certification

The following analysts hereby certify that their views about the companies and their securities discussed in this report are accurately expressed and that they have not received and will not receive direct or indirect compensation in exchange for expressing specific recommendations or views in this report: Jay Sole; Joseph Wyatt, CFA.

Unless otherwise stated, the individuals listed on the cover page of this report are research analysts.

### Global Research Conflict Management Policy

Morgan Stanley Research has been published in accordance with our conflict management policy, which is available at www.morganstanley.com/institutional/research/conflictpolicies.

### Important US Regulatory Disclosures on Subject Companies

As of December 31, 2015, Morgan Stanley beneficially owned 1% or more of a class of common equity securities of the following companies covered in Morgan Stanley Research: Nike Inc., Skechers USA Inc., **Under Armour Inc.**.

Within the last 12 months, Morgan Stanley managed or co-managed a public offering (or 144A offering) of securities of Vista Outdoor Inc..

Within the last 12 months, Morgan Stanley has received compensation for investment banking services from Vista Outdoor Inc..

In the next 3 months, Morgan Stanley expects to receive or intends to seek compensation for investment banking services from Caleres Inc, Columbia Sportswear Co., Deckers Outdoor Corp, DSW Inc., Finish Line Inc, Foot Locker Inc, Nike Inc., Performance Sports Group Ltd., PVH Corp., **Under Armour Inc.**, VF Corp, Vista Outdoor Inc., Wolverine World Wide Inc..

Within the last 12 months, Morgan Stanley has received compensation for products and services other than investment banking services from Hanesbrands Inc., PVH Corp., VF Corp, Vista Outdoor Inc..

Within the last 12 months, Morgan Stanley has provided or is providing investment banking services to, or has an investment banking client relationship with, the following company: Caleres Inc, Columbia Sportswear Co., Deckers Outdoor Corp, DSW Inc., Finish Line Inc, Foot Locker Inc, Nike Inc., Performance Sports Group Ltd., PVH Corp., **Under Armour Inc.**, VF Corp, Vista Outdoor Inc., Wolverine World Wide Inc..

Within the last 12 months, Morgan Stanley has either provided or is providing non-investment banking, securities-related services to and/or in the past has entered into an agreement to provide services or has a client relationship with the following company: Hanesbrands Inc., PVH Corp., VF Corp, Vista Outdoor Inc..

Within the last 12 months, Morgan Stanley has either provided or is providing non-securities related services to and/or in the past has entered into an agreement to provide services or has a client relationship with the following company: VF Corp.

Morgan Stanley & Co. LLC makes a market in the securities of Caleres Inc, Columbia Sportswear Co., Deckers Outdoor Corp, DSW Inc., Finish Line Inc, Foot Locker Inc, Genesco Inc, Hanesbrands Inc., Nike Inc., Performance Sports Group Ltd., PVH Corp., Ralph Lauren Corp, Skechers USA Inc., Steven Madden Ltd, **Under Armour Inc.**, VF Corp, Wolverine World Wide Inc..

The equity research analysts or strategists principally responsible for the preparation of Morgan Stanley Research have received compensation based upon various factors, including quality of research, investor client feedback, stock picking, competitive factors, firm revenues and overall investment banking revenues.

Morgan Stanley and its affiliates do business that relates to companies/instruments covered in Morgan Stanley Research, including market making, providing liquidity, fund management, commercial banking, extension of credit, investment services and investment banking. Morgan Stanley sells to and buys from customers the securities/instruments of companies covered in Morgan Stanley Research on a principal basis. Morgan Stanley may have a position in the debt of the Company or instruments discussed in this report.

Certain disclosures listed above are also for compliance with applicable regulations in non-US jurisdictions.

### STOCK RATINGS

Morgan Stanley uses a relative rating system using terms such as Overweight, Equal-weight, Not-Rated or Underweight (see definitions below). Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold and sell. Investors should carefully read the definitions of all ratings used in Morgan Stanley Research. In addition, since Morgan Stanley Research contains more complete information concerning the analyst's views, investors should carefully read Morgan Stanley Research, in its entirety, and not infer the contents from the rating alone. In any case, ratings (or research) should not be used or relied upon as investment advice. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations.

### Global Stock Ratings Distribution

(as of December 31, 2015)

For disclosure purposes only (in accordance with NASD and NYSE requirements), we include the category headings of Buy, Hold, and Sell alongside our ratings of Overweight, Equal-weight, Not-Rated and Underweight. Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold, and sell but represent recommended relative weightings (see definitions below). To satisfy regulatory requirements, we correspond Overweight, our most positive stock rating, with a buy recommendation; we correspond Equal-weight and Not-Rated to hold and Underweight to sell recommendations, respectively.

| STOCK RATING CATEGORY | COVERAGE UNIVERSE | | INVESTMENT BANKING CLIENTS (IBC) | | |
|---|---|---|---|---|---|
| | COUNT | % OF TOTAL | COUNT | % OF TOTAL IBC | % OF RATING CATEGORY |
| **Overweight/Buy** | **1193** | **35%** | **324** | **43%** | **27%** |
| **Equal-weight/Hold** | **1449** | **43%** | **330** | **44%** | **23%** |
| **Not-Rated/Hold** | **89** | **3%** | **12** | **2%** | **13%** |
| **Underweight/Sell** | **660** | **19%** | **88** | **12%** | **13%** |
| **TOTAL** | **3,391** | | **754** | | |

Data include common stock and ADRs currently assigned ratings. Investment Banking Clients are companies from whom Morgan Stanley received investment banking compensation in the last 12 months.

## Analyst Stock Ratings

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Not-Rated (NR). Currently the analyst does not have adequate conviction about the stock's total return relative to the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Unless otherwise specified, the time frame for price targets included in Morgan Stanley Research is 12 to 18 months.

## Analyst Industry Views

Attractive (A): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be attractive vs. the relevant broad market benchmark, as indicated below.

In-Line (I): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be in line with the relevant broad market benchmark, as indicated below.

Cautious (C): The analyst views the performance of his or her industry coverage universe over the next 12-18 months with caution vs. the relevant broad market benchmark, as indicated below.

Benchmarks for each region are as follows: North America - S&P 500; Latin America - relevant MSCI country index or MSCI Latin America Index; Europe - MSCI Europe; Japan - TOPIX; Asia - relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.

## Stock Price, Price Target and Rating History (See Rating Definitions)



Nike Inc. (NKE.N) – As of 1/9/16 in USD
Industry : Branded Apparel & Footwear

Stock Rating History: 1/1/13 : E/I; 10/29/13 : O/I

Price Target History: 2/24/12 : NA; 10/29/13 : 42.5; 7/2/14 : 44; 9/30/14 : 52.5; 6/26/15 : 54.5; 8/20/15 : 59.5; 9/25/15 : 65; 10/12/15 : 65.5; 12/3/15 : 69.5

Source: Morgan Stanley Research    Date Format: MM/DD/YY    Price Target : -- No Price Target Assigned (NA)
Stock Price (Not Covered by Current Analyst) —— Stock Price (Covered by Current Analyst) ——
Stock and Industry Ratings (abbreviations below) appear as ◆ Stock Rating/Industry View
Stock Ratings: Overweight (O) Equal-weight (E) Underweight (U) Not-Rated (NR) No Rating Available (NA)
Industry View: Attractive (A) In-line (I) Cautious (C) No Rating (NR)

Effective January 13, 2014, the stocks covered by Morgan Stanley Asia Pacific will be rated relative to the analyst's industry (or industry team's) coverage.

Effective January 13, 2014, the industry view benchmarks for Morgan Stanley Asia Pacific are as follows: relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.



## Important Disclosures for Morgan Stanley Smith Barney LLC Customers

Important disclosures regarding the relationship between the companies that are the subject of Morgan Stanley Research and Morgan Stanley Smith Barney LLC or Morgan Stanley or any of their affiliates, are available on the Morgan Stanley Wealth Management disclosure website at www.morganstanley.com/online/researchdisclosures. For Morgan Stanley specific disclosures, you may refer to www.morganstanley.com/researchdisclosures.

Each Morgan Stanley Equity Research report is reviewed and approved on behalf of Morgan Stanley Smith Barney LLC. This review and approval is conducted by the same person who reviews the Equity Research report on behalf of Morgan Stanley. This could create a conflict of interest.

## Other Important Disclosures

Morgan Stanley & Co. International PLC and its affiliates have a significant financial interest in the debt securities of Hanesbrands Inc., Nike Inc., PVH Corp., VF Corp, Vista Outdoor Inc..

Morgan Stanley is not acting as a municipal advisor and the opinions or views contained herein are not intended to be, and do not constitute, advice within the meaning of Section 975 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Morgan Stanley produces an equity research product called a "Tactical Idea." Views contained in a "Tactical Idea" on a particular stock may be contrary to the recommendations or views expressed in research on the same stock. This may be the result of differing time horizons, methodologies, market events, or other factors. For all research available on a particular stock, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Morgan Stanley Research is provided to our clients through our proprietary research portal on Matrix and also distributed electronically by Morgan Stanley to clients. Certain, but not all, Morgan Stanley Research products are also made available to clients through third-party vendors or redistributed to clients through alternate electronic means as a convenience. For access to all available Morgan Stanley Research, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Any access and/or use of Morgan Stanley Research is subject to Morgan Stanley's Terms of Use (http://www.morganstanley.com/terms.html). By accessing and/or using Morgan Stanley Research, you are indicating that you have read and agree to be bound by our Terms of Use (http://www.morganstanley.com/terms.html). In addition you consent to Morgan Stanley processing your personal data and using cookies in accordance with our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html), including for the purposes of setting your preferences and to collect readership data so that we can deliver better and more personalized service and products to you. To find out more information about how Morgan Stanley processes personal data, how we use cookies and how to reject cookies see our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html).

If you do not agree to our Terms of Use and/or if you do not wish to provide your consent to Morgan Stanley processing your personal data or using cookies please do not access our research.

Morgan Stanley Research does not provide individually tailored investment advice. Morgan Stanley Research has been prepared without regard to the circumstances and objectives of those who receive it. Morgan Stanley recommends that investors independently evaluate particular investments and strategies, and encourages investors to seek the advice of a financial adviser. The appropriateness of an investment or strategy will depend on an investor's circumstances and objectives. The securities, instruments, or strategies discussed in Morgan Stanley Research may not be suitable for all investors, and certain investors may not be eligible to purchase or participate in some or all of them. Morgan Stanley Research is not an offer to buy or sell or the solicitation of an offer to buy or sell any security/instrument or to participate in any particular trading strategy. The value of and income from your investments may vary because of changes in interest rates, foreign exchange rates, default rates, prepayment rates, securities/instruments prices, market indexes, operational or financial conditions of companies or other factors. There may be time limitations on the exercise of options or other rights in securities/instruments transactions. Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized. If provided, and unless otherwise stated, the closing price on the cover page is that of the primary exchange for the subject company's securities/instruments.

The fixed income research analysts, strategists or economists principally responsible for the preparation of Morgan Stanley Research have received

compensation based upon various factors, including quality, accuracy and value of research, firm profitability or revenues (which include fixed income trading and capital markets profitability or revenues), client feedback and competitive factors. Fixed Income Research analysts', strategists' or economists' compensation is not linked to investment banking or capital markets transactions performed by Morgan Stanley or the profitability or revenues of particular trading desks.

The "Important US Regulatory Disclosures on Subject Companies" section in Morgan Stanley Research lists all companies mentioned where Morgan Stanley owns 1% or more of a class of common equity securities of the companies. For all other companies mentioned in Morgan Stanley Research, Morgan Stanley may have an investment of less than 1% in securities/instruments or derivatives of securities/instruments of companies and may trade them in ways different from those discussed in Morgan Stanley Research. Employees of Morgan Stanley not involved in the preparation of Morgan Stanley Research may have investments in securities/instruments or derivatives of securities/instruments of companies mentioned and may trade them in ways different from those discussed in Morgan Stanley Research. Derivatives may be issued by Morgan Stanley or associated persons.

With the exception of information regarding Morgan Stanley, Morgan Stanley Research is based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We have no obligation to tell you when opinions or information in Morgan Stanley Research change apart from when we intend to discontinue equity research coverage of a subject company. Facts and views presented in Morgan Stanley Research have not been reviewed by, and may not reflect information known to, professionals in other Morgan Stanley business areas, including investment banking personnel.

Morgan Stanley Research personnel may participate in company events such as site visits and are generally prohibited from accepting payment by the company of associated expenses unless pre-approved by authorized members of Research management.

Morgan Stanley may make investment decisions that are inconsistent with the recommendations or views in this report.

To our readers in Taiwan: Information on securities/instruments that trade in Taiwan is distributed by Morgan Stanley Taiwan Limited ("MSTL"). Such information is for your reference only. The reader should independently evaluate the investment risks and is solely responsible for their investment decisions. Morgan Stanley Research may not be distributed to the public media or quoted or used by the public media without the express written consent of Morgan Stanley. Information on securities/instruments that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation or a solicitation to trade in such securities/instruments. MSTL may not execute transactions for clients in these securities/instruments. To our readers in Hong Kong: Information is distributed in Hong Kong by and on behalf of, and is attributable to, Morgan Stanley Asia Limited as part of its regulated activities in Hong Kong. If you have any queries concerning Morgan Stanley Research, please contact our Hong Kong sales representatives.

Morgan Stanley is not incorporated under PRC law and the research in relation to this report is conducted outside the PRC. Morgan Stanley Research does not constitute an offer to sell or the solicitation of an offer to buy any securities in the PRC. PRC investors shall have the relevant qualifications to invest in such securities and shall be responsible for obtaining all relevant approvals, licenses, verifications and/or registrations from the relevant governmental authorities themselves.

Morgan Stanley Research is disseminated in Brazil by Morgan Stanley C.T.V.M. S.A.; in Mexico by Morgan Stanley México, Casa de Bolsa, S.A. de C.V which is regulated by Comision Nacional Bancaria y de Valores. Paseo de los Tamarindos 90, Torre 1, Col. Bosques de las Lomas Floor 29, 05120 Mexico City; in Japan by Morgan Stanley MUFG Securities Co., Ltd. and, for Commodities related research reports only, Morgan Stanley Capital Group Japan Co., Ltd; in Hong Kong by Morgan Stanley Asia Limited (which accepts responsibility for its contents) and by Bank Morgan Stanley AG, Hong Kong Branch; in Singapore by Morgan Stanley Asia (Singapore) Pte. (Registration number 199206298Z) and/or Morgan Stanley Asia (Singapore) Securities Pte Ltd (Registration number 200008434H), regulated by the Monetary Authority of Singapore (which accepts legal responsibility for its contents and should be contacted with respect to any matters arising from, or in connection with, Morgan Stanley Research) and by Bank Morgan Stanley AG, Singapore Branch (Registration number T11FC0207F); in Australia to "wholesale clients" within the meaning of the Australian Corporations Act by Morgan Stanley Australia Limited A.B.N. 67 003 734 576, holder of Australian financial services license No. 233742, which accepts responsibility for its contents; in Australia to "wholesale clients" and "retail clients" within the meaning of the Australian Corporations Act by Morgan Stanley Wealth Management Australia Pty Ltd (A.B.N. 19 009 145 555, holder of Australian financial services license No. 240813, which accepts responsibility for its contents; in Korea by Morgan Stanley & Co International plc, Seoul Branch; in India by Morgan Stanley India Company Private Limited; in Indonesia by PT Morgan Stanley Asia Indonesia; in Canada by Morgan Stanley Canada Limited, which has approved of and takes responsibility for its contents in Canada; in Germany by Morgan Stanley Bank AG, Frankfurt am Main and Morgan Stanley Private Wealth Management Limited, Niederlassung Deutschland, regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin); in Spain by Morgan Stanley, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that Morgan Stanley Research has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations; in the US by Morgan Stanley & Co. LLC, which accepts responsibility for its contents. Morgan Stanley & Co. International plc, authorized by the Prudential Regulatory Authority and regulated by the Financial Conduct Authority and the Prudential Regulatory Authority, disseminates in the UK research that it has prepared, and approves solely for the purposes of section 21 of the Financial Services and Markets Act 2000, research which has been prepared by any of its affiliates. RMB Morgan Stanley (Proprietary) Limited is a member of the JSE Limited and regulated by the Financial Services Board in South Africa. RMB Morgan Stanley (Proprietary) Limited is a joint venture owned equally by Morgan Stanley International Holdings Inc. and RMB Investment Advisory (Proprietary) Limited, which is wholly owned by FirstRand Limited. The information in Morgan Stanley Research is being disseminated by Morgan Stanley Saudi Arabia, regulated by the Capital Market Authority in the Kingdom of Saudi Arabia , and is directed at Sophisticated investors only.

The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (DIFC Branch), regulated by the Dubai Financial Services Authority (the DFSA), and is directed at Professional Clients only, as defined by the DFSA. The financial products or financial services to which this research relates will only be made available to a customer who we are satisfied meets the regulatory criteria to be a Professional Client.

The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (QFC Branch), regulated by the Qatar Financial Centre Regulatory Authority (the QFCRA), and is directed at business customers and market counterparties only and is not intended for Retail Customers as defined by the QFCRA.

As required by the Capital Markets Board of Turkey, investment information, comments and recommendations stated here, are not within the scope of investment advisory activity. Investment advisory service is provided exclusively to persons based on their risk and income preferences by the authorized firms. Comments and recommendations stated here are general in nature. These opinions may not fit to your financial status, risk and return preferences. For this reason, to make an investment decision by relying solely to this information stated here may not bring about outcomes that fit your expectations. The trademarks and service marks contained in Morgan Stanley Research are the property of their respective owners. Third-party data providers make no warranties or representations relating to the accuracy, completeness, or timeliness of the data they provide and shall not have liability for any damages relating to such data. The Global Industry Classification Standard (GICS) was developed by and is the exclusive property of MSCI and S&P. Morgan Stanley Research, or any portion thereof may not be reprinted, sold or redistributed without the written consent of Morgan Stanley.

**INDUSTRY COVERAGE: Branded Apparel & Footwear**

| COMPANY (TICKER) | RATING (AS OF) | PRICE¹ (01/08/2016) |
|---|---|---|
| **Jay Sole** | | |
| Caleres Inc (CAL.N) | E (12/22/2014) | $23.70 |
| Columbia Sportswear Co. (COLM.O) | U (01/09/2015) | $46.29 |
| Deckers Outdoor Corp (DECK.N) | E (02/09/2015) | $44.28 |
| DSW Inc. (DSW.N) | U (10/29/2014) | $23.34 |
| Finish Line Inc (FINL.O) | E (09/22/2014) | $16.97 |
| Foot Locker Inc (FL.N) | E (10/29/2013) | $62.70 |
| Genesco Inc (GCO.N) | E (10/29/2014) | $55.62 |
| Hanesbrands Inc. (HBI.N) | O (01/09/2015) | $29.00 |
| Nike Inc. (NKE.N) | O (10/29/2013) | $58.87 |
| Performance Sports Group Ltd. (PSG.N) | O (08/19/2014) | $8.14 |
| PVH Corp. (PVH.N) | E (03/13/2014) | $70.34 |
| Ralph Lauren Corp (RL.N) | E (01/16/2014) | $103.59 |
| Skechers USA Inc. (SKX.N) | O (10/29/2014) | $26.77 |
| Steven Madden Ltd (SHOO.O) | E (10/29/2014) | $29.43 |
| Under Armour Inc. (UA.N) | U (01/10/2016) | $75.00 |
| VF Corp (VFC.N) | E (02/12/2014) | $58.22 |
| Vista Outdoor Inc. (VSTO.N) | E (05/29/2015) | $46.33 |
| Wolverine World Wide Inc. (WWW.N) | E (10/29/2014) | $15.73 |

Stock Ratings are subject to change. Please see latest research for each company.

* Historical prices are not split adjusted.

© 2016 Morgan Stanley

# EXHIBIT D

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.   Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

UNDER ARMOUR

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7TH day of _April_____, 2017.

> Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund
>
> By: _____
>
> Its: _____

UNDER ARMOUR

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Class-A Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/27/2016 | 11,613 | $68.63 |
| 02/03/2016 | 4,759 | $79.91 |
| 02/04/2016 | 6,266 | $79.50 |
| 02/05/2016 | 21,888 | $77.85 |
| 02/08/2016 | 5,837 | $71.64 |
| 02/10/2016 | 7,963 | $74.94 |
| 02/11/2016 | 2,948 | $71.76 |
| 02/12/2016 | 4,375 | $75.13 |
| 02/16/2016 | 6,836 | $79.31 |
| 02/19/2016 | 7,795 | $79.90 |
| 02/22/2016 | 3,312 | $80.88 |
| 02/23/2016 | 8,792 | $80.35 |
| 02/24/2016 | 1,763 | $80.25 |
| 02/29/2016 | 3,016 | $83.85 |
| 03/07/2016 | 2,722 | $83.08 |
| 03/08/2016 | 3,269 | $81.67 |
| 03/09/2016 | 2,210 | $79.11 |
| 03/09/2016 | 11,998 | $79.83 |
| 03/10/2016 | 6,835 | $80.79 |
| 03/15/2016 | 3,268 | $80.83 |
| 03/16/2016 | 572 | $79.96 |
| 04/15/2016 | 14,880 | $42.40 |
| 04/18/2016 | 8,958 | $43.32 |
| 04/19/2016 | 2,958 | $43.96 |
| 04/20/2016 | 11,375 | $43.93 |
| 04/22/2016 | 3,413 | $46.74 |
| 04/25/2016 | 2,275 | $46.48 |
| 04/26/2016 | 15,641 | $46.75 |
| 04/27/2016 | 3,014 | $45.07 |
| 04/29/2016 | 2,997 | $43.70 |
| 05/02/2016 | 5,119 | $43.67 |
| 05/03/2016 | 9,953 | $42.76 |
| 05/04/2016 | 43,317 | $40.07 |
| 05/13/2016 | 64,300 | $37.35 |
| 06/02/2016 | 17,148 | $36.58 |
| 06/03/2016 | 17,147 | $36.55 |
| 06/06/2016 | 7,613 | $36.80 |
| 06/07/2016 | 7,668 | $37.53 |
| 06/08/2016 | 12,770 | $38.69 |
| 06/09/2016 | 8,661 | $38.63 |
| 06/10/2016 | 10,393 | $38.55 |
| 12/09/2016 | 18,002 | $32.94 |
| 12/12/2016 | 34,796 | $31.98 |
| 12/13/2016 | 28,862 | $32.59 |
| 12/14/2016 | 16,144 | $31.85 |

**Class-C spin-off received**

| Date Acquired | Type/Amount of Securities Acquired | Closing Price |
|---|---|---|
| 04/08/2016 | 11,613 | $44.02 |
| 04/08/2016 | 4,759 | $44.02 |
| 04/08/2016 | 6,266 | $44.02 |
| 04/08/2016 | 21,888 | $44.02 |
| 04/08/2016 | 5,837 | $44.02 |
| 04/08/2016 | 7,963 | $44.02 |
| 04/08/2016 | 2,948 | $44.02 |
| 04/08/2016 | 4,375 | $44.02 |
| 04/08/2016 | 6,836 | $44.02 |
| 04/08/2016 | 7,795 | $44.02 |
| 04/08/2016 | 3,312 | $44.02 |
| 04/08/2016 | 8,792 | $44.02 |
| 04/08/2016 | 1,763 | $44.02 |
| 04/08/2016 | 3,016 | $44.02 |
| 04/08/2016 | 2,722 | $44.02 |
| 04/08/2016 | 3,269 | $44.02 |
| 04/08/2016 | 2,210 | $44.02 |
| 04/08/2016 | 11,998 | $44.02 |
| 04/08/2016 | 6,835 | $44.02 |
| 04/08/2016 | 3,268 | $44.02 |
| 04/08/2016 | 572 | $44.02 |

**Class-C Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 04/15/2016 | 14,918 | $41.40 |
| 04/18/2016 | 8,981 | $42.15 |
| 04/19/2016 | 2,965 | $42.96 |
| 04/20/2016 | 11,404 | $43.16 |
| 04/22/2016 | 3,421 | $45.01 |
| 04/25/2016 | 2,281 | $44.70 |
| 04/26/2016 | 15,681 | $44.21 |
| 04/27/2016 | 3,022 | $42.59 |
| 04/29/2016 | 3,009 | $40.85 |
| 05/02/2016 | 5,132 | $40.24 |
| 05/03/2016 | 9,979 | $39.94 |
| 05/04/2016 | 47,244 | $37.35 |

# EXHIBIT E

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MONROE   COUNTY   EMPLOYEES'   RETIREMENT   SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Monroe County Employees' Ret. Sys. v. The Southern Co., et al.*, No. 1:17-cv-00241 (N.D. Ga.)
*Monroe County Employees' Ret. Sys. v. The Advisory Board Company, et al.*, No. 1:17-cv-05886 (S.D.N.Y.)
*Gordon v. Nielsen Holdings plc, et al.*, No. 1:18-cv-7143 (S.D.N.Y.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

UNDER ARMOUR

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___1st___ day of ___November___, 2018.

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: ___Chairman_____

- 2 -

UNDER ARMOUR

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Class A**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 11/20/2015 | 676 | $47.33 |
| 01/28/2016 | 670 | $42.67 |
| 02/10/2016 | 790 | $38.90 |
| 03/01/2016 | 308 | $43.49 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 07/08/2016 | 783 | $40.30 |
| 10/26/2016 | 1,725 | $32.12 |
| 10/27/2016 | 1,475 | $30.71 |

*Opening position of 1,539 shares.

**Class C**

| Date Spin-Off Received | Amount of Shares Received | Price |
|---|---|---|
| 04/08/2016 | 4,011.271 | $43.71 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 06/29/2016 | 0.271 | $35.91 |
| 09/07/2016 | 701 | $35.46 |
| 10/27/2016 | 1,575 | $27.08 |
| 10/28/2016 | 1,372 | $26.12 |
| 10/31/2016 | 363 | $26.01 |

Adjustment factor of 1.0071 applied to all transctions (shares and prices) to reflect the 6/13/2016 stock dividend for CL-C shares.

Adjustment factor of 0.51658 applied to all transctions (prices) to reflect the 4/8/2016 spin-off for CL-A shares.

# EXHIBIT F

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Chris Sterckx and Johan Lema, on behalf of KBC Asset Management NV ("KBC"), on account of its funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      We have reviewed a complaint against Under Armour, Inc. ("Under Armour").

2.      We are duly authorized to institute legal action on behalf of KBC and the Funds, including litigation against Under Armour and any other defendants.

3.      KBC and the Funds did not purchase or sell the security that is the subject of this litigation at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.      KBC is willing to serve as lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  KBC also understands that it is subject to the jurisdiction of the Court and will be bound by all rulings of the Court, including rulings regarding any judgments.

5.      KBC will not accept any payment for serving as a representative party beyond the Funds' *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

6.      KBC has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

*City of Warwick Municipal Employees Pension Fund v. Rackspace Hosting, Inc.*, No. 1:17-cv-03501 (S.D.N.Y. July 10, 2017);

*Kleszynski v. General Motors Co.*, No. 17-cv-3213 (E.D.N.Y. July 26, 2017*)*; *Pope v. General Motors Co.*, No. 17-cv-12185 (E.D. Mich. July 26, 2017);

*Craig v. CenturyLink, Inc.*, No. 17-cv-01005 (W.D. La. Aug. 21, 2017); *Scott v. CenturyLink, Inc.*, No. 17-cv-01033 (W.D. La. Aug. 21, 2017); *Thummeti v. CenturyLink, Inc.*, No. 17-cv-01065 (W.D. La. Aug. 21, 2017);

*Parchmann v. MetLife, Inc.*, No. 1:18-cv-00780 (E.D.N.Y. Apr. 6, 2018);

*Retail Wholesale Department Store Union Local 338 Retirement Fund v. Synchrony Financial*, No. 3:18-cv-01818 (D. Conn. Jan. 2, 2019);

*City of Warren Police and Fire Retirement System v. DXC Technology Company*, No. 1:18-cv-01599 (E.D. Va. Feb. 25, 2019); and

*Gross v. AT&T Inc. et al.*, No. 1:19-cv-02892 (S.D.N.Y. May 31, 2019).

7.      KBC understands that this is not a claim form, and that the Funds' ability to share in any recovery as a member of the class is unaffected by KBC's decision to serve as a representative party.

8.      Attached hereto as Schedule A is a complete listing of all transactions the Funds made during the Class Period in the security that is the subject of this litigation.  KBC will provide records of those transactions upon request.

9.      KBC is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information and belief.**

Executed this 6 day of January, 2020.

For KBC Asset Management NV:

Chris Sterckx
Managing Director

Johan Lema
Managing Director

# Schedule A

## KBC Asset Management NV

## Under Armour Inc. (UA)

Class Period: 09/16/2015 - 11/01/2019

| | | Date | Shares | Price |
|---|---|---|---|---|
| **INDEX FUND** | | | | |
| | Purchases: | 4/8/2016 | 7,577.00 | 42.82 |
| | | 4/25/2016 | 2,900.00 | 44.26 |
| | | 6/13/2016 | 73.00 | 0.00 |
| | | 5/9/2017 | 7,882.00 | 19.81 |
| **KBC EQUITY FD** | | | | |
| | Purchases: | 4/8/2016 | 15,114.00 | 42.82 |
| | | 4/8/2016 | 4,595.00 | 42.82 |
| | | 4/8/2016 | 11,137.00 | 42.82 |
| | | 4/8/2016 | 1,227.00 | 42.82 |
| | | 4/29/2016 | 4,717.00 | 40.80 |
| | | 5/23/2016 | 4,707.00 | 34.83 |
| | | 6/13/2016 | 107.00 | 0.00 |
| | | 6/13/2016 | 32.00 | 0.00 |
| | | 6/13/2016 | 145.00 | 0.00 |
| | | 6/13/2016 | 8.00 | 0.00 |
| | | 6/24/2016 | 11,333.00 | 33.51 |
| | | 6/30/2016 | 16,746.00 | 36.40 |
| | | 9/26/2016 | 6,387.00 | 33.58 |
| | | 10/20/2016 | 2,283.00 | 33.42 |
| | | 10/24/2016 | 2,572.00 | 32.90 |
| | | 1/18/2017 | 153.00 | 25.35 |
| | | 1/27/2017 | 6,660.00 | 25.52 |
| | Sales: | 6/30/2016 | -9,796.00 | 36.37 |
| | | 6/30/2016 | -20,561.00 | 36.37 |
| | | 7/1/2016 | -8,907.00 | 36.84 |
| | | 7/11/2016 | -145.00 | 36.57 |
| | | 7/19/2016 | -5,843.00 | 36.95 |
| | | 8/18/2016 | -3,355.00 | 37.95 |
| | | 10/26/2016 | -2,743.00 | 27.46 |
| | | 11/2/2016 | -24,405.00 | 25.35 |
| | | 4/11/2017 | -10,178.00 | 18.04 |
| | | 6/12/2017 | -1,990.00 | 21.20 |

**PLATO INST.I.F**

| | | Date | Shares | Price |
|---|---|---|---|---|
| | Purchases: | 4/8/2016 | 3,053.00 | 42.82 |
| | | 6/13/2016 | 21.00 | 0.00 |
| | | 11/22/2016 | 4,904.00 | 24.01 |
| | Sales: | 12/6/2018 | -7,978.00 | 22.58 |

## Under Armour Inc. (UAA)

Class Period: 09/16/2015 - 11/01/2019

|  |  | Date | Shares | Price |
|---|---|---|---|---|
| **INDEX FUND** |  |  |  |  |
|  | Purchases: | 1/25/2016 | 1,443.00 | 68.10 |
|  |  |  |  |  |
| **KBC EQUITY FD** |  |  |  |  |
|  | Purchases: | 11/20/2015 | 11,161.00 | 92.01 |
|  |  | 11/25/2015 | 1,540.00 | 92.10 |
|  |  | 11/25/2015 | 5,533.00 | 92.10 |
|  |  | 11/25/2015 | 11,998.00 | 92.10 |
|  |  | 12/16/2015 | 1,508.00 | 83.11 |
|  |  | 1/29/2016 | 14,946.00 | 85.43 |
|  |  | 1/29/2016 | 4,638.00 | 85.43 |
|  |  | 2/18/2016 | 8,481.00 | 81.03 |
|  |  | 3/21/2016 | 1,040.00 | 85.51 |
|  |  | 3/21/2016 | 2,481.00 | 85.51 |
|  |  | 4/29/2016 | 5,185.00 | 43.94 |
|  |  | 6/2/2016 | 4,212.00 | 36.56 |
|  |  | 6/15/2016 | 1,623.00 | 37.76 |
|  |  | 6/30/2016 | 2,310.00 | 40.13 |
|  |  | 7/29/2016 | 26,063.00 | 39.46 |
|  |  | 9/7/2016 | 4,838.00 | 39.92 |
|  |  | 9/26/2016 | 19,969.00 | 38.60 |
|  |  | 10/24/2016 | 15,747.00 | 37.90 |
|  |  | 11/30/2016 | 284,310.00 | 30.85 |
|  |  | 11/30/2016 | 1,362.00 | 30.85 |
|  |  | 11/30/2016 | 22,558.00 | 30.85 |
|  |  | 1/12/2017 | 2,226.00 | 30.38 |
|  |  | 1/18/2017 | 5,265.00 | 29.35 |
|  |  | 1/27/2017 | 8,922.00 | 29.13 |
|  |  | 3/2/2017 | 291,754.00 | 20.94 |
|  |  | 8/22/2019 | 840.00 | 18.98 |
|  | Sales: | 12/4/2015 | -589.00 | 87.31 |
|  |  | 12/15/2015 | -1,655.00 | 81.52 |
|  |  | 12/15/2015 | -1,148.00 | 83.16 |
|  |  | 1/7/2016 | -1,098.00 | 78.00 |
|  |  | 1/12/2016 | -14,041.00 | 72.15 |

| Date | Shares | Price |
|---|---|---|
| 1/12/2016 | -3,767.00 | 72.15 |
| 1/12/2016 | -745.00 | 72.15 |
| 1/20/2016 | -2,396.00 | 67.34 |
| 1/25/2016 | -5,290.00 | 68.96 |
| 2/18/2016 | -1,751.00 | 81.03 |
| 6/30/2016 | -14,767.00 | 40.13 |
| 6/30/2016 | -4,595.00 | 40.13 |
| 6/30/2016 | -16,322.00 | 40.13 |
| 7/1/2016 | -2,683.00 | 40.43 |
| 10/3/2016 | -4,970.00 | 38.63 |
| 10/26/2016 | -3,171.00 | 31.81 |
| 10/31/2016 | -9,984.00 | 31.10 |
| 11/2/2016 | -35,716.00 | 30.79 |
| 1/3/2017 | -52,348.00 | 29.89 |
| 1/3/2017 | -35,977.00 | 29.87 |
| 1/31/2017 | -229,030.00 | 21.49 |
| 3/9/2017 | -8,792.00 | 19.15 |
| 3/31/2017 | -276,072.00 | 19.83 |
| 3/31/2017 | -1,362.00 | 19.78 |
| 4/11/2017 | -11,772.00 | 19.42 |
| 4/24/2017 | -18,614.00 | 19.44 |
| 6/12/2017 | -2,242.00 | 23.14 |
| 10/24/2019 | -840.00 | 20.86 |

**PLATO INST.I.F**

| | Date | Shares | Price |
|---|---|---|---|
| Purchases: | 11/25/2015 | 1,028.00 | 92.10 |
| | 12/6/2018 | 6,580.00 | 24.07 |

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ~~ABERDEEN CITY COUNCIL AS ADMINISTRATING AUTHORITY FOR THE NORTH EAST SCOTLAND PENSION FUND, and MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,~~ ) ) ) ) ) ) ) ) ) | Civil No. RDB-17-388 |
| | CLASS ACTION |
| ~~Plaintiffs,~~ ) | JURY TRIAL DEMANDED |
| ~~vs.~~ ) | |
| In re UNDER ARMOUR~~, INC., and KEVIN A. PLANK,~~ SECURITIES LITIGATION ) ) ) | |
| ~~Defendants.~~ ) ) ) ) | |

This Document Relates To:

   ALL ACTIONS.

