# EXHIBIT 9

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND


  In re UNDER ARMOUR SECURITIES
  LITIGATION.                       Civil No. RDB-17-388
  _____/



        -- CONFIDENTIAL UNDER PROTECTIVE ORDER --




   VIDEO-RECORDED DEPOSITION OF STEPHANIE RUHLE HUBBARD
                  Remote Zoom Proceedings
                    New York, New York
                 Wednesday, March 8, 2023






  REPORTED BY:
  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
  Pages 1 - 167                         Job No. 5693672
```

Page 1

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1        A.   I do.

 2        Q.   He's the founder of Under Armour; right?

 3        A.   Yes.

 4        Q.   You've met Mr. Plank before?

 5        A.   I have.                                          13:24:09

 6        Q.   How did you meet in the first instance?

 7        A.   Interviewing him on television.

 8        Q.   And about when was that?

 9        A.   I would guess approximately eight or nine years

10   ago.                                                       13:24:36

11        Q.   So it's 2023, so maybe 2014?

12        A.   During my time at Bloomberg, for sure.

13        Q.   What is your relationship with Mr. Plank now?

14        A.   We're friends.

15        Q.   And what was your relationship with Mr. Plank in 13:24:56

16   2015 to 2017?

17        A.   We were friends, and I covered -- and I covered

18   his company.

19             THE REPORTER:  "And I covered"?

20             THE WITNESS:  His company at the time.           13:25:11

21             THE REPORTER:  Thank you.

22        Q.   BY MR. HENSSLER:  As part of your work at

23   Bloomberg, you reported on Under Armour from time to

24   time?

25        A.   Yes.                                             13:25:17
```

Page 27

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   it would be to attend, you know, a conference or
 2   something we'd both be at.
 3       Q.  Did you ever fly on Mr. Plank's private jet to
 4   Cannes?
 5       A.  To where?                                        13:48:19
 6       Q.  Cannes, C-A-N-N-E-S?
 7       A.  Did I ever fly from the United States to Cannes?
 8       Q.  Yeah.
 9       A.  With him?  No.
10       Q.  Amsterdam?                                       13:48:30
11       A.  I'm not sure.  Maybe.
12       Q.  Anywhere else outside of the United States?
13       A.  I don't believe so.
14       Q.  Where do you recall flying with Mr. Plank on his
15   private jet?                                             13:48:50
16       A.  I specifically remember flying from New York to
17   Baltimore.  That was one trip.  And I remember flying
18   home from Cannes to New York.  I specifically remember
19   those.
20       Q.  So you flew from Cannes -- is that in France?    13:49:16
21       A.  Yes.
22       Q.  So you flew from Cannes, France, to New York on
23   Mr. Plank's private jet?
24       A.  Uh-huh.
25       Q.  Was that around 2015?                            13:49:27
```

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1        A.   I don't really remember the year, but probably

 2   around then.

 3        Q.   And when you flew on Mr. Plank's private jet,

 4   you understood that he was the CEO of Under Armour;

 5   right?                                                    13:49:40

 6        A.   Yes.

 7        Q.   Was it part of your work as a Bloomberg reporter

 8   to fly on Mr. Plank's private jet?

 9        A.   Not specifically.

10        Q.   Was it -- were you flying with him as           13:49:57

11   Mr. Plank's friend?

12        A.   I was flying on his plane as myself, Stephanie

13   Ruhle.  I'm -- I'm not really in a category one or the

14   other.

15        Q.   Well, but the question I'm trying to ask:  Was  13:50:13

16   it -- was it work-related travel where you're flying from

17   France to the US in Mr. Plank's private jet?

18        A.   I remember that flight, and we were flying home

19   from a conference that was work related, yes.

20        Q.   What was the conference?                        13:50:31

21        A.   It was an advertising conference, like a...

22        Q.   Did you pay for the flight from France to the US

23   on Mr. Plank's private jet?

24        A.   No, I didn't.

25        Q.   So the flight from France to the US on          13:50:55
```

