# EXHIBIT 32
[REDACTED]

1  hitting its consensus -- analyst consensus for
2  revenue, and help find revenue in that quarter?
3         MR. REISNER: Object to the form.
4         You may answer.
5     A   Yes, that was -- I don't -- I'm just not
6  aware of the -- the delta, what the actual number
7  was, whether that was the -- that helped, but I'm
8  not sure that was the difference of making it or
9  not making it.
10        BY MR. LYMAN:
11    Q   Okay. Let's go to Exhibit 213. Take a
12 look at Exhibit 213. What is this? What is
13 Exhibit 213?
14    A   It's an e-mail.
15    Q   E-mail from you on April 15, 2016, and it
16 says it's to█████████████████ Who's that?
17    A   Yes. That was an e-mail that Stephanie
18 Ruhle had.
19    Q   Okay. So this is an e-mail that you sent
20 to Stephanie Ruhle?
21    A   Yes.
22    Q   Okay. And why did you send this e-mail
23 to Stephanie Ruhle?
24    A   I don't recall.
25    Q   What was your relationship with Stephanie

HIGHLY CONFIDENTIAL

Plank
Exhibit No. 4
Date: 2-15-23
T. Alfaro

KP00004721

```
                                                    Page 153
 1   Ruhle?
 2        A     She's a close friend.
 3        Q     Okay.  I see you have an e-mail here,
 4   it's ███████████████████  One of the e-mails
 5   that you listed on your background -- your
 6   background questionnaire is R5001@ravenfoundry.com.
 7              Any reason you -- both you and Stephanie
 8   Ruhle share these adjacent e-mail addresses at
 9   ravenfoundry.com?
10        A     I provided her with the phone.
11        Q     Okay.  And so that's a ████ is a -- like
12   an iPhone or --
13        A     Yeah.
14        Q     Okay.  And why did you provide her a
15   phone in this time period?
16        A     To communicate with.
17        Q     Okay.  Is it so you could have offline
18   communications with her that wouldn't be read by
19   Jen Smith or anyone else at Under Armour?
20              MR. REISNER:  Objection to form.
21        A     It was so that we could communicate,
22   yeah.
23              BY MR. LYMAN:
24        Q     Is part of the reason why you provided
25   this offline communication so that folks at Under
```

```
                                                 Page 154
 1   Armour wouldn't read your e-mails with Stephanie
 2   Ruhle?
 3        A    It was -- it was so that we could
 4   communicate, yeah, privately.
 5        Q    Okay.  Did you have a separate device
 6   with this R5001@ravenfoundry.com e-mail?  Did you
 7   have a phone that -- that that e-mail was assigned
 8   to?
 9        A    I did.
10        Q    Okay.  Did you ever have any discussions
11   with Stephanie Ruhle, you know, aside from this,
12   which we'll listen to, that related to Under Armour
13   business using these ravenfoundry e-mails?
14        A    I don't believe so.
15        Q    Okay.  We see several e-mails from you to
16   Stephanie Ruhle that, you know, discuss various
17   things at Under Armour including, you know,
18   declining numbers and -- and preparing for -- for
19   earnings calls, things along those lines.
20             Does that refresh your recollection of
21   whether you ever sent e-mails to Stephanie Ruhle
22   that related to Under Armour business?
23        A    Yeah, I -- that doesn't refresh my
24   memory.  But anything that we would have a
25   conversation with was meant to be held in
```

HIGHLY CONFIDENTIAL

KP00004723

Page 155

1  confidence.
2      Q   Okay.  Did you provide your device that
3  uses the R5001@ravenfoundry.com to your attorneys
4  in the process of responding to our subpoena?
5      A   I did.
6      Q   Okay.  All right.  So I think you said
7  you -- or maybe I didn't ask, so I'll just ask
8  again.
9          Do you recall why you sent this -- this
10 e-mail to Stephanie Ruhle?
11     A   I don't.
12     Q   Okay.  Are you familiar with the
13 recording that's attached to this?
14     A   I am.
15     Q   Okay.
16     A   Through this process I am.
17     Q   Okay.  Try not to tell me stuff your
18 lawyers have told you, but I'm just going to ask
19 you some questions about it.
20         Where were you when you made the
21 recording?
22     A   I didn't have a memory of the recording.
23 I didn't remember making a recording, I didn't
24 remember forwarding a recording.  As I said before,
25 it wasn't a practice of what I would do.  But I

