<span style="color:red">REDACTED</span>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABERDEEN CITY COUNCIL AS ADMINISTRATING AUTHORITY FOR THE NORTH EAST SCOTLAND PENSION FUND, <br><br>                              Plaintiff, <br><br>     vs. <br><br> BLOOMBERG L.P., <br><br>                              Defendant. <br><br> (*In re Under Armour Securities Litigation, Pending in the United States District Court, District of Maryland*, Civil No. RDB-17-388) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Misc. Case No. 1:23-mc-00070-LAK-GWG |

## DEFENDANT BLOOMBERG L.P.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 2

FACTUAL BACKGROUND .............................................................................. 5

ARGUMENT ................................................................................................... 14

I.  The Reporter's Privilege Protects Bloomberg and Ruhle's Newsgathering ................... 14

    A.  The Limited *Chevron* Exception to Application of the Reporter's Privilege
       Is Triggered Only If the News Organization Cedes Editorial Control,
       Which Did Not Happen Here ................................................................. 14

        i.  The <u>Chevron</u> Exception .......................................................... 16

        ii.  Applying the <u>Chevron</u> Exception in <u>Fowler</u> ............................. 18

    B.  Bloomberg's Journalistic Process Does Not Fall Within the *Chevron*
       Exception ............................................................................................ 20

    C.  Ruhle's Newsgathering Also Is Protected .......................................... 22

II.  Plaintiff Has Not and Cannot Overcome the Reporter's Privilege ................... 29

III.  The MTC Also Should Be Denied Because the Overbroad and Duplicative
     Subpoena Unduly Burdens a News Organization .......................................... 32

CONCLUSION ................................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baker v. Goldman Sachs & Co.*,
  669 F.3d 105 (2d Cir. 2012)...................................................................27

*Chevron v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011)............................................................. *passim*

*Connecticut Bar Ass'n v. United States*,
  620 F.3d 81 (2d Cir.2010).....................................................................22

*Fowler v. Vary*,
  No. 22-mc-0063 (LAK), 20-CV-9586 (LAK),
  2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022) .................................... *passim*

*Giuffre v. Maxwell*,
  221 F. Supp. 3d 472 (S.D.N.Y. 2016)............................................ *passim*

*Gonzales v. Nat'l Broad. Co.*,
  194 F.3d 29 (2d Cir. 1999)............................................................ *passim*

*In re McCray, Richardson, Santana, Wise, Salaam Litig.*,
  991 F. Supp. 2d 464 (S.D.N.Y. 2013)..........................................29, 30, 31

*New England Teamsters & Trucking Inds. Pension Fund v. The New York Times
  Co.*,
  No. 14 Misc. 59, 2014 WL 1567297 (S.D.N.Y. April 17, 2014) ................16, 20, 32

*Prignoli v. City of New York*,
  No. 94 CIV. 4125 (KMW), 1996 WL 340001 (S.D.N.Y. June 19, 1996).............22

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008).....................................................................25

*In re Under Armour Sec. Litig.*,
  342 F. Supp. 3d 658 (D. Md. 2018)...................................................11

*In re Under Armour Sec. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019)...................................................11

*In re Under Armour Sec. Litig.*,
  No. CV RDB-17-0388, 2020 WL 363411 (D. Md. Jan. 22, 2020) ............11, 12, 31

*United States v. Marcos*,
  No. SSSS 87 CR. 598 (JFK), 1990 WL 74521 (S.D.N.Y. Jun. 1, 1990)................15

*von Bulow by Auersperg v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987)...........................................................................................27, 28

*Watson v. Geithner*,
    355 F. App'x 482 (2d Cir. 2009) ..........................................................................................22

**Other Authorities**

Fed. R. Civ. P. 37(a)(2).............................................................................................................14

Fed. R. Civ. P. 45(d)(3)(iii).......................................................................................................14

Fed. R. Civ. P.  37 ..............................................................................................................14, 29

Restatement (Third) of Agency § 2.04 .....................................................................................22

Defendant Bloomberg L.P. ("Bloomberg") submits this memorandum of law in opposition to the motion by Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Plaintiff" or "Aberdeen") to compel Bloomberg to produce documents in response to a subpoena served on January 6, 2023 seeking certain newsgathering information (respectively, the "MTC" (ECF 8) and the "Subpoena" (Declaration of Michael G. Capeci in Support of Plaintiff's Motion to Compel Bloomberg L.P. to Produce Documents Responsive to Plaintiff's Subpoena (the "Capeci Decl."), at Ex. 1)).

## PRELIMINARY STATEMENT

Plaintiff seeks to compel Bloomberg to produce newsgathering information relating to its reporting about Plaintiff's opponents in a class actions securities fraud case, Under Armour, Inc. and its former Chief Executive Officer, Kevin Plank (respectively, "UA" and "Plank"). Bloomberg has covered newsworthy events involving UA and/or Plank for years.  Plaintiff nevertheless claims that this Circuit's long-standing and strong protections against discovery of newsgathering materials do not apply here based on its spurious theory that Bloomberg, one of the world's leading financial news organizations, purportedly was not engaged in independent journalism when its (now former) reporter Stephanie Ruhle ("Ruhle") discussed UA during a single, 4 minute and 20 second-long report that aired on Bloomberg Television's *Bloomberg Markets* program in January 2016.  Plaintiff asserts that Ruhle was not acting as an independent journalist because, over the course of her longstanding newsgathering relationship with Plank and UA, she developed a friendship with Plank and sometimes gave him and others at UA advice. Despite Plaintiff's insinuations and misreading of Ruhle's communications (produced by others) that were submitted with the MTC, the actual evidence that Plaintiff offers as support for its claims shows that Ruhle was engaged in developing sources for purposes of newsgathering, with no evidence that she, much less Bloomberg, ceded any control of her reporting.  The MTC should be

1

recognized for what it is – an attempt to use a newsroom to obtain strategic advantage against opponents in a litigation that has nothing to do with Bloomberg or its reporting – and should be denied.

## SUMMARY OF ARGUMENT

The MTC seeks to pull Bloomberg into a legal dispute between Plaintiff and UA/Plank that has been pending for more than six years (*In re Under Armour Securities Litig.,* Civ. No. 1:17-cv-00388-RDB (D. Maryland), the "Maryland Litigation"). Neither Bloomberg nor any of its current or former employees is a party to the Maryland Litigation, nor is Bloomberg or any of its current or former employees ever mentioned in the operative complaint as having any connection to UA or Plank's alleged wrongdoing. Discovery closed in the Maryland Litigation on February 28, 2023, yet Plaintiff waited until January 6 to serve the Subpoena and did not file this MTC until March 15.

Nevertheless, Plaintiff has initiated this proceeding seeking to have this Court order a news organization to produce unpublished newsgathering material that is protected under federal constitutional and common-law protections that guard such material from discovery (the "Reporter's Privilege"). Under the Second Circuit's long-standing precedents, such newsgathering materials are privileged unless the requesting party can show that the evidence sought is likely relevant to a material issue in the underlying case and not reasonably available from any other source. *E.g., Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999). The broad protection that the Reporter's Privilege affords to newsgathering includes prohibiting litigants from appropriating newsroom resources for their own strategic advantage in a lawsuit, at the expense of the paramount First Amendment value of the free flow of information.

Plaintiff's principal argument does not address whether it can meet its burden under *Gonzales*, but rather claims that Bloomberg – one of the world's most preeminent financial and

business news organizations – purportedly does not qualify for Reporter's Privilege protection at all under *Chevron v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).  In *Chevron*, the Second Circuit created a narrow exception to the Reporter's Privilege by holding that its protections could be reduced (but not necessarily eliminated) where a journalist was not acting independently – which the *Chevron* Court found could be shown where a journalist both was commissioned to create a work for the purpose of telling the subject's story irrespective of what her own reporting revealed **and** ceded to the subject editorial or financial independence in the journalistic process. *Id.* at 308-09.

No court interpreting *Chevron* has ever applied its limited exception to a traditional news organization like Bloomberg.  Indeed, no court in this Circuit interpreting *Chevron* has ever found *any* other instance where a journalist invoking the Reporter's Privilege failed to qualify on grounds that he or she was not acting as an independent journalist; all subsequent cases that Bloomberg could find asking that question held that the journalist *was* protected under *Chevron*.  Plaintiff's arguments that the Court should, for the first time since *Chevron*, find that the *Chevron* exception applies should be rejected and its motion to compel should be denied, for several reasons.

**First, as a threshold matter**, even Plaintiff does not attempt to argue that Bloomberg, the news organization that received the subpoena, is not a legitimate journalistic enterprise with the right to protections under the Reporter's Privilege.

