UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ABERDEEN CITY COUNCIL AS                    :
ADMINISTRATING AUTHORITY FOR
THE NORTH EAST SCOTLAND                     :
PENSION FUND,
                                            :     OPINION AND ORDER
                        Plaintiff,
                                            :     23 Misc. 70 (LAK) (GWG)
            -v.-
                                            :
BLOOMBERG L.P.,
                                            :
                        Defendant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Aberdeen City Council ("Aberdeen") seeks an order compelling defendant

Bloomberg, L.P. ("Bloomberg"), which is located in New York, to produce emails and other

documents sent or received by a Bloomberg reporter so that Aberdeen can use them in a federal

securities fraud action it filed in Maryland.[1]  Bloomberg argues the documents are protected by

_____

        [1]  See Notice of Motion, filed Mar. 15, 2023 (Docket # 1) ("Mot."); Declaration of
Michael G. Capeci, filed Mar. 15, 2023 (Docket # 3) ("Capeci Decl."); Memorandum of Points
and Authorities, filed Mar. 16, 2023 (Docket ## 2, 8, 65) ("Mem."); Declaration of Michael G.
Capeci, filed Mar. 16, 2023 (Docket ## 9, 66) ("Second Capeci Decl."); Memorandum of Law in
Opposition, filed Apr. 20, 2023 (Docket ## 27, 32, 67) ("Opp."); Reply in Support, filed May 4,
2023 (Docket ## 43, 46, 69) ("Reply"); Sur-Reply Memorandum of Law in Further Opposition,
filed May 23, 2023 (Docket ## 51, 55, 71); Sur-Sur-Reply in Further Support, filed May 30,
2023 (Docket ## 57, 60, 72).

        The parties filed a number of documents in redacted form pending various requests to
seal (Docket ## 6, 30, 41, 52, 58).  The Court issued an order denying those sealing requests in
part and required the parties to file unredacted versions of certain documents.  See Opinion and
Order, dated Aug. 16, 2023 (Docket # 62).  Those filings were made on August 23, 2023 (Docket
## 65-72).  Our first citation to such documents in this Opinion and Order provides the docket
number of the initial redacted version, sealed unredacted version (where applicable), and newly
filed version of each document.

the journalist's privilege.  For the reasons that follow, we agree the documents are protected by that privilege.  Aberdeen's motion is therefore denied.

I.  <u>BACKGROUND</u>

A.  <u>The Underlying Complaint</u>

In 2017, Aberdeen and other plaintiffs filed a class action in the District of Maryland captioned <u>In re Under Armour Secs. Litig.</u>, No. 17-cv-388 (D. Md.) (the "Maryland Action"). <u>See</u> Mem. at 5; Opp. at 2. We describe the allegations of the complaint not because we assume them to be true but rather to explain plaintiff's contentions as to the relevance of the information sought.

In the Maryland Action, the plaintiffs allege that a company called Under Armour, Inc. ("Under Armour") and its Chief Executive Officer, Kevin Plank, among others, "misled investors . . . by falsely claiming that consumer demand for the company's products was strong between the third quarter of 2015 and the fourth quarter of 2016," and "manipulated the company's financial results by pulling sales forward from future quarters and engaged in other allegedly suspect sales practices."  <u>See</u> <u>In re Under Armour Secs. Litig.</u>, 540 F. Supp. 3d 513, 517 (D. Md. 2021).  Thus plaintiffs' "basic allegation . . . is that [Under Armour and Plank] . . . misrepresented the level of demand for Under Armour products."  <u>See</u> <u>id.</u> at 516.

The complaint in the Maryland Action alleges that Under Armour's scheme began in September 2015, when Under Armour told investors at its "Investor Day" that demand for its products had "never been stronger," despite "a severe decline in its apparel business" that was apparent to Under Armour and its executives at the time.  <u>See</u> Consolidated Third Amended Complaint, annexed as Ex. 5 to Capeci Decl. (Docket # 3-5) ("TAC"), ¶¶ 7-9, 151-53.  The complaint alleges that in an October 2015 quarterly report, the company and its executives

"failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour" and "misleadingly blamed [the company's] contraction on relatively benign factors . . . rather than declining sales." Id. ¶¶ 160-62.

As alleged in the complaint, the "first crack[] in Under Armour's veneer" of success was a January 10, 2016, report from Morgan Stanley, which "revealed declining ASPs [Average Selling Prices], market share, and margins since spring 2015." Id. ¶ 15.  Plaintiffs allege that Under Armour "denied the report and reassured investors that the Company's financial results and prospects were as strong as ever," id., despite the fact that Plank "had actual knowledge of industry sales data" that concurred with Morgan Stanley's reporting, see id. ¶ 108.  Later that month as part of a quarterly press release, defendants "continued to represent to investors that Under Armour's core products were in high demand and Under Armour was and would continue to be a premium brand," without revealing the "pull forward" scheme — that is, the scheme to pull sales forward from future quarters.  Id. ¶¶ 177-79.