**CONSOLIDATED ~~SECOND~~THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF THE ACTION .................................................................................2

III.    JURISDICTION AND VENUE .............................................................................~~5~~9

IV.     PARTIES ...............................................................................................................~~6~~10

V.      SUBSTANTIVE ALLEGATIONS .......................................................................~~8~~13

        A.      Background of the Company .......................................................~~8~~13

        B.      Plank Drove Under Armour's Aggressive Growth Strategy ................~~10~~14

        C.      Under Armour's Brand Heat Began to Die, Demand Weakened, and
                Sales Declined.........................................................................~~11~~16

        D.      Under Armour Ramps Up Its Promotional Activity ...................................18

        E.      Defendants Engaged in Suspect Sales Practices to Further Mask Slowing
                Demand and Maintain the Company's 20% Growth Streak....................20

                1.      Defendants Pull-Forward Sales and Stuff Channels to Artificially
                        Boost Revenues.......................................................................20

                2.      Defendants Induce Retailers to Take Unneeded Product with
                        Promises to Buyback Merchandise and Through Discounts and
                        Other Sweeteners ...................................................................24

        F.      Defendants' Declining Apparel Sales and Suspect Sales Practices Led to
                Excess Inventory and Liquidations.......................................................~~14~~26

        ~~E~~G.     Defendants Relied on Footwear and International Sales to Obscure the
                Company's Sales and Margin Declines ................................................~~16~~30

        ~~F.      The Company's Stock Price Declined When the~~

        H.      Under Armour's Declining Demand and Unsustainable Business
                Practices Catch Up to Them but Defendants Mislead the Market as to
                the True Reasons Behind the Company's Problems...................................31

        I.      The Market ~~Learned~~Began to Learn the Truth About the Company's
                Sales Problems~~17~~, Causing the Stock Price to Decline ..............................33

1495422_1

**Page**

J.      The SEC and DOJ Launched Investigations Into Under Armour's Accounting Practices and Related Disclosures, Plank Stepped Down as the Company's Chief Executive Officer, and the SEC Preliminarily Determined to File an Enforcement Action Against Defendants ............35

K.      Numerous Facts Support Defendants' Scienter .....................................~~19~~38

1.      ~~Defendant~~Numerous Facts Support Plank's Scienter ..................38

a.      Plank Had Direct Knowledge ~~or Reckless Disregard~~of, and Was Personally Implicated in, the Fraud ...................38

b.      Plank's Public Statements and Access to the Company's ~~Undisclosed Fundamental Shift~~Internal Systems and ~~Sales Problems~~ ...........................................................~~19~~Data ..................................................................................40

~~2~~c.      ~~Expert Opinion Confirms the~~The SportScan Data ~~Revealed by~~Cited in the Morgan Stanley ~~Was "Materially Consistent" with Under Armour~~Report Mirrored the Company's Internal Sales Data......................................~~26~~44

d.      ~~Defendant~~Plank~~Was Motivated to Maintain a Positive Market Perception of the Company and~~'s Participation in Company Meetings ..............................................................48

e.      Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value ...............~~28~~49

~~4.      Expert Opinion Confirms that Plank's Class Period Stock Sales Were Highly Suspicious~~ ........................................................~~33~~

2.      The Scienter of Company Executives Is Imputed to Defendant Under Armour .........................................................................~~37~~57

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .........................................................................................~~38~~61

A.      2015 Investor Day...........................................................................~~39~~63

B.      ~~3Q15~~Third Quarter 2015 Financial Results..........................................~~42~~66

**Page**

VII.    INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS
CONTINUE TO MISLEAD THE MARKET ............................................................. 4672

A.      Published Retail Data Exposes Growth, Market Share, and ASP
Declines at Under Armour .................................................................. 4673

B.      Misleadingly Positive 4Q15Fourth Quarter 2015 and FY15Fiscal Year
2015 Financial Results and Downplay of the Morgan Stanley Report.. 5077

C.      Press Release Reiterating 2016 Financial Outlook Despite Sports
Authority's Bankruptcy ...................................................................... 5584

D.      Misleadingly Positive 1Q16First Quarter 2016 Financial Results and
Guidance Raise ................................................................................... 5686

E.      Departures of the Company's Chief Merchandising Officer and Chief
Digital Officer ..................................................................................... 6193

F.      Reduced Financial Guidance Tied to the Sports Authority Bankruptcy6295

G.      Under Armour Bond Offering ............................................................. 6498

H.      Disappointing 2Q16Second Quarter 2016 Financial Results: Partial
Revelations of a Growth Slowdown .................................................... 6599

I.      Goldman Sachs Global Retailing Conference ..................................... 70107

J.      Disappointing 3Q16Third Quarter 2016 Financial Results: Further
Revelations of a Growth Slowdown and Compressed Margins .......... 71110

K.      Disappointing 4Q16 & FY16Fourth Quarter 2016 and Fiscal Year 2016
Financial Results: Revelations of a Severe Growth Slowdown and the
Sudden Resignation of CFO Molloy .................................................. 76118

L.      The Fallout From the Fraud Continued, but Defendants Conceal the Full
Truth From Investors ......................................................................... 127

M.     The Company Announces Plank's Resignation as CEO ........................ 138

N.      Federal Investigations Into the Company's Accounting Practices and
Related Disclosures ............................................................................ 139

VIII.   DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND
MISLEADING FINANCIAL STATEMENTS ................................................... 145

1495422_1

Page

    A.    Under Armour Failed to Disclose Its Improper Sales Practices ..............146

        1.    The Financial Impact of Channel Stuffing on Under Armour's Quarterly Revenue ........................................................................149

        2.    The Impact of Channel Stuffing on Future Results ....................150

    B.    Under Armour's Continued Growth Was Achieved by Improperly Recognizing Revenue on Contingent Sales and Understating Reserves for Customer Returns, Allowances, Markdowns, and Discounts ...........151

        1.    Improper Contingent Sales ........................................................152

    C.    Improper Reserves for Customer Returns, Allowances, Markdowns, and Discounts.................................................................................................156

    D.    Under Armour Overstated Inventory ..................................................159

IX.    POST-CLASS PERIOD REVELATIONS ...................................................~~82~~161

~~IX.~~    ~~VERIFIED DERIVATIVE COMPLAINT~~ ...............................................~~88~~

X.    LOSS CAUSATION AND ECONOMIC LOSS .........................................~~90~~166

    A.    January 10, 2016 Revelations ...............................................~~90~~167

    B.    May 3, 2016 Revelations ......................................................~~90~~167

    C.    May 31, 2016 Revelations ....................................................~~91~~168

    D.    July 26, 2016 Revelations .....................................................~~91~~168

    E.    October 25, 2016 Revelations ...............................................~~92~~168

    F.    January 31, 2017 Revelations ...............................................~~92~~169

    G.    August 1, 2017 Revelations ..................................................~~92~~169

    H.    November 3, 2019 Revelations...............................................170

XI.    PRESUMPTION OF RELIANCE .............................................~~94~~172

XII.    NO SAFE HARBOR ................................................................~~96~~174

XIII.    CLASS ACTION ALLEGATIONS ...........................................~~98~~176

Page

COUNT I ......................................................................................................................... 100

COUNT II ........................................................................................................................ 103

COUNT III ...................................................................................................................... 104

PRAYER FOR RELIEF .................................................................................................. 106

JURY TRIAL DEMANDED ........................................................................................... 107

## I.   INTRODUCTION

1.      Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") and"), Monroe County Employees' Retirement System ("Monroe"), and KBC Asset Management NV ("KBC") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.      Plaintiffs bring this federal class action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Under Armour, Inc. ("Under Armour" or "Company") between September 16, 2015, and January 30, 2017November 1, 2019, inclusive ("Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants Under Armour and the Company's former Chief Executive Officer ("CEO") and Chairman of the Board Kevin A. Plank ("Plank") (collectively, "Defendants").[1]

3.      Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel which included, without limitation: (a) review and analysis of public filings made by Under Armour and other related parties and non-parties with the United StatesU.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties; (e) interviews with factual sources, including individuals formerly employed

---

[1]    In the Court's September 19, 2018, Memorandum Opinion, the Court dismissed with prejudice the Section 11 and 15 claims brought under the Securities Act of 1933.  ECF No. 74 at 2, 50.  As such, Plaintiffs will not re-allege and replead these already rejected claims, but preserve their right to appeal the dismissal.  *See Young v. City of Mount Rainier*, 238 F.3d 567, 572-73 (4th Cir. 2001).

by the Company and its retail partners; and (f) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

4.    Under Armour is one of the largest sports apparel companies in the world.  The Company sells branded athletic products, which it divides into three categories: apparel, footwear, and accessories.  By a wide margin, apparel is the Company's largest selling product, accounting for over two-thirds of net revenue in 2016.  ~~Nearly~~During the Class Period, nearly two-thirds of the Company's sales ~~a~~were made through wholesale channels such as sporting goods chains (*e.g.*, Dick's Sporting Goods ("Dick's"), Foot Locker, Champs, Finish Line~~)~~, and The Sports Authority ("Sports Authority" or "TSA")).  While Under Armour products are available worldwide, over three-quarters of its sales come from North America.  According to Plank, North American apparel is the Company's "largest and most profitable business by far."

5.    Under Armour faces steep competition in the athletic apparel industry.  The Company's chief rivals, Nike and Adidas, have dominated the sector for decades.  But the Company slowly gained market share since its formation in 1996, capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour surpassed Adidas to become the number two sportswear brand by revenue in the United States~~,~~ and seemed poised to challenge Nike's supremacy as the top brand.

6.    Defendants knew that growth was critical to keep pace with competitors and to perpetuate the market's perception of the Company as a leading premium sports brand.  For 26 consecutive quarters, spanning from the second quarter of 2010 ("2Q10") to the third quarter of 2016 ("3Q16"), Under Armour reported a compounded annual growth rate of 20% or more.  At

every turn, Plank reminded investors of this feat, noting that it was shared by only one other company in the S&P 500, and assured the market that such growth would continue, and continue as a premium-priced brand.

7.     Indeed, at the start of the Class Period, during the Company's Investor Day on September 16, 2015 ("2015 Investor Day"), Defendants boasted that "demand for our brand has never been stronger" and led the market to believe that the Company's incredible growth streak would continue.

8.     In reality, however, the Company was ~~then~~ experiencing a severe decline in its apparel business due to its "brand heat" (*i.e.*, customer demand) dying.  In other words, customer demand for core products that the Company had successfully sold for years had begun to wane. As Defendants would later admit, the Company failed to compensate for this decline by offering new and fashionable products in line with the latest consumer trends, such as athletic leisure apparel (~~aka~~a.k.a. "lifestyle" or "athleisure").  As a result, the Company's apparel sales began to slow, causing it to lose market share to Nike and Adidas.

9.     ~~Faced with declining~~Although this slowdown in demand ~~and excess inventory due~~was apparent to ~~unsold products~~Defendants in 2015, Plank demanded that Under Armour maintain aggressive sales goals based on its historic 20% growth that were now unrealistic. However, it was never acceptable within the Company to lower these unrealistic goals – even after the Company's second biggest account, Sports Authority, declared bankruptcy.

~~9.~~10.   Accordingly, the Company abandoned its fundamental sales philosophy of competing on brand strength over price~~.  Instead, the Company~~, and resorted to lowering sales prices and offering promotions~~,~~ and ~~had to liquidate~~liquidating excess inventory~~at~~.  Defendants' steep ~~discounts.  This, in turn~~discounting, however, contributed to a drop in the Company's

- 3 -

average sales prices (("ASPs")") at a time when competitors in the sports apparel industry, such as the Company's chief rival Nike, were steadily increasing average sales prices.their own ASPs. Defendants also attempted to offset the decline of the Company's core apparel business by accelerating investments in lower margin footwear products and international expansion, which provided a scapegoat for the Company's margin declines.  While these strategies helped to temporarily prop up revenue growth, they were alone insufficient to generate the sales necessary to continue the Company's growth streak of 20%.

11.    ToAs a result, Defendants resorted to a slew of improper and/or concealed sales and accounting practices that violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations.  These practices were used repeatedly in 2015 and/or 2016, with multiple retailers such as the Company's largest customers, Dick's and Sports Authority, and included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, resulting in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.X. Co.[2] so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at the Company's own stores; and (f) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that

---

[2]   T.J.X. Co. is an American multinational off-price department store corporation that includes TJ Maxx, Marshalls, HomeGoods, Homesense, and Sierra in the United States.

- 4 -

Sports Authority was headed to bankruptcy and collectability of the revenue was not probable. These suspect sales practices enabled the Company to increase quarterly revenue, mask slowing demand for Under Armour products, and extend the 26-quarter streak of 20% sales growth. However, these illicit tactics were unsustainable.  Although they helped Under Armour hit the number and close the gap, they were robbing from future quarters.  As one former Under Armour sales executive explained to *The Wall Street Journal* ("WSJ"), the "[p]roblem is once this starts it doesn't seem to stop.  We found ourselves pulling forward every quarter."[3]

12.     The strains on Under Armour's business were evident inside the Company, as were the Company's suspect sales practices.  Plank and other executives knew of the Company's fading brand heat, excess inventories, steep discounting, pull forwards, and other machinations employed to boost revenue and hit Plank's aggressive sales targets.  Indeed, the U.S. Department of Justice ("DOJ") and SEC are investigating Defendants' involvement in these practices, including emails that show Plank knew about efforts to move revenue between quarters.[4]

~~10.~~13.  However, to preserve the Company's carefully cultivated image as a fast-growing, premium sports brand and a legitimate challenger to Nike, Defendants concealed ~~these~~ the Company's problems and improper accounting and sales practices during the Class Period.  Rather than explain to the market that "brand heat" for the Company's apparel was dying and that the Company was forced to employ improper accounting and sales tricks to maintain a façade of consistent growth, Defendants instead falsely claimed that Under Armour apparel ~~was~~sales were stronger than ever.  ~~Defendants~~Plank trumpeted explosive growth and strong customer demand,

---

[3]   Ex. A, Khadeeja Safdar & Aruna Viswanatha, *Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter'*, WALL ST. J., Nov. 14, 2019, at 3.

[4]   *See id.* at 2; *see also* Ex. B, Aruna Viswanatha & Khadeeja Safdar, *Under Armour Is Subject of Federal Accounting Probes*, WALL ST. J., Nov. 3, 2019, at 1.

while downplaying and concealing the Company's suspect sales practices, declining brand heat, ballooning inventory, liquidations, and gross margin compression. And, despite these negative trends afflicting the Company's core business, Defendants doubled down on their fraud on January 28, 2016, by repeatedly emphasizing the purportedly continuing premium brand strategy.

11.    Defendants also attempted to offset the decline of the Company's core apparel business by accelerating investments in lower margin footwear products and international expansion. This expensive strategy temporarily propped up revenue growth and provided a scapegoat for the Company's margin declines.

12.14.    As a result, Under Armour's common stock prices were artificially inflated throughout the Class Period. In fact, analysts noted that Under Armour stock achieved an "unprecedented valuation" near the beginning of the Class Period. Plank personally cashed in on suchthis artificial inflation (and the "unprecedented valuation") by selling a substantial amount of his Company stock for total proceeds of $138.2 million during the Class Period. As detailed below, and in the attached expert declaration, these sales were suspicious in timing and amount and dramatically out of line with Plank's selling practices before and after the Class Period. Indeed, over just nine days in November 2015 and April 2016, Plank sold 36% and 42%, respectively, of the shares he had available to sell shortly after making material misstatements and omissions. Since then2016, Plank has not sold a single share of his Company stock. Defendants also leveraged their fraud by raising nearly $600 million from the sale of then-investment grade bonds ("Bonds") during the Class Period.

13.15.    On The first cracks in Under Armour's veneer began to appear on January 10, 2016, when Morgan Stanley published a report ("Morgan Stanley Report") relying on fact-based industry sales data that revealed declining average sales pricesASPs, market share, and margins since spring

- 6 -

2015, before the start of the Class Period.[5] The sales data in the report was materially consistent with Under Armour's own internal sales data available to Defendants, through multiple sources. In response to this report the Morgan Stanley Report, Under Armour's stock price declined sharply, which represented the beginning of a decline in Under Armour common stock prices as the truth began to emerge. However, Defendants denied the report and reassured investors that the Company's financial results and prospects were as strong as ever and that the Company was and would continue to be a premium brand that would not compete on price. The market credited the Company's claim with numerous analysts issuing reports stating that Under Armour was now pursuing its premium-priced strategy even more aggressively.

14.16. Ultimately, the Company was no longer able to keep the charade going. The Company's illicit and unsustainable sales practices were no longer able to prop up Under Armour's sales, and its purported growth streak came to a crashing halt in the fourth quarter of 2016. Despite this months of pushback from Defendants against the Morgan Stanley Report data and their assurances that Under Armour would continue to grow and that its brand was strong, the market continued to learn of Under Armour's true financial condition through a series of additional disclosures, including a dramatic slowdown in growth, compressed margins, excess inventory, and Company executive resignations that included two of the Company's Chief Financial Officers ("CFO"), Brad Dickerson ("Dickerson") and Lawrence P. Molloy ("Molloy")., ") (who left after only 13 months on the job.). The market's reaction to these partial revelations caused precipitous drops in Under Armour's common stock prices and losses of millions of dollars by Under Armour's investors.

---

[5]   Ex. C, Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016) ("Morgan Stanley Report").

15.17.  Yet Plank – despite knowing of the Company's efforts to move revenue between quarters and the strains in Under Armour's business – continued to tell investors that that "our demand is still there," that Under Armour's revenue growth and "growth story" were "intact," that its "brand is truly stronger than it's ever been," and that the Company's problems were "due to the function of our extreme growth."  The Company's downward spiral continued after the Class Period ended on January 30, 2017thereafter, confirming the depth of the problems alleged herein. During the first half of 2017, Under Armour continued to report drastically reduced sales growth, lower margins, and excess inventory.  The Company also went through a massive restructuring in an attempt to restore the Company's "brand heat", including an evolution from Under Armour's traditional performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."  The Company's common stock has not recovered since the Class Period ended nearly 22 months ago, trading over 50% lower than its artificially inflated Class Period highs.⁶

18.     Defendants continued to conceal the full truth from investors, including the illicit sales practices they had used to buoy sales growth for more than a year and that the DOJ and SEC were investigating the Company's revenue-recognition, accounting and sales practices, Molloy's tenure, and its late 2016 results.

19.     On October 22, 2019, Under Armour announced suddenly that Plank was stepping down as CEO.  This came as a surprise because Plank had repeatedly told shareholders that "maintaining our founder-led approach" was so important that it required recapitalizing the

⁶   On November 15, 2018, Under Armour's publicly traded common stock closed at $22.39 (Class A) and $20.90 (Class C) per share compared to $28.94 and $25.09 per share on the final day of the Class Period (January 30, 2017), and Class Period highs of $52.95 and $46.20 per share on September 17, 2015 and April 21, 2016, respectively.

- 8 -

Company, which he did by creating a new class of common shares that allowed him to stay in control of Under Armour.  Defendants again failed to reveal the true reason behind his departure. Less than two weeks later, on November 3, 2019, WSJ surprised the market further by revealing that the DOJ and SEC were conducting criminal and civil securities fraud investigations into whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results "appear healthier" than they actually were.[7]  This article forced the Company to issue a statement confirming the ongoing investigations and admitting that they had hidden them from investors for nearly three years: "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[8]

      20.    Under Armour later disclosed that, as a result of the SEC's investigation, the Company, Plank, and Molloy's successor, CFO David E. Bergman ("Bergman"), each received a Wells Notice informing them that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters."  "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives." Notably, the Wells Notices concern the same time period in which Plank reaped profits of $138.2 million from his sales of Under Armour stock.

---

[7] Ex. B, at 1.

[8] *Id.* at 2.

21.    Under Armour subsequently provided additional information about the Wells Notices, including that the Wells Notices informed Defendants that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."

## III.    JURISDICTION AND VENUE

~~16.~~22.  The Exchange Act claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

~~17.~~23.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

~~18.~~24.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Under Armour conducts substantial business in this District~~,~~ and many of the acts and practices complained of herein occurred in substantial part in this District.

~~19.~~25.  In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

~~20.~~26.  Plaintiff Aberdeen was appointed to serve as Lead Plaintiff in this action by ~~Order~~the Orders of this Court dated April 26, 2017~~, Dkt.~~ [ECF No. 13~~,~~] and September 14, 2020 [ECF No. 150].  As shown in the certification filed with the Court on ~~April 11, 2017 (Dkt. No.~~

January 6 3), 2020 and attached hereto as Exhibit AD, Aberdeen purchased or otherwise acquired 495,441815,726 shares of Class A common stock and 128,037 shares ofand Class C common stock ofUnder Armour common stock at artificially inflated prices during the Class Period.[9]

21.27.  As shown in the certification attached hereto as Exhibit B, PlaintiffE, Monroe purchased Class A common stockCommon Stock of Under Armour at artificially inflated prices during the Class Period.

28.     As shown in the certification attached hereto as Exhibit F, KBC's funds purchased Class A Common Stock of Under Armour at artificially inflated prices during the Class Period.

22.29.  Plaintiffs suffered economic losses when true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the prices of such common stock.

23.30.  Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230.

24.31.  Defendant Plank is the founder of Under Armour and served as Chief Executive Officer ("CEO")CEO and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through present.  As CEO,January 1, 2020, when he stepped down as CEO and transitioned to Executive Chairman and Brand Chief.  Plank spoke on Under Armour's behalf during conference calls, in press releases, and in the media.  Plank was

---

[9]   The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common sStock outstanding and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

also the Company's largest shareholder throughout the Class Period, beneficially owning just over 15% of all shares outstanding and controlling approximately 65% of the voting shares.  Plank went to great lengths to maintain control of the Company, as demonstrated by a massive recapitalization during the Class Period that solidified Plank's control.  Since its Initial Public Offering ("IPO") in 2005, the Company had two classes of stock, Class A and Class B.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded and carries ten votes per share.  As of October 28, 2015, Plank held 35,700,000 ten-vote Class B shares and 76,445 one-vote Class A shares, giving him 66.5% of the votes.

25.32.  In the years following the 2005 IPO, events such as the issuance of new Class A stock and employee stock compensation, among other things, diluted Plank's ownership share and put his voting control of the Company at risk.  A provision in Under Armour's charter provides that should Plank's ownership stake fall below 15%, Plank's ten-vote Class B shares would automatically convert to one-vote Class A shares and, thereby, divest Plank of his voting power, which would fall from 65% to below 15%.  As one analyst noted, "Given there have been two splits in the last three years, his ownership has already been diluted, which is why it is becoming dangerously close to the 15% threshold."  In 2015, to prevent that from happening, Plank caused the Company to adopt several amendments to its charter centered on ensuring that Plank would not lose voting control.  Specifically, the Company resolved in July 2015 to issue a third class of common stock: Class C. (NYSE: UA).  The new Class C stock would have zero votes.

26.33.  Plank publicly lobbied for the Class C issuance in a June 15, 2015, letter to shareholders.  Plank acknowledged that the Company's dual-class structure was designed to ensure he "retain control over significant decisions impacting Under Armour's future."  Plank warned the dilution of that diluting his ownership stake "could ultimately undermine our current governance

- 12 -

structure." ~~A~~and claimed that "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders."  Plank's letter further touted the purported benefit of giving him "flexibility of selling these non-voting shares . . . while maintaining our founder-led approach."  Importantly, the related amendments to the Company's charter included a provision limiting the amount of shares Plank could sell in any given year to 2.5 million shares, with potential rollover starting in 2017.

~~27.~~34.  On April 7, 2016, the Class C shares were issued as a 1:1 dividend to all holders of Class A and Class B shares.  The benefit to Plank was two-pronged.  First, the Company could use the zero-vote Class C shares for employee stock-based compensation and financing transactions, *e.g.*, acquisitions involving Company stock, without diluting Plank's voting power.  Second, as discussed further below, Plank could sell Class C shares without reducing his voting power – as he did just a few weeks after the Class C shares were issued.

~~28.~~35.  ~~While~~Although the Class C issuance demonstrated the lengths Plank would go to maintain control of the company he founded, it was not well received by all.  As a July 24, 2015, analyst report issued by Morningstar Equity Research ("Morningstar") noted, the "addition of a Class C stock . . . can hardly be an improvement for shareholders as a whole."  Likewise, contemporaneous media noted, "the move by Under Armour will no doubt stoke the ire of some corporate governance experts and academics in the field.  Any time a single person has more voting power in a publicly traded company than her or his proportional ownership stake in that company, there will be potential conflict."

**I.V.    SUBSTANTIVE ALLEGATIONS**

   **A.    Background of the Company**

   ~~29.~~36.  ~~In 1996,~~ Under Armour was founded in 1996 by Plank, a 23-year-old former University of Maryland football player, who engineered a t-shirt using a synthetic fabric, with moisture-wicking performance fibers that helped keep athletes cool and dry under hot conditions. The Company specializes in highly technical, performance-oriented athletic apparel, such as ColdGear, HeatGear, and AllSeasonGear styles designed to enhance comfort and mobility and regulate body temperature in different types of weather.  Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

   ~~30.~~37.  Over the years, the Company's product lineup has expanded from a single shirt to myriad Under Armour branded athletic products in three categories: apparel, footwear, and accessories.  However, apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in fiscal year 2016 ("FY16").  While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016.  Thus, North American apparel sales are critical to the Company's success.  As Plank admitted ~~at the end of the Class Period,~~ on January 31, 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

   ~~31.~~38.  During the Class Period, nearly two-thirds of the Company's sales ~~(65% in 2016)~~ ~~are~~were wholesale sales to national and regional sporting goods chains (*e.g*., ~~The~~ Sports Authority, ~~Inc. ("Sports Authority"),~~ Dick's, Foot Locker, Champs), independent and specialty retailers,

- 14 -

department store chains, institutional athletic departments, and sports leagues and teams.  Under Armour also owned and operated its own retail locations (called "Brand House" and "Factory House" stores)[10] and retail websites that exclusively sold Under Armour products, which are collectively referred to as the "direct-to-consumer" ("DTC") channel, accounting for 31% of the Company's sales in 2016.

32.39.  Under Armour has many competitors, including athletic brands such as Nike, Adidas, Reebok, lululemon, Columbia, New Balance, Brooks, and Puma.  However, the Company steadily gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.  As one analyst put it just prior to the Class Period, Under Armour's "brand . . . is sacrosanct."  By protecting that premium brand image, by fall of 2014, Under Armour had become, by fall 2014, the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on number one – Nike.

**B.      Plank Drove Under Armour's Aggressive Growth Strategy**

33.40.  Since Under Armour's inception in 1996, and even after it went public in 2005, Plank has called the shots, always controlling a majority of stockholder votes and serving as CEO and until January 1, 2020, and as Chairman of the Board.  In throughout the Class Period.  Under this "founder-led" approach, which Plank went to great lengths to protect, Plank has set the destination and the route.

---

[10]    At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America.  Brand House stores showcase Under Armour's latest products.  Factory House stores, primarily located in outlet centers, soecldl excess or undesirable inventory at reduced prices.  At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America.  By the end of 2019, Under Armour had added only 1 Brand House store (19 total) but had added 18 Factory House stores (169 total) in North America.

1495422_1

34.41.  Plank relished the Company's image as a scrappy, fast-rising upstart from Baltimore.  He implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.  In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

35.42.  For Plank and Under Armour, the overriding objective was growth.  Within Under Armour, instructions for determining growth forecasts were very simple: take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with the maintaining Under Armour's 20% growth streak – which he played up on conference calls with analysts, repeatedly referring to Under Armour as a "growth company" – drove the Company's revenue-growth-at-all-costs strategy.  ForEmployees knew that the Company's growth record was extremely important to Plank and Under Armour, the overriding objective was growth such that it was never acceptable to lower sales goals.

36.43.  Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Class Period.  For 26 consecutive quarters (over six years) spanning from 2Q10 to 3Q16, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year-over-year basis).  Plank never missed an opportunity to remind investors of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it ***not because we are pushing or pressing, because it's the demand and the app from our consumer***.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And frankly, we have no expectation of that stopping anytime soon.

- 16 -

**C.      Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined**

~~37.~~44.  However, despite many years of successful growth, the Company's product styles had grown stale and its premium ~~"~~brand heat~~" (*i.e.*, customer demand)~~ was dying by the start of the Class Period in September 2015.  ~~The~~"Brand heat" was an expression Plank and others at Under Armour used to refer to the demand generated by the Company's brand appeal to consumers.  When the Company failed to offer new and updated products in line with the latest consumer trends~~.~~, its brand heat declined.  One such trend involved athletic leisure apparel (~~aka~~a.k.a. "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Class Period.  Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores.  Many of the Company's competitors, particularly Nike and Adidas, adapted to this trend by expanding their product lines to include athletic leisure apparel.  However, Under Armour failed to offer its own line of athletic leisure apparel until late ~~in the Class Period.~~2016.  Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts.  ~~While,~~Although historically~~,~~ these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors, and were not as interested in buying them again.  This enabled competitors to capture critical sales volume and market share from Under Armour, and enhance their brand values at the expense of Under Armour.

45.      Declining demand for Under Armour apparel caused progressively worse financial problems at the Company.  This was particularly damaging because apparel sales provided the majority of the Company's sales (67% of net revenue in 2016) and were critical to meeting the Company's aggressive financial projections.  According to SportScan retail data, the Company's

- 17 -

core apparel sales began slowing around spring of 2015, causing the Company to lose market share to rivals like Nike and Adidas.[11] Compounding these problems, the Company was experiencing a monumental downturn in its primary sales channel, North American wholesale.  Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (e.g., Target, Wal-Mart).  This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into the sales of, apparel sold at traditional sporting goods stores.

46.     This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period. On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.   And, on February 9, 2016, CNN reported that Under Armour's second-largest retail customer, Sports Authority, faced bankruptcy after missing a $20 million debt payment.  Sports Authority then filed for Chapter 11 bankruptcy protection on March 2, 2016, and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering

---

[11] *See* Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016),Ex. C, at 1, 4-6 ("Morgan Stanley Report").   The Morgan Stanley Report is attached hereto as Exhibit C and incorporated by reference herein.   As discussed in ¶¶64-72, 79-82 below, the SportsScan retail data set forth in this reportthe Morgan Stanley Report was materially consistent with Under Armour's internal retail data, showing a slowdown in core apparel sales that began around spring of 2015, but Defendants nonetheless publicly downplayed and discredited this report and falsely reassured investors that the Company's sales growth was as strong as ever.

- 18 -

463 stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  Losing these customers put additional pressure on the Company's faltering apparel demand.  Several former Under Armour executives told WSJ, "The strains in Under Armour's business were evident inside the company in 2016."[12]  They further explained to WSJ that this "slowdown was occurring in more places than just [TSA]" and that the TSA bankruptcy "just amplified the issue."[13]

47.  Despite losing these customers – including Sports Authority – Under Armour maintained its now-unrealistic sales goals.  Internally, it was never acceptable to lower these goals even though everyone knew they were unrealistic without Sports Authority – a major account for Under Armour.  Attempting to cover up these sales declines and provide the illusion of financial health, the Company Defendants' abandoned its Under Armour's fundamental sales philosophy of competing on brand strength rather than price.  Instead, the Company Defendants resorted to lowering sales prices, including offering heavy discounts and promotions, and engaging in a myriad of suspect sales practices.

**D.     Under Armour Ramps Up Its Promotional Activity**

38. 48. Beginning in 2015, Under Armour lowered sales prices and ramped up its promotional activity.[14]  This resulted in rapidly decelerating average sales prices of the Company's apparel, causing decreased product margins.  This trend compared unfavorably with the sports

---

[12]  Ex. A, at 3.

[13]  *Id.* at 4.

[14]  *See* id. Ex. C, at 1, 4-5.

apparel industry, overall and particularly with the Company's chief rival, Nike, which ~~were~~was

experiencing steadily *increasing* average sales prices.[15]

~~39.~~49.  Under Armour heard all the time from buyers and sales representatives in 2015 and

2016 that the Company's brand heat was dying down.  One notable example of this trend involved

Under Armour's "big logo hoodie" – a performance-oriented hooded fleece sweatshirt with a big

Under Armour logo on the chest.  This was a top seller and huge business volume driver for years

and, ~~as a result~~thus, Under Armour consistently carried a large inventory in many different colors.

However, as brand heat was dying, sales for this product began to decline significantly.  As a

result, the Company decided – for the first time ever – to run sales of the hoodie during Black

Friday of 2015 (November 27, 2015).  The Company offered the hoodie for as much as 25% off

at numerous stores, including Dick's, Sports Authority, and Macy's.

~~40.~~50.  The Company's sales declines opened the promotional floodgates.  After the hoodie

was put on sale for the first time ever in November 2015, Under Armour began to run more and

more promotions in 2015 and 2016.  For example, in addition to the big-logo hoodie, Under

Armour began to sell other staples of its apparel lineup like polo shirts and training t-shirts for

25% off in 2015 and 2016.  Like the big-logo hoodie, these products historically drove large sales

volume at premium prices and, unlike any prior time, had to be put on sale during the Class Period

because of dying demand for the Company's brand.

51.      ~~To incentivize retailers to order certain merchandise, the Company used a buyback~~

~~program~~For a while, the heavy discounts, promotions, and lower sales prices, helped the Company

continue to report revenue growth, meeting Plank's aggressive 20% growth projections.  But, this

manufactured, price-driven, low-quality growth caused lower product margins that damaged the

---

[15]  *See id.* at 4~~-5~~.

1495422_1

Company's bottom line and eroded the Company's "premium" brand image.  These negative effects were observed by a former Merchandising Manager of the Company, Brock Andersen ("Andersen"), who stated that: "Under Armour's apparel products . . . suffered from reduced customer appeal and demand"; "the Company's ASPs were falling sharply in North America"; and the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products."[16]  Andersen further stated that Plank knew or recklessly disregarded these "true facts" and misled investors about them during the Class Period.[17]

### E.     Defendants Engaged in Suspect Sales Practices to Further Mask Slowing Demand and Maintain the Company's 20% Growth Streak

#### 1.     Defendants Pull-Forward Sales and Stuff Channels to Artificially Boost Revenues

52.     In addition to the aggressive promotions and discounting described above, Defendants also employed a variety of improper sales and accounting practices to mask slowing demand, enable the Company to appear healthier, and maintain the façade of quarterly growth demanded by Plank.[18]  This false portrayal of growth was unsustainable, however, because the Company was robbing sales from future quarters to portray growth in the current one.

53.     Defendants engaged in channel stuffing by pulling forward sales from future quarters into the current quarter to artificially boost revenue, enabling the Company to close the

---

[16]   *Andersen v. Plank*, No. 1:18-cv-02239-TDC, Verified Shareholder Derivative Complaint, at 75-76 (D. Md. July 23, 2018), ECF No. 1 ("Andersen Complaint").

[17]   *See id.* at 74.

[18]   *See* Ex. A, at 3-5.

gap and hit aggressive sales goals, while feigning continued growth to the market. As a former Under Armour sales executive told WSJ, "It was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap."[19] As one former merchandising executive at Under Armour told WSJ, "It was all in the name of hitting the number, and it would happen out in the open."[20] This scramble to pull in as many orders as possible began as early as the third quarter of 2015 ("3Q15"), and continued at least through the end of 2016, increasing after the TSA bankruptcy.

54.    In some cases, Under Armour backdated shipment dates and moved shipment dates up from the first month of the following quarter to the last month of the current quarter. Indeed, a former logistics executive at Under Armour explained to WSJ that the Company's shipping plans in the final days of the quarter sometimes contradicted the dates on the boxes.[21]

55.    The practice of pulling forward sales occurred with retailers including Dick's, Under Armour's biggest customer in 2015 and 2016, totaling $400 million dollars of annual sales. The Company leaned on Dick's to boost its revenue. Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[22] However, as further detailed in Section V.E.2, such sales were contingent on "handshake" deals that allowed Dick's the right to return products it could not sell.

---

[19]  Ex. A, at 3.

[20]  *Id.* at 2.

[21]  *See id.*

[22]  *See id.* at 3.