Page 38

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    Mr. Plank's private jet was free to you?
 2         A.   It was.
 3         Q.   Did you ever price that out how much a flight
 4    from the US to France on a private jet would cost?
 5         A.   I don't believe I did.                          13:51:09
 6         Q.   Thousands of dollars; right?
 7         A.   Yes, theoretically.
 8         Q.   Did you ever send text messages with Mr. Plank?
 9         A.   Yeah, like you'd communicate with anyone.
10         Q.   So you have his phone number?                   13:51:28
11         A.   Yes.
12         Q.   His cell phone?
13         A.   Yes.
14         Q.   So when you text, you'd send text messages from
15    your cell phone number to his cell phone number?          13:51:38
16         A.   Sure.
17         Q.   And he texted you to your cell phone number,
18    also?
19         A.   Uh-huh.
20         Q.   And you understand that you received a subpoena 13:51:50
21    requesting documents and information relating to this
22    case; right?
23         A.   Yes.
24         Q.   Did you search your phone for any text messages
25    with Mr. Plank?                                           13:52:01
```

Page 39

1       video from January 11th, 2016, a Bloomberg news bit.

2               (Exhibit 11, Video, Watch Under Armour Shares

3               Decline, Here's Why, was marked for

4               identification by counsel electronically.)

5               MR. HENSSLER:  Just let me know if you have any          14:57:30

6       problems hearing it.

7               We're just getting it set up.

8               I'm sorry, we do need to take a quick break.

9       Hopefully, it's just five minutes, and we'll come back.

10      We'll let you know when we've got that teed up.  If you         14:59:12

11      want to take longer, we can do that, but let's go off the

12      record.

13              THE VIDEOGRAPHER:  All right.  Off the record at

14      2:59 p.m.

15              (Recess.)                                                 15:05:57

16              THE VIDEOGRAPHER:  On the record at 3:06 p.m.

17         Q.   BY MR. HENSSLER:  Welcome back, Ms. Ruhle.

18              Do you understand you're still under oath?

19         A.   Yes, sir.

20         Q.   Thank you.                                                15:06:16

21              And this -- as I noted, this will be Exhibit 11

22      to today's deposition.  This is a video from

23      January 11th, 2016, from Bloomberg.

24              (Video played.)

25         Q.   BY MR. HENSSLER:  So I'm going to pause and ask          15:07:10

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   some questions along the way.  If your preference is to

 2   watch the whole thing first, Ms. Ruhle, that's fine also.

 3           Do you have a preference?

 4           MR. PETRILLO:  Why don't we watch the whole

 5   thing and then come back.                                    15:07:26

 6           MR. HENSSLER:  That's fair.  We'll push play

 7   again.

 8           (Video played.)

 9       Q.  BY MR. HENSSLER:  So we may need to play back

10   some parts, but I had some questions about parts of that.    15:11:19

11           In part in the video we just watched, Ms. Ruhle,

12   which is Exhibit 11 to today's deposition, you referenced

13   the SportScan data.

14           Do you recall hearing yourself say that?

15       A.  I heard that, sure.                                  15:11:37

16       Q.  Yeah.  And you referenced that SportScan pulls a

17   point-of-sale data, but that it excludes Dick's and Foot

18   Locker.

19           Do you recall saying that?

20       A.  I heard myself say that in that segment, sure.       15:11:51

21       Q.  Where did you get that information from, that

22   SportScan data excludes Dick's and Foot Locker from its

23   data set?

24       A.  I have no idea.  This is from 2016.  I've done

25   hundreds, if not thousands of TV hits since then.  I have    15:12:09
```

Page 80

CONFIDENTIAL UNDER PROTECTIVE ORDER

1  no idea.
2      Q.  You also mentioned in connection with
3  referencing the SportScan data that it does include
4  Kohl's data.
5          Do you recall hearing yourself say that?                15:12:25
6      A.  Yes.  I just watched the segment.
7      Q.  Where did you get that information from, that
8  the SportScan data set does include Kohl's data?
9      A.  I have no recollection.
10     Q.  You talked about the Under Armour Connected        15:12:38
11 Fitness platform, also; right?
12         MR. PETRILLO:  Sorry, can you repeat that?
13         THE WITNESS:  Can you repeat that?  You broke
14 up.
15         MR. HENSSLER:  Happy to.                            15:12:52
16     Q.  On the video we just watched, you referenced the
17 Under Armour Connected Fitness platform; correct?
18         MR. PETRILLO:  One more --
19         THE WITNESS:  Yes, I -- did you just say to
20 me -- I want to make sure I heard you correctly.  Did you  15:13:04
21 just say to me, in that segment you referenced Under
22 Armour's Connected Fitness platform?  Is that what you
23 said?
24         MR. HENSSLER:  Yes.
25         THE WITNESS:  Yes.  That's what I watched on the    15:13:16