HIGHLY CONFIDENTIAL

Page 156

1  believe it to have been made on the back porch of
2  my office, where there's a small deck outside my
3  office at Under Armour.
4      Q   So -- and that's in Baltimore?
5      A   In Baltimore.
6      Q   Okay.  How -- how did you make the
7  recording?  Is this a recording of a -- like
8  through your phone?
9          And I know you didn't recall making it,
10 but hopefully by now maybe you've thought about it
11 and can recall.
12     A   I've thought a lot about it.  I have no
13 memory of why or how it got made.  As I said, it
14 wasn't practice for me to do this.
15     Q   Okay.  Do you know if this recording,
16 other than in -- in this e-mail or in Under Armour
17 e-mails, if this recording exists on -- on the
18 device upon which it was recorded?
19     A   I don't know.
20     Q   Okay.  Is Matt Mirchin aware that you
21 were recording this conversation with him?
22         MR. REISNER:  Is he or was he?
23         BY MR. LYMAN:
24     Q   Was he at the time aware that you were
25 recording this conversation with him?

HIGHLY CONFIDENTIAL
KP00004725

Page 157

1    A    I don't know.
2    Q    It's sort of interesting to me, and this
3    isn't really a question, but it's an observation,
4    and maybe you can -- you can help with this.
5         That this is -- one, this is a recording
6    with the president of North America at your
7    company, someone pretty -- pretty high up.  It's a
8    pretty detailed discussion you're having with him,
9    talking about the former CFO, the current CFO, and
10   you're sending it to Stephanie Ruhle.  It just --
11   it seems like a really strange situation to be a
12   one-off, and -- and I'm wondering after having
13   listened to it, as I'm sure you have, whether you
14   can give us any reason why you decided to -- to
15   record this conversation and at least as -- as it
16   was here, seems like start recording it in the
17   middle of the conversation.
18   A    I don't -- I don't have a recollection.
19   Q    After hearing the recording, do you think
20   there's anything -- anything notable about it
21   that -- that would have made you want to send it to
22   Stephanie Ruhle?
23   A    When I was made aware of this recording
24   by my counsel my reaction was, you know, this
25   may -- why does that exist, I wondered where it

HIGHLY CONFIDENTIAL
KP00004726

Page 158

1  came from, I never thought it had come from me. It
2  wasn't something that I would do. I believed it
3  not to be the case, and then when my attorneys told
4  me that I'd forwarded it, we later discovered it
5  was a late Friday night, Matt and I were drinking
6  on the -- on our porch, and I'm -- it's one of the
7  factors that went into possibly why this got made.
8      Q   So this recording is you and Matt Mirchin
9  both in person?
10     A   Correct.
11     Q   Okay. And you -- it looks like it was
12 sent at 8:25:36 p.m., or 8:25 p.m.
13         Do you think that this was -- this was
14 about the time the recording was made, or was
15 this -- it says "My night," which suggests you sent
16 it the same time you recorded it. Do you know one
17 way or the other of whether this was sent the same
18 time that it was made?
19     A   It sounds like a -- you know, an end to a
20 long day or long week, and sounds like trying to go
21 home and having a conversation with -- with Matt
22 late into the hours on a Friday evening.
23     Q   Okay. All right. I'll play the
24 recording.
25         MR. REISNER: Pardon me?

HIGHLY CONFIDENTIAL
KP00004727

```
                                                      Page 159
 1              MR. LYMAN:  I'm going to play the
 2      recording.
 3              (Recording played off the stenographic
 4                 record.)
 5              BY MR. LYMAN:
 6       Q      We can pause it there.
 7              So one of the first things that -- that
 8      Matt says to you is, you know, that if you go at it
 9      you can -- you're demotivating and intimidating
10      people.  That the first time you heard -- you heard
11      something along those lines about how you run Under
12      Armour?
13              MR. REISNER:  Objection to form.
14       A      I think you have two people talking on a
15      Friday night where they're more open to being
16      looser with -- with the dialogue.
17              I think Matt is being very transparent
18      and I think he's trying to make a point, and I
19      don't think his language is reflective of exactly
20      what he meant there, but, no, I don't think that's
21      a broader statement.
22              BY MR. LYMAN:
23       Q      Okay.  I mean, he also says that the --
24      the top -- at the top it's -- it's combative,
25      right? Similar -- similar tone, similar message as
```

HIGHLY CONFIDENTIAL

KP00004728