**Second**, the *Chevron* decision was carefully limited to specific facts not present here.  As detailed below, the exception in *Chevron* requires two showings: (1) a journalist must have been "commissioned" to create content for a third party that is not a journalist, such that the journalist accepted the task of telling that party's story regardless of the journalist's own research; and (2) that journalist must have ceded control of the journalistic process to the third party.  Subsequent

case law in this District – which is not discussed or cited at all in the MTC – conclusively rejects Plaintiff's arguments in favor of applying *Chevron* here. For example, in *Fowler v. Vary*, No. 22-mc-0063 (LAK), 20-CV-9586 (LAK), 2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022) (Kaplan, J.), the Court held that a personal relationship between a reporter and his source did not divest the Reporter's Privilege's protections for newsgathering. The Court specifically found that evidence of the reporter's willingness to tell the subject's story and even giving the subject public relations advice was insufficient to strip the reporter of the Reporter's Privilege. As explained in *Fowler*, such allegations simply do not show a lack of independence in the journalistic process sufficient to invoke the narrow exception in *Chevron*. Likewise, in *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 478-79 (S.D.N.Y. 2016), the Court rejected the argument that a close relationship between journalist and source meant that the journalistic privilege does not apply, holding that "[s]uccessful journalists must cultivate extensive networks of sources, and communicate with them regularly on a variety of topics," and that "frequent, often informal communication with sources, even if not for the immediate purpose of gathering information for a specific article, is an integral part of the overall newsgathering process."

**Third**, Plaintiff's argument that it is entitled to the requested discovery even if the Reporter's Privilege applies also should be rejected. Plaintiff refused to discuss this issue during the meet and confer process, expressly rejecting Bloomberg's repeated requests to do so, and so cannot raise it now in the MTC. In any event, the requested information is neither material to its case nor unavailable from other sources. Plaintiff claims that it needs the information as evidence of Plank's (and UA's) scienter, but it fails to articulate how third-party communications that Plank *never saw* could be probative of his state of mind. To the extent that Plaintiff seeks documents that Plank did receive or send, Plaintiff already has obtained voluminous documents from the

Defendants in the Maryland Litigation (including Plank), and it also has deposed Ruhle, Plank, and UA.  Indeed, the MTC quotes liberally from these other sources of discovery.  Plaintiff suggests that it is entitled to "verify" these other sources for completeness.  Whether that may be germane to other types of discovery, that is simply not the rule for materials protected by the Reporter's Privilege. To the contrary, Plaintiff's acknowledgement that it is merely seeking "verification" of the completeness of information *it already has* is an admission that the Subpoena seeks information that is available from other sources – which is fatal to Plaintiff's attempt to overcome the Reporter's Privilege.

For all of these reasons, the requested newsgathering is protected by the Reporter's Privilege, and the MTC should be denied in full.

## FACTUAL BACKGROUND

### A.     The Parties

Plaintiff Aberdeen is the Administrating Authority for the North East Scotland Pension Fund, Monroe County Employees' Retirement System, and KBC Asset Management NV.  (Capeci Decl., Ex. 5 ¶ 1.)  It is the lead plaintiff in the Maryland Litigation, claiming to have invested in UA, a publicly traded company that manufactures sports apparel, between September 16, 2015 and November 1, 2019.  (*Id.* at ¶¶ 2, 4, 26.)

Bloomberg is the owner and operator of Bloomberg News.  (Zelenko Decl. ¶ 2.[1])  Its newsroom of more than 2,700 journalists and analysts delivers thousands of stories a day, producing content that is featured across multiple media platforms, including digital, TV, radio, video, print, and live events.  (*Id.*)

---

[1] The Declaration of Laura Zelenko dated April 20, 2023 and the Declaration of Dori Ann Hanswirth, dated April 20, 2023, are filed in opposition to the MTC and will be referred to herein, respectively, as the "Zelenko Decl." and the "Hanswirth Decl."

Ruhle is a professional journalist who has reported on market and finance news for more than a decade.  (*Id*., Ex. A.)  She began her career in finance, where she worked as the highest-producing credit derivatives salesperson in the U.S. for Credit Suisse First Boston and as a Managing Director in Global Markets Senior Relationship Management with Deutsche Bank. (*Id.* ¶ 4.)  In 2011, Ruhle transitioned her industry knowledge, insights, and personal and professional contacts into a career in financial journalism when she began to co-host a two-hour early morning news program on Bloomberg Television called *Inside Track*.  (*Id*.)  Ruhle went on to host *Market Makers* and *Bloomberg <GO>*, Bloomberg's flagship morning show featuring global thought leaders across the business, technology, and media industries.  (*Id*.)  In addition to her work as an anchor, Ruhle also served as a managing editor for Bloomberg Television and editor-at-large for Bloomberg News.  (*Id*.)  On  April 12, 2016, Ruhle left Bloomberg to anchor various news programs at MSNBC, including *MSNBC Live With Stephanie Ruhle*, *MSNBC Live With Velshi and Ruhle*, and *The 11th Hour with Stephanie Ruhle*.  (*Id*.)

Ruhle has reported extensively on high profile leaders in business, such as Goldman Sachs CEO Lloyd Blankfein,[2] hedge fund manager David Tepper,[3] and JP Morgan Chase CEO and chairman Jamie Dimon.[4]  Ruhle also has reported routinely on the finance- and business-related activities of celebrity and professional athlete business moguls, such as musician Sean Combs,[5]

---

[2] "Lloyd Blankfein, Michael Bloomberg on Markets, Economy," *Bloomberg Television – Market Makers* (July 29, 2015),        https://www.bloomberg.com/news/videos/2015-07-29/lloyd-blankfein-michael-bloomberg-on-markets-economy.
[3] "Tepper: Stocks Interesting, Junk Bonds at Fair Value," *Bloomberg Television – Market Makers* (Oct. 1, 2014), https://www.bloomberg.com/news/videos/2014-10-01/tepper-stocks-interesting-junk-bonds-at-fair-value-video.
[4] "JPMorgan Chase CEO Jamie Dimon discusses economic impact of virus with Stephanie Ruhle," *MSNBC* (Aug. 11, 2020),         https://www.msnbc.com/stephanie-ruhle/watch/jpmorgan-chase-ceo-jamie-dimon-discusses-economic-impact-of-virus-with-stephanie-ruhle-89896005595.
[5] "Diddy: I Don't Need to Invest My Money in My Brands," *Bloomberg Originals* (Oct. 21, 2014), https://www.youtube.com/watch?v=nXgmqWa3_vY.

professional golf Masters Tournament winner Jordan Spieth,[6] Miami Heat star Dwyane Wade,[7] and tennis star Serena Williams.[8]  (*Id.* at ¶ 6.)

Ruhle's excellence as a business and financial reporter is widely recognized.  In 2023, her reporting was nominated for "Outstanding Live TV Journalism – Segment or Special" at the GLAAD Media Awards.[9]  In 2018, Ruhle was included on The New Power of New York List 2018 published by *Variety*, which praised her "journalistic chops."[10]  Today, her biography states that she serves as a member of the board of trustees for Girls Inc., which honored her as one of their Women of the Year in 2016.  (Zelenko Decl., Ex. A)  She also serves on the board and advises for "React To Film," an issue-based documentary film series, and formerly served on the corporate councils of iMentor and The White House Project.  (*Id.*)

### B.   Ruhle's Coverage of UA and Her Jan. 11, 2016 Bloomberg Television Appearance

Ruhle covered UA as part of her assigned news beat for Bloomberg.  (Zelenko Decl. ¶ 6; Capeci Decl., Ex. 9 at 27:22-25.)  She began covering the company in at least 2014 and has covered UA throughout the nine years since, both at Bloomberg and at MSNBC.  (Capeci Decl., Ex. 9 at 27:4-25.)  Ruhle first met Plank when interviewing him on television for Bloomberg.  (*Id.* at 27:6-

---

[6] "Masters Champion Spieth: I'm Aggressive, Young, Fearless," *Bloomberg Video – Market Makers* (Apr. 14, 2015), https://autos.yahoo.com/video/masters-champion-spieth-m-aggressive-151903243.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAIwBCVGIE8zplDWdiTlG3ppZ4FOGmXE5oUyrXtuyurRvGotVhBaU-SXDP3WYg42XV9le7MwukrE8fkWQNWNw7wUiCrc3wbv8eRGnJyR6i4OmSkfgR5xpVvwTySgImpeNopLhnQI5ShMXbFeIPdCeY763bnReNqOBQyzsIE5R7OA-.
[7]   "Dwyane Wade: My Passions Beyond Basketball," *Bloomberg Daybreak: Americas* (Dec. 8, 2015), https://www.bloomberg.com/news/videos/2015-12-08/dwyane-wade-my-passions-beyond-basketball.
[8]   "Serena Williams opens up about balancing tennis and 'mom guilt,'" *NBCNews* (Aug. 30, 2018), https://www.nbcnews.com/better/pop-culture/serena-williams-opens-about-balancing-career-mom-guilt-ncna904886.
[9]   "The Nominees for the 34th Annual GLAAD Media Awards," GLAADD.org, https://www.glaad.org/mediaawards/34/nominees.
[10] "The New Power of New York List 2018," *Variety* (Oct. 2, 2018), https://variety.com/gallery/2018-new-power-of-new-york-list/bloomberg-global-business-forum-new-york-usa-20-sep-2017/.