Plaintiffs allege that in March 2016, Under Armour "issued a press release confirming its previously released net revenue and operating income projections" despite its knowledge that one of the company's "largest retail customers" had filed for bankruptcy.  Id. ¶ 192.  In April 2016, defendants issued a quarterly report that attributed sales declines to outside factors, id. ¶ 195, and Plank "continued his exceedingly positive messaging" despite knowing that "apparel products . . . had been suffering from reduced customer appeal and demand since at least spring 2015."  Id. ¶¶ 197-208.

According to the complaint, it was not until July 2016 that the company made a partial revelation of "a decline in gross margins," but even then, defendants "continued to mislead investors and downplayed the negative news."  Id. ¶¶ 225, 234-35.  Further revelations followed

in October 2016, id. ¶ 249, and Under Armour stock "fell sharply as a result of th[e] negative news," id. ¶ 254.  In January 2017, when the company "finally began to more fully reveal the extent of its problems to investors," id. ¶ 265, "the price of Under Armour stock plummeted," id. ¶ 279.  Under Armour was "never able to turn the tide" despite repeated attempts to recover, id. ¶ 284, and in October 2019, Plank resigned, id. ¶ 317.  Shortly afterward, plaintiffs learned that the Department of Justice and Securities and Exchange Commission had opened investigations into "whether Under Armour shifted sales from quarter to quarter during the Class Period in order to make its financial results appear healthier."  Id. ¶ 318.

      B.     <u>Ruhle's Background and the Morgan Stanley Report</u>

Stephanie Ruhle began working for Bloomberg in 2011 as host of a Bloomberg Television program called "Inside Track."  Declaration of Laura Zelenko, filed Apr. 20, 2023 (Docket ## 29, 33, 68) ("Zelenko Decl."), ¶ 4.  She later hosted the programs "Market Makers" and "Bloomberg <GO>," the latter of which is a program "featuring global thought leaders across the business, technology, and media industries."  Id.  Ruhle also served as "managing editor" for Bloomberg TV and "editor-at-large" for Bloomberg News.  Id.  "[P]art of [Ruhle's] assigned news beat" at Bloomberg were topics relating to Under Armour.  See Zelenko Decl. ¶ 6.  Thus, Ruhle's work at Bloomberg included reporting "on Under Armour from time to time."  Deposition of Stephanie Ruhle, annexed as Ex. 9 to Second Capeci Decl. (Docket ## 9-5, 66-9) ("Ruhle Dep."), at 27:22-25.  Ruhle met Plank, then CEO of Under Armour, "on television" while interviewing him for Bloomberg in approximately 2014.  Id. at 27:6-11.

As alleged in the Maryland action, in January 2016, Morgan Stanley published a report that predicted a downturn in business for Under Armour and rated Under Armour stock as "underweight."  TAC ¶ 15; see <u>Under Armour Inc. Declining Share and ASPs Dual Threat to</u>

Premium Valuation, Downgrade to UW, Morgan Stanley (Jan. 10, 2016), annexed as Ex. 14 to Second Capeci Decl. (Docket ## 9-8, 66-14) ("Morgan Stanley Report").  As described further below, Ruhle had a number of contacts with Under Armour executives regarding that report, which Aberdeen argues show a lack of journalistic independence on Ruhle's part.  Ruhle also appeared on a Bloomberg television program to discuss the report.  These communications occurred while Under Armour was in a "quiet period" prior to the release of its quarterly earnings reports.  See Email from Plank, dated Jan. 11, 2016, annexed as Ex. 6 to Second Capeci Decl. (Docket ## 9-2, 66-6) ("Second Jan. 11 Email").[2]

       C.      The Instant Motion

      On January 6, 2023, as part of discovery in the Maryland Action, Aberdeen issued a subpoena to Bloomberg seeking "[a]ll documents and communications between" Ruhle and the defendants in the Maryland Action, including "Plank, Diane Pelkey, and Jen Smith."  Subpoena, annexed as Ex. 1 to Capeci Decl. (Docket # 3-1), at 12 ("Subpoena").  The subpoena also sought "[a]ll documents and communications sent or received by Ruhle concerning Under Armour."  Id.  On March 15, 2023, Aberdeen filed the instant motion seeking to compel Bloomberg to comply with the subpoena.  See Mot.  Bloomberg objected to the subpoena and opposes the motion to compel on the grounds that production would violate the journalist's privilege.[3]  Opp. at 3-5

---

   [2]  As summarized in Plank's deposition, the "quiet period" is a time "between the end of a financial quarter and the company announcing financial results" during which "a public company like Under Armour must avoid selective disclosure of material information." Deposition of Kevin Plank, annexed as Ex. 3 to Second Capeci Decl. (Docket ## 9-1, 66-3) ("Plank Dep."), at 259:21-260:16.

   [3]  Bloomberg also asserts that the subpoena is "overbroad and duplicative," and "unduly burdens" Bloomberg.  Opp. at 32.  We do not reach these issue because the subpoena must be quashed on privilege grounds.