1495422_1

56.     The former sales executive further explained to WSJ that the "[p]roblem is once this starts it doesn't seem to stop . . . .  We found ourselves pulling forward every quarter."[23]  The reason the Company repeatedly pulled sales forward was to sustain its growth record, including its 26-quarter streak of sales growth, which the Company's employees knew was important to Plank.[24]  Plank directed the Company's sales organization to maintain the growth streak and frequently bragged about the streak on conference calls with analysts, including on the Company's 3Q16 earnings call.[25]  Plank played up the Company's growth streak as a sign of its success, repeatedly referring to Under Armour as a "growth company."

57.     Although the sales goals needed to maintain such growth were unrealistic as discussed above, it was never acceptable to lower them.  Indeed, desperate to keep the streak alive during the summer of 2016, despite the loss of TSA, Plank told the sales organization that they needed to hit 20% growth or "heads will roll."  Accordingly, Plank set the tone at the top, and created an atmosphere which emphasized growth as the foremost priority regardless of what it took to get there.  And, critically, as further detailed below in Section V.K.1.a, WSJ reported that *federal investigators are examining emails that show Plank knew about efforts to move revenue between quarters*.[26]

58.     Indeed, the practice of pulling orders forward was well-known within the Company and discussed at weekly meetings attended by high-level executives.  The Company's demand planning team would send emails to employees passing down directives to pull orders forward

---

[23]   *Id.*

[24]   *See id.* at 1.

[25]   *See id.* at 2-3.

[26]   *See id.* at 2.

after looking to see how far off they were from meeting financial goals. The sales operation team was also instructed to pull forward orders from future quarters. The employees were asked to look at the inventory on hand and determine what orders were available to ship so Under Armour could report more sales and revenue in the current quarter. These requests increased over time, such that the employees were asked to pull more orders forward as 2016 progressed. The Company tracked the pull-forward orders in massive spreadsheets containing detailed sales and inventory data, including inventory that Under Armour had available to ship and inventory held by Under Armour customers such as Sports Authority. The spreadsheets were regularly updated and saved in a shared public folder, and anyone who wanted access could review them and identify orders that had been adjusted and pulled forward from one quarter into an earlier quarter.

59.    To further help meet the Company's quarterly targets in 2016, Under Armour also stuffed as much inventory as possible into certain retailers to frontload the recognition of revenue, despite the consequences that followed. For example, Under Armour began shipping new inventory intended for Factory House stores to T.J.X. Co. discount stores like T.J. Maxx.[27] A former merchandise executive at the Company explained to WSJ that this practice allowed Under Armour to immediately book the products as revenue instead of having to wait for a customer to buy them at its own stores.[28] Under Armour ensured its massive inventory shipments to T.J.X. Co. fell just short of triggering the 10% of sales threshold for disclosing the discount outlet as one of its top customers in Under Armour's securities filings.[29] This would have surely indicated to the market that Under Armour had loss its premium brand status and its ASPs were falling.

---

[27]  *See id.* at 4.

[28]  *See id.*

[29]  *See id.*

60.     Defendants also continued to stuff Under Armour's products into Sports Authority and book revenue for those sales, despite knowing that Sports Authority was having significant issues,[30] might not be able to pay for the products, and the products could be returned *en masse*. As former Under Armour executives in sales, logistics, merchandising, and finance stated to WSJ, Under Armour continued shipping goods to TSA, and booking sales for those goods, even after it was clear that TSA was in trouble.[31]  Indeed, red flags relating to retailer accounts, including TSA, were apparent to the Company's wholesale team as early as 2015.  Yet, Under Armour kept shipping inventory to TSA.  Unsurprisingly, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  The large amount of returns from TSA, Dick's, and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

61.     By stuffing customers with products, pulling forward sales, and shifting sales to discount retailers, Under Armour was able to mask declining sales and waning brand heat and inflate revenues to artificially continue Plank's growth streak.  However, many of these sales were achieved through discounting and premised on retailers' ability to return them.  They were, thus, contingent, illusory, and violated GAAP.

---

[30]   *See id.*

[31]   *See id.*

1495422_1

**2.** **Defendants Induce Retailers to Take Unneeded Product with Promises to Buyback Merchandise and Through Discounts and Other Sweeteners**

62. To pull-ahead much needed sales to perpetuate the Company's "growth," the Company leaned on retailers such as Dick's to accept early shipments of the Company's products.[32] To incentivize retailers to accept the shipments early, Defendants adjusted retailers' contract terms or offered them discounts.[33] As former Under Armour executives explained to WSJ, "Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products" in order to convince retailers to take products before their requested shipping date.[34]

~~41.~~63. Defendants also used a buyback program to incentivize retailers to order certain merchandise, under which sales representatives guaranteed that Under Armour would buy back a certain amount of the merchandise that did not sell. On the books, the Company's customers bought and owned the merchandise for three or four months, but after six months Under Armour was forced to buy back some of the unsold merchandise. ~~For instance, Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dicks' thought they needed because Under Armour promised that Dick's could return any of the products Dick's did not sell.~~These buyback or "return to vendor" agreements were regular at Under Armour with its biggest customers and increased in late 2015 and 2016. Because of low product sell-through, Under Armour wound up having to buy back a lot of product pursuant to these deals~~. Dick's generally wanted these side agreements documented~~

---

[32] *See id* at 3.

[33] *See id.*

[34] *Id.*

in emails.  Dick's was allowed to return a seemingly unlimited amount to Under Armour during the Class Period.  This resulted in a massive amount of returns.

64.    Indeed, under these arrangements, Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  In early 2016, for example, VP of North America Sales, Brian Cummings ("Cummings"), convinced Dick's to order shoes that Dick's did not want.  Dick's predicted they would have to return 80% of the shoes, but Cummings agreed that Under Armour would take back any unsold product.  Dick's ended up returning 80% or more of the deal later in 2016.

42.    By the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.  For a while, the heavy discounts, promotions, lower sales prices, and buyback arrangements helped the Company continue to report revenue growth, meeting Plank's aggressive 20% growth projections.  But this manufactured price-driven, low-quality growth caused lower product margins that damaged the Company's bottom line and eroded the Company's "premium" brand image.

65.    Compounding the Company's declining apparel demand, the Company was also experiencing a monumental downturn in its primary sales channel, North American wholesale.

66.    Accordingly, many of the Company's sales were illusory because Dick's and other customers accepted them on the condition that Under Armour would buy the products back if the

- 27 -

1495422_1

customers could not sell them.  These buyback and contingent sales arrangements violated GAAP, as discussed further below in Section VIII.B.  Moreover, as discussed in the following section, these arrangements came back to haunt Under Armour, leading to excess inventory and liquidations.

43.1.   Defendants' Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (e.g., Target, Wal-Mart).  This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into the sales of, apparel sold at traditional sporting goods stores.

44.   This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period. Most significantly, on February 9, 2016, CNN reported that one of Under Armour's largest retail customers, Sports Authority, faced bankruptcy after missing a $20 million debt payment. Ultimately, Sports Authority filed for Chapter 11 bankruptcy protection on March 2, 2016, and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering 463 stores. Other key Under Armour retailers were also forced to file bankruptcy and close.  On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  The loss of

- 28 -

~~several of Under Armour's major North American retailers further pressured the Company's struggling sales.~~

### ~~D.~~F.   Declining Apparel Sales and Suspect Sales Practices Led to Excess Inventory and Liquidations

~~45.~~67.   ~~Diminishing~~The diminishing demand for, and declining sales of, core Under Armour products resulted in excess inventory.  In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins~~,~~ and, in turn, the Company's gross margins.  This problem occurred at both the Company's own Brand House stores and at the stores of its retail customers.  Excess inventory was a constant problem throughout the Class Period at the Company's Brand House stores, including products from every category.

~~46.~~68.   At one point during the Class Period, for example, Under Armour's planning team bought a very large quantity of one of the Company's t-shirts, around 10,000 units, to be sold at Under Armour's top two Brand House stores, which were supposed to be the pinnacle of the Under Armour product experience.  However, only about 100 units of the t-shirt were actually sold, and the rest became excess inventory.  This excess inventory had to be sent to Under Armour's Factory House stores and other accounts to be liquidated at a discount.  This happened many times with different products throughout the Class Period, and was very common with men's apparel.

~~47.~~69.   Sometimes only about 30% of the inventory at the Company's Brand House stores was considered "productive," meaning only 30% was actually sold to consumers.  The remaining inventory was comprised of "presentation quantity" (inventory allowing the stores to present one or two units of each size on display) or excess inventory that had to be transferred back to Under Armour's distribution houses.

48. 70.  The distribution houses would send the excess inventory to the Company's Factory House stores (*i.e.*, outlet stores) or to liquidation channels like Marshalls and T.J. Maxx, where the products were sold at a discount.  The discount rates at the liquidation channels were the highest, providing the Company with very low product margins.  Sometimes Under Armour was simply trying to make its money back break even on products sent to the liquidation channels.  In addition to reducing margins (due to the discounted sales prices), distributions to the Factory House stores and liquidation channels resulted in higher expenses due to the extra shipping, processing, and labor costs required to transfer the excess inventory.

49. 71.  Excess inventory was also a problem at the Company's retail customers such as Sports Authority and Dick's.  Facing dwindling sales and ballooning inventory, the Company's merchandising team would collaborate with the sales teams and give suggestions about promotions for the inventory that Under Armour needed to move.  Retailers would also make requests for promotions to rid themselves of the excess inventory, and the Company would then determine whether to allow such promotions.

50. 72.  As with the inventory returned from Brand House stores, discussed above, the Company would attempt to sell the excess inventory returned from retail customers at discounted prices through liquidation channels such as discount stores like Marshalls and T.J. Maxx.  As a last resort, the Company would ship inventory to be liquidated at Costco stores in Mexico.  However, much of the excess inventory just sat around at the Company, not being sold through any channel, because the liquidation channels used by the Company were not enough to handle all of the excess.

73.     In addition, the Company's inventory problems were magnified by returns resulting from its contingent sales pursuant to buyback agreements, and its mass shipment of products in

- 30 -

the final days of a quarter.  As detailed above, the Company was able to pull ahead sales by entering into contingent sales arrangements with certain retailers (including Dick's – its biggest customer).  While this gave Under Armour a temporary boost in sales, they were obligated to buy back unsold inventory.  And, since they had overstuffed these retailers with products they did not need and could not sell (particularly where Under Armour's brand heat had diminished), much of that product was being returned to the Company.  As a former logistics executive at Under Armour explained to WSJ, "truckloads" of unopened boxes thus returned unsold to Under Armour in 2016.[35]

74.    Indeed, following TSA's bankruptcy, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  In July 2016, Plank announced a deal with Kohl's Corp. ("Kohl's"), a mid-tier value retailer.  As former executives told WSJ, Kohl's provided hundreds of new locations to stock its goods, including those meant for TSA.[36]  However, Kohl's ran frequent promotions in competition with Dick's and often had lower prices.  This move angered Dick's, who had been holding unsold Under Armour goods.[37]  Dick's then stopped agreeing to take products early, which had enabled the Company's pull forward sales, and took less product from Under Armour, making the Company even more dependent on off-price chains.[38]

51.75.  The excess inventory was a frequent topic of discussion among sales and planning leaders at the CompanyUnder Armour, and information on inventory was widely available at the Company.  Indeed, as discussed in §§V.G-H belowFor example, the Company's planning team

---

[35]  *Id.*

[36]  *See id.* at 4.

[37]  *See id.*

[38]  *See id.*

- 31 -

1495422_1

met weekly to discuss excess inventory.  Executives Matt Mirchin (President, North America) ("Mirchin") and Cummings (VP of North American Sales) both had access to sales and inventory reports, and Kevin Eskridge (Senior VP of Global Merchandizing and Planning, subsequently Chief Product Officer) ("Eskridge") talked with Merchandising staff about inventory all the time. Indeed, Plank and fellow executives admitted to the excess inventory in their public statements. HoweverBut, they misleadingly blamed the rising inventory on benign factors, including a strategic plan to improve the speed of shipments to customers, and reassured investors that the situation was improving.  In reality, this was untrue, as the excess inventory was caused by the Company's dying brand heat, which reduced customer demand and caused the sales declines discussed above., preventing it from unloading unwanted inventory.

76.     In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  This problem occurred continually from at least September 2015 through November 2016 at both the Company's own Brand House stores and at the stores of its retail customers, across all Under Armour brands.  The sheer amount of excess inventory made it obvious internally that Under Armour would eventually miss its sales goals, and ultimately led to inventory write downs as discussed in Section VIII.D, below.

### E.G.   Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines

52.77.  As a result of the Company's declining apparel sales, exacerbated by the collapse of the Company'sits primary sales channel, Defendants perceived a threat to the Company's carefully cultivated market perception as a fast- growing superstar of the sports brand business. To compensate, Defendants sought to aggressively expanded theirexpand Under Armour's footwear and international sales businesses. in 2015 through 2016.  This expansion, along with the

- 32 -

lowering of apparel prices and suspect sales practices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) into 2016 even as the Company's core North American apparel business was faltering. However, as Defendants admitted, ~~these~~the footwear and international businesses provided much lower margins than the ~~Company's core~~ North American apparel business, and a much smaller percentage of revenue (shoes accounted for only 21% of revenue in 2016). Moreover, the Company needed to make massive expenditures of time and money ~~in order~~ to undertake such expansion.

~~53.~~78. An example of the difficulty of this expansion was the rollout of Under Armour's "Curry One" shoe worn by star NBA basketball player Stephen Curry. in early 2015. Under Armour heavily promoted this shoe. However, ~~Under Armour~~the Company was essentially paying to have the shoe placed in stores because the associated expenses were so high and margins were so poor. The Company's "Curry Two" shoe faced similar problems. in the third and fourth quarter of 2015.[39] The shoes were badly underpriced in an apparent attempt to boost revenue and capture market share from Nike, at the risk of damaging Under Armour's brand image.[40] Under Armour also slashed their prices on running shoes in an attempt to compete on price rather than brand image and innovation.[41]

~~54.~~79. ~~The Company's international and footwear expansion, along with the lowering of apparel prices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) deep into the Class Period, even as the~~

---

[39] *See* Morgan Stanley Report at 8-9.

[40] *Id.* at 9-10.

[41] *Id.* at 11.

Company's core apparel and North American businesses were faltering.  Defendants used the footwear and international businesses as scapegoats for the Company's declining gross margins (see, e.g., ¶126).  At the same time, Defendants misleadingly claimed the Company's footwear and international margins and ASPs were improving and its *apparel* margins and ASPs remained strong (see, e.g., ¶127).  These misleading statements allowed Defendants to conceal the fact that margin compression was caused, not only by the growing footwear and international businesses, but also by declines in the Company's apparel business, driven by lower sales prices, rampant promotions and discounting, and excess inventory.  It was far more palatable for Defendants to blame margin compression on the Company's supposedly expanding footwear and international businesses than to reveal the truth about the declines in its core apparel segment, which accounted for most of the Company's sales.

> **H.     ~~The Company's Stock Price Declined When~~ Under Armour's Declining Demand and Unsustainable Business Practices Catch Up to Them but Defendants Mislead the Market ~~Learned~~ as to the True Reasons Behind the Company's Problems**

80.     As detailed above, the Company's suspect business practices, including pull-forward sales, channel stuffing, and buyback arrangements, temporarily helped the Company continue its growth streak.  However, as discussed further in Section VIII, these practices violated GAAP and also had significant adverse consequences for the Company's financial results.

81.     Indeed, during the time period that the Company was engaged in pulling sales forward (channel stuffing) and other machinations, the Company experienced explosive growth in its accounts receivables (which are sales made on credit to be paid back to the Company at a later date).  Before the third quarter of 2015, Under Armour's overall sales always eclipsed or grew evenly with its accounts receivables.  But, by the fourth quarter of 2015 ("4Q15"), accounts receivable growth badly outpaced revenue growth (55% accounts receivable growth vs. 31%

1495422_1

revenue growth), a trend that continued throughout 2016.  Further, Under Armour's days sales outstanding ("DSO"), the number of days it took the Company to collect its receivables, nearly doubled from 28 days in fourth quarter of 2014 ("4Q14")  to nearly 51 days in first quarter of 2017 ("1Q17").  This shows that the Company was increasingly extending credit to customers and getting paid later and later – consistent with the early shipments and adjusted contract terms.

82.    Likewise, the Company's reserves for returns skyrocketed 55% by the end of 2016 and 68% in 2017, reaching a whopping $247 million.  Demonstrating that it expected large volumes of excess inventory to be returned, the Company drastically increased its reserves for returns, the amount of money Under Armour set aside for markdowns or returns, as discussed in Section VIII.C below.

83.    In addition, Defendants' softening demand, returns, and illicit sales practices led to an accumulation of material amounts of excess and obsolete (*i.e.*, impaired) inventory at the Company.  Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018 due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down inventory, which should have been recorded in 2016.

84.    The excess inventory also caused the Company to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  Gross margins declined from 48.1% in fiscal year 2015 ("FY15"), to 46.5% in FY16, to 45.1% in fiscal year 2017 ("FY17").

85.    As further detailed in Section VII below, Defendants downplayed these negative financial trends, concealing the true reasons for them and attempting to explain them away.

- 35 -

However, as the market would later learn, the Company's declining financial condition and inventory problems were the direct result of the Company's waning brand heat, declining demand, and the various suspect practices the Company had undertaken to artificially prop up sales.

### ~~F.~~I.    ~~The Market Began to Learn~~ the Truth About the Company's Sales Problems, Causing the Stock Price to Decline

~~55.~~86.   The Company's declining sales problems, ~~including a~~ "fundamental shift" to competing on price rather than a premium product, and use of suspect sales practices to artificially boost revenue and mask slowing demand, were ultimately revealed in a series of partial disclosures that caused the Company's common stock prices to gradually decline, as detailed in ~~§§~~Sections VII~~-VIII, and~~ X, below.  The declines would have been swifter and steeper, but Defendants attempted to downplay and soften the news with continued misrepresentations and omissions throughout the Class Period.

~~56.~~87.   First, on January 10, 2016, Morgan Stanley issued a detailed report with point-of-sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales prices, and market share dating back to spring 2015.  This surprising news, which directly contradicted Defendants' carefully cultivated image of the Company, caused Under Armour common stock prices to fall.

~~57.~~88.   ~~On the heels of~~Following this report and the departure of the Company's CFO ~~Brad~~ Dickerson ~~("Dickerson")~~ in February 2016 – "which came as a surprise" to analysts, who noted that "this transition comes at an inopportune time in the company's history. . . . Losing a key leader at a time like this is a concern" – the Company's Chief Merchandising Officer ("CMO"), Henry Stafford ("Stafford"), suspiciously departed the Company in May 2016.  Stafford's departure coincided with the departure of another high-level executive, the Company's Chief Digital Officer ("CDO") Robin Thurston ("Thurston"), which was announced on the same day.

These abrupt and suspicious departures of these key executives caused common stock prices to decline again on May 4, 2016.

~~58.~~89.  On June 1, 2016, contrary to their prior assurances, Defendants revealed a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional common stock price declines.

~~59.~~90.  Over the next ~~months~~year, a series of increasingly poor quarterly financial results and reduced financial projections caused further declines in the Company's common stock prices after such news was released.  On July 26, 2016, Defendants reported second quarter of 2016 ("2Q16") decreases in operating and net income ~~and~~, announced a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast the slowest quarterly growth in over six years.  On October 25, 2016, Defendants revealed a further slowdown in growth in ~~the third quarter~~3Q16, attributed to North American apparel and wholesale declines, and compressed margins attributed in part to higher discounts, promotions, and liquidations.  On January 31, 2017, Defendants revealed a slowdown in 2016 growth that was far more severe than previously reported and dramatically reduced financial projections, attributed to problems in the North American apparel business, as well as compressed margins and inventory growth.  On the same day, Defendants surprised investors by revealing the sudden and highly suspicious departure of Molloy.  ~~Finally, on~~On August 1, 2017, the Company cut ~~20~~FY17 guidance and announced a massive restructuring, in order to "evolve" the Company's business and restore "brand heat," including a shift from traditional performance-oriented products to more fashionable products.  The Company further announced that it expected $110 to $130 million in restructuring-related charges including "approximately $20 million of inventory related charges."

91.     Despite the drastic measures being implemented, the Company's financial performance never recovered.  Indeed, no longer able to rely on the suspect sales practices that had allowed the Company to report 20% revenue growth and mask slowing demand, Under Armour experienced a severe downtown in its business.  The Company reported total revenue growth of just 3.4% and 4.1% and apparel revenue growth of 1.8% and 5.4% in 2017 and 2018, respectively.  Yet, the Company's stock price remained artificially inflated based on the concealment of Defendants' improper sales practices, including the pull-forward of sales to boost quarterly revenues and mask slowing demand.

**J.      The SEC and DOJ Launched Investigations Into Under Armour's Accounting Practices and Related Disclosures, Plank Stepped Down as the Company's Chief Executive Officer, and the SEC Preliminarily Determined to File an Enforcement Action Against Defendants**

92.     As news of the Company's true financial condition was slowly revealed, the DOJ and SEC launched non-public criminal and civil investigations into Defendants' sales and accounting practices, including whether they pulled sales forward during the Class Period in order to make the Company's quarterly revenue appear stronger than it actually was.  Although Defendants began responding to the investigators in July 2017, they concealed these investigations from shareholders for nearly three years.

93.     While the government investigations were ongoing, the Company suddenly announced on October 22, 2019, that Plank was stepping down as the Company's CEO, effective January 1, 2020, and transitioning to Executive Chairman and Brand Chief.  Less than two weeks later, on November 3, 2019, WSJ revealed the SEC and DOJ investigations, reporting that the probes focused on Under Armour's "accounting practices" and "whether the sportswear maker

shifted sales from quarter to quarter to appear healthier."[42]  The article forced the Company to issue a statement admitting that it was under investigation and "began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[43]  The Company's stock price suffered another steep decline in response to this news.

94.     On November 14, 2019, WSJ released a follow-up article with more information related to the investigations.[44]  The article revealed that the government's criminal and civil securities fraud probes were "into the Company's revenue recognition and whether there were improper tactics used to shift sales," and that investigators were examining "Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy."[45]  The article was based on interviews with former Company executives in four different departments – logistics, sales, merchandising, and finance – who told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel," and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[46]

95.     Before the market opened on July 27, 2020, the Company filed an SEC Form 8-K announcing that, on July 22, 2020, the Company, Plank, and Bergman received Wells Notices from the SEC, which "informed the Company and the Executives [Plank and Bergman] that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the

---

[42]   Ex. B, at 1.

[43]   *Id.* at 2.

[44]   Ex. A, at 2.

[45]   *Id.*

[46]   *Id.* at 1.

federal securities laws." The Company explained that the Wells Notices related to the Company's previously-disclosed SEC investigation, and further specified that:

> The Wells Notices relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of "pull forward" sales in connection with revenue during those quarters. A pull forward generally includes a customer sale that is executed earlier than originally planned. Specifically, the SEC Staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives.[47]

96.     The Company's filing on July 27, 2020, added that "the Company and the Executives . . . expect to engage in a dialogue with the SEC Staff to work toward a resolution of this matter."

97.     On August 6, 2020, Under Armour further disclosed in its second quarter of 2020 ("2Q20") Form 10-Q filing that "[t]he Wells Notices informed the Company" the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act." The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices included," among other things, "civil monetary penalties, as well

---

[47]   The SEC describes the general Wells Notice process as follows: "If [SEC] Enforcement makes a preliminary determination to recommend enforcement action, it may elect to provide individuals or entities who would be charged in the action with a Wells notice explaining the proposed charges against them and informing them that they can make a voluntary submission setting forth their interests and position. If Enforcement believes (based on the evidence it has compiled and after considering a Wells submission or deciding not to issue a Wells notice) that enforcement action should be taken, Enforcement seeks authorization from the Commission for the SEC to file a civil lawsuit, to commence an administrative proceeding, or, in certain circumstances, to issue a report of investigation. Any enforcement action that the SEC initiates is based on Commission authorization." U.S. Securities and Exchange Commission, *Investor Bulletin: SEC Investigations* (Oct. 22, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_investigations.html.

as, in the case of the Executives, a bar from serving as an officer or director of a public company." The Company also confirmed that the DOJ's separate investigation remained ongoing.

60.98. As discussed further below (Sections VII and X), Under Armour investors lost millions of dollars as a result of these revelations, which causedDefendants' fraud was revealed over time, causing the artificial inflation resulting from Defendants'the fraud to dissipate from the Company's common stock.

**G.K.   Numerous Facts Support Defendants' Scienter**

61.99.  Defendants knew of, or at a minimum were severely reckless in disregarding, the problems facing the Company as a result of declines in the apparel business. This is supported byAs discussed herein, numerous additional indicia of scienter support this, including the fact that federal investigators are examining emails that show Plank knew of the Company's efforts to move revenue between quarters,[48] the DOJ and SEC investigations, the Wells Notices, Plank's and other Company executives' statements admitting access to the relevant data, and Plank's highly suspicious Class Period sales of $138.2 million of Under Armour stock during the same period that is the subject of the SEC's Wells Notices to the Company and Plank.

**1.   DefendantNumerous Facts Support Plank's Scienter**

**a.   Plank Had Direct Knowledge or Reckless Disregard of, and Was Personally Implicated in, the Fraud**

1.100.  Plank had direct knowledge of the fraudulent conduct alleged herein. As part of the ongoing DOJ and SEC investigations "into the company's revenue recognition and whether there were improper tactics used to shift sales" during the Class Period, WSJ reported that investigators "are examining *emails that show Under Armour's founder and chief executive,*

---

[48]   *See Id.* at 2.

*Kevin Plank, knew about efforts to move revenue between quarters.*"[49]  Former Under Armour executives also told WSJ that "pulling sales forward helped the sportswear company sustain its growth record, which employees *knew was important to Mr. Plank*" and that "[t]he strains in Under Armour's business were evident inside the company in 2016."[50]  Indeed, Plank drove the Company's ~~Undisclosed Fundamental Shift and Sales Problems~~aggressive growth strategy, employing a founder-led approach.  He set the tone by pressuring employees to achieve 20% growth every quarter.

101.    ~~Plank made numerous public statements in which he~~Plank's direct knowledge of the Company's suspect sales practices is further evidenced by the fact that Plank personally received one of the SEC's Wells Notices.  The Wells Notice stated that a preliminary determination had been made to recommend that the SEC bring an enforcement action against him for federal securities law violations relating to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[51]

102.    The suspicious timing of Plank's resignation as CEO – announced on October 22, 2019, following a string of other executive departures as the truth leaked out – also supports his knowledge or reckless disregard of the fraud alleged herein.  Just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success.  On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of

---

[49]    *Id.*

[50]    *Id.* at 3.

[51]    Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

our business" because it "provides for clear accountability and efficient and effective leadership." The Company never explained the abrupt flip-flop.

103.   Less than two weeks after Under Armour announced Plank's resignation, the Company acknowledged that the DOJ and SEC were investigating its accounting and related disclosures.  As Morningstar observed:

> The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company. . . .  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began.  While Under Armour claims the investigation had nothing to do with Plank's decision, the timing looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.

104.   Other media also noted the suspicious timing of Plank's departure as CEO.  For example, *Forbes* stated in a November 4, 2019, article that "[i]n light of the recent investigations, it now makes more sense why Plank stepped aside.  There most likely will be serious repercussions related to the dual investigations."

105.   The timing of these events, coupled with the Plank emails and other indicia discussed herein, strongly supports that Plank was directly involved in and responsible for the matters under investigation.

### b.   Plank's Public Statements and Access to the Company's Internal Systems and Data

62.106.Plank's scienter is further supported by numerous public statements in which Plank discussed the Company's apparel sales growth, sales prices, gross margins, and inventory levels. In fact, Plank provided a prepared statement on – or was asked and answered detailed questions about – at least one of those matters during nearly every (14/16) quarterly earnings call with

- 43 -

securities analysts throughout the Class Period, as well as during the 2015 and 2018 Investor Day,[52] Meetings.  As detailed herein, Plank echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period.[53]  These statements evidenced Plank's knowledge of such matters.

63.107.Plank, and fellow Company executives, also stated that they had systems in place to closely monitor such aspects of the Company's business.  For example, Plank boasted of an SAP (Systems Applications Products) software system that provided point-of-sale information and other detailed business data.  The Company was in the process of enhancingenhanced this system during the Class Period.  As Plank stated during the 4Q15 earnings call on January 28, 2016:

> The single view of the consumer is something we're building with the team at SAP that combines **global point-of-sale, e-commerce and transactional information** through a single sign-on capability together with our Connected Fitness business to create an insight engine that will inform and guide our decision to help grow and scale our brand.  This will build on our existing SAP platform as we double down and continue to make big bets with big partners.  We believe that this unique technological advancement will position UA as a best-in-class real-time digital enterprise.

64.108.This statement by Plank confirms that, through "point-of-sale" information available on the Company's SAP system, Plank had actual knowledge of industry sales data from the Company's retailers.  The As discussed further below, because the SportScan data (a.k.a. SportScanInfo or SSI) revealed in the Morgan Stanley Report, attached hereto as Exhibit C, was based on the same point-of-sale industry data reported to Plank from the Company's retailers. Plank had actual knowledge of (or recklessly disregarded) the SportScan data revealed in the

---

[52]   *See* ¶¶118, 125, 142-143, 148, 150, 161-162, 195, 197, 209, 214, 230.

[53]   *See* ¶¶124, 130, 141-143, 152, 156, 158, 159, 167, 186-187, 194, 207, 212, 218, 221-222.

- 44 -

1495422_1

Morgan Stanley Report.[54]  The sales data showed that, since spring of 2015, the Company's North American apparel growth was in decline, the Company was losing market share, and the Company's ASPs were dropping.[55]  Everyone at Under Armour on the sales team had full visibility into sales data because they had very detailed and up-to-date data available to them through multiple sources, and the data was regularly reviewed.  Multiple reports showing sales data were distributed every Monday.  The sales reports were very detailed, including breakdowns by regions, retail store, and product styles.  Sales management also had a "dashboard" on their computers or iPads to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  Under Armour planning and sales employees also had access to inventory and sales-related data in massive and constantly-updated spreadsheets kept in a shared folder and available to anyone who wanted to access them (which also tracked pull-forward orders).  Further, Plank repeatedly claimed he had extensive data concerning consumer demand, buying preferences, and product usage through Under Armour's Connected Fitness platform.  As Plank boasted ~~at the end of~~during the Class Period, "I can't think of any companies that would have that amount of data flow to understand their consumer better."  Thus, Plank had knowledge of (or recklessly disregarded) the financial declines first revealed by Morgan Stanley.

109.  Additional evidence of Plank's scienter is found in Plank's statement during the first quarter of 2016 ("1Q16") conference call on April 21, 2016, that "probably the thing that drives [North American distribution] for us more than anything else is just merchandising. . . . And now we've really gotten to a point where understanding that merchandising needs to be a core

---

[54]  *See* Ex. C.

[55]  *See* ~~Morgan Stanley Report~~*id.* at ~~1, 4-6~~13.

competency for us. . . .   And so we really – we identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in 2014, we began building the [merchandising] team in 2015."   Through these merchandising efforts, Plank had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel).   In addition, Plank's statement indicated that the Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

110.    Plank also paid close attention to the Company's inventory during the Class Period, and therefore Plank knew or recklessly disregarded that the Company had excess inventory caused by declining demand and sales.  As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

> On the working capital front, *the majority of our focus is going to be on inventory management and the efficiency of inventory management*.  Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.
>
> First, on the near term – over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates.  This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.
>
> Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory.  These initiatives are focused on how we plan and deliver our seasonal products.

111.    Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

> *Today, we have inventory data in multiple retail, planning, transportation, and distribution systems*.  In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is

- 46 -

extremely powerful.  In fact, very few organizations have been able to achieve this goal.

112.   One system through which inventory data was available to Plank was the SAP system discussed by Plank in the statement quoted above.  The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation channels), and how much inventory was being sent to liquidation.  The SAP system provided inventory information for all Under Armour products sold to consumers.  Based on this data, Plank, who was intently focused on inventory, had actual knowledge of, or recklessly disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.

> c.      ~~The negative financial trends revealed by~~ The SportScan Data Cited in the Morgan Stanley Report ~~were based, in part, on industry data compiled by SportScan.~~ Mirrored the Company's Internal Sales Data

~~65.~~113. Numerous facts establish that the SportScan data cited in the Morgan Stanley Report, revealing negative financial trends at Under Armour, was a materially accurate depiction of the Company's internal sales data ~~at Under Armour~~, thus supporting Plank's knowledge or reckless disregard of such data.  Indeed, retail industry participants, including Under Armour, frequently use industry data compiled by SportScan.  For instance, in connection with a 2005 sale of $167 million in stock, Under Armour described SportScan as "a leading market research firm that provides weekly point-of-sale data for the athletic and sporting goods industry" and disclosed that the Company's "[i]nformation regarding the market for compression style clothing is ***derived from SportsScan~~INFO~~nfo.***"

~~66.~~114. Furthermore, Plank admitted on multiple occasions that industry data, and SportScan in particular, was reliable and consistent with internal Under Armour data.  Prior to and

during the Class Period, Under Armour, and Plank in particular, made repeated statements regarding Under Armour's market share.  Those statements relied on industry data, including ~~SportScan.~~data tracked by SportScan, thus supporting Plank's knowledge or reckless disregard of such data.  For example, during the October 25, 2016, 3Q16 earnings call, Plank boasted that "[i]n the back-to-school window of July through September, [Under Armour's] overall footwear market share nearly doubled according to ***industry data***."  ~~As an~~The following day, on October 26, 2016, ~~Wall Street Journal article noted,~~WSJ stated that this industry data came from SportScan ~~reported that Under Armour had, "[d]uring~~: "During the back-to-school period~~.~~, Under Armour . . . nearly doubled its share of the footwear market, amassing 8.2% of the market for the 13 weeks ended Oct. 1, up from 4.6% a year ago, ***according to industry tracker SportScanInfo***."  Other examples include Plank's September 16, 2015, and October 22, 2015, statements praising the Company's "40% market share" in football cleats.  *See also* ¶~~162~~200 ("we are taking share").

~~67.~~115.~~Importantly,~~Plank's knowledge or reckless disregard of the data reported by SportScan is further supported by the fact that SportScan captured Under Armour's ~~core~~largest sales channel~~—~~, North American wholesale, which had the greatest impact on the Company's growth, and encompassed virtually all of Under Armour's core sales channels.  As Plank said in January 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."  According to SportScan, its sales data includes sales from 15,000 retail doors across 12 separate retail channels.  ~~Under Armour~~Further, when Dickerson addressed the Morgan Stanley Report during the Company's 4Q15 earnings call on January 28, 2016, he admitted that the report's SportScan ~~captures its~~data captured the Company's largest customers~~like~~, citing Dick's as an example.  And, neither Dickerson, Plank, nor anyone else at the Company disputed the accuracy

- 48 -

of the data reported by SportScan (which included data for all four quarters of 2015 and ~~Foot Locker.~~prior).  The only portions of Under Armour's business that the SportScan ~~does~~data did not directly capture ~~a~~were lower-priced and less profitable sales that ~~a~~were much less indicative of how Under Armour's overall business is performing.  ~~For~~This included, for example, ~~most of~~ Under Armour's physical retail locations~~are~~, most of which were Factory House stores, ~~which are~~ a liquidation channel with low-margin sales.  ~~And~~This also included Under Armour's website, which analyst reports during the Class Period observed ~~Under Armour~~ "has been increasingly ~~using its website~~us[ed] . . . as a clearance channel."

~~68.~~116.~~Furthermore,~~Under Armour's financial disclosures corroborate the Morgan Stanley Report's revelations~~.~~ and confirm Plank's knowledge or reckless disregard of the data revealed.  For instance, Under Armour reported inventory growth ~~that~~outpaced sales in 3Q15 (~~35%~~36.0% year-over-year inventory increase vs. 28.4% year-over-year net revenue increase) and 4Q15 (~~46% increase).~~45.9% year-over-year inventory increase vs. 30.8% year-over-year net revenue increase).  Under Armour's gross margins also declined in ~~4Q15, contracting 1.9 percentage points~~3Q15 (from 49.6% to 48~~%.~~.8% year-over-year) and 4Q15 (from 49.9% to 48.0% year-over-year).  The extreme inventory increases and gross margins declines reported by Under Armour on January 28, 2016, for 4Q15, are consistent with the Morgan Stanley Report's disclosure on January 10, 2016, based on SportScan data, of decelerating sales growth, loss of market share, and declining ASPs.  When confronted, however, Defendants continued to mislead the market by falsely denying and downplaying these issues.  *See* Section VII.B.  In addition, with specific regard to the SportScan data disclosed in the ~~January 10, 2016,~~ Morgan Stanley Report, which included data for 2015 and prior, Plank and the Company did not dispute the accuracy of the data for ~~1Q15, 2Q15~~first quarter of 2015, second quarter of 2015, or 3Q15.