Page 81

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   television segment a moment ago.
 2        Q.   BY MR. HENSSLER:  And you referenced some of
 3   Under Armour's athletes, includes Steph Curry, Lindsey
 4   Vonn, and Jordan Spieth; right?
 5        A.   I'm sorry, sir.  I need you to repeat yourself.       15:13:28
 6        Q.   Happy to.  It sounds like maybe the issue is
 7   happening again.
 8        A.   We've lost your audio.
 9             MR. PETRILLO:  Yeah, we've lost you.  Sorry.
10             MR. HENSSLER:  That's okay.                           15:13:42
11        David, are you able to hear me?
12             THE VIDEOGRAPHER:  I can hear you just fine.
13             MR. HENSSLER:  Ms. Ruhle, can you hear me now?
14             MR. PETRILLO:  Let's take a break and we'll --
15   give us another two minutes.  We're going to try to fix        15:13:57
16   this.
17             MR. HENSSLER:  Off the record.
18             MR. WAREHAM:  We can hear you, by the way, for
19   what it's worth.
20             THE VIDEOGRAPHER:  All right.  Off the record at     15:14:08
21   3:14 p.m.
22             (Interruption in proceedings.)
23             THE VIDEOGRAPHER:  On the record at 3:17 p.m.
24        Q.   BY MR. HENSSLER:  Welcome back, Ms. Ruhle.
25             Do you understand you're still under oath?           15:17:55
```

Page 82

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1        A.  I do, sir.

 2        Q.  Thank you.

 3            And when we -- when we had to take a break, we

 4   were talking about the video that we watched, the

 5   January 11th, 2016 video.  And the last question, I'll      15:18:04

 6   just restate it because I think the record got a little

 7   jumbled.

 8            But the last question was:  You referenced some

 9   of Under Armour's athletes on that video segment that you

10   did on Bloomberg that day, including Steph Curry, Lindsey   15:18:17

11   Vonn, and Jordan Spieth; correct?

12        A.  Yes.

13        Q.  And another thing that you said on that video

14   was we haven't heard from the company; right?

15        A.  Yes.                                               15:18:30

16        Q.  By this time, and according to your email we

17   looked at in the last exhibit, this -- this was -- the

18   video was on air at 12:30 that day.  You had already

19   communicated with the company, Under Armour, about the

20   Morgan Stanley report, though; correct?                     15:18:57

21        A.  Yes, but "we" meaning no public statements from

22   the company.  No 8-K.  No 10-K.

23            MR. HENSSLER:  Okay.  Let's go to the next

24   exhibit.  This will be Exhibit 12.  And this one's back

25   to some paper, and this is at tab 11.                       15:19:13
```

Page 83

```
 1              (Exhibit 12, Email from KP13 to Stephanie Ruhle,
 2              01/11/16, with attachment, UA_01171485, was
 3              marked for identification by counsel
 4              electronically.)
 5              MR. HENSSLER:  For the record, Exhibit 12 is         12:29:40
 6   UA_01171485.
 7       Q.  Are you looking at a January 11th, 2016 email
 8   from KP13 to yourself, Ms. Ruhle?
 9       A.  Yes.
10       Q.  And the subject is "FW: Bullets."  Correct?            15:19:39
11       A.  Yes.
12       Q.  And this is an email you received from Mr. Plank
13   on January 11th, 2016; right?
14       A.  Yes.
15       Q.  And let's look at Mr. Plank's notes to you from        15:19:51
16   January 11th, 2016, at 2:56 p.m.  He says, "This is the
17   fact sheet we are going to send out to ALL" -- which is
18   in all caps -- "media to arm them for any discussion.
19   The 'losing market share' idea is preposterous.  Read the
20   FACTS" -- and facts is all caps.  "Please let me know if    15:20:15
21   you see anything missing from here."
22              That's what he wrote to you; right?
23       A.  That's what I see on the paper in front of me.
24       Q.  And -- and then he also includes a number of
25   bullets below; right?                                        15:20:31
```