10.)  She cultivated Plank as a regular news source and ultimately developed a friendship with him.  (*Id*. at 27:13-20.)

On January 10, 2016, a Morgan Stanley & Co. LLC analyst published a report about UA concluding that demand for UA product was declining (the "Morgan Stanley Report").  (MD-ECF 153-3; Capeci Decl., Ex. 14.)  In the early morning of January 11, Ruhle emailed Diane Pelkey ("Pelkey"), UA's Senior Vice President of Global Communications and Entertainment, to ask about information for use in Ruhle's reporting.  (Capeci Decl., Ex. 15.)  After Pelkey responded about that matter, Ruhle then raised the subject of the Morgan Stanley Report, stating that she had seen the news about the Morgan Stanley Report and discussing her views of what its market impact was likely to be.  (*Id.*)

Later that day, at approximately 12:30 p.m. Eastern Time, Ruhle appeared live on Bloomberg Television to discuss the Morgan Stanley Report (the "Jan. 11 Appearance").  (Zelenko Decl., Ex. B (video); Hanswirth Decl., Ex. B (transcript).)  The Jan. 11 Appearance was then published on Bloomberg.com under the title "Under Armour Shares Decline, Here's Why."[11] (Zelenko Decl., Ex. C.)  During the Jan. 11 Appearance, Ruhle discussed the Morgan Stanley Report and its effect on UA's stock with Starlet Fu and Alix Steel, the co-hosts of *Bloomberg Markets*.  Fu opened the segment with: "Under Armour shares [are] really taking it on the chin today . . . after a note from Morgan Stanley that said the sportswear company is losing its grip on women's apparel, losing market share for the first time in three years."  Steel chimed in, "the analyst there says that uncertainty about [UA]'s earnings is more than just weather-related" (the report was issued during the winter) and then asked "So, what's slowing down the company?" before turning to Ruhle for her insight on what Steel called a "price cut" in the stock value that

---

[11]   "Under Armour Shares Decline, Here's Why," Bloomberg TV (Jan. 11, 2016), https://www.bloomberg.com/news/videos/2016-01-11/under-armour-shares-decline-here-s-why.

"really stood out," and asking Ruhle to explain what was "behind the note [from Morgan Stanley]."

Ruhle answered with detailed information about the financial data that went into the Morgan Stanley Report.  She explained that it was based on data not from UA, but from third-party provider SportScan, which she said "pulls point-of-sale numbers from retailers."  Ruhle went on to discuss the extent to which SportScan's data tracked UA's key retailers.

During the segment, both Ruhle and Fu agreed that the Morgan Stanley Report "might be premature," and when Fu observed that Morgan Stanley also said that it "prefers Nike over Under Armour," Ruhle transitioned to discuss the larger context of UA's performance, noting that while the UA stock was down, the athletic apparel category was still growing relative to non-athletic fashion brands and that UA had made recent investments in wearable technology.  Ruhle also referred to larger market trends, pointing out that the stock drop took place at the end of the year, when investors commonly sell high-performing stocks to lock in gains.

Ruhle concluded with her opinion that the Morgan Stanley Report was concerning – in her words, "the stock is down today, eight percent, that's not a small number."  There is no assertion in the MTC that the Jan. 11 Appearance contained any erroneous factual information.

More than an hour after her Jan. 11 Appearance, Ruhle emailed Plank, Pelkey, and another person at UA at 1:41 p.m. Eastern with a link to the clip published on Bloomberg.com.  (Capeci Decl., Ex. 16.)  At 2:56 p.m. Eastern, Plank emailed Ruhle with information about UA and its performance that he intended for publication.  (*Id.*, Ex. 17.)  Plank emailed Ruhle with additional information for use in her reporting again at 3:22 p.m. (*id.*, Ex. 18) and 3:41 p.m. (*id.*, Ex. 19).[12]  No changes were made to the Jan. 11 Appearance or to its subsequent publication on

---

[12] Bloomberg's arguments are based on the evidence that Plaintiff submits in support of its MTC.  Bloomberg has not submitted additional materials at this time, but reserves the right to do so should the Court determine it would be helpful.

Bloomberg.com, and there is no indication in the record that anyone at UA (or otherwise) requested any such changes.  (*See generally id.*, Exs. 16-19 .)

The same day as the Jan. 11 Appearance, Bloomberg published other content regarding the Morgan Stanley Report.  For example, it published an article by Bloomberg journalist Nick Turner called "Under Armour Tumbles After Analyst Says It Has a Woman Problem" (the "Woman Problem Article").  (Zelenko Decl., Ex. D.)  In the Woman Problem Article, Bloomberg reported that "Under Armour Inc. suffered its worst stock decline in more than four months after Morgan Stanley pointed to a market-share decline for the company, especially among women."  It stated that "the company is losing ground to apparel rivals for the first time in three years and average selling prices are falling at an accelerated pace," specifically citing "a report from Morgan Stanley analyst Jay Sole."  (*Id.*) It also detailed the contents of the Morgan Stanley Report, quoting its opinion that "[b]oth trends are more pronounced in women's apparel, despite major marketing investment in this division last year," as well as its citation of SportScan data, and reporting its ultimate conclusion that the stock was "underweight, the equivalent of sell, and lowered his price target to $62 from $103."  (*Id.*)

Bloomberg also published another article the same day, authored by Janet Freund, under the title "UA Losing Mkt Shr in Women's; Footwear ASPs Dropping: M. Stanley" (the "UA Losing Market Share Article").  (*Id.*, Ex. E.)  In the UA Losing Market Share Article, Bloomberg reported that "Under Armour is seeing declining share in women's apparel, lower ASPs in footwear, Morgan Stanley analyst Jay Sole writes in note, citing recent SportScan data."  It included a nine bullet-point list detailing UA's poor performance, including that "N-T earnings uncertainty more than just weather-related; first time in 3 yrs UA losing shr in apparel," that "UA may be reaching maturity in U.A. apparel faster than previously thought" and its "shrs aren't priced

for U.S. slowdown"; that the shares were "underweight" and "PT to street-low $62 from $103"; and that UA was down 5.6% compared to Adidas being up 3.4% in Europe.

## C.     The Maryland Litigation

On February 10, 2017, Plaintiff Aberdeen and others (the "Maryland Plaintiffs") initiated the Maryland Litigation by filing Initial Complaints (MD-ECF 1[13]), later amended (MD-ECF 30, the "FAC"), claiming violations by multiple defendants of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").   Over the next several months the Court dismissed the FAC as well as a Second Amended Complaint (MD-ECF 78, the "SAC"), which dropped all defendants except for UA and Plank and all claims except those under the Exchange Act.  *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658 (D. Md. 2018) ["*UA Sec. Litig. I*"] (dismissing portion of FAC with prejudice and portion without); *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446 (D. Md. 2019) ["*UA Sec. Litig. II*"] (dismissing SAC).

While the Maryland Plaintiffs' appeal was pending, news broke that UA had been the subject of various federal investigations since July 2017, concerning whether UA had shifted sales from quarter to quarter to make its business appear healthier than it actually was.  (MD-ECF 139 at 1-2.)  Based on this and other new evidence (such as UA filings and statements that confirmed the investigations), the Maryland Plaintiffs moved for relief from the *UA Sec. Litig. II* judgment. (*Id.*)

In granting that request, the District Court found that the Maryland Plaintiffs' new evidence redressed deficiencies in the prior complaints.  *In re Under Armour Sec. Litig.*, No. CV RDB-17-0388, 2020 WL 363411, at *3 (D. Md. Jan. 22, 2020) ["*UA Sec. Litig. III*"]. The Court noted the new evidence offered regarding scienter – that is, intent "to deceive, manipulate, or defraud" –

---

[13] Citations to docket entries in the Maryland Litigation are designated by reference to "MD-ECF."  A copy of the current docket in the Maryland Litigation is annexed as Ex. C to the Hansawirth Decl.

including "emails" from Plank "reveal[ing] that he was personally aware of" the allegedly improper practices, as well as the fact of the federal inquiries. *Id.* at *7.   The Maryland Plaintiffs filed a Third Amended Complaint ("TAC") on Oct. 14, 2020, against UA and Plank.  (Capeci Decl., Ex. 5.)