II.   LEGAL STANDARD

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information." Gonzales v. Nat'l Broad. Co., 194 F.3d 29, 32 (2d Cir. 1999). Second Circuit precedent has identified two inquiries central to claims of the journalist's privilege. First, the Court must determine whether the privilege applies given the nature of the journalist's investigation and the information gathered. See In re McCray, Richardson, Santana, Wise, & Salaam Litig., 928 F. Supp. 2d 748, 754 (S.D.N.Y. 2013) ("McCray") (citing Chevron Corp. v. Berlinger, 629 F.3d 297, 307 (2d Cir. 2011)). If the privilege applies, the Court must then determine whether it has been overcome by a showing of need. See id. (citing Gonzales, 194 F.3d at 35-36; In re Petroleum Prods. Antitrust Litig., 680 F.2d 5, 7 (2d Cir. 1982)). If the privilege does not apply, the information at issue is subject only to ordinary discovery limitations. See Chevron, 629 F.3d at 308 ("It is not the policy of the law to exempt such undertakings from the obligation to produce information relevant to a dispute before a court of law.").

As to the first question, the Second Circuit has explained that the privilege for information gathered in a journalistic investigation "is intended to protect the public's interest in being informed by 'a vigorous, aggressive and independent press," such that for the privilege to apply, "the person [from whom documents are sought] must have acted in the role . . . favored by the public interest that motivates that privilege — the role of the independent press." Id. at 306-07 (emphasis in original) (quoting von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987)). Therefore, "[t]hose who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press." Id. at 308. As a result, where reporters "do not retain

6

independence as to what they will publish," and are instead "subservient to the objectives of others who have a stake in what will be published," there is "either a weaker privilege or none at all." Id. Nonetheless, a reporter who is "solicited to investigate an issue and presents the story supporting the point of view of the entity that solicited her" may still establish privilege, however, "by establishing the independence of her journalistic process, for example, through evidence of editorial and financial independence." Id. at 309. "A journalist seeking to invoke the privilege must also demonstrate that her intention at the time the information in question [was] gathered was for the purpose of disseminating the information to the public, and not for different reasons." McCray, 928 F. Supp. 2d at 754. The burden of demonstrating entitlement to the journalist's privilege falls on the person seeking to invoke it. Chevron, 629 F.3d at 309; accord McCray, 928 F. Supp. 2d at 754.

If the journalist's privilege is established, a court then considers whether there has been a sufficient showing of need by the party seeking discovery to justify overcoming the privilege. In cases where the information sought is confidential, "disclosure may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other sources." Petroleum Prods., 680 F.2d at 7. Where information is non-confidential, "the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." Gonzales, 194 F.3d at 36. This showing requires only "that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." Id. The burden of making the showing of need falls on the party seeking discovery. See id.; accord Breaking Media, Inc. v. Jowers, 2021 WL 1299108, at *4 (S.D.N.Y. Apr. 7, 2021).

III.    DISCUSSION

We first assess whether Ruhle's reporting on the Morgan Stanley report is protected by the journalist's privilege and then turn to whether Aberdeen has made the showing of need necessary to obtain the documents despite the applicability of the privilege.

A.    Bloomberg's Entitlement to the Journalist's Privilege

Aberdeen argues that the relationship between Ruhle and Under Armour CEO Plank was not that of a journalist and a source, but rather that of a "confidant, advisor, and friend" to Plank. Mem. at 20 (punctuation altered).  Second, Aberdeen argues that Ruhle's reporting on the Morgan Stanley evaluation was not "independent" because it was designed to "combat negative press about Under Armour . . . under the guise of objective news reporting."  Id. (punctuation omitted).  We address each argument separately.

1.    Effect of Relationship between Plank and Ruhle

In support of their claim that the personal relationship between Ruhle and Plank vitiates the journalist's privilege, Aberdeen points to Ruhle and Plank's own descriptions of their relationship.  Plank testified that Ruhle was "a confidant" with whom he had an "understanding of trust," such that he "would give her counsel on her career and she would give [Plank] counsel on things [he] was dealing with that were either banking or media or human nature in relation." Plank Dep. at 281:2-282:1.  Plank also referred to Ruhle as an "outside advisor[]" from whom he sought counsel.  Id. at 288:17-18.  Ruhle testified that she and Plank "were friends" although at the same time she "covered . . . his company" as part of her work with Bloomberg.  Ruhle Dep. at 27:17-18.

Aberdeen provides examples of what it characterizes as "regular[]" correspondence between Ruhle and Plank discussing Under Armour.  Mem. at 12; see Email from Ruhle to

Plank, dated Feb. 27, 2015, annexed as Ex. 28 to Second Capeci Decl. (Docket ## 9-22, 66-28); Email from Ruhle to Plank, dated Apr. 21, 2015, annexed as Ex. 29 to Second Capeci Decl. (Docket ## 9-23, 66-29); Email from Plank to Ruhle, dated June 15, 2015, annexed as Ex. 30 to Second Capeci Decl. (Docket ## 9-24, 66-30) ("June 15 Email").  In one such email, Plank forwarded Ruhle a letter announcing a new class of Under Armour stock, asking her to "[l]et me know what you think of my letter."  See June 15 Email.  Aberdeen also provides an email sent by Ruhle following the Morgan Stanley report, in which she forwards part of her conversation with an Under Armour shareholder.  See Email from Ruhle to Plank, dated Jan. 13, 2016, annexed as Ex. 20 to Second Capeci Decl. (Docket ## 9-14, 66-20) ("Jan. 13 Email").  The forwarded email reflects that Ruhle advised the shareholder to "buy the stock," referring to Under Armour.  Id. Plank's response asks Ruhle to "tell [the shareholder] to bear down and hang in there — UA will be just fine, we have a great [b]rand and business."  Id.  Ruhle informed Plank that the shareholder "is going to buy more."  Id.