69.117.Further evidence of ~~the reliability~~Plank's knowledge or reckless disregard of the SportScan data is found in ~~an April 10, 2016,~~subsequent Morgan Stanley reports issued during the Class Period.  In a report~~.  Therein~~ dated April 10, 2016, Morgan Stanley continued to discuss the declining demand for Under Armour apparel, particularly in women's~~.  While Morgan Stanley apparel,~~ based ~~that analysis~~primarily on SportScan data~~,~~.  Morgan Stanley noted that Under Armour's SEC filings corroborate the SportScan data.  In particular, Under Armour's disclosures "show sales to its biggest customer . . . were -8% in 4Q15," which is consistent with the declining apparel demand revealed in the earlier Morgan Stanley Report.  Morgan Stanley also noted that Dick's SEC filings "show a deceleration in UA sales growth~~," which was~~" consistent with the negative trends shown by SportScan.  Indeed, Under Armour sales to Dick's corroborate the "fundamental shift" of competing on price rather than a premium brand image.  As demand for Under Armour declined and the Company changed course to increased promotions and lower ASPs to find revenue, Under Armour sales to Dick's declined steadily.  As a percentage of Under Armour's revenue, sales to Dick's fell from 14.4% in FY14, to 11.5% in FY15, ~~and finally to 10% in FY16~~to 10% in FY16, and dropped below 10% in FY17 and thereafter (per Under Armour's Form 10-K filings), declines that were partly attributable to the fact that Under Armour lost business from Dick's in FY16 after entering into an agreement with value retailer Kohl's, angering Dick's.  *See* Section V.F.  As discussed below, Under Armour and Dick's personnel, including Plank and Dick's CEO, met regularly and exchanged sales data.[56]

70.118.In an October 27, 2016 report, Morgan Stanley continued to discuss falling ASPs at Under Armour and how competing on price rather than "brand image and innovation" evidenced

---

[56]  Nonetheless, Defendants ~~publicly~~falsely and misleadingly downplayed and discredited the Morgan Stanley Report and SportScan data cited therein. *See* ~~¶¶38 n.5, 132, 145-150, 260~~Section VII.B.

the "fundamental shift" Morgan Stanley first revealed in January 2016.  Morgan Stanley noted that its ASP data was based not only on SportScan, but also "on channel checks and conversations with retailers."   Based on extensive analysis from multiple sources, Morgan Stanley concluded the SportScan data was "directionally accurate."

71.119.InOn February 14, 2017, Morgan Stanley issued aanother report lowering its price target for Under Armour Class A shares from $25 to $20.  As it had in prior reports, Morgan Stanley relied on SportScan data, among other inputs.  In support of its continued reliance on SportScan data, Morgan Stanley compared historical SportScan data on total apparel sales growth and ASPs, such as that it disclosed (including data appearing in the January 2016 Morgan Stanley Report, issued on January 10, 2016) to Under Armour's actual results during that same period.  Morgan Stanley concluded: "SportScan data has accurately depicted directional UAA sales trends . . . and we continue to view it as the best source for understanding UAA's US business at a micro level."

<div align="center">

**d.** **Additional evidence of Plank's scienter is found in Plank's statement during the 1Q16 call on April 21, 2016 that "probably the thing that drives [North American distribution] for us more than anything else is just merchandising.** Plank's Participation in Company Meetings

</div>

72.1. . . .   And now we've really gotten to a point where understanding that merchandising needs to be a core competency for us. . . .   And so we really – we identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in 2014, we began building the [merchandising] team in 2015."   Through these merchandising efforts, Plank had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel).   In addition, Plank's statement indicated that the

<div align="center">- 51 -</div>

Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

73.1.   The Company's inventory also received Plank's close attention during the Class Period. As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

On the working capital front, *the majority of our focus is going to be on inventory management and the efficiency of inventory management*.   Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.

First, on the near term – over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates.   This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.

Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory.   These initiatives are focused on how we plan and deliver our seasonal products.

74.1.   Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

*Today, we have inventory data in multiple retail, planning, transportation, and distribution systems*.   In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is extremely powerful.   In fact, very few organizations have been able to achieve this goal.

75.1.   One system through which inventory data was available to Plank was the SAP system discussed by Plank in the statement quoted above (¶63).   The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation channels), and how much inventory was being sent to liquidation. The SAP system provided inventory information for all Under Armour products sold to consumers.   Based on this data, Plank, who was intently focused on inventory, had actual knowledge of, or recklessly

- 52 -

1495422_1

~~disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.~~

~~76.~~120.Plank's scienter is further evidenced by his attendance and presentation at meetings where Company performance was discussed.  Plank presented at quarterly "town hall" meetings ~~throughout~~during the Class Period where Plank discussed the Company's performance.  During two "town hall" meetings held close together in August 2016 or October 2016, Plank discussed how the Company was having struggles.  During the first of those two meetings, Plank discussed having to lower the Company's projections.  During the second meeting, Plank tried to ease employee~~'s~~'s' fears and further explain the situation.

121.   Plank also regularly attended one-on-one meetings with the President of Dick's. Monthly meetings with Dick's and Under Armour employees were also held.  The monthly meetings typically took place in Pittsburgh, at the offices of Under Armour or Dick's.  Sales to Dick's, which was once Under Armour's largest customer, soured heading into the Class Period. During the meetings, as demand for Under Armour products declined, Dick's told Under Armour that sales of Under Armour products at Dick's had begun to downturn significantly.  ~~By~~

~~77.~~122.As further detailed above, by the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did

- 53 -

not sell.  Dick's generally wanted these side agreements documented in emails.  Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  According to WSJ, former Under Armour executives in sales, finance, logistics, and merchandising stated that Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[57]  But, Dick's stopped taking products early after Under Armour struck a deal with value retailer Kohl's, who sold many of the same products as Dick's at lower prices, angering Dick's.[58]

78.1.  Similarly, prior red flags relating to retailer accounts, including TSA, were apparent to the March 2016 announcement that Sports Authority would file for bankruptcy protection, Sports Authority had been open and clear with Company's wholesale team as early as 2015.  Yet, Under Armour about the big problems at Sports Authority.  Throughout the Class Period, Sports Authority had been returning kept shipping TSA inventory.  Unsurprisingly, TSA returned massive amounts of products, some of which had to be charged off by Under Armour.  The large amount of returns from Sports Authority, Dick's and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

---

[57]  *See* Ex. A, at 4.

[58]  *See id.*

2.     ~~Expert Opinion Confirms the SportScan Data Revealed by Morgan Stanley Was "Materially Consistent" with~~TSA, Dick's, and other **Under** Armour customers required significant amounts of time and expense processing the returns (Under **Armour's** ~~Internal Data~~

79.     ~~Professor of Retailing and Director of Retail Studies at Columbia University Business School Mark A. Cohen, an expert and consultant on a wide range of issues in the retail industry, reviewed the Morgan Stanley Report, including the SportScan Data cited therein. After review of the relevant facts and based on his years of experience in the industry, including use of industry data similar to SportScan while a retail CEO, Professor Cohen concluded, "[t]he fact-based sales data from SSI Data disclosed by Morgan Stanley was materially consistent with Under Armour's own internal corporate data." Ex. D at 12.~~

80.     ~~In reaching his conclusion, Professor Cohen noted the Morgan Stanley Report's disclosures regarding declining ASPs and market share, and the "major concern that the company was, and had been since at least Spring 2015, engaged in a 'fundamental shift' away from innovative premium product to product whose appeal was based upon lowered retail prices." Ex. D at 7-8. Professor Cohen further noted, "Morgan Stanley based its exhaustive analysis on specific fact-based industry data, supplied by SSI Data, a leading data aggregator and data analysis group specializing in active and athletic merchandise categories." Id. at 8.~~

81.     ~~In assessing the reliability of the SportScan data cited in the Morgan Stanley Report, Professor Cohen noted that "SSI Data's efforts encompass virtually all of Under Armour's core retail selling channels" and that during his time leading~~ large ~~retailers he had relied on similar industry data. Id. Indeed, "[a]ggregation of source data by independent companies such as SSI Data . . . is a widely adopted and relied upon tool." Id. at 9. Professor Cohen cited several additional facts in support of his conclusion that "[t]he fact-based sales data from SSI Data disclosed by Morgan Stanley was materially consistent with Under Armour's own internal corporate data." Id. at 12.~~

- 55 -

- ~~"Under Armour stated that its internal data was consistent with SSI Data sales information when the Company cited to SSI Data in its own SEC filings when trying to sell stock";~~

- ~~"Under Armour also confirmed that the fact-based sales data from SSI Data was materially consistent with Under Armour's own internal corporate data when it repeatedly touted its market share gains based on SSI Data findings (including during the Class Period). Stated differently, either SSI Data was materially consistent with Under Armour's own internal data, or the Company was misleading investors by touting the SSI Data's findings of market share gains by the Company. They can't have it both ways";~~

- ~~"the Company never disputed the fact-based sales data from SSI Data for 1Q 2015, 2Q 2015, or 3Q 2015";~~

- ~~"Under Armour admitted that for 4Q 2015, the fact-based sales data from SSI Data captured approximately 40% of Under Armour's business";~~

- ~~"SSI Data's sales data encompass virtually all of Under Armour's core retail selling channels";~~

- ~~"the Company~~customers did not ~~dispute the accuracy of the approximately 40% of Under Armour's 4Q 2015 business that SSI Data captured";~~

- 123.   ~~"Under Armour's disclosures of dramatically increased~~pay for shipping).  Returned

inventory ~~levels (that outpaced sales growth), spiking 46% to $783 million in 4Q 2015 after a 36%~~

~~increase in 3Q 2015 corroborate the SSI Data";~~was often liquidated at lower prices and margins.

- ~~"Under Armour's disclosures of declining gross margins in 4Q 2015, which contracted 1.9 percentage points to 48% corroborate the SSI Data. In other words, if the SSI Data disclosing a loss of market share, decelerating sales growth and declining ASP's was accurate you'd expect Under Armour to report increased inventory levels and declining gross margins – exactly what happened";~~

- ~~"[T]he Company's admissions regarding declining sales at its largest customer, Dick's, further corroborate the SSI Data. In fact, Under Armour admitted that sales to its largest customer were -8% in 4Q 2015 – the only quarter it called out as a little bit challenged for assessing company performance using SSI Data"; and~~

- ~~"Morgan Stanley's February 14, 2017, comparison of Under Armour's reported results with what SSI Data had previously reported regarding Under Armour's sales demonstrates that the SSI Data was materially consistent with Under Armour's own internal corporate data. As Morgan Stanley explained, 'SportScan data has accurately depicted directional UAA sales trends [] and we continue to view it as the linked in best source for understanding UAA's US business at a micro level.'"~~

Ex. D at 13-14.

82.    Professor Cohen's analysis and conclusion further demonstrate that the SportScan Data revealed in the Morgan Stanley Report was the same as or materially consistent with the internal corporate data defendant Plank and other Under Armour executives had access to and regularly reviewed.

> ### 3.c.    Defendant Plank Was Motivated to Maintain a Positive Market Perception of the Company and Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value

83.124.For years, Plank had carefully cultivated a public perception of the Company as an up-and-coming, fast-growing challenger to Nike's position as the number one sportswear brand. Plank was highly motivated to maintain this public perception and, in turn, the Company's lofty, artificially inflated common stock prices.

84.125.Plank stood to gain most from the Company's artificially inflated share prices.  He was the Company's largest shareholder throughout the Class Period, owning just over 15% of the Company's total common stock Common Stock outstanding.  As of October 28, 2015, Plank beneficially owned 35,700,000 shares of Class B common stock Common Stock (which were not publicly traded but convertible to Class A common stock Common Stock) and 76,445 shares of Class A common stock Common Stock.  With such a massive equity stake in the Company, Plank was highly motivated to keep the share prices artificially inflated.

85.126.Plank profited handsomely from the artificial inflation by selling a massive number of Under Armour shares during the Class Period.  Specifically, over nine days in November 2015 and April 2016, Plank sold a total of 2,300,000 Under Armour shares for $138.2 million.  With all of Plank's shares coming from stock grants at no cost to him, that $138.2 million was 100% profit. As discussed further in the Declaration of Professor M. Todd Henderson, attached hereto as

1495422_1

~~Exhibit E, Plank's Class Period stock sales were highly suspicious in several respects.~~ Significantly, Plank's Class Period sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company: "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "***the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016***, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[59]

127.   Plank's Class Period stock sales were highly suspicious in ~~amount.  At the start of several respects.  Just prior to~~ the Class Period, Plank ~~beneficially owned 35,776,445 shares of~~ enacted a complicated and risky plan to protect his voting control and status as the unchallenged leader of Under Armour ~~common stock (.  Events such as the Company issuing new shares of~~ Class A ~~and Class B).  In order to maintain voting control, as discussed above,~~ Common Stock for executive compensation had diluted Plank's ownership ~~stake in Under Armour could not~~ share since the IPO.  Thus, Plank was concerned that such compensation, coupled with his own stock sales, would drop his ownership stake below 15~~% of outstanding stock.  Thus, to~~%, causing him to lose voting control.  To maintain voting control, Plank could only sell 3,448,332 shares of Class A and Class B Common Stock.  Because Plank made clear that giving up voting control was not an option and went to great lengths to prevent that from happening, those shares of Plank's needed to maintain his 15% ownership were effectively not available to sell.  To prevent further dilution and protect his control, Plank caused the Company to undertake an extraordinary recapitalization of the Company's balance sheet by issuing a new class of common stock – Class C Common Stock

---

[59]   Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

with zero votes.  Plank advocated for this third class of stock and the need for Plank to maintain control in a June 15, 2015, letter to shareholders.  Plank made clear that the recapitalization was intended to allow Plank to continue selling millions of dollars in Under Armour stock without losing control of the Company.  While Plank told investors "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders," the real beneficiary was Plank. In

128.    Although Plank's $138.2 million in sales were purportedly made pursuant to a Rule 10b-5-1 trading plan ("Plan") providing for his sale of Class B Common Stock and, when issued, Class C Common Stock, this supposed Plan was suspiciously entered into on October 28, 2015, while Plank was already in possession of material, non-public information about the Company - this nullifies the purpose of the Plan.  Moreover, to the extent such a Plan exists, there is no indication that the dates, timing, and price of Class Period sales were pursuant to a written formula in the Plan that were not susceptible to change or influence, or that that trades were in accordance with the unamended Plan.  *See* 17 C.F.R. 240.10b5-1(c).  Thus, any asserted Plan is suspect because it was entered into as a cover for Plank's insider trading at a time he was actively engaged in deceiving investors.

86.129.Specifically, in November 2015, Plank sold 1,250,000 shares of Class B Common Stock for proceeds of $99,968,961 million.  That sale amounted to roughly 36% of the shares Plank could sell without losing control of Under Armour.  In other words, in one week and while in possession of material negative information (in particular the Company's undisclosed "fundamental shift" of competing on price rather than brand strength and suspect sales practices), Plank sold 36% of the shares he had available to sell.

- 59 -

~~87.     As discussed above, just prior to the Class Period, Plank enacted a complicated and risky plan to protect his voting control and status as the unchallenged leader of Under Armour. ¶¶24-28.   Events such as the Company issuing stock-based compensation had diluted Plank's ownership share since the IPO.  To prevent further dilution and protect Plank's control, Plank caused the Company to issue a new class of common stock – Class C Common Stock with zero votes.  Plank advocated for the third class of stock and the need for Plank to maintain control in a June 15, 2015, letter to shareholders.  Plank made clear that issuing the Class C Common Stock was intended to allow Plank to continue selling millions of dollars in Under Armour stock without losing control of the Company.~~  On April 7, 2016, pursuant to Plank's recapitalization plan, the Company issued Class C Common Stock to all holders of Class A and Class B Common Stock. As a result~~While Plank told investors "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders," the real beneficiary was Plank.  On April 7, 2016, the Class C Common Stock was issued to all holders of Class A and Class B Common Stock.  As of April 18, 2016~~, Plank beneficially owned 135,020 shares of Class A Common Stock, 34,450,000 shares of Class B Common Stock, and 34,585,020 shares of Class C Common Stock.

~~88.~~130.  With the issuance of the Class C shares, Plank could continue his Class Period selling spree without ~~giving up any more~~ diluting his voting ~~power~~control.  He did just that.  ~~Over four days in April 2016,~~ Plank ~~sold~~liquidated a total of 1,050,000 of his newly-issued Class C shares~~,~~ for $38~~.2 million~~,262,467 in proceeds~~.~~, in a series of trades over four days on April 26-29, 2016.  As with his November 2015 sales, these were 100% profit.  Plank's April 2016 sales of 1,050,000 Class C shares ~~was~~liquidated a remarkable 42% of the shares he could sell ~~in 2016~~during the entire year without ceding control of the Company.[60]  And, like the November 2015 sales, the

---

[60]   Pursuant to a charter amendment made in connection with the creation of the Class C Common Stock, Plank was limited to selling 2,500,000 shares in any given year or his voting control would unwind.  Although the provision allowed for potential rollover of shares if Plank sold less than 2,500,000 shares in a year, thus increasing his annual limit, that did not apply to 2016 because it was the first year the provision was in effect.

April 2016 sales were made without disclosing the material negative information in Plank's possession.  In particular, at this time, ~~as disclosed by Morgan Stanley,~~ the Company was engaged ~~(and had been engaged)~~ in ~~a~~the "fundamental shift" ~~and had abandoned~~away from its oft-stated bedrock principle of not competing on price~~.~~ and was engaged in suspect sales practices including pulling sales forward in order to mask slowing demand and maintain the appearance of growth. And, Plank was aware of the Company's repeated efforts to move revenue between quarters, including by pulling sales forward.[61]

89.    Importantly, had Plank not ~~effectuated~~recapitalized Under Armour's balance sheet, he would have had to convert and sell additional Class B shares (which carried ten votes) in order to achieve the ~~issuance~~same amount of ~~zero-vote~~total Class Period proceeds ($138.2 million), thereby reducing his ownership of the Company's voting shares.  The recapitalization allowed Plank to avoid this by selling Class C shares~~, he would have been forced to continue selling ten-vote~~ (which carried no votes) instead of Class B shares~~as he did in November~~.  Had Plank sold 1,050,000 ~~shares of Class A or~~Class B shares in April 2016~~, rather than~~ (instead of the 1,050,000 Class C~~, Plank's~~ shares he actually sold), his total Class Period sales (2,300,000 shares) would have ~~amounted to~~represented a much larger portion – approximately 67% – of the shares Plank had available to sell from September 16, 2015, through January 30, 2017, without losing voting control of the Company~~.~~

90.131.~~Plank's Class Period stock sales were out of line with his prior trading.  Plank's Class Period sales of 2,300,000 shares for proceeds (and profit) of $138.2 million occurred over 9 days in November 2015 and April 2016.  Therefore, Plank averaged 1,150,000 shares per selling month in the Class Period.  During the three years proceedings the Class Period, Plank sold during 14 separate months.  In those months, Plank averaged 339,911 shares sold per month.  Thus, Plank~~

---

[61]   *See id.* at 2.

sold more than three and a half times more (3,448,332 shares per selling month during the Class Period than during the prior three years. Likewise, during the Class Period Plank averaged nearly $70 million in stock sales per selling month. During the prior three years, Plank averaged less than $23 million in stock sales per selling month. Again, Plank's Class Period average monthly proceeds during selling months was three times his average monthly proceeds during selling months for the three years prior to the Class Period.).

91.132.Plank's $138.2 million Class Period trades were also out of line with Plank's post-Class Periodsubsequent trading. Indeed, as the truth concealed by Defendants' fraud wasbegan to be revealed and Under Armour's stock price was punished accordingly, Plank stopped selling. Plank has not sold a single share of Under Armour stock since April 2016.

92.133.Plank's Class Period stock sales were also out of line with typical sales by public company executives. For example, a 2010 study found that "the typical CEO sells only about 1.9% of her equity incentives each year." Ex. E at 13 & n.24.[62] In contrast, Plank's November 2015 sales of 36% of the total shares he was able to sell without losing control of the Company were about 18 times the average annual sales of CEOs at large public companies. Plank's April 2016 sales of 42% of shares available to sell isare even more out of line with a typical CEO's behavior.

93.134.Plank's Class Period trading was also suspicious in timing. On September 16, 2015, October 2522, 2015, and November 4, 2015, Plank made a series of misstatements and omissions. ¶¶118, 124-125, 130-131. Beginning that artificially inflated, or maintained the artificial inflation of, the Company's stock price. From November 17-23, 2015, Plank begantook

---

[62] John E. Core & Wayne R. Guay, *Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework*, 24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).

advantage of this artificial inflation by selling approximately $100 million of Under Armour stock. Plank's November 2015 sales were made near all-time highs for Under Armour stock.  Less than two months after Plank reaped $100 million in illicit trading proceeds, the Morgan Stanley Report revealed that the Company's Company was experiencing a core business was in decline, the Company was losing market share, ASPs were falling, key margins were ASPs, and contracting and, unbeknownst to Under Armour investors, key margins, and the Company was (and had been) engaged in a fundamental shift in Company strategy.[63]  The Morgan Stanley Report also observed that the Company's shares had reached an "unprecedented valuation," trading at a price 78 times greater than the Company's earnings per share ("EPS") in FY15.[64]  Moreover, unbeknownst to Under Armour investors, Defendants were using undisclosed, suspect sales practices to mask slowing demand and make the Company appear healthier, including moving revenue between quarters by, among other things, pulling sales forward.

94.     Plank's sales in April 2016 ($38.2 million) were likewise suspicious in timing.  On March 2, 2016, one of Under Armour's biggest customers, Sports Authority, announced it was filing for bankruptcy.  On April 16, 2016, Sport Chalet, another of Under Armour's wholesale customers, announced it was going out of business.  Despite those announcements, during the on April 21, 2016 conference call to discuss 1Q16 results, Plank raised 2016 guidance and made a series of other false and misleading statements and omissions regarding the Company's purportedly strong financial condition, as alleged herein, causing Under Armour's stock prices to continue to trade trading at artificially inflated prices.

95. 135.  A few days later, on April 26, 2016, Sports Authority declared that rather than restructure and continue to operate in some capacity, as it had previously planned to do, it would

---

[63]  Ex. C.

[64]  *Id.* at 3.

liquidate.  That very same day, Plank sold 225,000 shares for nearly $10 million in profit.  In total, between April 26, 2016, and April 29, 2016, Plank unloaded 908,570 shares for $38.2 million in profit, taking advantage of the recapitalization plan discussed above.  At that time, Plank knew that the Company was engaged in suspect sales practices when at the same time the Company was losing one of its biggest customers and facing waning demand.[65]

136.   Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016, through November 3, 2019.

96.137. The financial press took note of Plank's "amazing" timing.  A February 7, 2017, article on *TheStreet.com* titled, "Under Armour Founder Kevin Plank Has Been Amazing at Predicting Recent Stock Crashes," noted "it shouldn't come as a shock that Plank's recent stock trades were a good indicator on the company's surprising new challenges, and Wall Street's subsequent brutal response." With regard toRegarding Plank's April 2016 sales, the article stated "[t]he sales were well-timed."

97.   Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016 through August 1, 2017. Significantly, Plank stopped selling shares altogether after April 2016, demonstrating that his sales were timed to capitalize on the Company's artificial stock price inflation, before the truth about

---

[65]   In April 2020, Plank belatedly disclosed additional Class Period sales from 2016 that were also suspicious in timing:  these sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company and while Plank possessed material negative information, including that the Company was engaged in the "fundamental shift" away from its oft-stated bedrock principle of not competing on price and was engaged in suspect sales practices like pulling sales forward to mask slowing demand and maintain the appearance of growth.  Although Plank's November 2015 and April 2016 trades were purportedly made pursuant to a Rule 10b5-1 trading plan, these belatedly-disclosed 2016 trades were not.

- 64 -

the Company was revealed.  As the truth leaked out, and the artificial inflation was removed from the stock, Plank no longer had the same motivation to sell.

98.138.Plank was also motivated to misrepresent and conceal the Company's true financial condition in order to conduct the Bond offering for nearly $600 million in proceeds on June 8, 2016.   On June 6, 2016, Under Armour filed a registration statement on Form S-3ASR ("Registration Statement") with the SEC regarding the Bond offering.  The Company also filed Forms 424B5 and FWP with the SEC on June 8, 2016 (with Registration Statement, "Offering Materials").  Pursuant to the Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million ("Offering").

99.139.The Company, and in turn Plank, immediately benefited from the Offering, receiving $593.6 million in total net proceeds.  The Offering terms would have been far less favorable to the Company had the market known the truth about the Company's ailing financial condition.  As the truth concealed by Defendants' Class Period misstatements and omissions was revealed through a series of partial disclosures, the Bonds were downgraded to junk status on February 1, 2017.  Had the Bonds been issued a junk status rating at the time of their issuance, the Offering would have made less financial sense and been less advantageous to Under Armour, particularly because Defendants intended to use the Bond proceeds to repay outstanding debt under its revolving credit facility.  Furthermore, Under Armour reported negative free cash flow in 2015 and 2016.  In fact, the Company's reported negative cash flow from operations of -$44 million in FY15 was its first negative operating cash flow year since FY07 and down from $219 million in FY14.  Under Armour's cash position provided an acute need for the Bond proceeds.  These facts were well known to Plank, serving as additional motive to misrepresent and conceal the

- 65 -

Company's true financial condition and suspect sales practices to keep the Bonds above junk status.

4.      **Expert Opinion Confirms that Plank's Class Period Stock Sales Were Highly Suspicious**

100.    Professor M. Todd Henderson, an expert on securities regulation and corporate governance, including executive compensation and insider trading, reviewed Plank's insider trading during the Class Period. After review and analysis of the relevant facts, including years of trading history by Plank, Professor Henderson concluded:

> Based on my research on executive compensation, securities regulation, and corporate governance, as well as my experience in consulting with companies regarding these issues, my opinion is that Mr. Plank's Class Period stock sales were extremely unusual and suspicious. For instance, during the Class Period, Mr. Plank sold more than one-third of the stock he had available to sell (while maintaining voting control). As explained below, the sale of between 36 percent and 42 percent of saleable shares raises serious suspicions about his motives. Moreover, Mr. Plank sold over three times more stock per month during the Class Period than his recent historical average. This dramatic departure from his past trading practice, coupled with the record high prices and the significant stock price declines shortly after his sales, as well as the Plaintiffs' allegations regarding Mr. Plank's informational advantage demonstrates that these stock sales were unusual and suspicious.

Ex. E at 2.

101.    Professor Henderson examined the amount of Under Armour shares beneficially owned by Plank as well as the Company's dual-class stock structure prior to April 2016. Ex. E at 5-6. Professor Henderson discussed the Company's "sunset provision" whereby Plank would lose voting control of Under Armour if his ownership fell below 15% of total shares outstanding. *Id.* at 6. Professor Henderson further noted, "Mr. Plank (and the Company) went to extraordinary lengths – including creating a new class of common shares (Class C) during the Class Period – to preserve Mr. Plank's personal control over the Company." *Id.* And that "[t]he evidence is overwhelming that Mr. Plank would not sell below 15 percent and give up control." *Id.* at 8. Based on the foregoing, Professor Henderson determined that, in analyzing the percent of holdings Plank sold during the Class Period, the "appropriate denominator . . . is not his 'overall holdings,' but

- 66 -

rather the shares he could sell while still retaining his position as the controlling shareholder of Under Armour." *Id.* at 4. "Using 'shares available to be sold' as the denominator, Mr. Plank sold approximately 36 percent of his shareholdings" in November 2015. *Id.* at 6. Professor Henderson opined, "this amount is extraordinary." *Id.* at 9.

102. With regard to Plank's April 2016 sales of 1,050,000 shares for $38.2 million, Professor Henderson found "[t]hese sales amounted to 42 percent of all shares Mr. Plank could sell that year without implicating his control over Under Armour." *Id.* at 10. That was because "[a]ccording to the revised charter after the issuance of the Class C shares, Mr. Plank could sell a maximum of 2.5 million shares in 2016." *Id.* at 10. Professor Henderson concluded, "[i]t is extraordinary for a CEO to sell such a high percentage of their shareholdings in a given year." *Id.* at 11.

103. Professor Henderson also analyzed Plank's April 2016 sales in the context of Plank's intent on maintaining control of Under Armour. *Id.* at 9-12. Professor Henderson noted Under Armour's recapitalization to introduce Class C shares. The recapitalization was motivated by "the concern that sales by Mr. Plank, as well as issuance of new Class A shares for executive compensation, were causing a dilution of Mr. Plank's ownership that was approaching the 15-percent threshold that would 'unwind' his position as controlling shareholder." *Id.* at 9. Professor Henderson opined, "Under Armour took significant risks to enable" Plank to sell without "implicating his voting control." *Id.* at 11. Professor Henderson concluded, "Mr. Plank took immediate and aggressive advantage of the new opportunities to liquidate his shares in Under Armour after receiving the Class C share dividend in April 2016. Over five days later that month, he sold 1,050,000 Class C shares for proceeds of $38.3 million." *Id.* at 10.

104. In evaluating the benefit of the Class C issuance, Professor Henderson analyzed the percent of available shares Plank would have sold if the recapitalization had not been effectuated. Without the Class C share issuance, Plank would have had to sell more Class A or Class B shares in April 2016. "In that case, Mr. Plank's April 2016 sale of 1,050,000 shares would have, when added to his 1,250,000 shares sold in November 2015, brought his total Class Period sales of Class

- 67 -

A shares to 2,300,000." *Id.* at 12.  Had Plank sold 2,300,000 – Class B shares during the Class Period – as he would have had to do without the risky Class C issuance – Plank's Class Period sales "would thus have been approximately 67 percent of the total shares he had available to sell." *Id.* at 12.  Only a "radical plan to recapitalize Under Armour" avoided that outcome. *Id.* at 3.

105.   Professor Henderson also compared Plank's Class Period trading with Plank's trading history in the three years prior to the Class Period. *Id.* at 13-14.  Professor Henderson observed that, based on Plank's November 2015 and April 2016 sales, Plank "sold an average of 1,150,000 during these two months during the Class Period." *Id.* at 13.  In the three years prior to the Class Period, Plank sold during fourteen separate months.  "In those months, [Mr. Plank] averaged 339,911 shares sold per month.  In other words, he sold almost three and a half times more shares per month during the Class Period than his practice during the prior three years selling Under Armour shares." *Id.* at 13.  Likewise, Professor Henderson observed Plank "averaged sales of nearly $70 million per month" during the Class Period but only "$23 million in proceeds per month in which he sold" in the three years prior to the Class Period. *Id.* at 13-14.  Based on these facts, Professor Henderson concluded Plank's "Class Period sales were three times more than his recent historical average" and dramatically out of line with his prior trading practices." *Id.* at 14.

106.   Professor Henderson further noted that Plank "has not sold a single share of Under Armour stock" since April 2016. *Id.*  "This strongly undercuts any claim that somehow his base salary was insufficient and therefore excused the earning of abnormal returns from his stock sales during the Class Period.  It also reinforces how unusual [Mr. Plank's] Class Period sales were." *Id.*

107.   Professor Henderson also compared Plank's Class Period trading with that of "the typical public-company executive." *Id.* at 12-13.  Professor Henderson cited a 2010 study that concluded, "'the typical CEO sells only about 1.9% of her equity incentives each year.'" *Id.* at 13 & n.24.  By comparison, Professor Henderson observed, Plank sold "at least 36 percent of his shares in several days during November 2015 – about 18 times more than the typical CEO of a large, public company." *Id.* at 13.

- 68 -

108.    Based on all of the foregoing, Professor Henderson concluded,

Based on my research, experience and analysis here, *Mr. Plank's Class Period stock sales are highly suspicious in timing and amount*.   At a time when Plaintiffs allege Mr. Plank was in possession of material negative information about Under Armour's business, Mr. Plank engaged in massive trades of Under Armour stock that were timed at record high prices.   As detailed herein, the attributes of these trades make them unusual and suspicious.

Mr. Plank sold at least 36 percent of his available shares during one month during the Class Period.   After an extraordinary recapitalization of the stock precipitated in part by this massive selling, in April 2016, Mr. Plank sold 42 percent of his available shares for the year in just a few days.   This large-scale dumping of shares is dramatically out of line with his prior trading practice over the prior three years and atypical for CEOs of large public companies.   The sales during the Class Period were not just unprecedented, they have never been replicated – Mr. Plank has not sold any Under Armour stock in 30 months since that time.

Moreover, the 36-percent number actually understates the relative level of Mr. Plank's selling.   Under Armour undertook a costly and risky recapitalization of its stock in order to permit him to sell more shares without imperiling his voting control. Had they not done so, Mr. Plank would have had to sell approximately 67 percent of all his available shares during the Class Period to achieve the same $140 million in proceeds.   This effective amount is truly extraordinary with respect to his own behavior and that of peer executives.

*Id.* at 14-15.

## ~~H.~~2.    The Scienter of Company Executives Is Imputed to Defendant Under Armour

~~109.~~140.    ~~Defendant~~ Plank's scienter is imputed to Under Armour.   In addition, numerous facts demonstrate that other members of the Company's senior management knew or recklessly disregarded the adverse facts concealed by the Class Period misrepresentations.   The scienter of these Under Armour executives, like that of Plank, is imputed to Under Armour. Because Plank and other members of Under Armour's senior management had the requisite scienter, Under Armour had the requisite scienter.

~~110.~~141.    In addition to Plank, the extensive information and reporting systems discussed above (¶¶~~63-64, 73-75~~107-108, 111-112) were available to other Company executives. Everyone at Under Armour on the sales team had full visibility into detailed and regularly updated

- 69 -

sales data.  Declining demand, excess inventory, and margin compression were widely discussed throughout Under Armour.  According to former Under Armour executives, as reported by WSJ: "The strains in Under Armour's business were evident inside the company in 2016."[66]  And, Under Armour employees in sales and planning relied on massive and constantly-updated spreadsheets with detailed sales and inventory data to track the Company's undisclosed practices of pulling forward sales and determine what inventory to get rid of.

142.   Two of the Company's most senior executives, former CFOs Dickerson and Molloy, made numerous public statements in which they discussed the Company's apparel sales growth, sales prices, inventory levels, and gross margins, evidencing their personal knowledge of such matters.  This included prepared statements on, and detailed answers about, at least one of those matters during every quarterly earnings call with securities analysts during their respective tenures in the Class Period.  During the Company's 2015 Investor Day, for example, Dickerson specifically acknowledged his and the Company's close monitoring of inventory, stating that "the majority of our focus is going to be on inventory management and the efficiency of inventory management."  Dickerson and Molloy also echoed these statements in numerous press releases and SEC filings of the Company during the Class Period.  Along with Plank, Dickerson signed and certified the Company's false and misleading Form 10-Q issued on November 4, 2015, and Molloy signed and certified the Company's false and misleading Form 10-K issued on February 22, 2016, and Forms 10-Q issued on April 29, 2016, August 3, 2016, and November 2, 2016.  Dickerson's knowledge of the SportScan data reported by Morgan Stanley is further supported by the fact that he discussed and responded to the Morgan Stanley Report at length during the Company's 4Q15 earnings call on January 28, 2016, as detailed in ¶183.  While he (along with

---

[66]   Ex. A, at 3.

Plank) tried to downplay and discredit the report and reassure the market of the Company's financial strength as to each of the business segments addressed in the report, these statements were simply motivated to keep the Company's stock price afloat, and ultimately proved false and misleading later in the Class Period, when Defendants revealed the same problems reported by Morgan Stanley.