Page 84

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1        A.   That's what I'm reading.
 2        Q.   It looks like about eight bullets of information
 3   which are his apparently response to the Morgan Stanley
 4   report; correct?
 5        A.   I don't know.  I don't remember ever seeing this     15:20:54
 6   email until this moment.
 7        Q.   Do you see there's an attachment that says
 8   "Morgan Stanley bullets" underneath the subject line?
 9        A.   I see it right now.
10        Q.   One of the things Mr. Plank said to you in this     15:21:13
11   email was he said, "The losing market share idea is
12   preposterous."
13             Do you see that, the second sentence?
14        A.   Yes.
15        Q.   Did you speak with Mr. Plank about that?            15:21:27
16        A.   Not that I recall.
17        Q.   Did he share any internal Under Armour reports
18   about Under Armour's market share position at this time?
19        A.   Not that I recall.
20        Q.   And let's look at these notes.  So the first one    15:21:48
21   says "Congrats."
22             Do you see that?
23        A.   I see on the left-hand side in bold the word
24   "congrats," hyphen, Jordan Spieth.
25        Q.   Perfect.  That's what I wanted to ask about.        15:22:03
```

Page 85

```
 1            In his email to you in the "Congrats" bullet, he
 2   referenced Jordan Spieth, Lindsey Vonn, and Steph Curry;
 3   right?
 4        A.   Yes.
 5        Q.   And you referenced all of those on your TV piece    15:22:17
 6   that we watched a minute ago; right?
 7        A.   Yes.  As a reporter that covers the company,
 8   those are the name athletes in all of their
 9   advertisements and campaigns.
10        Q.   Let's look at the SportScan line.  So go down       15:22:32
11   one.  Do you see there's a bolded SportScan?
12        A.   Uh-huh.
13        Q.   And Mr. Plank wrote to you, "SportScan.  Their
14   sell-through data captures actual data across only about
15   one third of what is the least premium part of our            15:22:47
16   business.  This excludes UA's DTC and international
17   business as well as DKS, Foot Locker, and our department
18   stores channel."
19            Do you see that?
20        A.   I'm reading it.                                     15:23:01
21        Q.   You understand "DKS" refers to Dick's Sporting
22   Goods?  It's the ticker?
23        A.   I actually didn't know that.
24        Q.   Well, I can represent to you that that refers to
25   Dick's Sporting Goods.  This -- withdrawn.                    15:23:18
```

Page 86

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1            What Mr. Plank states here is that the SportScan
 2    data excludes Dick's and Foot Locker; right?
 3         A.   You're explaining that to me now.  I don't
 4    re- -- I don't believe I've ever read this piece of paper
 5    in front of me, so...                                       15:23:44
 6         Q.   The email that Mr. Plank sent to you that we're
 7    looking at says, "This excludes UA's DTC and
 8    international business as well as DKS, Foot Locker, and
 9    our department stores channel."
10            Right?                                              15:24:01
11         A.   That's what the words on the paper in front of
12    me say.
13         Q.   And on that January 11th, 2016 Bloomberg News
14    piece we just watched, you referenced that SportScan data
15    excludes Dick's Sporting Goods and Foot Locker; right?      15:24:13
16         A.   I did say that as a part of a report.
17         Q.   Let's look at the next sentence in this
18    SportScan bullet.
19            Mr. Plank wrote, "Further, recent changes in
20    methodology includes Kohl's, where our competition has      15:24:29
21    aggressively sold in 2015, driving reported market share
22    where we do not have a presence."
23            That's what he wrote; right?
24         A.   It appears that way.
25         Q.   And on that TV piece we just watched, one of the  15:24:43
```

Page 87

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1   things you mentioned was that SportScan data includes

 2   Kohl's data; right?

 3        A.   That was one of the things that I mentioned.

 4        Q.   Let's go down a few more bullets.  The

 5   second-to-last is Connected Fitness; right?              15:25:00

 6        A.   Uh-huh.

 7        Q.   And you referenced the Connected Fitness

 8   platform from Under Armour during your January 11th, 2016

 9   news segment, also; right?