In the TAC, the operative complaint, the central allegation is that Defendants UA and Plank violated the Exchange Act by misrepresenting the level of demand for UA product between September 16, 2015 and November 1, 2019 (the "Class Period").  (*Id.* at ¶¶ 1-2.)  Neither Ruhle nor any of her reporting is mentioned in the TAC at all, and the only reference to Bloomberg is to cite a Bloomberg Tax article published on July 28, 2020 – nine months after the close of the Class Period and more than four years after Ruhle left Bloomberg – which Plaintiff uses as an example of general media coverage of an unrelated topic.  (*Id.* at ¶ 376.)

During discovery in the Maryland Litigation, Plank and UA each produced documents, some of which Plaintiff now includes as exhibits to the MTC.  (*See* Capeci Decl., Exs. 6-8, 10, 12, 14-31, 33-37 (UA); *see also id.*, Ex. 32 (Plank).)  Plank was deposed on February 15, 2023.  (*Id.*, Ex. 3.)  During his deposition, he discussed his interactions with Ruhle in detail.  (*See id.*)  He stated that Ruhle was his "friend" and someone from whom he "can get counsel."  (*Id.*, Ex. 3 at 281:3-4, 284:15-17.)  He testified that Ruhle never worked for UA and was "[n]ever compensated" by the company.  (*See id.*, Ex. 3 at 284:21-285:1.)  Plank further testified that there was no agreement with Ruhle other than an understanding he reached with her personally that at times they would exchange information on a confidential basis.  (*See id.*, Ex. 3 at 281:5-282:1, 318:7-320:5.)

On March 8, 2023, Plaintiff deposed Ruhle.  (Capeci Decl., Ex. 9.)  She, too, testified about her interactions with Plank, stating that, from 2015 to 2017, they were "friends, and I covered –

and I covered his company" as part of her work at Bloomberg.[14]   (*Id.* at 27:15-18.)   Plaintiff provided no evidence that it asked Ruhle if she was ever hired by UA or Plank or paid by them. (*See generally id.*, Ex. 9.)

> ### D.   The Subpoena

On January 6, 2023, after UA and Plank produced documents but before Plank or Ruhle were deposed, Plaintiff served the Subpoena on Bloomberg.  (Capeci Decl., Ex. 1.)  It sought (1) documents and communications between Ruhle and Plank or other UA employees concerning UA, and (2) documents and communications sent or received by Ruhle (regardless of whether a UA employee was involved) concerning UA, from January 1, 2015 to June 30, 2017.  (*Id.*)  Bloomberg served objections on January 19, 2023, including that the requested information was protected by the Reporter's Privilege and that the Subpoena was overbroad and overly burdensome.  (Hanswirth Decl., Ex. A.)  Based on its objections, Bloomberg declined to produce any documents.  (*Id.* ¶ 2.)

Attorneys for Bloomberg and Plaintiff met and conferred about Bloomberg's objections on January 23-25, February 6, February 23, February 27-28, and March 13-14.  (*Id.* ¶ 3.)  During these communications, Plaintiff took the position that the Reporter's Privilege did not apply at all based on the Second Circuit's decision in *Chevron*.  (*Id.* ¶ 4.)  Plaintiff declined Bloomberg's repeated requests to discuss or explain how, if *Chevron* did not apply, Plaintiff could make the showing that it was entitled to the requested materials.  (*Id.*)  As a result, Bloomberg was not provided with any insight into Plaintiff's factually based arguments (ultimately advanced in the MTC with over 700 pages of exhibits, *see generally id.*, Exs. 1-38) regarding why the requested materials are purportedly relevant to a significant issue in the Maryland Litigation or why the

---

[14] Plaintiff has not provided the full Plank and Ruhle transcripts.  We assume that Plaintiff has only included the portions most favorable to its argument.

information allegedly is not available from all the other discovery on the topic in that case. (Hanswirth Decl. ¶ 4.)  Bloomberg would not learn the nature or basis of Plaintiff's arguments in this regard until Plaintiff filed the MTC on March 16, 2023 and thereafter served Bloomberg with the unredacted MTC on March 21, 2023.  (*Id.*)

By the time that Plaintiff filed the MTC, discovery in the Maryland Action already had been closed for more than two weeks, since February 28, 2023.  (MD-ECF 250 at 3.)

## ARGUMENT

Federal Rule of Civil Procedure 37 permits a party to move for an order compelling disclosure or discovery from a non-party to an action. *See* Fed. R. Civ. P. 37(a)(2). A court *must* quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." *See* Fed. R. Civ. P. 45(d)(3)(iii).

## I.   THE REPORTER'S PRIVILEGE PROTECTS BLOOMBERG AND RUHLE'S NEWSGATHERING

Plaintiff's MTC is predicated almost entirely on the notion that, under *Chevron*, the Reporter's Privilege protections do not apply to the newsgathering materials requested here, on grounds that "the CEO of a publicly traded company [Plank]" purportedly "secretly enlist[ed] the help of a close, personal friend – and member of the financial media [Ruhle]" in order "to counter the negative public image and stock price impact caused by a critical analyst report."  (MTC 1.) Plaintiff's argument fails because *Chevron* does not apply to Bloomberg's newsgathering, based on that case's own terms as well as subsequent case law that Plaintiff does not cite, much less address, in its MTC.

### A.   The Limited *Chevron* Exception to Application of the Reporter's Privilege Is Triggered Only If the News Organization Cedes Editorial Control, Which Did Not Happen Here

The Second Circuit long has recognized the existence of a Reporter's Privilege, grounded

in the First Amendment and federal common law, which grants robust protections against discovery into information obtained in connection with newsgathering activities. *Gonzales*, 194 F.3d 29. The Reporter's Privilege serves "two interests safeguarded by the First Amendment." *United States v. Marcos*, No. SSSS 87 CR. 598 (JFK), 1990 WL 74521, at *2 (S.D.N.Y. Jun. 1, 1990). First, the privilege "reflects a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters . . . ." *Id.* (citation omitted). This interest recognizes that "effective gathering of newsworthy information in great measure relies upon the reporter's ability to secure the trust of news sources," that "[m]any doors will be closed to reporters who are viewed as investigative resources of litigants," and that without protections against disclosure of newsgathering, the "free flow of information" will be hindered in a way that is "inimical to the First Amendment." *Id.* Second, the privilege also recognizes the First Amendment interest in the press's independence in its "selection and choice of material for publication." *Id.* "Ready obtainment by litigants of court orders compelling disclosure of outtakes and unpublished information could prompt reporters or editors to purge from publication any information they fear would excite the interest of current or prospective litigants." *Id.*

Because the policy favoring the free flow of information to the public is implicated by any intrusion into the journalistic process, the Reporter's Privilege protects both confidential and nonconfidential newsgathering. *Gonzales*, 194 F.3d at 35-36; *Giuffre*, 221 F. Supp. 3d at 477 (courts have recognized that "important interests beyond confidentiality . . . are served by the reporter's qualified privilege," including "the privacy of editorial processes and the press's independence in its selection of material for publication in accordance with the broader public policy of encouraging the free flow of information and avoiding a chill on the press"). Under the

*Gonzales* test for nonconfidential newsgathering information, the one relevant here, "a subpoena *must be* quashed unless the issuing party demonstrates (1) 'that the materials at issue are of likely relevance to a significant issue in the case,' and (2) the materials at issue 'are not reasonably obtainable from other available sources.'" *New England Teamsters & Trucking Indus. Pension Fund v. The New York Times Co.*, No. 14 Misc. 59, 2014 WL 1567297, at *3 (S.D.N.Y. Apr. 17, 2014) (emphasis added) (citing and quoting *Gonzales*, 194 F.3d at 36).

> ### i.     The <u>Chevron</u> Exception

In *Chevron*, the Second Circuit adopted a narrow exception to the protections offered by the Reporter's Privilege.  In that case, the court considered an appeal of Judge Kaplan's ruling compelling disclosure of newsgathering materials over documentarian John Berlinger's invocation of the Reporter's Privilege.  629 F.3d at 300.  Berlinger had produced a documentary film, entitled *Crude*, about ongoing litigation in Lago Agrio, Ecuador  (the "Lago Agrio Litigation").  The Lago Agrio Litigation stemmed from allegations that an affiliate of Chevron Corp. had caused environmental damage from its petroleum exploration and extraction operations.  Chevron Corp., which was a defendant in the Lago Agrio Litigation, and its attorneys, who were defendants in a related criminal proceeding, sought to force Berlinger to produce unpublished outtakes from the film for use in both the Lago Agrio Litigation and the criminal proceedings.  *Id*. at 300, 304.

The District Court ordered the footage to be produced, and the Second Circuit affirmed, holding that Berlinger was not entitled to assert the Reporter's Privilege protections because, based on the circumstances of that case, he had not acted in "the role of the *independent* press" when producing the documentary.[15]  *Id*. at 307 (emphasis in original).  In so ruling, the Second Circuit held that a claim to the Reporter's Privilege could be *reduced*, but *not necessarily destroyed*, if

---

[15] The court declined to decide whether he had no privilege or merely a weakened one.  *Id.*

there were evidence that (a) the journalist was "commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting," such that, as the court explained, the journalist would be "promoting a particular point of view regardless of what her investigations may reveal," *and* (b) there was a resulting lack of "independence of her journalistic process," which could be shown with evidence of a loss of "editorial and financial" control. *Id*. at 308-09.