Aberdeen also points to several emails that it alleges contain "material nonpublic information," sent by Plank to a private email address accessible via a cell phone Plank had "given to Ruhle for their private communications."  Mem. at 13-14; see Email from Plank to Ruhle, dated Apr. 15, 2016, annexed as Ex. 33 to Second Capeci Decl. (Docket ## 9-27, 66-33); Email from Plank to Ruhle, dated July 24, 2016, annexed as Ex. 35 to Second Capeci Decl. (Docket ## 9-29, 66-35); Email from Plank to Ruhle, dated Oct. 24, 2016, annexed as Ex. 36 to Second Capeci Decl. (Docket ## 9-30, 66-36) ("Oct. 24 Email").  In one of these, Plank forwarded a script for a call discussing "Q3" of 2016, with the subject line "Please Read and advise."  See Oct. 24 Email.

Aberdeen also identifies at least two instances in which Ruhle accompanied Plank on his private jet, which it contends were not related to her reporting on Plank or Under Armour.  Mem. at 13.  Ruhle testified that she had flown on Plank's private jet on at least two occasions, at no cost to her.  Ruhle Dep. at 37:16-19; 38:25-39:2.  She testified that these flights were "[n]ot specifically" "part of [her] work as a Bloomberg reporter," although she stated that one of the flights was "work related" in that Ruhle was returning from an "advertising conference."  Id. at 38:7-21.

Bloomberg emphasizes Ruhle's testimony that she first met Plank "[i]nterviewing him on television" as part of her work at Bloomberg.  Ruhle Dep. at 27:4-12.  Bloomberg provides the affidavit of Bloomberg editor Laura Zelenko, who states that covering Under Armour was "part of [Ruhle's] assigned news beat."  Zelenko Decl. ¶¶ 1, 6.  Bloomberg avers that Ruhle left the network on April 12, 2016, and notes that all communications between Ruhle and Plank alleged to include "material nonpublic information" took place after this date.  Opp. at 28.

One case in this district, in Fowler v. Vary, 2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022), has considered a situation in which a journalist's personal relationship with a subject called into question that journalist's independence.  Although Fowler addressed whether the journalist was a "professional" under New York State's journalist shield law, Fowler assessed this question through the lens of the Second Circuit's concept of the "vigorous, aggressive, and independent press" as articulated in Chevron.  See 2022 WL 3211638, at *7 (citing Chevron, 629 F.3d at 306).  Thus, we find Fowler's analysis to be helpful.

 Fowler involved a journalist and subject who had been "personal friends" for over twenty years, in a case in which "messages . . . and other documents indicat[ed] [the journalist's] willingness to shape the story to [the subject's] objectives, to overlook or massage unverified

10

details, or to directly advise [the subject] on public relations strategy." Id. at *8. Fowler noted

that these communications "c[a]me close to painting [the journalist] as a commissioned agent."

Id. However, Fowler found that the journalist's independence was demonstrated by "several

instances in which [he] appear[ed] to have refused to depart from the editorial process," and the

fact that there was "no indication that [the journalist] made changes to the final story at [the

subject's] urging, attempted to circumvent his editors, or sought any special treatment for [the

subject]" from the publication in which the story ultimately appeared. Id. Fowler further noted

that it had not "encountered any evidence of financial ties" between the journalist and subject.

Id. Thus, Fowler found that privilege applied. See id.

        This case is factually similar to Fowler in that there is no indication that Ruhle made any

changes to a story at Plank's direction, attempted to circumvent her editors, or sought any special

treatment from Bloomberg for Under Armour. Also, as Fowler persuasively emphasizes, the

operative question is not whether there was a personal relationship between journalist and

source, but rather whether the journalist was "independent" in her work relating to that source.

We agree with this approach. Here, the fact that Ruhle and Plank had a personal relationship,

even if it involved Ruhle giving business advice, does not by itself defeat Ruhle's entitlement to

the journalist's privilege in this case. In the end, the personal relationship between Ruhle and

Plank did not mean that Ruhle was not acting as a journalist with respect to her dealings with

Under Armour.

        2.      Ruhle's Actions in Response to the Morgan Stanley Report

        We turn next to Under Armour's argument that Ruhle was not "independent" with

respect to her reporting on the Morgan Stanley report specifically.

11

The Morgan Stanley report was released on January 10, 2016.  See Morgan Stanley

Report.  The next morning at around 8:00 a.m., Ruhle contacted Pelkey to request information

regarding the Under Armour mobile application and advised Pelkey to "make the rounds" with

new statistics about the app "in case anyone decides to cover the Morgan [S]tanley[] thing."  See

Emails from Stephanie Ruhle to Diane Pelkey, annexed as Ex. 15 to Second Capeci Decl.