143.   Moreover, in just over a one-year period, as Defendants' fraud was gradually revealed to the market, Dickerson and Molloy both departed the Company.  Molloy's abrupt departure came only 13 months after he had joined the Company, replacing Dickerson.  And, according to WSJ, investigators are examining "the tenure of former finance chief Chip Molloy."[67] These sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that Dickerson and Molloy knew of the fraud detailed herein.

144.   Molloy's replacement as CFO, Bergman, also knew of the fraud detailed herein. Along with Plank, Bergman personally received a Wells Notice from the SEC informing him that SEC Staff made a preliminary determination to recommend that the SEC file an enforcement action against him alleging violations of the federal securities laws.  During the Class Period, Bergman signed and certified the Company's Forms 10-Q issued on May 9, 2017, August 8, 2017, and November 9, 2017; May 10, 2018, August 3, 2018, and November 5, 2018; and May 9, 2019, and August 1, 2019; and the Company's Forms 10-K issued on February 23, 2017, February 28, 2018, and February 25, 2019.

111.145.   Kip Fulks, ("Fulks"), the Company's co-founder and Chief Product Officer CPO during the Class Period, and Plank's "right-hand man," attended the Company's monthly sales meetings with Dick's.  Brian Cummings, Senior Vice President VP Regional Sales

---

[67]   Ex. A, at 2.

("Cummings"),, also attended these meetings.  As noted, the declining demand for Under Armour products at Dick's was discussed at these meetings, and Dick's provided Under Armour with detailed sales reports.  Cummings pressured the Under Armour sales team to do whatever they could to get the sales, and the sales team was encouraged to get customers to place orders by telling them that the orders could be cancelled or returned later.  For example, Cummings orchestrated a deal with Dick's in early 2016 wherein Cummings convinced Dick's to order shoes that Dick's did not want (Dick's predicted they would have to return 80% of the shoes).  But, Cummings agreed that Under Armour would take back any unsold product.  Dick's ended up returning 80% or more of the deal later in 2016.

112.146.    Fulks and Cummings also received internal sales reports every Monday.  The sales team also prepared summaries of the sales data for upper management.  In addition, sales management had a "dashboard" on their computers or tablets to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  For example, sales reports in 2016 indicated that the sell-through for Under Armour's athleisure products was only around 1% to 2%, when it should have been closer to 10% to 15%.

113.147.    The Company's extensive inventory reporting systems were not limited to Plank.  Rather,, including information about excess inventory, was widely available.  Indeed, the Company's inventory problems, including excess inventory across all brands, were topics of frequent discussion.  For example, Matt Mirchin, President North America and later Strategic Advisor Global Revenue ("Mirchin"),, Rob Goodwin, Vice President ("Goodwin"), VP of North American Merchandising, Bill Healy, Director Hunt/Fish & Tactical Sales, Kevin Eskridge, Senior Vice PresidentVP Global Merchandising and later President Sports Performance, and Cummings

- 72 -

discussed excess inventory. Goodwin noted that Under Armour had the most excess inventory he had ever seen at a company. The amount of excess inventory grew so large that Under Armour's liquidation channels became flooded and, for some of the inventory, there was nowhere to go.

## ~~II.~~VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

~~114.~~148.    Throughout the Class Period, Defendants misrepresented the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies. Defendants' misstatements and omissions failed to provide a full picture of the true circumstances at Under Armour. In reality, the Company's primary product category, apparel, suffered from reduced customer appeal and demand, which hurt the Company's revenue and operating income growth, created excess inventory, ~~forced the Company to make a fundamental strategic shift to competing on price rather than premium strength (*i.e.*, dropping sales prices), and compressed the Company's margins.~~ caused Defendants to make a fundamental strategic shift to competing on price rather than premium strength (*i.e.*, dropping sales prices), and compressed the Company's margins. Defendants concealed these problems and employed several fraudulent sales and accounting practices, in violation of GAAP,[68] to inflate Under Armour's quarterly financial results and growth in order to appear healthier and to mask slowing demand. These practices included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter,

---

[68]   Defendants' GAAP violations and materially false and misleading financial statements during the Class Period are detailed in Section VIII, below.

which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy and the goods would be returned; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman alleging violations of the federal securities laws by pulling forward sales during the Class Period.

115.149.      When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about the Company and its products that would have made such statements not misleading.  Specifically, they were under a duty to disclose the Company's slower revenue and operating income growth, lower ASPs, increased discounting and promotions, elevated inventory, and compressed margins attributable to the Company's apparel issues and fundamental shift in strategy (competing on price rather than brand strength) during the Class Period, and their manipulation of quarterly results, including by pulling future sales forward in order to appear healthier and to mask slowing demand.  This information was material because it would have altered the total mix of information made available to reasonable investors.  However, Defendants failed to reveal this information, and, instead, they omitted and concealed it from investors.  In addition, many of Defendants' statements about sales, demand, market share, pricing, inventory, and margins were explicitly and materially false and

misleading in and of themselves.   Defendants' material omissions and false and misleading statements are detailed in this section.

116.150.   Defendant Under Armour is liable for the material misstatements and omissions of its employees alleged herein.   Likewise, as CEO, Chairman, and controlling stockholder throughoutduring the Class Period, Defendant Plank is liable for the material misstatements and omissions of Under Armour employees alleged herein.

A.   **2015 Investor Day**

117.151.   The Class Period begins on September 16, 2015.  On that day, the Company held its 2015 Investor Day.  Plank and other members of Under Armour's senior management gave presentations on behalf of the Company.

152.   Throughout the meeting, Plank and other senior executives repeatedly represented that the Company was experiencing increased demand and sales growth in key categories. Throughout the meeting, Plank and other senior executives repeatedly made false and misleading statements that the Company was experiencing increased demand and sales growth in key categories.  In particular, Defendants failed to disclose that they inflated the Company's financial results and growth to appear healthier and to mask slowing demand for Under Armour by (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  As noted above, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they

- 75 -

violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015, which is the same quarter the Investor Day statements were made.

~~118.~~153.      Plank stated that "[t]he demand for our brand has never been stronger" and represented that the "drivers" of sales growth were the same as they had been "over the past 10 years."  ~~Chief Merchandising Officer~~CMO Stafford told investors that Under Armour's "men's business is stronger than ever."  With respect to women's products, in particular, ~~Vice President~~VP of the Women's Division, Kelly Cortina, added, "[d]emand for our product is growing."  And Peter Ruppe, Senior ~~Vice President~~VP Footwear, stated that the Company had "raised margins" in the footwear division.

~~119.~~154.      Dickerson added that "[a]pparel, our largest category, continues to grow over 20%."  Stafford told investors that the Company was "increasing our ASPs" in men's apparel. Defendants failed to disclose that the Company's apparel business – its largest and most important business – was compressing margins as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

~~120.~~155.      Another Company representative, Susie McCabe, Under Armour's Senior ~~Vice President~~VP of Global Retail, made clear that Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

~~121.~~156.      With regard to wholesale sales, which accounted for 65% of Under Armour's sales in 2016, Mirchin, President North America, misleadingly stated that "[Under Armour's] relationship and our partnership with Dick's has never been stronger and our business continues to grow."  Mirchin stated that the Company had "incredible growth at wholesale."

~~122.~~157.     Analysts reacted positively to Defendants' statements made at Under Armour's 2015 Investor Day.  For example:

(a)     in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating and stated, "UA continues to be our *#1* pick for long-term growth investors."   In support of the positive outlook, the report noted the "company has been patient and methodical in managing the growth of the brand by only entering the proper channels";

(b)     on September 16, 2015, KeyBanc Capital Markets issued a report stating "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and investments should continue to support >20% top-line growth over the next few years. We think UA's impressive growth demonstrates the power of strong brands";

(c)     on September 17, 2015, Cowen and Company issued a report raising its estimates and increasing its price target to $120 from $112, stating, "[m]anagement's revenue targets could ultimately be conservative given the acceleration in investments"; and

(d)     on September 17, 2015, BB&T Capital Markets issued a report raising its price target to $115 and commenting, "we came away from UA's Investor Day enthusiastic about the brand's trajectory."

158.   The Company's Class A Common Stock increased from a closing price of $49.34 per share[69] on September 15, 2015, to $51.68 per share on September 16, 2015, and $52.05 per share on September 17, 2015 (the stock's all-time high closing price).

---

[69]   The prices of Class A Common Stock on or before April 7, 2016, referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

123.159.	Defendants' misstatements and omissions on September 16, 2015, as set forth in ¶¶118-121151-156 above, were materially false and misleading and omitted material facts for the following reasons:

(a)	Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and, promotions, and liquidations, and compressed margins (see ¶¶37-51, 134-138);

(b)	Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (see ¶¶134-138);

(c)	the sales growth and demand trumpeted by Defendants were overstated by their undisclosed quarterly practice of shifting sales from quarter to quarter to appear healthier and to mask slowing demand, including by pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

(c)(d)	Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that apparel growth was continuing and that demand for the Company's products "has never been stronger" (see ¶118); and," when in truth Under Armour was experiencing declining demand and using pull-forward sales and contingent sales pursuant to buyback agreements to maintain a façade of growth;

- 78 -

(d)(e)   T the Company was not "protect[ing] the brand" through controlled use of off-price distribution and refraining from "chas[ing] easy profits"; rather, the Company was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth projections, in an attempt to combat the core apparel declines, which compressed margins (see ¶120).; and

(f)   3Q15 Under Armour's wholesale business, including with Dick's, was not "stronger" but weaker, and the Company did not have "incredible growth at wholesale."  In fact, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale.

**B.**   **Third Quarter 2015 Financial Results**

160.   On October 22, 2015, the Company issued a press release announcing its financial results for 3Q15, followed by a conference call the same day to discuss those results.  On November 4, 2015, the Company filed a Form 10-Q with the SEC reporting its financial results for 3Q15.  In the press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO

Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015 when they made these statements.

124.    The press released stated gross margin headwinds were "partially offset by favorable product margins." During a conference call held that same day to discuss the 3Q15 results, Dickerson stated that "[i]nventory for the quarter increased 36% to $867 million."

125.161.    During the October 22, 2015 conference call, Plank again misrepresented the level of demand for the Company's products, which he would later admit had failed to adapt to changing consumer preferences.¶¶224-225, 230, 241, 251. ¶¶275-276, 301-303.  Plank stated that the Company was experiencing "unparalleled demand for the Under Armour brand."  During the conference call, Dickerson stated that "[i]nventory for the quarter increased 36% to $867 million."

126.162.    Dickerson admitted that margins had contracted, but he misleadingly blamed such contraction on relatively benign factors including the strength of the U.S. dollar, exchange rates, and the emerging footwear business (which carried lower margins), rather than declining sales of apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins:

> Moving on to margins, third quarter gross margins contracted 80 basis points to 48.8%, compared to 49.6% in the prior year's period.  The following factors were the primary drivers during the quarter.  First, the continued strength of the US dollar negatively impacted gross margins by approximately 90 basis points versus the prior year.  Second, sales mix negatively impacted gross margin by approximately 50 basis points in the third quarter versus the prior year, primarily driven by the continued strong performance of our footwear business.

> Also, on our ongoing focus to better flow of product to service our business resulted in higher freight expenses, which negatively impacted gross margin by approximately 20 basis points in the quarter versus the prior year.  Partially offsetting these margin pressures, we continue to see favorable product margins in both our North America and international business, which benefited gross margin by approximately 90 basis points in the third quarter.

127.163.    Dickerson further represented that "we *continue* to see favorable product margins in both our North America and international businesses" and that "we will *continue* to see improvements in our product margins."   Dickerson was asked for additional detail on the Company's margin contraction during the question-and-answer session with analysts, and made clear that margins in the apparel business were not to blame, and were actually improving "right now":

> **Omar Saad, Evercore ISI:** . . . [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera.  But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that.  Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?

> **Dickerson:** That's really probably more on our core apparel business.  Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, ***most of our core apparel product margins are improving***.  That's helping offset some of the other pressures we talked about.

> **Saad:** Is that more generating scale in the business on the cost side? Are you taking price strategically, or is it mixed to more premium products? Maybe just expand a little bit more?

> **Dickerson:** Yes, it's a little bit across the board. . . .  But, again, you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so ***that's where we're seeing it right now***.

128.164.    Separately, Dickerson failed to attribute elevated inventory levels to the Company's slowing apparel sales.  Instead, he misleadingly blamed this on a strategic plan to flow product to customers in a timelier manner, and stated the "bigger driver of" increased inventory levels "is the flow of product."

129.165.    Analysts reacted positively to Defendants' statements on October 22, 2015, regarding Under Armour's strong 3Q15 financial results.  For example:

(a)    in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results;

- 81 -

1495422_1

(b)     on October 22, 2015, SunTrust maintained its "Buy" rating and commented that Under Armour showed "[s]trength across categories" and its guidance should prove "conservative"; and

(c)     on October 23, 2015, Telsey Advisory Group ("TAG") issued a report maintaining its "Outperform" rating and saying the results "marked another solid beat and raise quarter" for Under Armour.

130.166.     On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15, which were also discussed in the Company's press release and during its earnings call on October 22, 2015.  The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

131.167.     Plank signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating, in relevant part:

1.     I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*     *     *

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

- 82 -

adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

~~132.~~168.     Defendants' misstatements and omissions on October 22, 2015, and November 4, 2015, as set forth in ¶¶~~124-128, 130, 131~~160-164, 166-167 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting ~~and~~, promotions, and liquidations, and compressed margins ~~(see ¶¶37-51, 134-138);~~.

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth ~~(see ¶¶134-138);~~.

(c)     the net revenue growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

~~(c)~~(d)   Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including

- 83 -

apparel growth, remained strong and consistent with historical trends (see ¶125); when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and contingent sale pursuant to buyback agreements to maintain a façade of growth;

(d)(e)   The Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline.  Rather, they were narrowing due to increasing Company discounts and promotions and, falling ASPs of the Company's products (see ¶127);, and increasing liquidations;

(e)(f)   The "bigger driver of" the Company's increasing inventory was not a strategic plan concerning "the flow of product" but, rather, the declining sales of apparel (see ¶128);apparel sales and reduced demand for Under Armour's products;

(f)(g)   The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (see ¶130);  Under Armour only maintained the false appearance of growth by engaging in the suspect sales practices described herein; and

(g)(h)   The Company's Form 10-Q for 3Q15 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

## ~~III.~~VII.        INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

~~133.~~169.        Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins.  The truth was ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's common stock prices.  The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the ~~state of the Company's financial condition.~~true state of the Company's financial condition and by concealing Defendants' improper sales and accounting practices, which inflated its quarterly financial results and growth to appear healthier and to mask slowing demand for its products, including by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a

- 85 -

preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.  By continuing to mislead the market in this manner, Defendants kept the Company's common stock prices artificially inflated throughout the remainder of the Class Period.  This section details the partial revelations of truth regarding Defendants' fraud, the resulting Under Armour common stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's common stock prices artificially inflated even as the truth began to leak out.

A.     **Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour**

134.170.     On Sunday, January 10, 2016, Morgan Stanley issued a report downgrading the Company, reducing its sales and ~~earnings per share ("~~EPS~~")~~ growth forecasts for the Company, and significantly reducing its price target for the Company's stock from $103 to $62 per share.[70] Based on analysis of several data points, including fact-based sales data capturing Under Armour's core sales channel provided by SportScan, Morgan Stanley revealed a "fundamental shift" at Under Armour whereby the Company had, unbeknownst to investors, began competing on price rather than its premium brand image.[71]  Citing retail data, the report explained that the Company's North American apparel business was slowing, leading to market share and average sales price declines:

> Data indicates near-term earnings uncertainty is more than just weather: Recent SportScan data shows [Under Armour] is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace.  Both trends are more pronounced in women's apparel, despite major marketing investment in this division last

---

[70]   ~~See Morgan Stanley Report~~Ex. C, at 1.

[71]   ~~See id~~Id. at 2.

year.  Though warm weather surely explains some of this, we think [Under Armour] may be reaching maturity in US apparel faster than previously thought.  Though we remain constructive on [Under Armour]'s int'l opportunity, we don't think the shares are priced for a US slowdown.[72]

~~135.~~171.          According to the retail data disclosed in the report, the declines were occurring since at least spring of 2015 (prior to the Class Period):

> Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests [Under Armour] is losing apparel market share (Exhibit 5).  Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single- digit growth this year.  This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs (Exhibit 6).[73]

~~136.~~172.          In particular, the report concluded, based on the retail data, that the Company's sales of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth, falling ASPs, and market share losses cited above have been more pronounced in women's apparel.  Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share loss in women's has been larger and happening for 5 months, while Nike continues to take share (Exhibit 7)."[74]  This was "concerning because Under Armour invested nearly $15M in a major marketing campaign in 2014 targeted toward women. . . .  To continue its growth story, [Under Armour] must excel in women's apparel."[75]

~~137.~~173.          The report also raised concerns about Under Armour's potential distribution deal with Kohl's~~, a mid-tier department store that ran frequent promotions~~.  "Entering Kohl's

---

[72]   ~~*See id*~~*Id*. at 1.

[73]   ~~*See id*~~*Id*. at 4.

[74]   ~~*See id*~~*Id*. at 6.

[75]   ~~*See id*~~*Id*.

- 87 -

would seem like Under Armour is risking some of its brand equity to find growth . . . [and] would imply there may not be as much growth in these other channels as previously thought."[76] Expansion to Kohl's would be further evidence of a "fundamental shift" at Under Armour because it "risks eroding the premium image of the UA brand" in order to try and maintain revenue growth with higher volume lower priced sales.[77]  Morgan Stanley further noted that the move to Kohl's "was not part of UA's 2018 plan given at its investor day" and expansion into Kohl's would signal that "growth is becoming harder to find for UA than previously thought."[78]  In subsequent reports, Morgan Stanley explained further that a move by Under Armour into mid-tier stores "changes the UA investment thesis.  One main reason to own UA is it is a premium brand.  Premium brands have reputations for having higher margins, holding price better, and having more sustainable cash flows long-term.  The market, in turn, would likely not perceive the same growth or margin story that it used to and send the P/E lower."  Put another way, "adding more mid-tier doors is really UA just taking its brand down – essentially trading on its premium brand image in exchange for sales growth."

138.174.    In addition to the apparel problems, the Morgan Stanley Report, citing the fact-based retail data, noted that "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . .  [Under Armour] has always competed on brand image and innovation, rarely on price.  This change in trend is a major concern because

---

[76]  *See id*Id. at 7.

[77]  *See id*Id.

[78]  *See id*Id. at 4.  As other analysts at the time noted, Under Armour made clear at Analyst Day that its focus was on "premium distribution" and "premium locations" in order "to maintain brand strength."  *See* Brean Capital'sCapital, LLC, UA: Initiating with a Buy; As Good of A Growth Story As There Is, October 15, 2015 report.

- 88 -

this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."[79]   The report also noted that, with respect to the Company's Curry Two basketball shoes, Under Armour appeared to be "trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."[80]

139.175.          In response to the Morgan Stanley Report, the Company's Class A common stockCommon Stock price fell sharply.  After closing at $37.50 per share[81] on Friday, January 8, 2016, the stock closed at $34.98 per share on Monday, January 11, 2016 (the first trading day after the report was issued), a decline of 6.72% ($2.52 per share), on unusually high trading volume of over 29 million shares.

140.176.          In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example:

(a)      on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS";

(b)      in a report dated January 25, 2016, Cowen and Company lowered its estimates and reduced its price target to $95 from $110; and

(c)      on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that product discounting was "likely worse than expected."

---

[79]   See id.Ex. C, at 1.

[80]   See idId. at 10.

[81]   The prices of Class A common stock on or before April 7, 2016 referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

**B.    Misleadingly Positive** ~~4Q15 and FY15~~ Fourth Quarter 2015 and Fiscal Year 2015 **Financial Results and Downplay of the Morgan Stanley Report**

~~141.~~177.      On January 28, 2016, Defendants issued a press release announcing the Company's 4Q15 and FY15 financial results.  The press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 90 basis points from sales mix, specifically from strong footwear growth, approximately 80 basis points from the continued strength of the U.S. Dollar, and approximately 30 basis points from higher liquidations." Defendants held a conference call that same day to discuss the 4Q15 and FY15 results.  During the January 28, 2016 conference call, Dickerson stated that "[i]nventory for the quarter increased 46% to $783 million compared to $537 million at December 31, 2014."  On February 22, 2016, the Company filed a Form 10-K with the SEC reporting its financial results for 4Q15 and FY15.

178.    In the 4Q15 and FY15 press release, on the subsequent conference call, and in the Form 10-K, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

142.179.   In the January 28, 2016, press release and conference call, Plank continued to represent to investors that Under Armour's core products were in high demand and Under Armour was and would continue to be a premium brand.  Plank stated "'[o]ur core business remains incredibly strong'" and that Under Armour's "growth story is strong, we remain a growth company, and none of that is wavered."  Although he would later admit the Company's apparel offerings had failed to change with consumer preferences, Plank led investors to believe the Company's revenue growth was based on high demand for core apparel.  Plank stated that "[i]n the fourth quarter, Apparel growth of 22% show cases that our brand has products for all seasons and temperatures."  And that "[o]ur brand, our presence, our ability to drive ASPs have never been stronger in North America."

143.180.   Defendants also discussed the declining margins and increasing inventory, but pinned the blame on relatively benign and short-term factors (faster growing but lower margin footwear and international business, the strength of the U.S. dollar, and higher freight expenses) rather than declines in the Company's apparel business.

144.181.   Dickerson tied excess inventory and liquidations to a designed strategy to deliver products to customers earlier, as well as recent weather trends, rather than any sales problems caused by the declining apparel business:

> This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . .  In addition, the recent weather trends have led to some excess inventory creation, which we will continue to work through across our normal liquidation channels during the first half of 2016.

145.182.   Following Dickerson's opening remarks, an analyst questioned Defendants about the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP reductions, as detailed in ¶¶134-138Sections V.C-D above and in Exhibit C attached hereto.  Dickerson downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data),

claiming the data was too focused on the Company's large accounts like, citing Dick's and Foot Locker.as an example.  In response to the same question, Dickerson and Plank also reassured investors that, notwithstanding such data, apparel growth was robust:

> **Matthew J. McClintock, Barclays:** My question is, Kevin, there seems to be a lot of debate in the marketplace on several of your strategies, and you kind of hit upon some of this in your prepared remarks.  But in particular, the competitive positioning of both your Footwear and your Women's business, and then also the potential maturity of the domestic business.  I was just wondering if you can give us your updated thoughts on those topics?  Have there been any strategic changes that we should be thinking about?  Thanks.

> **Dickerson:** . . .  So utilizing that [SportScan] data as a proxy for our success, especially in the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%.  So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular.

146.183.    In discussing the Company's gross margin contraction, Dickerson omitted any mention of the Company's declining ASPs in apparel and increased promotions and liquidations, all of which, unbeknownst to investors, were negatively impacting Under Armour's gross margins:

> Moving on to margins.  Fourth quarter gross margins contracted 190 basis points to 48% compared to 49.9% in the prior year's period.  The following factors were the primary drivers during the quarter: First, sales mix negatively impacted gross margin by approximately 90 basis points in the fourth quarter versus the prior year, primarily driven by the continued strong performance of our Footwear business.  Second, the continued strength of the U.S. dollar negatively impacted gross margin by approximately 80 basis points versus the prior year.  Third, higher inventory liquidations negatively impacted gross margin by approximately 30 basis points.

147.184.    In discussing 2015 gross margin headwinds, Dickerson stated that "we were able to offset most of the non-currency related [gross margin] pressure through *more favorable product margins in* both our *North America* and International businesses."

148.185.    Defendants were asked specifically about ASPs of apparel and gross margins, and Plank and Dickerson responded as follows:

**Omar Saad, Evercore ISI**: You kept mentioning premiumization, I think specifically to Footwear.  Can you just dig a little bit deeper there, and then talk about does this translate over to Apparel at some point, we sort of see ASPs going up there?  And then Brad, maybe you could comment on premiumization, maybe how it might flow-through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag and what are the really underlying gross margins going to do over time?  Thanks.

**Plank**: . . .  So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel.  So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators.

<div align="center">

\*          \*          \*

</div>

As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . .  ***We continue to drive and demonstrate that premium position in the marketplace***.

<div align="center">

\*          \*          \*

</div>

**Dickerson**: And we were able to offset a lot of that [gross margin contraction] just through ***our general increase and improvement in product margins, specifically on the Apparel side***.

So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins. . . .

So I think in all aspects of our business, you will see that improve over time. . . .  And our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak.

~~149.~~186.       Further attempting to allay gross margin concerns, Dickerson represented that "we're definitely seeing improvements in Footwear margins in general" and that "Footwear margins . . . have improved."

~~150.~~187.       Plank later added, "we do see the ability to *continue* to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

~~151.~~188.       Analysts reacted positively to Defendants' statements on January 28, 2016 regarding Under Armour's strong 4Q15 and FY15 financial results.  For example:

<div align="center">

- 93 -

</div>

(a)      in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders";

(b)      on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness;

(c)      on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73;

(d)      on January 28, 2016, Deutsche Bank issued a report noting Under Armour's representations that, contrary to the Morgan Stanley Report, the Company remained a premium brand: "UA m[anagement] made it clear today that they are now pursuing premiumization more aggressively";

(e)      on January 28, 2016, Cowen and Company issued a report titled "*Sentiment Normalizes Post 'Sportscan' Fear*" that noted the importance of "the introduction of evermore premium price points in footwear and apparel [to] improve[] prospects for long-term margin enhancement; and

(f)      on January 28, 2016, Evercore ISI issued a report noting UA's purported "increasing success in more premium products."

152.189.      On February 22, 2016, the Company filed with the SEC a Form 10-K reporting financial results for 4Q15 and FY15, which were also discussed in the Company's press release and earnings call on January 28, 2016.  The Form 10-K stated that "[w]e believe that our

- 94 -

growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

153.190.      The Company's Form 10-K also contained SOX certifications by Plank that were materially similar to those identified above in ¶131167.

154.191.      Defendants' misstatements and omissions on January 28, 2016, and February 22, 20167, as set forth in ¶¶141-150, 152-153178-187, 189-190 above, were materially false and misleading and omitted material facts for the following reasons:

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (see ¶¶37-51, 134-138);

(b)      Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (see ¶¶134-138);

(c)      the growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders

- 95 -

forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap, and making contingent sales subject to buyback agreements;

(c)(d)  Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (see ¶142);, when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and making contingent sales subject to buyback agreements to maintain a façade of growth;

(d)(e)  Plank's assertion that the Company's ability "to drive ASPs have never been stronger in North America" was false because the Company's ASPs were falling sharply in North America as Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices (see ¶148);, increase promotions and discounts (e.g., offering its key products on sale for the first time during Black Friday, 2015), and liquidate more products;

(e)(f)  Defendants' attempts to downplay the January 10, 2016 Morgan Stanley Report were false and misleading, as because the Company was, in fact, as the report stated, experiencing lower apparel sales growth, increasing ASPs, and a loss of market share (see ¶145);

(f)(g)  Tthe Company's inventory growth was not "largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates" or simply due to "recent weather trends have led to some excess inventory creation." Rather, it was a symptom of reduced sales and market share due to the Company's declining apparel business (see ¶144);and buying back unsold products pursuant to buyback agreements;

- 96 -

(g)(h)   Defendants were not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (see ¶152);and had been diminishing since at least spring 2015.  As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and pulling sales forward and making contingent sales subject to buyback agreements to try to compensate for its declining brand heat, creating a façade of growth and the false appearance of interest in its products;

(h)(i)   Tthe Company was not "able to offset a lot of that [gross margin contraction] just through our general increase and improvement in product margins, specifically on the Apparel side" and improvement in apparel margins was not "happening right now as we speak."  Rather, apparel margins were deteriorating as a result of reduced ASPs, discounting, and promotions, and increased liquidations as Defendants' scrambled to maintain lofty growth projections artificially in the face of monumental declines in the Company's apparel business (see ¶148);. and

(i)(j)   Tthe Company's Form 10-K for FY15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### C.   Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy

155.192.   On March 4, 2016, the Company issued a press release confirming its previously released net revenue and operating income projections for 2016, notwithstanding the

- 97 -

bankruptcy of Sports Authority, one of Under Armour's largest retail customers, filed on March 2, 2016.

~~156.~~193.    The March 4, 2016 press release stated that the Company planned to offset the impact of the bankruptcy on the Company's full year 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

~~157.~~194.    Defendants' ~~misstatements and omissions on~~ March 4, 2016~~, as set forth in ¶¶155-156 above, were~~ press release was materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting ~~and~~, promotions, and liquidations, and compressed margins ~~(see ¶¶37-51, 134-138);~~.

(b)    Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth ~~(see ¶¶134-138);~~, including shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at a higher price at its own stores;

- 98 -

(b)(c)   the Company's net revenue and operating income were being inflated by Defendants' suspect sales and accounting practices designed to make Under Armour's financial results and growth to appear healthier and to mask slowing demand for its products; and

(c)(d)   Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using suspect sales practiced, as detailed herein, to create a façade of growth.

D.   **Misleadingly Positive 1Q16First Quarter 2016 Financial Results and Guidance Raise**

158.195.   On April 21, 2016, Defendants issued a press release announcing the Company's 1Q16 financial results.  The press release stated a decline in gross margins "primarily reflect[ed] negative impacts of approximately 100 basis points from higher liquidations and approximately 70 basis points from foreign currency exchange rates, partially offset by approximately 60 basis points from improved product cost margins."  During a conference call held that same day to discuss the 1Q16 results, Molloy stated that "[i]nventory for the quarter increased 44% to $834 million compared to $578 million at March 31, 2015."  On April 29, 2016, the Company filed a Form 10-Q with the SEC reporting its financial results for 1Q16.

196.   In the 1Q16 press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose improper sales and accounting practices, which inflated the Company's quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to

- 99 -

take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products early; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

159.197.    In the April 21, 2016 press release, Plank continued his exceedingly positive messaging: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate *the balanced growth of our brand across product categories*, channels and geographies."

160.198.    Plank was similarly optimistic as to Under Armour's future growth.  Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company *raised* its outlook for FY16 net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

- 100 -

~~161.~~199.      During the question-and-answer session of the April 21, 2016 conference call, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand:

> **Camilo Lyon, Canaccord Genuity**: Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel.  There's a lot of moving parts and some of your bigger customers have been shutting doors, some of the tertiary players are going away. Can you talk about the health of that channel and what that could lead to from a channel expansion opportunity and how do you think about segmentation, within that strategy?
>
> *        *        *
>
> **Plank**: I mean, posting 30% growth in a quarter where . . . one of our largest customers, one of our top two or three customers just a few years ago filed for bankruptcy.  I think putting that kind of number up is something that just continues to demonstrate the strength of the brand and how strong our portfolio ultimately is.
>
> We do believe that there is still an underlying very strong wholesale market out there.  And we expect to continue to be iconic, to be a destination.
>
> *        *        *
>
> So . . . ***our growth is effectively coming from everywhere***.   And North America is something that we feel incredibly strong about.

~~162.~~200.      In response to a separate question, Plank emphasized that "[a]nd again we are, to be clear, driving massive growth.  ***We are taking share***."  As to footwear, Plank stated "[w]e are a premium Footwear brand that's ***driving ASPs meaningfully higher*** . . . ."

~~163.~~201.      During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to rising inventory levels, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  Molloy stated further: "As previously mentioned, the strategy to improve wholesale, customer service levels resulted in elevated inventory investments beginning in the second quarter of last year."

- 101 -

164.202.    In response to an analyst question later in the call, Molloy stated that the

majority of inventory increases were planned:

> **Camilo Lyon, Canaccord Genuity**: If you could just disaggregate the composition of
> inventory between planned inventory increases and any sort of excesses that you have,
> given the liquidations they had during the quarter?  And coupled with the expectations for
> flat gross margins in Q2.  If you could just help us understand.  It seems like we're shifting
> more towards that planned increase, if I'm reading that correctly.  But just any detail there
> would be great.

> **Molloy**: . . .  [M]ajority of the growth is planned.  But we did have slightly excess. . . .  But
> we are working through that.  ***As you can see we worked through it*** through liquidation.
> We're continuing to manage through that. . . .  So we were working through it.  But the
> majority of it is planned.

165.203.    As to gross margins, Molloy blamed "higher liquidations to clear through

excess inventory and foreign currency exchange rates," but stated that product margins were

"favorable" (offsetting the overall gross margin declines), rather than disclosing that apparel

product margins were declining as a result of reduced customer demand, prompting lower sales

prices, discounting, and promotions.  In response to an analyst's question on gross margins, Molloy

highlighted "product margin improvements we've seen."

166.204.    Analysts reacted positively to Defendants' statements on April 21, 2016.

For example:

(a)    in a report dated April 21, 2016, Deutsche Bank Market Research raised its

price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but

so did gross & operating margins and EPS" and also noted that the Company's management

"reiterated that inventories would normalize in 2Q";

(b)    on April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating

that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is

experiencing across categories, channels, and geographies, and moreover should allay concerns

around its growth outlook and opportunities"; and

- 102 -

(c)     on April 22, 2016, ~~Telsey Advisory Group~~TAG issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

205.    The Company's Class A Common Stock rose from a closing price of $43.95 per share on April 20, 2016, to a closing price of $46.93 on April 21, 2016.  The Company's Class C Common Stock rose from a closing price of $42.46 per share on April 20, 2016, to a closing price of $45.41 per share on April 21, 2016.

~~167.~~206.       On April 29, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 1Q16, which were also discussed in the Company's press release and during its earnings call on April 21, 2016.  The Form 10-Q also stated:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf."

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy. . . ."

~~168.~~207.       The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶~~131~~167.

~~169.~~208.       Defendants' misstatements and omissions on April 21, 2016 and April 29, 2016, as set forth in ¶¶~~158-165, 167-168~~196-203, 206-207 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including

- 103 -

1495422_1

declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and, promotions, and liquidations, and compressed margins (see ¶¶37-51, 134-138);.

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (see ¶¶134-138);.

(c)     the purportedly "massive" and "balanced" net revenue growth "effectively coming from everywhere" was inflated by Defendants' (undisclosed) improper sales and accounting practices, which inflated quarterly financial results and growth to appear healthier and to mask slowing demand, including pulling sales forward from future quarters; adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; shipping products earlier than planned and in the final days of the quarter; continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

- 104 -

(c)(d)   Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (see ¶¶159-161);.   In reality truth, Under Armour was experiencing declining demand and created a façade of growth using the suspect sales practices detailed herein.   Further, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing;

(d)(e)   Tthe decrease in gross margin percentage was not primarily driven by Under Armour's "changing inventory management strategy."   Rather, gross margin decreases were primarily driven by increased discounting and promotions and lower sales prices (see ¶167);, including discounts offered to incentivize retailers to take products before their requested ship dates, increased liquidations, and selling new inventory intended for the Company's own factory stores to off-price sellers to book that inventory as revenue immediately, and corresponding lower sales prices;

(e)(f)   Tthe Company was not "driving massive growth, and . . . taking share." Rather, its growth and market share were falling as a result of the Company's apparel sales declines (see ¶162);, and Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, that it obscured using the suspect sales practices detailed herein;

(f)(g)   Tthe Company's rising inventory was not merely a result of "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and the majority of the inventory growth was not part of a strategic plan.  Rather, it was largely attributable to declining apparel sales and diminishing demand, contingent sales

- 105 -

pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which led to resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess inventory, which it failed to write down in 2016 (*see* ¶162 Section VIII.D);

(g)(h)  Tthe Company's gross margin declines were not caused by strategically planned inventory increases and offset by "favorable" product margins.  Rather, declining product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, anddiscounts and other promotions, including those offered to retailers as incentives to take products before their requested ship dates, and increased liquidations due to lower consumer demand for the Company's apparel (see ¶165);;

(h)(i)  Tthe Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was, and had been, diminishing (see ¶167);since at least spring 2015. As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and was covering this up by engaging in the suspect sales practices described herein; and

(i)(j)  Tthe Company's Form 10-Q for 1Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

- 106 -

E.     **Departures of the Company's Chief Merchandising Officer and Chief Digital Officer**

170.209.       After the market closed on May 3, 2016, the Company surprised investors by filing a Form 8-K with the SEC announcing the departures of two key executives, CMO Stafford and CDO Thurston, both of whom spoke glowingly about the Company's financial results and outlook at the Company's 2015 Investor Day.  The Company provided no reason for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming on the heels of former CFO Dickerson's departure and Morgan Stanley's downgrade and exposure of problems affecting the Company's revenue and operating income growth, gross margins, and market share, and the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

171.210.       As a result of this news, the price of Under Armour's Class A common stockCommon Stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the stock dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

172.211.       The Company's Class C common stockCommon Stock, which was issued to Class A common stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

173.212.       The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced

- 107 -

or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

174.213.      Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example:

(a)      in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent";

(b)      on May 4, 2016, Brean Capital, LLC lowered its rating to "Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations; and

(c)      on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

175.214.      Defendants' misstatements and omissions regarding the Stafford and Thurston departures on May 3, 2016, as set forth in ¶¶170, 173¶209 above, were materially misleading because they failed to disclose problems at the Company that contributed to such departures, namely the declines in the Company's apparel business resulting from lower customer demand..