10        A.   Among other things.                            15:25:18

11        Q.   Does looking at this, Ms. Ruhle, refresh your

12   recollection that you talked to Mr. Plank before your

13   on-air segment about Under Armour on January 11th, 2016?

14        A.   No.

15             MR. HENSSLER:  Okay.  We can put that one aside. 15:25:29

16             This will be Exhibit 13.

17             (Exhibit 13, Email string from Stephanie Ruhle

18             to KP13, 01/11/16, with attachments, UA_01171456

19             - 458, was marked for identification by counsel

20             electronically.)                               15:25:37

21             MR. HENSSLER:  And it's at tab 12.

22             For the record, Exhibit 13 is UA_01171456.

23        Q.   And just so we're looking at the same thing,

24   Ms. Ruhle, are you looking at an email from yourself from

25   January 11th, 2016, at 3:21 p.m. to KP13 at UA?          15:26:04
```

Page 88

CONFIDENTIAL UNDER PROTECTIVE ORDER

```
 1    exclamation point.

 2          Right?

 3       A.  Uh-huh.

 4       Q.  And she copied you on that email; right?

 5       A.  Uh-huh.                                    15:52:33

 6       Q.  And the subject is Stephan Curry; right?

 7       A.  Yes.

 8       Q.  "TY," that's an abbreviation for thank you;

 9    correct?

10       A.  Yes, sir.                                  15:52:41

11       Q.  Okay.  And then Ms. Pelkey sends an email that

12    says, "This is all set.  Tai and Stoney will both be with

13    Stephen for the taped interview on Monday with

14    Stephanie."

15          Right?                                      15:52:53

16       A.  Yes.

17       Q.  Do you know who Tai and Stoney are?

18       A.  I don't.

19       Q.  And then look at the top of the page.  You can

20    see there's an email from Mr. Plank.  It looks like       15:53:05

21    you're not included in this, but he emails Ms. Pelkey and

22    he says, "Thanks for all of your help here, Di.  That is

23    so cool and a great thank you for being the only member

24    of media to get UA's back when MS came out against us.  I

25    hope that the CNBC crew takes notice and shows more love  15:53:24
```

Page 110

CONFIDENTIAL UNDER PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q. So Mr. Plank is -- is sharing information with | |
| 2 | you at that RavenFoundry.com address; right? | |
| 3 | A. I'm seeing that in this email, but as I'm just | |
| 4 | scanning, I don't believe I've ever seen this email | |
| 5 | before this moment. And so I'm saying as I'm scanning | 16:17:22 |
| 6 | it, I'm not familiar with any of it. | |
| 7 | Q. When -- so you have this -- how many phones did | |
| 8 | you carry in -- in around this time in July of 2016? Did | |
| 9 | you have your own personal phone and then one separate | |
| 10 | Kevin Plank phone, or did you have more than that? | 16:17:39 |
| 11 | A. I probably would have also had a work phone at | |
| 12 | the time. | |
| 13 | Q. So you had three phones at that time: So a work | |
| 14 | phone, a personal phone, and a Kevin Plank phone? | |
| 15 | A. Yeah. I'm just trying to think if there would | 16:17:58 |
| 16 | have been anything else. I feel like at one point I had | |
| 17 | like a device with my kids, but maybe not then. Or I | |
| 18 | don't remember. So, yeah, it would probably be three. | |
| 19 | Q. Okay. Well, let's look at the emails and see if | |
| 20 | it jogs any recollections. | 16:18:23 |
| 21 | So going down about a quarter of the way from | |
| 22 | the top of the page, do you see there's an email from | |
| 23 | Mr. Plank on July 24th, 2016, at 10:31? | |
| 24 | A. Uh-huh. | |
| 25 | Q. And he emails -- he sends this to Jason LaRose, | 16:18:36 |

Page 122