The Second Circuit issued a detailed opinion explaining what it meant, and, more importantly here, what it did *not* mean, in adopting this limited exception. The *Chevron* court took pains to emphasize that the mere fact that a journalist was *commissioned* by a third party to create a journalistic work is insufficient to show that the journalist lacked independence. *Id*. at 309. It held that there must *also* be evidence that the journalist failed to retain editorial or financial control of her journalistic process. *See id.* Indeed, the Court specifically warned that its ruling "does not imply that a journalist who has been solicited to investigate an issue and presents the story supporting the point of view of the entity that solicited her cannot establish the privilege." *Id.* In that case, the Court stated, "such a journalist can establish entitlement to the privilege by establishing the independence of her journalistic process, for example, through evidence of editorial and financial independence." *Id.* Likewise, the Court expressly stated, "[w]e do not suggest that a journalist loses or weakens her privilege merely because her publication reflects her previously held point of view. Consistency of point of view does not show lack of independence." *Id*. at 308 n.4.

Applying the above, the *Chevron* court found that, based on "the circumstances of the making of the film," the Reporter's Privilege did not block the requested production. The court pointed to the fact that "Berlinger's making of the film was *solicited* by the plaintiffs in the Lago

Agrio [L]itigation *for the purpose of telling their story*" **and** that "changes to the film were made at their instance." *Id*. at 300 (first emphasis added, second emphasis in original).  In reaching this conclusion, the court emphasized that Berlinger had been approached by Steven Donziger, one of the lead counsel for the plaintiffs in the Lago Agrio Litigation, and "solicited" to "create a documentary depicting the Lago Agrio Litigation from the perspective of his clients." *Id*. at 302-03.  The court also underscored that Berlinger "*altered*" certain scenes "*at the direction of plaintiff's counsel*" to remove certain sensitive content.  *Id*. at 303 (emphasis in original).

ii.    *Applying the <u>Chevron</u> Exception in <u>Fowler</u>*

This past summer, Judge Kaplan applied *Chevron* to a new case, *Fowler v. Vary*, No. 22-mc-0063 (LAK), 20-CV-9586 (LAK), 2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022), in which a reporter was accused of not acting "independently" under *Chevron* based on his personal relationship with the subject of his reporting.  In *Fowler*, any discussion of which is glaringly absent from Plaintiff's MTC, actor Anthony Rapp claimed "that Kevin Spacey Fowler, best known as Kevin Spacey, sexually assaulted him in 1986, when Rapp was a 14 year old boy and Spacey a young man in his twenties." *Id*., at *1.  Rapp did not report the incident, but in 2017 he "went public" with his allegations by giving an interview to Rapp's "friend" of over 15 years, *Buzzfeed* writer Adam Vary, who published an article detailing Rapp's story.  *Id*.  Spacey sought to depose Vary regarding his interviews with Rapp, on the theory that Vary's testimony could bear on Rapp's credibility.  Vary refused to produce any documents and, when deposed, declined to answer many pertinent questions concerning his interactions with Rapp as well as his own actions in reporting the piece, on grounds that he was protected from making such disclosures by New York's state-law version of the Reporter's Privilege.

When Spacey moved to compel, the Court analyzed Vary's "independence" from Rapp

under *Chevron*.[16]   The Court first raised what it called a number of "serious questions" about "the reliability of Vary's reporting and his independence from Rapp." *Id*., at *8.  The Court observed that the pair "apparently have been personal friends since 1999," but then specifically found that the personal relationship, in itself, was **not** "what calls Vary's independence into question." *Id*. Rather, the Court said that it was instead concerned about evidence that Vary was willing "to shape the story to Rapp's objectives," "to overlook or massage unverified details," and "to directly advise Rapp on public relations strategy." *Id*.  In the Court's words, the evidence went "far beyond a 'point of view' about the subject matter," rather, "[i]n some instances, they come close to painting Vary as a commissioned agent." *Id*.

Despite these "serious questions," the Court nevertheless held that Vary **was entitled** to assert the privilege.  In reaching this conclusion, it found that it was significant that Vary did not provide an opportunity for Rapp to review a pre-publication draft of the story. *Id*.  The Court also emphasized that there was "no indication that Vary made changes to the final story at Rapp's urging, attempted to circumvent his editors, or sought any special treatment for Rapp vis-à-vis *Buzzfeed*." *Id*.  Nor was there evidence of "financial ties linking Vary and Rapp." *Id*.  The Court concluded that despite the *personal connection* between Vary and Rapp, despite Vary's *willingness to tell the story in the way that Rapp wanted*, and despite Vary's *acting as Rapp's public relations advisor*, the Court was "satisfied" that Vary "acted as a 'professional journalist'" within the meaning of *Chevron*. *Id*.  *Accord Giuffre*, 221 F. Supp. 3d at 475, 478-79 (rejecting argument that relationship with source meant that reporter was not acting as a journalist).

---

[16] The *Fowler* case involved a state-law claim; accordingly, the assertion of privilege was governed by state law.  2022 WL 3211638, at *4-7.  Nevertheless, Judge Kaplan found that *Chevron*'s holding that those "who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press" applied with equal force to a claim under New York's statutory privilege and to the federal privilege under the First Amendment and federal common law. *Id*., at *7 ("The Circuit has acknowledged that the New York statute and the federal reporter's privilege are motivated by an identical 'paramount public interest': that of maintaining 'a vigorous, aggressive and independent press.'").

Taken together, *Chevron* and *Fowler* articulate the limits of the *Chevron* exception in the context of a journalist who has reported on someone with whom she is alleged to have either a personal or broader professional relationship.  In *Chevron*, the journalist in question was found not to have acted independently because he (a) was solicited by an interested party to create a work on its behalf; (b) was expressly commissioned to tell that party's story from that party's point of view; **and** (c) had ceded editorial control by allowing the commissioning party to direct deletions or alterations of the resulting work.  *See generally* 629 F.3d 297.  Significantly, the *Chevron* court emphasized that evidence of (a) or (b) would not be sufficient to divest or dilute the privilege without evidence of (c).  *See id.*  In *Fowler*, the Court applied this distinction to hold that evidence of a personal relationship – even one that led the journalist to tell the story being reported in a fashion that was favorable to its subject and shaped to suit the subject's objectives, and even one that resulted in the journalist giving advice to the subject about media relations in general – is insufficient for the *Chevron* exception to apply.  2022 WL 3211638, at *8.  It is clear from these decisions that before significant First Amendment interests will yield to *Chevron*'s exception to the Reporter's Privilege, there *must be* evidence that the subpoenaed party ceded control of the journalistic process to a third party, such as by giving that third party editorial or financial control of the journalistic process.

### B.    Bloomberg's Journalistic Process Does Not Fall Within the *Chevron* Exception

Here, the Subpoena is directed to Bloomberg.  (Capeci Decl., Ex. 1.)  The Reporter's Privilege applies both to journalists and to the news organizations that employ them.  *New England Teamsters*, 2014 WL 1567297, at *3-6 (applying *Gonzales* privilege in denying motion to compel The New York Times Company corporate entity to produce newsgathering materials).

Accordingly, Bloomberg is entitled to assert the Reporter's Privilege.[17]

Plaintiff offers no argument that Bloomberg ever acted as anything other than an independent news organization.  (*See generally* MTC.)  There is no evidence that Bloomberg was "commissioned" by UA or Plank.  There is no evidence that Bloomberg agreed to tell UA or Plank's story as they wished for it to be told regardless of what Bloomberg's own research revealed.  To the contrary, the same day as the Jan. 11 Appearance, Bloomberg published two additional articles regarding the Morgan Stanley Report, both of which reported in detail on Morgan Stanley's criticism of UA's performance and stock valuation, without pushback.  (*See* Zelenko Decl., Exs. D, E.)  And there is no evidence that UA or Plank were ever involved in any of Bloomberg's editorial review of its reporting about UA or Plank, much less that they had the power to exercise editorial or financial control over Bloomberg's editing or decision to publish.  And, indeed, they did not exercise such control – as detailed below, Plaintiff's own evidence shows both that no changes were made to the Jan. 11 Appearance or to its subsequent publication on Bloomberg.com based on UA's, Plank's, or anyone else's request, and that Ruhle was in no way commissioned by UA or Plank to prepare the Jan. 11 Appearance.  To the contrary, Ruhle was the one who raised the Morgan Stanley Report to UA.  (Capeci Decl., Exs. 15-19.)