(Docket ## 9-9, 66-15) ("First Jan. 11 Email").  She noted that a "hea[dl]ine just crossed [about]

[M]organ [S]tanley going underweight [on] [Under Armour]," and the statistics could "combat[]

any risk of negativity."  Id.  Pelkey responded that Under Armour "[w]ill push positive messages

out," and Ruhle advised her to "arm the anchors (me, [C]ramer[4] in the 9am) with this good

tidbit."  Id.

Around 11:00 a.m., Plank emailed Under Armour employees with the subject "Morgan

[S]tanley."  Second Jan. 11 Email.  In this email, Plank scheduled a call to discuss "a strategy to

put [Under Armour's] friends in media and other analysts to work to refute [the Morgan Stanley]

report."  Id.  Plank noted that although Under Armour was in a "quiet period," "this will not go

unanswered."  Id.

At 12:30 p.m., see Mem. at 3; Opp. at 8, Ruhle appeared on the program Bloomberg TV,

see Under Armour Shares Decline, Here's Why, Bloomberg Markets (Jan. 11, 2016),

https://www.bloomberg.com/news/videos/2016-01-11/under-armour-shares-decline-here-s-why

("Bloomberg Video").  As part of this appearance, Ruhle and other analysts discussed the

Morgan Stanley report and Under Armour.  Id.  During the program, Ruhle stated that the

Morgan Stanley report was "bas[ed] . . . on data they're getting from SportScan," that reflected

"point of sale numbers from retailers" rather than Under Armour's official earnings report.  Id.

---

[4]  Cramer refers to Jim Cramer, an analyst on CNBC.  See Plank Dep. at 305:12-21.

Ruhle opined that the report omitted "two huge outlets for Under Armour" and included one outlet where an Under Armour rival "made a huge push" and Under Armour itself did not sell goods.  Id.  Ruhle cautioned that it was "very early to actually evaluate" the sales numbers, and one of the other analysts agreed that the evaluation "might be premature," noting that Under Armour had made "huge strides" toward integrating technology into its products.  Id.  Ruhle agreed and stated that Under Armour had recently won a "wearable technology award" and released several new products.  Id.

Ruhle referred to Under Armour as a "long-term buy," and another analyst opined that the current Under Armour earnings suffered from "tough comp[arisons]" because of the company's past growth.  Id.  Ruhle opined that Under Armour had an advantage over competitors because it sponsored athletes including basketball player Stephen Curry, football player Tom Brady, skier Lindsey Vonn, and golfer Jordan Spieth, and stated that "clearly, they pick winners."  Id.  Ruhle concluded the report stating: "But, the stock is down today.  Eight percent, that's not a small number. . . .  [Investors] potentially will reload in February, and I'm not saying that's definitively the case here, but it's a common trend you see . . . ."  Id.

An hour later, Ruhle emailed Under Armour executives Plank, Pelkey, and Jen Smith a link to an online video of the program.  See Email from Ruhle to Plank, Pelkey, & Smith, annexed as Ex. 16 to Second Capeci Decl. (Docket ## 9-10, 66-16) ("Third Jan. 11 Email").  She stated that she "went on-air at 12:30 covering [Under Armour's] stock move," and relayed the endorsement of a member of the "Bloomberg Intelligence team" who "remain[ed] very bullish" about Under Armour.  Id.

Around 3:00 p.m., Plank sent an email to Ruhle attaching a "fact sheet" that Under Armour intended to "send out to ALL media to arm them for any discussion" of the Morgan

Stanley report.  Email from Kevin Plank to Stephanie Ruhle, annexed as Ex. 17 to Second

Capeci Decl. (Docket ## 9-11, 66-17) ("Fourth Jan. 11 Email").  Plank asked Ruhle to "[p]lease

let me know if you see anything missing from here."  Id.  The "fact sheet" noted that the Morgan

Stanley data had come from "SportScan," and that it omitted major Under Armour retailers and

included a retailer where a rival had "aggressively sold . . . [and] we do not have a presence."  Id.

The sheet referenced Under Armour's "mobile and digital strategy," and the company's

sponsorship of Curry, Vonn, and Spieth.  Id.  The sheet made reference to the fact that Under

Armour's "full story" would be available once earnings reports were released.  Id.  Thus, the fact

sheet made reference to many of the same arguments made by Ruhle in her Bloomberg TV

appearance.

  The same day, Plank sent Ruhle multiple emails in which he noted positive reporting on

Under Armour.  One such email forwarded an article opining that "concerns are overblown."

Email from Plank to Ruhle, dated Jan 11, 2016, annexed as Ex. 18 to Capeci Decl. (Docket ## 9-

12, 66-18).  Another included an article that rated Under Armour a "long-term buying

opportunity" and noted that the SportScan data was not complete.  Email from Plank to Ruhle,

dated Jan. 11, 2016, annexed as Ex. 19 to Second Capeci Decl. (Docket ## 9-13, 66-19).