F.      **Reduced Financial Guidance Tied to the Sports Authority Bankruptcy**

176.215.      On May 31, 2016, the Company issued a press release titled, "Under Armour Updates 2016 Outlook," which lowered the Company's 2016 financial guidance, after Defendants had provided strong reassurances as to the Company's financial health and raised 2016

1495422_1

financial guidance just a month earlier.  The Company's updated projection included: (a) FY16 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY16 operating income in a range of $440 million to $445 million (down from the previously projected $503 million to $507 million).  The Company also announced an impairment charge of $23 million and FY16 revenues of $43 million from Sports Authority (instead of the originally planned $163 million) "given the recent decision of the bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business."

~~177.~~216.    As a result of this announcement, the Company's stock fell from $37.73 at the close of trading on May 31, 2016, to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.

~~178.~~217.    Similarly, the Company's Class C ~~common stock~~Common Stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

~~179.~~218.    In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to the bankruptcy.  For example:

(a)    on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35;

(b)     on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)";

(c)     on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target from $43 to $35, citing the Company's $23M impairment charge in 2Q16 and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million; and

(d)     On June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range from $38-$42 to $34-$38.

180.219.    The stock declines on June 1, 2016, would have been larger had Defendants revealed the full truth to investors regarding the Company's financial problems.  However, Plank continued to mislead the market in the May 31, 2016 press release, stating "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."  This statement was materially false and misleading and omitted material facts because growth in and demand for the Company's apparel business were in decline, not increasing (see ¶¶37-51, 134-138).  Moreover, the Company's apparent growth and demand were overstated by Defendants' concealed sales and accounting practices, which inflated its financial results and growth quarterly to make the Company to appear healthier and to mask slowing demand for its products, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping

- 110 -

products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

181.220.    As Defendants continued to mislead, the market continued to be deceived. Indeed, despite the partial revelation of the truth on May 31, 2016, a Deutsche Bank report stated, "[n]otably, m[anagement] reiterated 2Q's rev[enue] plan of 'growth in high 20%s', allaying palpable fears that trends slowed since 1Q."

### G.    Under Armour Bond Offering

182.221.    On June 6, 2016, Under Armour filed the Registration Statement with the SEC concerning the Bond offering. The Company filed additional Offering Materials, Forms 424B5 and FWP with the SEC on June 8, 2016. Pursuant to the Registration Statement and Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million.

183.222.        The Offering Materials incorporated by reference the Company's Form 10-K for 4Q15 and FY15 and Form 10-Q for 1Q16, which contained the false and misleading statements and omissions of material fact detailed in ¶¶152, 167177-187, 189-190 above.

184.223.        One month after the Bond offering was completed, on July 8, 2016, Morgan Stanley issued a report with additional analysis regarding Under Armour's strategy and fundamental shift to competing on price rather than brand strength, which the Company had not disclosed and indeed refuted.  Morgan Stanley again analyzed Under Armour's declining ASPs, noting that although wholesale sales are up, "the sales increase can be explained by the ASP decline."  The report recognized that historically and, according to Defendants' Class Period misrepresentations to date, Under Armour "is a premium brand."  But, based on SportScan data, Morgan Stanley stated that, "seven straight quarters of 2.5% ASP declines, on average, challenges that notion."  Morgan Stanley also analyzed women's apparel, as it had in January, concluding that "UA's women's apparel sales growth rate in the US wholesale channel has decelerated."  With regard to footwear, Morgan Stanley noted that "two low priced styles . . . drove 9% of the FY15 growth in running footwear. . . .  We believe selling low priced footwear threatens to erode UA premium brand image and limit its long-term growth potential."

185.224.        The July 8, 2016,report issued by Morgan Stanley reporton July 8, 2016 also looked at the impact of a potential move by Under Armour into Kohl's.  The report noted "UA knows there is risk in entering this channel" and "UA has not pursued [Kohl's] or [JCPenney] until now because a) these channels may cause erosion of UA's premium brand image and UA didn't want to take the risk, and b) it had so many other growth avenues.  We think the reason UA is preparing to enter Kohl's or JC Penney now is it needs to find new avenues to maintain the sales growth rates the market expects.  Otherwise, it probably wouldn't want to take the risk."  This risk

- 112 -

materialized almost immediately thereafter, when unbeknownst to investors, Dick's stopped taking Under Armour products early because it was angered by Under Armour's decision to sell at Kohl's.[82] Overall, Morgan Stanley viewed the declining ASPs, emphasis on low-priced footwear, decelerating women's wholesale apparel, and a potential move into a mid-tier store like Kohl's and concluded that the "strategies UA is using to stimulate sales growth jeopardize its brand equity."

### H. Disappointing 2Q16 Second Quarter 2016 Financial Results: Partial Revelations of a Growth Slowdown

186.225.   On July 26, 2016, just three months after raising guidance, the Company issued a press release announcing disappointing 2Q16 financial results.  The Company reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

187.226.   The Company also reported 2Q16 gross margin of 47.7%, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  Earnings were only $0.01 per share, $0.03 lower than the year-ago quarter.

227.   On the same day, July 26, 2016, Under Armour hosted a conference call to discuss its 2Q16 financial results.  On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16

---

[82]   Ex. A, at 4.

- 113 -

228.    In the 2Q16 press release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

188.229.    In his opening remarks on the conference call, Molloy staddted that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

189.230.    During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY16.  Molloy stated

- 114 -

that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

~~190.~~231.    Separately, the Company forecast 3Q16 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

~~191.~~232.    On this news, the Company's Class A ~~common stock~~Common Stock fell from a close of $43.59 per share on July 25, 2016, to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares.  The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares per day, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

~~192.~~233.    The Company's Class C ~~common stock~~Common Stock also fell on this news, dropping from $38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6 million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1 million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

~~193.~~234.    The stock declines would have been larger had the Company revealed the full truth to investors.  But Defendants continued to mislead investors and downplayed the negative news.

194.235.     The July 26, 2016 press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins." In a conference call to discuss the 2Q16 results that same day, Molloy reported "[i]nventory for the quarter increased 30% to $1.1 billion compared to $837 million at June 30, 2015."

195.236.     Plank continued to insist that Under Armour remained "a growth company" and falsely stated that "[o]ur second-quarter results are strong evidence that *demand for Under Armour has never been higher*."

196.237.     Echoing this message, in his opening earnings call comments, Molloy emphasized "the *consistent growth across our diverse product lines and channels* [that] delivered another quarter of strong results," including growth in apparel revenues.

197.238.     During the question-and-answer session that followed, an analyst inquired about "athletic inventory in the channel today" and whether Plank was comfortable with the promotional backdrop. Plank admitted to a high level of promotion as well as a shifting retail environment, but misleadingly stated that the level of promotion was the same as in prior years, and that the Company's core base of apparel was growing, notwithstanding shifting fashion trends such as athletic leisure:

> **Matthew Robert Boss, JPMorgan**: Kevin, can you talk about athletic inventory in the channel today? It sounds like inventory for you guys will be in line with sales by the end of this quarter. Nike expects to be clean by August. I guess are you comfortable with the promotional backdrop you see out there today? And then larger picture, what would you say to those calling for a top in the athletic cycle out there?

> **Plank**: Yes, I'm not going to say I'm comfortable with the promotion out there in the market today, but *I don't know if that's different than what we've seen in the last several years, either*.

- 116 -

*       *       *

I think there's a shift happening.  I think the way the people are dressing is changing, and it's altering.  And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend.  But the good news is that we're not grounded in trend, we're grounded in sport.  That'll keep us here, and the trends will come and go.  But *we're also watching our core base continue to grow* for us, as well.

~~198.~~239.      With regard to the Company's deteriorating margins, Molloy again falsely attributed the declines largely to benign factors, concealing the margin declines caused by reduced demand for apparel, increased promotions and liquidations, and declining ASPs.  Molloy instead falsely represented that the Company's product margins were improving.

Moving on to margins, second quarter gross margins decreased 70 basis points to 47.7% compared to 48.4% in the prior year's period.  Sales mix negatively impacted the second quarter by approximately 130 basis points, *primarily driven by the continued strength of our footwear and international growth*.  Partially offsetting this negative impact were *continued favorable product margins*, benefiting gross margin by approximately 50 basis points.

~~199.~~240.      Plank also announced that the Company was expanding its wholesale distribution to include Kohl's.  Plank falsely represented that there was "nothing reactionary about Kohl's" a mid-tier department store with frequent steep discounting but rather, "[t]his was a proactive move for us."

~~200.~~241.      Despite Defendants' continued false and misleading statements, a number of analysts reacted negatively to Defendants' statements on July 26, 2016, regarding Under Armour's 2Q16 financial results and declining average sales prices.  For example:

(a)      on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target to $40 from $47; and

(b)      on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "[s]ales are growing solidly, but ASPs are fading.  UA competes

- 117 -

on brand image and innovation, rarely on price.  This trend change is a concern because it suggests a fundamental shift in the UA story."  With regard to the Company's expansion into Kohl's, which Morgan Stanley had discussed in prior reports, the report noted it "is not a positive in our view," voicing concern that "it is potentially brand dilutive."

201.242.    On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16, which were also discussed in the Company's press release and during its earnings call on July 26, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

202.243.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶131167.

203.244.    Defendants' misstatements and omissions on July 26, 2016, and August 3, 2016, as set forth in ¶¶186-190, 194-199, 201-202228-230, 234-240, 242-243 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discountingUnder Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower

- 118 -

ASPs, increased discounting and, promotions, and liquidations, and compressed margins (see ¶¶37-51, 134-138);.

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (see ¶¶134-138);.

(c)     the "continued" and "consistent" growth and high demand Defendants reported were overstated by Under Armour's suspect quarterly practices, designed to make the Company to appear healthier and to mask slowing demand for its products, including: pulling sales forward, adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates, making contingent sales pursuant to buyback agreements, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(c)(d)  Defendants failed to disclose these improper practices and material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (see ¶195);.  In truth, Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and covering up declining demand and sales by engaging in the suspect sales practices described herein to create a façade of growth;

(e)     The Molloy's statement that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our

- 119 -

1495422_1

growth in the back half of the year without shipping to [Sports Authority]" omitted that Under Armour continued to ship products to Sports Authority, and booked sales for those goods when shipped, even after it knew that TSA was headed to bankruptcy and the goods would be returned;

(d)(f)   the statement that "demand for Under Armour has never been higher" was false and misleading because customer demand for the Company's apparel products, which accounted for the majority of sales, was suffering and in decline (see ¶195);, and Defendants obscured this decline using improper and undisclosed sales practices to appear healthier and to mask slowing demand, as detailed herein;

(e)(g)   Tthe Company was not experiencing consistent growth across all product lines and channels.  Rather, growth was slowing due to the declining apparel business (see ¶196);, Under Armour was covering up this decline and creating the false appearance of growth engaging in the suspect sales practices described herein;

(f)(h)   Tthe Company's promotions were growing and were not the same as "the last several years," as Plank misleadingly implied; rather, they were, but much higher, as the Company ran an increasing number of promotions of apparel products throughoutduring the Class Period (see ¶197);;

(g)(i)   Tthe statement that Under Armour was "watching our core base continue to grow" despite changing fashion trends was misleading because the Company's failure to capitalize on changing fashion trends, such as the athletic leisure trend, was reducing demand for the Company's products and thus reducing the Company's core base (see ¶197);.  Further, Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and creating a façade of growth to appear healthier and to mask slowing demand by engaging in suspect sales practices, as detailed herein;

- 120 -

(h)(j)   T̶the statements indicating that the gross margin decline was temporary due to rising product margins, and driven by the footwear and international businesses, were misleading because they implied that apparel margins were strong and failed to disclose that gross margin declines were also driven by slower apparel sales, promotions, discounts, lower sales prices, and liquidations (*see* ¶¶194-198); and a monumental decline in Under Armour's primary North American wholesale sales channel, resulting in promotions, discounts (including adjusted contract terms or discounts offered to retailers to incentivize them to take products before their requested ship dates), lower sales prices, increased liquidations, and shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(i)(k)   T̶the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶201).  Further, any growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices to manipulate its quarterly results; and

(j)(l)   T̶the Company's Form 10-Q for 2Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

I.     **Goldman Sachs Global Retailing Conference**

245.   On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference. Defendants made false and misleading statements at the conference. In particular, Defendants failed to disclose that they inflated the Company's financial results and growth quarterly in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

204.246.     Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained. When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved,

- 122 -

and that despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> Yeah, for us *we're in a really good position [with inventory levels]*. We feel really healthy and it's our understanding that the marketplace is in a healthy position, too. Came out of the winter season, there was a lot of excess inventory. You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies. It was flush with inventory. It was a promotional environment. *We didn't participate – have to participate too much in that promotional environment*.

> But from what we can understand that as of the end of August that most of the domestic retail partners are in really good inventory positions. *We know we are*.

~~205.~~247.      In response to additional questions on inventory, Molloy stated that "retail is pretty good and inventories are clean" and that "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected."

248.   Molloy's September 7, 2016, misstatements and omissions set forth in ¶¶~~204-205~~245-247 above were materially false and misleading and omitted material facts ~~because~~for the following reasons:

~~206.~~(a) the Company's inventory levels were not healthy, clean, in a good position, or "cleaned up a lot sooner than many expected." Rather, inventory levels were inflated and continued to grow due to declining customer demand for, and declining sales of, the Company's apparel, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's shipping products in the final days of a quarter, resulting in "truckloads of unopened boxes [that] would come back to Under Armour" in 2016. As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016. *See* Section VIII.D. Moreover, Defendants were indeed participating in, and creating, a "promotional environment" by running heavy and increasing promotions and discounts in response

- 123 -

to the Company's apparel sales declines and inflated inventory levels, which had to be liquidated at a steep discount (see ¶¶37-51, 134-138), and by offering discounts to incentivize retailers to take products before their requested ship dates.  Further, the Company was shipping new inventory intended for the Company's own factory stores directly to off-price sellers like T.J.X. Co., which allowed Under Armour to book the inventory as revenue immediately (instead of having to wait for a customer to buy the items at its own stores) but at a lower prices and thus lower margins;

(b)     In truth, Under Armour was experiencing an ongoing monumental downturn in its primary retail sales channel, North American wholesale, and any retail growth was because the Company manipulated its quarterly sales to appear healthier and to mask slowing demand, including by making contingent sales pursuant to buyback agreements with its biggest retailers (including Dick's), pulling forward sales from future quarters, adjusting contract terms and offering discounts that incentivized retailers to take products before their requested ship dates, shipping products in the final days of the quarter to hit numbers, and shipping new inventory intended for the Company's own factory stores to off-price sellers so that Under Armour could book the inventory as revenue immediately instead of having to wait for a customer to buy the items at its own stores.

**J.      Disappointing 3Q16Third Quarter 2016 Financial Results: Further Revelations of a Growth Slowdown and Compressed Margins**

249.    On October 25, 2016, the Company issued its 3Q16 earnings release.  Defendants surprised investors by reporting 3Q16 gross margin of only 47.5%, compared with 48.8% in the prior year's period.  On the same day, Under Armour hosted a conference call to discuss its 3Q16 financial results.  On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16.

250.   In the 3Q16 earnings release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.   In particular, Defendants failed to disclose that they inflated the Company's quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.   And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

207.251.   Plank and Molloy participated in the call on behalf of the Company.  In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations.  Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year."

- 125 -

208.252.     During the conference call, Molloy further revealed that apparel growth would be less than projected at the Company's 2015 Investor Day: "[T]he landscape for our business and our industry continues to evolve . . . .  North America apparel growth is slowing across the industry.  While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

209.253.     Molloy also revealed that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years."  In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . .  [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution."

210.254.     The Company's stock fell sharply as a result of this negative news.  Under Armour's Class A common stockCommon Stock dropped from a close of $37.90 per share on October 24, 2016, to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.  The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per day, as the market continued to digest the news.  The total stock price decline over this four-day period was 18.36% ($6.96 per share).

211.255.   The Company's Class C ~~common stock~~Common Stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016, to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.  The stock dropped an additional 8.67% ($2.46 per share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

212.256.   The stock declines would have been larger had Defendants revealed the full truth regarding the Company's problems.  Instead, Defendants continued to mislead investors and downplay the negative news.  In an October 25, 2016 press release, Defendants stated that a decline in gross margins "primarily reflect[ed] negative impacts from the timing of liquidation, increased promotions, and foreign exchange rates, partially offset by continued product cost margin improvements."  During the October 25, 2016, conference call to discuss 3Q16 results, Molloy stated that "[i]nventory for the quarter increased 12% to $971 million."

213.257.   Plank boasted during the October 25, 2016, earnings call that "*[w]e are a growth company*.  And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter.  Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."  Plank insisted that "*our demand is still there*" and that "*[revenue] growth remains intact.*"

214.258.   Plank also stated during the earnings call that "with *apparel remaining incredibly profitable* . . . there's not an end to the North American apparel story.  That continues to march on for us as well."

215.259.    Defendants continued to conceal the full extent and causes of the Company's deteriorating margins and operating income, pointing investors to the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as opposed to the declining apparel business being a source of the margin and operating income issues).  Molloy also represented that "*we're already seeing improvements in our footwear margins.*"

216.260.    With regard to inventory, Molloy assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier.*"  In response to an analyst question later in the call, Molloy falsely stated that the Company was "*in really good shape from an inventory perspective*" and "growth rates [have] come down, but *the inventory is in great shape.*"

217.261.    Notwithstanding Defendants' attempts to put a positive spin on the disappointing 3Q16 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example:

(a)    on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak," noting "UA's entry into low-end channels has raised the risk its brand equity erodes";

(b)    on October 25, 2016, Wells Fargo Equity Research issued a report stating the Company's new 2017/2018 outlook was "far worse than expected";

(c)    on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal";

- 128 -

(d)    on October 25, 2016, Piper Jaffray issued a report in response to the Company's disclosures, commenting "[c]learly we and the Street were blindsided by m[anagement]'s update to its long-term guidance on the call";

(e)    on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM"; and

(f)    ~~On~~on October 27, 2016, Morgan Stanley issued a report in response to the Company's October 25, 2016, disclosures.  The report noted that although the market had been led to believe Under Armour's contracting margins were due to investment for future growth, the poor results and margin guidance "suggests UA is increasing discounting and pursuing business in lower-margin channels to meet its sales goals."   Morgan Stanley concluded, "UA's brand momentum is slowing."  The report further noted, with the recent announcement of an expansion into Kohl's alongside worsening margins and falling ASPs, "Under Armour's brand strategy seems increasingly risky.  On one hand the company tries to elevate the brand . . . [o]n the other hand, it allows its brand to be sold at deep discounts."  The report warned, "[i]f the brand equity erodes, it will be almost impossible to get back and growth will be increasingly hard to come by."

~~218.~~262.    On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16, which were also discussed in the Company's press release and during its earnings call on October 25, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

219.263.     The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶131167.

220.264.     Defendants' misstatements and omissions on October 25, 2016, and November 2, 2016, as set forth in ¶¶207-209, 212-216, 218-219250, 256-260, 262-263 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discountingUnder Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (see ¶¶37-51, 134-138);

(a)     , promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (see ¶¶134-138);

(c)     the "intact" net revenue growth and "incredible" financial results reported by Defendants were inflated by the Company's suspect sales and accounting practices, which manipulated its quarterly growth and financial results to appear healthier and to mask slowing demand, including by: pulling sales forward from future quarters, making contingent sales pursuant to buyback agreements with its biggest customers like Dick's, adjusting contract terms

1495422_1

or offering discounts to incentivize retailers to take products before their requested ship dates, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(c)(d)   Defendants failed to disclose these material problems and suspect practices to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (see ¶¶213-214);   In truth, Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and covering up declining demand and sales by using the suspect sales practices detailed herein to create a façade of growth;

(d)(e)   Tthe pressure on the Company's margins and operating income was not driven solely by the footwear and international businesses becoming greater sources of revenue and the need for additional investment to take advantage of growth opportunities, as Defendants misleadingly stated.  Such pressure was also a function of the declining apparel business, which reduced sales and ASPs, while increasing promotions, discountsliquidations, inventory, discounts, including discounts offered to retailers to incentivize them to take products before their requested ship dates, and liquidations (see ¶¶212, 215);lowering sales prices, including by shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(e)(f)   Tthe Company's inventory position was not "healthier" or in "great shape." Rather, inventory was a major problem and continued to get worse, causing a high levelincreased levels of inventory that the Company was forced to liquidate at discounted prices and to offer

- 131 -

1495422_1

discounts to incentivize retailers to take products before their requested ship dates, as demand for the Company's apparel products continued to suffer (see ¶216);. The Company's elevated inventory levels were exacerbated by diminishing demand and sales of Under Armour's core products, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter resulting in "truckloads" of unopened boxes of inventory returned to Under Armour. As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016;

(f)(g) The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (see ¶218);. Indeed, purported growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices, a detailed herein; and

(g)(h) The Company's Form 10-Q for 3Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

**K.** **Disappointing 4Q16 & FY16Fourth Quarter 2016 and Fiscal Year 2016 Financial Results: Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy**

265. The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017. On that day, Under Armour stunned investors with a press release

announcing dramatically lower-than-expected growth and other financial problems during ~~4Q16 and FY16.~~ the fourth quarter of 2016 ("4Q16") and FY16.  During a conference call with analysts on the same day, Defendants elaborated on the news revealed in the Company's earnings release. Defendants made false and misleading statements in the 4Q16 earnings release and on the 4Q16 earnings call.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

~~221.~~266.      In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results."  Specifically, the Company revealed that:

- Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth. Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

- Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

- FY16 gross margin dropped from 48.1% to 46.5%.

- 4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

- FY16 inventory increased 17%.

222.267.    Moreover, the press release provided a surprisingly negative outlook for 2017.  Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters.  In addition, gross margin was "expected to be slightly down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

223.268.    Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he washad only been at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Molloy was replaced by Dave Bergman ("Bergman"), the Company's SVPSenior VP of Corporate Finance, who was Under Armour's third CFO in the 2016-2017 period.

224.269.    During a conference call with analysts on the same day, January 31, 2017, Defendants elaborated on the news revealed in the Company's earnings release.  Plank, Molloy, and Bergman participated in the January 31, 2017 conference call on behalf of the Company.  In

- 134 -

his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.
>
> *       *       *
>
> So first, I'd like to explain a few things: what happened, what we learned and what we're doing about it.  So let's start with what happened.  ***In the fourth quarter, slower traffic caused significant promotional activities earlier, deeper and broader than expected. This commoditized some of our more basic core product that had previously sold through for us in years past***.
>
> This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment.  ***So we lost top line volume as we worked to adapt [through] our mix and pricing***.  Now, to be fair, we did comp positively in the quarter in both our own retail stores and our e-commerce channel, but ultimately the result was below original plan.
>
> There was also lower channel recapture of bankruptcy volume that we'd expected, as ***pricing came down in the points of distribution that we serve***.  Finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full price sales.
>
> *       *       *
>
> We learned that when we play in a discounted environment, we can drive volume and win, but the role both we and retailers expect us to play is as a premium full-price brand.

225.270.      While Plank couched these issues as having emerged in 4Q16, in reality, this was a continuation of problems known, or recklessly disregarded, by Defendants throughoutduring the Class Period.  Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

- 135 -

226.271.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today."  He emphasized that "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

227.272.    Molloy also stated that "[f]ourth quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior year's period.  The decrease includes a negative impact of approximately 230 basis points, driven by higher discounts and promotions," as well as lower margins resulting from footwear and international sales.  As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory including discounting, especially in the back half of the year."

228.273.    Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call, and proactive actions to manage inventory levels down in the marketplace, we expect full year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017."  Regarding the first quarter of 2017 ("1Q17"),. Bergman stated:

> We anticipate the first quarter to grow at a mid-single digit rate as fourth quarter conditions in North America carry over and we will have not yet lapsed some of the significant bankruptcies we saw in 2016.  We're expecting first quarter gross margin to be down almost 100 basis points year-over-year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

229.274.    Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

230.275.        During a question-and-answer session with analysts, Plank confirmed the
shift in consumer preference towards more fashion-oriented athletic apparel and referenced
increased competition and heavy discounting in Under Armour's "core basic" performance-
oriented athletic apparel:

> **Omar Saad, Evercore ISI**: [M]aybe if you could expand on a comment you made I think
> in the prepared remarks around some trends going on in the apparel business, maybe
> moving away from performance more to fashion or lifestyle?  I know the UA Sportswear
> line is still kind of pretty nascent, but maybe elaborate on what you're seeing from that
> standpoint.
>
> Is there something pretty deep going on at the consumer level?  A shift towards more
> fashion-oriented athletic apparel versus performance oriented?  Obviously, Under Armour
> is known for its technical performance.  And if this is the case, how do you evolve the
> brand a little bit to be really relevant on both sides of that fence?
>
> **Plank**: Yes. . . .
>
> *We need to become more fashionable with the products that we have out there*.  And one
> of the things we found is that some of the core basics were some of the challenges that we
> saw, is that we were counting on core basics as we have in years past to do more work for
> us.  *But the consumer today frankly has more options.*
>
> *[F]rankly most of those options are from good brands that we compete with, that are
> heavily discounting as well*.  So what you'll see is that I don't think it's one shift of
> abandoning one for the other.  Obviously, with things like the investment we're making in
> [Under Armour Sportswear] in sport lifestyle in general, but we need to become more
> fashion.  The consumer wants it all.

231.276.        Plank responded to a separate question by stating that the retail market for
apparel was being "disrupted" and that "promotions and the consumer environment, all those
things are very, very real, but we could have done a better job with our merchandising mix to be
more proactive and more thoughtful about where they were going."

232.277.        Separately, an analyst from UBS inquired about 2017 gross margins as to
the North American market:

> I would've thought . . . that would largely be down next year due to more markdowns.  And
> then your guidance and inventory seems to sound like it will be improving through the year
> relative to the rate of revenue growth.  What do you think is the realistic near term recapture

- 137 -

rate for the gross margin after 2017 after some inventory clearing?

278.   Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

233.279.     On this news, the price of Under Armour stock plummeted.  After closing at $28.94 per share on January 30, 2017, shares of Class A common stockCommon Stock dropped *25.74%* ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares.  This represented the largest single-day stock price decline in the Company's history.  The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued to digest the news.  The total stock price decline over this three-day period was *28.65%* ($8.29 per share).

234.280.     Shares of Under Armour's Class C common stockCommon Stock also fell sharply as a result of this news.  After closing at $25.09 per share on January 30, 2017, shares of Class C common stockCommon Stock dropped ***23.40%*** ($5.87 per share) in a single trading day, closing at $19.22 per share on January 31, 2017, on unusually high trading volume of approximately 57 million shares.  The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of ***27.78%*** ($6.97 per share) over this three-day period.

235.281.　　In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy.  For example:

(a)　　on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario";

(b)　　on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story";

(c)　　on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.'  Wall Street often assumes that an executive leaving for 'personal reasons' is a sign that a company is in trouble and that someone needs to take the fall.  Under Armour (UAA) tanked on this trifecta of bad news.  Shares plunged nearly 25% in early trading Tuesday.  That put the stock on track for its worst one-day drop ever";

(d)　　on January 31, 2017, Reuters released an article titled, "Under Armour's founder-led approach wears thin."  The article observed that the Company "reported its slowest top- line growth in eight years and signaled more challenges ahead.  Its chief financial officer is also bailing.  The news wiped a quarter off the company's market value.  Chief Executive Kevin Plank's strategy of maintaining power [by controlling the Company's voting stock] is

- 139 -

underperforming badly. . . . revenue growth slowed dramatically to 12 percent because of deep discounting caused by slower foot traffic";

(e)     on February 1, 2017, ~~Telsey Advisory Group~~TAG issued a report stating that "the magnitude of the miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide- down for 2017 came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment thesis as estimates and multiples are revised downwards";

(f)     on February 1, 2017, Oppenheimer issued a report calling Under Armour's announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus far"; and

(g)     on February 3, 2017, Sporting Goods Monitor issued a report expressing its disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue growth at half of the rate we, and Wall Street, expected" and Under Armour's management "*severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent earnings calls.*"

282.    Defendants continued to mislead investors on the 4Q16 earnings call by concealing the full truth, attributing Under Armour's poor performance to "extreme growth" while continuing to tout the Company's "incredible brand strength."  Plank claimed in his prepared remarks that Under Armour's "brand is truly stronger than it's ever been," that the Company's "growth strategy is intact," and that "there is no change to our growth strategy."  In response to an analyst question about Under Armour's purported "22% top line growth," Plank said that "there's acceleration there," assuring investors that "you'll see 20% growth from this company."  Molloy said on the January 31, 2017 conference call that "total revenue was up 12%," that "sales to wholesale customers were up 5%," and that "North American revenues . . . increased 6%."

- 140 -

283.    Defendants' misstatements and omissions on January 31, 2017, as set forth in ¶¶269-271, 282 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's "top line" apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, increased liquidations, and compressed margins;

(b)    Under Armour had undergone a "fundamental shift" and was competing on price rather than brand strength and a premium product; as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)    Defendants failed to disclose these material problems and improper sales and accounting practices to the market (practices they used to appear healthier and to mask slowing demand), but instead they gave investors the misleadingly positive perception that the Company's brand was "stronger than it's ever been" and that the Company was seeing acceleration in "top-line" apparel that was leading back to 20% growth ("there's acceleration there"), consistent with historical trends.  In truth, Under Armour had been covering up declining demand and sales by using contingent sales pursuant to buyback agreements, pull-forward sales, adjusted contract terms or discounts that incentivized retailers to take products before their requested ship dates, shipments in the final days of the quarter, and shipments of new inventory intended for the Company's own factory stores to off-price sellers (so that Under Armour could book the inventory as revenue

immediately instead of having to wait for a customer to buy the items at its own stores) to create a façade of growth and brand health; and

(d)     Under Armour's inventory increases were not part of a strategic plan or a result of the Company's "efforts to manage the brand appropriately for the marketplace.  Rather the excess inventory was a result of diminishing demand and sales, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016.

**L.     The Fallout From the Fraud Continued, but Defendants Conceal the Full Truth From Investors**

284.     The fallout from the fraud continued.  Defendants attempted a massive restructuring and other dramatic actions to revive the Company, but without the ability to rely on suspect sales practices to meet sales targets, they were never able to turn the tide, as the Company's sales continued to struggle.

**IV.I.     On~~POST- CLASS PERIOD REVELATIONS~~**

~~236.     Following the Class Period, Defendants' financial downturn continued and additional revelations came out about the nature and severity of the problems experienced by Defendants throughout the Class Period.~~

~~237.~~285.     ~~For example, on~~ February 9, 2017, The Motley Fool published an article titled, "5 Signs Under Armour Inc. Needs New Management," which stated that:

> ***Under Armour needs a leader who makes realistic promises***.  At the end of fiscal 2015, [Under Armour] estimated its annual revenue would rise 25% to $4.95 billion in 2016. However, its 2016 revenue actually rose just 22% to $4.8 billion, and [Under Armour] now expects sales to rise just 11-12% in 2017.

That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5 billion

- 142 -

in annual revenues in fiscal 2018.  Plank insists that the company is still on track to hit that target, but that would require its top line growth to accelerate to over 40% in 2018 – which hardly seems realistic.

238.286.        A February 14, 2017, Morgan Stanley report recognized that – according to the Company's own data – 2016 sales growth rates were "overstated," due to the increased reliance on "low quality" sales that caused Ddays sales outstanding to increase to a nine year high.  The Morgan Stanley report stated:

> Plus UAA accounts receivable increased 44% in FY16 on top of 55% growth in FY15 (Exhibit 11).  Day sales outstanding increased to 47 days (Exhibit 12), a nine year high, and this is even more surprising considering DTC makes up a much bigger percentage of sales than it did nine years ago.  These data points signal some of UAA's recent sales may have been low quality and thus recent sales growth rates may be overstated.

287.     The Company's data discussed by Morgan Stanley further corroborates Plank's admission that 2016 growth was achieved by driving volume in a "discounted environment," and not by sticking to the role the market expected Under Armour to continue to "play" "as a premium full-price brand."

239.288.        On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's rating to underperform and slashed the Company's Class A common stockCommon Stock price target from $20 to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause UA apparel growth/margins to be worse than expected."

240.289.        On April 27, 2017, the Company announced its 1Q17 results includingin a press release and then discussed those results on an earnings call with analysts later the same day. The 1Q17 press release announced total net revenue growth of only 7%, a far cry from the

consistent 20% growth Defendants reported and projected ~~throughout the Class Period.~~previously. Net revenue growth from the Company's apparel business also grew only 7%, the North American business was down 1%, gross margin was down 70 basis points (to 45.2%) "due to continued inventory management efforts," and inventory increased 8%.

~~241.~~290.      On the 1Q17 earnings call the same day~~, April 27, 2017~~, Plank and Bergman (the new CFO following Molloy's suspicious departure) discussed the Company's struggles ~~during an earnings call with analysts.~~.  Much of the call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.  Plank stated that the Company was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products.  Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

291.    Nonetheless, Defendants continued to mislead the market.  Defendants concealed that the Company had used suspect sales practices to appear healthier and to mask slowing demand from 3Q15 through the end of FY16 and failed to disclose that the Company was still grappling with the consequences of those practices, such as elevated inventories, which it was desperately trying to clear.  Yet, Plank misleadingly told investors that the Company's "inventory levels are appropriate."

~~242.~~292.      Evercore issued an analyst report on April 27, 2017, following the Company's 1Q17 results.  The report noted "North America was negative for first time in the history of the company - despite N[orth ]A[merican] store count up 8% and initial shipments into Kohl's, both of which should have contributed to growth."

243.293.      An April 27, 2017, report from Susquehanna noted the Company's "hasty

distribution strategy" was reactionary to declines in Under Armour's wholesale business and "hurt

the sanctity of the Under Armour brand:"

> We continue to raise flags about Under Armour's expanded distribution into the moderate/family channel (KSS, DSW, Famous Footwear, SCVL).  It is true, as CEO Plank pointed out on the earnings call, that Under Armour has about 10,000 fewer points of distribution vs. Nike.  Nike has successfully done business in the moderate/family channel for years without hurting its brand.  However, Under Armour has yet to build out the product depth, grassroots expertise, and overall marketing prowess that allows for a successfully segmented business across channels.  A proper strategy takes time and resources, yet UAA is moving quickly and hastily down-market.  We believe that the decision to expand into the moderate channel is a result of the liquidation of TSA and Sport Chalet, the pending liquidations of Gander Mountain & MC Sports. As a result, the sanctity of the Under Armour brand is being put at risk.

> We believe that the reason North American revenue was only down 1.1% is because of the initial orders sold into Kohl's.  The assortment sold into Kohl's was, in our view, too broad, lacked appropriate segmentation, and will do more harm than good to the Under Armour brand.

244.294.      On June 20, 2017, David Butler published an article on SeekingAlpha.com

titled, "Underperforming Under Armour."  Butler stated that "[e]verything really peaked in 2014

when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in

net income.  Ever since, things have been slowing.  It's not a trendy shift either.  We've seen

almost two and half years of decreasing business growth.  The company isn't maneuvering to

maintain margins in spite of the slowdown either."