Instead, all of the arguments in Plaintiff's MTC solely concern Ruhle's alleged "secret[]" interactions with Plank.  (MTC 1-2.)  Plaintiff alleges that Ruhle "was helping her close friend Plank and [UA] ***co-opt*** Bloomberg…" and that she was acting in service of her "personal" relationship.  (*Id.* at 4 (emphasis in original), 12, 19 ("It is frankly perplexing that Bloomberg chooses to argue that Ruhle's activities are worthy of First Amendment protection rather than to

---

[17] Indeed, the Subpoena calls not only for documents and communications between Ruhle and Plank or other UA employees, but also for *all* documents and communications sent or received by Ruhle that concerned UA, which would encompass Ruhle's communications with her editors at Bloomberg and others, including other news sources.  (Capeci Decl., Ex. 1.)

recognize Ruhle and [UA]'s co-option of their platform for what it is."), 19 n.70 (arguing that "Ruhle's activities violated Bloomberg's own ethics policies").)  But Plaintiff can't have it both ways.  First, as set forth below, these allegations do not show a lack of independence sufficient to invoke the *Chevron* exception.   Second, even if Plaintiff's erroneous factual premises were accepted (which they should not be), based solely on its own arguments, all of the conduct Plaintiff cites as evidence that Ruhle purportedly was not independent concerned only her *personal* activities.  Such activities, by Plaintiff's own admissions, would not have been within the scope of her work for Bloomberg, would not have been known to Bloomberg, and thus could not be imputed to the company.  *See* Restatement (Third) of Agency § 2.04 (an employer is liable under respondeat superior if the employee, in committing the act complained of, was acting within the scope of his employment); *see also Prignoli v. City of New York*, No. 94 CIV. 4125 (KMW), 1996 WL 340001, at *5 (S.D.N.Y. Jun. 19, 1996) ("[T]he employer cannot be held liable when the acts of the employee are outside the scope of employment, or are done with a purpose foreign to the interests of the employer.") (citation omitted).

For these reasons, Plaintiff has not shown, nor really attempted to show, that Bloomberg's newsgathering falls within the *Chevron* exception.[18]

### C.      Ruhle's Newsgathering Also Is Protected

Separate and apart from the reporting by Bloomberg as a whole, Ruhle herself was acting at all times in the service of her newsgathering in her capacity as a Bloomberg journalist.  Thus, Bloomberg can assert the privilege both with respect to its larger editorial processes, and also with

---

[18] It would be improper if Plaintiff were to attempt to fashion together a new argument raised for the first time in its reply.  *See Watson v. Geithner*, 355 F. App'x 482, 483 (2d Cir. 2009) (court may decline to consider an argument raised for the first time in a reply brief); *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); *see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 169 (2d Cir. 2006) (issue raised for the first time in the plaintiff's reply brief "is not properly before us, because we deem it waived").

respect to Ruhle's specific work.  Plaintiff cites a number of arguments for why Ruhle (and therefore Bloomberg) purportedly was not acting "independently," but each of them crumbles under scrutiny – because they are indistinguishable from facts that the *Chevron* court said were insufficient to trigger the *Chevron* exception; inconsistent with subsequent case law interpreting the *Chevron* exception; or simply irrelevant to the *Chevron* test.

To begin, Plaintiff cites evidence that the *Chevron* court stated was incompatible with its limited exception.  For example, the evidence Plaintiff cites shows affirmatively that Ruhle was never commissioned by UA or Plank.  Plank testified specifically that there was *no* agreement with Ruhle (other than an agreement that some material would not be published) and that she was never paid by the company.  (Capeci Decl., Ex. 3 at 281:5-19, 284:21-285:1, 318:7-18, 319:11-320:5.) Furthermore, far from being solicited by UA to tell its story "regardless of what her investigations may reveal," the evidence in the MTC shows affirmatively that it was *Ruhle* who first reached out *to UA* to discuss the Morgan Stanley Report, and that she offered her own opinion on its likely market impact.  (MTC 6-7 (stating that "Ruhle actually emailed Diane Pelkey, [UA]'s Senior Vice President of Global Communications and Entertainment, about a different [UA] business matter early on January 11, 2016," and after Pelkey responded about that matter, it was Ruhle who then broached the subject of the report, stating that "she had seen the news about Morgan Stanley downgrading [UA] and offered some advice.").)  In other words, Plaintiff's own evidence shows that the *Chevron* exception expressly does *not* apply because: (1) Ruhle was *not* commissioned or solicited by UA (the opposite is in fact true, as she reached out to them about the issue), and (2) Ruhle's statements on air reflected her "previously held point of view" (the Morgan Stanley Report was going to result in a stock drop but that there were still positive aspects of UA's business).  *See Chevron*, 629 F.3d at 308 (journalist must be solicited by source), 308 n.4 (reporting consistent

with previous point of view is not evidence of lack of independence).  Further, Ruhle did not simply present Defendants' point of view "*regardless of what her investigations may reveal*," *id.* at 308 (emphasis added), as Plaintiff claims (MTC 18-19) –  in addition to positive aspects about UA, she also stated that the Morgan Stanley Report was "early" (not that it was wrong) and that the drop in the stock price was "not a small number."  (Hanswirth Decl., Ex. B.)

Likewise, in contrast to the facts in *Chevron*, the evidence Plaintiff cites in the MTC shows that Ruhle did *not* give UA or Plank the opportunity to exercise editorial control over her Jan. 11 Appearance.  Plaintiff cites evidence that Ruhle emailed UA and Plank a link to the video of her appearance (which was sent *after* the appearance was over and *already had been broadcast* and *had been published on Bloomberg.com*), and also claims that "[UA] and Ruhle coordinated regarding the substance of [UA] – and Ruhle's – response to the Morgan Stanley report *before* Ruhle went on-air at 12:30 p.m."  (MTC 7-9; Capeci Decl., Ex. 16.)  None of this evidence indicates that Ruhle ceded editorial control of that appearance to anyone.  The editorial control cited in *Chevron* was the ability to direct editing and deletion of unfavorable content.  629 F.3d at 304, 308.  By contrast, gathering information from a source and using it for news reporting is exactly what a reporter is supposed to do.  With respect to the "coordinat[ion]" between UA and Ruhle prior to the segment, *Fowler* makes clear that a reporter repeating their source's information, *with the aim of telling the source's story in the way that the source wants it to be told*, does not trigger the *Chevron* exception.  *Fowler*, 2022 WL 3211638, at *8.

Further, there is no indication that Plank or UA demanded that this reporting be changed, or that Ruhle complied with any such request.  To the contrary, that never happened – and Plaintiff never asserts anything to the contrary.  (Capeci Decl., Ex. 15-19.)  Plaintiff attempts to argue that "Ruhle made changes to her so-called reporting at [UA]'s insistence," by citing to Exhibit 37 to

the Capeci Declaration as evidence that Ruhle changed a headline at Plank's request.  (MTC 19.)

But Plaintiff fails to inform the Court that the Exhibit is an email exchange from April 2015 – i.e.,

several months before the Class Period began in September 2015 and even longer before the

Morgan Stanley Report and Ruhle's reporting on it in January 2016 – and in which *Plank did not*

*request (much less* <u>*insist on*</u>) *any changes*, instead stating only "Check out the UA headlines from

Bloomberg."  (Capeci Decl., Ex. 37.)  What's more, Plaintiff provides no evidence the headline or

any other reporting was ever actually changed.  (MTC 19.)  Clearly, an email exchange about a

different story, unrelated to the Morgan Stanley Report, for which UA did not request changes,

and for which there is no evidence that any changes were made, is not evidence that Ruhle ceded

editorial control of her reporting about the Morgan Stanley Report to UA or to Plank.

Plaintiff also cites facts that are identical to those the *Fowler* court expressly found were

insufficient to block application of the Reporter's Privilege under *Chevron*.  For example, Plaintiff

repeatedly takes issue with Ruhle's purportedly providing advice to UA/Plank about how to handle

media relations.  (MTC at 7, 9.)  In *Fowler*, however, the court found that a reporter providing

"public relations strategy" to a source was not evidence showing a lack of independence in the

journalistic process.  2022 WL 3211638, at *8.  Likewise, Plaintiff makes repeated and gratuitous

references to Plank and Ruhle's purportedly "close relationship" (a transparent attempt to

embarrass and harass Ruhle[19]) (*e.g.*, MTC 12), but this argument too was expressly rejected in

---

[19] Plaintiff repeatedly cites and quotes a *Wall Street Journal* article, which it leaves unredacted in the public version
of its brief, for the notion that Ruhle and Plank had an "intimate relationship."  (MTC 2 n.2, 12, 15.)  This blatant
misuse of a news article purportedly to establish the truth of the matter asserted is completely inappropriate.  *See,
e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008) (court may not take judicial notice of
news articles to the extent they are offered for the truth of the matters asserted therein).  The deposition testimony
establishes merely that, as a result of meeting through a professional newsgathering relationship, Ruhle developed a
friendship with Plank.  That testimony is the only probative evidence of the nature of their relationship, and it is the
only evidence that Plaintiff should have put before this Court and in its public files.  (Capeci Decl., Ex. 3, 9, 32.)  The
fact that Plaintiff ignored a fundamental rule of evidence to take a shot at Ruhle (and Plank) is strong evidence that its
true motivation is to cause embarrassment and to harass.