  Bloomberg editor Zelenko avers that Ruhle's January 11 email to Pelkey referencing the

Morgan Stanley report was "a standard action for a reporter to take before reporting about a

subject."  Zelenko Decl. ¶ 10.  Zelenko states that Ruhle's "expression of views regarding the

Morgan Stanley Report and her sharing of her opinions regarding the same" in the January 11

message "is equally a standard part of developing a source and conducting newsgathering."  Id.

Finally, Zelenko states that "Ruhle's follow up sharing with the company a link to her

appearance and her receipt of emails from Plank regarding the information he wanted to share

with the media comprise continuing newsgathering over a developing news story."  Id.  We

accept Zelenko's statements as true inasmuch as there is nothing in the record to contradict them.

Over the days that followed, Plank sent Ruhle multiple updates regarding evaluations of

Under Armour.  See Email from Plank to Ruhle, dated Jan. 12, 2016, annexed as Ex. 21 to

Second Capeci Decl. (Docket ## 9-15, 66-21); Email from Plank to Ruhle, dated Jan. 21, 2016,

annexed as Ex. 22 to Second Capeci Decl. (Docket ## 9-16, 66-22).  During this period, Ruhle

forwarded Plank an email in which she had counseled a shareholder to buy Under Armour stock.

See Jan. 13 Email.

On January 28, Ruhle forwarded Plank an article noting that Under Armour shares had

"jump[ed] 9.4% pre-[market]."  Email from Ruhle to Plank, dated Jan. 28, 2016, annexed as Ex.

25 to Second Capeci Decl. (Docket ## 9-19, 66-25).  The next day, Pelkey emailed Ruhle and

another Bloomberg employee, stating that "we were able to secure Stephen [Curry] for [an]

interview on Monday."  Email from Pelkey to Ruhle & A. Toscano, dated Jan. 29, 2016, annexed

as Ex. 27 to Second Capeci Decl. (Docket ## 9-21, 66-27).  Ruhle replied: "[w]e are so excited."

Id.  Plank then emailed Pelkey stating that giving Ruhle an interview with Curry was "a great

thank you for [Ruhle] being the only member of media to get [Under Armour's] back when [the

Morgan Stanley report] came out against us."  Email Chain, dated Jan. 29, 2016, annexed as Ex.

10 to Second Capeci Decl. (Docket ## 9-6, 66-10) ("Jan. 29 Email Chain").  Plank concluded

with the sentiment that he hoped other broadcasters would "take[] notice and show[] more love

(even when the chips are down!)."  Id.

Aberdeen contends that this evidence shows that Under Armour planned to enlist media

in its defense, that Ruhle reported favorably on Under Armour using the same talking points that

the company would later distribute to other media, and that Ruhle was eventually compensated

15

for this reporting with the "coveted" Curry interview.  See Mem. at 3.  Aberdeen argues that

Ruhle's reporting was not independent but rather was done at the behest of, and later rewarded

by, Under Armour.  See id.  In an effort to place this case within the scope of Chevron, Aberdeen

asserts that "Ruhle was commissioned by Under Armour to tell its story in response to the

Morgan Stanley Report."  Reply at 14.

Having considered all the evidence and arguments offered by Aberdeen, we do not find

Aberdeen's argument that Ruhle lacked independence to be persuasive.  Starting with the claim

that Ruhle was "commissioned" to report favorably on Under Armour, the only evidence of

Ruhle being "commissioned" is that she ultimately was given the Curry interview.  But there is

no suggestion whatever that Ruhle received any promise of that interview for her coverage and,

more significantly, no evidence that Under Armour controlled Ruhle in her reporting on the

Morgan Stanley Story.  Indeed, Plank's message to Pelkey makes it clear that he intended the

interview not only as a reward for Ruhle, but also as a message to other networks that favorable

coverage could give them access to Under Armour's sponsored athletes.  See Jan. 29 Email

Chain.

Furthermore, it was Ruhle who first reached out to Under Armour with advice regarding

the Morgan Stanley report.  See First Jan. 11 Email.  Likewise, Plank sent Ruhle talking points

only after she appeared on the Bloomberg program.  See Bloomberg Video; Fourth Jan. 11

Email.  Ruhle's fellow analysts on the Bloomberg program concurred with several of her points,

and Ruhle noted that the drop in Under Armour's stock was potentially a negative sign.  See

Bloomberg Video.  These facts show independence and do not suggest that Ruhle was

"commissioned" to present a positive point of view on Bloomberg TV.  That Ruhle's

connections with Under Armour, knowledge of its operations and even affinity for the company

may have influenced her assessment of the company's prospects is irrelevant.  The Second

Circuit was clear in Chevron that a journalist does not surrender privilege "merely because her

publication reflects her previously held point of view."  629 F.3d at 308 n.4.  Instead, the court

found privilege lacking where a journalist is "commissioned to . . . promot[e] a particular point

of view regardless of what her investigations may reveal."  Id. at 308.