245.295.      On June 26, 2017, Kenra Investors published an article on

SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."  The article discussed

continual declines in the Company's brand power and customer interest dating back to 2015,

stating,

> There are several datasets that show ongoing weakness for Under Armour. . .-.  Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an idea of how digital sales are evolving. . . .  *[T]here is a strong downtrend [that] started in*

- 145 -

*mid-2015, and search interest [in Under Armour] actually became negative since a few months ago*.

296.    The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive, and search interest is in a sharp downtrend. . . . *So many negative signs make me think the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015*."

246.297.    Another June 26, 2017, article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."  The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think.  In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand.  For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times.  On Friday morning's call, Under Armour was mentioned just once. . . . and it was a part of a broader discussion regarding multiple brands.

247.298.    On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is Down 30% This Year."  The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling this year, with the sportswear stock down 30% . . . . The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways."  Specifically, the article noted that wholesale revenue was up just 5% in 4Q16 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand."  The article concluded that "Under Armour's slowing growth is a sign that

- 146 -

the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . . The company needs to establish itself as a fashion brand as well as a performance one."

299.   In July 2017, unbeknownst to investors, Under Armour began responding to requests for documents and information from federal investigators at the DOJ and SEC in connection with Defendants' practice of pulling future sales forward to inflate quarterly financial results.  But, Defendants concealed both the issues under investigation and the existence of the investigations from investors.

248.300.    News from the Company worsened on August 1, 2017, when it reported financial results for the second quarter of 2017.  The Company issued a press release reporting total net revenue growth and apparel net revenue growth of 9% and 11%, respectively, far below the quarterly 20%+ growth previously reported and projected by Defendants throughout the Class Period.  Footwear also performed surprisingly poorly, with net revenue declining 2%.  The Company blamed the revenue declines on a "dynamic and promotional retail environment in North America [that] continued to temper results."  The Company also reported an operating loss of $5 million, a net loss of $12.3 million, and $0.03 decline in diluted EPS.  Gross margin declined 190 basis points (to 45.8%) based in part on "inventory management initiatives" with inventory again increasing 8%.

249.301.    In conjunction with this negative news, the Company also announced on August 1, 2017, that it was implementing a massive restructuring plan "to more closely align its financial resources to support the [C]ompany's efforts to better serve the evolving needs of the changing consumer and customer landscape."  As a result, the Company announced expected "restructuring and related charges" of $110 to $130 million in 2017, including "approximately $20 million of inventory related charges and approximately $40 million of intangibles and other asset

- 147 -

related impairments." The restructuring ~~will~~would involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

~~250.~~302.        During the August 1, 2017, earnings call that followed, Plank discussed the restructuring in more depth. He stated that ~~"[t]he~~, "The landscape is evolving quickly. Therefore, we too must evolve quickly. This evolution requires a pivot, and we're doing just that." He later explained that "we are clearly operating in a different environment, particularly in our largest market, North America. With our largest growth drivers including international, footwear and DTC continuing to scale but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

~~251.~~303.        Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends especially the top line, can you just give us an update where you think the brand health is and the vision for the business today?" He acknowledged that "*we're not pleased with where we're positioned right now*" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear." To that end, he later added that:

> [W]e've adjusted the balance of product we've had, which is *decreas[ing] many of the core and key items that we've had*. We used to have – we're a very much a key item focused, a big logo hoodie and things in-store, and now we've got a lot of balance of that around versatility, layering, and newness . . . . We will be telling our story in the back half of this year, and *you'll see increased brand heat coming from us*, frankly spending against that.

~~252.~~304.        The Company's negative news on August 1, 2017 also involved a reduction in guidance for FY17. Total net revenue was expected to grow only 9%-11% (vs. previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American business," while

- 148 -

adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

253.305.     As a result of this news, the Company's common stockCommon Stock prices fell precipitously.  After closing at $20.02 per share on July 31, 2017, the Company's Class A common stockCommon Stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C common stockCommon Stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high trading volume of over 23 million shares.

306.   Under Armour's stock price would have fallen further had its true financial condition been fully revealed.  Instead, Plank continued to mislead the market, touting Under Armour's "rapid growth" and the achievement of "more than doubl[ing] our revenue from $2.3 billion to $4.8 billion" over "the last three years" while concealing that the Company had engaged in suspect sales practices to appear healthier and mask slowing demand from 3Q15 through the end of 2016.  Plank also concealed that a month earlier, Under Armour had begun responding to requests for documents and information from the DOJ and SEC in connection with the criminal and civil investigations into the Company's accounting practices and related disclosures.

254.307.     Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . .  [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this

decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US . . . [and] US customers are abandoning the brand because it lacks a clear identity."  The article further noted that "Plank has previously acknowledged [on January 31, 2017] that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

255.308.      Susquehanna issued a report following the Company's second quarter of 2017 ("2Q17") results on August 1, 2017.  The report noted that despite expansion into more mid-tier retailers, "2Q17 North American revenue only increased 0.3%.  2Q17 wholesale revenue increased 3.1%, which implies a material drop in North American revenue."  The report further stated the "problem . . . is that incremental shipments in the moderate retail channel . . . are being more than offset by order cancellations from Under Armour's best, and most brand appropriate retailers, such as Dick's Sporting Goods."  Susquehanna concluded "the heart of UAA current problems stem from the decision to open distribution to the moderate channel prior to having a broad enough product assortment in order to appropriately execute a segmentation strategy."

## V.      VERIFIED DERIVATIVE COMPLAINT

309.    Defendants continued to conceal the truth regarding the depth of the problems Under Armour was facing.  Although they had propped up the Company's financial results and growth in 2015 and 2016, they never disclosed this to investors.  No longer able to rely on suspect sales practices to inflate the numbers, the Company's revenue growth continued to decline from 2017 through 2019.  During that period, total year-over-year ("YOY") net revenue growth plummeted from 20%+ growth to low single digit % growth, while North American and apparel revenues suffered even steeper declines:

| $ in thousands | Total Net Revenue | North America Net Revenue | Apparel Net Revenue |
|---|---|---|---|
| FY17 | $4,989,244 (3.2% YOY increase) | $3,802,406 (5.1% YOY decrease) | $3,284,652 (1.7% YOY increase) |

| | | | |
|---|---|---|---|
| **FY18** | $5,193,185 (4.1% YOY increase) | $3,735,293 (1.8% YOY decrease) | $3,464,120 (5.5% YOY increase) |
| **FY19** | $5,267,132 (1.4% YOY increase) | $3,658,353 (2.1% YOY decrease) | $3,470,285 (0.2% YOY increase) |

310.    Nonetheless, Plank continued to tout Under Armour's "rapid growth"; the "hyper-growth" the Company had enjoyed "for several years"; the achievement of doubling the business by 2013 "and then doubl[ing] again from 2013 to 2016[] [f]ueled by strategic growth in North America"; and the Company's "26-quarter streak of 20% sales growth," while omitting that such growth had been fueled not by Under Armour's premium brand image (which had lost heat), but by discounting and myriad suspect sales practices.

311.    And, while Defendants struggled to deal with the Company's elevated inventory levels resulting in part from the suspect sales practices detailed herein, including the ramifications of buybacks (*see* Sections V.E-F), Defendants failed to disclose the true cause of the Company's inventory problems and continued to assure investors that Under Armour's inventory levels were "appropriate."  Then, beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory.  *See* Section VIII.D.  Despite the Company's inventory write downs, however, Under Armour continued to experience bloated inventory levels that were exacerbated by its suspect sales practices.  In 2017 and 2018, Under Armour took aggressive measures to reduce its inflated inventory levels by liquidating product to off-price sales channels like its own Factory House outlet stores and third-party off-price partners, continuing to devalue its brand and drive margins down.  It ultimately took Under Armour approximately 1.5 years to "really clean up the marketplace," which had been flooded with excess inventory.

~~256.~~312.    On   July   23,   2018,   ~~former   Under   Armour   employee   Brock Anderson~~Andersen, along with shareholder Balraj Paul, filed a verified derivative complaint on behalf of Under Armour "against certain current and former officers and directors of the Company

for breaches of fiduciary duties, insider selling, and unjust enrichment." Mr. Anderson[83] Andersen worked at Under Armour for nearly all of the Class Period (September 2015 through November 2016) as a Merchandising Manager. Mr. Anderson'sAndersen's job duties included, among others, "[i]nitiat[ing] seasonal business plans for all Outdoor categories across Outdoor/Action Sports Specialty, Sporting Goods, Department Stores, & Mall channels focusing on strategic initiatives, revenue targets, local market characteristics, style/SKU efficiencies, demand, forecasts, current inventory levels, segmentation/differentiation, & distribution" and "[a]nalyz[ing], understand[ing], & clearly communicat[ing] sales history, market trends/forces."

257.313.    The Andersoen Complaint alleges Plank and other defendants caused Under Armour to issue materially false and misleading statements, including many of the statements alleged herein to be false and misleading. For example, the Andersoen Complaint alleges Plank's September 16, 2015 statement that "demand for our brand has never been stronger" and Dickerson's October 22, 2015, statement that "most of our core apparel product margins are improving" were materially false and misleading when made.[84] Other examples include Plank's January 28, 2016 statement that "[o]ur core business remains incredibly strong,"[85] April 21, 2016, statement that Under Armour was "driving massive growth," and we"[w]e are taking share,"[86] and May 31, 2016, statement that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."[87]

---

[83]   Andersen Complaint, at 1.

[84]   Andersen Complaint, at 3, 38.

[85]   *Id.* at 42.

[86]   *Id.* at 48.

[87]   *Id.* at 35.

258.314.      The Anderseen Complaint alleges that Plank and the other defendants concealed the "true facts, which were known or recklessly disregarded by" Plank.[88]  Those "true facts" alleged in the Anderseen Complaint to have been concealed include, among others, that: "Under Armour's apparel products . . . suffered from reduced customer appeal and demand"; the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products"; the "Company's inventory increases . . . were due to declining sales of the Company's apparel"; "the Company's ASPs were falling sharply in North America"; and "growth and market share were falling as a result of the Company's apparel sales declines."[89]

315.      Defendants' misstatements and omissions continued.  In December 2018 - over a year into the government's non-public criminal and civil investigations into Under Armour - Plank blamed the Company's performance at the end of 2016 on "a number of internal and external factors" that "conspired" against Under Armour, while concealing both that the Company had been engaged in suspect sales practices and the existence of the investigations.

316.      Meanwhile, suspicious executive departures continued to plague the Company.  On April 18, 2019, the Company reported that Jason LaRose, the head of its North American business since October 2016, would leave the Company at the end of the month.  On May 1, 2019, the Company disclosed that its Senior VP and Principal Accounting Officer, Andrew Page, had left the Company after serving in that position for only three months.  Yet, Defendants never disclosed

---

[88]  *Id.* at 74.

[89]  *Id.* at 75-77.

the ongoing SEC and DOJ investigations into Defendants' suspect business practices and disclosures.

**M.      The Company Announces Plank's Resignation as CEO**

317.     Then, on October 22, 2019, Under Armour announced Plank's resignation as CEO, effective January 1, 2020, but again remained silent on the SEC and DOJ investigations he and the Company were facing.  At the time, media and analysts linked the move to Under Armour's ongoing financial problems discussed herein, including a dramatic slowdown in growth, lost market share, and severe stock price declines.  For example, in an article released the same day, *The New York Times* observed that the Company "has faltered while the revenues of its rivals Nike and Adidas have grown thanks to surging consumer interest in athleisure wear.  The company . . . has seen its once-robust profit turn into net losses of more than $46 million in each of the last two fiscal years.  Last year, it cut around 400 jobs to streamline a business suffering from slowing growth.  Under Armour's stock peaked around $52 in September 2015, but is currently trading around $20."  *Forbes* released an article two days later, on October 24, 2019, observing that Plank's move was "perhaps not surprising" given the Company's "financial troubles," including a dramatic slowdown in growth after years of 20%-plus annual revenue increases, and the Company's severe stock price decline since reaching its all-time high in September 2015. Moreover, just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success.  On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of our business" because this "provides for clear accountability and efficient and effective leadership."

### N.      Federal Investigations Into the Company's Accounting Practices and Related Disclosures

318.     On November 3, 2019, less than two weeks after the Plank announcement, WSJ surprised the market by revealing that the DOJ and SEC were investigating whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results appear healthier than they actually were.[90]  According to the article, the investigators were in the process of questioning people in the Company's hometown of Baltimore, and had done so within the week prior to the article's release.[91]  The article noted that "[w]hen examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions."[92]  The article further linked the investigation to the Company's apparent success (26 straight quarters of 20% revenue growth), followed by sales problems at the Company that emerged publicly in January 2017, causing the stock price to plummet:

> The company [Under Armour], which is scheduled to report third-quarter [2019] results on Monday, has been restructuring its operations and struggling with weak sales in the past two years.  Until then, it had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth.  That streak ended abruptly when Under Armour missed its sales targets in the final quarter of 2016.  On Jan. 31, 2017, the company's shares plunged after it reported sales growth of 12% in the holiday quarter and cut its growth forecasts for the next year.  That day, Under Armour also said its then-finance chief [Molloy] was leaving after a year on the job.[93]

319.     After the release of the WSJ article, Defendants were forced to issue a statement confirming the investigations and revealing that they had been ongoing for well over two years:

---

[90]   Ex. B, at 1.

[91]   *See id.*

[92]   *Id.* at 2.

[93]   *Id.*

"The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[94]

320.   Before the market opened on the following day, on November 4, 2019, the Company filed an SEC Form 8-K reiterating that "[t]he Company confirmed to *The Wall Street Journal* that it has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017."  The Company added that it "continues to believe its accounting practices and related disclosures were appropriate" but "does not intend to comment further on the status of this investigation except to the extent required by law."

321.   Similar statements were made by Bergman during the Company's earnings call that took place before the market opened on November 4, 2019.  Bergman stated in his opening remarks that he was "break[ing] from our typical company policy of not discussing any regulatory or litigation matters" in order to address the SEC and DOJ investigations revealed by WSJ.  Bergman stated that "[w]e have been fully cooperating with these inquiries for nearly 2.5 years.  To this effect, we began responding back in July of 2017 to their request for documents and information. We firmly believe that our accounting practices and disclosures were appropriate."  Later in the call, Bergman was asked for comments on the investigations and why the market was "just hearing about it now" after two-and-a-half years.  Bergman declined to provide any additional information.

322.   In response to the news that the Company's accounting practices and related disclosures were under investigation, calling into question the propriety of such practices and disclosures, the Company's Class A Common Stock price fell 18.92% ($4.00 per share), from a closing price of $21.14 per share on Friday, November 1, 2019, to a closing price of $17.14 per

---

[94]   *Id.*

share on Monday, November 4, 2019, on unusually high volume of 43.42 million shares.  The Company's Class C Common Stock price fell 18.35% ($3.47 per share), from a closing price of $18.91 per share on Friday, November 1, 2019, to a closing price of $15.44 per share on Monday, November 4, 2019, on unusually high volume of 18.69 million shares.

323.    Securities analysts and media took note of the surprising news regarding the Under Armour investigations, the serious misconduct being investigated, and the resulting stock price decline.  For example:

(a)    in a November 4, 2019, article titled, "Under Armour's Stock Tanks as Troubles Pile Up," *The New York Times* wrote that the Company's stock sank over 18% following news that the federal authorities were investigating "whether Under Armour had shifted sales results from quarter to quarter to appear healthier," coupled with the announcement of a fifth straight quarterly revenue decline and reduced annual revenue forecast;

(b)    WSJ released an article on November 4, 2019, titled, "Under Armour Shares Slide on News of Accounting Probe," observing the Company's stock price decline "after the company confirmed it was the subject of a federal investigation into its accounting practices," and noting that "[e]xecutives declined on an earnings call Monday to provide details about the probe or explain why Under Armour hadn't previously disclosed its existence, even though they had been responding to document requests for more than two years";

(c)    the *Baltimore Business Journal* released an article on November 4, 2019 stating that "Wall Street analysts wanted to know why they are just now learning about a federal investigation into Under Armour Inc.'s accounting practices that has been going on for more than two years . . . . In a move that deviated from Under Armour's usual policy, CFO David Bergman confirmed the Baltimore-based sportswear maker began responding to inquiries from the federal

- 157 -

agencies in July 2017 and has been fully cooperating with the probe" although "[t]he inability to answer questions about the probe and Under Armour's North American sales outlook caused the company's stock price to get hammered";

(d)     an article by *Fortune* on November 4, 2019, observed that: "Under Armour Inc. shares plunged after the company disclosed that federal officials have been probing its accounting practices for more than two years, bringing a fresh headache to investors just as the sports brand prepares for a CEO transition. . . . Investigators from the Justice Department and SEC were questioning people at the sports apparel's base in Baltimore as recently as last week [*The Wall Street Journal*] reported, citing people familiar with the matter.  The probe is focused on whether Under Armour inflated sales from quarter to quarter, the newspaper said";

(e)     on November 4, 2019, CNBC released an article stating that news regarding the federal probe into Under Armour's accounting practices, along with lowered 2018 guidance, "sent the retailer's shares plunging more than 18%. . . .  Under Armour says it has been responding to requests for documents related to its accounting practices since 2017, which is about when an incredible sales streak came to an end.  Until the end of 2016, it had reported more than 20 consecutive quarters of sales growth topping 20%, making it one of the fastest growing retailers in the U.S.";

(f)     on November 4, 2019, analyst Susquehanna released a report titled, "Under Armour, Inc.: Weak Guidance Post 3Q Beat Further Marred by Federal Investigations," stating in part that the "[f]ailure of management, on the earnings call, to address why the investigation was not disclosed prior to last night is disconcerting" and that, among other factors, "we expect the overhang of the federal investigations . . . to cast shadows over UAA's results and stock performance for quite some time[]";

<div style="text-align:center">- 158 -</div>

(g)     on November 4, 2019, Morningstar released a report stating that, along with a reduced outlook, "news of an investigation into its revenue recognition practices by the SEC and [DOJ], caus[ed] shares to drop by a midteen percentage. . . . The timing is notable, as Under Armour's business began to deteriorate in late-2016, in part because of the bankruptcy of retail partner Sports Authority.  Moreover, former CFO James Molloy resigned in January 2017 for personal reasons after just over one year in the position.  We view news of this investigation as potentially serious.  Investigations of this type can lead to fines and earnings re-statements and, less commonly, criminal charges. . . . The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company.  Under Armour has been hit with bad publicity and management turnover in recent years.  Unless quickly resolved, news of this investigation will certainly draw more negative attention.  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began.  While Under Armour claims the investigation had nothing to do with Plank's decision, the timing looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.  Although companies are not legally required to disclose SEC investigations, we think Under Armour should have done so[]";

(h)     also on November 4, 2019, PiperJaffray released a report observing: "UAA shares closed down ~19% today despite sound execution & encouraging trends on the call as the WSJ article flagging the DOJ/SEC accounting investment pressured the stock[]";

(i)     analyst TAG also released a report on November 4, 2019, stating that "Under Armour's better-than-expected 3Q19 result was overshadowed by the cut to its 2019 revenue outlook and the WSJ story that emerged yesterday about an ongoing investigation by the SEC and DOJ into the company's accounting practices[]";

(j)      analyst William Blair noted the effect the Company's disclosures had in its November 4, 2020, report, stating that "Under Armour's stock is down nearly 20% as investors digest the lower-than-expected fourth-quarter outlook and accounting investigation[]";

(k)      CFRA's November 4, 2019, report likewise emphasized the effect the belated disclosure of the investigations had on Under Armour stock: "We also expect increased awareness about regulatory and litigation matters regarding UAA's accounting practices to weigh on shares and further adds to our negative view[]";

(l)      a report by Oppenheimer on November 4, 2019, stated that "the real issue for UAA and its shares is likely to prove reports from WSJ over the weekend that the company is subject to a federal criminal investigation over its accounting practices and efforts to make trends appear more upbeat."  The report went on to say that "indications of potential accounting irregularities at the [Under Armour] brand further cloud an already shaky fundamental story[]";

(m)      on November 5, 2019, the *Baltimore Sun* released an article on the investigation noting that the Company's stock price was "pummeled" nearly 19% in "reaction to news of the investigation," and including the following comments from financial consultant Timothy Spence, who advises companies on SEC matters: "Public companies must follow strict rules regarding the way revenue is recognized, including proper timing . . . . There appear to be two questions here.  The first is, was this a smoothing of revenue to make quarterly revenue recognition more consistent?  Another question would be whether the company recognized revenue in advance and expected to make it up in the next quarter, he said.  Both practices are highly questionable accounting if not outright fraud[]"; and

(n)      Argus published a report on November 13, 2019, stating that Under Armour's disclosure of the DOJ and SEC investigations "overshadowed the company's 3Q19

- 160 -

results", which were reported on the same day, and noted that "UAA shares dropped 19% on news that the SEC and the Justice Department were investigating the company's revenue recognition practices, including the potential manipulation of revenues to make them appear stronger and steadier."

## VIII.   DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

324.   In order to demonstrate continued revenue growth during the Class Period, Plank and the Company engaged in a scheme to inflate revenue by pulling in – channel stuffing – sales into earlier quarters.  This practice violated GAAP[95] and SEC disclosure rules.

325.   Defendants, in violation of GAAP, also improperly recorded revenue on contingent sales and understated the Company's sales returns and allowances, markdowns and discounts, and failed to timely record the write-down of excess and obsolete inventory.

326.   As a result of the above, the following Under Armour financial statements issued to the public and filed with the SEC were materially false and misleading: Form 10-K for the year ended December 31, 2015, and Form 10-Q's for periods ending September 30, 2015, March 31, 2016, June 30, 2016, and September 30, 2016.

| ($ in thousands, except EPS) | 3Q15 | 4Q15 | FY15 | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|---|---|---|
| Net Revenues | $ 1,204,109 | $ 1,170,686 | $ 3,963,313 | $ 1,047,702 | $ 1,000,783 | $ 1,471,573 |
| Net Income | $ 100,477 | $ 105,602 | $ 232,573 | $ 19,180 | $ 6,344 | $ 128,225 |
| Earnings Per Share - Diluted | $ 0.45 | $ 0.48 | $ 1.05 | $ 0.04 | $ 0.15 | $ 0.29 |
| Inventories | $ 867,082 | $ 783,031 | $ 783,031 | $ 834,287 | $ 1,086,749 | $ 970,621 |

---

[95]   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

327.    The misstatements were material.  For example, in 3Q16, Under Armour's net income and EPS were overstated by an estimated 30% considering only the impact of the (a) understated sales reserves for returns, allowances, markdowns and discounts and (b) inflated inventory.  This does not even include the impacts of contingent sales and channel stuffing, which further inflated net income and EPS in each relevant quarter as described herein.

A.      **Under Armour Failed to Disclose Its Improper Sales Practices**

328.    During the Class Period, Under Armour pulled sales into the current fiscal quarter to boost its reported revenue and artificially report continued revenue growth of 20%+.[96]  The premature recognition of sales that would have otherwise been recognized in a subsequent period is commonly referred to as "channel stuffing."  The SEC has defined channel stuffing as follows: [T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[97]

329.    As pled herein, Under Armour engaged in severe channel stuffing practices routinely in order to meet sales growth and earnings targets communicated to the market, and "sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the product" to convince retailers to take products before their requested shipping date.[98]  This practice of pulling forward orders occurred regularly in 2015 and 2016.[99]

---

[96]   *See* Ex. A, at 1.

[97]   *In re Sunbeam Corp.*, SEC Release No. 7976, Exchange Act Release No. 44305, SEC Order Instituting Public Administrative Proceedings (May 15, 2001).

[98]   Ex. A, at 3.

[99]   *See id.*

Indeed, investigators are examining emails that show Plank knew about efforts to move revenue between quarters.[100]

330.    The SEC is very clear that channel stuffing practices and their financial impact are required to be disclosed under Item 303.  The SEC affirmed this position when it filed claims of earnings management against the Sunbeam Corporation ("Sunbeam").  The SEC specifically cited that Sunbeam's "undisclosed or inadequately disclosed acceleration of sales through 'channel stuffing' . . . materially distorted the Company's reported results of operations."[101]

331.    Subsequent speeches made by SEC staff further support these requirements.  For example, former Chief Accountant with the SEC, Lynn Turner, noted the following:

> The *Sunbeam* case highlights . . . ***channel stuffing*** abuses, among others, and sends a message to registrants and their auditors – the SEC will aggressively attack fraudulent revenue recognition practices. . . .  Sunbeam failed to disclose that it offered discounts and other inducements to customers to sell merchandise immediately that otherwise would have been sold in later periods, which threatened to depress Sunbeam's future results of operations.  [SEC Staff Accounting Bulletin ("SAB") 101] notes that disclosure in [Management's Discussion & Analysis of Financial Condition ("MD&A")] is required of shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.  MD&A disclosures also are required of the impact of granting extended payment terms to customers that will result in a longer collection period for accounts receivable and, thus, slower cash inflows from operations, ultimately impacting a registrant's liquidity and capital resources.[102]

332.    The SEC expressly states that disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations.  Item 303 (and Instruction No. 3 to Paragraph (a) of Item 303) requires companies to:

---

[100]  *See id.* at 2.

[101]  *Supra*, n.93, at 1.

[102]  Lynn Turner, Chief Accountant, *Speech by SEC Staff: Revenue Recognition* (May 31, 2001).

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

<center>*          *          *</center>

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .[103]

333.    The undisclosed pull-in of revenue from future periods to the current period "*cause[d] reported financial information*" contained in Under Armour's SEC filings to "*not . . . be . . . indicative of future operating results*."

334.    Defendants also violated GAAP by failing to disclose the Company's channel stuffing practices and their financial impact in the Company's financial footnotes.  Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 275, *Risks and Uncertainties*, focuses primarily on disclosures arising from risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term.  In particular, it also calls for financial statement disclosure in certain circumstances, if the volume of business transacted with particular customers could be severely impacted in the near term.[104]  ASC 605, *Revenue Recognition*, requires that companies provide both qualitative and quantitative information about their revenue arrangements and about significant judgments that may

---

[103]  17 C.F.R. §229.303.  Similarly, SAB 114 Topic 13 requires the MD&A to contain "a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

[104]  FASB ASC 275-10-05-2, FASB ASC 275-10-50-16, FASB ASC 275-10-50-18.

<center>- 164 -</center>

significantly affect the timing or amount of revenue recognition.[105]   Thus, significant channel stuffing would also trigger the need for such footnote disclosure in an entity's financial statements under ASC 275 and ASC 605.

335.   By failing to make required disclosures in accordance with GAAP and SEC disclosure rules, Under Armour's revenue growth, earnings, and inventory reported in the Company's SEC filings were materially misstated during the Class Period, from 3Q15 through 3Q16.

### 1.   The Financial Impact of Channel Stuffing on Under Armour's Quarterly Revenue

336.   From the beginning of the Class Period through 3Q16, Under Armour stressed the importance of quarterly revenue growth by touting that the Company had more than 20 consecutive quarters of revenue growth of at least 20%.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an [sic] quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And, frankly, we have no expectation of that stopping anytime soon.

337.   And Plank stated on the Company's 2Q16 earnings call held on July 26, 2016:

> And we're still projecting; we're 25 quarters north of 20% in a row.  Over six years of doing that, we see that trend continuing for us, number one.  We do continue to see it to project 25% plus growth for the full year.

338.   Unbeknownst to investors, Defendants achieved Under Armour's 20%+ revenue growth by stuffing the channel with premature sales taken from future quarters.[106]   Without

---

[105]  FASB ASC 605-25-50-1.

[106]  *See* Ex. A, at 1.

channel stuffing, which added at least tens of millions in sales every quarter, the Company's quarterly growth percentage would have been materially less than reported.

### 2.     The Impact of Channel Stuffing on Future Results

339.    The significant financial impact of channel stuffing on Under Armour's future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules, *i.e.*, Item 303.

340.    The MD&A should give investors an analysis of the registrant's financial condition and results of operations, "with particular emphasis on the registrant's prospects for the future,"[107] and:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information ***not to be necessarily indicative of future operating performance*** or of future financial condition.
>
> *         *         *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the ***likelihood that past performance is indicative of future performance.*** [108]

341.    SAB 114 Topic 13 also provides the following specific example of a required disclosure pertaining to the Company's recognition of revenue: Shipments of product at the end of a reporting period that significantly reduce customer backlog and that ***reasonably might be***

---

[107] SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, SEC Release Nos. 33-6835; 34-26831; IC-16961; FR-36 (May 18, 1989).

[108] SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-48960; FR-72, (effective Dec. 29, 2003).

- 166 -

*expected to result in lower shipments and revenue in the next period.*[109]  This is exactly what Under Armour was doing, but failing to disclose to investors.[110]

342.    By pulling-in or taking revenue from future quarters, Under Armour was aware that revenue in subsequent quarters would be adversely impacted.  As a result, the Company was required to warn investors that its reported revenue was not indicative of future revenue.

**B.    Under Armour's Continued Growth Was Achieved by Improperly Recognizing Revenue on Contingent Sales and Understating Reserves for Customer Returns, Allowances, Markdowns, and Discounts**

343.    As pled herein, Defendants assured investors through 3Q16 that the Company's trend of 20%+ revenue growth would continue.  Continuing this growth, however, came at a cost.  In order to achieve 20%+ revenue growth, Defendants engaged in two accounting schemes: (a) improperly recognizing revenue on contingent sales; and (b) improperly understating reserves for product returns, allowances, markdowns, and discounts.  Both of these schemes violated GAAP.

**1.    Improper Contingent Sales**

344.    Defendants, in violation of GAAP, inflated revenues and earnings in the Company's Forms 10-Q and 10-K, press releases and investor conference calls from 3Q15 through 3Q16 by recognizing revenue on contingent sales.[111]  Contingent sales are transactions in which

---

[109]  SAB 114, Topic 13.B.

[110]  Under Armour attempted to conceal the impact on a future quarter by repeating the practice at the end of each quarter (*e.g.*, at the second quarter Under Armour made up for the second quarter revenue that had been artificially pulled into the first quarter by repeating the practice and artificially pulling the third quarter revenue into the second quarter).  However, the practice of channel stuffing is unsustainable and will eventually impact future revenues.  Indeed, Under Armour shocked the market with revenue growth of only 11.5% for 4Q16 – far below the touted 20%+ guidance.  Since then, the Company has been unable to achieve even low double-digit growth, and has even experienced revenue decreases in some quarters.

[111]  Correspondingly, Under Armour's accounts receivable balance, which is a direct function of revenue but appears on the balance sheet instead of the income statement, was also overstated.

- 167 -

payment to the seller is contingent upon the buyer's ability to resell the merchandise.   The recognition of revenue for contingent sales is not permissible under GAAP.  When an entity sells its product but gives the buyer the right to return the product, revenue from the sales transaction may only be recognized at the time of sale if certain conditions are met, including that "[t]he buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is ***not contingent*** on resale of the product."[112]  Revenue for such contingent sales may not be recognized until the return privilege has substantially expired.[113]

346.    Defendants falsely assured investors that the Company was complying with GAAP and not recording revenue on contingent sales transactions.  Specifically, the Company's Forms 10-Q stated that Under Armour's financial statements were:

[p]resented in accordance with the rules and regulations of the Securities and Exchange Commission . . . and accounting principles generally accepted in the United States of America for interim consolidated financial statements. In the opinion of management, all adjustments consisting of normal, recurring adjustments considered necessary for a fair statement of the financial position and results of operations were included. . . .[114]

346.    Defendants further claimed in Under Armour's revenue recognition policy that "[n]et sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods."[115]

---

[112]  FASB ASC 605-15-25-1.

[113]  *Id.*

[114]  Similarly, the Company's Forms 10-K disclosed that Under Armour's consolidated financial statements were "presented in accordance with principles generally accepted in the United States of America."

[115]  *See, e.g.,* Under Armour's 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

347.   Contrary to Defendants' statements, Under Armour's financial statements were ***not*** prepared in accordance with GAAP and SEC requirements and were ***not*** a fair representation of the Company's operations.

348.   Through the end of 2016, to incentivize buyers/accounts to order certain merchandise, Under Armour utilized a buyback program under which Under Armour sales representatives ***guaranteed*** that Under Armour would buy back a certain amount of unsold merchandise (*i.e.*, these sales were contingent upon resale) (*see* Section V.E). On the books, the accounts bought and owned the inventory temporarily, but after six months Under Armour would buy back some of the unsold inventory. The number of buybacks increased over time throughout 2016.

349.   In addition, Under Armour was not collecting on its accounts receivable because customers did not have to pay for the merchandise unless (if ever) it was sold. Beginning with 4Q15, the rate of growth of Under Armour's accounts receivable balance over prior year was consistently outpacing net revenue growth until the fourth quarter of 2017.[116] As a result of the increased receivables from the contingent sales, Under Armour's DSO[117] nearly doubled from 28 days in the fourth quarter of 2014 ("4Q14") to nearly 51 days in 1Q17. At the end of 2015, Under

---

[116] In 2018, in an effort to help reduce the bloated receivables balance on its balance sheet resulting from the Company's elusive accounting schemes in these earlier periods, Under Armour entered into contracts with two financial institutions to sell selected receivables (up to $290 million) on a recurring, non-recourse basis. Despite this, receivables growth still outpaced sales growth throughout 2018.

[117] DSO is a common financial measure for assessing the age and quality of accounts receivable. DSO represents the average number of days it takes a company to collect its receivables. It is a measure of collectability and serves as a useful measure of cash flow efficiency and revenue quality. A DSO of 30, for example, means that it takes a company 30 days on average to convert a credit sale (*i.e.*, an account receivable) into cash.

- 169 -

Armour's DSO of 40 equaled the median DSO of the Textiles, Apparel & Footwear industry.[118]
However, Under Armour's DSO increased 18% during 2016 while the industry median DSO
*decreased* 9% during the same period.[119]  Similarly, beginning in 1Q16, Under Armour's DSO
was consistently higher than that of direct competitor Nike, when it had been comparable
previously.[120]  Further, Under Armour's DSO had historically been better than that of rival Adidas.
But, Adidas' DSO was slightly improving during the Class Period, while Under Armour's DSO
was worsening and higher (worse) than Adidas by 2017.  Thus, Under Armour's rising DSO was
not attributable to industry conditions but rather to Defendants' fraud.

349. By the first quarter of 2018 ("1Q18"), as a result of the Company's accounting
practices, Under Armour's DSO had swollen to 62 days – more than double what it had been back
in 4Q14 and 55% more than the median DSO in 2017 for the Textiles, Apparel & Footwear
industry.[121]  Moreover, the DSO figure of 62 in 1Q18 does not even include the $55.6 million of
receivables that the Company had sold to a financial institution that quarter, all of which remained
outstanding.  If Under Armour had not factored these receivables, its true 1Q18 DSO would have
been 66 days (approximately 65% more than the 2017 industry median).  An increasing DSO is a
sign that receivables are at risk of collection and may indicate problems with a company's

[118]  The Hackett Group, 2017 US Working Capital Survey.

[119]  *Id.*

[120]  Nike has a May 31 fiscal year end.  The quarterly periods referenced here are Under Armour's fiscal quarter and Nike's nearest fiscal quarter (closest in time; one month difference).  For example, 1Q16 refers to Under Armour's quarter ended March 31, 2016 and Nike's closest quarter ended February 29, 2016.

[121]  The Hackett Group, 2018 US Working Capital Survey.

1495422_1

collection process.[122]   The significance of this measure has been noted by the SEC: "A growing DSO figure is often a telltale sign that a company's receivables are impaired."[123]   Similarly, Ernst & Young, a Big Four accounting firm, has noted the significance of a DSO spike: "The higher the number, the greater should be the concern over customers not paying the bills."   The older a receivable becomes, the less likely it is to be collected.   This is consistent with Under Armour's increasing DSO resulting from its practice of booking contingent sales for which accounts receivable would never be collected.