*Fowler* as well as other case law.  *See Fowler*, 2022 WL 3211638, at *8; *see also Giuffre*, 221 F. Supp. 3d at 475, 478-79 (rejecting argument that close relationship between journalist and source meant that the journalistic privilege does not apply; holding that "[s]uccessful journalists must cultivate extensive networks of sources, and communicate with them regularly on a variety of topics" and that "frequent, often informal communication with sources, even if not for the immediate purpose of gathering information for a specific article, is an integral part of the overall newsgathering process.").  Further, the emails from Ruhle that Plaintiff cites to support its spurious legal theory all concern UA's business and are newsgathering.  (MTC 12-13.)

Plaintiff additionally claims that Ruhle was not independent because she was "rewarded" for her Jan. 11 Appearance because, two weeks later, UA and Plank arranged for Ruhle to be able to conduct "a coveted interview of [UA]-sponsored NBA star Stephen Curry."  (MTC 3.)  But this is no evidence of a lack of independence.  It does not indicate in any way that Ruhle ceded editorial or financial control to UA or Plank.  It is, at most, "rewarding" newsgathering with the opportunity to conduct *more newsgathering*.  Nothing in *Chevron* suggests that allowing a journalist access to newsgathering based on previous positive coverage would disturb the application of the Reporter's Privilege.  Indeed, in *Giuffre*, the reporter had developed a years-long relationship with her source, resulting in a series of news reports based on their personal and professional relationship.  *See* 221 F. Supp. 3d at 475, 478-79.  The Court rejected the argument that this ongoing relationship fell within the *Chevron* exception.  *Id*.

Plaintiff also points to purportedly "free flights all over the world on Plank's private jet" (MTC 13), but Ruhle's deposition testimony shows only that she recalled there were two such flights – one returning to New York from Cannes and another between New York and Baltimore, and that they took place in 2015, well before the Jan. 11 Appearance at issue here.  (Capeci Decl.,

26

Ex. 9 at 37:14-19, 37:25-38:2.)   Indeed, Ruhle testified that her trip returning from Cannes pertained to her work for Bloomberg.  (*Id*., Ex. 9 at 38:15-19.) This is not the kind of "financial" control contemplated in *Chevron*.  Bloomberg – a multibillion dollar company – clearly had full power and ability to publish its reporting whether or not a couple of flights were provided to Ruhle.

Plaintiff also points to a number of facts that have nothing to do with *Chevron* at all.  For example, it claims that because Plank and Ruhle had "an understanding of trust" that some of what they discussed about UA was "not to be shared with anyone," which meant that Plank gave her information that was not intended for publication, this must be evidence that Ruhle was not engaged in journalism.  (MTC 2, 16-17, 21.)   This is nonsense.  As confirmed by Plaintiff's own case law, the Reporter's Privilege expressly applies to "unpublished" newsgathering information. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, at 142 (2d Cir. 1987). *Accord Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012) (unpublished information and newsgathering techniques protected).  Thus, the privilege presupposes not only that sources will provide information that is not published, but also that such unpublished information will be protected by the privilege.  *See id*.  Indeed, sources routinely provide information to reporters on an "off the record" basis, which means that the reporter has permission to use the information to find out other information but expressly cannot publish it.  The Associated Press Statement of News Values and Principles, at 6, Associated Press, https://www.ap.org/about/news-values-and-principles/downloads/ap-news-values-and-principles.pdf ("Off the record. The information cannot be used for publication.").  It is entirely within the bounds of standard newsgathering practices for a source to share some information that can be reported and other information that cannot, and nothing in *Chevron* calls that into question.[20]

---

[20] Plaintiff cites *von Bulow*, 811 F.2d at 144 for the notion that the only *information* that can be protected by the Reporter's Privilege is that which is intended eventually to be reported.  (MTC 21.)  This misreads *von Bulow*.  In that

Further, this argument ignores that the Reporter's Privilege is intended to protect the entirety of the source-journalist relationship, which means that its scope is not strictly construed based on the contents of a specific communication, but rather applies *broadly* to *all efforts* to develop a source, including communications pertinent to a personal relationship that are unrelated to efforts specifically to publish the news.  *See Giuffre*, 221 F. Supp. 3d at 479 (protections for newsgathering "do[] not narrowly apply only to the specific exchanges where the source conveys 'news'").

Plaintiff even tries to argue that Ruhle must not have been acting independently because Plank purportedly sent her "material nonpublic information about the Company during its quiet periods."  (MTC 13-15.)  To begin, Plaintiff highlights that the communications between Plank and Ruhle made during UA's quiet period used "a special email account, accessible on a specific iPhone, created and given to Ruhle for their private communications," (*id.* at 13-14), but fails to acknowledge that all such communications Plaintiff cites post-date Ruhle's employment at Bloomberg, which ended on April 12, 2016.  (*See* Capeci Decl. Ex. 33 (email dated Apr. 15, 2016); Ex. 34 (████ dated ████); Ex. 35 (email dated ████); Ex. 36 (email dated ████).)  The same is true for all alleged "material nonpublic information" – all was allegedly disclosed after Ruhle departed Bloomberg on April 12, 2016.  (MTC at 14; Capeci Decl.

_____

case, an individual who was not a journalist had extensive communications with a defendant in the case, and then, sometime later, decided that those communications could be used to write a book.  The Court rejected the witness's attempt to apply the Reporter's Privilege, holding that whether someone is considered a journalist for purposes of the privilege "must be determined by the person's intent at the inception of the information-gathering process."  *von Bulow*, 811 F.2d at 142.  *Von Bulow* did not hold, as Plaintiff claims, that every communication from a source must be approved for publication, or anything like that.  To the contrary, *von Bulow* expressly recognized that "unpublished resource material likewise may be protected."  *Id.* As explained in *Giuffre*, the inquiry in *von Bulow* concerned the nature of the relationship between the journalist and the source, not the extent of the source's permission to publish particular communications.  *Giuffre*, at 478-79.  Here, Ruhle testified that she met Plank while interviewing him on television and reported on him and UA for years through her work at Bloomberg.  (Capeci Decl., Ex. 9 at 27:6-25.)  That is sufficient to show intent, from the inception of the relationship, to engage in newsgathering, which is all *von Bulow* requires.

Ex. 32 at 152:11-24, 155:2-159:21; Ex. 33 (email dated April 15, 2016); Ex. 3 at 274:5-280:17;

Ex. 36 (email dated ███████).) Moreover, whether or not any disclosure of allegedly "material

nonpublic information" could create potential issues for Plank or UA under the securities

regulations (see MTC at 13 n.53), it is *certainly part of a reporter's job* to obtain nonpublic

information that is not authorized for publication, whether or not such material ultimately makes

it into a published piece. Bloomberg is aware of no case law, and Plaintiff certainly cites none,

holding that receipt of nonpublic information would divest a journalist of the Reporter's Privilege.

If that were in fact the rule, the privilege would be cold comfort and of little use to investigative

journalism.

In short, none of Plaintiff's arguments in favor of applying the *Chevron* exception to

Ruhle's reporting stands up to scrutiny, and they should be rejected.

## II.     PLAINTIFF HAS NOT AND CANNOT OVERCOME THE REPORTER'S PRIVILEGE

Having spent almost all of its brief arguing that Blomberg is not entitled to assert the

Reporter's Privilege, Plaintiff devotes only three paragraphs to attempting to overcome the

privilege. (MTC 22-23.) Plaintiff's halfhearted effort goes absolutely nowhere.

First, as a preliminary matter, none of the arguments in Plaintiff's MTC was raised during

the meet and confer process.  Both Rule 37 of the Federal Rules of Civil Procedure and Rule 2(A)

of the Individual Practices of Magistrate Judge Gabriel W. Gorenstein require conferral "in good

faith" in an effort to resolve the dispute.  Refusing to address at all the legal standard that would

entitle Plaintiff to the relief requested here does not satisfy this requirement.

Second, Plaintiff bears the burden of showing that it can overcome the Reporter's Privilege.

*In re McCray, Richardson, Santana, Wise, Salaam Litig.*, 991 F. Supp. 2d 464, 469 (S.D.N.Y.