Aberdeen argues that "the evidence shows that Ruhle only published what Plank wanted

made public."  Reply at 16; see Mem. at 15-17; Reply at 17.  The basis for this argument appears

to be Plank's statement at a deposition that he had an understanding with Ruhle that she would

not share nonpublic information.  See Mem. at 15-17; Plank Dep. at 280:18-281:19.  We do not

find that this alters any characterization of Ruhle as an independent journalist.  First, an

agreement with a source not to publish certain information provided by the source — commonly

called going "off-the-record" — is a common journalistic practice.  See Associated Press

Statement of News Values and Principles, Associated Press, https://www.ap.org/about/news-

values-and-principles/downloads/ap-news-values-and-principles.pdf, at *5.  Second, an

agreement of this kind between a source and a journalist does not show that the source has any

control over the content of the report that is ultimately produced by the journalist except in the

most simplistic sense.  In fact, a journalist may remain completely independent in her reporting

and still agree to hear off-the-record information.  Aberdeen's claim that the confidential

information in this case was not "gather[ed] . . . as part of a journalistic investigation," Reply at

16, is merely an unsupported ipse dixit.

In the end, the evidence marshalled by Aberdeen fails to show that Under Armour had

any editorial control over Ruhle's reporting.  Most obviously, there is nothing to suggest that

Ruhle needed or sought Under Armour's approval for anything she planned to report about the

company.  Certainly, there is evidence that Ruhle supplied Plank with advice and information,

that she was unusually helpful to Under Armour, and that Under Armour in turn helped her or

her employer.  But as has been remarked about the making of sausages, sometimes it is best not

to see how journalism is actually made.  What matters here is that the evidence does not support

Aberdeen's contention that Ruhle was beholden to Under Armour such that her reporting lacked

the independence necessary to assert the journalistic privilege.  Thus, the documents relating to

her reporting on Morgan Stanley and Under Armour are covered by the privilege.[5]

      B.    <u>Aberdeen's Showing of Need</u>

Because Ruhle's communications are within the scope of the qualified privilege,

Aberdeen must make a showing of need in order to obtain the documents it seeks.  Aberdeen

seeks two types of documents from Bloomberg: communications from Ruhle to Under Armour

(and its executives), and communications between Ruhle and others that mention Under Armour.

<u>See</u> Subpoena at 12.  Bloomberg does not contend that the information sought by Aberdeen is

from a confidential source.  <u>See</u> Opp.  As such, the <u>Gonzales</u> standard for non-confidential

information applies, and Aberdeen must show that the information sought is "of likely relevance

to a significant issue" in the Maryland Action and "not reasonably obtainable from other

available sources."  <u>Gonzales</u>, 194 F.3d at 36.  As noted, the burden is on Aberdeen to make this

showing.  <u>See</u> <u>id.</u>

With regard to the first category --- communications between Ruhle and the Under

Armour --- Aberdeen has not met its burden of showing that such communications could not be

---

    [5]  Because we find that Ruhle was "independent" such that her reporting on Under Armour is entitled to privilege, we need not address Bloomberg's contention that it, as an entity, is also entitled to the qualified privilege.  <u>See</u> Opp. at 20-22.

obtained from "other available sources."  Aberdeen has apparently been given the opportunity to take discovery from Under Armour and the defendants in the Maryland Action.  Yet Aberdeen provides no evidence that Under Armour or any of those defendants have spoliated evidence, let alone spoliated communications with Ruhle.[6]  Indeed, Aberdeen's papers make no discernable argument that it has any basis for thinking there will be communications between Under Armour and Ruhle that could not be obtained from Under Armour and the Maryland defendants themselves.  Accordingly, Aberdeen has failed to make a showing of need as to this category of documents.

As to communications between Ruhle and non-parties to the Maryland action about Under Armour, Aberdeen's need for these documents is entirely speculative.  Most obviously, Aberdeen has not shown why it could not obtain such documents from the parties that Ruhle communicated with rather than from Bloomberg.  The record reflects that Aberdeen deposed Ruhle and thus was free to ask her about any parties outside of Under Armour itself with whom she discussed Under Armour's business.  Yet, Aberdeen has put no evidence in the record about what efforts it has made to find out who Ruhle communicated with and whether those individuals have copies of their communications with Ruhle.  Thus, Aberdeen has failed to meet

_____

[6]  In a footnote, Aberdeen asserts that it has received over 300,000 documents from Under Armour "none of which answer the question of where Ruhle obtained the information about SportsScan data used in the Morgan Stanley Report."  Reply at 19 n.17 (citing Declaration of T. Alex B. Folkerth, filed May 4, 2023 (Docket ## 40, 44, 70) ("Folkerth Decl."), ¶ 2).  This is obviously insufficient to show that any documents are missing from the Under Armour custodians.

Similarly insufficient is Aberdeen's claim that "Under Armour did not produce many of the communications that [p]laintiff obtained from . . . Ruhle's employer after [she left] Bloomberg."  Mem. at 23 n.81.  This statement is not supported by any citation to the record and thus provides no basis for finding that Bloomberg has documents that Under Armour does not.

19

its burden of proving that Bloomberg is the only source from which it can obtain such documents.