351.   Defendants improperly overstated revenue by recording contingent sales, which caused the Company's net revenue, net income, and EPS to be materially overstated.   In addition, throughout the Class Period, Defendants failed to make MD&A and financial footnote disclosures describing the Company's contingent sales from the buyback program and resulting financial impacts, as required by SEC and GAAP.   *See* Section VIII.A, above.[124]

---

[122]   *See* David C. Hammer, *Performance is reality, how is your revenue cycle holding up?*, HEALTHCARE FIN. MGMT. ASSOC. (July 1, 2005); *see also* Michael D. Carpenter & Jack E. Miller, *A Reliable Framework for Monitoring Accounts Receivable*, 8 FIN. MGMT., 37-40 (Winter 1979); Scott Blakeley, Esq., *The Credit Professional's Duty and Protection with Disclosing Corporate Fraud at the Public Company*, CREDIT RES. FOUND., at 2 (Nov. 2002) ("A company's DSO is, at least on Wall Street, an important indicator of the condition of its accounts receivable, and therefore a gauge of asset quality.").

[123]   *See SEC v. Korkuc*, No. 2:03-cv-03017-LDW-WDW, Complaint at ¶28 (E.D.N.Y. June 19, 2003); *see also* SEC Accounting and Auditing Enforcement Release No. 1673A (Nov. 25, 2002), http://www.sec.gov/litigation/litreleases/lr17859a.htm.

[124]   Under Armour was also required to disclose the impact of contingent revenue transactions. *See* Section VIII.A, above.   FASB ASC 235-10-50, *Notes to Financial Statements*, states that "[i]nformation about the accounting policies adopted by an entity is essential for financial statement users," and that the "[d]isclosure of accounting policies shall identify and describe the accounting principles followed by the entity and the methods of applying those principles that materially affect the determination of financial position, cash flows, or results of operations . . . [and] shall encompass important judgments as to appropriateness of principles relating to recognition of revenue."   Contingent transactions were not allowed under GAAP to be recognized as revenue as discussed herein.   However, since Under Armour improperly recognized revenue

### C.      Improper Reserves for Customer Returns, Allowances, Markdowns, and Discounts

352.    Defendants, in violation of GAAP, also inflated the Company's revenues and earnings reported in Forms 10-Q and Forms 10-K, press releases, and investor conference calls from 3Q15 through 3Q16, by failing to properly reduce revenue for estimated customer returns, allowances, markdowns, and discounts given to customers.

353.    SEC Reg. S-X Rule 5-03 requires companies to report "net sales of tangible products (gross less discounts, returns and allowances)."  17 C.F.R. §210.5-03.

354.    GAAP, specifically ASC 605-50-45-1, allows that a vendor may give a customer a sales incentive or other consideration, where such consideration is either:

a.  An adjustment of the selling prices of the vendor's products or services and therefore characterized as a reduction of revenue when recognized in the vendor's income statement.

b.  A cost incurred by the vendor for assets or services received from the customer and therefore characterized as a cost or expense when recognized in the vendor's income statement.

355.    GAAP also requires that revenue may only be recognized if the amount of future returns can be reasonably estimated.[125]   FASB Statement No. 48, Revenue Recognition When Right of Return Exists, ¶7 states: "If sales revenue is recognized . . ., any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement

and decreased inventory as a result of contingent transactions – which materially affected Under Armour's financial position and results of operations by overstating revenue and earnings and understating inventory – this accounting practice was required to be, but was not, disclosed by Defendants.

[125]  FASB ASC 605-15-25-1.

No. 5, Accounting for Contingencies.  *Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns*."[126]

356.    Defendants falsely assured investors that the Company was complying with GAAP, as discussed above, and that the Company was properly accounting for estimated allowances, markdowns, discounts, and returns.  Specifically, they stated in Under Armour's revenue recognition policy in its SEC filings:

> We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us.  The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates.  *If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination.*  Provisions for customer specific discounts are based on contractual obligations with certain major customers.  Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices . . . .[127]

357.    Under Armour had excess inventory across all brands from at least 3Q15 through 4Q16.  The Company's core apparel sales began slowing by at least spring 2015.  To increase sales, Under Armour had to give incentives and promotions such as selling products for 25% off.  But the Company's inventory problems persisted.  The bankruptcy of TSA in 2016 further increased excess inventory.  One of the top reasons Under Armour missed its financial goals at the end of 2016 was because of inventory management.

---

[126]  *See also* FASB ASC 605-15-25-2.

[127]  *See, e.g.*, Under Armour 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

358.   As a result, Under Armour sold excess inventory at heavy discounts and even shipped some to Mexico just to get its money back (*see* Section V.F).  But overall there was so much inventory in the latter half of 2016 that Under Armour's liquidation channels were already flooded and there was nowhere to go with some of the inventory.

359.   Further, in order to clear the inventory and meet its sales and profit projections (including continued 20%+ growth), during 2015 and 2016, Under Armour began offering deeper and broader price discounts and allowances; increasing sales promotions to many of its customers; and accepting the returns of more products (in addition to the increased buybacks as discussed above) (*see* Sections V.D-F).  These known and anticipated discounts and allowances, along with destocking and sales returns, should have reduced Under Armour's reported net sales, margin, and income as discussed above (*see* ¶¶353-357).

360.   However, Under Armour failed to adequately account for these known and estimable returns, discounts, markdowns, and allowances.  Defendants, who authorized this scheme, knew that the Company's results would be false and misleading as a result.  By the end of 3Q16, Under Armour failed to properly recognize approximately $34 million in sales returns, allowances, markdowns, and discounts.[128]  This scheme alone caused the Company to materially overstate net sales, net income, and EPS during 3Q16 by as much as over 2%, 17%, and 18%, respectively.  The Company ultimately increased its reserves for customer returns, allowances, markdowns and discounts to more than 5.2% of net product sales in 2017 whereas previously at

---

[128]  $34 million was calculated by applying and comparing the 2017 percentage of reserves for customer returns, allowances, markdowns, and discounts (5.2%) to 3Q16 net product sales, assuming the percentage actually used by the Company during 3Q16 was the average of the percentages used at year end 2015 (2.5%) and year end 2016 (3.1%).

- 174 -

the end of 2015, these reserves represented just 2.5% of net product sales – a 109% increase.  These large increases in 2017 support that Under Armour had under-reserved in 2016.

### D.    Under Armour Overstated Inventory

361.    As a result of poor planning, softening demand, returns, and increased buybacks from contingent sale transactions, Under Armour accumulated material amounts of excess and obsolete (*i.e.*, impaired) inventory, which it failed to write down during 2016.

362.    GAAP mandates that inventory:

Be measured at the lower of cost and net realizable value.[129]  When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs.  That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes.[130]

363.    Similarly, Under Armour disclosed to the public in its SEC filings:

Market value[131] is estimated based upon assumptions made about future demand and retail market conditions.  If the Company determines that the estimated market value of its inventory is less than the carrying value of such inventory, it records a charge to cost of goods sold to reflect the lower of cost or market . . .[132]

364.    Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018.  This was due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Such

---

[129]  Net realizable value is determined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation.  FASB ASC 330-10-20.

[130]  FASB ASC 330-10-35-1B.

[131]  "As used in the phrase lower of cost or market, the term market means current replacement cost (by purchase or by reproduction, as the case may be) provided that it meets both of the following conditions: a. Market shall not exceed the net realizable value [and] b. Market shall not be less than net realizable value reduced by an allowance for an approximately normal profit margin."  FASB ASC 330-10-20.

[132]  Under Armour, Inc., Annual Report (Form 10-K) (Feb. 20, 2015), at 47.

incentives reduced the net realizable value of inventory.  At any given time, Under Armour had at least twice as much, and even three to four times as much, inventory than the Company's plan.

365.    As noted above, TSA's bankruptcy in 2016 added to the excess inventory problem because full categories and seasons of apparel had been allocated to TSA before it closed, and the inventory had to go back to Under Armour, including apparel from old seasons (*see* ¶¶60, 74, 123). Moreover, Under Armour did not cancel TSA orders before the bankruptcy or reduce its sales goals after it, thus exacerbating its excess inventory problem (*see id.*).

366.    This is consistent with the Company's inventory growth rate, which significantly outpaced its revenue growth rate from 3Q15 through 2Q16, indicating that demand for Under Armour products was slowing and the Company was not able to sell as much of its burgeoning supply of inventory as anticipated.

367.    Despite Defendants' knowledge regarding excess inventory as described herein, Under Armour continued the charade by misleading investors during the 3Q16 earnings call on October 25, 2016, when Malloy stated: "Despite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward*."  Malloy also reiterated the expectation for revenues to grow approximately 20% in 4Q16, and explicitly told an analyst, "*We feel like we're in really good shape from an inventory perspective*."

368.    Under Armour's positive statements regarding inventory were misleading because, unbeknownst to investors, the Company's inventory was impaired.  Projected sales growth and corresponding attrition of inventory could only be achieved through the Company's unprecedented promotions and discounts, which impacted margins well beyond 2016, and undisclosed contingent sales and channel stuffing.

- 176 -

369.   Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory.  These charges to reduce the overstated inventory balance should have been recorded in 2016.  Under Armour's inventory balance was overstated from 2016 through 2018 by as much as 3%.  This was a material overstatement, as demonstrated by the fact that, by failing to take the impairment charge in 3Q16, Under Armour's operating income and net income for that quarter were both overstated by approximately 13%.  Moreover, Under Armour would have missed its operating income guidance had the full charge been taken in 3Q16.

## IX.    POST-CLASS PERIOD REVELATIONS

370.   Following the Class Period, additional facts were revealed concerning the nature and severity of Defendants' fraud.  As discussed above, on November 14, 2019, WSJ released an article titled, "Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter,'" which was based on interviews with several former Company executives in sales, logistics, merchandising, and finance, and referenced emails obtained by federal investigators showing Plank's direct knowledge of the efforts to move revenue between quarters.[133]   The former executives told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel" and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[134]  According to WSJ, a former sales executive said "[i]t was a pretty common practice to pull forward orders from the

---

[133]  Ex. A, at 2.

[134]  *Id.* at 1.

month after the quarter to ship within the quarter in order to hit the number or close the gap."[135] According to these former executives, WSJ reported, Defendants used these tactics every quarter "to help extend a 26-quarter streak of 20% sales growth," a streak that "employees knew was important to Mr. Plank," which "came to an abrupt end in late 2016."[136]

371.   A former merchandising executive at the Company explained to WSJ that these practices were "all in the name of hitting the number."[137]  These former executives also explained to WSJ how if "retailers declined to take products before their requested ship date, Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products."[138]  And a former logistics executive further revealed to WSJ that "[s]hipping plans in the final days of the quarter sometimes contradicted the dates on the boxes, and truckloads of unopened boxes would come back to Under Armour."[139]  WSJ also reported that the former executives observed that the "strains in Under Armour's business were evident inside the company in 2016," that Under Armour continued shipping products and booking sales to Sports Authority even "[a]fter it was clear Sports Authority was in trouble," and that Dick's (which was holding unsold Under Armour goods) stopped taking products early because it was "angered" by Under Armour's deal with discount value retailer Kohl's, who often offered the same products but with more discounts.[140]  Additionally, WSJ reported, a former merchandise executive

---

[135]  *Id.* at 3.

[136]  *Id.* at 1-2.

[137]  *Id.* at 2.

[138]  *Id.* at 3.

[139]  *Id.*

[140]  *Id.* at 3-4.

1495422_1

said that, "[t]o help meet its quarterly targets, Under Armour in 2016 shipped new inventory intended for its own factor stores to off-price seller TJX Cos.," which "allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the item at its own stores."[141]  But "[t]his executive and another former employee said Under Armour was careful to avoid shipping too much inventory to TJX so that it wouldn't have to disclose that the discounter was among its major customers in its securities filings," according to WSJ.[142]

372.   On November 15, 2019, the *Baltimore Business Journal* released an article discussing accounting irregularities at the Company that were likely being reviewed by the SEC and DOJ.  In particular, the article focused on the Company's rising accounts receivable that began in the final quarter of 2015 – when it jumped 55% vs. sales growth of 31% - and continued through the end of 2016, along with a rising number of days sales outstanding.  The article stated in part:

> The revelation of a federal probe, [Plaintiffs'] lawsuit and claims by former executives of aggressive sales tactics offer a glimpse into what may have been behind Under Armour's stumbles after so much success.  The company says no accounting irregularities occurred and that it was just an unfortunate mix of market forces – Sports Authority's demise, the retail industry's free fall and a trend toward athleisure apparel that Under Armour declined to embrace.

> The shareholders' allegations and past executives quoted in the Wall Street Journal story point to *something more nefarious*.  Whether done intentionally by UA executives or driven by market pressure, some accountants and university professors called on by the Baltimore Business Journal to review the numbers say something was amiss that caused unusual patterns in the company's financials.

> \*        \*        \*

> Under Armour's financial statements show a pattern of rising accounts receivable and sales that couldn't keep up as the company struggled to keep pace in an increasingly competitive industry.

---

[141]  *Id.* at 4.

[142]  *Id.*

373.    On January 6, 2020, the *Baltimore Business Journal* reported that Under Armour had

"quietly hired a chief accounting officer [Aditya Maheshwari] in November, filing a key C-suite position for the sportswear maker whose accounting practices are at the center of a federal probe. . . . Maheshwari was brought on three weeks after Under Armour confirmed a Wall Street Journal report that its accounting practices are being investigated by the SEC and the [DOJ].

*        *        *

While the investigation continues, he will be responsible for cooperating with regulators and ensuring Under Armour is following all of the rules."  By not issuing a press release or submitting a filing with the SEC announcing Maheshwari's hiring, the article noted, Under Armour departed from the usual corporate practice of notifying shareholders by of an executive appointment.

374.    On July 27, 2020, Under Armour disclosed in their SEC Form 8-K that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws."  These "Wells Notices," Under Armour's filing stated, "relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters." "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives."

375.    On August 6, 2020, Under Armour further disclosed in its 2Q20 Form 10-Q that "[t]he Wells Notices informed the Company" that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."  The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices

included," among other things, "civil monetary penalties, as well as in the case of the Executives, a bar from serving as an officer or director of a public company."

376.    Securities analysts and media took note of the additional news regarding the Under Armour investigations, the seriousness of the misconduct being investigated, and the SEC's preliminary decision to file an enforcement action.  For example:

(a)    on November 18, 2019, UBS released an analyst report stating that the investigations created an "overhang" on the stock.  The report interviewed an expert on DOJ and SEC investigations, who explained that it was "routine" for companies to disclose such investigations in their SEC filings;

(b)    on January 6, 2020, J.P.Morgan released a report "applying a 20% haircut for accounting investigation overhang";

(c)    On January 20, 2020, Zack's published an analyst report looking back on 2019 and observing that, despite "better-than-expected third-quarter 2019 results," "a federal accounting probe and trimming of 2019 revenue growth forecast hurt investor sentiment"; and

(d)    Jefferies' February 11, 2020 report emphasized how "the accounting investigation is an item for investors to contend with" even months after Under Armour belatedly disclosed the nearly three-year old DOJ and SEC investigations;

(e)    in a July 27, 2020 article, WSJ quoted a partner at Arthur Andersen, who called the Wells Notices "the declaration of war" and said they mean "Enforcement is locked and loaded, ready to go."  WSJ further noted the "serious" nature of the Notices, noting that "[t]he SEC issues a so-called Wells Notice when it believes it can establish a violation and is prepared to recommend the commission file a civil lawsuit[]"

(f) on July 28, 2020, Bloomberg Tax published an article emphasizing shareholder implications, stating that "the SEC inquiry is focused on what the athletic apparel company disclosed to shareholders about [pulling sales from the next quarter into the current period]." The Bloomberg article noted that "[c]ompanies are supposed to disclose how they make material accounting estimates, including whether their policy is to recognize revenue by pulling forward sales." Explaining how these practices are unsustainable, Bloomberg quoted an auditor, who said: "At some point, the music is going to stop and you're not going to have a chair . . . . You don't have any more sales to pump up into that quarter." The auditor explained that "[a]ll of this really relates to revenue smoothing. . . . They are trying to provide consistent, recurring, smooth numbers that meet or beat analyst expectations instead of just reporting what really happened[]" Bloomberg further noted that pull-forward sales "often come[ ] with incentives to the customer in the form of discounts, rebates or buy-back guarantees, all of which impact revenue[,]" and "can also disguise sham transactions known as channel stuffing."

**~~VI.~~X.   LOSS CAUSATION AND ECONOMIC LOSS**

~~259.~~377.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated (or maintained the artificial inflation of) the prices of Under Armour's common stock and operated as a fraud or deceit on Class Period purchasers of Under Armour's common stock. When ~~Defendants' prior misrepresentations and fraudulent conduct were~~ the relevant truth was revealed and became apparent to the market, the prices of Under Armour's common stock fell as the prior artificial inflation came out. The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations ~~that cast doubt on the veracity of Defendants' Class Period statements.~~ of truthful information. As a

- 182 -

result of their purchases of Under Armour's common stock during the Class Period, Plaintiffs and the other members of the Class (defined in ¶286407 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.    January 10, 2016 Revelations

260.378.        The truth began to emerge on Sunday, January 10, 2016, when, as detailed in ¶¶134-138Section VII.A above, Morgan Stanley issued a report detailing slower growth of the Company's North American apparel sales, falling sales prices, and reduced market share.  As a result of the information revealed to the market, the Company's Class A common stockCommon Stock dropped approximately 6.72% on unusually high trading volume.  At the Company's next earnings call on January 28, 2016, the Company downplayedrejected and denied the reportMorgan Stanley Report's revelations and reassured investors of the Company's strong financial condition.

### B.    May 3, 2016 Revelations

261.379.        The truth continued to emerge after the market closed on May 3, 2016, when, as detailed in ¶170Section VII.E above, the Company surprised investors by announcing the sudden departures of key executives Stafford and Thurston.  These departures, coming on the heels of Dickerson's departure, the Morgan Stanley Report exposing problems at the Company, and three major retail customer bankruptcies, were viewed by investors as a signal that there were undisclosed problems at the Company.   As a result, the Company's Class A common stockCommon Stock dropped approximately 7.54% on unusually high trading volume.  The Company's Class C common stockCommon Stock, which was issued to Class A common stockCommon Stock holders on a one-for-one basis after the market closed on April 7, 2016, also experienced a price decline as a result of this news, falling approximately 6.80% on unusually high trading volume.  The declines would have been more dramatic had Defendants disclosed the

declines in sales demand, the suspect sales practices used to mask slowing demand, and the resulting financial problems that led to the departures of Stafford and Thurston. Instead, Defendants were completely silent on the reasons for their departures.

### C.     May 31, 2016 Revelations

262.380.      As detailed in ¶176Section VII.F above, the Company surprised investors on May 31, 2016, by revealing that, contrary to the Company's positive statements and guidance raise just a month earlier, 2016 revenue and operating income would be much lower than projected, citing the Sports Authority bankruptcy. As a result of the information revealed to the market, the Company's Class A common stockCommon Stock and Class C common stockCommon Stock prices dropped approximately 3.92% and 3.57%, respectively, on unusually high trading volume. The drops would have been more dramatic had Defendants disclosed the suspect sales practices used to mask slowing demand and the true extent of the financial difficulties facing the Company. Instead, Defendants misleadingly stated that Under Armour's momentum was stronger than ever, and that the Company continued to experience growth and increased demand across all product categories and geographies.

### D.     July 26, 2016 Revelations

263.381.      The truth continued to emerge on July 26, 2016, when, as detailed in ¶¶186-190Section VII.H above, the Company surprised investors by revealing slowdowns in apparel sales growth, operating income, and net income. As a result of the information revealed to the market, the Company's Class A common stockCommon Stock and Class C common stockCommon Stock prices dropped approximately 5.12% and 3.56%, respectively, on unusually high trading volume. The drops were tempered by Defendants' attempts to blunt the negative results by making misleadingly positive statements regarding the Company's sales demand and

- 184 -

revenue growth, and their failure to disclose the suspect sales practices used to mask slowing demand and the true extent of financial difficulties facing the Company.

### E. October 25, 2016 Revelations

~~264.~~382.   As detailed in ~~¶¶207-209~~Section VII.J above, on October 25, 2016, the Company revealed a slowdown in North American apparel growth and compressed margins attributed to higher discounts, promotions, and liquidations.  As a result of the information, Under Armour's Class A ~~common stock~~Common Stock and Class C ~~common stock~~Common Stock prices dropped approximately 18.36% and 21.25%, respectively, on unusually high trading volume.  The drops would have been more dramatic had Defendants disclosed the true extent of the sales declines~~and~~, the suspect sales practices used to mask slowing demand, and the associated financial difficulties facing the Company.  But Defendants failed to do so and, instead, reassured investors that the Company's overall growth and demand were strong and stated that the Company's inventory position was healthier.

### F. January 31, 2017 Revelations

~~265.~~383.   On January 31, 2017, the Company shocked investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in ~~¶¶221-232~~Section VII.K above.  As a result, the Company's Class A ~~common stock~~Common Stock and Class C ~~common stock~~Common Stock prices plummeted approximately 28.65% and 27.78%, respectively, on unusually high trading volume.  The share price declines would have been larger had Defendants disclosed the suspect sales practices used to mask slowing demand and the true state of the Company's financial

- 185 -

condition.  But, Defendants continued to hide these facts and made misleading statements about the reasons for the reported financial results.

### G.      August 1, 2017 Revelations

~~266.~~384.      On August 1, 2017, the Company's common stock prices fell precipitously when ~~the Company reported~~ it announced another quarter of poor North American sales, lowered 2017 guidance, and ~~announced~~ a massive restructuring in~~vol~~ud~~v~~ing hundreds of job cuts, and $110 to $130 million in expected restructuring-related charges, including "approximately $20 million of inventory related charges," as detailed further in ~~¶¶248-252~~Section VII.L above.  The Company's Class A ~~common stock~~Common Stock and Class C ~~common stock~~Common Stock prices dropped 8.59% and 10.38%, respectively, on unusually high trading volume.

### H.      November 3, 2019 Revelations

385.      As detailed in Section VII.N above, WSJ revealed on November 3, 2019 that Under Armour's revenue recognition practices were subject to ongoing civil and criminal investigations by the SEC and DOJ, and that Under Armour had been responding to requests for documents and information since July 2017.  The Company released a statement later that day confirming the investigations.  As a result, the Company's Class A Common Stock and Class C Common Stock prices fell 18.92% and 18.35%, respectively, on unusually high trading volume.

~~267.~~386.      As a result of their purchases of Under Armour common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Under Armour's business and prospects. Defendants' false and misleading statements had the intended effect and caused Under Armour common stock to trade at artificially inflated levels throughout the Class Period.

- 186 -

268.387.    When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of Under Armour's common stock declined. These declines removed the inflation from the prices of Under Armour's common stock, causing real economic loss to investors who had purchased Under Armour's common stock during the Class Period.

269.388.    The declines in the prices of Under Armour's common stock after the revelations came to light were a direct result of the nature and extent partial disclosures of truthful information relating to Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Under Armour common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This is evidenced by the chart below, which demonstrates the clear divergence of the Company's Class A common stock Common Stock prices from the Company's benchmark indices and peer company stock prices[143] as the revelations of the truth became known to the market:

---

[143] Under Armour has identified the S&P 500 Index and S&P Apparel, Accessories and Luxury Good Index as benchmarks for its Class A Common Stock performance in its FY16 Form 10-K, filed with the SEC on February 23, 2017.  In addition, the peer comparison above is based on the stock prices of the following publicly traded industry competitors identified in the Company's FY16 Form 10-K: Nike, Inc. (NKE US Equity), Adidas AG (ADDYY US Equity), Lululemon Athletica Inc. (LULU US Equity), Columbia Sportswear Company (COLM US Equity), and Puma SE (PMMAF US Equity). FY15 through FY19 Forms 10-K.



**Under Armour (UAA) vs S&P 500 and S&P 500 Apparel/Accessories**
Indexed to UAA 9/15/2015 Closing Price



1495422_1

270.389.      The economic losses, i.e., damages, suffered by Plaintiffs and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Under Armour common stock and the subsequent significant declines in the value of Under Armour common stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## VII.XI.      PRESUMPTION OF RELIANCE

271.390.      A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

272.391.      A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Class (defined in ¶286 below) purchased or otherwise acquired the Company's publicly traded common stock relying

upon the integrity of the market price of those securities and the market information relating to Under Armour, and have been damaged thereby.

273.392.        At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)        Asas a regulated issuer, Under Armour regularly made public filings with the SEC and related press releases;

(b)        Under Armour regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)        Under Armour was followed by several securities analysts employed by major brokerage firms, such as Morgan Stanley, Deutsche Bank, Canaccord Genuity, Wells Fargo, Credit Suisse, Barclays, UBS, Jeffries, Cowen and Company, and Piper Jaffray, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace; and

(d)        Ccertain of the Company's securities, Class A common stockCommon Stock and Class C common stockCommon Stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

274.393.        As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of the Company's common stock.

- 190 -

275.394.    Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

276.395.    At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

277.396.    As a result of the above circumstances, the presumption of reliance applies.

278.397.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## VIII.XII.    NO SAFE HARBOR

279.398.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking

- 191 -

statements, there were no meaningful cautionary statements accompanying them.   To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Under Armour's Class Period filings.

280.399.      For example, Under Armour's 2014 Form 10-K, filed with the SEC on February 20, 2015, contained the following boilerplate "caution":

> *A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth*.

281.400.      The generic nature of this disclosure is illustrated by the fact that it was simply repeated verbatim from the Company's 2013 Form 10-K, filed with the SEC on February 21, 2014, and was again repeated in the Company's 2015, 2016, 2017, 2018, and 2016 Form2019 Forms 10-KsK filed with the SEC on February 22, 2016, February 23, 2017, February 28, 2018, February 25, 2019, and February 23, 201726, 2020, respectively, when the problems plaguing the Company were well known internally.

282.401.      Similarly, Under Armour issued the following risk warning in both its 2013 and 2014 Forms 10-KsK concerning the decline of brand image, net revenues, and profitability:

> *If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of a global business and as a result our brand image, net revenues and profitability may decline*.

283.402.      A substantially similar warning appeared in the Company's 2015 and 2016 Form 10KsForms 10-K:

> *We must continue to effectively manage our growth and the increased complexity of a global business or we may not achieve our long-term growth targets and our brand image, net revenues and profitability may decline*.

403.    A substantially similar warning appeared in the Company's 2017, 2018, and 2019 Forms 10-K:

- 192 -

*We must successfully manage the increasingly complex operations of our global business, or our business and results of operations may be negatively impacted. . . . If we experience difficulties in supporting the growth of our business, we could experience an erosion of our brand image and a decrease in net revenues and net income.*

284.404.     The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

285.405.     Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew it was false or misleading when made.

## IX.XIII.     CLASS ACTION ALLEGATIONS

286.406.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded common stock of Under Armour during the Class Period, and who were damaged thereby ("Class").  Excluded from the Class are Defendants,

the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

287.407.    Members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's SEC filings, as of JanuaryOctober 31, 20179, Under Armour had more than 1838 million shares of Class A common stockCommon Stock and more than 2208 million shares of Class C Common sStock outstanding.  While the exact number of members of the Class can only be determined by appropriate discovery, Plaintiffs believe that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

288.408.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the members of the Class sustained damages arising out of Defendants' wrongful conduct complained of herein.

289.409.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class that Plaintiffs seek to represent.

290.410.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

291. 411.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)    whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)    whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Under Armour and Plank**

- 195 -

292.412.   Plaintiffs repeat and reallege the allegations set forth in ¶¶1-291411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

293.413.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Plaintiffs and other members of the Class to purchase the Company's publicly traded common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

294.414.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendant Plank is also sued as a controlling person of Under Armour, as alleged below.

295.415.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*)

- 196 -

and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

296.416.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

297.417.    Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

298.418.    Defendant Plank's primary liability and controlling person liability arise from the following facts, among others: (a) Plank was a high-level executive at the Company during the Class Period; (b) Plank, by virtue of his responsibilities and activities as CEO and Chairman was privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) Plank enjoyed significant personal contact and

familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) Plank was aware of the Company's dissemination of information to the investing public which he knew, or recklessly disregarded, was materially false and misleading.

299.419.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

300.420.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material

1495422_1

adverse information that was known to, or disregarded with recklessness by, Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired the Company's common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the common stock price declines above.

301.421.      At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Under Armour publicly traded common stock during the Class Period; or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

302.422.      By virtue of the foregoing, Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

303.423.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was removed from the Company's common stock.

## COUNT IICOUNT II

**For Violations of Section 20(a) of the Exchange Act Against
Defendants Under Armour and Plank**

- 199 -

304.424.        Plaintiffs repeat and reallege the allegations set forth in ¶¶1-291411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

305.425.        Defendant Plank acted as a controlling person of Under Armour within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Plank had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Plank was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In addition, Plank had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.  Under Armour controlled Plank and the Company's other officers and employees.

306.426.        As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their control, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class

Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## COUNT III~~COUNT III~~

**For Violation of Section 20A of the Exchange Act**
**Against ~~Defendant~~ Plank**

~~307.~~427.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1 ~~291~~411 above as though fully set forth herein.  This claim is asserted against ~~Defendant~~ Plank on behalf of Plaintiffs who were damaged by ~~Defendant~~ Plank's insider trading.

~~308.~~428.    As detailed herein, Plank was in possession of material, non-public information concerning Under Armour.  Plank took advantage of his possession of material, non-public information regarding Under Armour to obtain millions of dollars in insider trading profits during the Class Period.

~~309.~~429.    ~~Defendant~~ Plank's sales of Under Armour stock were made contemporaneously with ~~Plaintiffs~~ Aberdeen's ~~and~~, Monroe's, and one of KBC's fund's purchases, and other Class Members' purchases, of Under Armour stock during the Class Period.

~~310.~~430.    For example, in November 2015, Plank sold the following shares of Under Armour common stock for total proceeds of $99,968,961.

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/23/2015 | $92.46 | 199,920 | $18,484,603 |
| 11/23/2015 | $93.00 | 80 | $7,440 |
| 11/23/2015 | $92.46 | 24,991 | $2,310,668 |
| 11/23/2015 | $93.00 | 9 | $837 |
| 11/20/2015 | $92.72 | 80 | $7,418 |
| 11/20/2015 | $92.04 | 68,917 | $6,343,121 |
| 11/20/2015 | $91.24 | 131,003 | $11,952,714 |
| ~~Date~~ | ~~Share Price~~ | ~~No. of Shares~~ | ~~Proceeds~~ |
| 11/20/2015 | $92.72 | 9 | $834 |
| 11/20/2015 | $92.04 | 8,615 | $792,925 |
| 11/20/2015 | $91.24 | 16,376 | $1,494,146 |
| 11/19/2015 | $89.60 | 320 | $28,672 |
| 11/19/2015 | $88.89 | 158,001 | $14,044,709 |
| 11/19/2015 | $88.42 | 41,679 | $3,685,257 |
| 11/19/2015 | $89.60 | 40 | $3,584 |
| 11/19/2015 | $88.89 | 19,751 | $1,755,666 |
| 11/19/2015 | $88.42 | 5,209 | $460,580 |
| 11/18/2015 | $85.39 | 89,002 | $7,599,881 |
| 11/18/2015 | $87.09 | 10,838 | $943,881 |
| 11/18/2015 | $86.42 | 100,160 | $8,655,827 |
| 11/18/2015 | $85.39 | 11,125 | $949,964 |
| 11/18/2015 | $87.09 | 1,355 | $118,007 |
| 11/18/2015 | $86.42 | 12,520 | $1,081,978 |
| 11/17/2015 | $87.31 | 1,200 | $104,772 |
| 11/17/2015 | $86.17 | 28,676 | $2,471,011 |
| 11/17/2015 | $85.42 | 170,124 | $14,531,992 |
| 11/17/2015 | $87.31 | 151 | $13,184 |
| 11/17/2015 | $86.17 | 3,584 | $308,833 |
| 11/17/2015 | $85.42 | 21,265 | $1,816,456 |

~~311.~~431.        ~~Plaintiff~~Monroe purchased the following shares of Under Armour common

stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/20/2015 | 91.62 | 676 | $61,935 |

432.    One of KBC's fund's purchased the following shares of Under Armour common

stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/20/2015 | 92.01 | 11,161.00 | $1,026,923.60 |

312.433.    In addition, Defendant Plank sold the following shares of Under Armour

common stock in April 2016 for total proceeds of $38,262,467.

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 4/29/2016 | $40.84 | 197,680 | $8,073,251 |
| 4/29/2016 | $41.58 | 2,320 | $96,466 |
| 4/29/2016 | $40.84 | 24,709 | $1,009,116 |
| 4/29/2016 | $41.58 | 291 | $12,100 |
| 4/28/2016 | $42.92 | 48,446 | $2,079,302 |
| 4/28/2016 | $42.45 | 151,554 | $6,433,467 |
| 4/28/2016 | $42.92 | 6,056 | $259,924 |
| 4/28/2016 | $42.45 | 18,944 | $804,173 |
| 4/27/2016 | $43.00 | 33,762 | $1,451,766 |
| 4/27/2016 | $42.39 | 166,238 | $7,046,829 |
| 4/27/2016 | $43.00 | 4,220 | $181,460 |
| Date | Share Price | No. of Shares | Proceeds |
| 4/27/2016 | $42.39 | 20,780 | $880,864 |
| 4/26/2016 | $44.15 | 200,000 | $8,830,000 |
| 4/26/2016 | $44.15 | 25,000 | $1,103,750 |

313.434.    Plaintiff Aberdeen purchased the following shares of Under Armour

common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 5/4/2016 | $40.07 | 43,317 | $1,735,712 |
| 5/3/2016 | $42.76 | 9,953 | $425,590 |
| 5/2/2016 | $43.67 | 5,119 | $223,547 |
| 4/29/2016 | $43.70 | 2,997 | $130,969 |
| 4/27/2016 | $45.07 | 3,014 | $135,841 |
| 4/26/2016 | $46.75 | 15,641 | $731,217 |
| 4/25/2016 | $46.48 | 2,275 | $105,742 |
| 4/22/2016 | $46.74 | 3,413 | $159,524 |
| 4/20/2016 | $43.93 | 11,375 | $499,704 |
| 4/19/2016 | $43.96 | 2,958 | $130,034 |

435.    KBC's funds purchased the following shares of Under Armour common stock,

among others:

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 4/29/2016 | 43.94 | 5,185.00 | $227,828.90 |

- 203 -

314.436.    Plaintiffs and other Class members, who purchased shares of Under Armour common stock contemporaneously with sales by Plank suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§Sections 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Aberdeen and Monroe, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding rescission or a rescissionary measure of damages; and.

E.    Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  ~~November 16, 2018~~October 14, 2020

ROBBINS GELLER RUDMAN
 & DOWD LLP
MARK SOLOMON
ROBERT R. HENSSLER JR.
~~AUSTIN P. BRANE~~MATTHEW I. ALPERT
JUAN CARLOS SANCHEZ
CHRISTOPHER R. KINNON

                   ~~/~~s/ *Robert R. Henssler Jr.*
                ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
bhenssler@rgrdlaw.com
~~abrane~~malpert@rgrdlaw.com
jsanchez@rgrdlaw.com
ckinnon@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
PAUL J. GELLER
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
MAUREEN E. MUELLER
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
mmueller@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Plaintiffs*

- 205 -

MOTLEY RICE LLC
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for KBC Asset Management NV*

SILVERMAN THOMPSON SLUTKIN
   & WHITE LLC
AndrewANDREW C. White, WHITE (Federal
Bar No. 0821
)
WILLIAM SINCLAIR (awhite@mdattorney.com
William Sinclair, Federal Bar No. 28833
)
PIERCEbsinclair@mdattorney.com
Pierce C. Murphy, MURPHY (Federal Bar No.
30030
)pmurphy@mdattorney.com
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)
awhite@mdattorney.com
bsinclair@mdattorney.com
pmurphy@mdattorney.com

*Local Counsel for Plaintiffs*

- 206 -

## **CERTIFICATE OF SERVICE**

I ~~hereby certify~~HEREBY CERTIFY that on ~~November 16, 2018,~~October 14, 2020 I electronically filed the foregoing ~~CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS~~ with the Clerk of ~~the~~ Court using the CM/ECF system, which will ~~deliver the document~~send a Notice of Electronic Filing to all counsel of record ~~who have appeared in the action~~.

<div align="right">

~~/s/ Robert R. Henssler Jr.~~
~~ROBERT R. HENSSLER JR.~~


s/ Robert R. Henssler Jr.
ROBERT R. HENSSLER JR.

</div>