2013) ("Under *Gonzales*, the Court may compel disclosure of non-confidential material when *the*

*requesting party* shows the materials at issue are (1) 'of likely relevance to a significant issue in the case' and (2) 'are not reasonably obtainable from other available sources'") (emphasis added) (quoting *Gonzales*, 194 F.3d at 36); *see also id.* (in deciding a motion to compel newsgathering materials, court considered the requesting party's "burden pursuant to *Gonzales* and its progeny"). Plaintiff has not done so.

As to the first prong of *Gonzales*, Plaintiff falsely claims that Bloomberg "has not even contested relevance," citing an email from counsel sent during the meet and confer process.  (MTC 22 (citing Capeci Decl., Ex. 11).)  But the email does not say that Bloomberg does not contest relevance.  Rather, it criticizes Plaintiff for refusing to provide any legal arguments in support of its position, including failing to explain why the requested material was likely relevant, which Plaintiff refused to do at all, either in writing or over the phone.  (*See* Capeci Decl., Ex. 11; Hanswirth Decl. ¶ 4.)

In fact, the requested information is not likely relevant to any significant issue, which is the first required prong under *Gonzales*.  For the first time in its MTC, Plaintiff argues that "the Responsive Documents are probative of both Plank and [UA]'s 'scienter' (i.e., culpable state of mind), which Plaintiff must ultimately prove to prevail on its securities fraud claim."  (MTC 4.) This argument makes no sense.  If Plank and UA's scienter is the "significant issue," then all that matters is what Plank or UA subjectively knew or said.  That would exclude both categories of documents that are the focus of Plaintiff's MTC – namely, "Ruhle's emails *to other nonparties* about [UA]" (which presumably neither UA nor Plank could have seen) and any emails "with [UA and Plank]" that she could have "forwarded … *to others*" (again, presumably without copying UA or Plank).  (*Id.* at 23 (emphasis added).)   Plaintiff makes no effort to explain how communications that UA and Plank did not send or receive would shed light on their scienter.

Further, despite completing discovery and having access to the hundreds of pages of materials annexed to its motion, Plaintiff has made no particularized showing that the requested documents "would provide evidence regarding the issues alleged." *See In re McCray*, 991 F. Supp. 2d at 469-70 (requesting parties failed to satisfy burden to overcome Reporter's Privilege where they "point to no particular interview or outtake that would provide the evidence they seek" and "instead" made "only . . . general claims that the outtakes are likely to contain relevant material"). Plaintiff's failure to make this showing indicates that this Subpoena is precisely the kind of fishing expedition that the Reporter's Privilege is designed to prevent. *See Giuffre*, 221 F. Supp. 3d at 477 (the Reporter's Privilege protects "the need to allow the press to publish freely on topics of public interest without harassment and scrutiny by litigants seeking to conduct 'fishing expeditions' into [unpublished] materials in the hope that some relevant information may turn up.") (citation omitted). "[G]eneral claims that the [requested material] are likely to contain relevant material . . . [are] insufficient," particularly where Plaintiff already has access to communications, testimony, and other evidence of Plank and UA's scienter referenced in *UA Sec. Litig. III*. *See In re McCray*, 991 F. Supp. 2d at 469-70; *UA Sec. Litig. III* (noting Plaintiff has access to such evidence as a Form 8-K submitted by UA to the SEC and earnings call statements and emails from Plank regarding the same).

Plaintiff also fails to satisfy *Gonzales*' second prong – that the materials are "not reasonably obtainable from other available sources" – because information that would be potentially relevant to Plank or UA's scienter (i.e., evidence showing what Plank or UA knew) would already be available in Plank or UA's own correspondence or via their own testimony. Plaintiff argues that there may be additional information that it does not already have, stemming from its own speculation that (a) Defendants' document production *may* be somehow incomplete based on a

single redaction of an email address, even though that email address is now apparently known to Plaintiff and available for discovery by subpoena (MTC 23); and (b) that Ruhle *may* have other documents because she could not recall if she had communicated with UA before the Jan. 11 Appearance (but Plaintiff does not explain why UA would not have copies or knowledge of such "communications").[21]  The Reporter's Privilege, however, requires more than speculation.  *See New England Teamsters*, 2014 WL 1567297, at *5.

For all of these reasons, Plaintiff fails to overcome the Reporter's Privilege.

## III.   THE MTC ALSO SHOULD BE DENIED BECAUSE THE OVERBROAD AND DUPLICATIVE SUBPOENA UNDULY BURDENS A NEWS ORGANIZATION

In summarily dismissing Bloomberg's additional objections based on burden, overbreadth, and being duplicative, Plaintiff ignores the special concern for the First Amendment interests embodied in and protected by the Reporter's Privilege.  Courts in this Circuit routinely recognize that the Reporter's Privilege exists to "protect[ ] newsgathering efforts from the burdensome wholesale production of press files that risk impeding the press in performing its duties," and thereby "support the press's important public service function to seek and reveal truthful information."  *New England Teamsters*, 2014 WL 1567297, at *3 (citation omitted).  In other words, one of the privilege's primary purposes is to prevent the unnecessary enmeshing of the press in litigation that arises from events they cover.  *Gonzales*, 194 F.3d at 35.

---

[21] Plaintiff claims that *New Park Ent. L.L.C. v. Elec. Factory Concerts, Inc.*, held that a plaintiff is entitled to serve third-party subpoenas "to test the veracity of defendants' assertion that they have produced all documents they were required to produce." No. Civ.A. 98-775, 2000 WL 62315, at *5 (E.D. Pa. Jan. 13, 2000) (cited in MTC at 23).  This was not the court's holding – it was the litigant's argument. The portion of the opinion quoted by Plaintiff reads in full: "Thus, plaintiff claims that it needs the third parties' documents, not only as a supplement to defendants' productions, but also to test the veracity of defendants' assertions that they have produced all the documents they were required to produce."  *Id.*  To the extent that Plaintiff is trying to argue that the court endorsed this argument, it was on facts that are far afield from the facts here.  First, there was no privilege applicable to the third-party documents, and the court held that "there are sure to be many other documents in the possession of the third parties not in the possession of the defendants."  *Id.*  Here, Plaintiff has failed to give any support for its speculation that there may be documents or "communications" UA has withheld from production.  Moreover, in *New Park*, the cost of the duplicated efforts was not to be borne by the defendant, who had objected and filed the motion to quash, but by the third parties, who had not.  Here, Bloomberg bears the cost and the intrusion into its newsroom, and it objects.

This protection reflects serious First Amendment interests and directly implicates the free flow of information to the public.  The Reporter's Privilege safeguards against "burden[ing] the press with heavy costs of subpoena compliance," *Gonzales*, 194 F.3d at 35, and these costs are not merely of time, money, and effort, though those are also substantial. The Reporter's Privilege is designed to prevent litigants from "impair[ing] [the press's] ability to perform its duties," which the Second Circuit recognizes would result "particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation," *id.*, or if access to news organizations and their files were easily or routinely obtainable in standard discovery proceedings. Further, unrestricted litigant access to press files would create socially wasteful incentives for press entities "to clean out files containing potentially valuable information lest they incur substantial costs" of subpoena compliance.  *Id*.

Plaintiff's argument that their request "impos[es] very little burden" because the documents sought only "require simple search protocols" (MTC 24) fails to recognize these important First Amendment concerns.  Indeed, allowing Plaintiff the discovery requested here would risk "the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Gonzales*, 194 F.3d at 35.  The cost of this intrusion into the free flow of information would be borne not only by Bloomberg, but also by the public at large, especially where there is no evidence that Bloomberg ceded editorial control of its reporting and where the Plaintiff has failed to make the required showing of a need for the materials.

## CONCLUSION

Divesting a news organization of the protections of the Reporter's Privilege is a serious proposition.  We have located no court opinion applying *Chevron* that has found that a professional journalist working for a traditional news organization lacked "independence" such that they could not qualify for protection under the *Gonzales* test.  This Court should decline Plaintiff's invitation

to take that unprecedented step here.  Nothing in the record before the Court indicates that Bloomberg was acting other than as an independent news organization.  And despite all of the gratuitous and unsupported aspersions Plaintiff casts on Ruhle, the actual evidence shows that she, too, was acting as an independent journalist well within the limits of *Chevron* and its progeny, most notably the court's recent decision in *Fowler*.  To hold otherwise would deprive news organizations of the critical, First Amendment-guaranteed protections against the sort of intrusion into their newsrooms that the Reporter's Privilege is designed to prohibit.  The requested materials are protected as newsgathering, and Plaintiff's MTC should be denied in full and with prejudice.

DATED:  April 20, 2023

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Dori Ann Hanswirth

DORI ANN HANSWIRTH

Dori Ann Hanswirth
Theresa M. House
250 West 55th Street
New York, NY 10019-9710
Tel.: (212) 836-8095
Fax: (212) 836-8689
Dori.Hanswirth@arnoldporter.com
Theresa.House@arnoldporter.com
*Attorneys for Defendant Bloomberg L.P.*