All that is left are internal communications between Ruhle and Bloomberg employees. But the relevance of these documents to the litigation is speculative.[7]  Aberdeen argues that "the Morgan Stanley report that Ruhle helped Under Armour . . . attack was the first time the relevant truth about [Under Armour's] true financial condition was partially disclosed to the investing public," and the alleged concealment of this information forms the basis of Aberdeen's fraud claim in the Maryland Action.  Mem. at 3-4.  Aberdeen argues that the documents sought will show "how the Under Armour CEO and other [c]ompany executives put their 'friends in the media and other analysts to work to refute' the first hint to the public of the truth concealed by their fraudulent scheme."  Id. at 22 (citation omitted).  Aberdeen infers that the requested documents, to the extent they exist, are "probative of both Plank and Under Armour's 'scienter' . . . which [class plaintiffs] must ultimately prove to prevail on [their] securities fraud claim."  Id. at 4.

This broad argument, however, does not make sense in relation to any communications Ruhle had with Bloomberg personnel.  Aberdeen argues that "Ruhle's emails to other nonparties" in particular "are . . . at least 'likely relevant' . . . because they show the full reach of Under Armour and Plank's misrepresentations."   Reply at 18.  But given that Aberdeen's

---

[7]   Although Aberdeen states that "Bloomberg has not even contested relevance," Mem. at 22, referring to Bloomberg's initial response to a subpoena, Bloomberg contested relevance in its opposition to Aberdeen's motion, see Opp. at 30-31. To the extent Aberdeen claims the opposition was not articulated originally, we disagree inasmuch Bloomberg stated in its response to the subpoena that Bloomberg "ha[s] no information to indicate that [Aberdeen] ha[s] a critical, specific need" for the evidence requested.  See Email from Dori Hanswirth, dated Feb. 27, 2023, annexed as Ex. 11 to Capeci Decl. (Docket # 3-11).

argument that the "significant issue" for which the documents are sought revolves around scienter, we cannot see how the "reach" of Under Armour's messaging is relevant.  What matters instead is the Under Armour executives' knowledge.  It does not matter what Ruhle said to others about Under Armour.

Aberdeen argues that the materials may demonstrate "how Ruhle obtained the information pushing back on the Morgan Stanley report," including the source of "highly detailed information about SportScan" that Ruhle referenced in her January 11, 2016, Bloomberg appearance.  Id. at 19.  But we fail to see how this provides evidence on scienter, which, for purposes of a securities fraud claim, is a mental state "embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Obviously, there is some theoretical possibility that Ruhle repeated to others at Bloomberg something about the Under Armour executives' knowledge of their financial situation.  But this is a far cry from meeting the burden of proving that there are documents in Bloomberg's possession that likely bear on the scienter issue.  Courts have recognized that document requests present a possible chilling effect on journalism.  See Sikelianos v. City of N.Y., 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008) ("a litigant seeking nonconfidential materials will not be granted unfettered access to 'sift through [journalists] files in search of information supporting [his] claims,' because such access would undermine the public's perception of the press as an independent institution and foster the view that it is 'an investigative arm of the judicial system, the government, or private parties.'") (quoting Gonzales, 194 F.3d at 35).  As such, a movant's mere belief that documents exist in a journalists' files is insufficient to overcome the qualified privilege.  See, e.g., Schoolcraft v. City of N.Y., 2014 WL 1621480, at *9 (S.D.N.Y. Apr. 22, 2014) (where party seeking discovery expressed a "belief" that reporter had responsive

documents but did "not know what specific documents, if any," were in the reporter's possession and "[did] not provide any information as to whether [the reporter] even ha[d] the documents," the party "failed to make the necessary showing" to overcome the journalistic privilege).  We will thus not rely on speculation that documents may exist at Bloomberg to justify piercing the journalist privilege.  Accordingly, we find that Aberdeen has not overcome the qualified privilege that protects these materials.[8]

Conclusion

For the foregoing reasons, plaintiff's motion to compel (Docket # 1) is denied.

SO ORDERED.

Dated:  August 25, 2023
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[8]  In a footnote in its reply brief, Aberdeen argues that there has been an "express waiver" of the journalist privilege because Ruhle apparently did not claim it in her deposition, taken after she left Bloomberg.  See Reply at 11 n.11.  We do not address this argument because it is made for the first time in a reply brief, see Ocean Partners, LLC v. North River Ins. Co., 546 F. Supp. 2d 101, 111 n.8 (S.D.N.Y. 2008) (arguments made for the first time in a reply brief are waived), and also because it is made in a footnote, see Weslowski v. Zugibe, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them."), aff'd, 626 F. App'x 20 (2d Cir. 2015); Sec. & Exch. Comm'n v. Allaire, 2019 WL 6114484, at *3 n.1 (S.D.N.Y. Nov. 18, 2019) ("An argument mentioned only in a footnote is not adequately raised and need not be considered."), aff'd, 15 F.4th 166 (2d Cir. 2021); see also Local Civil Rule 7.1(a)(2) (requiring that each "issue[] to be determined" be presented under an "appropriate heading[]").  Even if we were to reach the issue, we would find it meritless for the reasons stated by Bloomberg.  See Sur-Reply at 5-10.